# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## APPEAL NO. 14-13703-E

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

### NAJAM AZMAT,

Defendant-Appellant.

**On Appeal from the United States District Court
for the Southern District of Georgia**

**BRIEF OF APPELLANT**

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant
Najam Azmat*

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Appellee, | § | |
| | § | APPEAL NO. 14-13703-E |
| v. | § | |
| | § | |
| NAJAM AZMAT, | § | |
| | § | |
| Defendant-Appellant. | § | |

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, the undersigned counsel certifies that, to the best of his knowledge, the following persons, firms, and associations are the only ones that may have an interest in the outcome of this case:

The Honorable William T. Moore, Jr., United States District Judge

The Honorable G. R. Smith, United States Magistrate Judge

Najam Azmat, Defendant

Jeffrey J. Buerstatte, Assistant United States Attorney

David M. Burns, Jr.

The Law Office of David M. Burns, Jr., PC

Candace Anne Carreras, Defendant

Sean Michael Clark, Defendant

C-1

James D. Durham, Assistant United States Attorney

Gillen Withers & Lake, LLC

E. Gregory Gilluly, Jr., Assistant United States Attorney

Katten Munchin Rosenman, LLP

David A. Kettel

Karl Irving Knoche, Assistant United States Attorney

Adelaida M. Lizama, Defendant

Shelly Lynn Morford, Defendant

Nye & Siamos, PC

Anne Pannell Rodman

Law Office of Anne Pannell

Page A. Pate

The Pate Law Firm, LLC

Robert P. Phillips, III

Phillips and Roberts

Brian T. Rafferty, Assistant United States Attorney

James Stuchell, Assistant United States Attorney

Edward J. Tarver, United States Attorney

C-2

The Wade Law Firm

Daniel John Wise, Defendant

This 14th day of November, 2014.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed.R.App.P. 34, Defendant-Appellant believes that oral argument should be permitted for the reason that it might assist this Court in its consideration of the issues in this case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ... C-1

STATEMENT REGARDING ORAL ARGUMENT ... i

TABLE OF CONTENTS ... ii

TABLE OF AUTHORITIES ... v

STATEMENT OF JURISDICTION ... xii

STATEMENT OF THE ISSUES ... xiii

STATEMENT OF THE CASE ... 1

I.   Statement of the Facts Course of Proceedings and Disposition Below ... 1

   A. Evidence Relating to the Charged Conspiracy and the "Dispensing" of Controlled Substances ... 2

   B. Evidence Relating to Dr. Azmat and the Charged Money Laundering Conspiracy ... 5

   C. Admission of the Expert Testimony of Dr. Gene Kennedy and Limitation of Cross-Examination ... 7

   D. Prejudicial Evidence and Argument by the Government ... 11

   E. Sentencing ... 12

II.  Standards of Review ... 13

SUMMARY OF THE ARGUMENT     14

ARGUMENT AND CITATION OF AUTHORITIES     19

I.    The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty and Trial Court Erred In Denying Appellant's Motion for Judgment of Acquittal     19

    A. The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Count One of the Superseding Indictment—The Conspiracy Count     19

    B. The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Counts Two through Fifty of the Superseding Indictment—The "Dispensing Controlled Substances" Counts     21

    C. The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Count Fifty-Two of the Superseding Indictment— The "Money Laundering Conspiracy" Count     32

II.    The Trial Court Abused Its Discretion in Admitting the Testimony of Dr. Gene Kennedy     35

III.    The Trial Court Clearly Erred in Determining the Drug Quantity Attributable to Dr. Azmat     38

IV.    Dr. Azmat's Sentence Was                        41
       Unreasonable as a Result of the
       Trial Court's Failure to Consider the
       Need to Avoid Unwarranted
       Sentence Disparities

V.     Dr. Azmat's Punishment Was in                  45
       Violation of His Sixth Amendment
       Right to Trial Because Dr. Azmat
       Chose to Exercise His Right Instead
       of Entering a Guilty Plea

VI.    Reversal Is Warranted Based Upon               51
       Prosecutorial Misconduct

VII.   Reversal Is Warranted Based Upon               54
       Cumulative Error

CONCLUSION                                            54

CERTIFICATE OF COMPLIANCE                             55

CERTIFICATE OF SERVICE                               56

# TABLE OF AUTHORITIES

## Cases

*Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment CSX Transp. Northern Lines v. CSX Transp., Inc.*, 522 F.3d 1190 (11th Cir. 2008) .......... 30

*Burgess v. United States*, 553 U.S. 124 (2008) .......... 31

*Crocklin v. United States*, 252 F.2d 561 (5th Cir. 1958) .......... 51-52

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......... 7, 8, 35, 36, 37

*Gall v. United States*, 552 U.S. 38 (2007) .......... 14

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......... 14, 37

*Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014) .......... 14

*Johnson v. Breeden*, 280 F.3d 1308 (11th Cir. 2002) .......... 31

*Lafler v. Cooper*, 566 U.S. --, 132 S.Ct. 1376 (March 21, 2012) .......... 46, 47

*McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233 (11th Cir. 2005) .......... 38

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 (11th Cir. 2002) .......... 36

*Missouri v. Frye*, 566 U.S. --, 132 S.Ct. 1399 (March 21, 2012) .......... 46

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) .......... 38

*Quiet Tech. DC–8, Inc. v. Hurel–Dubois, UK, Ltd.*, 326 F.3d 1333 (11th Cir. 2003) .......... 36

*Rothgery v. Gillespie County*, 554 U.S. 191 (2008) .......... 47

*Stansell v. Revolutionary Armed Forces of Colombia*, .......... 30

704 F.3d 910 (11th Cir. 2013)

*Stenberg v. Carhart*, 530 U.S. 914 (2000)                                    31

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)                                    30

*United States v. Adams*, 74 F.3d 1093 (11th Cir. 1996)                      54

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998)                  33

*United States v. Almedina*, 686 F.3d 1312 (11th Cir. 2012)                  13

*United States v. Alston*, 895 F.2d 1362 (11th Cir. 1990)                    39

*United States v. Araujo*, 539 F.2d 287 (2d Cir. 1976)                    47, 50

*United States v. Badia*, 490 F.2d 296 (2d Cir. 1973)                        28

*United States v. Baron*, 284 Fed.Appx. 781 (11th Cir. 2008)                 27

*United States v. Barsoum*, 763 F.3d 1321 (11th Cir. 2014)                   13

*United States v. Bartee*, 479 F.2d 484 (10th Cir. 1973)                     24

*United States v. Beasley*, 2 F.3d 1551 (11th Cir. 1993)                     39

*United States v. Black*, 512 F.2d 864 (9th Cir. 1975)                       28

*United States v. Booker*, 543 U.S. 220 (2005)                           50, 51

*United States v. Bourlier*, 518 Fed.Appx. 848 (11th Cir. 2013)              26

*United States v. Capriola*, 537 F.2d 319 (9th Cir. 1976)                    47

*United States v. Christo*, 129 F.3d 578 (11th Cir. 1997)                 33, 34

*United States v. Chube II*,  538 F.3d 693 (7th Cir. 2008)                   40

*United States v. Clark*, 434 F.3d 684 (4th Cir. 2006)                       43

*United States v. Colbert*, 302 Fed.Appx. 886 (11th Cir. 2008)    43

*United States v. Crosby*, 397 F3d. 103 (2d Cir. 2005)    50

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992)    52

*United States v. Dicter*, 198 F.3d 1284 (11th Cir. 1999)    27

*United States v. Dimeck*, 24 F.3d 1239 (10th Cir. 1994)    33, 34

*United States v. Docampo*, 573 F.3d 1091 (11th Cir. 2009)    43

*United States v. Edgmon*, 952 F.2d 1206 (10th Cir. 1991)    33

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)    35

*United States v. Genser*, 710 F.2d 1426 (10th Cir. 1983)    24

*United States v. Godoy*, 439 Fed.Appx. 789 (11th Cir. 2011)    39

*United States v. Godwin*, 765 F.3d 1306 (11th Cir. 2014)    13

*United States v. Golomb*, 754 F.2d 86 (2d Cir. 1985)    48

*United States v. Hammond*, 781 F.2d 1536 (11th Cir. 1986    27

*United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014)    14

*United States v. Hutchings*, 757 F.2d 11 (2d Cir. 1985)    47, 48, 49

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012)    26, 27

*United States v. Ismond*, 993 F.2d 1498 (11th Cir. 1993)    39

*United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013)    26

*United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995    34

*United States v. Lamonds*, 291 Fed.Appx. 314 (11th Cir. 2008)    43

*United States v. Lawrence*, 47 F.3d 1559 (11th Cir. 1995)                    39

*United States v. Leigh*, 487 F.2d 206 (5th Cir. 1973)                    28, 30

*United States v. Ly*, NO. CR407-286, 2008 WL 717743                    28
     (S.D.Ga., March 17, 2008)

*United States v. Majors*, 196 F.3d 1206 (11th Cir. 1999)                    33

*United States v. Martinelli*, 454 F.3d 1300 (11th Cir. 2006)                    32

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007).                    48

*United States v. Medina-Cervantes*, 690 F.2d 715 (9th Cir. 1982)                    48

*United States v. Menasche*, 348 U.S. 528 (1955)                    30

*United States v. Moore*, 423 U.S. 122 (1975)                    26

*United States v. Ortiz*, 318 F.3d 1030 (11th Cir. 2003)                    13

*United States v. Pacchioli*, 718 F.3d 1294 (11th Cir. 2013)                    13

*United States v. Pacheco*, 2009WL383257                    8
     (S.D.Fla., February 14, 2009)

*United States v. Preciado-Cordoboas*, 981 F.2d 1206                    54
     (11th Cir. 1993)

*United States v. Pressley*, 473 F.Supp.2d 1303 (N.D.Ga. 2006)                    44

*United States v. Reeves*, 742 F.3d 487 (11th Cir. 2014)                    13

*United States v. Rodriguez*, 398 F.3d 1291 (11th Cir. 2005)                    14

*United States v. Rogers*, 609 F.2d 834 (5th Cir. 1980)                    24

*United States v. Savage*, 67 F.3d 1435 (9th Cir. 1995)                    33

*United States v. Steele*, 117 F.3d 1231 (11th Cir. 1997)                    24

*United States v. Steele*, 147 F.3d 1316 (11th Cir. 1998)    24

*United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir. 1978)    48, 50

*United States v. Thompson*, 624 F.2d 740 (5th Cir. 1980)    30

*United States v. Tighe*, 551 F.2d 18 (3d Cir. 1977)    29

*United States v. Varma*, 691 F.2d 460 (10th Cir. 1982)    24

*United States v. Vue*, 13 F.3d 1206 (8th Cir. 1994)    52

*United States v. White*, 869 F.2d 822 (5th Cir. 1989)    47

*United States v. Zapata*, 139 F.3d 1355 (11th Cir. 1998)    38

**<u>Statutes</u>**

18 U.S.C. § 1956    1, 34

18 U.S.C. § 3553    12, 42, 43, 44

21 U.S.C. § 802    15, 23, 24, 27, 28, 29, 30, 31

21 U.S.C. § 829    28

21 U.S.C. § 830    27

21 U.S.C. § 841    1, 6, 23, 24, 25, 28

21 U.S.C. § 846    1, 19, 20

28 U.S.C. § 991    43

**<u>Federal Rules</u>**

Fed.R.Crim.P. 16    7

Fed.R.Crim.P. 29                                                          5

Fed.R.Evid. 702                                                      35, 37

**<u>Federal Regulations</u>**

21 C.F.R. § 1306.03                                                      25

21 C.F.R. § 1306.04                                                      27

21 C.F.R. § 1306.06                                                      25

21 C.F.R. § 1306.11                                                      25

21 C.F.R. § 1306.21                                                      25

**<u>Sentencing Guidelines</u>**

U.S.S.G. § 2A1.3                                                         42

U.S.S.G. § 2B3.1                                                         43

U.S.S.G. § 2D1.1                                              12, 17, 38, 40

U.S.S.G. § 2G2                                                          42

U.S.S.G. § 3E1.1                                                        49

U.S.S.G. § 6A1.3                                                        38

**<u>Other Materials</u>**

Bibas, Stephanos, "Plea Bargaining Outside the Shadow of Trial,"       45
117 Harv. L. Rev. No. 8 (2004)

Bogira, Steve, "Courtroom 302: A Year Behind the Scenes in an          45
American Criminal Courthouse," 38, 83 (2005)

Bowers, Josh "Punishing the Innocent" (2008)                           45

Bright, Stephen, "Symposium: Cruel and Unusual Punishment: Litigating under the Eighth Amendment: The Failure to Achieve fairness: Race and Poverty Continue to Influence Who Dies," 11 U. Pa. J. Const. L. (2008)                                    45

Dept. of Justice, Bureau of Justice Statistics, Table 5.22.2009, http://www.albany.edu/sourcebook/pdf/t5222009.pdf                46

King, Nancy J., et al., "When Process Affects Punishment: Differences in Sentences After Guilty Plea, Bench Trial, and Jury Trial in Five Guidelines States," 959 Colum. Law R. (2005)        49

"Land Without Plea Bargaining: How The Germans Do It," 78 204 (1979)                                                             45

Luna, Erik, "Symposium on Overcriminalization: Prosecutorial Decriminalization, Summer 2012," 102 J. Crim. L. & Criminology    45

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this direct appeal from the judgment and sentence of the District Court, pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

I.  Whether the evidence was insufficient to support a finding that Dr. Azmat was guilty and whether the trial court erred in denying appellant's motion for judgment of acquittal.

II.  Whether the trial court clearly erred in determining the drug quantity attributable to Dr. Azmat.

III. Whether Dr. Azmat's sentence was unreasonable as a result of the trial court's failure to consider the need to avoid unwarranted sentence disparities.

IV. Whether Dr. Azmat's punishment was in violation of his Sixth Amendment right to trial because Dr. Azmat chose to exercise his right instead of entering a guilty plea.

V. Whether reversal is warranted based upon the trial court's refusal to give Dr. Azmat's theory of the defense instruction.

VI. Whether reversal is warranted based upon prosecutorial misconduct.

VII. Whether reversal is warranted based upon cumulative error.

## STATEMENT OF THE CASE

### I. Statement of the Facts and Course of Proceedings and Disposition Below

On February 7, 2013, six defendants, including Dr. Najam Azmat, were indicted in the United States District Court for the Southern District of Georgia. (Doc. 3). As set forth in the government's Superseding Indictment, the government alleged that Defendants Sean Michael Clark and Adelaida Lizama organized East Health Center, a pain management clinic located in Garden City, Georgia, in or about January of 2011. (Doc. 156, 5, 7, 8). The government alleged that Dr. Azmat worked as a physician for East Health Center. (Doc. 156, 5). The government's Superseding Indictment charged Dr. Azmat with conspiracy, in violation of 21 U.S.C. § 846 (Count One); unlawful dispensation of controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Counts Two through Fifty); and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Count Fifty, Two). (Doc. 156, 6, 19). Specifically, the government alleged that Dr. Azmat dispensed oxyodone and Xanax between February 21, 2011, and March 15, 2011, a period of several weeks. (Doc. 156, 12, 15).

The trial of Dr. Azmat commenced on January 13, 2014. (Doc. 304). On January 17, 2014, the jury returned a verdict finding Dr. Azmat guilty on Counts One, Counts Two through Fifty, and Count Fifty-Two of the Superseding Indictment. (Doc. 320).

## A. <u>Evidence Relating to the Charged Conspiracy and the "Dispensing" of Controlled Substances</u>

The government alleged in Count One of its Superseding Indictment that Dr. Azmat knowingly and willfully conspired with the co-defendants and others to knowingly and intentionally distribute and dispense, and cause to be distributed and dispensed, quantities of controlled substances. (Doc. 156, 6). Counts Two through Fifty of the Superseding Indictment, charged that Dr. Azmat did "knowingly, intentionally and unlawfully dispense" (Doc. 156, 11), controlled substances. The government defined "dispense" as "to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery." (Doc. 156, 4)

Adelard LeFrancois, who had worked for similar clinics in Florida, decided to open a pain management clinic, East Health Center, in Garden City, Georgia. (Doc. 386, 214). LeFrancois testified at trial that he placed an advertisement looking for a doctor for East Health Center, and that Dr. Azmat responded to the ad. (Doc. 386, 218, 225). Dr. Azmat's first day at East Health Center was February 21, 2011. (Doc. 385, 127).

Dr. Azmat was at East Health Center for approximately three weeks before LeFrancois terminated him on March 18, 2011. (Doc. 386, 245, 276). LeFrancois

testified that he terminated Dr. Azmat because of complaints by patients that, among other things, Dr. Azmat was reducing the amount of their drugs. (Doc. 386, 246, 276). Le Francois admitted that he himself complained to Francis Barbuscia, a marketer for East Health Center, that Dr. Azmat was not giving patients what they wanted and that he was "a disaster." (Doc. 386, 263-64, 308-09). Le Francois acknowledged that he had a confrontation with Dr. Azmat on his first day at work about East Health Center not having malpractice insurance for primary care, and that he decided that Dr. Azmat had to go and that he started searching for a replacement. (Doc. 386, 270-71). Daniel Wise, another marketer, complained that Dr. Azmat was not writing enough prescriptions, and acknowledged that patients called him all the time to complain about the amount of drugs they were prescribed. (Doc. 386, 377-78; 387, 584). Furthermore, Joseph Travis Bradley, one of East Health Center's patients called by the government at trial, stated that he complained to Wise that Dr. Azmat prescribed him less medication. (Doc. 386, 428).

The government's case agent, Drug Enforcement Administration Diversion Investigator Charles Sikes, testified that "dispensing" of controlled substances usually occurs at pharmacies, hospitals, and other facilities which are licensed or registered for the purpose of dispensing medication. (Doc. 385, 91). Investigator Sikes admitted that "dispensing" medication consisted of giving a person a prescription in a bottle with instructions on it. (Doc. 385, 91). Mary Ross, M.D., a

physician who responded to an advertisement by East Health Center and who testified for the government at trial, stated that physicians do not have a license to "dispense." (Doc. 385, 94).

In regard to East Health Center, LeFrancois testified that East Health Center was never authorized to "dispense" medications. (Doc. 386, 263); *see also* (Doc. 387, 572). Kenneth Gossett, M.D., a physician who worked for East Health Center after Dr. Azmat left, admitted that he did not have a license to dispense medications and that he did not dispense medications. (Doc. 387, 556). Furthermore, the government's expert, Gene Kennedy, M.D., admitted that he found no evidence that medications were dispensed from East Health Center. (Doc. 387, 705).

In his testimony at trial, Investigator Sikes acknowledged that Dr. Azmat never saw any of the patients more than once. (Doc. 385, 158). Investigator Sikes, Dr. Kennedy and Dr. Gossett acknowledged that Dr. Azmat discontinued or cancelled some patients' prescriptions for narcotics; reduced some patients' prescriptions for narcotics, or "weaned" the patients off narcotics; and prescribed some patients non-narcotic drugs. (Doc. 385, 165-181; 387, 553, 694, 716, 719; 388, 739-743, 748). Patients of Dr. Azmat called by the government admitted that Dr. Azmat discontinued their drugs, reduced the quantity of drugs they were taking, or prescribed them non-narcotic drugs. (Doc. 386, 345, 424, 451).

At the close of the government's case-in-chief, counsel for Dr. Azmat made a motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, in part on the ground that the government had failed to prove that Dr. Azmat dispensed controlled substances, as alleged in Counts Two through Fifty-Two of the Superseding Indictment, beyond a reasonable doubt. (Doc. 388, 778-79). At the same time, Dr. Azmat filed a Motion for Judgment of Acquittal Pursuant to Fed.R.Crim.P. 29. (Doc. 307). Dr. Azmat renewed his motion at the close of evidence, and the trial court denied the motion. (Doc. 388, 930; 389, 973).

Dr. Azmat filed a Renewed Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial, on January 31, 2014 (Doc. 324), and a Supplemental Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial on May 20, 2014 (Doc. 334). The Court denied Dr. Azmat's motions in an Order issued on June 6, 2014. (Doc. 341).

### B. Evidence Relating to Dr. Azmat and the Charged Money Laundering Conspiracy

The government charged in the money laundering conspiracy count of its Superseding Indictment, Count Fifty-Two, that, beginning at least on or about January 18, 2011, the defendants, including Dr. Azmat, knowingly and intentionally combined, conspired, and agreed with each other and others to conduct and attempt to conduct financial transactions with funds which were proceeds of a specified unlawful activity, unlawful "dispensation" of Schedule II, III, and IV controlled

substances, in violation of 21 U.S.C. § 841(a)(1). (Doc. 156, 15, 16). As overt acts of the alleged conspiracy, the government charged that, between March 1, 2011, and March 18, 2011, the defendants made daily salary payments to Dr. Azmat in amounts ranging between $1,000 and $2,000. (Doc. 156, 18).

LeFrancois expressly testified at trial that East Health Center was a cash-based business. (Doc. 386, 255). The government's case agent, Investigator Sikes testified that East Health Center only accepted cash. (Doc. 385, 149-150).

Concerning Dr. Azmat's compensation or salary, LeFrancois admitted at trial as follows:

> Q    And you paid your doctors?
> A    Yes, sir, that was cash—
> Q    -- Dr. Azmat in particular?
> A    That was cash every day, $2,000.
> Q    And the source of that cash was, what?
> A    From the proceeds from the patients paying for their visits.

(Doc. 386, 243); *see also* (Doc. 386, 227, 260).

Moreover, Wise testified at trial that he was the person who paid Dr. Azmat and that he paid Dr. Azmat as follows:

> Q    Yeah, who paid him? I mean…
> A    East Health Center. I'm the one that handed him the cash.
> Q    Where'd you get the cash with which you paid him?
> A    From the daily take of whatever came in that day."

(Doc. 387, 578-79); *see also* (Doc. 387, 583). Konstantino Afthinos, who performed security at East Health Center, testified that the money East Health Center used to

pay Dr. Azmat came "[f]rom the patients. Every day we would count out — from whatever money we made we'd count out $2,000, wrap it up in a piece of paper, and hand it to Dr. Azmat." (Doc. 386, 368).

### C. Admission of the Expert Testimony of Dr. Gene Kennedy

On September 26, 2013, the government filed its Disclosure of Expert Testimony Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), seeking to admit, in its case, in, chief at trial, the testimony of Gene Kennedy, M.D., as an expert in medicine and pain management, and Martin Zdanowicz, Ph.D., as an expert in pharmacology. (Doc. 223, 1). The government stated that Dr. Kennedy would testify regarding his opinion that Dr. Azmat routinely prescribed controlled substances outside the usual course of professional practice as a medical doctor and without legitimate purpose. (Doc. 223, 1).

On October 25, 2013, Dr. Azmat filed a *Daubert* Motion to Exclude Government's Experts Dr. Gene Kennedy and Martin Zdanowicz and Request for an Evidentiary Hearing ("*Daubert* Motion"). (Doc. 241). On November 19, 2013, Dr. Azmat filed a Supplement to Motion to Exclude government Experts Dr. Gene Kennedy and Martin Zdanowicz ("Supplement"), in which Dr. Azmat argued that the testimony of the proposed expert witnesses should be excluded because the government had filed no response to his *Daubert* Motion within fourteen (14) days,

as required by Rule 12.1 of the Local Rules for the Administration of Criminal Cases for the United States District Court for the Southern District of Georgia. (Doc. 260).

On December 27, 2013, the district court issued an Order in which the court denied Dr. Azmat's *Daubert* Motion in part, and denied his Supplement. (Doc. 292, 1, 12). The court found that the disclosure of Dr. Kennedy's proposed opinions did not outline what the appropriate standards of care were, and how Dr. Kennedy determined those were the appropriate standards. (Doc. 292, 5-6). It ordered that the government must demonstrate what methodology Dr. Kennedy used in creating his opinions and by what standards he evaluated Dr. Azmat's actions, and directed the government to file a supplemental response explaining the standards of care against which Dr. Kennedy evaluated Dr. Azmat's actions and how he determined that those were the applicable standards. (Doc. 292, 6, 7) (quoting *United States v. Pacheco*, 2009WL383257 (S.D.Fla., February 14, 2009)).

On January 6, 2014, the government filed its Response to Court Order of December 27, 2013 [DOC 291] Concerning Reliability of Proposed Expert Testimony. (Doc. 297). In its Response, the government stated that Dr. Kennedy would give opinions at trial, including (1) that Dr. Azmat prescribed controlled substances without legitimate medical purpose and outside the usual course of practice generally recognized and accepted in the United States, (Doc. 297, 1-2); (2) that Dr. Azmat did not use medications or other modalities based on generally

accepted indications (Doc. 297, 7-8); (3) that Dr. Azmat did not comply with the simplest of measures outlined by the Georgia Composite State Board of Medical Examiners and Federation of State Medical Boards, (Doc. 297, 10); that Dr. Azmat failed to comply with applicable state and federal regulations, (Doc. 297, 13);  (4) that Dr. Azmat did not prepare individual treatment plans, (Doc. 297, 11); (5) that alternative forms of treatment could have been explored and were not, (Doc. 297, 7-8, 12); (6) that Dr. Azmat failed to adequately discuss the risks and benefits of the use of controlled substances with the patient or address the risk that patients were drug abusers, (Doc. 297, 12); (7) that the patients were seeking drugs for inappropriate purposes, (Doc. 297, 7); and (8) that Dr. Azmat did not procure information from objective sources, including  family members, (Doc. 297, 12).

In his direct examination at trial, Dr. Kennedy repeatedly gave his opinion to the jury that the treatment, management, or prescriptions given to particular patients or the management of particular patients were medically "not legitimate." (Doc. 387, 624, 629, 630, 631, 632, 633, 635, 637, 640, 642, 645, 646, 648, 649, 652, 653, 654, 655, 656-57, 659, 661, 662, 664, 665, 669, 671, 672). In support of this repeated opinion, Dr. Kennedy cited to circumstances of patients coming to East Health Center from other states, patients with no previous medical history or records, patients with MRI reports from other states or with no referring doctor, patients reporting high levels of pain, young patients with high levels of pain, patients with

negative drug screens, and patients traveling with spouses or family members, further giving opinions that some of these circumstances unusual, suspicious, or raised "red flags." (Doc. 387, 626, 644, 645, 646, 647, 651, 653, 654, 657, 661, 662, 664, 665-66, 667, 669, 670, 671). Dr. Kennedy also opined that particular patients' medical records, MRI reports, or physical exam did not support the prescriptions given to the patient. (Doc. 387, 632, 635-36, 641, 649-650, 655-56, 664, 667, 669).

Dr. Kennedy also repeatedly gave his opinion that certain patients' physical examinations were not "credible." (Doc. 387, 637, 654, 655, 659, 662). In regard to certain patients, he opined that the number of pills prescribed to the patient was excessive, (Doc. 387, 627), or that the patient would potentially manage better with other treatment, (Doc. 387, 660). He furthermore gave his opinion as to whether it was likely a patient with a high pain level would travel to Georgia to be seen by a doctor and obtain a prescription, and whether such patients' pain levels would drop to zero after taking drugs. (Doc. 387, 628, 641).

In regard to treating patients for pain in general, Dr. Kennedy also gave opinions that a patient's medical history, treatment records, a physical examination, and verification of the patient's level of pain, are important to a decision on whether controlled substances are to be prescribed. (Doc. 387, 619, 620, 622, 671-72). He testified that it is important for a physician to consider diversion of drugs to the street in giving a prescription. (Doc. 387, 634-35). Dr. Kennedy testified that it was

10

important to document what was prescribed, to monitor patients, and to conduct follow-up examinations. (Doc. 387, 623).

Dr. Kennedy stated that he was familiar with national policies such as those of the Federation of State Medical Boards and the guidelines of the Georgia Composite State Medical Board relating to the prescription of controlled substances for the treatment of pain. (Doc. 387, 617). However, at the conclusion of his direct examination, Dr. Kennedy stated, regarding his opinion that, in the cases of the patients brought up by the government, "none" of Dr. Azmat's treatment had been "legitimate":

> Q      And is that — would that opinion be under guidelines and standards of the State of Georgia?
> A      I'm not exactly sure —
> Q      — Would those guidelines, whether we're looking at this from a national or a state standard, would your opinion be the same?
> A      Yes, sir.

(Doc. 387, 672-73).

### D. Prejudicial Evidence and Argument by the Government

During its cross-examination of Dr. Azmat's expert and sole witness, Thomas Simopoulos, M.D., the prosecution intentionally stated that Dr. Azmat graduated from medical school in "Pakistan." (Doc. 388, 860-61). Counsel for Dr. Azmat did not object at the time, but shortly thereafter moved for a mistrial based on the statement. (Doc. 388, 868). The trial court denied Dr. Azmat's motion, but characterized the statement as a "low blow." (Doc. 388, 869).

Furthermore, during its closing arguments, the prosecution attempted to link Dr. Azmat and the other defendants to organized crime. The prosecution stated that "Azmat came to East Health Center for one reason, and that was not to minister to people's pain. He is every bit as cynical and ruthless as Al LeFrancois, Sean Clark, Frankie Barbuscia, all those wannabe wise guys from south Florida. He's no different. He's no better." (Doc. 389, 944). From its opening statements (Doc. 385, 63, 67, 72, 76), through its examination of witnesses (Doc. 385, 110; 386, 202, 216, 288, 353, 358, 384; 387, 569, 571), through to its closing arguments (Doc. 389, 933, 940), The prosecution emphasized the fact that most of the personnel at East Health Center—other than Dr. Azmat—were from "South Florida." The prosecution argued to the jury in its opening that Florida "was the capital of pill mills." (Doc. 385, 72).

### E. Sentencing

On July 30, 2014, Dr. Azmat filed a Sentencing Memorandum Regarding the Guideline For oxycodone. (Doc. 354). On August 5, 2014, he filed his Second Sentencing Memorandum, in which he argued that the Presentence Investigation Report did not reliably calculate the drug quantity under U.S.S.G. § 2D1.1, and for any sentence imposed to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, pursuant to 18 U.S.C. § 3553(a)(6). (Doc. 359, 5-7, 10-12).

12

The district court conducted a sentencing hearing regarding Dr. Azmat on August 6, 2014. (Doc. 362). At the hearing, counsel for Dr. Azmat argued that no reliable evidence that every prescription written by Dr. Azmat was for an unlawful or improper purpose. (Doc. 381, 9). Counsel also argued that Dr. Azmat's proposed sentence did not fit with the other sentences given out in the case. (Doc. 381, 55-56). The district court stated that it concurred with the findings of the Presentence Investigation Report. (Doc. 381, 20). The court gave Dr. Azmat a downward variance in sentence and imposed a sentence of 133 months' imprisonment on Dr. Azmat. (Doc. 381, 86).

## II. <u>Standards of Review</u>

The sufficiency of the evidence to support a conviction and the denial of a motion for a judgment of acquittal is reviewed *de novo*, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility choices in the verdict's favor. *See United States v. Godwin*, 765 F.3d 1306, 1319 (11th Cir. 2014) (quoting *United States v. Pacchioli*, 718 F.3d 1294, 1299 (11th Cir. 2013)); *United States v. Barsoum*, 763 F.3d 1321, 1330 (11th Cir. 2014) (quoting *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003)).

A district court's determination of drug quantity is reviewed for clear error. *United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014) (citing *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012)).

The substantive reasonableness of a sentence is reviewed for abuse of discretion, examining the totality of the circumstances, including the extent of any variance from the guidelines range. *United States v. Hayes*, 762 F.3d 1300 (11th Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

A district court's decision to admit expert testimony is reviewed for abuse of discretion. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under plain error review, a defendant must show: (1) error; (2) that is plain; and (3) that affects substantial rights. *See United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005). If the defendant makes this showing, the Court may then exercise its discretion to notice a forfeited error, but only if "'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"

## SUMMARY OF THE ARGUMENT

The evidence presented at trial was insufficient to support Dr. Azmat's convictions. In Counts One of its Superseding Indictment, the government charged Dr. Azmat with conspiracy to knowingly and willfully dispense controlled substances. There was insufficient evidence that Dr. Azmat knowingly entered into a conspiracy with the operators or employees of East Health Center. On the contrary, the evidence introduced at trial showed that the charged co-conspirators were dissatisfied with Dr. Azmat's performance and that they received complaints from patients that Dr. Azmat was prescribing them less medication, and that the leader of the charged conspiracy had confrontations with Dr. Azmat and decided to look for a replacement for him on Dr. Azmat's first day.

In Counts Two through Fifty of its Superseding Indictment, the government charged Dr. Azmat with unlawfully "dispensing" controlled substances. Dr. Azmat did not have a license to "dispense" medications, and the government's witnesses repeatedly acknowledged that East Health Center did not dispense any medications. As a matter of law, the meaning of "dispense" is to deliver a controlled substance to an ultimate user, including the packaging, labeling or compounding necessary to prepare the substance for such delivery. *See* 21 U.S.C. § 802(10). To "distribute" a controlled substance is to deliver a controlled substance by a means other than dispensing. *See* 21 U.S.C. § 802(11). The government quoted these definitions in its

Superseding Indictment, and failed to amend the Superseding Indictment prior to trial to charge Dr. Azmat with distribution. The evidence at trial was insufficient for the jury to find Dr. Azmat guilty beyond a reasonable doubt of the dispensing controlled substances Counts, and the district court erred in refusing to grant his motion for judgment of acquittal as to the Counts.

The evidence at trial was also insufficient for the jury to find Dr. Azmat guilty beyond a reasonable doubt of the money laundering conspiracy charge in Count Fifty-Two of the Superseding Indictment. No evidence was introduced to support a finding that Dr. Azmat conspired with any other persons to engage in money laundering. Moreover, the specified unlawful activity for the money laundering charge was the government's charge of dispensing controlled substances, which was insufficient. In addition, the government failed to introduce sufficient evidence to establish any money laundering activity separate from the completed, underlying activity. The government's witnesses testified that East Health Center's patients virtually always paid in cash and that they paid Dr. Azmat cash from these proceeds each day. The district court erred in refusing to grant Dr. Azmat's motion for judgment of acquittal as to the money laundering conspiracy charge.

The district court's admission of the expert testimony of Gene Kennedy, M.D., offered by the government, constituted an abuse of discretion. Dr. Kennedy failed to offer any standards or bases for many of the "opinions" which he gave to

the jury at trial, and many of his opinions constituted Dr. Kennedy's mere say-so. Dr. Kennedy's opinions were unreliable, unreliably applied to the facts of the case, and prejudicial to Dr. Azmat.

The district court clearly erred in failing to base the drug quantity used to sentence Dr. Azmat under U.S.S.G. § 2D1.1 on reliable evidence. Evidence at trial showed that Dr. Azmat frequently discontinued or cancelled some patients' prescriptions for drugs; reduced some patients' prescriptions for drugs, or attempted to "wean" the patients off drugs; and prescribed some patients non-narcotic drugs. The government failed to meet its burden of producing reliable evidence of the drug quantity. The district court's adoption of the Presentence Investigation Report's attribution of all pills prescribed by Dr. Azmat as the drug quantity or weight, and the court's failure to make findings of fact regarding the drug quantity or weight, were clearly erroneous.

The sentence imposed on Dr. Azmat by the district court was also unreasonable as a result of the district court's failure to impose a sentence which complied with the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Dr. Azmat's recommended offense level and sentencing range was comparable to those of violent or dangerous offenders, and even though the district court imposed a sentence below

the recommended Guidelines range, Dr. Azmat's sentence was still far greater than any of the other individuals charged related to East Health Center.

Reversal is warranted based upon the government's prejudicial injection of Dr. Azmat's nationality into the trial, the government's prejudicial reference to organized crime, and its prejudicial, repeated references to the fact that Dr. Azmat's charged co-conspirators were all from "South Florida." Finally, even if the errors raised herein are held to be insufficient to warrant reversal, standing alone, Dr. Azmat submits that the cumulative errors denied him a fair trial and merit reversal.

## ARGUMENT AND CITATION OF AUTHORITIES

**I.  The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty and the Trial Court Erred In Denying Appellant's Motion for Judgment of Acquittal**

### A.  The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Count One of the Superseding Indictment—The Conspiracy Count

Insufficient evidence was introduced at trial to support a finding beyond a reasonable doubt that Dr. Azmat knowingly and willfully conspired with anyone to unlawfully dispense controlled substances. To prove in violation of 21 U.S.C. § 846, the government must show (1) an agreement between two or more people to commit a crime; (2) defendant's knowledge of that agreement; and (3) his voluntary joinder in the agreement. *See United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). This Court has recognized the inherent danger in a multi-defendant conspiracy prosecution "that individuals who are not actually members of the group will be swept into the conspiratorial net." *United States v. Chandler*, 388 F.3d 796, 798 (11th Cir. 2004). "[B]ecause the government is permitted broad prosecutorial discretion to prove the conspiracy, the likelihood exists that those who associate with conspirators will be found guilty of a crime that they have not intended to commit, and part of a group that they never joined. *Id.* In order to avoid this danger, the cardinal rule of conspiracy law exists that "one does not become a coconspirator simply by virtue of knowledge of a conspiracy and association with conspirators."

*United States v. Grassi*, 616 F.2d 1295, 1301 (5th Cir. 1980). In addition, "[a] defendant does not join a conspiracy merely by participating in a substantive offense…" *United States v. Alvarez*, 610 F.2d 1250, 1255 (5th Cir. 1980). "It is not enough that a defendant may have wittingly aided a criminal act or that he may have intended to do so in the future; to convict a defendant of conspiracy the government must demonstrate that the defendant agreed with others that together they would accomplish the unlawful object of the conspiracy." *Id.* Where a government's case is predicated largely, if not solely, on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict. *See United States v. Perez-Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994). If there is insufficient proof that the defendant conspired with another, then a conspiracy conviction will not be sustained. *See United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1998).

There was no evidence that Dr. Azmat voluntarily joined a conspiracy to unlawfully distribute controlled substances under 21 U.S.C. § 846. On the contrary, testimony from the government's witnesses established exactly the opposite. Adelard LeFrancois, the owner of East Health Center, testified that he had a confrontation with Dr. Azmat on Dr. Azmat's first day regarding East Health Center's lack of malpractice insurance, and that he began trying to find a replacement. (Doc. 386, 270-71). LeFrancois stated that Dr. Azmat was a "disaster." (Doc. 386, 263-64, 308-09). He and other East Health Center witnesses for the

20

government testified that East Health Center received complaints from patients about Dr. Azmat cutting their drugs. (Doc. 386, 246, 276, 377-78; 387, 584). Moreover, Joseph Travis Bradley, an East Health Center patient, admitted that he complained to Daniel Wise during his visit to East Health Center that Dr. Azmat prescribed him less medication than he had previously been prescribed. (Doc. 386, 428).

The testimony presented at trial was insufficient to establish beyond a reasonable doubt that Dr. Azmat knowingly and willfully joined in a conspiracy with the personnel of East Health Center to unlawfully dispense controlled substances. To the contrary, Dr. Azmat had no prior relationship with the staff of East Health. He was terminated from his employment after only a few weeks by LeFrancois, the organizer of the charged conspiracy. (Doc. 386, 245, 276). LeFrancois' statements about his disagreements with Dr. Azmat and that Dr. Azmat was a "disaster" show— to borrow the language of the Court's decision in *Chandler*—that the charged conspiracy constituted "a group that [Dr.] Azmat never joined." Without sufficient evidence that he knowingly and willfully joined any conspiracy, Dr. Azmat could not have been convicted of conspiracy, even if his acts happened to assist the conspirators. The district court erred in denying Dr. Azmat's motion for judgment of acquittal as to Count One.

**B. The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Counts Two through Fifty of the Superseding Indictment—The "Dispensing Controlled Substances" Counts**

Counts Two through Fifty of its Superseding Indictment charged that Dr. Azmat "knowingly, intentionally and unlawfully" "dispensed" controlled substances. (Doc. 156, 11). The Government defined "dispense" in its Superseding Indictment as "to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery." (Doc. 156, 4.)

Uncontroverted testimony at trial established that Dr. Azmat—like most physicians—did not have a license to "dispense" medications. (Doc. 385, 91, 94). Furthermore, Adelard LeFrancois, the owner of East Health Center, and Dr. Kenneth Gosset, the Government's own expert, admitted that East Health Center did not "dispense" any medications during the time that Dr. Azmat was employed. (Doc. 386, 263; 387, 556).

Since Dr. Azmat was not authorized to "dispense" and the Government did not prove that he dispensed any medication, Counts Two through Fifty-One were fatally defective. Count Fifty-Two, the money laundering conspiracy, should have also been dismissed since the "specified unlawful activity" was "dispensation." (Doc. 156, 15, 16).

Counts Two through Fifty charged Dr. Azmat with a violation of 21 U.S.C. § 841(a)(1), which provides as follows:

> Except as authorized by this subchapter, it shall be unlawful for a person knowingly or intentionally
> (1) to… *distribute, or dispense* . . . a controlled substance. . . .

21 U.S.C. § 841(a)(1) (emphasis added). Title 21 defines "dispense" as follows:

> The term "dispense" means *to deliver a controlled substance to an ultimate user… by, or pursuant to the lawful order of, a practitioner***,** including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery. The term "dispenser" means a practitioner who so delivers a controlled substance to an ultimate user . . .

21 U.S.C. § 802(10) (emphasis added). The Government quoted this definition in its Superseding Indictment. (Doc. 156, 4.)

> Title 21 defines "distribute" as follows:
> The term "distribute" means to deliver (*other than by administering or dispensing*) a controlled substance… The term "distributor" means a person who so delivers a controlled substance…

21 U.S.C. § 802(11) (emphasis added). The Government also quoted this definition in its Superseding Indictment.

There was proof at trial that Dr. Azmat "prescribed" controlled substances. However, there was insufficient evidence for the jury to find beyond a reasonable doubt that he "dispensed" controlled substances. The plain language of the statute demonstrates that "prescribe" and "dispense" are distinct ways in which the statute can be violated.

The Eleventh Circuit Court of Appeals and other courts have expressly recognized that "'dispense' by statutory definition is *delivery* performed by a practitioner." *United States v. Steele*, 117 F.3d 1231, 1235 (11th Cir. 1997), *overruled on other grounds in United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (affirming the defendant's conviction for knowingly and intentionally dispensing controlled substances in violation of Section 841(a)(1), finding that "because [the defendant] was acting as an agent of a registered pharmacy, he was authorized to dispense controlled substances in the course of his professional practice as a pharmacist, *but only pursuant to a prescription issued by a practitioner*") (emphasis added); *see also United States v. Genser*, 710 F.2d 1426, 1431 (10th Cir. 1983) ("To prove the crime of dispensation, the government must show knowing or intentional *delivery* of a controlled substance by a practitioner") (emphasis added) (citing *United States v. Bartee*, 479 F.2d 484, 488 (10th Cir. 1973); *United States v. Varma*, 691 F.2d 460, 462 (10th Cir. 1982); *United States v. Rogers*, 609 F.2d 834, 839 (5th Cir. 1980)). Thus, to "dispense" a controlled substance, a practitioner has to deliver the controlled substance, i.e. by prescribing *and* administering it *and* packaging, labeling, or compounding it. "Administer" refers "to the direct application of a controlled substance to the body of a patient or research subject…" 21 U.S.C. § 802(2). There was no evidence in this case that Dr. Azmat "delivered" any controlled substances through "administering" controlled

substances to any patient or research subject, or that he "packaged," "labeled," or "compounded" any controlled substance.

Not only does the statute define "distribute" and "dispense" as separate and distinct ways to violate Section 841, but also the comprehensive regulatory scheme for prescription drugs demonstrates the same. One commonly thinks of physicians as prescribing drugs and pharmacists as dispensing drugs; "dispensing" connotes the packaging and the delivery of a prescription drug to a patient. The Drug Enforcement Administration's regulations contemplate such a scheme for Schedule II, III, and IV drugs.

In typical situations, "[a] prescription for a controlled substance may be issued only by an individual practitioner" who is authorized by his state's licensing board and registered by the DEA. 21 C.F.R. § 1306.03(a). "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice… or [a] registered institutional practitioner." 21 C.F.R. § 1306.06. Schedule II drugs may be dispensed by a pharmacist "only pursuant to a written prescription signed by a practitioner." 21 C.F.R. § 1306.11(a), (b). Schedule III and IV controlled substances carry similar requirements, i.e., that a pharmacist may dispense these drugs only pursuant to a practitioner's prescription, and the practitioner may dispense these drugs directly only upon meeting the requirements of Section 1306.07. 21 C.F.R. § 1306.21(a), (b).

25

Here, Dr. Azmat had a license to prescribe, but not a license to dispense. Counts Two through Fifty which charged that he "dispensed" the medication are fatally flawed. As a result of the government's flawed allegations, the jury must necessarily entertain a reasonable doubt as to whether Dr. Azmat allegedly "dispensed" any controlled substances. The district court erred in failing to grant Dr. Azmat's motion for judgment of acquittal.

The case law supports this contention as well as do the charging decisions of the government. The seminal case which clarified that physicians who illegally dispensed and prescribed controlled substances could be prosecuted under Title 21 is the United States Supreme Court's decision in *United States v. Moore*, 423 U.S. 122, 124 (1975). *Moore* itself involved an indictment charging a physician with "the knowing and unlawful distribution and dispensation" of a controlled substance. *Id.* at 124. And Eleventh Circuit cases have noted that physicians have been charged with distributing, dispensing, or both. *See, e.g.*, *United States v. Joseph*, 709 F.3d 1082, 1087 (11th Cir. 2013) (noting that indictment charged physician and physician's assistant with "dispensing or distributing controlled substances"); *United States v. Bourlier*, 518 Fed.Appx. 848 (11th Cir. 2013) (observing physician's conviction for dispensing); *United States v. Ignasiak*, 667 F.3d 1217, 1219 (11th Cir. 2012) (noting that physician convicted of "dispensing controlled

substances")[1]; *United States v. Baron*, 284 Fed.Appx. 781, 782 (11th Cir. 2008) (discussing sentencing appeal of physician who pleaded guilty to distributing controlled substances); *United States v. Dicter*, 198 F.3d 1284, 1287-88 (11th Cir. 1999) (noting physician's conviction for distributing controlled substances based upon doctor's selling prescriptions for narcotics); *United States v. Hammond*, 781 F.2d 1536, 1537 (11th Cir. 1986) (observing physician's conviction for distribution via prescribing controlled substances).

The Superseding Indictment should have charged Dr. Azmat with distributing, not dispensing. Another court has explained the distinction:

> The real issue… is the meaning of "dispense," which the statute defines as "deliver[ing] a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner…" 21 U.S.C. § 802(10)… "Practitioner" is defined as a "physician… registered, or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." 21 U.S.C. § 802(20)… The combined effect of these statutory definitions in the present context is to limit the meaning of "dispense" to delivery of controlled substances by a physician who is acting in the course of professional practice or research. The point is made explicitly in the regulations. *See* 21 C.F.R. § 1306.04(a)… Delivery of controlled substances outside the course of

---

[1] *Ignasiak* cited 21 U.S.C. § 830(b)(3)(A)(ii) for the proposition that a "DEA-registered physician may dispense controlled substances so long as he does so "for a legitimate medical purpose" and while "acting in the usual course of his professional practice." 667 F.3d at 1228. It then observed that for conviction, the government must prove that a physician dispensed controlled substances in violation of these requirements. *Id*. But Section 830(b)(3)(A)(ii) never mentions dispensing; it defines the term "valid prescription."

> professional practice or research would constitute "distributing," *see* 21
> U.S.C. § 802(11)…, an activity which violates § 841(a)(1) even if
> carried on by a registered physician.

*United States v. Badia*, 490 F.2d 296, 298 (2d Cir. 1973).[2] *See also United States v.*

*Leigh*, 487 F.2d 206 (5th Cir. 1973) (concluding summarily under § 802(10) that "a

doctor who administers or prescribes a controlled substance is, for the purposes of

the statute, dispensing it," and dismissing indictment against physician alleging

distribution). And, as another court observed:

> By definition "dispense" expressly contemplates a "lawful order"; if the
> order is not such, the prescription is not lawful under 21 U.S.C. § 829.
> [Fn]. If the prescription is not lawful, the "practitioner" does not
> dispense; rather, under § 802(11), he "distributes"-that is, he effects
> delivery "other than by dispensing." [Fn]. In short, a "practitioner" who
> dispenses does not violate the Act.

*United States v. Black*, 512 F.2d 864, 866 (9th Cir. 1975) (citing 21 U.S.C. § 829(a);

21 C.F.R. § 306.04(a); *Badia*, 490 F.2d 296). *Compare United States v. Ly*, NO.

CR407-286, 2008 WL 717743, *1 (S.D.Ga., March 17, 2008) (in which physician

was charged with and convicted of prescribing and "dispensing" controlled

substances, observing that "[i]nvestigation also revealed that Defendant purchased

large quantities of controlled substances so that he could fill his patients'

prescriptions himself).

---

[2] *Badia* explained its belief that Congress included "dispense" in § 841(a)(1) "to
compel physicians to become properly licensed"; if not, "a physician could then be
convicted of unlawful dispensing." 490 F.2d at 298, n. 4.

In *United States v. Tighe*, 551 F.2d 18 (3d Cir. 1977), the defendant argued that he did not dispense a controlled substance because he did not "deliver [it] to an ultimate user…" since the user's prescriptions remained unfilled. *Id*. at 19. The court after some strained reasoning concluded that placing a prescription for controlled substance in the hands of the end user completes the offense of dispensing. *Id*. at 20.

Two things support a conclusion that the holding in *Tighe* is erroneous. First, *Tighe* equates "prescribe" with "deliver" in the applicable statutory definition. Substituting the former for the latter renders other language superfluous, to wit:

> The term "dispense" means to [prescribe] a controlled substance to an ultimate user… by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery…

21 U.S.C. § 802(10). If "deliver" merely means to "prescribe," then there is no reason to provide that "dispense" includes prescribing and administering. Second, requiring possession of a controlled substance by the ultimate user is consistent with both its definition and the definition of "dispense." *See* 21 U.S.C. § 802(27). As the Eleventh Circuit has recognized, "[a]n 'ultimate user' is 'a person who has *lawfully obtained ... a controlled substance* for his own use or for the use of a member of his household,' 21 U.S.C. § 801(27), as by prescription from a practitioner." *Steele*, 147 F.3d at 1318 (emphasis added). At the very least, "dispense" requires prescribing and packaging or administering a controlled substance. 21 U.S.C. § 802(10).

"Administering" involves "direct application of a controlled substance to the body of a patient" by a practitioner or the "patient… at the direction and in the presence of the practitioner…" 21 U.S.C. § 802(2).

Neither do the former Fifth Circuit decisions in *United States v. Thompson*, 624 F.2d 740 (5th Cir. 1980) and *Leigh*, 487 F.2d 206 change the result. While *Thompson* and *Leigh* did hold that a physician who prescribes controlled substances may be charged with "dispensing" controlled substances, *Thompson*, at 742; *Leigh*, at 208; those opinions do not appear to have considered the legal effect of the requirements of Section 802(10) that "dispense" means "to deliver *a controlled substance to an ultimate user or research subject* by, or pursuant to the lawful order of, a practitioner, *including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery*." 21 U.S.C. § 802(10) (emphasis added).

In construing a statute, the central principal is to give meaning to every word and clause in a statute, and to reject "statutory interpretations that would render portions of a statute surplusage." *See Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment CSX Transp. Northern Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) (citing *United States v. Menasche*, 348 U.S. 528, 538–39 (1955); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). Statutory definitions control the meaning of a statute's terms. *See Stansell*

*v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910, 915 (11th Cir. 2013) (citing *Burgess v. United States*, 553 U.S. 124, 129–30 (2008)). Where statutory language provides an explicit definition, the definition should be applied even if it differs from a term's ordinary meaning. *See Johnson v. Breeden*, 280 F.3d 1308, 1325 (11th Cir. 2002) (citing *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)).

Section 802(10) clearly envisions that "dispensing" occurs when a drug is *physically* delivered with its packaging and labeling to an ultimate user or research subject, pursuant to a prescription by a practitioner—i.e. when the drug is delivered by a pharmacy or other facility licensed to "dispense" controlled substances. No other construction is possible without rendering several portions of Section 802(10) surplusage—a result forbidden by the canons of statutory construction. As set forth above, Dr. Azmat was never licensed to "dispense" controlled substances. East Health Center was never licensed to dispense controlled substances. No evidence was presented at trial that Dr. Azmat ever physically administered any controlled substances, or that he ever delivered any controlled substances packaged and labeled for delivery to any ultimate users.

Given the statutory definitions and framework, the government failed to prove that Dr. Azmat "dispensed" controlled substances under the plain definitions of the Superseding Indictment and Title 21. The evidence was insufficient to support Dr.

Azmat's conviction, and the district court erred in refusing to grant his motion for judgment of acquittal on Counts Two through Fifty of the Superseding Indictment.

### C. The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Count Fifty-Two of the Superseding Indictment—The "Money Laundering Conspiracy" Count

The trial court likewise erred in failing to grant Dr. Azmat's motion for judgment of acquittal as to Count Fifty-Two of the Superseding Indictment, which charged a money laundering conspiracy. That count alleged that the specified unlawful activity was "the unlawful dispensation of Schedule II, III, and IV controlled substances." (Doc. 156, 16). This is the same erroneous allegation which the government charged in Counts Two through Fifty. As set forth at length above, there was no evidence that Dr. Azmat violated Title 21's prohibition against dispensing controlled substances. Since no evidence showed that Dr. Azmat engaged in dispensation, the specified unlawful activity charged in the superseding indictment, insufficient evidence supported his conviction for money laundering conspiracy. *See United States v. Medina*, 485 F.3d 1291, 1300 (11th Cir. 2007).

Furthermore, in order to obtain a conviction for a money laundering conspiracy the government bore the burden of proving beyond a reasonable doubt that: (1) two or more persons agreed to commit a money laundering violation; and (2) that the defendant, knowing the unlawful plan, voluntarily joined the conspiracy. *See United States v. Martinelli*, 454 F.3d 1300, 1310 (11th Cir. 2006). In addition,

32

the government must prove beyond a reasonable doubt that each defendant had a deliberate, knowing, specific intent to join the conspiracy. *See United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998). Insufficient evidence was presented at trial to support any finding that Dr. Azmat allegedly conspired with any other persons to launder proceeds of any alleged specified unlawful activity.

In addition, the government failed to prove alleged money laundering conduct following, and sufficiently separate from, the underlying alleged over acts. Money laundering "must 'follow in time' the completion of the underlying transaction as an activity designed to conceal or disguise the origins of the proceeds." *United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999) (citing *United States v. Dimeck*, 24 F.3d 1239, 1246 (10th Cir. 1994)). "Before the primary offense of money laundering can occur, the underlying criminal activity must be complete, generating proceeds to be laundered." *Id*. at 1212 n. 12 (citing *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997)).

"Congress aimed the crime of money laundering at conduct that *follows in time* the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" *United States v. Edgmon*, 952 F.2d 1206, 1214 (10th Cir. 1991) (emphasis added); *accord United States v. Savage*, 67 F.3d 1435, 1442 (9th Cir. 1995) (describing proceeds as "funds obtained from prior, separate criminal activity"). Distributing the fruits of a crime to co-conspirators does not

necessarily constitute money *laundering*, since a crime may not be complete until such a distribution occurs. *See Dimeck*, 24 F.3d at 1247 (dismissing money laundering counts based on mere delivery of drug proceeds to co-conspirators, since "[t]he money laundering statute was designed to punish those drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises"). "The main issue in a money laundering charge, therefore, is determining when the predicate crime become a 'completed offense' after which money laundering can occur." *Christo*, at 580 (citing *United States v. Kennedy*, 64 F.3d 1465, 1477-78 (10th Cir. 1995)).

The evidence at trial established that virtually all patients who visited East Health Center paid in cash. (Doc. 385, 149-150; R. 386, 255). Furthermore, the owner and employees of East Health Center testified consistently that Dr. Azmat was paid cash directly from the monies paid by patients, before the monies were deposited. (Doc. 386, 227, 243, 260; R. 387, 578-79, 583). There was no separate act of money laundering separate from, and following in time, the completed, underlying activity. On the contrary, at most, the evidence at trial showed the distribution of proceeds. Accordingly, the government failed to present evidence sufficient to permit the jury to find Dr. Azmat guilty of alleged money laundering conspiracy in violation of 18 U.S.C. § 1956(h) beyond a reasonable doubt. The

district court erred in failing to grant Dr. Azmat judgment of acquittal as to Count Fifty-Two.

## II. <u>The Trial Court Abused Its Discretion in Admitting the Testimony of Dr. Gene Kennedy</u>

The district court's admission of the testimony of Dr. Gene Kennedy at trial constituted an abuse of discretion. Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702 require district courts to perform the critical gatekeeping function concerning the admissibility of expert testimony. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The Eleventh Circuit has explained that district courts fulfill that function by engaging in a three part inquiry considering whether, (1) the expert is qualified to testify competently regarding the matters he intends to address; 2) the methodology by which the expert reaches his conclusions is sufficiently reliable as to be determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific expertise, to understand the evidence or to determine a

fact in issue. *Id*. While there will often be some overlap between these concepts of qualification, reliability, and helpfulness, they are distinct concepts that courts should be careful not to conflate. *See Quiet Tech. DC–8, Inc. v. Hurel–Dubois, UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The burden of establishing that these requirements are met rests with the proponent of the expert testimony, and not the *Daubert* challenger. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

Dr. Kennedy gave very few of the opinions which the government represented that he would give at trial in its Response to Court Order of December 27, 2013 [DOC 291] Concerning Reliability of Proposed Expert Testimony. (Doc. 297). He did not even offer the arguably relevant opinions stated by the government regarding whether Dr. Azmat's conduct was "outside the usual course of practice generally recognized and accepted in the United States," (Doc. 297, 1-2); whether Dr. Azmat complied with any specific measures of the Federation of State Medical Boards or the Georgia Composite State Board of Medical Examiners, (Doc. 297, 10); or that Dr. Azmat failed to comply with any specific, applicable federal or state regulations, (Doc. 297, 13).

In contrast, at trial, Dr. Kennedy merely said Dr. Azmat's actions relating to certain patients were medically "not legitimate." (Doc. 387, 624, 629, 630, 631, 632, 633, 635, 637, 640, 642, 645, 646, 648, 649, 652, 653, 654, 655, 656-57, 659, 661,

662, 664, 665, 669, 671, 672). Although he cited some facts as the basis for his opinions, for the majority of his opinions, Dr. Kennedy did not offer any standards or state how Dr. Azmat's actions fell "outside the usual course of professional practice as a medical doctor…" (Doc. 156, 11). Dr. Kennedy furthermore referred to no laws, regulations, standards, etc. in his repeated references to facts being unusual, suspicious, or raising "red flags." (Doc. 631, 633, 634, 638, 641, 643, 647, 653, 664). He merely declared Dr. Azmat's physical examinations of patients not "credible," without giving a basis. (Doc. 387, 637, 654, 655, 659, 662). Dr. Kennedy did not reference any standard or explain his opinions that the number of pills prescribed to a particular patient was excessive, (Doc. 387, 627), or why a patient would potentially manage better with other treatment, (Doc. 387, 660).

The majority of the actual opinions given by Dr. Kennedy at trial failed to meet the admission requirements of Rule 702 and *Daubert*. The opinions were not reliable and were not reasonably applied to facts of the case. On the contrary, Dr. Kennedy testified to numerous "opinions" which were merely his say-so.

> "The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient." [Cit.]. Such statements can spring just as quickly from the *ipse dixit* of the expert… As the Supreme Court explained in Joiner: "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." [Cit.]. Moreover, "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"

*McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005) (internal citations omitted) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997); Fed.R.Evid. 702, Advisory Committee's Note (2000)).

The district court should have excluded Dr. Kennedy's testimony as unreliable, and the admission of the expert testimony against Dr. Azmat at trial constituted an abuse of discretion. Dr. Azmat's conviction should be reversed.

## III. **The Trial Court Clearly Erred in Determining the Drug Quantity Attributable to Dr. Azmat**

For the purposes of determining Dr. Azmat's base offense level under the Drug Quantity Table of U.S.S.G. § 2D1.1, the Presentence Investigation Report attributed to Dr. Azmat all of the pills prescribed to the patients seen by him. (Doc. 359, 1, 6). The district court stated that it concurred with the findings of the Presentence Investigation Report. (Doc. 381, 20).

In calculating the drug amounts for purposes of the Guidelines calculation, a sentencing court must rely on information that is reliable. *See* U.S.S.G. § 6A1.3(a) (requiring information bearing on a factor important to the sentencing determination have "sufficient indicia of reliability to support its probable accuracy"); *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998) (drug quantity "may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant, [but it] cannot be based on calculations of drug

quantities that are merely speculative"). "The necessity of requiring reliable evidence in support of the government's position is 'particularly manifest in cases… where the quantity of drugs attributed to a defendant can have a marked impact on the length of his sentence.'" *United States v. Godoy*, 439 Fed.Appx. 789, 791-92 (11th Cir. 2011) (quoting *United States v. Lawrence*, 47 F.3d 1559, 1567 (11th Cir.1995). Where a defendant challenges the quantity of drugs attributed to him, the government has the burden of establishing the quantity by a preponderance of the evidence. *See Lawrence*, at 1566 (citing *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993); *United States v. Alston*, 895 F.2d 1362, 1373 (11th Cir. 1990)). Furthermore, "[i]n determining the quantity of drugs attributable to a particular defendant under the Guidelines, a district court must make proper findings of fact." *Lawrence*, at 1566 (quoting *Ismond*, 993 F.2d at 1499; citing *United States v. Beasley*, 2 F.3d 1551, 1561 (11th Cir. 1993); quoting *Ismond*, at 1499).

The record in this case was characterized by the striking absence of any reliable evidence as to what portion of the relevant prescriptions were legitimately used to treat pain. On the contrary, substantial evidence and testimony was introduced at trial, including testimony of the government's case agent and medical expert, as well as former patients of Dr. Azmat, showing that Dr. Azmat discontinued or cancelled some patients' prescriptions for narcotics; reduced some patients'

prescriptions for narcotics, or "weaned" the patients off narcotics; and prescribed some patients non-narcotic drugs. (Doc. 385, 165-181; 386, 345, 424, 451; 387, 553, 694, 716, 719; 388, 739-743, 748).

In determining the quantity of drugs attributable to Dr. Azmat under Section 2D1.1 for the purpose of determining his offense level, the Court should have made findings regarding the portion of the drug quantities which were unlawful, not for a legitimate medical purpose, or not in the usual course of professional practice. (Doc. 156, 6, 11). In *United States v. Chube II*, 538 F.3d 693, 705 (7th Cir. 2008), the Seventh Circuit Court of Appeals held that "[f]or a prescription to be included in relevant conduct, the court must evaluate the facts surrounding that particular prescription and explain why those facts render it unlawful." The Court in *Chube II* was particularly concerned because there were indications in the physicians' notes that they were trying to "wean" the patients off of their medications. *Id*. The Court further noted that those notes were supported by the fact that many of the patient files supported that view because the amount of oxycodone prescribed was reduced. *Id*. As in *Chube II*, there was ample evidence in this case in the form of patient files and notes by Dr. Azmat that Dr. Azmat discontinued drugs prescribed to patients or reduced the amounts of drugs prescribed. *See also United States v. Bell*, 667 F.3d 431, 444 (4th Cir. 2011) (vacating sentence of defendants convicted of conspiracy to distribute oxycodone where one of the defendants possessed a

prescription for oxycodone which her co-conspirators conspired to distribute a quantity of, concluding that "absent a finding (adequately supported by reliable evidence) that the entire quantity prescribed to [the defendant] was "within the scope of the criminal activity" she and her co-conspirators undertook… it would be improper to include in the drug quantity pills [the defendant] lawfully consumed…").

The drug quantity calculation which the district court adopted was insufficiently reliable. It was clear error for the district court to concur in the Presentence Investigation Report's attribution of the entire weight of the drugs prescribed by Dr. Azmat for sentencing purposes, without requiring the government to meet its burden of producing reliable evidence. The government presented no "sufficiently reliable" evidence that would allow this Court to make a determination regarding the total drug weight attributable to Dr. Azmat. It was furthermore clear error for the district court to agree with the drug quantity calculation without making proper findings of fact. Dr. Azmat accordingly requests that his sentence be vacated.

## IV. Dr. Azmat's Sentence Was Unreasonable as a Result of the Trial Court's Failure to Consider the Need to Avoid Unwarranted Sentence Disparities

The Presentence Investigation Report gave Dr. Azmat a total offense level of 36 and a Guidelines range of imprisonment of 188 to 235 months. (Doc. 359, 2). Dr. Azmat therefore faced a potential sentence similar to that of a violent or dangerous

offender. *See* U.S.S.G. § 2B3.1 (base offense level 20 (U.S.S.G. § 2B3.1(a); +2 levels for robbing a financial institution (U.S.S.G. § 2B3.1(b)(1); +7 levels for discharging a firearm (U.S.S.G. § 2B3.1(b)(2)); U.S.S.G. § 2A1.3 (base offense level of 38 for second degree murder); U.S.S.G. § 2G2.3 (selling or buying a child for use in the production of child pornography).

Even with a downward variance, the sentence imposed on Dr. Azmat was more than twice as great as the largest sentence received by any of his charged co-conspirators, and was as much as ten (10) times greater than the sentence imposed on others (Adelard Lefrancois-52 months imprisonment; Kenneth Gossett, M.D.- 42 months imprisonment; Francis Barbuscia-42 months imprisonment; Daniel Wise-42 months imprisonment; Sean Clark-40 months imprisonment; Candace Carreras-24 months imprisonment; Adelaida Lizama-18 months imprisonment; Konstantinos Afthinos-15 months imprisonment; Shelly Morford-13 months imprisonment; Louis Tremetara/Nuvest-$2,000,000 fine).

One of the goals of the Sentencing Reform Act was to provide for proportionality in punishment among offenses of different seriousness. S.Rep. No. 98-225, at 45-46 (1983). 18 U.S.C. § 3553 provides, in relevant part:

> (a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider…

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct…

18 U.S.C. § 3553(a). As the Court has recognized:

> One of the purposes of the Sentencing Commission, and by extension the Sentencing Guidelines, is to "establish sentencing policies and practices for the Federal criminal justice system that... provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct ...."

*United States v. Docampo*, 573 F.3d 1091, 1102 (11th Cir. 2009) (quoting 28 U.S.C.

§ 991(b)(1)(B); citing *United States v. Clark*, 434 F.3d 684, 687 (4th Cir. 2006)).

The Eleventh Circuit and Georgia federal courts have relied upon disparities in sentences between similarly situated offenders with similar records in sentencing defendants to the low end, or below, the sentencing range recommended by the United States Sentencing Guidelines. For instance, in *United States v. Colbert*, 302 Fed.Appx. 886 (11th Cir. 2008) (*per curiam*; unpublished), the defendant, who was convicted with conspiracy with intent to distribute cocaine and money laundering, argued that his co-conspirators, including the head of the conspiracy, received substantially lower sentences, and the Eleventh Circuit held that the district court did not abuse its discretion in sentencing the defendant where "[t]he court expressly chose a sentence at the low end of the guidelines range to avoid unwarranted sentencing disparities," *id*. at 889. Similarly, the defendant in *United States v. Lamonds*, 291 Fed.Appx. 314, (11th Cir. 2008) (*per curiam*; unpublished) was

43

convicted of conspiracy to distribute or possess with intent to distribute cocaine and the Court of Appeals affirmed his sentence, observing that "the district court considered [the defendant's] arguments regarding the sentencing disparity with his co-conspirator and his limited participation in the offense, and then varied downward 120 months from the low end of the guideline range because of those factors," *id.*, at 317. Furthermore in *United States v. Pressley*, 473 F.Supp.2d 1303 (N.D.Ga. 2006) (Order) this Court considered disparities between defendants convicted of continuing criminal enterprise and drug trafficking who had similar records and had been found guilty of similar conduct in order to impose a downward variance from 27 years to 16 years, holding that "the Court can properly evaluate the disparity factor under a reasonableness analysis, it deems a 27 1/2 year sentence for a Category I offender to be out of kilter with the substantially reduced sentences awarded to his co-defendants, who had far worse criminal records," *id.* at 1317.

The disparity in sentence between the individuals who organized and operated East Health Center and Dr. Azmat, who worked at the clinic for approximately 19 days, was wholly unwarranted. Pursuant to the Sentencing Reform Act and Section 3553(a)(6)'s directive to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of the statute—including the need to avoid unwarranted sentencing disparities—the sentence imposed on Dr.

44

Azmat by the district court was unreasonable. Dr. Azmat's sentence should be reversed and the case remanded.

## V. Dr. Azmat's Punishment Was in Violation of His Sixth Amendment Right to Trial Because Dr. Azmat Chose to Exercise His Right Instead of Entering a Guilty Plea

As discussed in the preceding section, the sentence imposed on Dr. Azmat was markedly greater than the sentences of his charged co-conspirators. Commentators have noted the phenomenon of the so-called "trial tax," exacted on some defendants who refuse to enter a guilty plea and insist on exercising their Sixth Amendment right to trial.[3] At issue is whether imposition of such a trial tax by the

---

[3] A sample of law review articles reveals broad awareness of the problem by scholars and practitioners: "The plea-bargaining process is infamously coercive… If a defendant refuses to plead guilty and waive his constitutional rights, a `trial tax' is exacted upon conviction: a sometimes grossly excessive penalty for exercising his rights." Luna, Erik, "Symposium on Overcriminalization: Prosecutorial Decriminalization, Summer 2012," 102 J. Crim. L. & Criminology, 785, 797; describing "that terrible attribute that defines our plea bargaining and makes it coercive and unjust: the sentencing differential by which the accused is threatened with an increased sanction for conviction after trial by comparison with that which is offered for confession and waiver of trial,…" "Land Without Plea Bargaining: How The Germans Do It," 78 Mich L. Rev. 204, 223(1979) (cited in, Bowers, Josh "Punishing the Innocent," 156 U. Pa. L. Rev. 1117, 1158 (2008); "Some defendants will plead not guilty. Their cases will be put on the trial calendar. If not resolved with dismissal or plea, they will go to trial and, if convicted, the defendant will pay the `trial tax' – a more severe sentence than he or she would have received as part of a plea bargain." Bright, Stephen, "Symposium: Cruel and Unusual Punishment: Litigating under the Eighth Amendment: The Failure to Achieve fairness: Race and Poverty Continue to Influence Who Dies," 11 U. Pa. J. Const. L. 23 (2008). Perhaps the best study of issues arising in the context of plea bargaining is Bibas, Stephanos, "Plea Bargaining Outside the Shadow of Trial," 117 Harv. L. Rev. No. 8 (2004). For an anecdotal account of the trial tax in operation, *see*, Bogira, Steve, "Courtroom

sentencing court amounts to a denial of a defendant's Sixth Amendment trial rights because the tax punishes those who assert with vigor the full range of their Sixth Amendment rights, including the very right to go to trial at all, to confront the witnesses against them, and to have the assistance of counsel for their defense.

In two recent cases, the Supreme Court focused on the centrality of guilty pleas as a means of resolving criminal cases. *See Missouri v. Frye*, 566 U.S. --, 132 S.Ct. 1399 (March 21, 2012); *Lafler v. Cooper*, 566 U.S. --, 132 S.Ct. 1376 (March 21, 2012). The focus of these cases was on pre-trial proceedings, to wit, plea-bargaining. "Ninety seven percent of federal convictions and ninety- four percent of state convictions are the result of guilty pleas." *Frye*, at 1407 (citing Dept. of Justice, Bureau of Justice Statistics, Table 5.22.2009, http://www.albany.edu/sourcebook/pdf/t5222009.pdf). Our criminal justice system "is for the most part a system of pleas, not… trials." *Lafler*, at 1381. As a result, the Court concluded that "[t]he reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye*, at 1407.

---

302: A Year Behind the Scenes in an American Criminal Courthouse," 38, 83 (2005).

Both *Lafler* and *Frye* arose in the context of post-conviction claims for relief in which there was a record that shed light on the pre-trial proceedings: In Frye, defense counsel failed to convey a plea offer to his client. In Lafler, defense counsel gave bad advice to a client on whether to accept a plea, so poorly relating the evidence to the elements of the offense charged that his client was misadvised on whether to take a plea or go to trial. But for the habeas corpus petitions perfected, no record would have existed to review these claims. The communications between the petitioners and their counsel were initially cloaked in the attorney-client privilege.

Sixth Amendment rights attach once adversarial proceedings commence. *See Rothgery v. Gillespie County*, 554 U.S. 191 (2008). While it is permissible for the government to attempt to purchase a guilty plea by an offer of a reduced sentence, *see United States v. White*, 869 F.2d 822 (5th Cir. 1989), a trial judge may not punish a defendant who chooses to exercise his right to trial by jury. "The 'augmentation of sentence' based on a defendant's decision to 'stand on [his] right to put the Government to its proof rather than plead guilty' is clearly improper." *United States v. Hutchings*, 757 F.2d 11, 14 (2d Cir. 1985) (quoting *United States v. Araujo*, 539 F.2d 287, 291-92 (2d Cir. 1976)). "It is well settled that an accused may not be subjected to more severe punishment simply because he exercised his right to stand trial." *United States v. Capriola*, 537 F.2d 319, 321 (9th Cir. 1976). "The 'courts

47

must not use sentencing power as a carrot and stick to clear congested calendars, and they must not create the appearance of such a practice.'" *United States v. Medina-Cervantes*, 690 F.2d 715 (9th Cir. 1982) (quoting *United States v. Stockwell*, 472 F.2d 1186, 1187 (9th Cir. 1978).

In *Hutchings*, for example, the apparent imposition of a trial tax was clear and constituted error. The record was transparent and obvious. Immediately after the jury returned its verdict of guilty, the judge said, on the record in open court: "[This trial was] a total waste of public funds and resources … there was no defense in this case. This man was clearly and unquestionably guilty, and there should have been no trial."  757 F.2d at 13. The judge then asked if he could consider "needless expenditure of public funds at sentencing." *Id*. When he asked whether the defendant could be "taxed for the expenses of this prosecution," defense counsel responded: "Mr. Hutchings has a constitutional right to have a trial in a criminal matter." *Id*. The judge responded that he thought he could take the waste into consideration, but then said: "If I cannot, if the indications are that I cannot, I will not. But I certainly will if I have the right to do so...." *Id*., 14.  The case was remanded for resentencing so that the trial court could clarify what factors he relied upon at sentencing.[4]

---

[4] Sentence was imposed prior to the imposition of the Comprehensive Crime Control Act of 1984 and the enactment of federal Sentencing Guidelines at a time in which a judge was not required to state the reasons for the sentence imposed. *See United States v. Golomb*, 754 F.2d 86, 90-91 (2d Cir. 1985).

48

The record here is absent remarks comparable to those in *Hutchings*, but the grossly dissimilar sentencing outcomes between Dr. Azmat and the other actors charged in relation to East Health Center speak volumes: the controlling factor behind the comparative length of Dr. Azmat's sentence was his decision to go to trial. The only cogent explanation is that Dr. Azmat was not just punished for the charged offenses, but for daring to go to trial.

The Federal Sentencing Guidelines contemplate a modest reduction in the total offense level in exchange for a guilty plea: they authorize a two point reduction in those cases in which the total offense level is less than 16 points, and permit a third point in reduction, on the government's motion, for cases in which the total offense level is 16 or more. *See* U.S.S.G. § 3E1.1. "The United States Sentencing Commission recognized the importance of preserving predictably more lenient sentences for defendants who admit guilt, and included a sentencing credit for 'acceptance of responsibility' that has functioned as a discount for waiving trial." King, Nancy J., et al., "When Process Affects Punishment: Differences in Sentences After Guilty Plea, Bench Trial, and Jury Trial in Five Guidelines States," 959 Colum. Law R. 961 (2005).

It is difficult to comprehend the disparity of why Dr. Azmat faced a potential sentence comparable to those imposed on violent or dangerous offenders, which was three to four-and-a-half times greater than the largest sentence imposed on any of

49

his charged co-conspirators in terms other than a *sub silencio* imposition of the "trial tax" on Dr. Azmat. Even the reduced sentence imposed on Dr. Azmat by the district court was still more than double that of the largest sentence imposed on any of his charged co-conspirators. The disparity in sentences certainly exceeds anything contemplated by application of the guidelines alone.

The only rational explanation is that Dr. Azmat was punished for his decision to exercise his Sixth Amendment rights. It is not enough to say that in the post-*United States v. Booker*, 543 U.S. 220 (2005) era the trial court has the authority to impose a non-Guidelines sentence if it so chooses; the admonition of *United States v. Crosby*, 397 F3d. 103 (2d Cir. 2005), to judges in this Circuit to consider the guidelines was far from an invitation to smuggle prohibited considerations into sentencing calculations. The Ninth Circuit's *dicta* on avoiding the appearance of punishing a defendant for exercising her Sixth Amendment rights is instructive: "The courts must not use sentencing power as a carrot and stick to clear congested calendars, and they must not create the appearance of such a practice.'" *Stockwell*, 472 F.2d at 1187.

"The 'augmentation of sentence' based on a defendant's decision to 'stand on [his] right to put the Government to its proof rather than plead guilty' is clearly improper." *Araujo*, 539 F.2d at 291-92. There is ample evidence—eleven years'

worth—to suggest that occurred in this case. Justice requires, at the very least, a remand.

The trial tax is an issue worth reviewing separate from the reasonableness of a sentence. The defendant acknowledges that imposition of the trial tax likely yields a sentence that does not survive reasonableness review as established in a *United States v. Booker*, 543 U.S. 220, 245 (2005). But he asks a question different than Booker and its progeny. Reasonableness review questions whether the punishment fits the crime. A sentence imposed for a prohibited reason is certainly substantively and procedurally unreasonable. But when trial courts, the busiest guardians of fundamental rights, begin to impose sentences based upon the very exercise of the rights they are designed to protect, an odious and peculiar wrong occurs. Hence, the Dr. Azmat raises this issue separate and apart from the reasonableness of his sentence based on the obvious and unmistakable fact that the district court imposed a severe sentence based upon her exercise of his fundamental rights.

## VI. <u>Reversal Is Warranted Based Upon Prosecutorial Misconduct</u>

Throughout the trial, the government engaged in numerous instances of misconduct to the prejudice of Dr. Azmat. As the former Fifth Circuit Court of Appeals recognized, "[i]n a close case, appeals to prejudice take on added weight. When the scales of justice may tip either way and a man's liberty lies in the balance, courts must be especially vigilant to protect an accused." *Crocklin v. United States*,

252 F.2d 561, 562-63 (5th Cir. 1958).

During its cross-examination of Dr. Azmat's expert and sole witness, the prosecution intentionally stated that Dr. Azmat had graduated from medical school in Pakistan. (Doc. 388, 860-61). Although the district denied defense counsel's motion for mistrial, it referred to the statement as a "low blow." (Doc. 388, 869).

The prosecution's injection of the fact that Dr. Azmat is from Pakistan or was educated in Pakistan was improper and highly prejudicial. Other courts have found similar conduct to constitute reversible error. In *United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992), the Second Circuit Court of Appeals reversed the defendant's conviction for conspiracy to possess cocaine with intent to distribute where a government expert testified that the area where the drug transactions took place had "a very high Hispanic population," including "Dominican[s]," holding that "Injection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial…" *Id.* at 664. Similarly, in *United States v. Vue*, 13 F.3d 1206 (8th Cir. 1994), where the government introduced expert testimony regarding the propensity of certain ethnic groups to engage in drug smuggling, the Eight Circuit Court of Appeals held that "[t] he error here was indeed of constitutional dimension, because the injection of ethnicity into the trial clearly invited the jury to put the [defendants'] racial and cultural background into the balance in determining their guilt." *Id.* at 1213.

The prosecution's continuous eliciting testimony from the individuals who organized and operated East Health Center as being from "South Florida" (Doc. 385, 110; 386, 202, 216, 288, 353, 358, 384; 387, 569, 571), culminating in its "Mafia" reference to Dr. Azmat being "cynical" and no better than "all those wannabe wise guys from south Florida" (Doc. 389, 944), during closing argument was also improper and prejudicial. In *United States v. Love*, 534 F.2d 87 (6th Cir. 1976), in which the defendant National Account System employee was tried for communicating threats to injure another person in violation of 18 U.S.C. § 875(c), the Sixth Circuit Court of Appeals found harmful, reversible error where an attorney for the prosecution asked a question to the defendant similar to the government's statement in this case. *Id.* at 89. The Court found that "[t]he government strike force attorney's question whether the National Account System was part of another organization 'of ill character like Mafia or anything like that' injected into the trial a highly prejudicial suggestion that [the defendant] was part of a widely publicized enterprise reputedly involved in organized crime." *Id.*

The government's misconduct in injecting improper considerations into the trial of Dr. Azmat was harmful and prejudiced Dr. Azmat in an otherwise defensible and close case. Such misconduct supports reversal of his convictions.

53

## VII. <u>Reversal Is Warranted Based Upon Cumulative Error</u>

Assuming, *arguendo*, that the issues raised in Issues I through V herein are not held to be reversible standing alone, Dr. Azmat submits that the cumulative error so prejudiced Dr. Azmat's right to a fair trial that reversal is warranted. *See United States v. Preciado-Cordoboas*, 981 F.2d 1206 (11th Cir. 1993); *United States v. Adams*, 74 F.3d 1093 (11th Cir. 1996).

## <u>CONCLUSION</u>

For the reasons set forth herein, this Court should reverse Defendant-Appellant's conviction.

Respectfully submitted, this 14th day of November, 2014.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because it contains 13,083 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*

55

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing filing was this day served by the undersigned by depositing with a commercial carrier, for delivery within three days, for filing and service, served on the following persons at the following addresses:

**R. Brian Tanner**
**Jeffrey J. Buerstatte**
**James D. Durham**
**E. Gregory Gilluly, Jr.**
**Karl I. Knoche**
**Brian T. Rafferty**
**Edward J. Tarver**
**United States Attorney's Office**
22 Barnard Street
Suite 300
Savannah, Georgia 31401

This 14th day of November, 2014.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*