IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 14-13703-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NAJAM AZMAT,

Defendant-Appellant.

## APPENDIX VOLUME I

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone: 912-447-8400
Facsimile:   912-629-6347
twithers@gwllawfirm.com

*Attorney for Defendant-Appellant
Najam Azmat*

# TABLE OF CONTENTS

## <u>VOLUME I</u>

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

DISTRICT COURT DOCKET SHEET . . . . . . . . . . . . . . . . . . . . . . . . . B

INDICTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUPERSEDING INDICTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

GOVERNMENT'S DISCLOSURE OF EXPERT TESTIMONY
PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE
16(A)(1)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

DR. AZMAT'S DAUBERT MOTION TO EXCLUDE GOVERNMENT
EXPERT'S DR. GENE KENNDY AND MARTIN ZDANOWICZ
AND REQUEST FOR AN EVIDENTIARY HEARING. . . . . . . . . . . . . 241

DR. AZMAT'S SUPPLEMENT TO MOTION TO EXCLUDE
GOVERNMENT EXPERTS DR. GENE KENNEDY AND MARTIN
ZDANOWICZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

ORDER ON DR. AZMAT'S MOTIONS TO EXCLUDE
GOVERNMENT EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

GOVERNMENT'S RESPONSE TO COURT ORDER OF
DECEMBER 27, 2013 CONCERNING REALIABILTY OF
PROPOSED EXPERT TESTIMONY. . . . . . . . . . . . . . . . . . . . . . . . . . . 297

COURT'S MINUTES FROM TRIAL (1/13/2014). . . . . . . . . . . . . . . . . 304

DR. AZMAT'S MOTION FOR JUDGMENT OF ACQUITTAL
PURSUANT TO FED. R. CRIM. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . 307

## VOLUME II

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

VERDICT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320

DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF
ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR
NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

DEFENDANT NAJAM AZMAT'S SUPPLEMENTAL MOTION FOR
JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE,
MOTION FOR NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

ORDER ON DEFENDANT AZMAT'S MOTION FOR JUDGMENT
OF ACQUITTAL OR, IN THE ALTERANTIVE, MOTION FOR
NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

DEFENDANT AZMAT'S SENTENCING MEMORANDUM
REGARDING THE GUIDELINE FOR OXYCODONE. . . . . . . . . . . . . 354

DEFENDANT AZMAT'S SECOND SENTENCING
MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .359

SENTENCING MINUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 362

JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

NOTICE OF APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .369

SENTENCING TRANSCRIPT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

## VOLUME III

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 1 . . . . . . . . . . . . . . . 385

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 2 . . . . . . . . . . . . . . . 386

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 3 . . . . . . . . . . . . . . . 387

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 4 . . . . . . . . . . . . . . . 388

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 5 . . . . . . . . . . . . . . . 389

CERTIFICATE OF SERVICE

Case: 14-13703    Date Filed: 11/19/2014    Page: 5 of 250

APPEAL,CLOSED

# U.S. District Court
## Southern District of Georgia (Savannah)
### CRIMINAL DOCKET FOR CASE #: 4:13-cr-00028-WTM-GRS-4

Case title: USA v. Clark et al

Date Filed: 02/07/2013
Date Terminated: 08/08/2014

Assigned to: Judge William T. Moore, Jr
Referred to: Magistrate Judge G. R. Smith

Appeals court case number: 14-13703-E Eleventh Circuit

## Defendant (4)

**Najam Azmat**
*TERMINATED: 08/08/2014*
*also known as*
Dr. Hazmat
*TERMINATED: 08/08/2014*

represented by **David M. Burns , Jr.**
The Law Office of David M. Burns, Jr., PC
102 E. Liberty Street
8th FL
Savannah, GA 31401
912-233-2570
Fax: 912-231-9157
Email: attorneydavidburns@gmail.com
*TERMINATED: 04/26/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Thomas A. Withers**
Gillen Withers & Lake, LLC
P.O. Box 10164
Savannah, GA 31412
912-447-8400
Fax: 912-629-6347
Email: twithers@gwllawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

## Pending Counts

21 USC 846 - Conspiracy

## Disposition

Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a

| | |
|---|---|
| (1s) | term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (2s-13s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (14s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (15s-17s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (18s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (19s-25s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (26s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (27s-28s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful | Defendant is hereby committed to the custody of the USBOP for a total term |

| | |
|---|---|
| Dispensation of Controlled Substances (29s) | of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 21 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (30s-50s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |
| 18 USC 1956(a)(1)(A)(i) - Conspiracy to Launder Monetary Instruments (52s) | Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00 |

## Highest Offense Level (Opening)

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 12 USC 846 - Conspiracy (1) | Dismissed |
| 21 USC 856(a)(1) - Maintaining Drug-Involved Premises (2) | Dismissed |
| 12 USC 841(a)(1) - Unlawful Dispensation of Controlled Substances (3-51) | Dismissed |
| 18 USC 1956(a)(1)(A)(i) - Conspiracy to Launder Monetary Instruments (53) | Dismissed |

## Highest Offense Level (Terminated)

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

## surety
**Deborah Ruffino**

**surety**

**Sameena Azmat**

---

**Plaintiff**

**USA**                              represented by  **Karl Irving Knoche**
                                                    U.S. Attorney's Office - Savannah
                                                    P.O. Box 8970
                                                    Savannah, GA 31412
                                                    912-652-4422
                                                    Fax: 912-652-4388
                                                    Email: karl.knoche@usdoj.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Brian T. Rafferty**
                                                    U.S. Attorney's Office - Savannah
                                                    P.O. Box 8970
                                                    Savannah, GA 31412
                                                    912-201-2575
                                                    Fax: 912-652-4388
                                                    Email: brian.rafferty@usdoj.gov

                                                    **E. Gregory Gilluly , Jr.**
                                                    U.S. Attorney's Office - Savannah
                                                    P.O. Box 8970
                                                    Savannah, GA 31412
                                                    912-652-4422
                                                    Fax: 912-652-4388
                                                    Email: greg.gilluly@usdoj.gov
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Edward J. Tarver**
                                                    U.S. Attorney's Office - Savannah
                                                    P.O. Box 8970
                                                    Savannah, GA 31412
                                                    912-652-4422
                                                    Fax: 912-652-4388
                                                    Email: Edward.Tarver@usdoj.gov

                                                    **James D. Durham**
                                                    U.S. Attorney's Office - Savannah
                                                    P.O. Box 8970
                                                    Savannah, GA 31412
                                                    912-652-4422
                                                    Fax: 912-652-4388
                                                    Email: james.durham@usdoj.gov

                                                    **Jeffrey J. Buerstatte**

U.S. Attorney's Office - Savannah
P.O. Box 8970
Savannah, GA 31412
912-652-4422
Fax: 912-652-4388
Email: jeff.buerstatte@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/24/2011 | 40 | Docket report for MJ411-43 as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras. (mah) (Entered: 03/18/2013) |
| 07/07/2011 | 41 | Docket Report for MJ411-56 as to Sean Michael Clark, Daniel John Wise, Najam Azmat, Shelly Lynn Morford. (mah) (Entered: 03/18/2013) |
| 02/07/2013 | 1 | MOTION to Seal Indictment by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. REFERRED to Judge G. R. Smith.(mah) (Entered: 02/08/2013) |
| 02/07/2013 | 2 | ORDER granting 1 Motion to Seal as to Sean Michael Clark (1), Adelaida M. Lizama (2), Daniel John Wise (3), Najam Azmat (4), Candace Anne Carreras (5), Shelly Lynn Morford (6). Signed by Magistrate Judge G. R. Smith on 2/7/2013. (mah) (Entered: 02/08/2013) |
| 02/07/2013 | 3 | SEALED INDICTMENT as to Sean Michael Clark (1) count(s) 1, 2, 53, Adelaida M. Lizama (2) count(s) 1, 2, 53, Daniel John Wise (3) count(s) 1, 2, 52, 53, Najam Azmat (4) count(s) 1, 2, 3-51, 53, Candace Anne Carreras (5) count(s) 1, 2, 53, Shelly Lynn Morford (6) count(s) 1, 2, 53. (mah) (Additional attachment(s) added on 2/8/2013: # 1 Foreperson signature page) (mah). (Entered: 02/08/2013) |
| 02/07/2013 | 4 | PENALTY CERTIFICATION by Government as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. (mah) (Entered: 02/08/2013) |
| 02/07/2013 | 5 | DEFENDANT INFORMATION SHEETS as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. (mah) (Entered: 02/08/2013) |
| 02/26/2013 | 6 | MOTION to Unseal Indictment by USA. REFERRED to Judge G. R. Smith. (mah) (Entered: 02/26/2013) |
| 02/26/2013 | 7 | ORDER granting 6 Motion to Unseal Indictment. Signed by Magistrate Judge G. R. Smith on 2/26/2013. (mah) (Entered: 02/26/2013) |
| 02/26/2013 | 8 | Minute Entry for proceedings held before Magistrate Judge G. R. Smith:Initial Appearance as to Najam Azmat held on 2/26/2013 (Court Reporter FTR.) (sff) (Entered: 02/26/2013) |
| 02/26/2013 | | ORAL MOTION to Appoint Counsel by Najam Azmat. REFERRED to Judge |

| | | |
|---|---|---|
| | | G. R. Smith.(sff) (Entered: 02/26/2013) |
| 02/26/2013 | | ORAL ORDER granting ORAL Motion to Appoint Counsel as to Najam Azmat (4) (sff) (Entered: 02/26/2013) |
| 02/26/2013 | | ORAL MOTION for PRETRIAL Detention by Karl Irving Knoche as to Najam Azmat. REFERRED to Judge G. R. Smith.(sff) (Entered: 02/26/2013) |
| 02/26/2013 | 10 | CJA 23 Financial Affidavit by Najam Azmat. (mah) (Entered: 02/26/2013) |
| 02/26/2013 | | Attorney update in case as to Najam Azmat. Attorney David M. Burns, Jr. for Najam Azmat added. (sff) (Entered: 02/26/2013) |
| 02/27/2013 | 12 | NOTICE OF HEARING as to Najam Azmat. Detention Hearing set for 2/28/2013 09:00 AM in Savannah - Mag Jud Courtroom before Magistrate Judge G. R. Smith. (sff) (Entered: 02/27/2013) |
| 02/28/2013 | 19 | Minute Entry for proceedings held before Magistrate Judge G. R. Smith:Detention Hearing as to Najam Azmat held on 2/28/2013; COURT ORDERS PRETRIAL DETENTION (Court Reporter FTR.) (sff) (Entered: 02/28/2013) |
| 02/28/2013 | | ORAL ORDER granting ORAL MOTION FOR PRETRIAL DETENTION as to Najam Azmat (4) (sff) (Entered: 02/28/2013) |
| 02/28/2013 | 20 | GOVERNMENT'S EXHIBIT LIST as to Najam Azmat. (mah) (Entered: 02/28/2013) |
| 03/04/2013 | 30 | CJA 20 as to Najam Azmat: Appointment of Attorney David M. Burns, Jr. Signed by Magistrate Judge G. R. Smith on 02/26/2013. (lmm) (Entered: 03/04/2013) |
| 03/05/2013 | 33 | NOTICE OF ATTORNEY APPEARANCE: David M. Burns, Jr. appearing for Najam Azmat (Burns, David) (Entered: 03/05/2013) |
| 03/11/2013 | 38 | First MOTION for Bond *Reconsideration* by David M. Burns, Jr. as to Najam Azmat. Responses due by 3/25/2013. (Burns, David) (Entered: 03/11/2013) |
| 03/12/2013 | | MOTION as to Najam Azmat REFERRED to Magistrate Judge: 38 First MOTION for Bond. (mah) (Entered: 03/12/2013) |
| 03/12/2013 | 39 | NOTICE OF HEARING as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Shelly Lynn Morford. Arraignment set for 3/25/2013 09:00 AM in Savannah - Mag Jud Courtroom before Magistrate Judge G. R. Smith. (sff) (Entered: 03/12/2013) |
| 03/19/2013 | 43 | ORDER OF DETENTION PENDING TRIAL as to Najam Azmat. Signed by Magistrate Judge G. R. Smith on 3/19/2013. (mah) (Entered: 03/19/2013) |
| 03/19/2013 | 44 | MOTION to Allow Disclosure of Documents Under Seal by Karl Irving Knoche as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Responses due by 4/1/2013. (Attachments: # 1 Text of Proposed Order)(Knoche, Karl) (Entered: 03/19/2013) |
| | | |

| 03/19/2013 | | MOTION as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford REFERRED to Magistrate Judge: 44 MOTION to Allow Disclosure of Documents Under Seal. (mah) (Entered: 03/19/2013) |
|---|---|---|
| 03/20/2013 | 45 | ORDER granting 44 Motion to Allow Disclosure of Documents under Seal. Signed by Magistrate Judge G. R. Smith on 3/20/2013. (mah) (Entered: 03/20/2013) |
| 03/21/2013 | 47 | RESPONSE in Opposition by USA as to Najam Azmat re 38 First MOTION for Bond *Reconsideration* (Knoche, Karl) (Entered: 03/21/2013) |
| 03/25/2013 | 49 | Minute Entry for proceedings held before Magistrate Judge G. R. Smith:Arraignment as to Sean Michael Clark (1) Count 1,2,53 and Adelaida M. Lizama (2) Count 1,2,53 and Daniel John Wise (3) Count 1,2,52,53 and Najam Azmat (4) Count 1,2,3-51,53 and Shelly Lynn Morford (6) Count 1,2,53 held on 3/25/2013; BOND REMAINS AS PREVIOUSLY SET FOR CLARK, LIZAMA, WISE & MORFORD WITH ADDITIONAL CONDITIONS; AZMAT REMAINS UNDER DETENTION (Court Reporter FTR.) (sff) (Entered: 03/25/2013) |
| 03/25/2013 | | ORAL MOTION for Extension of Time FOR 50 ADDITIONAL DAYS to File PRETRIAL MOTIONS by Julie M. Wade, Robert N. Nye, III, David M. Burns, Jr as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Shelly Lynn Morford. REFERRED to Judge G. R. Smith.(sff) (Entered: 03/25/2013) |
| 03/25/2013 | | ORAL ORDER granting ORAL Motion for Extension of Time FOR 50 ADDITIONAL DAYS to File PRETRIAL MOTIONS as to Sean Michael Clark (1), Adelaida M. Lizama (2), Daniel John Wise (3), Najam Azmat (4), Shelly Lynn Morford (6) (sff) (Entered: 03/25/2013) |
| 03/25/2013 | | ORAL ORDER denying 38 Motion for Bond as to Najam Azmat (4) (sff) (Entered: 03/25/2013) |
| 03/25/2013 | 50 | SCHEDULING ORDER as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Shelly Lynn Morford. Motions due by 5/24/2013. Signed by Magistrate Judge G. R. Smith on 3/25/13. (jgb) (Entered: 03/25/2013) |
| 04/01/2013 | 56 | NOTICE OF ATTORNEY APPEARANCE: Thomas A. Withers appearing for Najam Azmat (Withers, Thomas) (Entered: 04/01/2013) |
| 04/02/2013 | 57 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Najam Azmat ( Filing fee $ 37 receipt number 113J-1379555.) (Attachments: # 1 Exhibit A)(Withers, Thomas) (Entered: 04/02/2013) |
| 04/09/2013 | 59 | MOTION for Leave of Absence as to Najam Azmat for dates of : 04/12/13 - 04/15/13. Responses due by 4/22/2013. (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 04/09/2013) |
| 04/09/2013 | 60 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Detention Hearing as to Najam Azmat held on February 28, 2013, before Judge G. R. Smith. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. |

| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 4/30/2013. Redacted Transcript Deadline set for 5/10/2013. Release of Transcript Restriction set for 7/8/2013. (Cowart, Marie) (Entered: 04/09/2013) |
|---|---|---|
| 04/09/2013 | 61 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 04/09/2013) |
| 04/09/2013 | 62 | MOTION for Discovery by Karl Irving Knoche as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Responses due by 4/22/2013. (Knoche, Karl) (Entered: 04/09/2013) |
| 04/09/2013 | | MOTION as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford REFERRED to Magistrate Judge: 62 MOTION for Discovery. (mah) (Entered: 04/09/2013) |
| 04/10/2013 | 63 | ORDER granting 59 Motion for Leave of Absence as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 4/10/2013. (mah) (Entered: 04/10/2013) |
| 04/16/2013 | 68 | RESPONSE by USA as to Najam Azmat re 57 Appeal of Magistrate Judge Decision to District Court (Knoche, Karl) (Entered: 04/16/2013) |
| 04/17/2013 | 69 | ORDER granting request to enter a limited appearance re 56 Notice of Attorney Appearance filed by Thomas A. Withers for Najam Azmat. Signed by Magistrate Judge G. R. Smith on 4/16/2013. (mah) (Entered: 04/17/2013) |
| 04/19/2013 | 70 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 04/19/2013) |
| 04/26/2013 | 71 | NOTICE OF ATTORNEY APPEARANCE: Thomas A. Withers appearing for Najam Azmat (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 04/26/2013) |
| 04/26/2013 | 72 | RESPONSE by Najam Azmat re 68 Response *Reply to Government's Response* (Attachments: # 1 Exhibit A)(Withers, Thomas) (Entered: 04/26/2013) |
| 04/29/2013 | 73 | NOTICE OF HEARING as to Najam Azmat. Hearing on Appeal to the District Court for Review of Detention Order set for 5/6/2013 at 10:15 AM in Savannah - 3rd Floor before Judge William T. Moore, Jr.(jgb) (Entered: 04/29/2013) |
| 04/29/2013 | 74 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 04/29/2013) |
| 05/06/2013 | 75 | WITNESS LIST by Najam Azmat (jgb) (Entered: 05/06/2013) |

| 05/06/2013 | 76 | EXHIBIT LIST by Najam Azmat (jgb) (Entered: 05/06/2013) |
|---|---|---|
| 05/06/2013 | 77 | Minute Entry for proceedings held before Judge William T. Moore, Jr.: Hearing on Appeal to the District Court for Review of Detention Order as to Najam Azmat held on 5/6/2013. Court will issue a written decision. (Court Reporter Marie Cowart.) (jgb) (Entered: 05/06/2013) |
| 05/09/2013 | 78 | ORDER re 57 Appeal of Magistrate Judge Decision to District Court filed by Najam Azmat. The Court holds that Defendant is entitled to bond. Signed by Judge William T. Moore, Jr. on 5/9/2013. (mah) (Entered: 05/09/2013) |
| 05/10/2013 | 79 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 05/10/2013) |
| 05/10/2013 | 80 | CLERK'S CERTIFICATE/ORDER of cash deposit as to Najam Azmat. (Entered: 05/10/2013) |
| 05/13/2013 | 81 | ADDRESS AFFIDAVIT by Najam Azmat. (mah) (Entered: 05/13/2013) |
| 05/13/2013 | 82 | Appearance Bond Entered as to Najam Azmat in amount of $ 100,000.00, secured by 5%. (mah) (Entered: 05/13/2013) |
| 05/13/2013 | 83 | ORDER Setting Conditions of Release as to Najam Azmat (4): $100,000.00 secured by 5%. Signed by Magistrate Judge G. R. Smith on 5/13/2013. (mah) (Entered: 05/13/2013) |
| 05/23/2013 | 91 | MOTION for Release of Brady Materials by Robert N. Nye, III as to Daniel John Wise. Responses due by 6/6/2013. (Nye, Robert) Modified on 5/24/2013 (mah). (Entered: 05/23/2013) |
| 05/24/2013 | 105 | ******* MOTION for Disclosure *of Seized Evidence the Government Intends to Reply Upon at Trial*, MOTION for Extension of Time to File *A Motion to Suppress Said Evidence and Memorandum of Law* by Thomas A. Withers as to Najam Azmat. Responses due by 6/6/2013. (Withers, Thomas) (Entered: 05/24/2013) |
| 05/24/2013 | 106 | MOTION for Release of Brady Materials by Thomas A. Withers as to Najam Azmat. Responses due by 6/6/2013. (Withers, Thomas) (Entered: 05/24/2013) |
| 05/24/2013 | 107 | MOTION for Discovery *and Inspection* by Thomas A. Withers as to Najam Azmat. Responses due by 6/6/2013. (Withers, Thomas) (Entered: 05/24/2013) |
| 05/24/2013 | 108 | MOTION for Disclosure *of Evidence of Other Crimes, Wrongs or Acts Pursuant to Fed. R. Evid. 404(b)* by Thomas A. Withers as to Najam Azmat. Responses due by 6/6/2013. (Withers, Thomas) (Entered: 05/24/2013) |
| 05/24/2013 | | MOTIONS as to Najam Azmat REFERRED to Magistrate Judge: 106 MOTION for Release of Brady Materials , 108 MOTION for Disclosure *of Evidence of Other Crimes, Wrongs or Acts Pursuant to Fed. R. Evid. 404(b)*, 107 MOTION for Discovery *and Inspection*, 105 MOTION for Disclosure *of Seized Evidence the Government Intends to Reply Upon at Trial, MOTION for Extension of Time to File A Motion to Suppress. (mah) (Entered: 05/24/2013)* |
| 05/24/2013 | 115 | MOTION to Dismiss *Count Two of the Indictment* by Thomas A. Withers as |

| | | |
|---|---|---|
| | | to Najam Azmat. Responses due by 6/10/2013. (Withers, Thomas) (Entered: 05/24/2013) |
| 05/28/2013 | | MOTION as to Najam Azmat REFERRED to Magistrate Judge: 115 MOTION to Dismiss *Count Two of the Indictment. (mah) (Entered: 05/28/2013)* |
| 06/13/2013 | 129 | NOTICE to Counsel as to Najam Azmat. (mah) (Entered: 06/13/2013) |
| 07/01/2013 | 131 | MOTION for Leave of Absence as to Najam Azmat for dates of : 07/26/2013 - 08/05/2013. Responses due by 7/15/2013. (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 07/01/2013) |
| 07/03/2013 | 132 | ORDER granting 131 Motion for Leave of Absence by Thomas A. Withers as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 07/03/2013. (lmm) (Entered: 07/03/2013) |
| 07/07/2013 | 133 | GOVERNMENT'S RESPONSE to Motions as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford re 106 MOTION for Release of Brady Materials , 99 MOTION to Strike *Surplusage*, 102 First MOTION to Adopt motions of other defendants *with Proposed Order*, 101 MOTION for Bill of Particulars , 87 MOTION for Extension of Time to File *Additional Motions*, 91 MOTION for Release of Brady Materials , 108 MOTION for Disclosure *of Evidence of Other Crimes, Wrongs or Acts Pursuant to Fed. R. Evid. 404(b)*, 97 First MOTION for Extension of Time to Declare case complex, 100 MOTION to Suppress *Statements to Grand Jury*, 111 MOTION for Release of Brady Materials , 104 First MOTION for Witness List, 117 MOTION to Reveal any Agreement, Deal or Consideration , 94 MOTION for Discovery , 124 First MOTION to Dismiss *with Proposed Order*, 93 MOTION for Disclosure *Under LR 12.3*, 95 MOTION for Disclosure *Early Disclosure of Criminal Histories*, 110 MOTION to Adopt motions of other defendants , 113 MOTION for Jencks Material , 118 MOTION to Suppress *Statements By Defendant to Law Enforcement*, 107 MOTION for Discovery *and Inspection*, 112 MOTION for Discovery , 98 First MOTION to Sever Defendant, 92 MOTION to Adopt motions of other defendants , 109 First MOTION for Release of Brady Materials , 89 MOTION for Release of Brady Materials , 105 MOTION for Disclosure *of Seized Evidence the Government Intends to Reply Upon at Trial* MOTION for Extension of Time to File *A Motion to Suppress Said Evidence and Memorandum of Law*, 116 MOTION for Disclosure *of Information and Witnesses*, 114 MOTION for Disclosure *of Evidence of other Crimes, Wrongs or Acts*, 90 MOTION for Disclosure *404b*, 96 First MOTION for Bill of Particulars. (Knoche, Karl) Modified on 7/8/2013 (mah). (Entered: 07/07/2013) |
| 07/12/2013 | 137 | ORDER granting 97 Motion to Designate Case as Complex and to Exclude Time Under the Speedy Trial Act by Sean Michael Clark (1). Accordingly, Defendants' speedy trial clock shall be tolled until further order of this Court. Signed by Judge William T. Moore, Jr. on 7/12/2013. (mah) (Entered: 07/12/2013) |
| 07/26/2013 | 155 | NOTICE OF HEARING as to Sean Michael Clark, Adelaida M. Lizama, |

| | | |
|---|---|---|
| | | Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Motion/Evidentiary Hearing set for 8/19/2013 09:00 AM in Savannah - Mag Jud Courtroom before Magistrate Judge G. R. Smith. (sff) (Entered: 07/26/2013) |
| 08/07/2013 | 156 | SUPERSEDING INDICTMENT as to Sean Michael Clark (1) Count(s) 1s, 52s, Adelaida M. Lizama (2) Count(s) 1s, 52s, Daniel John Wise (3) Count(s) 1s, 51s, 52s, Najam Azmat (4) Count(s) 1s, 2s-50s, 52s, Candace Anne Carreras (5) Count(s) 1s, 52s, Shelly Lynn Morford (6) Count(s) 1s, 52s. (mah) (Additional attachment(s) added on 8/9/2013: # 1 Signature Page) (mah). (Entered: 08/09/2013) |
| 08/07/2013 | 157 | PENALTY CERTIFICATION by Government as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. (mah) (Entered: 08/09/2013) |
| 08/07/2013 | 158 | DEFENDANT INFORMATION SHEETS as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. (mah) (Entered: 08/09/2013) |
| 08/14/2013 | 162 | NOTICE OF HEARING as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Arraignment ON SUPERSEDING INDICTMENT set for 8/19/2013 09:00 AM in Savannah - Mag Jud Courtroom before Magistrate Judge G. R. Smith. (sff) (Entered: 08/14/2013) |
| 08/15/2013 | 167 | NOTICE OF HEARING RESCHEDULING as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Shelly Lynn Morford. Motion/Evidentiary Hearing RESET for 9/10/2013 09:00 AM in Savannah - Mag Jud Courtroom before Magistrate Judge G. R. Smith. (sff) (Entered: 08/15/2013) |
| 08/16/2013 | 168 | ******* MOTION for Waiver of Appearance at Arraignment by Thomas A. Withers as to Najam Azmat. Responses due by 8/29/2013. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order B)(Withers, Thomas) (Entered: 08/16/2013) |
| 08/16/2013 | | MOTION as to Najam Azmat REFERRED to Magistrate Judge: 168 MOTION for Waiver of Appearance at Arraignment. (mah) (Entered: 08/16/2013) |
| 08/16/2013 | | ORAL ORDER granting 168 Motion FOR ACCEPTANCE OF WAIVER OF PERSONAL APPEARANCE AT ARRAIGNMENT as to Najam Azmat (4) (sff) (Entered: 08/16/2013) |
| 08/19/2013 | 175 | Minute Entry for proceedings held before Magistrate Judge G. R. Smith:Arraignment as to Sean Michael Clark (1) Count 1s,52s and Adelaida M. Lizama (2) Count 1s,52s and Daniel John Wise (3) Count 1s,51s,52s and Najam Azmat (4) Count 1s,2s-50s,52s and Candace Anne Carreras (5) Count 1s,52s and Shelly Lynn Morford (6) Count 1s,52s held on 8/19/2013 (Court Reporter FTR.) (sff) (Entered: 08/19/2013) |
| 08/19/2013 | 178 | ORDER as to Najam Azmat re 168 MOTION for Entry of Plea of Not Guilty |

| | | |
|---|---|---|
| | | and Waiver of Appearance at Arraignment . Follows oral order of 8/16/2013. Signed by Magistrate Judge G. R. Smith on 8/19/2013. (mah) (Entered: 08/19/2013) |
| 09/06/2013 | 192 | MOTION to Modify Conditions of Release by Thomas A. Withers as to Najam Azmat. Responses due by 9/19/2013. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Withers, Thomas) (Entered: 09/06/2013) |
| 09/06/2013 | | MOTION as to Najam Azmat REFERRED to Magistrate Judge: 192 MOTION to Modify Conditions of Release. (mah) (Entered: 09/06/2013) |
| 09/06/2013 | | Motions No Longer Referred as to Najam Azmat: 192 MOTION to Modify Conditions of Release. (mah) (Entered: 09/06/2013) |
| 09/09/2013 | 194 | ORDER granting 192 Motion to Modify Conditions of Release as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 9/9/13. (jgb) (Entered: 09/10/2013) |
| 09/10/2013 | 195 | Minute Entry for proceedings held before Magistrate Judge G. R. Smith:Evidentiary Hearing as to Sean Michael Clark, Adelaida M. Lizama, Najam Azmat held on 9/10/2013, Motion Hearing as to Sean Michael Clark, Adelaida M. Lizama, Najam Azmat held on 9/10/2013 re 118 MOTION to Suppress Statements By Defendant to Law Enforcement filed by Adelaida M. Lizama (Court Reporter FTR.) (sff) (Entered: 09/10/2013) |
| 09/11/2013 | 199 | NOTICE OF HEARING as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Pretrial Conference set for 9/23/2013 at 3:00 PM in Savannah - 3rd Floor Courtroom before Judge William T. Moore, Jr. (jgb) (Entered: 09/11/2013) |
| 09/12/2013 | | NOTICE that docket 200 Notice of Hearing Rescheduling was docketed in error, the pretrial conference is still scheduled for 9/23/13 @ 3:00 p.m. (jgb) (Entered: 09/12/2013) |
| 09/16/2013 | 203 | MINUTE ORDER denying 104 Motion for Witness List as to Sean Michael Clark (1); granting 89 Motion for Release of Brady Materials as to Adelaida M. Lizama (2); granting 90 Motion for Disclosure as to Adelaida M. Lizama (2); granting 93 Motion for Disclosure as to Adelaida M. Lizama (2); granting 94 Motion for Discovery as to Adelaida M. Lizama (2); granting 95 Motion for Disclosure as to Adelaida M. Lizama (2); denying 99 Motion to Strike as to Adelaida M. Lizama (2); taking under advisement 100 Motion to Suppress as to Adelaida M. Lizama (2); taking under advisement 118 Motion to Suppress as to Adelaida M. Lizama (2); granting 106 Motion for Release of Brady Materials as to Najam Azmat (4). Signed by Magistrate Judge G. R. Smith on 9/16/2013. (sff) (Entered: 09/16/2013) |
| 09/16/2013 | 214 | ORDER finding as moot 62 Motion for Discovery as to Sean Michael Clark (1), Adelaida M. Lizama (2), Najam Azmat (4), Candace Anne Carreras (5), Shelly Lynn Morford (6). Finding as moot 96 Motion for Bill of Particulars; 98 Motion to Sever Defendant; 102 Motion to Adopt; 109 Motion for Release of Brady Materials; 124 Motion to Dismiss; and 165 Motion for Release of Brady Materials as to Sean Michael Clark (1). Finding as moot 101 Motion for |

| | | |
|---|---|---|
| | | Bill of Particulars as to Adelaida M. Lizama (2). Finding as moot 105 Motion for Disclosure; 105 Motion for Extension of Time to File; 107 Motion for Discovery; 108 Motion for Disclosure; and 115 Motion to Dismiss as to Najam Azmat (4). Finding as moot 112 Motion for Discovery as to Shelly Lynn Morford (6). Signed by Magistrate Judge G. R. Smith on 9/16/2013. (mah) (Entered: 09/20/2013) |
| 09/18/2013 | 210 | MOTION to Travel *UNOPPOSED* by Thomas A. Withers as to Najam Azmat. Responses due by 10/3/2013. (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 09/18/2013) |
| 09/18/2013 | | MOTIONS as to Najam Azmat REFERRED to Magistrate Judge: 210 MOTION to Travel *UNOPPOSED* (jgb) (Entered: 09/18/2013) |
| 09/20/2013 | 213 | ORDER granting 210 Motion to Travel as to Najam Azmat (4). Signed by Magistrate Judge G. R. Smith on 9/20/2013. (mah) (Entered: 09/20/2013) |
| 09/23/2013 | 216 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motions and Evidentiary Hearing as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford held on September 10, 2013, before Judge G. R. Smith. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/15/2013. Redacted Transcript Deadline set for 10/24/2013. Release of Transcript Restriction set for 12/23/2013. (Cowart, Marie) (Entered: 09/23/2013) |
| 09/23/2013 | 218 | Minute Entry for proceedings held before Judge William T. Moore, Jr.:Pretrial Conference as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford held on 9/23/2013. (Court Reporter Marie Cowart.) (jgb) (Entered: 09/24/2013) |
| 09/24/2013 | 217 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 09/24/2013) |
| 09/26/2013 | 223 | NOTICE *of Expert Testimony* by USA (Knoche, Karl) (Entered: 09/26/2013) |
| 09/27/2013 | 224 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 09/27/2013) |
| 10/10/2013 | 231 | MOTION for Leave of Absence as to Najam Azmat for dates of : 10/31/13 - 11/08/2013. Responses due by 10/24/2013. (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 10/10/2013) |
| 10/15/2013 | 233 | ORDER granting 231 Motion for Leave of Absence as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 10/14/13. (jgb) (Entered: 10/15/2013) |
| 10/15/2013 | 234 | MOTION to Travel by Thomas A. Withers as to Najam Azmat. Responses due by 10/28/2013. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order |

| | | |
|---|---|---|
| | | Proposed Order)(Withers, Thomas) (Entered: 10/15/2013) |
| 10/15/2013 | | MOTION as to Najam Azmat REFERRED to Magistrate Judge: 234 MOTION to Travel. (mah) (Entered: 10/15/2013) |
| 10/16/2013 | 236 | ORDER denying 234 Motion to Travel as to Najam Azmat (4). Signed by Magistrate Judge G. R. Smith on 10/16/2013. (mah) (Entered: 10/16/2013) |
| 10/18/2013 | 239 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Najam Azmat ( Filing fee $ 37 receipt number 113J-1487263.) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Withers, Thomas) (Entered: 10/18/2013) |
| 10/18/2013 | 240 | ORDER ON APPEAL OF MAGISTRATE JUDGE DECISION TO DISTRICT JUDGE as to Najam Azmat re 239 Appeal of Magistrate Judge Decision to District Court. Defendant's request is granted. Signed 10/18/2013 by Judge William T. Moore, Jr. (mah) (Entered: 10/21/2013) |
| 10/25/2013 | 241 | Daubert Motion *to Exclude Government Experts Drs. Kennedy and Zdanowicz and Request for Evidentiary Hearing* by Thomas A. Withers as to Najam Azmat. Responses due by 11/7/2013. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Withers, Thomas) Modified on 10/25/2013 (mah). (Entered: 10/25/2013) |
| 10/25/2013 | | MOTION as to Najam Azmat REFERRED to Magistrate Judge: 241 Daubert Motion *to Exclude Government Experts Drs. Kennedy and Zdanowicz and Request for Evidentiary Hearing. (mah) (Entered: 10/25/2013)* |
| 11/01/2013 | 243 | NOTICE OF HEARING as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Pretrial Conference set for 11/13/2013 at 3:00 PM in Savannah - 3rd Floor COURTROOM before Judge William T. Moore, Jr. (jgb) (Entered: 11/01/2013) |
| 11/13/2013 | 250 | Minute Entry for proceedings held before Judge William T. Moore, Jr.:Pretrial Conference as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford held on 11/13/2013. (Court Reporter Marie Cowart.) (jgb) (Entered: 11/13/2013) |
| 11/13/2013 | 251 | NOTICE OF HEARING as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Jury Selection and Jury Trial set for 1/13/2014 at 9:00 AM in Savannah - 3rd Floor before Judge William T. Moore, Jr. (jgb) (Entered: 11/13/2013) |
| 11/15/2013 | 257 | MOTION in Limine *to Exclude Cross-Examination of DEA Special Agent Douglas Kahn Regarding Unfounded Allegations of Impropriety* by E. Gregory Gilluly, Jr as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford. Responses due by 11/29/2013. (Gilluly, E.) (Entered: 11/15/2013) |
| 11/18/2013 | 258 | MOTION in Limine *to Exclude Any Reference at Trial Concerning Punishment or Plea Agreements for Persons Not Called as Government Witnesses at Trial* by E. Gregory Gilluly, Jr as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne |

| | | Carreras, Shelly Lynn Morford. Responses due by 12/2/2013. (Gilluly, E.) (Entered: 11/18/2013) |
|---|---|---|
| 11/19/2013 | 260 | Supplemental MOTION to Exclude *Government Experts Dr. Gene Kennedy and Martin Zdanowicz* by Thomas A. Withers as to Najam Azmat. Responses due by 12/2/2013. (Withers, Thomas) (Entered: 11/19/2013) |
| 11/19/2013 | 262 | RESPONSE in Opposition by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford re 246 Second MOTION to Adopt motions of other defendants *with Proposed Order*, 241 MOTION Daubert Motion *to Exclude Government Expert's Drs. Kennedy and Zdanowicz and Request for Evidentiary Hearing*, 260 Supplemental MOTION to Exclude *Government Experts Dr. Gene Kennedy and Martin Zdanowicz*, 245 MOTION to Adopt motions of other defendants *Dr. Azmat's Daubert Motion to Exclude Government's Experts Kennedy and Zdanowicz*, 244 Second MOTION to Adopt motions of other defendants *to Exclude Expert Witnesses* (Knoche, Karl) (Entered: 11/19/2013) |
| 11/20/2013 | | Motions No Longer Referred as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford: 246 Second MOTION to Adopt motions of other defendants *with Proposed Order*, 245 MOTION to Adopt motions of other defendants *Dr. Azmat's Daubert Motion to Exclude Government's Experts Kennedy and Zdanowicz*, 244 Second MOTION to Adopt motions of other defendants *to Exclude Expert Witnesses*, 241 MOTION Daubert Motion *to Exclude Government Expert's Drs. Kennedy and Zdanowicz and Request for Evidentiary Hearing* (jgb) (Entered: 11/20/2013) |
| 11/25/2013 | 263 | MOTION to Travel *UNOPPOSED* by Thomas A. Withers as to Najam Azmat. Responses due by 12/9/2013. (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 11/25/2013) |
| 11/26/2013 | 264 | ORDER granting 263 Motion to Travel as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 11/26/13. (jgb) (Entered: 11/26/2013) |
| 11/26/2013 | 265 | NOTICE *Of Intent to File a Reply to Government's Response to Motion in Limine to Exclude Government's Experts* by Najam Azmat re 262 Response in Opposition. (Withers, Thomas) (Entered: 11/26/2013) |
| 12/02/2013 | 268 | RESPONSE in Opposition by Najam Azmat re 258 MOTION in Limine *to Exclude Any Reference at Trial Concerning Punishment or Plea Agreements for Persons Not Called as Government Witnesses at Trial* (Withers, Thomas) (Entered: 12/02/2013) |
| 12/02/2013 | 269 | RESPONSE in Opposition by Najam Azmat re 257 MOTION in Limine *to Exclude Cross-Examination of DEA Special Agent Douglas Kahn Regarding Unfounded Allegations of Impropriety* (Withers, Thomas) (Entered: 12/02/2013) |
| 12/02/2013 | 270 | REPLY TO RESPONSE to Motion by Najam Azmat re 241 MOTION Daubert Motion *to Exclude Government Expert's Drs. Kennedy and Zdanowicz and Request for Evidentiary Hearing*, 260 Supplemental MOTION to Exclude *Government Experts Dr. Gene Kennedy and Martin Zdanowicz* |

| | | |
|---|---|---|
| | | (Withers, Thomas) (Entered: 12/02/2013) |
| 12/02/2013 | 271 | NOTICE *of Dr. Azmat's Expert Witness Disclosure* by Najam Azmat (Withers, Thomas) (Entered: 12/02/2013) |
| 12/02/2013 | 272 | NOTICE *of Dr. Azmat's First Supplement to Expert Witness Disclosure* by Najam Azmat re 271 Notice (Other) (Attachments: # 1 Supplement CV) (Withers, Thomas) (Entered: 12/02/2013) |
| 12/11/2013 | 275 | Writ of Habeas Corpus ad Testificandum Issued. Signed by Magistrate Judge G. R. Smith on 12/11/2013. (mah) (Entered: 12/11/2013) |
| 12/12/2013 | 277 | NOTICE *Government's Brady-Giglio Notice* by USA (Knoche, Karl) (Entered: 12/12/2013) |
| 12/13/2013 | 279 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 12/13/2013) |
| 12/18/2013 | 281 | Proposed Voir Dire by USA as to Daniel John Wise, Najam Azmat, Shelly Lynn Morford (Knoche, Karl) (Entered: 12/18/2013) |
| 12/18/2013 | 283 | Request to Charge by USA as to Daniel John Wise, Najam Azmat, Shelly Lynn Morford (Knoche, Karl) (Entered: 12/18/2013) |
| 12/18/2013 | 284 | Request to Charge by Najam Azmat (Withers, Thomas) (Entered: 12/18/2013) |
| 12/18/2013 | 285 | Proposed Voir Dire by Najam Azmat (Withers, Thomas) (Entered: 12/18/2013) |
| 12/19/2013 | 287 | MOTION to Travel *UNOPPOSED* by Thomas A. Withers as to Najam Azmat. Responses due by 1/2/2014. (Attachments: # 1 Text of Proposed Order Order) (Withers, Thomas) (Entered: 12/19/2013) |
| 12/20/2013 | 288 | ORDER granting 287 Motion to Travel as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 12/20/13. (jgb) (Entered: 12/20/2013) |
| 12/20/2013 | 293 | NOTICE of Conflict as to Najam Azmat. (mah) (Entered: 12/27/2013) |
| 12/23/2013 | 289 | CERTIFICATE OF DISCLOSURE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Knoche, Karl) (Entered: 12/23/2013) |
| 12/27/2013 | 292 | ORDER granting 246 Motion to Adopt; denying in part 241 Motion to Exclude Experts; denying 260 Supplemental Motion to Exclude as to Daniel John Wise (3) and Najam Azmat (4). The Government is directed to file a supplemental response on or before 1/6/2014. Signed by Judge William T. Moore, Jr. on 12/27/2013. (mah) (Entered: 12/27/2013) |
| 12/27/2013 | | Set/Reset Deadlines as to Daniel John Wise, Najam Azmat: Response due by 1/6/2014. (mah) (Entered: 12/27/2013) |
| 12/30/2013 | 294 | ORDER deferring ruling on 257 Motion in Limine as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 12/30/2014. (mah) (Entered: 12/30/2013) |
| | | |

| 01/03/2014 | 295 | ORDER granting 258 Motion in Limine as to Daniel John Wise (3), Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 1/3/2014. (mah) (Entered: 01/03/2014) |
| 01/05/2014 | 296 | MOTION in Limine by Thomas A. Withers as to Najam Azmat. Responses due by 1/20/2014. (Withers, Thomas) (Entered: 01/05/2014) |
| 01/06/2014 | 297 | RESPONSE by USA as to Sean Michael Clark, Adelaida M. Lizama, Daniel John Wise, Najam Azmat, Candace Anne Carreras, Shelly Lynn Morford (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Knoche, Karl) (Entered: 01/06/2014) |
| 01/08/2014 | 298 | RESPONSE by USA as to Najam Azmat re 296 MOTION in Limine (Gilluly, E.) (Entered: 01/08/2014) |
| 01/10/2014 | 299 | ORDER granting in part and dismissing as moot in part 296 Motion in Limine as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 1/10/2014. (mah) (Entered: 01/10/2014) |
| 01/10/2014 | 300 | ORDER denying 241 Motion to Exclude Government Experts as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 1/10/2014. (mah) (Entered: 01/10/2014) |
| 01/10/2014 | 301 | NOTICE *Government's Second Brady Notice* by USA (Knoche, Karl) (Entered: 01/10/2014) |
| 01/11/2014 | 302 | CERTIFICATE OF DISCLOSURE by USA as to Najam Azmat (Knoche, Karl) (Entered: 01/11/2014) |
| 01/13/2014 | 303 | Minute Entry for proceedings held before Judge William T. Moore, Jr.:Voir Dire begun on 1/13/2014 Najam Azmat (4) on Count 1s,2s-50s,52s. (Court Reporter Marie Cowart.) (jgb) (Entered: 01/14/2014) |
| 01/13/2014 | 304 | (Day 1) Minute Entry for proceedings held before Judge William T. Moore, Jr.:Jury Selection and Jury Trial as to Najam Azmat held on 1/13/2014. (Court Reporter Marie Cowart.) (jgb) (Entered: 01/14/2014) |
| 01/13/2014 | 309 | WITNESS LIST by USA as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/13/2014 | 310 | EXHIBIT LIST by USA as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/13/2014 | 311 | WITNESS LIST by Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/13/2014 | 312 | EXHIBIT LIST by Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/13/2014 | 313 | Jury Impaneled as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/14/2014 | 305 | (Day 2) Minute Entry for proceedings held before Judge William T. Moore, Jr.:Jury Trial as to Najam Azmat held on 1/14/2014. (Court Reporter Marie Cowart.) (jgb) (Entered: 01/15/2014) |
| 01/15/2014 | 306 | (Day 3) Minute Entry for proceedings held before Judge William T. Moore, Jr.:Jury Trial as to Najam Azmat held on 1/15/2014. (Court Reporter Marie Cowart.) (jgb) (Entered: 01/16/2014) |
| 01/16/2014 | 307 | MOTION for Acquittal *Pursuant to Fed. R. Crim. P. 29* by Thomas A. |

| | | |
|---|---|---|
| | | Withers as to Najam Azmat. Responses due by 1/30/2014. (Withers, Thomas) (Entered: 01/16/2014) |
| 01/16/2014 | 308 | (Day 4) Minute Entry for proceedings held before Judge William T. Moore, Jr.:Jury Trial as to Najam Azmat held on 1/16/2014. (Court Reporter Marie Cowart.) (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 314 | Minute Entry for proceedings held before Judge William T. Moore, Jr.:Jury Trial as to Najam Azmat held on 1/17/2014. (Court Reporter Marie Cowart.) (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 315 | Jury Notes #1 as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 316 | Jury Note #2 as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 317 | Court's response to Jury Notes as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 318 | ORDER to disburse to the establishment which provided the meal to the jury as to Najam Azmat. Signed by Judge William T. Moore, Jr. on 1/17/14. (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 319 | Jury Charge as to Najam Azmat (jgb) (Entered: 01/17/2014) |
| 01/17/2014 | 320 | JURY VERDICT as to Najam Azmat (4) Guilty on Count 1s,2s-50s,52s. (jgb) (Entered: 01/17/2014) |
| 01/28/2014 | 321 | MOTION for Reconsideration *of Bond Pending Sentencing* by Thomas A. Withers as to Najam Azmat. Responses due by 2/10/2014. (Withers, Thomas) (Entered: 01/28/2014) |
| 01/31/2014 | 324 | ******* MOTION for Judgment NOV *(Renewed) and*, MOTION for New Trial by Thomas A. Withers as to Najam Azmat. Responses due by 2/13/2014. (Withers, Thomas) (Entered: 01/31/2014) |
| 02/05/2014 | 325 | RESPONSE to Motion by USA as to Najam Azmat re 321 MOTION for Reconsideration *of Bond Pending Sentencing* (Knoche, Karl) (Entered: 02/05/2014) |
| 02/14/2014 | 326 | RESPONSE in Opposition by USA as to Najam Azmat re 324 MOTION for Judgment NOV *(Renewed) and* MOTION for New Trial (Knoche, Karl) (Entered: 02/14/2014) |
| 02/17/2014 | 327 | Defendant Azmat's NOTICE OF INTENT to file a reply to Government's response to 324 MOTION for Judgment NOV *(Renewed) and* MOTION for New Trial , 321 MOTION for Reconsideration *of Bond Pending Sentencing* (Withers, Thomas) Modified on 2/20/2014 (jgb). (Entered: 02/17/2014) |
| 02/19/2014 | 328 | REPLY TO RESPONSE to Motion by Najam Azmat re 321 MOTION for Reconsideration *of Bond Pending Sentencing* (Attachments: # 1 Exhibit A) (Withers, Thomas) (Additional attachment(s) added on 2/20/2014: # 2 Exhibit signed exhibit) (loh). (Entered: 02/19/2014) |
| 02/28/2014 | 329 | REPLY TO RESPONSE to Motion by Najam Azmat re 324 MOTION for Judgment NOV *(Renewed) and* MOTION for New Trial (Withers, Thomas) (Entered: 02/28/2014) |
| | | |

| 03/26/2014 | 330 | MOTION for Leave of Absence as to Najam Azmat for dates of : May 29, 2014 - June 3, 2014. Responses due by 4/14/2014. (Attachments: # 1 Text of Proposed Order Order)(Withers, Thomas) (Entered: 03/26/2014) |
| 03/28/2014 | 331 | ORDER granting 330 Motion for Leave of Absence as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 3/28/14. (jgb) (Entered: 03/28/2014) |
| 05/20/2014 | 334 | *******Supplemental MOTION for Acquittal *or in the Alternative*, MOTION for New Trial by Thomas A. Withers as to Najam Azmat. Responses due by 6/6/2014. (Withers, Thomas) (Entered: 05/20/2014) |
| 05/21/2014 | 335 | RESPONSE by USA as to Najam Azmat re 334 Supplemental MOTION for Acquittal *or in the Alternative* MOTION for New Trial (Gilluly, E.) (Entered: 05/21/2014) |
| 05/27/2014 | 336 | First MOTION to Modify Conditions of Release *to Allow Defendant's Relocation* by Robert P. Phillips, III as to Sean Michael Clark. Responses due by 6/13/2014. (Phillips, Robert) (Entered: 05/27/2014) |
| 06/06/2014 | 341 | ORDER denying 321 Motion for Reconsideration as to Najam Azmat (4); denying 324 Motion for Judgment NOV as to Najam Azmat (4); denying 324 Motion for New Trial as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 6/6/14. (jgb) (Entered: 06/06/2014) |
| 06/13/2014 | 342 | MOTION for Extension of Time to File Objections to Presentence Investigation Report *UNOPPOSED* by Thomas A. Withers as to Najam Azmat. Responses due by 6/30/2014. (Attachments: # 1 Text of Proposed Order Proposed Order)(Withers, Thomas) (Entered: 06/13/2014) |
| 06/13/2014 | 343 | ORDER granting 342 Motion for Extension of Time as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 6/13/14. (jgb) (Entered: 06/13/2014) |
| 06/26/2014 | 344 | MOTION for Leave of Absence as to Najam Azmat for dates of : 07/25/14-08/04/14. Responses due by 7/14/2014. (Attachments: # 1 Text of Proposed Order Proposed Order)(Withers, Thomas) (Entered: 06/26/2014) |
| 06/27/2014 | 345 | ORDER granting 344 Motion for Leave of Absence as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 6/27/14. (jgb) (Entered: 06/27/2014) |
| 07/22/2014 | 352 | NOTICE OF HEARING as to Najam Azmat. Sentencing set for 8/6/2014 at 3:00 PM in Savannah - 3rd Floor before Judge William T. Moore, Jr. (jgb) (Entered: 07/22/2014) |
| 07/30/2014 | 354 | SENTENCING MEMORANDUM by Najam Azmat (Withers, Thomas) (Entered: 07/30/2014) |
| 08/05/2014 | 359 | SENTENCING MEMORANDUM by Najam Azmat (Attachments: # 1 Exhibit U.S. Sentencing Commission News Release, # 2 Exhibit DOJ News Release, # 3 Exhibit Family & Friends Letters)(Withers, Thomas) (Entered: 08/05/2014) |

| | | |
|---|---|---|
| 08/06/2014 | 362 | Minute Entry for proceedings held before Judge William T. Moore, Jr.:Sentencing held on 8/6/2014 for Najam Azmat (4), Count(s) 1, 2, 3-51, 53, Dismissed; Count(s) 1s, 2s-50s, 52s, Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00. (Court Reporter Victoria Root.) (jgb) (Entered: 08/07/2014) |
| 08/06/2014 | 363 | WITNESS LIST by USA as to Najam Azmat (jgb) (Entered: 08/07/2014) |
| 08/06/2014 | 364 | SENTENCING AGREEMENT by USA, Najam Azmat. (jgb) (Entered: 08/07/2014) |
| 08/08/2014 | 367 | JUDGMENT as to Najam Azmat (4), Count(s) 1, 2, 3-51, 53, Dismissed; Count(s) 14s, 15s-17s, 18s, 19s-25s, 1s, 26s, 27s-28s, 29s, 2s-13s, 30s-50s, 52s, Defendant is hereby committed to the custody of the USBOP for a total term of 133 months; supervised release for a term of 3 years; standard/special conditions of supervision; assessment of $5,100.00. Signed by Judge William T. Moore, Jr. on 8/8/2014. (mah) (Entered: 08/13/2014) |
| 08/12/2014 | 365 | ******* MOTION to Release Bond Obligation , MOTION Release of Passports of Family Members by Thomas A. Withers as to Najam Azmat. Responses due by 8/29/2014. (Attachments: # 1 Text of Proposed Order Proposed Order)(Withers, Thomas) (Entered: 08/12/2014) |
| 08/14/2014 | 368 | ORDER granting 365 Motion to Release Bond Obligation as to Najam Azmat (4); granting 365 MOTION to Release Passports of Family Members as to Najam Azmat (4). Signed by Judge William T. Moore, Jr. on 8/13/14. (jgb) (Entered: 08/14/2014) |
| 08/18/2014 | 369 | NOTICE OF APPEAL by Najam Azmat re 367 Judgment, Filing fee $ 505, receipt number 113J-1651135. (Withers, Thomas) (Entered: 08/18/2014) |
| 08/19/2014 | 370 | Transmission of Notice of Appeal and Docket Sheet as to Najam Azmat to US Court of Appeals. Related Documents: 367 Judgment, 369 Notice of Appeal - Final Judgment. (WS) (Entered: 08/19/2014) |
| 08/19/2014 | 371 | USCA Case Number 14-13703-E for 369 Notice of Appeal - Final Judgment filed by Najam Azmat. (WS) (Entered: 08/20/2014) |
| 08/22/2014 | 374 | Notice of Post-Conviction Consultation Certification (Withers, Thomas) (Entered: 08/22/2014) |
| 08/27/2014 | 376 | TRANSCRIPT REQUEST by Najam Azmat for proceedings held on 7/13/2014-7/17/2014, 8/6/2014 before Judge William T. Moore, Jr. (mah) (Entered: 08/27/2014) |
| 08/28/2014 | 379 | TRANSCRIPT REQUEST by Najam Azmat - Court Reporter Acknowledgment. (Cowart) (mah) (Entered: 08/28/2014) |
| 08/28/2014 | 380 | TRANSCRIPT REQUEST by Najam Azmat - Court Reporter Acknowledgment. (Root) (mah) (Entered: 08/29/2014) |
| 09/03/2014 | 381 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT OF SENTENCING HEARING as to Najam Azmat held on August 6, 2014, before Judge William |

| | | |
|---|---|---|
| | | T. Moore, Jr. Court Reporter/Transcriber: Victoria L. Root, Telephone number (912) 650-4066. Tape Number: FTR. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 9/24/2014. Redacted Transcript Deadline set for 10/6/2014. Release of Transcript Restriction set for 12/2/2014. (Root, Victoria) (Entered: 09/03/2014) |
| 09/03/2014 | 382 | TRANSCRIPT REQUEST by Najam Azmat - Notification that transcript has been filed in District Court. (mah) (Entered: 09/03/2014) |
| 09/18/2014 | 384 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 "This being Volume 1A (Voir dire and Jury Selection)1/13/2014" as to Najam Azmat held on 01/13/2014, before Judge William T. Moore, Jr.. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/9/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/17/2014. (Overstreet, Becky) (Entered: 09/18/2014) |
| 09/18/2014 | 385 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 "This being Volume 1, 1/13/2014" as to Najam Azmat held on 01/13/2014, before Judge William T. Moore, Jr.. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/9/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/17/2014. (Overstreet, Becky) (Entered: 09/18/2014) |
| 09/18/2014 | 386 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 "This being Volume 2, 01/14/2014" as to Najam Azmat held on 01/14/2014, before Judge William T. Moore, Jr.. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/9/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/17/2014. (Overstreet, Becky) (Entered: 09/18/2014) |
| 09/18/2014 | 387 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 "This being Volume 3, 1/15/2014" as to Najam Azmat held on 01/15/2014, before Judge |

| | | |
|---|---|---|
| | | William T. Moore, Jr.. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/9/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/17/2014. (Overstreet, Becky) (Entered: 09/18/2014) |
| 09/18/2014 | 388 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 "This being Volume 4, 1/16/2014" as to Najam Azmat held on 01/16/2014, before Judge William T. Moore, Jr.. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/9/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/17/2014. (Overstreet, Becky) (Entered: 09/18/2014) |
| 09/18/2014 | 389 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 "This being Volume 5, 1/17/2014" as to Najam Azmat held on 01/17/2014, before Judge William T. Moore, Jr.. Court Reporter/Transcriber Marie Cowart, Telephone number 912-650-4066. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 10/9/2014. Redacted Transcript Deadline set for 10/20/2014. Release of Transcript Restriction set for 12/17/2014. (Overstreet, Becky) (Entered: 09/18/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/17/2014 10:06:44 | | |
| PACER Login: | gc0796:2737385:0 | Client Code: | Azmat |
| Description: | Docket Report | Search Criteria: | 4:13-cr-00028-WTM-GRS |
| Billable Pages: | 21 | Cost: | 2.10 |

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | INDICTMENT NO. **CR 4 1 3 - 0 2 8** |
| | ) | |
| v. | ) | VIO:  21 U.S.C. § 846 |
| | ) | Conspiracy |
| SEAN MICHAEL CLARK, | ) | |
| ADELAIDA M. LIZAMA, | ) | 21 U.S.C. § 856(a)(1) |
| DANIEL JOHN WISE, | ) | Maintaining Drug-Involved Premises |
| NAJAM AZMAT, | ) | |
|   AKA "DR. HAZMAT," | ) | 21 U.S.C. § 841(a)(1) |
| CANDACE ANNE CARRERAS, | ) | Unlawful Dispensation of |
| SHELLY LYNN MORFORD | ) | Controlled Substances |
| | ) | |
| | ) | 21 U.S.C. § 841(a)(1) |
| | ) | Distribution of Controlled Substance |
| | ) | |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | Conspiracy to Launder Monetary |
| | ) | Instruments |
| | ) | |
| | ) | 18 U.S.C. § 2 |
| | ) | Aiding and Abetting |
| | ) | |
| | ) | 21 U.S.C. § 853 |
| | ) | Forfeiture |
| | ) | |
| | ) | 18 U.S.C. § 982 |
| | ) | Forfeiture |

**THE GRAND JURY CHARGES:**

**INTRODUCTION**

At all times material to this Information:

1.  The Controlled Substances Act, 21 U.S.C. §§ 841 et. seq.(CSA) governs the

manufacture, distribution, and dispensing of controlled substances in the United States.  With

limited exceptions for medical professionals, the CSA makes it "unlawful for any person

knowingly or intentionally ... to manufacture, distribute, or dispense ... a controlled substance," or conspire to do so.

2. Medical practitioners authorized to prescribe or dispense controlled substances by the jurisdiction in which they are licensed to practice medicine are authorized under the CSA to write prescriptions for or otherwise dispense controlled substances if they are registered with the Attorney General of the United States. Such medical practitioners are each assigned a unique registration number by the Drug Enforcement Administration (DEA).

3. A controlled substance is prescribed by a medical practitioner (physician) in the usual course of a professional practice and, therefore, lawfully, if the substance is prescribed by the physician in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States. Under Chapter 21, Code of Federal Regulations, Section 1306.04(a), medical practitioners registered with the DEA cannot issue a prescription unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice .... An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research [is] not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, [is] subject to the penalties provided for violations of the provisions relating to controlled substances."

4. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and those controlled substances are then assigned to one of five schedules, Schedule I, II, III, IV, or V, depending on their potential for abuse,

2

likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

 5. The term "Schedule II" means that the drug or other substance has a high potential for abuse; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

 6. The term "Schedule III" means that the drug or other substance has a high potential for abuse less than the drugs listed in Schedule II; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

 7. The term "Schedule IV" means that the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule II; the drug or other substance has a currently accepted medical use in treatment; and abuse of the drug or other substances may lead to limited physical or psychological dependence relative to the drugs or substance in Schedule III.

 8. Pursuant to the CSA and its implementing regulations, oxycodone is the generic name for a highly addictive prescription analgesic (pain relieving medication). The use of oxycodone in any form can lead to physical and/or psychological dependence, and abuse of the drug may result in addiction. It is classified as a Schedule II Controlled Substance. It is sold generically or under a variety of brand names, including Roxicodone, OxyContin, and Percocet. If legally prescribed for a legitimate medical purpose, these drugs are typically used to treat moderate to severe pain. Oxycodone and other Schedule II drugs have a high potential for abuse. This abuse can lead to addiction, overdose, and sometimes death.

3

9. Pursuant to the CSA and its implementing regulations, hydrocodone is the generic name for an addictive prescription analgesic. The use of hydrocodone in any form can lead to physical and/or psychological dependence, and abuse of the agent may result in addiction. When combined with some other drugs, the combination is classified as a Schedule III Controlled Substance, and is sold generically or under a variety of brand names, including Vicodin, Lortab, Lorcet and Norco. When hydrocodone is legally prescribed for a legitimate medical purpose, it is typically used to combat moderate to moderately severe pain.

10. Pursuant to the CSA and its implementing regulations, alprazolam is classified as a Schedule IV Controlled Substance, and is sold generically or under the brand name Xanax. When prescribed for a legitimate medical purpose, it typically is used to treat anxiety disorder, panic disorder, and anxiety caused by depression.

11. The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery. The term "dispenser" means a practitioner who so delivers a controlled substance to an ultimate user or research subject. (21 U.S.C. § 802(10)).

12. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical. The term "distributor" means a person who so delivers a controlled substance or a listed chemical. (21 U.S.C. § 802(11)).

13. The term "doctor shopping" refers to the practice of a patient requesting care from multiple physicians without making efforts to coordinate care or informing the physicians of the

4

other prescribing physicians in order to divert the drugs to others or feed their own addiction to certain prescription drugs by faking or exaggerating the extent of their true condition, or both.

14. The term "sponsor," in reference to the "pill mill" community, is a person who pays for all expenses associated with another person's appointment at a pain clinic in exchange for all or a portion of the other person's medications after the appointment.

15. Defendant **SEAN MICHAEL CLARK**, who has no known medical education or background, was an organizer and a marketer for East Health Center. Among other activities, **CLARK** also established bank accounts for East Health Center.

16. Defendant **ADELAIDA M. LIZAMA**, who has no known medical education or background, was an organizer of East Health Center. Among other activities, **LIZAMA** incorporated East Health Center, established bank accounts, helped train East Health Center staff, and performed administrative duties.

17. Defendant **DANIEL JOHN WISE**, who has no known medical education or background, began as a marketer for East Health Center and later became its on-site manager.

18. Defendant **NAJAM AZMAT** was at all times during the course of the conspiracy a medical doctor, licensed by the State of Georgia and registered by the United States Drug Enforcement Administration and worked as a physician at East Health Center, located at 626 Highway 80, Garden City, Chatham County, Georgia.

19. Defendant **CANDACE ANNE CARRERAS**, who has no known medical education or background, helped train the East health Center staff, ordered supplies and furniture, and performed administrative and financial duties for East Health Center.

5

20. Defendant **SHELLY LYNN MORFORD**, who has no known medical education or background, was the receptionist at East Health Center and performed various administrative duties.

## COUNT ONE
## CONSPIRACY
## 21 U.S.C. §846

21. Paragraphs 1 through 20 of the General Allegations section of this Indictment are realleged and incorporated fully herein by reference.

22. From an unknown date, but at least as early as September 2009, up to and including in or about December 2011, in Chatham County, in the Southern District of Georgia, and elsewhere, the defendants herein,

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**NAJAM AZMAT,**
**  AKA "DR. HAZMAT,"**
**CANDACE ANNE CARRERAS,**
**SHELLY LYNN MORFORD,**

aided and abetted by each other and by other persons known and unknown, did knowingly and willfully combine, conspire, confederate and agree with other persons, both known and unknown, to commit the following offenses:

a) to knowingly and intentionally distribute and dispense, and cause to be distributed and dispensed, quantities of controlled substances, including oxycodone, a Schedule II Controlled Substance, hydrocodone, a Schedule III controlled substance, and alprazolam, a Schedule IV controlled substance, not for a legitimate medical purpose and not in the usual course of professional practice, contrary to Title 21, United States Code, Section 841(a)(1); and

6

b) to knowingly and intentionally open, lease, rent, use and maintain, and cause to be opened, leased, rented, used, and maintained, a certain place for the purpose of distributing dispensing controlled substances unlawfully, including oxycodone, a Schedule II controlled substance, hydrocodone, a Schedule III controlled substance, and alprazolam, a Schedule IV controlled substance contrary to Title 21, United States Code, Section 856(a)(1).

### PURPOSE AND OBJECT OF THE CONSPIRACY

23. It was the purpose and object of the conspiracy for the conspirators to enrich themselves by promoting, managing, and operating East Health Center, which unlawfully dispensed Schedule II, III, and IV controlled substances.

### MANNER AND MEANS OF THE CONSPIRACY

The manner and means of this conspiracy included the following:

24. The defendants operated and assisted in operating one or more nominal pain management facilities (pill mills) which dispensed controlled substances without any legitimate medical purpose.

25. Some members of the conspiracy gained experience in the workings of and management of pill mills in or about September 2009, and thereafter, when they began working at Margate Pain and Rejuvenation in Margate, Florida, a nominal pain management clinic in the Southern District of Florida.

26. Beginning in November 2009, some members of the conspiracy began managing and working at Palm Beach Pain and Rejuvenation in Boca Raton, Florida. Margate Pain and Rejuvenation and Palm Beach Pain and Rejuvenation were places that individuals could go to obtain controlled substances without a legitimate medical purpose. Margate Pain and

7

Rejuvenation and Palm Beach Pain and Rejuvenation mostly saw customers who lived outside of the State of Florida, particularly in the southeastern part of the United States. Customers at these clinics paid cash. The clinics did not accept payments from medical insurers. A high percentage of the customers at these clinics were drug addicts or drug seekers. Prescriptions were typically given for 210, 180, or 150 tablets of oxycodone, a Schedule II controlled substance, and for a large quantity of alprazolam, a Schedule IV controlled substance.

27. In or about December 2010, the conspirators, none of whom resided in the Southern District of Georgia, nor had any known connection thereto, met with each other and discussed opening East Health Center in the Southern District of Georgia in part because the Georgia laws dealing with pain clinics were less restrictive than those newly enacted in Florida and because it would be closer to their customer base.

28. In or about January 2011, the conspirators did knowingly open, lease, rent, use, operate and maintain, and cause to be opened, leased, rented, used, and maintained, East Health Center, located at 626 U.S. Highway 80, Garden City, Chatham County, Georgia, for the purpose of causing the unlawful dispensation of controlled substances. As with the Margate Pain and Rejuvenation and Palm Beach Pain and Rejuvenation clinics, East Health Center was a nominal "pain management clinic" which in fact was a pill mill engaged in the unlawful dispensation of Schedule II, III, and IV controlled substances. Prescriptions issued at East Health Center were done outside the usual course of professional practice and without legitimate medical purpose.

29. Members of the conspiracy marketed and advertised East Health Center by recruiting customers from other pill mills and by providing discounted rates to people who referred new customers to East Health Center.

8

30. In early 2011, conspirators opened bank accounts at SunTrust Bank and BB&T to promote and facilitate the criminal activity described herein.

31. In early 2011, conspirators hired employees and trained them on how to operate the pill mill.

32. Between February 2011 and May 2011, the conspirators employed medical doctors to work at East Health Center. The doctors who worked at East Health Center were typically paid cash at the end of each business day. The conspirators, by virtue of the medical licenses of doctors employed at the clinic, were able to provide to drug-seeking customers, prescriptions for schedule II, III and IV controlled substances. These customers were habituated to, and abusive users of, the controlled substances for which they obtained prescriptions. These prescriptions were issued for no legitimate medical reason and were prescribed in quantities greatly in excess of those which might be used for legitimate purposes.

33. The conspirators typically required an immediate payment of $250 to $350 as a clinic visit fee for new patients, typically in cash but at times by credit card. Follow-up patients were charged a visitation fee of $200 to $300. Neither medical insurance, checks, nor other forms of non-cash payment were accepted.

34. In order to create an appearance of legitimacy, new "patients" at the clinics were required to obtain or furnish magnetic resonance imaging ("MRI") reports before being allowed to be seen by a doctor.

35. Members of the conspiracy encouraged and accepted "sponsors" who brought one or more "patients" to subject pain clinics and paid for the patients' MRIs and all pain clinic fees in exchange for receiving all or a portion of the "patient's" prescription medications.

9

36. Members of the conspiracy distributed and dispensed, and cause to be distributed and dispensed, controlled substances that were not prescribed for a legitimate medical purpose, and not in the usual course of professional practice in one or more of the following manners:

a) inadequate verification of the patient's medical complaint;

b) cursory or no medical examinations by the attending doctors;

c) inadequate patient medical history and no follow-up verification;

d) incomplete or inadequate mental or physical examinations;

e) insufficient dialogue with the patients regarding treatment options and risks and benefits of such treatments;

f) treating patients with highly addictive controlled substances while failing to consider other treatment options;

g) failure to refer patients to specialists for treatment;

h) lack of, or inadequate diagnostic testing;

i) increasing the patients' dosages over time;

j) prescribing inappropriate combinations of drugs to patients;

k) allowing patients to suggest or direct the medications to be prescribed;

l) treating a large number of patients who resided either out of the state or long distances from East Health Center with prescriptions for highly addictive controlled substances;

m) directing patients to particular pharmacies that were known to fill the prescriptions;

n) prescribing highly addictive controlled substances to patients with vague physical complaints where alternative treatment options would be indicated;

o) failing to assess the risk of abuse by individual patients;

10

p) failing to monitor patients' responses to the medication; and

q) issuing prescriptions for highly addictive controlled substances for an inordinately high percentage of younger adult patients.

37. It was further part of the conspiracy that the defendant and other members of the conspiracy hid and concealed and caused others to hide and conceal the nature of the illegal activity and the acts committed in furtherance thereof.

38. Between February 2011 and up to and including May 26, 2011, members of the conspiracy prescribed and caused to be prescribed more than 4 million milligrams of oxycodone. During this same period, prescriptions were written for more than 480 "patients" who lived outside the state of Georgia, including more than 130 from Kentucky; more than 50 from North Carolina; more than 30 from South Carolina; and more than 80 from Florida.

All done in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Section 846.

### COUNT TWO
### MAINTAINING DRUG-INVOLVED PREMISES

**THE GRAND JURY FURTHER CHARGES:**

That from on or about January 1, 2011, continuing to on or about May 26, 2011, in Chatham County, within the Southern District of Georgia, the defendants herein,

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**NAJAM AZMAT,**
  **AKA "DR. HAZMAT,"**
**CANDACE ANNE CARRERAS, and**
**SHELLY LYNN MORFORD,**

11

aided and abetted by each other and by others known and unknown, knowingly and intentionally

opened and maintained a place known as East Health Center, located at 626 U.S. Highway 80,

Garden City, Georgia for the purpose of dispensing Schedule II, III and IV controlled substances

outside the usual course of professional practice and without legitimate medical purpose, in

violation of Title 21, United States Code, Section 856(a)(1).

## COUNTS THREE THROUGH FIFTY-ONE
## UNLAWFUL DISPENSATION OF CONTROLLED SUBSTANCES

### THE GRAND JURY FURTHER CHARGES THAT:

On each of the dates listed below, in Chatham County, within the Southern District of

Georgia, the defendant,

### NAJAM AZMAT,
### AKA "DR. HAZMAT,"

who at all times hereinafter mentioned was a medical doctor, licensed by the State of Georgia

and registered by the United States, aided and abetted by others known and unknown, including

the defendants

### SEAN MICHAEL CLARK,
### ADELAIDA M. LIZAMA,
### DANIEL JOHN WISE,
### CANDACE ANNE CARRERAS, and
### SHELLY LYNN MORFORD,

who as aiders and abettors are also criminally responsible for the offenses charged below, did,

outside the usual course of professional practice as a medical doctor and without legitimate

purpose relating to the practice of medicine, knowingly, intentionally and unlawfully dispense

the Schedule II, Schedule III, and Schedule IV controlled substances listed below, in violation of

Title 21, United States Code, Section 841 (a)(1):

12

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 3 | 02/21/2011 | Jim B. Frenchburg, KY | Oxycodone | 30mg | 180 | II |
| 4 | 02/21/2011 | Jim B. Frenchburg, KY | Oxycodone | 15mg | 60 | II |
| 5 | 02/21/2011 | George H. Frenchburg, KY | Oxycodone | 30 mg | 180 | II |
| 6 | 02/21/2011 | George H. Frenchburg, KY | Oxycodone | 15 mg | 60 | II |
| 7 | 02/21/2011 | Billy L. Kissimee, FL | Oxycodone | 30 mg | 180 | II |
| 8 | 02/21/2011 | Billy L. Kissimee, FL | Oxycodone | 15 mg | 60 | II |
| 9 | 02/21/2011 | Kim L. Kissimee, FL | Oxycodone | 30 mg | 60 | II |
| 10 | 02/21/2011 | Kim L. Kissimee, FL | Oxycodone | 15 mg | 60 | II |
| 11 | 02/21/2011 | David L. Kissimee, FL | Oxycodone | 30 mg | 90 | II |
| 12 | 02/21/2011 | David L. Kissimee, FL | Oxycodone | 15 mg | 30 | II |
| 13 | 02/21/2011 | Latina S. Frenchburg, KY | Oxycodone | 30 mg | 150 | II |
| 14 | 02/21/2011 | Latina S. Frenchburg, KY | Oxycodone | 15 mg | 30 | II |
| 15 | 02/21/2011 | Latina S. Frenchburg, KY | Xanax | 1 mg | 30 | IV |
| 16 | 02/25/2011 | James L. Lexington, KY | Oxycodone | 30 mg | 150 | II |
| 17 | 02/25/2011 | James L. Lexington, KY | Oxycodone | 15 mg | 60 | II |

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 18 | 02/28/2011 | Carlie C. Jackson KY | Oxycodone | 30mg | 150 | II |
| 19 | 02/28/2011 | Carlie C. Jackson KY | Hydrocodone | 10/325 | 60 | III |
| 20 | 02/28/2011 | Paul C. Jackson KY | Oxycodone | 30 mg | 150 | II |
| 21 | 02/28/2011 | Paul C. Jackson KY | Oxycodone | 15mg | 90 | II |
| 22 | 02/28/2011 | Tyrice H. Jacksonville, FL | Oxycodone | 30 mg | 150 | II |
| 23 | 02/28/2011 | Tyrice H. Jacksonville, FL | Oxycodone | 15 mg | 30 | II |
| 24 | 02/28/2011 | Danelle P. Jacksonville, FL | Oxycodone | 30 mg | 150 | II |
| 25 | 02/28/2011 | Danelle P. Jacksonville, FL | Oxycodone | 15 mg | 30 | II |
| 26 | 02/28/2011 | Brian S. Brunswick, GA | Oxycodone | 30 | 150 | II |
| 27 | 02/28/2011 | Brian S. Brunswick, GA | Xanax | 1 mg | 15 | IV |
| 28 | 03/01/2011 | Joseph B. Middleburg, FL | Oxycodone | 30 mg | 150 | II |
| 29 | 03/01/2011 | Joseph B. Middleburg, FL | Oxycodone | 15 mg | 60 | II |
| 30 | 03/01/2011 | Joseph B. Middleburg, FL | Xanax | 1 mg | 30 | IV |
| 31 | 03/01/2011 | James G. Bluffton, SC | Oxycodone | 30 mg | 150 | II |
| 32 | 03/02/2011 | Gary E. Barbourville KY | Oxycodone | 30 mg | 150 | II |

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 33 | 03/02/2011 | Gary E. Barbourville KY | Oxycodone | 15 mg | 30 | II |
| 34 | 03/03/2011 | Chris C. Winter Park, FL | Oxycodone | 30 mg | 150 | II |
| 35 | 03/03/2011 | Joshua M. Winter Park, FL | Oxycodone | 30 mg | 150 | II |
| 36 | 03/03/2011 | Joshua M. Winter Park, FL | Percocet | 10/325 | 60 | II |
| 37 | 3/08/2011 | Patricia R. Lexington, KY | Oxycodone | 30 mg | 150 | II |
| 38 | 03/08/2011 | Patricia R. Lexington, KY | Oxycodone | 15 mg | 60 | II |
| 39 | 03/08/2011 | Jessica R. Means, KY | Oxycodone | 30 mg | 150 | II |
| 40 | 03/08/2011 | Jessica R. Means, KY | Oxycodone | 15 mg | 60 | II |
| 41 | 03/09/2011 | Troy R. London, KY | Oxycodone | 30 mg | 150 | II |
| 42 | 03/09/2011 | Troy R. London, KY | Lorcet | 10/500 | 30 | II |
| 43 | 03/10/2011 | Barry H. Barbourville, KY | Oxycodone | 30 mg | 150 | II |
| 44 | 03/10/2011 | Jason J. Mansfield, Ohio | Oxycodone | 30 mg | 150 | II |
| 45 | 03/10/2011 | Jason J. Mansfield, Ohio | Oxycodone | 15 mg | 60 | II |
| 46 | 03/11/2011 | Sherry F. Lexington, KY | Oxycodone | 30 mg | 150 | II |
| 47 | 03/11/2011 | Sherry F. Lexington, KY | Oxycodone | 15 mg | 60 | II |

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 48 | 03/14/2011 | Nancy B. Morehead, KY | Oxycodone | 30 mg | 120 | II |
| 49 | 03/14/2011 | Nancy B. Morehead, KY | Oxycodone | 15 mg | 90 | II |
| 50 | 03/15/2011 | John K. Moncks Corner, SC | Oxycodone | 30 mg | 150 | II |
| 51 | 03/15/2011 | John K. Moncks Corner, SC | Percocet | 10/325 | 60 | II |

## COUNT FIFTY-TWO
## DISTRIBUTION OF CONTROLLED SUBSTANCE

**THE GRAND JURY FURTHER CHARGES:**

That on or about the 9th day of May 2011, in Chatham County, within the Southern

District of Georgia, the defendant herein:

**DANIEL JOHN WISE,**

did knowingly and intentionally distribute a mixture or substance containing a detectable amount

of oxycodone, a schedule II controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and (b)(1)(C).

## COUNT FIFTY-THREE
## CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS

**THE GRAND JURY FURTHER CHARGES:**

1.    Paragraphs 1 through 38 of the Introduction section and Count One of this

Indictment are realleged and incorporated fully herein by reference.

16

2.      From an unknown date, but at beginning at least on or about January 18, 2011 and

continuing through on or about May 26, 2011, in Chatham County, within the Southern District

of Georgia, and elsewhere, the defendants herein,

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**NAJAM AZMAT,**
**    AKA "DR. HAZMAT,"**
**CANDACE ANNE CARRERAS, and**
**SHELLY LYNN MORFORD,**

aided and abetted by each other and by others known and unknown, did knowingly and

intentionally combine, conspire, and agree with each other and with other persons known

and unknown, to conduct and attempt to conduct financial transactions affecting interstate

commerce, with funds which were proceeds of a specified unlawful activity, that is unlawful

dispensation of Schedule II, III, and IV controlled substances, not for a legitimate medical

purpose and not in the usual course of professional practice, in violation of Title 21 United States

Code, Sections 846 and 841(a)(1), and which the defendants knew to be the proceeds of some

form of unlawful activity, and did conspire to do so with the intent to promote the carrying on of

the aforesaid specified unlawful activity, in violation of Title 18, United States Code, Section

1956(a)(1)(A)(i).

## OVERT ACTS

In furtherance of the conspiracy, the conspirators committed and caused to be committed

in the Southern District of Georgia and elsewhere, financial transactions affecting interstate

commerce, using funds which were, and which the defendants knew to be, proceeds of the

unlawful dispensation of Schedule II, III, and IV controlled substances, including, but not limited to, the transactions shown below:

1. Between January 18, 2011 and February 25, 2011, conspirators made multiple deposits, by check and cash, to SunTrust Bank Account No. 1000133995083 ranging in amount from $6,000 to $29,000.

2. On or about February 28, 2011, conspirators closed SunTrust Bank Account No. 1000133995083 and withdrew the sum of $15,727.27, representing the balance of the account.

3. Between March 22, 2011 and May 25, 2011, conspirators made multiple cash deposits to BB&T Bank Account No. 0005242045442 ranging in amount from $20.00 to $9,622.00.

4. Between February 25, 2011 and May 18, 2011, conspirators made weekly salary payments by cash or check to **Sean Michael Clark** in amounts ranging between approximately $1,000 and $5,900.

5. Between February 11, 2011 and May 19, 2011, conspirators made weekly salary payments by cash or check to **Adelaida M. Lizama** in amounts ranging between approximately $500 and $1,850.

6. Between February 15, 2011 and May 19, 2011, defendants made weekly salary payments by cash or check to Adelard LeFrancois in amounts ranging between approximately $1,000 and $2,500.

7. Between February 19, 2011 and May 12, 2011, defendants made weekly salary payments by cash or check to **Daniel John Wise** in amounts ranging between $700 and $1,000.

18

8. Between February 19, 2011 and May 19, 2011, conspirators made weekly salary payments by cash or check to Konstantinos Afthinos in amounts ranging between approximately $500 and $600.

9. Between February 21, 2011 and May 18, 2011, conspirators made weekly salary payments by cash or check to Francis Barbuscia in amounts of approximately $1,000.

10. Between February 25, 2011 and May 18, 2011, conspirators made weekly salary payments by cash or check to **Candace Anne Carreras** in amounts ranging between approximately $400 and $1,000.

11. Between March 1, 2011 and March 18, 2011, defendants made daily salary payments by cash, check, or credit card to **Najam Azmat** in amounts ranging between approximately $1,000 and $2,000.

12. Between March 31, 2011 and May 12, 2011, defendants made weekly salary payments by cash or check to **Shelly Lynn Morford** in amounts of $600.

13. Between March 19, 2011 and May 25, 2011, defendants made daily salary payments by cash to Kenneth Gossett in amounts ranging between approximately $1,500 and $1,750.

14. Between April 4, 2011 and May 23, 2011, conspirators made payments by check in amounts ranging from $365.00 to $3,335.00 as "investor pay-backs" to Nuvest LLC.

15. Between March 1, 2011 and May 1, 2011, conspirators made periodic payments by cash and check to lease the premises located at 626 U.S. Highway 80, Garden City, Chatham County Georgia in which East Health Center was operated, and to rent a house located at 50 Crystal Lake Drive, Pooler, Chatham County, Georgia, where various conspirators, including

19

**Daniel John Wise, Shelly Lynn Morford**, and Konstantinos Afthinos resided from time to time during the course of the conspiracy.

    16. Between January 21, 2011, and May 25, 2011, conspirators engaged in numerous credit card transactions to promote the unlawful conspiracy.

    17. On or about May 26, 2011, **Adelaida M. Lizama** made a cash withdrawal of $5,000 from BB&T Bank Account no. 0005242045442 after a search warrant was executed at East Health Center.

    18. On or about May 26, 2011, **Sean Michael Clark** made a cash withdrawal of $9,500 from BB&T Bank Account no. 0005242045442 after a search warrant was executed at East Health Center.

    All done in violation of Title 18, United States Code, Sections 2 and 1956(h).

## FORFEITURE ALLEGATION

**THE GRAND JURY FURTHER CHARGES AND FINDS PROBABLE CAUSE:**

    **1.**    **Drug Trafficking Offenses:**

That upon conviction of one or more of the Title 21 offenses alleged in this indictment,

each punishable by imprisonment for more than one year, the defendants herein:

        **SEAN MICHAEL CLARK,**
        **ADELAIDA M. LIZAMA,**
        **DANIEL JOHN WISE,**
        **NAJAM AZMAT,**
            **AKA "DR. HAZMAT,"**
        **CANDACE ANNE CARRERAS, and**
        **SHELLY LYNN MORFORD,**

shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, all of

their right, title and interest in and to any property, real and personal,

        (1)      constituting, or derived from any proceeds the Defendants obtained, directly or

                  indirectly, as the result of such violation(s) of Title 21, United States Code, and all

                  property traceable to such property;

        (2)      used or intended to be used, in any manner or part, to commit or to facilitate the

                  commission of such violations of Title 21, United States Code.

    **2.**    **Money Laundering Offense:**

    A.      Upon conviction for the violations of Title 18, United States Code, Section

1956(h), as charged in Count Fifty-Three of this Indictment, the defendants herein:

        **SEAN MICHAEL CLARK,**
        **ADELAIDA M. LIZAMA,**
        **DANIEL JOHN WISE,**
        **NAJAM AZMAT,**
            **AKA "DR. HAZMAT,"**

21

**CANDACE ANNE CARRERAS, and**
**SHELLY LYNN MORFORD,**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), all

of their right, title and interest in and to any property, real and personal, involved in such offense,

and any property traceable to such property.

    **3.**    **Property:**

    A.    Pursuant to Title 21, United States Code, Sections 853(a)(1) and 853(a)(2), and

Title 18, United States Code, Section 982(a)(1), the property which is subject to forfeiture upon

conviction of the Defendants for offenses charged in this Indictment includes, but is not limited

to, the following property or property traceable to such property:

    (1)    <u>Proceeds / Personal Money Judgment:</u>

        (a)    A sum of money equal to all proceeds the Defendants obtained directly or

            indirectly as a result of the Title 21 offenses charged in this Indictment,

            and all property used or intended to be used to facilitate such offenses,

            and equal to the value of all property, and any property traceable to such

            property, involved in money laundering transactions conducted as part of

            the money laundering conspiracy charged in Count Fifty-Three of this

            Indictment, that is, a minimum of $365,000 in United States currency, and

            all interest and proceeds traceable thereto, in that such sum, in aggregate,

            was received by the defendants in exchange for the unlawful dispensation

            of controlled substances or is traceable thereto. If more than one

            defendant is convicted of an offense, the defendants so convicted are

22

jointly and severally liable for the amount subject to forfeiture under this
paragraph.

**4.** **Substitution of Assets:**

A.     If any of the property described above as being subject to forfeiture, as a
result of any act or omission of the Defendants –

        (1)     cannot be located upon the exercise of due diligence;

        (2)     has been transferred or sold to, or deposited with, a third person;

        (3)     has been placed beyond the jurisdiction of the Court;

        (4)     has been substantially diminished in value; or

        (5)     has been commingled with other property which cannot be subdivided
              without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and
Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the
said Defendant up to an amount equivalent to the value of the above-described forfeitable
property;

By virtue of the commission by the defendants of the Title 21 felony drug offenses or of
the Title 18 money laundering offense charged in this indictment, any and all interest the
defendants have in the property subject to forfeiture is vested in the United States and is hereby
forfeited to the United States pursuant to Title 21, United States Code, Section 853 and Title 18,
United States Code, Section 982(a)(1).

A True Bill.

_____
Edward J. Tarver
United States Attorney
Georgia Bar No. 698380

_____
James D. Durham
Assistant United States Attorney
Georgia Bar No. 235515

_____
E. Greg Gilluly, Jr.*
Assistant United States Attorney
Tennessee Bar No. 019397

_____
Brian T. Rafferty
Assistant United States Attorney
New York Bar No. 2809440

_____
Karl I. Knoche*
Assistant United States Attorney
Georgia Bar No. 426624

_____
Jeffrey J. Buerstatte*
Assistant United States Attorney
Georgia Bar No. 093416

\* counsel to be served

_____
foreperson

24

A True Bill.

_____

Edward J. Tarver
United States Attorney
Georgia Bar No. 698380

_____

James D. Durham
Assistant United States Attorney
Georgia Bar No. 233515

_____

E. Greg Gilluly, Jr.*
Assistant United States Attorney
Tennessee Bar No. 019397

_____

Brian T. Rafferty
Assistant United States Attorney
New York Bar No. 2809440

_____

Karl I. Knoche*
Assistant United States Attorney
Georgia Bar No. 426624

_____

Jeffrey J. Buerstatte*
Assistant United States Attorney
Georgia Bar No. 093416

* counsel to be served

_____
Foreperson

24

# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **SUPERSEDING** |
| | ) | **INDICTMENT NO. 413-028** |
| v. | ) | |
| | ) | **VIO: 21 U.S.C. § 846** |
| SEAN MICHAEL CLARK, | ) | **Conspiracy** |
| ADELAIDA M. LIZAMA, | ) | |
| DANIEL JOHN WISE, | ) | **21 U.S.C. § 841(a)(1)** |
| NAJAM AZMAT, | ) | **Unlawful Dispensation of** |
| AKA "DR. HAZMAT," | ) | **Controlled Substances** |
| CANDACE ANNE CARRERAS, and | ) | |
| SHELLY LYNN MORFORD | ) | **21 U.S.C. § 841(a)(1)** |
| | ) | **Distribution of Controlled Substance** |
| | ) | |
| | ) | **18 U.S.C. § 1956(h)** |
| | ) | **Conspiracy to Launder Monetary** |
| | ) | **Instruments** |
| | ) | |
| | ) | **18 U.S.C. § 2** |
| | ) | **Aiding and Abetting** |
| | ) | |
| | ) | **21 U.S.C. § 853** |
| | ) | **Forfeiture** |
| | ) | |
| | ) | **18 U.S.C. § 982** |
| | ) | **Forfeiture** |

**THE GRAND JURY CHARGES:**

## INTRODUCTION

At all times material to this Indictment:

1. The Controlled Substances Act, 21 U.S.C. §§ 841 et. seq.(CSA) governs the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA makes it "unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense ... a controlled substance," or conspire to do so.

2. Medical practitioners authorized to prescribe or dispense controlled substances by the jurisdiction in which they are licensed to practice medicine are authorized under the CSA to write prescriptions for or otherwise dispense controlled substances if they are registered with the Attorney General of the United States. Such medical practitioners are each assigned a unique registration number by the Drug Enforcement Administration (DEA).

3. A controlled substance is prescribed by a medical practitioner (physician) in the usual course of a professional practice and, therefore, lawfully, if the substance is prescribed by the physician in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States. Under Chapter 21, Code of Federal Regulations, Section 1306.04(a), medical practitioners registered with the DEA cannot issue a prescription unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice .... An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research [is] not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, [is] subject to the penalties provided for violations of the provisions relating to controlled substances."

4. The CSA and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and those controlled substances are then assigned to one of five schedules, Schedule I, II, III, IV, or V, depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

2

5. The term "Schedule II" means that the drug or other substance has a high potential for abuse; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

6. The term "Schedule III" means that the drug or other substance has a high potential for abuse less than the drugs listed in Schedule II; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

7. The term "Schedule IV" means that the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule II; the drug or other substance has a currently accepted medical use in treatment; and abuse of the drug or other substances may lead to limited physical or psychological dependence relative to the drugs or substance in Schedule III.

8. Pursuant to the CSA and its implementing regulations, oxycodone is the generic name for a highly addictive prescription analgesic (pain relieving medication). The use of oxycodone in any form can lead to physical and/or psychological dependence, and abuse of the drug may result in addiction. It is classified as a Schedule II Controlled Substance. It is sold generically or under a variety of brand names, including Roxicodone, OxyContin, and Percocet. If legally prescribed for a legitimate medical purpose, these drugs are typically used to treat moderate to severe pain. Oxycodone and other Schedule II drugs have a high potential for abuse. This abuse can lead to addiction, overdose, and sometimes death.

9. Pursuant to the CSA and its implementing regulations, hydrocodone is the generic name for an addictive prescription analgesic. The use of hydrocodone in any form can lead to physical and/or psychological dependence, and abuse of the agent may result in addiction. When

3

combined with some other drugs, the combination is classified as a Schedule III Controlled

Substance, and is sold generically or under a variety of brand names, including Vicodin, Lortab,

Lorcet and Norco. When hydrocodone is legally prescribed for a legitimate medical purpose, it is

typically used to combat moderate to moderately severe pain.

10. Pursuant to the CSA and its implementing regulations, alprazolam is classified as a

Schedule IV Controlled Substance, and is sold generically or under the brand name Xanax. When

prescribed for a legitimate medical purpose, it typically is used to treat anxiety disorder, panic

disorder, and anxiety caused by depression.

11. The term "dispense" means to deliver a controlled substance to an ultimate user or

research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and

administering of a controlled substance and the packaging, labeling or compounding necessary to

prepare the substance for such delivery. The term "dispenser" means a practitioner who so

delivers a controlled substance to an ultimate user or research subject. (21 U.S.C. § 802(10)).

12. The term "distribute" means to deliver (other than by administering or dispensing) a

controlled substance or a listed chemical. The term "distributor" means a person who so delivers a

controlled substance or a listed chemical. (21 U.S.C. § 802(11)).

13. The term "doctor shopping" refers to the practice of a patient requesting care from

multiple physicians without making efforts to coordinate care or informing the physicians of the

other prescribing physicians in order to divert the drugs to others or feed their own addiction to

certain prescription drugs by faking or exaggerating the extent of their true condition, or both.

14. The term "pill mill" means a nominal pain management facility which dispenses or

distributes controlled substances outside the usual course of professional practice and without

4

legitimate medical purpose. The term "sponsor," in reference to the "pill mill" community, is a person who pays for all expenses associated with another person's appointment at a nominal pain management facility in exchange for all or a portion of the other person's medications after the appointment.

15. Defendant **SEAN MICHAEL CLARK**, who has no known medical education or background, was an organizer and a marketer for East Health Center. Among other activities, **CLARK** also established bank accounts for East Health Center.

16. Defendant **ADELAIDA M. LIZAMA**, was an organizer of East Health Center. Among other activities, **LIZAMA** incorporated East Health Center, established bank accounts, helped train East Health Center staff, and performed administrative duties.

17. Defendant **DANIEL JOHN WISE**, who has no known medical education or background, began as a marketer for East Health Center and later became its on-site manager.

18. Defendant **NAJAM AZMAT** was at all times during the course of the conspiracy a medical doctor, licensed by the State of Georgia and registered by the United States Drug Enforcement Administration and worked as a physician at East Health Center, located at 626 Highway 80, Garden City, Chatham County, Georgia.

19. Defendant **CANDACE ANNE CARRERAS**, who has no known medical education or background, helped train the East health Center staff, ordered supplies and furniture, and performed administrative and financial duties for East Health Center.

20. Defendant **SHELLY LYNN MORFORD**, who has no known medical education or background, was the receptionist at East Health Center and performed various administrative duties.

5

## COUNT ONE
## CONSPIRACY
## 21 U.S.C. §846

21. Paragraphs 1 through 20 of the General Allegations section of this Indictment are realleged and incorporated fully herein by reference.

22. From an unknown date, but at least as early as September 2009, up to and including in or about December 2011, in Chatham County, in the Southern District of Georgia, and elsewhere, the defendants herein,

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**NAJAM AZMAT,**
   **AKA "DR. HAZMAT,"**
**CANDACE ANNE CARRERAS, and**
**SHELLY LYNN MORFORD,**

aided and abetted by each other and by other persons known and unknown, did knowingly and willfully combine, conspire, confederate and agree with other persons, both known and unknown, to knowingly and intentionally distribute and dispense, and cause to be distributed and dispensed, quantities of controlled substances, including oxycodone, a Schedule II Controlled Substance, hydrocodone, a Schedule III controlled substance, and alprazolam, a Schedule IV controlled substance, not for a legitimate medical purpose and not in the usual course of professional practice, contrary to Title 21, United States Code, Section 841(a)(1).

### PURPOSE AND OBJECT OF THE CONSPIRACY

23. It was the purpose and object of the conspiracy for the conspirators to enrich themselves by promoting, managing, and operating East Health Center, which unlawfully distributed and dispensed Schedule II, III, and IV controlled substances.

6

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means of this conspiracy included the following:

24. The defendants operated and assisted in operating one or more nominal pain management facilities (pill mills) which dispensed controlled substances without any legitimate medical purpose.

25. Some members of the conspiracy gained experience in the operation of and management of pill mills in or about September 2009, and thereafter, when they began working at Margate Pain and Rejuvenation in Margate, Florida, a nominal pain management clinic in the Southern District of Florida.

26. Beginning in November 2009, some members of the conspiracy began managing and working at Palm Beach Pain and Rejuvenation in Boca Raton, Florida. Margate Pain and Rejuvenation and Palm Beach Pain and Rejuvenation were places that individuals could go to obtain controlled substances without a legitimate medical purpose. Margate Pain and Rejuvenation and Palm Beach Pain and Rejuvenation mostly saw customers who lived outside of the State of Florida, particularly in the southeastern part of the United States. Customers at these clinics paid cash. The clinics did not accept payments from medical insurers. A high percentage of the customers at these clinics were drug addicts or drug seekers. Prescriptions were typically given for 210, 180, or 150 tablets of oxycodone, a Schedule II controlled substance, and for large quantities of alprazolam ("Xanax"), a Schedule IV controlled substance.

27. In or about December 2010, the conspirators, most of whom resided outside of the Southern District of Georgia, and had no known connection thereto, met with each other and discussed opening East Health Center in the Southern District of Georgia in part because the

7

Georgia laws dealing with pain clinics were less restrictive than those newly enacted in Florida and because it would be closer to their customer base.

28. In or about January 2011, the conspirators did knowingly open, lease, rent, use, and maintain, and cause to be opened, leased, rented, used, and maintained, East Health Center, located at 626 U.S. Highway 80, Garden City, Chatham County, Georgia, for the purpose of causing the unlawful dispensation of controlled substances. As with the Margate Pain and Rejuvenation and Palm Beach Pain and Rejuvenation clinics, East Health Center was a nominal pain management clinic which in fact was a pill mill engaged in the unlawful dispensation of Schedule II, III, and IV controlled substances. Prescriptions issued at East Health Center were done outside the usual course of professional practice and without legitimate medical purpose.

29. Members of the conspiracy marketed and advertised East Health Center by recruiting customers from other pill mills and by providing discounted rates to people who referred new customers to East Health Center.

30. In early 2011, conspirators opened bank accounts at SunTrust Bank and BB&T to promote and facilitate the criminal activity described herein.

31. In early 2011, conspirators hired employees and trained them on how to operate the pill mill.

32. Between on or about February 21, 2011 and through on or about May 26, 2011, the conspirators employed medical doctors to work at East Health Center. The doctors who worked at East Health Center were typically paid cash at the end of each business day. The conspirators, by virtue of the medical licenses of doctors employed at the clinic, were able to provide to drug-seeking customers, prescriptions for schedule II, III and IV controlled substances. These

8

prescriptions were issued for no legitimate medical reason and were prescribed in quantities greatly in excess of those which might be used for legitimate purposes.

33. The conspirators required an immediate payment of $250 to $350 as a clinic visit fee for new patients, typically in cash but at times by credit card. Follow-up patients were charged a visitation fee of $200 to $300. Medical insurance was not accepted.

34. In order to create an appearance of legitimacy, new "patients" at the clinics were required to obtain or furnish magnetic resonance imaging ("MRI") reports before being allowed to be seen by a doctor.

35. Members of the conspiracy encouraged and accepted "sponsors" who brought one or more "patients" to subject pain clinics and paid for the patients' MRIs and all pain clinic fees in exchange for receiving all or a portion of the "patient's" prescription medications.

36. Members of the conspiracy distributed and dispensed, and cause to be distributed and dispensed, controlled substances that were not prescribed for a legitimate medical purpose, and not in the usual course of professional practice in one or more of the following manners:

    a) inadequate verification of the patient's medical complaint;

    b) cursory or no medical examinations by the attending doctors;

    c) inadequate patient medical history and no follow-up verification;

    d) incomplete or inadequate mental or physical examinations;

    e) insufficient dialogue with the patients regarding treatment options and risks and benefits of such treatments;

    f) treating patients with highly addictive controlled substances while failing to consider other treatment options;

9

g) failure to refer patients to specialists for treatment;

h) lack of, or inadequate diagnostic testing;

i) increasing the patients' dosages over time;

j) prescribing inappropriate combinations of drugs to patients;

k) allowing patients to suggest or direct the medications to be prescribed;

l) treating a large number of patients who resided either out of the state or long distances from East Health Center with prescriptions for highly addictive controlled substances;

m) directing patients to particular pharmacies that were known to fill the prescriptions;

n) prescribing highly addictive controlled substances to patients with vague physical complaints where alternative treatment options would be indicated;

o) failing to assess the risk of abuse by individual patients;

p) failing to monitor patients' responses to the medication; and

q) issuing prescriptions for highly addictive controlled substances for an inordinately high percentage of younger adult patients.

37. It was further part of the conspiracy that the defendant and other members of the conspiracy hid and concealed and caused others to hide and conceal the nature of the illegal activity and the acts committed in furtherance thereof.

38. Between on or about February 21, 2011 and up to and including May 26, 2011, members of the conspiracy prescribed and caused to be prescribed more than 4 million milligrams of oxycodone. During this same period, prescriptions were written for more than 480 "patients" who lived outside the state of Georgia, including more than 130 from Kentucky; more than 50 from North Carolina; more than 30 from South Carolina; and more than 80 from Florida.

10

All done in violation of Title 18, United States Code, Section 2 and Title 21, United States Code, Section 846.

## COUNTS TWO THROUGH FIFTY
### UNLAWFUL DISPENSATION OF CONTROLLED SUBSTANCES

On each of the dates listed below, in Chatham County, within the Southern District of Georgia, the defendant,

**NAJAM AZMAT,**
**AKA "DR. HAZMAT,"**

who at all times hereinafter mentioned was a medical doctor, licensed by the State of Georgia and registered by the United States, aided and abetted by others known and unknown, including the defendants

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**CANDACE ANNE CARRERAS, and**
**SHELLY LYNN MORFORD,**

who as aiders and abettors are also criminally responsible for the offenses charged below, did, outside the usual course of professional practice as a medical doctor and without legitimate purpose relating to the practice of medicine, knowingly, intentionally and unlawfully dispense the Schedule II, Schedule III, and Schedule IV controlled substances listed below, in violation of Title 18, United States Code, Section 2, and Title 21, United States Code, Section 841 (a)(1):

11

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 2 | 02/21/2011 | Jim B. Frenchburg, KY | Oxycodone | 30mg | 180 | II |
| 3 | 02/21/2011 | Jim B. Frenchburg, KY | Oxycodone | 15mg | 60 | II |
| 4 | 02/21/2011 | George H. Frenchburg, KY | Oxycodone | 30 mg | 180 | II |
| 5 | 02/21/2011 | George H. Frenchburg, KY | Oxycodone | 15 mg | 60 | II |
| 6 | 02/21/2011 | Billy L. Kissimee, FL | Oxycodone | 30 mg | 180 | II |
| 7 | 02/21/2011 | Billy L. Kissimee, FL | Oxycodone | 15 mg | 60 | II |
| 8 | 02/21/2011 | Kim L. Kissimee, FL | Oxycodone | 30 mg | 60 | II |
| 9 | 02/21/2011 | Kim L. Kissimee, FL | Oxycodone | 15 mg | 60 | II |
| 10 | 02/21/2011 | David L. Kissimee, FL | Oxycodone | 30 mg | 90 | II |
| 11 | 02/21/2011 | David L. Kissimee, FL | Oxycodone | 15 mg | 30 | II |
| 12 | 02/21/2011 | Latina S. Frenchburg, KY | Oxycodone | 30 mg | 150 | II |
| 13 | 02/21/2011 | Latina S. Frenchburg, KY | Oxycodone | 15 mg | 30 | II |
| 14 | 02/21/2011 | Latina S. Frenchburg, KY | Xanax | 1 mg | 30 | IV |
| 15 | 02/25/2011 | James L. Lexington, KY | Oxycodone | 30 mg | 150 | II |
| 16 | 02/25/2011 | James L. Lexington, KY | Oxycodone | 15 mg | 60 | II |

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 17 | 02/28/2011 | Carlie C. Jackson KY | Oxycodone | 30mg | 150 | II |
| 18 | 02/28/2011 | Carlie C. Jackson KY | Hydrocodone | 10/325 | 60 | III |
| 19 | 02/28/2011 | Paul C. Jackson KY | Oxycodone | 30 mg | 150 | II |
| 20 | 02/28/2011 | Paul C. Jackson KY | Oxycodone | 15mg | 90 | II |
| 21 | 02/28/2011 | Tyrice H. Jacksonville, FL | Oxycodone | 30 mg | 150 | II |
| 22 | 02/28/2011 | Tyrice H. Jacksonville, FL | Oxycodone | 15 mg | 30 | II |
| 23 | 02/28/2011 | Danelle P. Jacksonville, FL | Oxycodone | 30 mg | 150 | II |
| 24 | 02/28/2011 | Danelle P. Jacksonville, FL | Oxycodone | 15 mg | 30 | II |
| 25 | 02/28/2011 | Brian S. Brunswick, GA | Oxycodone | 30 | 150 | II |
| 26 | 02/28/2011 | Brian S. Brunswick, GA | Xanax | 1 mg | 15 | IV |
| 27 | 03/01/2011 | Joseph B. Middleburg, FL | Oxycodone | 30 mg | 150 | II |
| 28 | 03/01/2011 | Joseph B. Middleburg, FL | Oxycodone | 15 mg | 60 | II |
| 29 | 03/01/2011 | Joseph B. Middleburg, FL | Xanax | 1 mg | 30 | IV |
| 30 | 03/01/2011 | James G. Bluffton, SC | Oxycodone | 30 mg | 150 | II |
| 31 | 03/02/2011 | Gary E. Barbourville KY | Oxycodone | 30 mg | 150 | II |

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 32 | 03/02/2011 | Gary E. Barbourville KY | Oxycodone | 15 mg | 30 | II |
| 33 | 03/03/2011 | Chris C. Winter Park, FL | Oxycodone | 30 mg | 150 | II |
| 34 | 03/03/2011 | Joshua M. Winter Park, FL | Oxycodone | 30 mg | 150 | II |
| 35 | 03/03/2011 | Joshua M. Winter Park, FL | Percocet | 10/325 | 60 | II |
| 36 | 3/08/2011 | Patricia R. Lexington, KY | Oxycodone | 30 mg | 150 | II |
| 37 | 03/08/2011 | Patricia R. Lexington, KY | Oxycodone | 15 mg | 60 | II |
| 38 | 03/08/2011 | Jessica R. Means, KY | Oxycodone | 30 mg | 150 | II |
| 39 | 03/08/2011 | Jessica R. Means, KY | Oxycodone | 15 mg | 60 | II |
| 40 | 03/09/2011 | Troy R. London, KY | Oxycodone | 30 mg | 150 | II |
| 41 | 03/09/2011 | Troy R. London, KY | Lorcet | 10/500 | 30 | II |
| 42 | 03/10/2011 | Barry H. Barbourville, KY | Oxycodone | 30 mg | 150 | II |
| 43 | 03/10/2011 | Jason J. Mansfield, Ohio | Oxycodone | 30 mg | 150 | II |
| 44 | 03/10/2011 | Jason J. Mansfield, Ohio | Oxycodone | 15 mg | 60 | II |
| 45 | 03/11/2011 | Sherry F. Lexington, KY | Oxycodone | 30 mg | 150 | II |
| 46 | 03/11/2011 | Sherry F. Lexington, KY | Oxycodone | 15 mg | 60 | II |

14

| Count | Date | Person to whom Dispensed | Controlled Substance | Strength | Quantity | Schedule |
|-------|------|--------------------------|----------------------|----------|----------|----------|
| 47 | 03/14/2011 | Nancy B. Morehead, KY | Oxycodone | 30 mg | 120 | II |
| 48 | 03/14/2011 | Nancy B. Morehead, KY | Oxycodone | 15 mg | 90 | II |
| 49 | 03/15/2011 | John K. Moncks Corner, SC | Oxycodone | 30 mg | 150 | II |
| 50 | 03/15/2011 | John K. Moncks Corner, SC | Percocet | 10/325 | 60 | II |

## COUNT FIFTY-ONE
## DISTRIBUTION OF CONTROLLED SUBSTANCE

On or about the 9th day of May 2011, in Chatham County, within the Southern District of

Georgia, the defendant herein:

### DANIEL JOHN WISE,

did knowingly and intentionally distribute a mixture or substance containing a detectable amount

of oxycodone, a schedule II controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and (b)(1)(C).

## COUNT FIFTY-TWO
## CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS

1.     Paragraphs 1 through 38 of the Introduction section and Count One of this

Indictment are realleged and incorporated fully herein by reference.

2.     From an unknown date, but at beginning at least on or about January 18, 2011 and

15

continuing through on or about May 26, 2011, in Chatham County, within the Southern District of Georgia, and elsewhere, the defendants herein,

> **SEAN MICHAEL CLARK,**
> **ADELAIDA M. LIZAMA,**
> **DANIEL JOHN WISE,**
> **NAJAM AZMAT,**
> **  AKA "DR. HAZMAT,"**
> **CANDACE ANNE CARRERAS, and**
> **SHELLY LYNN MORFORD,**

aided and abetted by each other and by others known and unknown, did knowingly and

intentionally combine, conspire, and agree with each other and with other persons known

and unknown, to conduct and attempt to conduct financial transactions affecting interstate

commerce, with funds which were proceeds of a specified unlawful activity, that is the unlawful

dispensation of Schedule II, III, and IV controlled substances, in violation of Title 21 United

States Code, Section 841(a)(1), and which the defendants knew to be the proceeds of some form

of unlawful activity, and did conspire to do so with the intent to promote the carrying on of the

aforesaid specified unlawful activity, in violation of Title 18, United States Code, Section

1956(a)(1)(A)(i).

### OVERT ACTS

In furtherance of the conspiracy, the conspirators committed and caused to be committed

in the Southern District of Georgia and elsewhere, financial transactions affecting interstate

commerce, using funds which were, and which the defendants knew to be, proceeds of the

unlawful dispensation of Schedule II, III, and IV controlled substances, including, but not limited

to, the transactions shown below:

16

1. Between January 18, 2011 and February 25, 2011, conspirators made multiple deposits, by check and cash, to SunTrust Bank Account No. 1000133995083 ranging in amount from $6,000 to $29,000.

2. On or about February 28, 2011, conspirators closed SunTrust Bank Account No. 1000133995083 and withdrew the sum of $15,727.27, representing the balance of the account.

3. Between March 22, 2011 and May 25, 2011, conspirators made multiple cash deposits to BB&T Bank Account No. 0005242045442 ranging in amount from $20.00 to $9,622.00. Bank records and spread sheets

4. Between February 25, 2011 and May 18, 2011, conspirators made weekly salary payments by cash or check to **Sean Michael Clark** in amounts ranging between approximately $1,000 and $5,900.

5. Between February 11, 2011 and May 19, 2011, conspirators made weekly salary payments by cash or check to **Adelaida M. Lizama** in amounts ranging between approximately $500 and $1,850.

6. Between February 15, 2011 and May 19, 2011, defendants made weekly salary payments by cash or check to Adelard LeFrancois in amounts ranging between approximately $1,000 and $2,500.

7. Between February 19, 2011 and May 12, 2011, defendants made weekly salary payments by cash or check to **Daniel John Wise** in amounts ranging between $700 and $1,000.

8. Between February 19, 2011 and May 19, 2011, conspirators made weekly salary payments by cash or check to Konstantinos Afthinos in amounts ranging between approximately $500 and $600.

17

9. Between February 21, 2011 and May 18, 2011, conspirators made weekly salary payments by cash or check to Francis Barbuscia in amounts of approximately $1,000.

10. Between February 25, 2011 and May 18, 2011, conspirators made weekly salary payments by cash or check to **Candace Anne Carreras** in amounts ranging between approximately $400 and $1,000.

11. Between March 1, 2011 and March 18, 2011, defendants made daily salary payments by cash, check, or credit card to **Najam Azmat** in amounts ranging between approximately $1,000 and $2,000.

12. Between March 31, 2011 and May 12, 2011, defendants made weekly salary payments by cash or check to **Shelly Lynn Morford** in amounts of $600.

13. Between March 19, 2011 and May 25, 2011, defendants made daily salary payments by cash to Kenneth Gossett in amounts ranging between approximately $1,500 and $1,750.

14. Between April 4, 2011 and May 23, 2011, conspirators made payments by check in amounts ranging from $365.00 to $3,335.00 as "investor pay-backs" to Nuvest LLC.

15. Between March 1, 2011 and May 1, 2011, conspirators made periodic payments by cash and check to lease the premises located at 626 U.S. Highway 80, Garden City, Chatham County Georgia in which East Health Center was operated, and to rent a house located at 50 Crystal Lake Drive, Pooler, Chatham County, Georgia, where various conspirators, including **Daniel John Wise, Shelly Lynn Morford**, and Konstantinos Afthinos resided from time to time during the course of the conspiracy.

16. Between January 21, 2011, and May 25, 2011, conspirators engaged in numerous credit card transactions to promote the unlawful conspiracy.

18

17. On or about May 26, 2011, **Adelaida M. Lizama** made a cash withdrawal of $5,000 from BB&T Bank Account no. 0005242045442 after a search warrant was executed at East Health Center.

18. On or about May 26, 2011, **Sean Michael Clark** made a cash withdrawal of $9,500 from BB&T Bank Account no. 0005242045442 after a search warrant was executed at East Health Center.

All done in violation of Title 18, United States Code, Sections 2 and 1956(h).

19

## FORFEITURE ALLEGATION

**THE GRAND JURY FURTHER CHARGES AND FINDS PROBABLE CAUSE:**

### 1.  Drug Trafficking Offenses:

That upon conviction of one or more of the Title 21 offenses alleged in this indictment,

each punishable by imprisonment for more than one year, the defendants herein:

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**NAJAM AZMAT,**
  **AKA "DR. HAZMAT,"**
**CANDACE ANNE CARRERAS, and**
**SHELLY LYNN MORFORD,**

shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, all of their

right, title and interest in and to any property, real and personal,

(1)  constituting, or derived from any proceeds the Defendants obtained, directly or

indirectly, as the result of such violation(s) of Title 21, United States Code, and all

property traceable to such property;

(2)  used or intended to be used, in any manner or part, to commit or to facilitate the

commission of such violations of Title 21, United States Code.

### 2.  Money Laundering Offense:

A.  Upon conviction for the violations of Title 18, United States Code, Section

1956(h), as charged in Count Fifty-Two of this Indictment, the defendants herein:

**SEAN MICHAEL CLARK,**
**ADELAIDA M. LIZAMA,**
**DANIEL JOHN WISE,**
**NAJAM AZMAT,**
  **AKA "DR. HAZMAT,"**

CANDACE ANNE CARRERAS, and
SHELLY LYNN MORFORD,

shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), all of
their right, title and interest in and to any property, real and personal, involved in such offense,
and any property traceable to such property.

    **3.**    **Property:**

    A.    Pursuant to Title 21, United States Code, Sections 853(a)(1) and 853(a)(2), and
Title 18, United States Code, Section 982(a)(1), the property which is subject to forfeiture upon
conviction of the Defendants for offenses charged in this Indictment includes, but is not limited
to, the following property or property traceable to such property:

    (1)    Proceeds / Personal Money Judgment:

        (a)    A sum of money equal to all proceeds the Defendants obtained directly or
indirectly as a result of the Title 21 offenses charged in this Indictment, and
all property used or intended to be used to facilitate such offenses, and
equal to the value of all property, and any property traceable to such
property, involved in money laundering transactions conducted as part of
the money laundering conspiracy charged in Count Fifty-Three of this
Indictment, that is, a minimum of $365,000 in United States currency, and
all interest and proceeds traceable thereto, in that such sum, in aggregate,
was received by the defendants in exchange for the unlawful dispensation
of controlled substances or is traceable thereto. If more than one defendant

21

is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount subject to forfeiture under this paragraph.

**4.** **Substitution of Assets:**

A.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendants –

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third person;

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the said Defendant up to an amount equivalent to the value of the above-described forfeitable property;

By virtue of the commission by the defendants of the Title 21 felony drug offenses or of the Title 18 money laundering offense charged in this indictment, any and all interest the defendants have in the property subject to forfeiture is vested in the United States and is hereby forfeited to the United States pursuant to Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(1).

22

A True Bill.

_____
Foreman

_____
Edward J. Tarver
United States Attorney
Georgia Bar No. 698380

_____
James D. Durham
Assistant United States Attorney
Georgia Bar No. 235515

_____
E. Greg Gilluly, Jr.*
Assistant United States Attorney
Tennessee Bar No. 019397

_____
Brian T. Rafferty
Assistant United States Attorney
New York Bar No. 2809440

_____
Karl I. Knoche*
Assistant United States Attorney
Georgia Bar No. 426624

_____
Jeffrey J. Buerstatte*
Assistant United States Attorney
Georgia Bar No. 093416

* counsel to be served

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CR 413-028 |
| | ) |
| v. | ) |
| | ) |
| SEAN MICHAEL CLARK, ET AL. | ) |

### GOVERNMENT'S DISCLOSURE OF EXPERT TESTIMONY
### PURSUANT TO FEDERAL RULE
### OF CRIMINAL PROCEDURE 16(a)(1)(G)

Now comes the United States of America, by and through Edward J. Tarver, United States Attorney for the Southern District of Georgia, and files the government's Disclosure of Expert Testimony Pursuant to Fed. R. Crim. P. 16 (a)(1)(G). In support of its disclosure, the government states as follows:

In accordance with Fed. R. Evid. 702, 703, and 705, the government intends to call during its case-in-chief, Gene Kennedy, M.D. as an expert witness in the field of medicine and pain management and Martin M. Zdanowicz, Ph.D. as an expert in the field of pharmacology. The *curricula vitae* listing the qualifications of these experts is being provided to counsel via email and are incorporated herein by reference. Both Dr. Kennedy and Dr. Zdanowicz were retained by the United States as expert witnesses in the case of United States v. Hung Thien Ly, CR 407-286.

A.   WITNESSES OPINIONS:

Written reports containing the opinions of Dr. Kennedy, and the bases therefor, were previously provided to counsel as USAO-002335 through USAO 002916. A written report of Dr. Zdanowicz is being provided separately. In summary,

Dr. Kennedy is expected to testify that in his opinion, the defendant Azmat routinely prescribed controlled substances outside the usual course of professional practice as a medical doctor and without legitimate purpose relating to the practice of medicine, as set forth in the indictment. Dr. Zdanowicz will testify that in his opinion the defendant Azmat demonstrated a gross pattern of over-prescription of scheduled drugs without consideration of alternative therapies, drug interactions and side effects, contraindications for the prescribed drugs, and evidence of street drug abuse.

B.  BASES AND REASONS THEREFOR:

In forming their opinions the experts relied on their training and experience in the fields in which they are tendered as experts and their review of patient medical records. In addition, standard reference materials, including, but not limited to, the Physicians Desk Reference and the Merck Manual may have been considered.

C.  MEMORANDUM OF LAW AND CITATIONS TO AUTHORITY

The Federal Rules of Evidence provide for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed.R.Evid. 702. Under Rule 702, in such situations a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify ... in the form of an opinion or otherwise." Id.

The admissibility of scientific expert testimony is admissible only if it is both relevant and reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In order to ensure that both of these elements are present, under Fed.R.Evid. 702, the trial judge serves as a "gatekeeper." United States v. Majors, 196 F.3d 1206,

2

1215 ( 11th Cir. 1999) citing Daubert. In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court extended Daubert's gatekeeping obligation beyond scientific experts. The trial judge is required to inquire into the areas of relevance and reliability whether the expert testimony is "scientific" or otherwise. Majors, 196 F.3d at 1215 citing Daubert. and United States v. Paul, 175 F.3d 906 (11th Cir.1999). "'[F]ederal district courts ... perform [this] important gatekeeping function by screening the reliability of all expert testimony, but they have substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable.'" United States v. Majors, 196 F.3d at 1215 quoting Forklifts of St. Louis, Inc. v. Komatsu Forklift, USA, Inc., 178 F.3d 1030, 1034 (8th Cir.1999), citing Kumho.[1]

While evidence received from lay witnesses surrounding the facts and circumstances of the prescriptions can be sufficient for a jury to find that a doctor prescribed controlled substances outside of the usual course of medical practice and was acting other than for a legitimate medical purpose, the use of expert testimony is both permissible and useful. See, e.g., United States v. Rogers, 609 F.2d 834 (5th Cir. 1980).

---

[1]     A district court's decision to admit or exclude expert testimony under Rule 702 is reviewed for abuse of discretion. General Elec. Co. v. Joiner, 522 U.S. 136 (1997); United States v. Gilliard, 133 F.3d 809, 812 (11th Cir.1998).

WHEREFORE, the government requests that the Court permit Gene Kennedy, M.D. and Martin M. Zdanowicz, Ph.D. to testify as experts in their respective fields, subject to the government laying the proper evidentiary foundation at trial.

Respectfully submitted,

EDWARD J. TARVER
UNITED STATES ATTORNEY

*s/ Karl I. Knoche*

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624

P.O. Box 8970
Savannah, Ga. 31401
(912) 652-4422

4

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 26th day of September, 2013.

Respectfully submitted,

EDWARD J. TARVER
UNITED STATES ATTORNEY

*s/ Karl I. Knoche*

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624

Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422

5

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | INDICTMENT NUMBER: |
| | ) | CR 4:13 – 028 |
| DR. NAJAM AZMAT, | ) | |
| | ) | |
| Defendant. | ) | |

## DR. AZMAT'S DAUBERT MOTION TO EXCLUDE GOVERNMENT EXPERT'S DR. GENE KENNEDY AND MARTIN ZDANOWICZ AND REQUEST FOR AN EVIDENTIARY HEARING

Comes Now, Dr. Najam Azmat, ("Dr. Azmat") one of the defendants herein, and moves to exclude the government experts, Dr. Gene Kennedy and Martin Zdanowicz, Ph.D., pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rules 401, 403 and 701-704 of the Federal Rules of Evidence and the Due Process Clause of the Fifth Amendment, and shows the Court the following:

## I. INTRODUCTION

### A. The Government's Burden at Trial is to Prove that Dr. Azmat was a Drug Dealer

The admissibility of the Government's proffered expert opinions under *Daubert* must be analyzed within the framework of what the Government must prove in this case. Under 21 U.S.C. § 841(a)(1), the Government must prove beyond a reasonable doubt that a defendant physician essentially ceased being a doctor, even a poor or negligent doctor, and "intentionally ... distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice." *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). Importantly, a good faith defense is available to Dr. Azmat such that if he had a "good faith" belief that he was conducting his practice "in the usual course of his professional [practice]," then he can not be convicted of violating 21 U.S.C. Section 841. *See United*

1

*States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008) (approving jury instruction regarding good faith). Thus, the jury should consider whether Dr. Azmat subjectively believed his prescriptions served a legitimate medical purpose and whether he was practicing outside the course of professional practice is evaluated from an objective standpoint. *See United States v. Tobin*, 676 F.3d 1264, 1282-1283 (11th Cir. 2012); *see also United States v. Norris*, 780 F.2d 1207, 1209 n.2 (5th Cir. 1986) (finding proper district court's instruction to the jury that "[a] controlled substance is prescribed by a physician in the usual course of a professional practice, and, therefore, lawfully, if the substance is prescribed by him in good faith, medically treating a patient in accordance with a standard of medical practice generally recognized and accepted in the United States"); *United States v. Alerre*, 430 F.3d 681, 692 (4th Cir. 2005) (noting that "the jury was correctly instructed on the applicable legal principles," and that the jury was instructed that the defendant-doctors "could not be convicted if they had dispensed the controlled substances at issue 'in good faith' "); *United States v. Hughes*, 895 F.2d 1135, 1141-42 (6th Cir. 1990) (finding that physicians cannot be convicted if they "dispens[e] controlled substances in the course of professional practice" and explaining that "[b]ecause Dudley was a licensed physician, the jury could not find him guilty of distributing controlled substances, as long as he acted in 'good faith' "); *United States v. Vamos*, 797 F.2d 1146, 1151 (2d Cir. 1986) ("[T]he doctor must act in the good faith belief that his distribution of the controlled substance is for a legitimate medical purpose and in accordance with the usual course of generally accepted medical practice."); *United States v. Carroll*, 518 F.2d 187, 189 (6th Cir. 1975) (reversing conviction because trial court "did not advise [the jury] that physicians are exempt from the provisions of the drug abuse statute when they dispense or prescribe controlled substances in good faith to patients in the regular course of professional

2

practice"). In short, to be found guilty of violating the 21 U.S.C. § 841(a)(1), a medical professional must have acted "in illicit drug dealing and trafficking as conventionally understood." *Gonzales*, at 270.

Dr. Azmat respectfully submits that the Court should hold an evidentiary hearing, although one is not required by the rules. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (although trial court was not under an obligation to hold a *Daubert* hearing, such hearings may be helpful in complicated cases involving multiple experts); *see also, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("Where the opposing party thus raises a material dispute as to the admissibility of expert scientific evidence, the district court must hold an in limine hearing (a so-called *Daubert* hearing to consider the conflicting evidence and make findings about the soundness and reliability of the methodology employed by the scientific experts"); *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000) (holding that it was abuse of discretion for district court judge to admit expert testimony without a *Daubert* hearing).

## II. PROCEDURAL HISTORY

Dr. Azmat is indicted, in a Superseding Indictment on one count of conspiracy, in violation of 18 U.S.C. § 846 (Count One), and controlled substances offenses, in violation of 21 U.S.C. § 841(a)(1) (Counts Two through Fifty).

The indictment arises from Dr. Azmat's employment at the East Health Clinic in Garden City, Georgia, where he was employed in February and March of 2011.

## A. Relevant Facts Regarding the Government's Experts

On Thursday, September 26, 2013 the government provided its Rule 16 expert disclosures for Dr. Gene Kennedy and Martin Zdanowicz, Ph.D., who have, apparently reviewed

3

particular patient files of Dr. Azmat. The opinions of Dr. Kennedy are attached as Exhibit "A." The opinions of Dr. Zdanowicz are attached as Exhibit "B."

The Government's Disclosures for Dr. Kennedy fail to list any peer-reviewed articles, treatises or other objective standards for assessing patient treatment in support of the disclosed opinions. *See* Disclosures. The Government likewise failed to disclose whether or how any training and experience of each proffered expert enabled them to come to any reliable opinion about Dr. Azmat's treatment of patients or any other topics. *See id.* The Government's Disclosure with regard to Dr. Kennedy incorporates by reference 25 individual patient reviews, which are lengthy, and they are briefly summarized below.

Dr. Kennedy opines that Dr. Azmat's medical practices fell short of an acceptable standard of care and were outside the scope of legitimate medical practice, without articulating the standard or scope to which he is referring. *See Id.* Dr. Kennedy fails to cite to any source as to what constituted an "acceptable standard of care" or what "legitimate medical practice" means during the relevant time period. *See Id.*

Dr. Zdanowicz, is a pharmacology professor, who doesn't treat patients, who doesn't prescribe medication, but he nevertheless opines extensively regarding the propriety of patient care of Dr. Azmat. He testified without objection in an earlier trial before this Court, *United States v. Hung Thien Ly*, Case No. 407-286, pp. 604-05, regarding his review of medical records and what he found and did not find regarding those records. [1]

---

[1] There was no *Daubert* motion filed in the *Ly* case, thus, the fact that these witnesses testified, mostly without objection is of no legal consequence.

## III. ARGUMENT AND CITATION OF AUTHORITY

### A.    The Legal Standard for Admissibility Under *Daubert*

This Court has frequently addressed *Daubert* issues over the years, *see North American Specialty Co., v. Wells*, 2013 WL 4482455 (S.D. Ga., August 19, 2013); *Barnes v. 3/12 Transportation, Inc.*, 2012 WL 1014810 (S.D. Ga., March 23, 2012), and has noted the now familiar standards to be applied in assessing expert testimony.  Federal Rule of Evidence 702, as interpreted and applied in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), sets the bounds of admissible expert testimony.  Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the  trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the  case.

Fed.R.Evid. 702. As the Supreme Court made abundantly clear in *Daubert,* Rule 702 compels district courts to perform the critical gatekeeping function concerning the admissibility of expert testimony. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The Eleventh Circuit has explained that district courts fulfill that function by engaging in a three part inquiry considering whether, (1) the expert is qualified to testify competently regarding the matters he intends to address; 2) the methodology by which the expert reaches his conclusions is sufficiently reliable as to be determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific expertise, to understand the evidence or to determine a fact in issue. *Id.* While there will often be

5

some overlap between these concepts of qualification, reliability, and helpfulness, they are distinct concepts that courts should be careful not to conflate. *See Quiet Tech. DC–8, Inc. v. Hurel–Dubois, UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The burden of establishing that these requirements are met rests with the proponent of the expert testimony, and not the *Daubert* challenger. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.2002).

And, although "[a]n opinion is not objectionable just because it embraces an ultimate issue," Federal Rule of Evidence 704(a), an expert may not "merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir.1990) (citing Fed.R.Civ.P. 704 committee notes (telling jury what result to reach is not helpful to jury and therefore not admissible testimony)).

As this Court has noted, in *Wells*, 2013 WL 4482455, * 2, the Eleventh Circuit and courts within the Eleventh Circuit have excluded expert testimony where it is simply a reiteration or recasting of a parties' contentions. *See Cook ex rel. Estate of Tessier*, 402 F.3d at 1111 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Frazier*, 387 F.3d at 1262–63 ("[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."); *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir.1998).

### i. Demonstrating Reliability Under *Daubert*

To assess the requirement of reliability, *Daubert* and its progeny have set forth flexible, non-exclusive factors, among them:

- Testability, i.e. is the opinion subject to verification;
- Peer review or publication of the theory or technique;
- The known or potential rate of error; and
- Degree of acceptance within the relevant scientific community.

6

*Frazier*, 387 F.3d at 1262 ("Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial."); *United States v. Hebshie*, 754 F.Supp.2d 89, 126–27 (D. Mass. 2010) (vacating conviction because of ineffective assistance of counsel where he failed to request a *Daubert* hearing to exclude unreliable laboratory evidence that the Court found there was a "reasonable probability" it would have excluded).

As the Court in *Daubert* pointed out, whether an opinion can be tested is a key question when determining the admissibility of an expert opinion. *Daubert*, 509 U.S. at 593. "'Testability' has also been described as 'falsifiability.' A proposition is 'falsifiable' if it is 'capable of being proved false . . . .'" *United States v. Mitchell*, 365 F.3d 215, 235 (3rd Cir. 2004). The Court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

Further, a garbage in, garbage out rule applies: experts must ground their opinions in sound facts. Thus, although the central focus of a *Daubert* inquiry is an expert's methodology, a court may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)).

### ii. **Meeting *Daubert*'s Heightened Standard for Relevance**

Ensuring that the opinion offered is "relevant to the task at hand" also is an essential requirement of the *Daubert* analysis. *Daubert*, 509 U.S. at 591. As the Supreme Court explained, Rule 702's requirement that an expert's testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" is one of relevance. *Daubert*, 509

U.S. at 591. In other words, Rule 702, as visualized through the *Daubert* prism, "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592; *see, e.g., Brown v. Wal-Mart Stores, Inc.*, 402 F.Supp.2d 303, 310 (D. Me. 2005) (excluding expert opinions because those opinions were both irrelevant and unreliable); *Kipperman v. Onex Corp.*, 411 B.R. 805, 849 (N.D. Ga. 2009) (excluding opinions of plaintiff's expert because the relevant question was whether debtors received "reasonably equivalent value" and expert never analyzed whether the value of assets debtors received was equivalent to what they gave).

### iii. The Importance of the *Daubert* Analysis

The Court's role in ensuring that purported expert testimony which does not pass muster under *Daubert* be kept out of earshot of the jury is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given substantial weight by the jury due to the expert's background and approach. *See Daubert*, 509 U.S. at 595; *Kumho Tire, Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999). As the Eleventh Circuit noted in *Frazier*, 387 F.3d at 1263, "expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Accord United States v. Hines*, 55 F.Supp.2d 62, 64 (D. Mass. 1999) (noting that "a certain patina attaches to an expert's testimony unlike any other witness: this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve").

**B. Dr. Kennedy's Opinions Are Inadmissible.**

Dr. Kennedy opines without citation to medical literature, or **any** standards that Dr. Azmat is a drug dealer because:

> 1) the initial physician patient encounter is not "credible",
>
> 2) there is no documentation in the patient file from other physician's,
>
> 3) the MRI reports do not "alone support narcotic management,"
>
> 4) the lack of documentation in the chart combined with the lack of previous treatment records is not sufficient to support the prescription of scheduled agents,
>
> 5) there is no plan of treatment recorded, and
>
> 6) on occasion that the patient's presentation raises an index of suspicion.

*See generally* Kennedy Reports, Exhibit "A."

Dr. Kennedy's opinions are inadmissible under *Daubert* as an expert may not offer an opinion based only on his own say-so. *See McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F.Supp.F.Supp.2d 418, 423-24 (D. Mass. 2008) ("Expert testimony is the product of reliable principles and methods if the theory employed by the expert to explain the meaning of her observations is shown to be valid and was derived through the so-called scientific method.") (internal quotations omitted). Such opinions are not reliable, because they are neither testable nor based upon any objective standard. *Daubert*, 509 U.S. at 591. In that regard, experience is not a proxy for reliability.

### i. Opinions About the Quality of Medical Care Based Only on an Expert's Say-So Or Personal Views of Best Practices Are Inadmissible

Courts across the country regularly exclude expert opinions about medical care where, as here, the opinions are based upon nothing but the expert's *ipse dixit* because such opinions are unreliable. *See, e.g., Adams v. Lab. Corp. of Am.*, 2012 WL 370262, at *14–15 (N.D. Ga. Feb. 3,

2012) (excluding expert testimony regarding the appropriate standard of care, because expert's opinion was unreliable where she agreed with objective benchmarks for evaluating care but did not apply them); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.F.Supp.2d 334, 354 (S.D.N.Y. 2005) (excluding expert opinion "which appears to be based on no scientific support other than his own personal experience" that defendant-physician's failure to respond to discharge of synovial fluid following operation fell below the standard of care); *Algarin v. New York City Dep't of Corr.*, 460 F.Supp.2d 469, 477 (S.D.N.Y. 2006) (excluding as unreliable expert opinion that assessments resulting in psychiatric commitment "were not performed in conformity with the standards of the medical profession," because the expert was not relying on any objective standards but only how he thought the assessment should have been conducted). "An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the relevant professional community." *Berk*, 380 F.Supp.F.Supp.2d at 354. *Accord, Clarke v. Schofield*, 632 F.Supp.2d 1350 (M.D. Ga. 2009) (excluding emergency room physician's opinion regarding cause and location of deep vein thrombosis).

In *McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, for example, the Court excluded the testimony of plaintiff's expert regarding the appropriate standard of care in a medical malpractice case, because there were no indicia of reliability that the opinion was anything other than the expert's own say-so. 584 F.Supp.F.Supp.2d at 424-25 (D. Mass. 2008) Of course, an expert may testify "solely on the basis of experience," but "he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Brown*, 402 F.Supp.2d at 308-09. The plaintiff's expert in *McGovern* could not pass that

10

rigorous test for demonstrating reliability when offering an opinion based only on one's experience and knowledge.

As described above, *Daubert* set out a handful of non-exclusive considerations to determine whether an expert's opinion is reliable, including the testability of the opinion. These considerations are vital, because if experts could pontificate without regard for the scientific method, testable standards, or any other indicia of reliability, opinions without any reliable basis at all could multiply without end. To allow this, would confuse jurors who naturally trust experts, and would upend the essential principle of *Daubert* that expert opinions must be reliable. *See Hebshie*, 754 F.Supp.F.Supp.2d at 125.

As the Supreme Court of the United States explained, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is only the *ipse dixit* of the expert. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). As the Eleventh Circuit explained, "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

The recent case of *United States v. Zolot*, __ F.Supp.2d __, 2013 WL 4832705 (D. Mass. Sept. 13, 2013) is instructive. In *Zolot*, the court noted in ruling on the *Daubert* motions of both parties, that, while experts may testify on the basis of experience, if they are relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id.* at *11, (citing Fed.R.Evid. 702, Advisory Committee's Note).

In finding that the government's experts should be excluded the court found that the experts had failed to "sufficiently articulate the standard of care they are applying to assess the defendants' conduct . . . " *Id.*, at 14. The district court stated that the expert had to "specifically cite the written standard they are relying on or provide testimony as to the accepted standard in the field." *Id.*

Similarly, here, Dr. Kennedy offers his opinions without supporting those opinions for reliability under *Daubert*. Applying the *Daubert* criteria, Dr. Kennedy does not state whether his opinions have been subject to peer review and publication. Indeed, he cites no medical literature that support his conclusions. And, Dr. Kennedy does not establish how he arrived at a standard of care that, for instance, requires every treating physician to obtain prior treatment records. Dr. Kennedy does not provide any indication that his opinions are widely accepted and, as discussed below, Dr. Kennedy has not accounted for alternative explanations.

Dr. Kennedy's opinions should, therefore, be excluded.

### ii. **The Opinions of Dr. Kennedy Are Nothing But *Ipse Dixit*, And Should Be Excluded**

The entirety of the expert disclosure of Dr. Kennedy are comprised of unsupported opinions like those of the doctors in *McGovern* who invented a standard of care in the medical negligence case. *See* 584 F.Supp.F.Supp.2d at 424-25. Nowhere in the Government's disclosures, however, does the Government provide a source or peer-reviewed article supporting the existence of so-called requirements or obligations. Dr. Kennedy relies on nothing but his own subjective opinions to impose non-existent standards of care on Dr. Azmat.

Dr. Kennedy takes his advocacy one step further, however, when he begins describing that Dr. Azmat's examinations with his patient were "not credible." An expert doesn't get to dress up his opinions under the guise of expert testimony that are merely contentions of the

parties.

This Court should exclude Dr. Kennedy's opinions, just as courts across the country exclude expert medical testimony that is nothing but subjective opinion unsupported by any peer-reviewed citation because those opinions lack any objective measure. *Zolot*, 2001 WL 4832705, at 14, *McGovern*, 584 F.Supp. at 424-25; *Adams*, 2012 WL 370262, at *14–15; *Berk*, 380 F.Supp.F.Supp.2d at 354; *Algarin*, 460 F.Supp.2d at 477.

### iii. The "Task at Hand" Under 21 U.S.C. § 841(a)(1) is to Determine Whether a Medical Practitioner Prescribed Controlled Substances as a Drug Dealer

Under 21 U.S.C. § 841(a)(1), a medical practitioner with a Drug Enforcement Agency ("DEA") license is convicted only if he intentionally distributes controlled substances for other than "a legitimate medical purpose in the usual course of professional practice." The terms "course of his professional practice" and "legitimate medical purpose" are not defined by either statute or regulation.

The question in this case is whether Dr. Azmat ceased being a doctor at all and was acting as a drug dealer. For instance, in *United States v. Joseph*, 709 F.3d 1082, 1102-1104 (11th Cir. 2013), the Eleventh Circuit just earlier this year, in affirming the conviction of the defendant-physician, noted that he had prescribed an inordinately large quantity of controlled substances, prescriptions were issued to a patient for delivery to others, no physical examination was conducted, prescriptions were pre-signed and prescriptions were issued to patients never seen by a physician, in finding that there was sufficient evidence to convict the defendant physician. *See United States v. Elder*, 682 F.3d 1065, 1072 (8th Cir. 2012) (upholding conviction of physician-defendant where he did not maintain any patient files and rarely saw patients himself, yet prescribed medication to 544 patients in a five month period); *United States v.*

13

*Kaplan*, 895 F.2d 618, 620–21 (9th Cir. 1990) (failure of defendant-doctor to ever conduct physical exam or to take medical histories was sufficient evidence to convict defendant-doctor under 21 U.S.C. § 841(a)(1)); *United States v. Bartee*, 479 F.2d 484, 485–87 (10th Cir. 1973) (finding there was sufficient evidence to support conviction under 21 U.S.C. § 841(a)(1) where defendant-doctor told patient to go to "different drugstores each time [the patient filled a prescription]" because of pressure from the Federal Bureau of Narcotics and Dangerous Drugs, used slang terms for controlled substances, and the defendant-doctor never performed a physical examination); *United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) (defendant-physician convicted where he developed scheme for nurses to see patients without the doctor, and defendant-physician signed prescriptions without even knowing identity of patients).

In his disclosures, Dr. Kennedy gives no basis for his opinions. He does not contend for instance that the standards he employs are supported in the medical literature. He does not contend that his opinions have been peer reviewed. Rather, it seems that Dr. Kennedy's opinions have been fashioned together for the purpose of this litigation.

Finally, though Dr. Kennedy consistently comments on the lack of supporting documentation from Dr. Azmat as a standard of care issue that supposed opinion is debunked by the American Medical Association. Under the American Medical Association Code of Medical Ethics, Opinion 7.02, "Notes made in treating a patient are primarily for the physician's own use and constitute his or her personal property." Thus, if the patient record belongs to the physician for his or her own use, the lack of such a record can not by definition be a standard of care issue.

### iv. Dr. Kennedy Has Failed to Account for Alternative Explanations

One of the duties of an expert is to account for alternative explanations for the conduct at issue. One of the problems with both the proposed testimony of Dr. Kennedy and Dr. Zdanowich

is that neither expert has properly framed the conduct of Dr. Azmat. Bear in mind, Dr. Azmat was employed at the East Health Clinic for only a period of weeks and he never saw any of the patients at issue more than once.

Dr. Kennedy repeatedly writes that Dr. Azmat initiated a regimen of controlled substances. What Dr. Kennedy fails to see in the patient chart is that the patient was already on controlled substances at the time of the initial visit and that Dr. Azmat routinely reduced the amount and number of controlled substances the patient was on. Attached as Exhibit "C" is a chart reflecting the controlled substances the patient was on at the time of visit to Dr. Azmat and the dosage and number of controlled substances prescribed by Dr. Azmat. Unfailingly, Dr. Azmat **reduced** the dosage and in most cases **eliminated** the prescription of Xanax.

Thus, Dr. Kennedy has completed failed to account for the fact that Dr. Azmat routinely attempted to wean the patient's from the controlled substance.

Pain management is a difficult, dangerous profession. A treating physician has to consider weaning his or her patients from the controlled substance, and this is what Dr. Azmat unfailingly did.

Dr. Kennedy failed to consider this obvious alternative explanation in arriving at his opinions and his opinions, should, therefore, be excluded.

**v. What Dr. Kennedy Does in his Practice Does Not Establish the Standard of Care**

It is expected that the government will try and establish the appropriate standard of care – what was required of Dr. Azmat in his treatment of the patients outlined in the indictment by reference to what Dr. Kennedy does in his own practice. That is not the question.

As set forth above, what the government must prove is that Dr. Azmat entered into an agreement to as a drug dealer, rather than as a doctor.

Dr. Kennedy has earlier testified before this court and without objection stated what his practice is at his clinic. *See Hung Thien Ly*, Case No. 407-286, Trial Transcript, pp. 650-653. In fact, Dr. Kennedy's personal practice was repeatedly held up to the jury as the standard. However, what a physician would do in his own practice does not set the standard of care. The appropriate inquiry for establishing a standard of professional care is that degree of skill and care employed by physicians generally under similar conditions and like surrounding circumstances. In *Joseph*, the Eleventh Circuit cited with approval the jury instruction of the district court that the jury should consider whether the defendants acted in "accordance with a standard of medical practice generally recognized and accepted in the United States. 709 F.3d at 1095. The court went on to note that no Supreme Court, or Eleventh Circuit case had disapproved of jury instructions to evaluate the conduct of a defendant physician against a "standard of medical practice generally recognized and accepted in the United States." *Id.*, at 1096, *quoting Moore*, 423 U.S. at 139.

Thus, any opinion of Dr. Kennedy regarding his own personal practice is not relevant to the task at hand.

### vi. Dr. Kennedy Should not be Permitted to Testify Whether Dr. Azmat Conducted his Practice Without a Legitimate Medical Purpose

It is not for Dr. Kennedy, or any other professional to opine whether Dr. Azmat has issued medication without a legitimate medical purpose, as such testimony is not a medical opinion that analyzes the defendant-doctor's treatment of the patient. Rather, it is a legal opinion about the defendant-doctor's guilt, which is a question properly reserved for the jury.

The government will seek to have Dr. Kennedy qualified as a medical expert. In that capacity, Dr. Kennedy if properly qualified, may be permitted to testify to two and only two issues. First, through Dr. Kennedy the government will attempt to define the "standard of care"

for prescribing pain medication. Second, assuming such a standard even exists and can be identified, Dr. Kennedy may testify about whether Dr. Azmat violated that standard. His testimony has no other relevance in this case.

Dr. Kennedy has earlier testified – again without objection – that the defendant-doctor's conduct violated the legal standard if "legitimate medical purpose." *See Hung Thien Ly*, Case No. 407-286, Trial Transcript, pp. 681-683. However, this Court will instruct the jury to consider – whether the defendant-doctor's breach of the medical "standard of care" was also "outside the course of professional practice" and not for a "legitimate medical purpose." While Rule 704(a) allows expert testimony about facts that "embrace[] an ultimate issue to be decided by the trier of fact," opinion testimony that "states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) (emphasis added; citations omitted).

The Eleventh Circuit has been particularly rigorous in enforcing this rule. *See, e.g., Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1112 n. 8 (11th Cir. 2005) ("an expert witness may not substitute for the court in charging the jury regarding the applicable law" and holding that the plaintiff's doctor expert's testimony that the Monroe County Detention Center "was deliberately indifferent to [the plaintiff] was 'a legal conclusion that does little more than tell the jury what result should be reached'") (citation omitted); *Montgomery*, 898 F.2d at 1541 ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law") (citations omitted).

An expert's testimony violates this principle when the opinion is expressed in words that "'have a separate and distinct and specialized meaning in the law different from that present in the vernacular.'" *McIver*, 470 F.3d at 562, quoting *United States v. Barile*, 286 F.3d 749, 760

(4th Cir. 2002). For example, an expert cannot testify that a defendant's actions constituted "extortion," *Dibella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005), that a dog's bite constituted "deadly force," *Miller v. Clark County*, 340 F.3d 959, 963 n. 7 (9th Cir. 2003), or that a product was "unreasonably dangerous." *Strong v. E.I.DuPont de Nemours Co.*, 667 F.2d 682, 685-86 (8th Cir. 1981).2

In other words, the government intends to have Dr. Kennedy render expert opinions on the essential element of the crimes charged in this case. Such testimony "does little more than tell the jury what result should be reached" and, therefore, far exceeds the range of permissible expert "medical" testimony. *Cook*, 402 F.3d at 1112 n. 8.

### vii. <u>Dr. Kennedy's Testimony Violates Rule 704</u>

The Federal Rules of Evidence expressly bar one category of potential expert testimony. Rule 704(b) bars testimony about a defendant's mens rea or "intent" in committing the charged crime:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Testimony about the defendant's mens rea by witnesses paid by the government is both unhelpful to juries and usurps their function. "Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991).

---

[2] The only "doctor" case that counsel have found in which this issue was raised was *McIver*, where the issue was raised for the first time on appeal and, thus, reviewed only for "plain error." The Fourth Circuit rejected the argument but, in doing so, did not recognize that the expert's testimony (that Dr. McIver's conduct was "outside the course of legitimate medical practice") was identical to the legal standard. *See McIver*, 470 F.3d at 562 (claiming that the expert's testimony did "not involve terms with similar legal significance.

This type of testimony is plainly a violation of Rule 704(b). *See, e.g., Omar v. Babcock*, 177 Fed. Appx. 59, 63 n. 5 (11th Cir. 2006) (affirming district court's ruling striking testimony of expert who testified that "'the defendants consciously disregarded known signs of abuse'"). In his earlier testimony Dr. Kennedy testified that the defendant-doctor was not writing prescriptions for a "legitimate medical purpose." *See Hung Thien Ly*, Case No. 407-286, Trial Transcript, pp. 681-683. In addition to constituting an improper opinion on the central issue of law in the case, rather than a medical opinion within Dr. Kennedy's expertise, see infra, testimony about a defendant- doctor's alleged "purpose" is a flagrant violation of Rule 704(b).

The "reports" Dr. Kennedy has written for the government in this case contain similar editorializing – in each of his patient reports, at page 3, he inevitably describes the physical examination as "not credible." This sort of exaggerated opinion is not a medical opinion at all, but a closing argument clothed in an expert's "testimony" and violates Rule 704(b).

## A. **Dr. Zdanowich is a Pharmacology Professor and Can Not Give Clinical Standard of Care Opinions**

The exclusion of the great majority of Dr. Zdanowich's opinions is not a close call. He is **not** a clinician. He has never treated a patient. He does not prescribe controlled substances. He can not prescribe controlled substances. If properly qualified, Dr. Zdanowich could perhaps testify about the side effects of the controlled substances at issue, but even that evidence would not assist the trier of fact in determining whether Dr. Azmat is a drug dealer because there will be no dispute that the substances at issue are controlled substances.

His opinions disclosed by the government indicate that wide range of potential topics about which he has no qualification to testify. Although not altogether clear, Dr. Zdanowich, apparently proposes to testify regarding the following and they will be addressed in turn:

1) The long term use of opioids for chronic back pain remains controversial. Whether the long term use of opioids is controversial is not an issue in this case. This opinion should be excluded;

2) Drug interactions "were possible" in patients receiving benzodiazapines and opioids. Dr. Zdanowich doesn't explain what drug interactions "were possible" and such testimony does not add to the question for the jury's determination. This opinion should be excluded;

3) There was no indication that patients were counseled regarding the addictive potential of opioids, nor were there any obvious attempts to wean patients off opioids. Dr. Zdanowich is not qualified to give an opinion about what is appropriate standard of care in the physician-patient relationship and this opinion should be excluded. Moreover, he expressly ignores the evidence set forth in Exhibit "C";

4) He extensively cites to the American Pain Society guidelines for chronic opioid therapy and speaks extensively to what "clinicians" should do in treating patients. Dr. Zdanowich, is not a clinician, and his opinions should be excluded;

5) Many patients were exhibiting what he describes as "classic drug seeking behavior." Again, however, Dr. Zdanowich is not a physician, he has never treated a patient and, so, he shouldn't be permitted to testify about "classic" behaviors of a patient;

6) Dr. Zdanowich even criticitizes the use of MRI's commenting that they are "highly questionable" and can be "easily faked." This is not expert testimony at all, but rather contentions of a party bound up as expert testimony. This proposed testimony should be excluded;

7) Soma is an outdated medication that is a drug of abuse. However, Dr. Azmat didn't prescribe Soma to any of the 25 patients listed in the indictment. This opinion, therefore, doesn't fit this case and is not relevant;

8) Indications for the prescription of Xanax and Valium is "unclear" and is "controversial." There are 2 problems here: 1) Dr. Azmat always weaned the patient from Xanax (as set forth in Exhibit "C" four patients presented with a history of Valium, but none were prescribed Valium (Diazepam) by Dr. Azmat and, in fact, he discontinued that controlled substance in each of those 4 patients (#9, 14, 20, and 24)), and 2) Dr. Zdanowich is not a medical doctor and can not testify about the propriety of prescription given a patient's presentation. This testimony should be excluded;

9) Evidence of "true anxiety disorders in patients checking anxiety [on the admission history] is questionable." Dr. Zdanowich also comments that recommended doses are 0.5 mg, while "a number of patients" were started on 1.0 mg or 2.0 mg. Two problems present with this proposed testimony. First, the question here is whether Dr. Azmat became a drug dealer. Dr. Zdanowich doesn't get to second guess the patient's description in their history and label it as "questionable." Such testimony is not expert testimony at all. Secondly, this testimony doesn't fit as Dr. Azmat **reduced** the Xanax being taken by his patients (23 of the 25 patients were on either Xanax or some other benzodiazepine (Valium, Diazepam, Lorezepam) and only 3 patients were continued on Xanax in a reduced dose (#6, 12 and 13) in order to wean them off of that controlled substance. This testimony should be excluded;

10) Other medical issues were missed for patients. Again, Dr. Zdanowich is not a physician, so he is not qualified to testify about the propriety of the medical care rendered and whether a patient's blood pressure was too high, or the patient was, or was not obese.

11) Some patient's tested positive for THC and that is a "red flag." As a non-physician, Dr. Zdanowich should not be permitted to testify about the clinical presentation of a patient.

12) Doses of Lorcet "appear" to be excessive in light of the vague indications. There are two problems with this proposed testimony. First, Dr. Zdanowich is not a physician and, is, therefore, not qualified to testify about an appropriate dosage for a given patient presentation and second, the proposed testimony of what "appear[s]" to be excessive does not establish a standard of care, and therefore, does not assist the jury. None of Dr. Zdanowich's proposed opinions withstand scrutiny under *Daubert* and, therefore, his testimony should be excluded.

## CONCLUSION

Based upon all of the reasons and authorities set forth above, Dr. Azmat respectfully requests that this Court exclude all expert testimony from Dr. Kennedy and Zdanowicz as set forth herein. Dr. Azmat respectfully requests an evidentiary hearing on the issues presented by this motion.

This the 25th day of ____October____, 2013.

/s/ **Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this court.

This 25th day of ___October___, 2013.

/s/ **Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
E-Mail: Twithers@gwllawfirm.com

# EXHIBIT "A"

## EXPERT WORK SHEET

Case # 66                    NAME:  Dr. Gossett

PATIENT NAME: ███████████

1. **Brief description of symptoms, diagnosis and course of treatment.**

This 49-year-old patient from Florida was being treated for low back pain. The pain complaint was reportedly 8 years in duration and secondary to an MVA. The chart contains an MRI report, a patient completed history, a physical examination form, and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 03/21/2011, 04/13/2011 and 05/20/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, Percocet 10/325, Xanax, Colace and Motrin. The lumbar MRI report from 07/07/2010 reports an impression: "Broad-based posterior disc herniation at L4-L5 and L5-S1. Bulging of the annulus fibrosis at L3-L4. Diffuse dehydration of the discs. Moderate to severe narrowing of the disc spaces. Mild endplate spondylosis. Mild facet joint arthrosis. Straightening of the normal lordosis." Initial physical examination note is essentially normal with the exception of restricted cervical and lumbar range of motion. Intake urine toxicology screen was reported as positive for oxycodone.

2. **Can you form an opinion?**

   ☒ **Yes, I can form an opinion.**

   ☐ No, I cannot form an opinion.

   ☐ Need more information (specify):

3. **What is your opinion?**

   a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒ Below minimum standards
   ☐ Within minimum standards

   **EXPLAIN YOUR OPINION:**

USAO-002663

Initial Physical examination was not credible and there is no documentation that the patient was examined on follow-up visits. The MRI report alone does not rise to the level of supporting initial narcotic management. Previous treatment records are entirely absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The attending physician inappropriately provided prescriptions for several schedule II opiates in the absence of a credible supporting physical examination. The findings from the provided lumbar MRI report alone does not support initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no support for prescribing Xanax. There is no documentation in the chart that records an actual plan of treatment. Over the course of treatment, oxycodone was increased from #150 pills to #180 without explanation.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not documented. Initial encounter physical examination assessment note is cryptic. Follow-up encounters did not document any physical examination.

USAO-002664

## OVERALL SUMMARY:

The treatment of this patient from out of state falls below an acceptable standard
of care. The initial physical examination was not credible or accompanied by
adequate historical documentation, and was not supportive of prescribing
narcotics. A physical examination was not documented on the 2 follow-up visits.
At no point was a previous treating physician contacted about this patient, and
records were not requested. The radiographic report does not document findings
that support narcotic management. There is nothing else in the chart that supports
the reported pain history. The lack of other supporting documentation or
appropriate physical examination, in my opinion, indicates that this patient's
management was not medically legitimate, falls below a reasonable standard of
care, and may represent a significant danger to the patient's safety.

2/15/13
_____
Date of Review

_____
Signature of Peer Reviewer

# EXPERT WORK SHEET

Case # 78                    NAME:  Dr. Gossett

PATIENT NAME: 

1. **Brief description of symptoms, diagnosis and course of treatment.**

This 41-year-old patient from Kentucky was being treated for low back and leg pain. The patient's pain complaint dates from 19 years of age and is secondary to an unspecified job and accident related injuries. The chart contains an MRI report, a patient completed history, a physical examination form, and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 02/21/2011 and 04/05/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Xanax, Motrin and Colace. The lumbar MRI report from Boca Raton, Florida, on 07/06/2009 reports an impression: "1. At L5-S1, desiccation of the intervertebral disc with bilateral facet hypertrophy. There is a disc osteophyte complex projection posterior lateral to the right without evidence of neural foraminal narrowing or central spinal canal stenosis. 2. At L4-L5, posterior bulge of the intervertebral disc posterolateral to the right with mild neural foraminal narrowing. The left neural foramen is patent." Initial physical examination note is cryptic, consisting of approximately 10 words, and appears to be essentially normal. Intake urine toxicology screen was positive for oxycodone.

2. **Can you form an opinion?**

☒ **Yes, I can form an opinion.**

☐ No, I cannot form an opinion.

☐ Need more information (specify):

3. **What is your opinion?**

a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

USAO-002430

Initial Physical examination was not credible and there is no documentation that the patient was examined on the follow-up visits. The MRI findings are equivocal and do not rise to the level of initiating narcotic management. Previous treatment records are absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ **Below minimum standards**
☐ **Within minimum standards**

EXPLAIN YOUR OPINION:

The attending physician inappropriately provided prescriptions for several schedule II opiates and Xanax in the absence of a credible physical examination or previous treatment documentation. The findings from the MRI report do not support narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documented rationale for prescribing Xanax. There is no documentation in the chart that records an actual plan of treatment. On the initial appointment, the patient was prescribed a total of #210 scheduled pills. On the second visit the total dosage of oxycodone was decreased while the pill count remained unchanged.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ **Below minimum standards**
☐ **Within minimum standards**

EXPLAIN YOUR OPINION:

The documentation present in the chart is cryptic and inadequate. On the initial visit, the encounter documentation consists of approximately 10 words and there is no assessment, treatment plan or rationale for prescribing

controlled agents. Follow-up encounter did not document any physical examination.

## OVERALL SUMMARY:

The treatment of this 41-year-old out of state patient falls below an acceptable standard of care in every respect. The initial physical examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. As noted above, the entire physical examination documentation consists of approximately 10 words. A physical examination was not performed on the follow-up encounter. At no point was a previous treating physician contacted about this patient, and records were not obtained. The MRI report does not support narcotic management. There is nothing else in the chart that supports the reported pain history, and long-standing clinical documentation should have been available. A patient from Kentucky that is seeking narcotic pain management in Georgia based solely on the minimal findings of a 2 year old MRI performed in Florida raises an extremely high index of suspicion about the patient's credibility. Additionally, it should be noted that on the second encounter the treating physician records: "Good pain control. Patient feels she needs increase in Xanax." Xanax dosage was then doubled without further explanation. These issues, combined with the lack of supporting documentation or appropriate physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/15/12
Date of Review

Signature of Peer Reviewer

# EXPERT WORK SHEET

Case # 79    **NAME:** Dr. Gossett

      **PATIENT NAME:** ▓▓▓▓▓▓▓

1. <u>Brief description of symptoms, diagnosis and course of treatment.</u>

 This 41-year-old patient from Kentucky was being treated for low back pain. The patient's 3 year pain complaint is reported as having no precipitating incident. The chart contains an MRI report, a patient completed history, a physical examination form, and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 03/14/2011, 04/11/2011 and 05/23/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Valium, Naprosyn and Neurontin. The lumbar MRI report from Premier Medical Imaging in Florida, dated 02/11/2011 reports an impression: "Disc bulging at all levels, most severe at L5-S1. Neural encroachment as detailed above." Initial physical examination notes the patient weighs 268 pounds with blood pressure 155/123 and pulse of 106. Physical examination somewhat cryptic, it appears to document restricted lumbar range of motion, "straight leg raising 75 degrees bilateral," and bilateral ankle swelling. Examination otherwise essentially normal. Intake urine toxicology screen was equivocal, follow-up was positive for oxycodone and benzodiazepines.

2. <u>Can you form an opinion?</u>

  ☒ <u>Yes, I can form an opinion.</u>

  ☐ No, I cannot form an opinion.

  ☐ Need more information (specify):

3. <u>What is your opinion?</u>

  a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

 ☒ Below minimum standards
 ☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

USAO-002860

Initial Physical examination was not credible. Follow up physical examinations either not credible or not performed. The MRI finding of severe left-sided L5-S1 neural foraminal stenosis is significant, and could rise to the level of initiating narcotic management, but previous treatment records are absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided other than a pharmacy report indicating that this patient had previously received oxycodone and diazepam prescriptions in Florida.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The attending physician inappropriately initially prescribed a schedule II opiate and Valium in the absence of a credible physical examination or previous treatment documentation. On presentation, this 268-pound patient had malignant hypertension. This was not addressed. The findings from the MRI report could be significant, but the report alone does not support narcotic management, and there is nothing else in the chart that supports the prescribed treatment. The radiographically described lesion could be amenable to interventional treatment, but referral was not entertained. There is no documentation in the chart that records an actual plan of treatment. There is no documented rationale for the initial prescription of Valium. On the initial appointment, the patient was prescribed a total of #210 scheduled pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The documentation present in the chart is inadequate. On the initial visit, the physical examination documentation is not credible. There is no treatment plan or rationale for prescribing controlled agents. Documentation on follow-up encounters was not credible.

## OVERALL SUMMARY:

The treatment of this 41-year-old out of state patient falls below an acceptable standard of care. The initial physical examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The physical examination on follow-up encounters was absent or not credible. At no point was a previous treating physician contacted about this patient, and records were not obtained. The MRI report does not alone support narcotic management, and there is nothing else in the chart that supports the reported pain history. The treating physician does not record entertaining a referral for interventional management. A patient from Kentucky that is seeking narcotic pain management in Georgia based on the findings of an MRI performed in Florida raises a very high index of suspicion. The patient had a suspicious and documented history of obtaining prescriptions for scheduled agents from multiple physicians in Florida. Additionally, it should be noted that on the initial encounter the treating physician records that Valium is to be discontinued, but the patient had a urine toxicology screen that was positive for benzodiazepines on her next encounter. While this is theoretically possible, in light of the other factors associated with this patient, this matter should have been addressed. These issues, combined with the lack of supporting documentation or appropriate physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/15/12

Date of Review

Signature of Peer Reviewer

USAO-002862

# EXPERT WORK SHEET

Case # 81          NAME:  Dr. Azmat

PATIENT NAME: 

---

1.    <u>Brief description of symptoms, diagnosis and course of treatment.</u>

This 37-year-old patient from Kentucky was being treated for back and hip pain.
The patient's 11 year pain complaint does not date from a specified injury, and
was rated by the patient as "9" in severity.  The chart contains an MRI report, a
patient completed history, a physical examination form, a pharmacy medication
history and other office documentation. There are no previous medical records in
the chart.  The encounter documentation is comprised of office notes from
03/11/2011 and an undated progress note which appears to be from 04/18/2011.
Also included in the chart are copies of prescriptions for oxycodone 30 mg,
oxycodone 15 mg, Valium, Elavil and Motrin. The lumbar MRI report from
Tamarac, Florida, on 08/19/2009 reported findings of moderate sized disc
protrusion at L4-S1 with bulging of the annulus and bilateral nerve root
effacement, small disc protrusions at L1-L4 without nerve root effacement. The
radiologist also recommended correlation with clinical symptoms and neurologic
exam to assess the significance of these findings. Initial physical examination
note reports: "**Lumbar flexion 90 degrees, (illegible), tenderness L-S paravertebral,
straight leg raising 90 degrees bilateral (illegible)**" Examination is otherwise
unremarkable. Intake urine toxicology screen was positive for oxycodone.  Patient
was diagnosed with chronic low back pain and multilevel degenerative disc
disease, nerve root effacement.

---

2.    <u>Can you form an opinion?</u>

      ☒  <u>Yes, I can form an opinion.</u>

      ☐  No, I cannot form an opinion.

      ☐  Need more information (specify):

3.  <u>What is your opinion?</u>

    a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical
    examination, laboratory, and radiographic studies, when applicable."

☒  **Below minimum standards**

USAO-002835

☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not supportive of prescribing narcotics and there is no documentation that the patient was examined on the follow-up visit. The MRI report findings alone or in combination with the physical examination noted above do not rise to the level of initiating narcotic management. Previous treatment records are absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ **Below minimum standards**
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The attending physician inappropriately provided several prescriptions for a schedule II opiate and Valium in the absence of a credible supporting physical examination or previous treatment documentation. As noted above, the findings from the provided MRI reports alone do not support initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. On the subsequent appointment, opiates were decreased to #180 pills and Valium was added without explanation other than "need help sleeping." There is no treatment goal other than "medical management."

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ **Below minimum standards**
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

USAO-002836

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination assessment documentation is inadequate to support prescribed treatment. Follow-up encounter did not document any physical examination. There is no documentation that supports the prescriptions for Valium. There is no documented effort to retrieve a previous treatment record.

**OVERALL SUMMARY:**

The treatment of this 37-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The pharmacy documentation in the chart clearly showed that the patient had received narcotics prescriptions from several previous treating physicians, so clinical documentation should have been available. A physical examination was not documented on the follow-up visit. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI reports do not document findings that support narcotic management and there is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on a 2 year old MRI obtained in Florida raises a high index of suspicion. The lack of supporting documentation or appropriate physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_2/21/12_
Date of Review

_Signature of Peer Reviewer_

# EXPERT WORK SHEET

Case # 82        NAME:  Dr. Azmat

PATIENT NAME: 

1.    Brief description of symptoms, diagnosis and course of treatment.

This 55-year-old patient from Kentucky was being treated for neck pain. The patient's reported 10 year pain complaint dated from a fall injury, and was rated as "9" in severity. The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of a single office note from 03/08/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Flexeril and Motrin. The lumbar MRI report from Plantation, Florida, on 10/25/2010 reported an impression: "Broad-based posterior disc herniation at C5-C6. Posterior central disc herniation at C6-C7. Diffuse dehydration of the disc. Loss of disc height, as described above. Straightening of the normal lordosis." The patient weighed 261 pounds and had an initial blood pressure reading of 196/116. Initial physical examination note reports: "Decreased range of motion flexion/extension/lateral flexion/rotation, no C-spine tenderness." Restricted left lumbar rotation was noted. Examination is otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone. Patient was diagnosed with chronic neck pain and degenerative disc disease with (illegible) radiculopathy.

2.    Can you form an opinion?

   ☒  Yes, I can form an opinion.

   ☐  No, I cannot form an opinion.

   ☐  Need more information (specify):

3.  What is your opinion?

   a.  *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒  Below minimum standards
   ☐  Within minimum standards

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings could be significant with this patient, but alone do not rise to the level of initiating narcotic management. Physical examination reported only "nonfocal" neurologic findings and subjectively restricted cervical range of motion without cervical tenderness. Previous treatment records are absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

The attending physician inappropriately provided several prescriptions for a schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. As noted above, the findings from the provided MRI reports alone do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. There is no mention of the patient's markedly elevated blood pressure.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

USAO-002721

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment.

## OVERALL SUMMARY:

The treatment of this patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, and the cervical examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported a 10 year history of pain with previous treatment, so clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI reports do not document findings that support narcotic management and there is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on an MRI obtained in Florida raises a high index of suspicion. A lack of any mention of the patient's near malignant hypertension raises a very high index of suspicion. The lack of supporting documentation or credible supporting physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_2/21/12_
Date of Review

_____
Signature of Peer Reviewer

USAO-002722

# EXPERT WORK SHEET

**Case # 83**          **NAME:  Dr. Azmat**

**PATIENT NAME:** ▓▓▓▓▓▓▓

1. <u>**Brief description of symptoms, diagnosis and course of treatment.**</u>

This 49-year-old patient from Kentucky was being treated for back pain.  The patient's reported 6 year pain complaint dated from an MVA, and was rated as "8" in severity without medications and "0" in severity with medications.  The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation.  There are no previous medical records in the chart.  The encounter documentation is comprised of a single office note from 02/28/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg, hydrocodone 10/325 mg, and Naprosyn. The lumbar MRI report from Delray Beach, Florida, on 01/17/2011 reported an impression: "Disc bulging at all levels, most severe at L2-L3.  Spinal stenosis at L4-L5.  Neural encroachment as detailed above." Initial physical examination note reports: "Lumbar flexion 75 degrees lateral flexion 20 degrees, no tenderness."  Examination is otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone, opiates and benzodiazepines.  Patient was diagnosed with chronic low back pain with multilevel disc bulging.

2. <u>**Can you form an opinion?**</u>

   ☒ <u>Yes, I can form an opinion.</u>

   ☐ No, I cannot form an opinion.

   ☐ Need more information (specify):

3. <u>**What is your opinion?**</u>

   a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒ Below minimum standards
   ☐ Within minimum standards

   **EXPLAIN YOUR OPINION:**

USAO-002474

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings could be significant with this patient, but alone do not rise to the level of initiating narcotic management. Physical examination reported only "grossly intact" neurologic findings and subjectively restricted lumbar range of motion without tenderness. Previous treatment records are completely absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The attending physician inappropriately provided several prescriptions for schedule II and schedule III opiates in the absence of a credible supporting physical examination or previous treatment documentation. As noted above, the findings from the provided MRI reports alone do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is

not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment.

## OVERALL SUMMARY:

The treatment of this patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported a 6 year history of pain subsequent to a an MVA and reportedly had received previous treatment, so clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI reports do not document findings that alone support narcotic management and there is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on an MRI obtained in Florida raises a high index of suspicion. That the patient also reports a pain severity level of "8" without narcotic medication and "0" with narcotic medication raises a very high index of suspicion. The lack of supporting documentation or credible supporting physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12

_____
Date of Review

_____
Signature of Peer Reviewer

USAO-002476

# EXPERT WORK SHEET

**Case # 84**          **NAME:  Dr. Azmat**

**PATIENT NAME:** 

**1.**    Brief description of symptoms, diagnosis and course of treatment.

This 60-year-old patient from Kentucky was being treated for back and knee pain.
The patient's reported pain complaint dated from a work-related injury in 1999
and was rated as "10" in severity without medications and "3" in severity with
medications.  The chart contains MRI reports, a patient completed history, a
physical examination form and other office documentation. There are no previous
medical records in the chart.  The encounter documentation is comprised of office
notes from 03/02/2011, 03/30/2011 and 04/28/2011.  Also included in the chart are
copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Percocet 10/325 mg
and Motrin. The lumbar MRI report from Kentucky on 07/21/2010 reported an
impression: "Broad-based disc bulge at L3-L4 and L4-L5.  More significant at L4-
L5 is hypertrophy of the ligamentum flavum and narrowing of the spinal canal."
Initial physical examination note reports restricted lumbar range of motion and a
left paraspinal tenderness.  Extremity full range of motion was noted.
Examination is otherwise unremarkable. Intake urine toxicology screen was
positive for oxycodone.  Patient was diagnosed with chronic low back pain with
bulging disc and narrowing of spinal canal, right knee ligament tear.

**2.**    Can you form an opinion?

    ☒  Yes, I can form an opinion.

    ☐  No, I cannot form an opinion.

    ☐  Need more information (specify):

**3.  What is your opinion?**

    a.  *Diagnosis.*  "Evaluation of a medical problem using means such as history, physical
    examination, laboratory, and radiographic studies, when applicable."

☒  **Below minimum standards**
☐  **Within minimum standards**

**EXPLAIN YOUR OPINION:**

USAO-002635

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings do not demonstrate neurologic impingement and do not rise to the level of initiating narcotic management. Physical examination reported only "grossly intact" neurologic findings and subjectively restricted lumbar range of motion with tenderness. At no point was the patient's knee examined. Previous treatment records are completely absent. Previous treating physician or physicians were not listed, and there is no indication that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The attending physician inappropriately provided several prescriptions for a schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. As noted above, the findings from the provided MRI reports alone do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #180 scheduled pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is

USAO-002636

inadequate to support prescribed treatment. During the course of an initial visit and several follow-up appointments, a knee examination is not documented.

## OVERALL SUMMARY:

The treatment of this patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, "full range of motion" of the extremities, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported a very extensive history of pain subsequent to a work injury and reportedly had received previous treatment, so clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI reports do not document findings that alone support narcotic management and there is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on an equivocal MRI raises an elevated index of suspicion. That the patient also reports a pain severity level of "10" without narcotic medication and "3" with narcotic medication raises a very high index of suspicion. The lack of supporting documentation or credible supporting physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

# EXPERT WORK SHEET

**Case # 85**     **NAME:** Dr. Azmat

**PATIENT NAME:** ████████

1. ## Brief description of symptoms, diagnosis and course of treatment.

This 37-year-old patient from South Carolina was being treated for back pain. The patient's reported 15 year pain complaint was secondary to heavy lifting at work and was rated as "9" in severity without medications and "6" in severity with medications. The chart contains MRI reports, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 03/11/2011, 03/29/2011 and 04/26/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, Valium 10 mg and Motrin. The lumbar MRI report from Inverness, Florida dated 06/17/2010 reported an impression: "Degenerative disc disease changes of the lumbar spine at L4/L5 and L5/S1. These findings are most likely chronic. There is moderate bilateral neural foraminal stenosis as well as mild to moderate central canal stenosis at L5/S1. Similar findings are visualized to a mild degree at L4/L5. No acute findings are identified." Initial physical examination note reports restricted lumbar range of motion, no lumbosacral tenderness. Extremity full range of motion and nonfocal neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone and benzodiazepines. Patient was diagnosed with chronic low back pain and degenerative disc disease with foraminal and central canal stenosis.

2. ## Can you form an opinion?

☒ Yes, I can form an opinion.

☐ No, I cannot form an opinion.

☐ Need more information (specify):

3. ## What is your opinion?

a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ **Below minimum standards**

USAO-002604

☐ Within minimum standards

EXPLAIN YOUR OPINION:

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings do not demonstrate neurologic impingement and do not rise to the level of initiating narcotic management. Physical examination reported only "nonfocal" neurologic findings and subjectively restricted lumbar range of motion without tenderness. Previous treatment records are completely absent. Previous treating physician or physicians were listed in this case, but there is no indication that a previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The attending physician inappropriately provided a prescription for a schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI reports alone do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #150 scheduled pills. There was no documented support for prescribing Valium.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

USAO-002605

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment. During the course of an initial visit and several follow-up appointments, Valium was provided in addition to oxycodone without explanation. There is no documentation that a follow up physical examination was ever performed.

**OVERALL SUMMARY:**

The treatment of this patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, "full range of motion" of the extremities, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported a 15 year history of pain subsequent to a work injury and reportedly had received previous treatment, so copious clinical documentation should have been available. Although the treating physician recorded the name of a previous medical care provider, at no point was the previous treating physician contacted about this patient, and records were not requested. The MRI reports do not document findings that alone support narcotic management and there is nothing else in the chart that supports the reported pain history. A patient from South Carolina that is presenting for narcotic management in Georgia based on an equivocal MRI raises an elevated index of suspicion. The lack of supporting documentation or credible supporting physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

# EXPERT WORK SHEET

Case # 86          NAME: Dr. Azmat


PATIENT NAME: 


## 1.    Brief description of symptoms, diagnosis and course of treatment.


This 27-year-old patient from Florida was being treated for back pain. The patient's reported 8 year pain complaint was secondary to a fall injury at work and was rated as "9" in severity without medications and "4" in severity with medications. The patient reported a usual pain level of "9." The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 03/03/2011, 04/12/2011 and 05/09/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Percocet 10/325 mg, soma, Naprosyn and Motrin. The lumbar MRI report from Plantation, Florida dated 03/17/2010 reported an impression: "Posterior central disc herniation at L5-S1. Bulging of the annulus fibrosis at L4-L5. There is partial dehydration of the disc with mild narrowing of the disc basis. Mild endplate spondylosis. Mild facet joint arthrosis." Initial physical examination note reports a limping gait, restricted lumbar range of motion, straight leg raise to 90 degrees, and left paraspinal lumbosacral tenderness. Extremity full range of motion and nonfocal neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone and benzodiazepines. Patient was diagnosed with chronic low back pain and degenerative disc disease with herniation and facet arthropathy.


## 2.   Can you form an opinion?

    ☒ **Yes, I can form an opinion.**

    ☐ No, I cannot form an opinion.

    ☐ Need more information (specify):

## 3. What is your opinion?

    a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings do not demonstrate neurologic impingement and do not rise to the level of initiating narcotic management. Physical examination reported only "nonfocal" neurologic findings and subjectively restricted lumbar range of motion with tenderness. Previous treatment records are completely absent. Previous treating physician or physicians were listed in and included pharmacy history, but there is no indication that a previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The attending physician inappropriately provided several prescriptions for a schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI reports do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. There was no documented support for prescribing Soma.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-002693

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment. During the course of an initial visit and several follow-up appointments, Soma was provided in addition to oxycodone without explanation. There is no documentation that a follow up physical examination was ever performed.

**OVERALL SUMMARY:**

The treatment of this patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, "full range of motion" of the extremities, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported an 8 year history of pain subsequent to a work injury and reportedly had received previous treatment, so copious clinical documentation should have been available. On the enclosed pharmacy printout, there were listed at least 3 physicians who had previously prescribed scheduled medications. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI reports do not document findings that alone support narcotic management and there is nothing else in the chart that supports the reported pain history. A 27-year-old patient from Florida that is presenting for narcotic management in Georgia based on an equivocal MRI raises an elevated index of suspicion. That he rates his usual pain level as "9," raises a very high index of suspicion. The lack of supporting documentation or credible supporting physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

# EXPERT WORK SHEET

**Case # 87**          **NAME:** Dr. Azmat

**PATIENT NAME:** 

1. <u>**Brief description of symptoms, diagnosis and course of treatment.**</u>

This 26-year-old patient from Kentucky was being treated for back pain. The patient's reported 4 year pain complaint was work related and was rated as "8" in severity without medications and "5" in severity with medications. The patient reported a usual pain level of "8." The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 03/18/2011, 04/05/2011 and 05/11/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Xanax 1 mg, Colace and Motrin. The lumbar MRI report from West Palm Beach, Florida, dated 07/16/2010 reported an impression of small multilevel herniated disc protrusions L3 through S1, with the most significant finding being a herniated disc protrusion 6 x 10 mm in size indenting the thecal sac in the midline with moderate spinal stenosis. Initial physical examination note reports restricted lumbar range of motion, straight leg raise to 90 degrees, and no lumbosacral tenderness. Nonfocal neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone. Patient was diagnosed with chronic low back pain with multilevel herniated disc and foraminal narrowing/degenerative disc disease.

2. <u>**Can you form an opinion?**</u>

   ☒ **Yes, I can form an opinion.**

   ☐ **No, I cannot form an opinion.**

   ☐ **Need more information (specify):**

3. <u>**What is your opinion?**</u>

   a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒ **Below minimum standards**
   ☐ **Within minimum standards**

USAO-002740

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings, while significant, do not demonstrate neurologic impingement and do not rise to the level of initiating narcotic management. Physical examination reported only "nonfocal" neurologic findings and subjectively restricted lumbar range of motion without tenderness. Previous treatment records are completely absent. Previous treating physician or physicians were listed as "West Palm Medical in Florida," with a notation that previous pharmacy/medical records were unavailable due to the clinic being shut down or having gone out of business. There is no indication that a previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The attending physician inappropriately provided several prescriptions for a schedule II opiate and Xanax in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI reports do not alone rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. There was no documented support for prescribing Xanax.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-002741

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment. During the course of several follow-up appointments, Xanax was provided in addition to oxycodone without explanation. There is no documentation that a follow up physical examination was ever performed.

**OVERALL SUMMARY:**

The treatment of this 26-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported a 4 year history of pain and reportedly had received previous treatment, so clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI report does not document findings that alone support narcotic management, and there is nothing else in the chart that supports the reported pain history. A 26-year-old patient from South Carolina that is presenting for narcotic management in Georgia based on an MRI obtained in Florida raises an elevated index of suspicion. That she rates her usual pain level as "8," raises a high index of suspicion. The lack of supporting documentation or a credible supporting initial physical examination, and the complete absence of a follow up physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

USAO-002742

## EXPERT WORK SHEET

Case # 88          NAME:  Dr. Azmat

PATIENT NAME:███████████

1.    **Brief description of symptoms, diagnosis and course of treatment.**

This 45-year-old patient from Florida was being treated for back pain.  The patient's reported 1 year pain complaint was secondary to a fall from a tree, and was rated as "10" in severity.  The patient reported a usual pain level of "10."  The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation.  There are no previous medical records in the chart.  The encounter documentation is comprised of an office note from 02/28/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, and Naprosyn.  The lumbar MRI report from West Palm Beach, Florida, dated 09/07/2010 reported an impression of mild spinal stenosis due to facet arthropathy at L3-L4, with no focal herniated disc or neural foraminal stenosis.  A small slightly left paracentral herniated disc protrusion measuring 2 x 4 mm in size indenting the thecal sac in the midline was noted at L4-L5, without spinal stenosis or neural foraminal stenosis.  A transitional vertebra was noted at L5, with a small central L5-S1 disc protrusion indenting the midline thecal sac.  No spinal stenosis or neural foraminal stenosis noted.  Initial physical examination note reports restricted lumbar range of motion, straight leg raise to 30 degrees bilaterally, and (illegible) L-S. "Grossly intact" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was negative.  Patient was diagnosed with chronic low back pain with herniated disc/facet arthropathy with spinal stenosis.

2.   **Can you form an opinion?**

☒ **Yes, I can form an opinion.**

☐ **No, I cannot form an opinion.**

☐ **Need more information (specify):**

3.  **What is your opinion?**

a.  *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

USAO-002531

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings do not demonstrate neurologic impingement and do not rise to the level of initiating narcotic management. Physical examination reported only "grossly intact" neurologic findings and subjectively restricted lumbar range of motion. Previous treatment records are completely absent. Previous prescribing physicians were listed on an enclosed pharmacy profile, but there is no indication that a previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The treating physician inappropriately provided several prescriptions for a Schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI reports do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #180 scheduled pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-002532

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is cryptic and inadequate to support prescribed treatment.

**OVERALL SUMMARY:**

The treatment of this patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible, was not accompanied by adequate historical documentation, and was not supportive of prescribing narcotics. The patient reported a 1 year history of pain and reportedly had received previous treatment, so clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. Review of the included pharmacy profile reveals that at least two previous physicians had prescribed controlled medications to this patient. The MRI report does not document findings that alone support narcotic management, and there is nothing else in the chart that supports the reported pain history. A patient from Florida that is presenting for narcotic management in Georgia based on an equivocal MRI raises an elevated index of suspicion. That he rates his usual pain level as "10" raises a very high index of suspicion. The lack of supporting documentation or a credible supporting initial physical examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_2/21/12_
Date of Review

_[signature]_
Signature of Peer Reviewer

USAO-002533

# EXPERT WORK SHEET

**Case # 89**                    **NAME:  Dr. Azmat**


**PATIENT NAME:** ▓▓▓▓▓▓▓


1.    **Brief description of symptoms, diagnosis and course of treatment.**


This 22-year-old patient from Kentucky was being treated for back pain.  The patient's reported 5 year pain complaint was secondary to an MVA.  The patient reported a usual pain level of "9."  The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation.  There are copies of pharmacy printouts from 02/11/2011 from a previous physician.  There are no other previous medical records in the chart.  The encounter documentation is comprised of office notes from 03/09/2011, 04/07/2011 and 05/05/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Xanax 1 mg, Flexeril, Colace and Motrin.  The lumbar MRI report from West Palm Beach, Florida, dated 02/09/2011 reported an impression of several small disc protrusions from L1 through S1, without spinal or neural foraminal stenosis.  Initial physical examination note reports restricted lumbar range of motion, straight leg raise to 60 degrees on the right and 90 degrees on the left, and lumbosacral tenderness. "Grossly intact" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable.  Intake urine toxicology screen was positive for oxycodone.  Patient was diagnosed with chronic low back pain with multilevel degenerative disc disease-herniation.


2.    **Can you form an opinion?**

&#9747; **Yes, I can form an opinion.**

&#9744; No, I cannot form an opinion.

&#9744; Need more information (specify):

3.  **What is your opinion?**

a.  *Diagnosis.*  "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

&#9747; **Below minimum standards**
&#9744; **Within minimum standards**

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not supportive of prescribing narcotics. The MRI report findings do not demonstrate neurologic impingement and do not support initiating narcotic management. Physical examination reported only "grossly intact" neurologic findings and lumbar examination was not credible. On follow-up encounters, no physical examination was performed. Previous treatment records are completely absent. Previous prescribing physicians were listed on an enclosed pharmacy profile, but there is no indication that the previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided a prescription for a Schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI report do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #150 scheduled pills. By the final encounter, this had increased to #180 scheduled pills. Other than "not sleeping well," there is no support for prescribing Xanax.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is cryptic, inadequate to support prescribed treatment, and there is no physical examination whatsoever documented on follow-up encounters.

## OVERALL SUMMARY:

The treatment of this 22-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not accompanied by adequate historical documentation, was not repeated, and was not supportive of prescribing narcotics. The patient reported a 5 year history of pain and the prescription printout contains the name of a physician who had prescribed scheduled agents as little as one month previously, so clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI report was nondiagnostic and does not document findings that support narcotic management. There is nothing else in the chart that supports the reported pain history, and there is no support for prescribing Xanax. A 22-year-old patient from Kentucky that is presenting for narcotic management in Georgia based on an equivocal MRI from Florida raises an markedly elevated index of suspicion. That he rates his usual pain level as "9" raises a very high index of suspicion. The lack of supporting documentation or a credible supporting initial physical examination, combined with the absence of a follow-up examination, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

## EXPERT WORK SHEET

Case # 90              NAME:  Dr. Azmat

PATIENT NAME: 

---

1.    **Brief description of symptoms, diagnosis and course of treatment.**


This 26-year-old patient from Florida was being treated for back pain.  The patient's reported 4 year pain complaint was secondary to lifting at work.  The patient reported a usual pain level of "9." The chart contains an MRI report, a patient completed history, a physical examination form and other office documentation. There are copies of pharmacy printouts from two separate pharmacies dating from 06/01/2010, listing 5 previous scheduled medication prescribers. There are no other previous medical records in the chart.  The encounter documentation is comprised of a single office note from 03/01/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Xanax 1 mg, and Motrin. The lumbar MRI report from Jacksonville, Florida, dated 05/04/2010 reported an impression of L4-L5 and L5-S1 disc degeneration, with mild neural foraminal encroachment. Signal focus consistent with an annular tear at L5-S1 with a broad-based posterior and extruded central disc herniation with mild caudal migration of disc material and slight ventral thecal sac impingement.  Initial physical examination note reports restricted cervical range of motion without C-spine tenderness. A systolic murmur was noted.  Restricted lumbar flexion and markedly restricted lateral flexion was noted, minimal (undecipherable). Straight leg raising was either 70 or 90 degrees, (undecipherable) on the right and 90 degrees on the left, and lumbosacral tenderness. "Grossly intact" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone and benzodiazepines.  Patient was diagnosed with low back pain with herniated disc with tear and neural entrapment.


2.    **Can you form an opinion?**

&#9746;  **Yes, I can form an opinion.**

&#9744;  No, I cannot form an opinion.

&#9744;  Need more information (specify):

3.    **What is your opinion?**

a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

Initial Physical examination could conceivably be supportive of prescribing narcotics in this case with a radiologically diagnosed annular tear, but previous treatment records are completely absent and the physical examination documentation makes no reference to obtaining any. This patient clearly had narcotics prescribed by a large number of physicians, and had a urine toxicology screen that was positive for oxycodone and benzodiazepines. The MRI report findings do not demonstrate neurologic impingement and do not alone support initiating narcotic management. Physical examination did document restricted range of motion, but did not document any tenderness to palpation and reported only "grossly intact" neurologic findings. Although the patient reported a history of "anxiety or problems sleeping," there is no mention of any psychological/psychosocial interview that in any way supports the prescribing of Xanax. There is no other contributing medical history provided or requested.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The treating physician inappropriately provided a prescription for a Schedule II opiate and Xanax in the absence of adequate supporting documentation. The findings from the provided MRI report do not necessarily rise to the level of initial narcotic management, and there is no other historical documentation in the chart that supports the prescribed treatment. There is no support for prescribing Xanax. There is no plan of treatment. On the initial encounter, the patient was prescribed a total of #240 scheduled pills.

USAO-002585

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards


EXPLAIN YOUR OPINION:


The documentation present in the chart is inadequate to support the prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded.


OVERALL SUMMARY:


The treatment of this 26-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not accompanied by historical documentation. The patient reported a 4 year history of pain and the prescription printout contains the names of 5 physicians who had prescribed scheduled agents as recently as two months previously, so extensive clinical documentation should have been available. At no point was a previous treating physician contacted about this patient, and records were not requested. The MRI report, while documenting an annular tear and bulging disc, does not record "entrapment" as stated by the treating physician. There is nothing else in the chart that supports the reported pain history, and there is no support for prescribing Xanax. A 26-year-old patient from Florida that is presenting for narcotic management in Georgia raises an elevated index of suspicion. That he rates his usual pain level as "9" raises a very high index of suspicion. That 5 physicians had previously provided scheduled medications casts severe doubt on the patient's credibility. The lack of any credible supporting historical documentation, combined with the unsupported Xanax prescriptions and the quantity of narcotics prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_2/21/12_
Date of Review

_[signature]_
Signature of Peer Reviewer

## EXPERT WORK SHEET

Case # 91                    NAME:  Dr. Azmat

PATIENT NAME: 

---

1.    <u>Brief description of symptoms, diagnosis and course of treatment.</u>

This 50-year-old patient from Kentucky was being treated for back pain.  The
patient's reported pain complaint was secondary to multiple MVAs in the 1980s.
The patient reported a usual pain level of "9," and stated that it was exacerbated
by "doing different things." The chart contains an MRI report, a patient
completed history, a physical examination form and other office documentation.
There are no other previous medical records in the chart.  The encounter
documentation is comprised of an office note from 02/28/2011.  Also included in
the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg and
Motrin. The lumbar MRI report from Hazard, Kentucky, dated 04/30/2010
reported an impression: "1. Mild Bulging disc at L3-L4. 2. Central and slightly
right-sided L4-L5 disc herniation with bilateral neural foraminal encroachment
related to lateral bulging of the disc and hypertrophic facet joint change, right side
greater than left. 3. Grade 1 anterior spondylolisthesis of L5 on S1 with central
disc protrusion. 4. Bilateral SI joint sclerosis." Initial physical examination note
reports 75 degrees lumbar flexion, 15 degrees (unspecified) lateral flexion,
(undecipherable), no tenderness, and straight raising to 90 degrees. "Grossly
intact" neurologic exam was noted, and the remainder of the examination was
otherwise unremarkable. Intake urine toxicology screen was positive for
oxycodone and benzodiazepines.  Patient was diagnosed with "Chronic low back
pain, herniated disc with neural foraminal encroachment/facet arthropathy and
spondylolisthesis."

2.    <u>Can you form an opinion?</u>

&#9746;  <u>Yes, I can form an opinion.</u>

&#9744;  No, I cannot form an opinion.

&#9744;  Need more information (specify):

3.  <u>What is your opinion?</u>

a.  *Diagnosis.* "Evaluation of a medical problem using means such as history, physical
examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not credible and was not supportive of prescribing narcotics. Lumbar flexion and straight leg raising tests were normal. Neurologic exam was normal. The MRI report findings combined with the normal physical examination findings do not support initiating narcotic management. Physical examination reported only "grossly intact" neurologic findings. Previous treatment records are completely absent. Previous prescribing physicians were not listed and there is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided several prescriptions for a Schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI report, while potentially significant, do not alone rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #240 oxycodone pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-002494

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents.  A coherent rationale for the treatment of this patient is not recorded.  Initial encounter physical examination documentation is inadequate to support prescribed treatment.

**OVERALL SUMMARY:**

The treatment of this 50-year-old patient from out of state falls below an acceptable standard of care.  The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible, was largely normal, and was not supportive of prescribing narcotics.  The patient reported a history of pain treatment dating back to the 1980s, so plentiful clinical documentation should have been available.  Although the patient was positive for oxycodone and benzodiazepines on presentation, a previous treating physician was not contacted about this patient, and records were not requested.  The MRI report does not alone document findings that support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on an MRI (with a history that is in conflict with the current presentation) raises a markedly elevated index of suspicion.  That he rates his usual pain level as "9" raises a very high index of suspicion. The lack of supporting documentation or a credible supporting initial physical examination, combined with the large number of oxycodone dosages prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_2/21/12_
Date of Review

_____
Signature of Peer Reviewer

USAO-002495

## EXPERT WORK SHEET

Case # 92                     NAME:  Dr. Azmat


PATIENT NAME: ▓▓▓▓▓▓▓▓▓▓▓

1.     Brief description of symptoms, diagnosis and course of treatment.


This 30-year-old patient from Florida was being treated for back pain.  The
patient's reported pain complaint was secondary to an MVA in 2006.  The patient
reported a usual pain level of "10."  The chart contains an MRI report, a patient
completed history, a physical examination form and other office documentation.
There are no other previous medical records in the chart.  The encounter
documentation is comprised of an office note from 02/28/2011.  Also included in
the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg and
Naprosyn. The lumbar MRI report from West Palm Beach, Florida, dated
11/20/2010 reported an impression: "The L5-S1 disc space level demonstrates
desiccation of the disc.  There is a small to moderate-sized focal central herniated
disc protrusion measuring 4 x 5 mm in size, indenting the thecal sac in the midline.
Small bilateral foraminal herniated disc are noted measuring 3 x 3 mm in size.
There is mild facet arthropathy without spinal stenosis.  The disc is desiccated."
Initial physical examination note reports: "Lumbar flexion decreased 60 degrees"
and: "Straight raising 75 degrees bilaterally. Tender lumbosacral paraspinal."
"Nonfocal" neurologic exam was noted, and the remainder of the examination was
otherwise unremarkable.  The patient was markedly hypertensive with blood
pressure reading of 173/112. Intake urine toxicology screen was negative for tested
agents. Patient was diagnosed with "Chronic low back pain with degenerative disc
disease/herniation and facet arthropathy."


2.    Can you form an opinion?

     ☒  Yes, I can form an opinion.

     ☐  No, I cannot form an opinion.

     ☐  Need more information (specify):

3.  What is your opinion?

   a.  *Diagnosis.*  "Evaluation of a medical problem using means such as history, physical
       examination, laboratory, and radiographic studies, when applicable."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

Initial Physical examination was not credible and was not supportive of prescribing narcotics. Lumbar flexion and straight leg raising tests were normal. Neurologic exam was normal. Neither the MRI report findings nor the normal physical examination findings support initiating narcotic management. Previous treatment records are completely absent. Previous treating physician was noted as: "VIP/Jacksonville, Florida," but there is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

    b.  *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided several prescriptions for a Schedule II opiate in the absence of a credible supporting physical examination or previous treatment documentation. The findings from the provided MRI report do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. Aside from an unexplained prescription for Naprosyn, no alternative treatment modalities are mentioned. On the initial encounter, the patient was prescribed a total of #180 oxycodone pills. The patient's markedly elevated blood pressure is completely unaddressed.

    c.  *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ **Below minimum standards**
☐ **Within minimum standards**

USAO-002513

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is not credible and is inadequate to support prescribed treatment.

**OVERALL SUMMARY:**

The treatment of this 30-year-old patient from out of state falls below an acceptable standard of care. His marked hypertension was unaddressed. The initial physical examination revealed only "nonfocal" neurologic findings, and the lumbar examination was not credible, was largely normal, and was not supportive of prescribing narcotics. The patient reported a history of pain treatment dating back to 2006, so clinical documentation should have been available. The patient was negative for any scheduled agents on urine toxicology screening, but was prescribed five 30 mg oxycodone pills per day, with an additional 15-mg pill included without explanation, for a total of six oxycodone pills per day. A previous treating physician was not contacted about this patient, and records were not requested. The MRI report does not alone document findings that support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Florida that is presenting for narcotic management in Georgia raises an elevated index of suspicion. That he rates his usual pain level as "10" raises a very high index of suspicion. The lack of supporting documentation or a credible supporting initial physical examination, combined with the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

# EXPERT WORK SHEET

Case # 93              NAME:  Dr. Azmat

PATIENT NAME: ████████████

1. <u>Brief description of symptoms, diagnosis and course of treatment.</u>

This 62-year-old patient from Kentucky was being treated for back pain. The patient's reported 30 year pain complaint was secondary to an MVA.  The patient reported a usual pain level of "6-7." The chart contains CT reports, a patient completed history, a physical examination form, a pharmacy printout and other office documentation. There are no other previous medical records in the chart. The encounter documentation is comprised of an office note from 03/09/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, Lorcet 10/500 mg and Naprosyn. The lumbar CT report from Corbin, Kentucky, dated 08/09/2010 reported an impression: "Fairly extensive arthritic changes but no destruction was identified."  Head CT performed 12/28/2009 was negative. Physician reports history as: "Fell off wall and "busted it" in 1984. Had 3 surgeries on back." Initial physical examination note reports a pain level of 9, a limping gait and: "Decreased lumbosacral flexion 45 degrees.  Lateral flexion decreased 10 degrees, (illegible), and: "Straight raising right 90 degrees left 60 degrees. No tenderness." Physician describes: "Back has healed long scar from surgery. Nerve stimulator SQ right upper thigh nontender."  "Grossly nonfocal" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable.  The patient weighed 240 pounds and was markedly hypertensive, with blood pressure reading of 203/105. Intake urine toxicology screen was positive for oxycodone.  Patient was diagnosed with "Chronic low back pain status post multiple surgeries, systemic arthritis."

2. <u>Can you form an opinion?</u>

&#9746; <u>Yes, I can form an opinion.</u>

&#9744; No, I cannot form an opinion.

&#9744; Need more information (specify):

3. <u>What is your opinion?</u>

a. *Diagnosis*. "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

This patient's surgical history was reportedly significant. The CT scan reports provided at the initial presentation did not document any postsurgical changes and did not support the initiation of narcotics. The patient provided a history of this pain being secondary to an MVA 30 years in the past. The physician provided a history of the pain being secondary to a fall injury. This conflicting history is alarming. This patient was 62 years old, weighed 240 pounds and had a blood pressure of 203/105. This markedly elevated blood pressure reading was not addressed, and the reading was not repeated. The initial Physical examination documented surgical scarring and restricted range of motion. Straight leg raising test was not credible and was not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. Previous treating physician was noted as: "Dr. Adi - Orange Park, Jacksonville, Florida," but there is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided prescriptions for Schedule II and schedule III opiates in the presence of conflicting medical/surgical history, and in the absence of supporting previous treatment documentation. The findings from the provided CT report do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. Aside from an unexplained prescription for Naprosyn, no alternative treatment modalities are mentioned. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. The patient's markedly elevated blood pressure is completely unaddressed.

USAO-002765

c. *Records*. "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment.

**OVERALL SUMMARY:**

The treatment of this 62-year-old patient from out of state falls below an acceptable standard of care. His marked hypertension was unaddressed. The initial physical examination revealed only "nonfocal" neurologic findings, and the straight leg raising examination was not credible. The patient reported a history of pain treatment dating back "30 years," with several surgeries and a spinal cord stimulator implantation. Very significant clinical documentation should have been available to support this. The patient was positive for oxycodone on urine toxicology screening, but no previous treating physician was contacted about this patient, and records were not requested. The CT report does not document findings that support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia raises an elevated index of suspicion. The lack of supporting documentation combined with the large dosages of oxycodone and hydrocodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_____
2/21/12
Date of Review

_____
Signature of Peer Reviewer

## EXPERT WORK SHEET

Case # 94    NAME:  Dr. Azmat

PATIENT NAME: ▓▓▓▓▓▓▓▓

1.  **Brief description of symptoms, diagnosis and course of treatment.**

This 45-year-old patient from Florida was being treated for back pain.  The patient's reported 10 year pain complaint was secondary to a work-related fall injury.  The patient reported a usual pain level of "9" The chart contains a lumbar MRI report, a patient completed history, a physical examination form and other office documentation.  There are no other previous medical records in the chart.  The encounter documentation is comprised of an office note from 02/21/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg and oxycodone 15 mg.  The lumbar MRI report from Plantation, Florida, dated 01/05/2010 reported an impression: "1. Desiccation of the intervertebral disc of the lumbar spine. 2. At L5-S1, posterior bulge of the intervertebral disc posterolateral to the right with right neural foraminal encroachment.  The left neural foramen is patent. 3. At L4-L5, posterior bulge of the intervertebral disc with bilateral neural foraminal encroachment, left greater than right."  Physician reports history as: "Logging accident-Kentucky 6 years ago fell 15 feet." Initial physical examination note reports a pain level of 9 without medication, 4 with medication. "Decreased lumbosacral flexion 45 degrees, (illegible) L-S positive. "Nonfocal" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable.  Intake urine toxicology screen was positive for oxycodone. Patient was diagnosed with: "Chronic low back pain, bulging disc with encroachment neural foramina and DDD."

2.  **Can you form an opinion?**

   ☒ **Yes, I can form an opinion.**

   ☐ No, I cannot form an opinion.

   ☐ Need more information (specify):

3.  **What is your opinion?**

   a.  *Diagnosis.*  "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

USAO-002375

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The MRI report alone does not support prescribing narcotics. The physical examination is not credible, and is not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. The findings from the provided MRI report do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #240 scheduled pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

USAO-002376

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment.


OVERALL SUMMARY:


The treatment of this 45-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, and the lumbar examination was not credible. The patient reported a history of pain treatment dating back "10 years." Very significant clinical documentation should have been available to support this. The patient was positive for oxycodone on urine toxicology screening, but no previous treating physician was contacted, and records were not requested. The MRI report does not document findings that alone support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Florida that is presenting for narcotic management in Georgia raises an elevated index of suspicion. The lack of supporting documentation combined with the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_2/21/12_
Date of Review

_____
Signature of Peer Reviewer

USAO-002377

## EXPERT WORK SHEET

Case # 95                    NAME:  Dr. Azmat

PATIENT NAME: <span style="background:black">      </span>

1.    <u>Brief description of symptoms, diagnosis and course of treatment.</u>

This 30-year-old patient from Ohio was being treated for back pain. The patient's reported 6 year pain complaint was secondary to an MVA in 2005 and a fall injury in 2009.  The patient reported a usual pain level of "9" The chart contains a lumbar MRI report, a patient completed history, a physical examination form, a pharmacy printout and other office documentation.  There are no other previous medical records in the chart.  The encounter documentation is comprised of office notes from 03/10/2011 and 04/11/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg and oxycodone 15 mg, Naprosyn and Neurontin. The lumbar MRI report from Plantation, Florida, dated 01/11/2010 reported an impression: "Broad-based posterior disc herniation at L3-L4, L4-L5 and L5-S1.  Moderate narrowing of the neural foramina at L4-L5 with impingement of the L4 nerve roots.  There is partial dehydration of the disc with mild narrowing of the spaces.  Mild endplate spondylosis.  Mild joint arthrosis." Initial physical examination note reports a pain level of 9 without medication, 4 with medication. "LS flexion 75 degrees, no tenderness.  Straight leg raising 75 degrees right, left 90 degrees."  "Grossly intact" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable.  Intake urine toxicology screen was positive for oxycodone.  Patient was diagnosed with: "Chronic low back pain, DDD multilevel with herniation and L4 impingement."

2.    <u>Can you form an opinion?</u>

      ☒  <u>Yes, I can form an opinion.</u>

      ☐  No, I cannot form an opinion.

      ☐  Need more information (specify):

3.  <u>What is your opinion?</u>

    a.  *Diagnosis.*  "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒  **Below minimum standards**

USAO-002810

☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The MRI report alone does not support prescribing narcotics. The physical examination is not credible, and is not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards ·

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. The findings from the provided MRI report do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. On the follow up encounter, the physical examination was not performed and the patient was prescribed the same number of pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is inadequate to support prescribed treatment.

## OVERALL SUMMARY:

The treatment of this 30-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible. There was no physical examination performed on the follow up visit. The patient reported a history of pain treatment dating back "6 years." The enclosed pharmacy printout records 2 previous physicians that had prescribed scheduled agents to this patient, and the treating physician lists a clinic from which these medications were provided. Previous clinical treatment documentation should have been available. The patient was positive for oxycodone on urine toxicology screening, but no previous treating physician was contacted, and records were not requested. The MRI report does not document findings that alone support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Ohio that is presenting for narcotic management in Georgia based on an MRI from Florida raises a markedly elevated index of suspicion. The lack of supporting documentation combined with the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_____
Date of Review

_____
Signature of Peer Reviewer

USAO-002812

# EXPERT WORK SHEET

**Case # 96**      **NAME:  Dr. Azmat**


**PATIENT NAME:** 


## 1.   Brief description of symptoms, diagnosis and course of treatment.


This 33-year-old patient from South Carolina was being treated for back pain. The patient's reported 8 year pain complaint was secondary to an MVA.  The patient reported a usual pain level of "8" The chart contains lumbar MRI reports, a patient completed history, a physical examination form, a pharmacy printout and other office documentation. There are no other previous medical records in the chart. The encounter documentation is comprised of office notes from 03/15/2011 and 04/21/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg and oxycodone 15 mg, Percocet 10/325 mg, Naprosyn and Motrin. The lumbar MRI report from 10/23/2008 reported an impression of mild disc degeneration at L2-L3, minimal central protrusion and annular tear without nerve root deformity or stenosis.  At L3-L4 and L4-L5, mild degenerative changes without stenosis were noted.  Grade 1 spondylolisthesis of L5 on S1 secondary to bilateral L5 pars interarticularis defects.  Central canal was patent.  Minimal left L5 foraminal stenosis was noted.  MRI report from 06/26/2009 noted a mild interval progression of disc bulges and shallow protrusions spanning L2-L3 through L4-L5, with a slight new posterior deflection transiting left L5.  No severe stenosis or neural impingement was noted. Initial physical examination note reports a pain level of "10" without medication, "4" with medication. Restricted cervical range of motion on lateral flexion and rotation was noted.  No C-spine tenderness was noted.  Lumbar exam revealed decreased lumbar flexion at 30 degrees, lateral flexion decreased at 10 degrees, "upper lumbar tender" was noted. Straight leg raising positive at 90 degrees on the right, 75 degrees on the left. "Grossly intact" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable.   Intake urine toxicology screen was positive for oxycodone, opiates and benzodiazepines.  Patient was diagnosed with: "Chronic low back pain, DDD with (illegible) deflection."


## 2.   Can you form an opinion?

&#9746; Yes, I can form an opinion.

&#9744; No, I cannot form an opinion.

☐ Need more information (specify):

3. **What is your opinion?**

   a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒ Below minimum standards
   ☐ Within minimum standards

   EXPLAIN YOUR OPINION:

   The MRI reports alone do not support prescribing narcotics. The physical examination is not credible, and is not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

   b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

   ☒ Below minimum standards
   ☐ Within minimum standards

   EXPLAIN YOUR OPINION:

   The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. The findings from the provided MRI reports do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #210 scheduled pills. On the follow up encounter, the physical examination was not performed. The patient was prescribed 180 pills, with a decrease in the 30 mg oxycodone to #120 pills, a discontinuation of Percocet, and an initiation of 15 mg oxycodone. Except for the notation "Percocet not working," there is no explanation for this.

   c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents.   A coherent rationale for the treatment of this patient is not recorded.  Initial encounter physical examination documentation is not credible and is inadequate to support prescribed treatment. Follow-up encounter documentation does not include a physical examination.

**OVERALL SUMMARY:**

The treatment of this 33-year-old patient from out of state falls below an acceptable standard of care.  The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible. There was no physical examination performed on the follow up visit. The patient reported a history of pain treatment dating back "8 years."  The enclosed pharmacy printout records 2 previous physicians that had prescribed scheduled agents to this patient.  Previous clinical treatment documentation should have been available.  The patient was positive for oxycodone, opiates and benzodiazepines on urine toxicology screening, but no previous treating physician was contacted, and records were not requested.   The MRI reports do not document findings that alone support narcotic management.  There is nothing else in the chart that supports the reported pain history. A patient from South Carolina that is presenting for narcotic management in Georgia based on MRIs that are several years old raises an elevated index of suspicion. The lack of supporting documentation combined with the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

USAO-002892

# EXPERT WORK SHEET

Case # 97        **NAME: Dr. Azmat**

**PATIENT NAME:** ▓▓▓▓▓▓▓▓

## 1.   Brief description of symptoms, diagnosis and course of treatment.

This 42-year-old patient from Kentucky was being treated for back pain. The patient's reported 6 year pain complaint was reportedly job-related. The patient reported a usual pain level of "7-8." The chart contains a lumbar MRI report, a patient completed history, a physical examination form and other office documentation. There are no other previous medical records in the chart. The encounter documentation is comprised of office notes from 02/25/2011 and 03/25/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Xanax 2 mg, Naprosyn, Neurontin and Motrin. The lumbar MRI report from Plantation, Florida, dated 08/10/2009 reported an impression of a posterior central disc herniation of L5-S1 and bulging of the annulus fibrosis at L4-L5. Neural foramina were adequate in size at each level and there was no nerve root impingement. Initial physical examination note reports a pain level of "9" without medication, "4" with medication. Lumbar exam revealed decreased lumbar flexion at 60 degrees, lateral flexion 20 degrees, (illegible), and "tender paravertebral" was noted. Straight leg raising decreased 70 degrees left, right 90 degrees." "Nonfocal" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone. Patient was diagnosed with: "Chronic low back pain."

## 2.   Can you form an opinion?

     ☒   Yes, I can form an opinion.

     ☐   No, I cannot form an opinion.

     ☐   Need more information (specify):

### 3.   What is your opinion?

     a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒   **Below minimum standards**
   ☐   **Within minimum standards**

USAO-002453

**EXPLAIN YOUR OPINION:**

The MRI reports do not support prescribing narcotics.  The physical
examination is not credible, and is not supportive of prescribing narcotics.
Neurologic exam was normal.  Previous treatment records are completely
absent.  There is no indication that any previous physician was contacted or
that records were requested.  There is no other contributing medical history
provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and
approved indications, with proper precautions to avoid adverse physical reactions,
habituation or addiction."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

The treating physician inappropriately provided several prescriptions for a
schedule II opiate in the absence of supporting previous treatment documentation.
The findings from the provided MRI reports do not rise to the level of initial
narcotic management, and there is nothing else in the chart that supports the
prescribed treatment.  There is no documentation in the chart that records an
actual plan of treatment.   On the initial encounter, the patient was prescribed a
total of #210 scheduled pills. On the follow up encounter, a physical examination
was not performed, Xanax was added without explanation, and the patient was
again prescribed #210 oxycodone pills.  Previously prescribed Naprosyn and
Neurontin were not represcribed, without explanation.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the
patient's medical evaluation, treatment and response."

☒ **Below minimum standards**
☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is not credible and is inadequate to support prescribed treatment. Follow-up encounter documentation does not include a physical examination.


OVERALL SUMMARY:


The treatment of this 42-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, and the lumbar examination was not credible. There was no physical examination performed on the follow up visit. The patient reported a history of pain treatment dating back "6 years." Previous clinical treatment documentation should have been available. The patient was positive for oxycodone on urine toxicology screening, but no previous treating physician was contacted, and records were not requested. The MRI reports do not document findings that alone support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on equivocal, several-year-old MRIs from Florida raises a markedly elevated index of suspicion. The lack of supporting documentation combined with the unexplained prescription for Xanax and the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

2/21/12
_____
Date of Review

_____
Signature of Peer Reviewer

## EXPERT WORK SHEET

Case # 98                    NAME:  Dr. Azmat

PATIENT NAME: ████████████

1.    <u>Brief description of symptoms, diagnosis and course of treatment.</u>

This 63-year-old patient from Kentucky was being treated for back pain. The patient's reported 20 year pain complaint was reportedly job-related, accident related, illness and slip/fall related.  The patient reported a usual pain level of "9."  The chart contains a lumbar MRI report, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart.  The encounter documentation is comprised of office notes from 02/21/2011 and 04/05/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg, Flexeril, Colace and Motrin.

The lumbar MRI report from Plantation, Florida, dated 07/06/2009 reported an impression of mild marginal osteophytes extending from the superior endplates of L4 and L5, and L5-S1 disc osteophyte complex projecting to the left with consequent left neural foraminal stenosis, and mild L4-L5 left greater than right neural foraminal narrowing.

Initial physical examination note reports a pain level of "8-9" without medication, "3-4" with medication.  Lumbar exam revealed decreased lumbar flexion at 45 degrees, and "tender L-S" was noted.   "Nonfocal" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable.   Intake urine toxicology screen was negative.  Patient was diagnosed with: "Chronic low back pain with bulging with facet arthropathy and foramina narrowing.  DDD with osteophyte complex."

2.    <u>Can you form an opinion?</u>

&#9746;  <u>Yes, I can form an opinion.</u>

&#9744;  No, I cannot form an opinion.

&#9744;  Need more information (specify):

3.  <u>What is your opinion?</u>

USAO-002335

a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The MRI report was almost 2 years old on presentation, and while revealing positive findings it does not alone support prescribing narcotics. The physical examination is cryptic and is not credible, and it is not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. The findings from the provided MRI reports do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #240 scheduled pills. On the follow up encounter, a physical examination was not performed, and the patient was again prescribed #210 oxycodone pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-002336

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is not credible and is inadequate to support prescribed treatment. Follow-up encounter documentation does not include a physical examination.

**OVERALL SUMMARY:**

The treatment of this 63-year-old patient from out of state falls below an acceptable standard of care. The initial physical examination revealed only "nonfocal" neurologic findings, and the lumbar examination was not credible. There was no physical examination performed on the follow up visit. The patient reported a history of pain dating back "20 years." Previous clinical treatment documentation should have been available. The patient was negative for oxycodone on urine toxicology screening, raising a question about his recent treatment history. Previous treating physician was not contacted and records were not requested. The MRI reports do not document findings that alone support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient from Kentucky that is presenting for narcotic management in Georgia based on a several-year-old MRI from Florida raises a markedly elevated index of suspicion. The lack of supporting documentation combined with the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and represents a significant danger to the patient's safety.

_2/21/12_
_____
Date of Review

_HL_
_____
Signature of Peer Reviewer

USAO-002337

## EXPERT WORK SHEET

Case # 99          NAME:  Dr. Azmat

PATIENT NAME: 

1.      **Brief description of symptoms, diagnosis and course of treatment.**

This 35-year-old patient from Kentucky was being treated for back pain. The patient's reported 10 year pain complaint was reportedly accident related. The patient reported a usual pain level of "9." The chart contains a lumbar MRI report, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of an office note from 02/21/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg and Neurontin.

The lumbar MRI report from 03/17/2010 reported postsurgical changes at L3-L4, multilevel degenerative disease, L5-S1 disc protrusion contributing to moderate left neural foraminal stenosis. Overall impression, "Unchanged degenerative disc disease as detailed above and possible chronic scarring as detailed above."

Patient 6 feet 8 inches in height, weight of 340 pounds. Hypertensive at 158/106. Initial physical examination note reports a pain level of "8-9" without medication, "4-5" with medication. Neck examination reports: "Decreased ROM, no C-spine (Illegible). Lumbar exam revealed decreased lumbar flexion at 60 degrees, and "paraspinal tenderness +" was noted. "Grossly intact" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone. Patient was diagnosed with: "Chronic low back pain with multilevel degenerative disc disease herniated L5-S1 with effacement S1 and facet arthropathy."

2.      **Can you form an opinion?**

☒ **Yes, I can form an opinion.**

☐ **No, I cannot form an opinion.**

☐ **Need more information (specify):**

3.  **What is your opinion?**

USAO-002357

a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The MRI report revealed positive findings and supported a surgical history, but the findings do not alone rise to the level of supporting initial narcotic management. The physical examination is cryptic and is not credible, and it is also not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. The findings from the provided MRI reports do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed a total of #240 scheduled pills. The patient's elevated body mass index and marked hypertension were completely unaddressed.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-002358

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for #240 scheduled pills.  A coherent rationale for the treatment of this patient is not recorded.  Initial encounter physical examination documentation is not credible and is inadequate to support prescribed treatment.

**OVERALL SUMMARY:**

The treatment of this 35-year-old patient from out of state falls below an acceptable standard of care.  His marked hypertension was not mentioned by the treating physician.  The initial physical examination revealed only "grossly intact" neurologic findings, and the lumbar examination was not credible.  There was no physical examination performed on the follow up visit.  The patient reported a history of pain dating back "10 years" and included a significant surgical history.  Previous clinical treatment documentation should have been available.  The patient was positive for oxycodone on urine toxicology screening, but a previous treating physician was not contacted and records were not requested.  The MRI reports do document a significant medical/surgical history, but do not alone reveal findings that support narcotic management.  There is nothing else in the chart that supports the reported pain history.  A patient from Kentucky that is presenting for narcotic management in Georgia raises an elevated index of suspicion. The lack of supporting documentation combined with the large dosage of oxycodone prescribed, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and represents a significant danger to the patient's safety.

_2/21/12_
Date of Review

_[signature]_
Signature of Peer Reviewer

USAO-002359

## EXPERT WORK SHEET

Case # 100          NAME:  Dr. Azmat

PATIENT NAME: 

1.   **Brief description of symptoms, diagnosis and course of treatment.**

This 44-year-old patient was being treated for back pain. The patient's greater than 20 year pain complaint was reportedly job and accident related. The patient reported a usual pain level of "9-10." The chart contains lumbar MRI reports, a patient completed history, a physical examination form and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of notes from 02/24/2011, 03/28/2011, 04/25/2011 and 05/23/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, Soma, Xanax, Flexeril and Motrin.

The lumbar MRI report from 10/26/2006 revealed a minimal circumferential disc bulge at L4-L5 without canal stenosis or foraminal encroachment. L5-S1 minimal broad-based central disc protrusion slightly effacing the ventral aspect of the thecal sac was reported. No canal stenosis or foraminal encroachment was noted. Lumbar MRI report from 12/16/2010 revealed an overall impression: "Interval development of a posterior central disc protrusion and facet arthropathy at L4-L5, with some encroachment of the neural foraminal canal, but no evidence of spinal stenosis. Stable, small broad-based concentric bulge at L5-S1."

Initial physical examination note reports a pain level of "10" without medication, "6" with medication. Neck examination reports: "Decreased ROM lateral flexion and rotation." Lumbar exam revealed: "Lumbar flexion decreased at 75 degrees, lateral flexion 15 degrees with pain, no LS tenderness." "Straight leg raising 90 degrees bilat" was noted. "Nonfocal/intact grossly" neurologic exam was noted, and the remainder of the examination was otherwise unremarkable. Intake urine toxicology screen was positive for oxycodone and "Meth." Patient was diagnosed with: "Chronic low back pain."

2.   **Can you form an opinion?**

☒ **Yes, I can form an opinion.**

☐ No, I cannot form an opinion.

USAO-002551

☐ Need more information (specify):

3. <u>What is your opinion?</u>

    a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The MRI report findings do not alone rise to the level of supporting initial narcotic management. The physical examination is cryptic and is not credible, and is also not supportive of prescribing narcotics. Neurologic exam was normal. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided.

    b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The treating physician inappropriately provided several prescriptions for a schedule II opiate and a schedule IV benzodiazepine in the absence of supporting previous treatment documentation. The findings from the provided MRI reports do not rise to the level of initial narcotic management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment. On the initial encounter, the patient was prescribed scheduled medications and soma despite testing positive for "Meth." There is no support for prescribing soma or Xanax.

    c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards

USAO-002552

☐ **Within minimum standards**

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to support prescriptions for any scheduled medications. A coherent rationale for the treatment of this patient is not recorded. Initial encounter physical examination documentation is not credible and is inadequate to support prescribed treatment.

**OVERALL SUMMARY:**

The treatment of this patient falls below an acceptable standard of care. The initial physical examination revealed only normal neurologic findings, makes no mention of any psychiatric distress, and the lumbar examination was not credible. There was no physical examination performed on the 3 follow-up encounters. The patient reported a history of pain dating back in excess of 20 years. Previous clinical treatment documentation should have been available. The patient was positive for oxycodone on initial urine toxicology screening, but a previous treating physician was not contacted and records were not requested. <u>Alarmingly, this patient was also positive for unspecified "meth," and the presence of an illicit on urine toxicology screen is not mentioned in the chart.</u> The MRI reports do not support narcotic management. There is nothing else in the chart that supports the reported pain history. A patient presenting for narcotic management with equivocal MRIs and a urine toxicology screen that is positive for illicits raises an extremely high index of suspicion.

The lack of supporting documentation combined with the prescriptions for oxycodone, as well as the unsupported prescriptions of Xanax and soma in the presence of an unaddressed urine toxicology screen that is positive for illicits, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and represents a significant danger to the patient's safety.

_____2/21/12_____
**Date of Review**

_____ ~~~~~~ _____
**Signature of Peer Reviewer**

USAO-002553

# EXPERT WORK SHEET

Case # 123                    NAME:  Dr. Azmat

PATIENT NAME: ~~████████████~~

---

1.    **Brief description of symptoms, diagnosis and course of treatment.**

This 46-year-old patient from Florida was being treated for back pain.  The patient's reported 11 year pain complaint was secondary to an accident related injury.  The patient reported a usual pain level of "8-9."  The chart contains a lumbar MRI report, a patient completed history, a physical examination form, a urine toxicology screen and other office documentation.  There are no other previous medical records in the chart.  The encounter documentation is comprised of an office note from 02/21/2011.  Also included in the chart are copies of prescriptions for oxycodone 30 mg and oxycodone 15 mg.

The lumbar MRI report from Plantation, Florida, dated 02/01/2010 reported an impression: "At L5-S1, posterior bulge of the intervertebral disc posterolateral to left without evidence of neural foraminal narrowing."

 Initial physical examination note reports a pain level of 8/9 without medication, 4/5 with medication.  Examination findings include: "Decreased lumbar flexion 45 degrees.  "Nonfocal" neurologic exam was noted, and the remainder of the examination was normal.   Intake urine toxicology screen was positive for oxycodone.

Patient was diagnosed with: "Chronic low back pain."  Treatment plan was: "Wean off narcotics."  Patient was provided with prescriptions for oxycodone 15 mg #60, and oxycodone 30 mg #60.

2.    **Can you form an opinion?**

      ☒ **Yes, I can form an opinion.**

      ☐ No, I cannot form an opinion.

      ☐ Need more information (specify):

3.    **What is your opinion?**

USAO-003822

a. *Diagnosis.* "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The physical examination is noncontributory, not credible, and nondiagnostic. Neurologic exam was normal. The only noted physical examination finding was lumbar flexion at 45 degrees. The MRI report states that the study is "without evidence of neural foraminal narrowing." Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided. Further workup was not pursued.

b. *Treatment.* "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

☒ Below minimum standards
☐ Within minimum standards

EXPLAIN YOUR OPINION:

The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. The findings from the provided MRI report do not rise to the level of initial opiate management, and there is nothing else in the chart that supports the prescribed treatment. There is no documentation in the chart that records an actual plan of treatment other than the prescriptions and "wean off narcotics." On the initial encounter, the patient was prescribed a total of #120 scheduled pills.

c. *Records.* "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

USAO-003823

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to document a credible physician encounter or support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded.

**OVERALL SUMMARY:**

The treatment of this 46-year-old patient falls below an acceptable standard of care. The initial physical examination was abbreviated and not credible. The patient reported a history of pain treatment dating back "11 years." Very significant clinical documentation should have been available to support this. The patient was positive for oxycodone on urine toxicology screening, but no previous treating physician was contacted, and records were not requested. The MRI report does not document findings that support prescribing opiates. There is nothing else in the chart that supports the reported pain history.

A patient from Florida, presenting for opiate management in Georgia, raises an elevated index of suspicion. Considering that this out of state patient presented in the same clinic on the same day as 2 of her relatives, and all of them were seeking and were provided with prescriptions for identical scheduled medications, strongly indicates that this was not legitimate medical practice.

The lack of supporting documentation combined with the oxycodone prescriptions provided both to this patient and her family members, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

_3/19/13_
Date of Review

_[signature]_
Signature of Peer Reviewer

# EXPERT WORK SHEET

**Case # 124**          **NAME: Dr. Azmat**

**PATIENT NAME:** ▮▮▮▮▮▮▮▮

1.    **Brief description of symptoms, diagnosis and course of treatment.**

This 25-year-old patient from Florida was being treated for back pain. The patient's reported 5 year pain complaint was secondary to an accident related injury. The patient reported a usual pain level of "9." The chart contains a lumbar MRI report, a patient completed history, a physical examination form, a urine toxicology screen and other office documentation. There are no previous medical records in the chart. The encounter documentation is comprised of office notes from 02/21/2011 and 03/25/2011. Also included in the chart are copies of prescriptions for oxycodone 30 mg, oxycodone 15 mg and Motrin 800 mg.

The lumbar MRI report from Delray Beach, Florida, dated 12/07/2009 reported a conclusion: "Disc herniation at L4-L5. Bulging disc at L5-S1." Normal foramina noted at all levels.

Initial physical examination note reports a pain level of 10 without medication, 5 with medication. Examination findings include: "Decreased lumbar flexion 45 degrees. Tenderness lumbosacral." "Nonfocal" neurologic exam was noted, and the remainder of the examination was normal. Intake urine toxicology screen was positive for oxycodone.

Patient was diagnosed with: "Chronic low back pain. Herniated and bulging discs." Treatment plan was: Decrease oxycodone to 30 mg #90, and oxycodone 15 mg #30. Patient was also provided with a prescription for Motrin, 800 mg.

On the subsequent appointment, oxycodone 30 mg was increased to #120 pills and oxycodone 15 mg was increased to #60 pills.

2.    **Can you form an opinion?**

&#9746; **Yes, I can form an opinion.**

&#9744; No, I cannot form an opinion.

&#9744; Need more information (specify):

3. **What is your opinion?**

   a. *Diagnosis*. "Evaluation of a medical problem using means such as history, physical examination, laboratory, and radiographic studies, when applicable."

   ☒ **Below minimum standards**
   ☐ Within minimum standards

   EXPLAIN YOUR OPINION:

   The physical examination is noncontributory, nondiagnostic and not credible. Neurologic exam was normal. The patient's reported pain level of "9" on initial presentation and "10" on the follow-up encounter is not supported. The only noted physical examination findings were lumbar flexion at 45 degrees and lumbosacral tenderness. The MRI report concludes that there is a right central disc herniation at L4-L5, but the report provides no specifics whatsoever as to the size or relevance of the lesion described. In the body of the report it notes that the neural foramina are normal at all levels, and does not describe any nerve impingement. Previous treatment records are completely absent. There is no indication that any previous physician was contacted or that records were requested. There is no other contributing medical history provided. Further workup was not pursued.

   b. *Treatment*. "Use of medications and other modalities based on generally accepted and approved indications, with proper precautions to avoid adverse physical reactions, habituation or addiction."

   ☒ **Below minimum standards**
   ☐ Within minimum standards

   EXPLAIN YOUR OPINION:

   The treating physician inappropriately provided several prescriptions for a schedule II opiate in the absence of supporting previous treatment documentation. There is no documentation in the chart that records an actual plan of treatment other than to decrease oxycodone, but the physician increased this agent on the subsequent appointment. On the initial encounter, the patient was prescribed a total of #120 oxycodone pills. On the subsequent encounter he was prescribed #180.

   c. *Records*. "Maintenance of records to furnish documentary evidence of the course of the patient's medical evaluation, treatment and response."

☒ Below minimum standards
☐ Within minimum standards

**EXPLAIN YOUR OPINION:**

The documentation present in the chart is inadequate to record a credible physician encounter or to support prescriptions for scheduled agents. A coherent rationale for the treatment of this patient is not recorded.

**OVERALL SUMMARY:**

The treatment of this 25-year-old patient falls below an acceptable standard of care. The initial physical examination was not credible, and there was no examination performed on the follow up encounter. The patient reported a history of pain treatment dating back "5 years." Very significant clinical documentation should have been available to support this. The patient was positive for oxycodone on urine toxicology screening, but no previous treating physician was contacted, and records were not obtained. The MRI report does not document findings that support prescribing opiates. There is nothing else in the chart that supports the reported pain history.

A patient from Florida, presenting for opiate management in Georgia, raises an elevated index of suspicion. Considering that this out of state patient presented in the same clinic on the same day as 2 of his relatives, and all of them were seeking and were provided with prescriptions for identical scheduled medications, strongly indicates that this was not legitimate medical practice.

It should be noted that on his intake documentation, this patient reported that he had previously been prescribed a total of #480 scheduled pills per month. This equals #16 scheduled pills per day, including a total of 330 mg of oxycodone per day (equivalent in oxycodone to 33 Percocet/10 per day) combined with 6 mg of Xanax. This simply defies belief.

The lack of supporting documentation combined with the oxycodone prescriptions provided both to this patient and his family members, in my opinion, indicates that this patient's management was not medically legitimate, falls below a reasonable standard of care, and may represent a significant danger to the patient's safety.

3/19/13
Date of Review

Signature of Peer Reviewer

# EXHIBIT "B"

Summary of Patient Chart Review:

- The vast majority of patients received at least one prescription for oxycodone (Schedule II) at maximal dose for "back pain". Most also received a second prescription for a lower dose of oxycodone for supposed "breakthrough pain." All patients essentially rated pain without medication 8-10 on a scale of 10. The use of long-term opioids for chronic back pain remains controversial. No referrals to other specialists or therapists were made for chronic back pain. There are a number of other potential agents that could be employed for lower back pain such as pregabalin, gabapentin, duloxetine, tramadol, tricyclic antidepressants (amitriptyline) in place of opioids. Numerous other non-pharmacologic therapies have also been used effectively for chronic lower back pain. These include: spinal manipulation, acupuncture, biofeedback, nerve block, traction, ultrasound and transcutaneous electrical nerve stimulation (TENS). None of these were suggested.
- Tamper-proof, controlled release oxycodone is available but never prescribed.

- Very significant drug-drug-interactions were possible in patients receiving opioids plus benzodiazepines and/or soma. All can cause significant central nervous system depression & marked sedation which can impact motor and cognitive function. The central nervous system depressant effects of these agents are significantly potentiated if taken together or with alcohol.

- Despite signing pain management contracts, there was no indication that patients were counseled regarding the addictive potential of opioids nor were there any obvious attempts to wean patients off opioids. Many patients do not appear to have been counseled about other potentially significant side effects of opioid such as constipation, sedation, or respiratory depression.

- According to the American Pain Society-American Academy of Pain Medicine Opioids Guidelines Panel, chronic opioid therapy (COT) "can be an effective therapy for carefully selected and monitored patients with chronic non-cancer pain." However, according to their guidelines (Journal of Pain, 2009):

  o Before initiating COT, clinicians should conduct a history, physical examination and appropriate testing, including an assessment of risk of substance abuse, misuse, or addiction. Prior to treating with opioids, clinicians should determine if the pain could be treated with other, non-opioid medications.
  o Clinicians may consider a trial of COT as an option if chronic non-cancer pain is moderate or severe pain is having an adverse impact on function or quality of life

USAO-004117

and potential therapeutic effects outweigh or are likely to <u>outweigh potential harms.</u>

- o A continuing discussion with the patient regarding COT should include <u>goals, expectations, potential risks, and alternatives to COT.</u>
- o There is <u>insufficient evidence to recommend short-acting versus long-acting</u> or as-needed versus around-the-clock doing of opioids.
- o Clinicians <u>should taper or wean patients off COT who engage in repeated aberrant drug-related behaviors or drug abuse/diversion, experience no progress toward meeting therapeutic goals</u> or who experience intolerable side effects.
- o Since chronic-non-cancer pain is often a complex biopsychosocial conditions, clinicians should routinely <u>integrate psychotherapeutic interventions, functional restorations, interdisciplinary therapy, and other adjunctive nonopioid therapies.</u>
- o Clinicians should counsel patients on COT about transient or lasting <u>cognitive impairment that may affect driving and work safety.</u>
- o Clinicians should counsel women of child-bearing potential about the <u>risks of COT during pregnancy and after delivery.</u>

- Studies of patients with chronic non-cancer pain taking opioids on a long-term basis suggest that as many as 45% could be engaging in aberrant drug-taking behaviors (Michna, Clinical Journal of Pain, 2007). Many patients seen by both physicians exhibited classic signs of drug-seeking behavior:

  - o Requesting maximal doses of drug or increases in drug doses.
  - o Prescriptions received from multiple sources in multiple states and filled at different pharmacies in different states.
  - o Numerous patients resided in cities or counties that were different from that of the doctor's office. A very significant number of patients came to the clinic from other states Kentucky, Ohio, Florida, West Virginia as well as different areas of Georgia.
  - o Paying cash for a consultation /examination. Evidence of medical insurance not present in patient records.
  - o Many patients appear to be unemployed yet can nevertheless afford expensive prescription medications.
  - o Requesting a certain type or dosage of a drug during the office visit. Patients almost always left with prescriptions for the drugs they were previously receiving.
  - o At follow-up or return appointments the number of tablets and/or doses that were prescribed monthly appears to have increased, in many instances at the patient's request.
  - o Although other prescriptions were written (Motrin, Colace, Naprosyn) only those for oxycodone, soma, lorcet or benzodiazepine appear to have been filled.

USAO-004118

- MRI reports are highly questionable. Many are from states where the patients did not live. Notations in chart mention that MRI reports were directly faxed and verified. A number of MRI reports are not on letterhead. MRI reports are easily faked and many are readily available on the web for modification.

- Soma (carisoprodol) is an outdated medication (FDA approved 1959) with few limited current uses. Effective January 12, 2012, the DEA placed carisoprodol into schedule IV of the federal Controlled Substances Act. Its active metabolite meprobamate is also schedule C-IV compound. In 1997 the FDA Drug Abuse Advisory Committee requested that addiction studies for Soma be provided for review. Soma is a drug of abuse (Reeves, J. Am. Osteopath. Assoc. Carisoprodol: a drug of continuing abuse, 1997) and the use of Soma has been shown to cause psychological dependence and significant withdrawal symptoms are observed with sudden cessation. Effects of Soma are similar to those of the benzodiazepines but it has been reported that drug abusers prefer carisoprodol over benzodiazepines for its effects. Patients do not appear to have been warned of the potential side effects or dependence liability of this drug. Doses and duration of Soma used also appear to be excessive. The manufacturers maximum recommended dose of Soma is 1400 mg/day for adults. Again there was no assessment of patient liver function despite the fact that this agent is also primarily liver metabolized. Patients should also be told to take this agent with food to minimize gastric irritation. The combination of Soma and oxycodone/xanax is also questionable since both have the potential for significant CNS depression.

- Indications for the prescribing of benzodiazepines (xanax, valium) (Schedule IV) is unclear. Their use in chronic pain is controversial. They have a clear addiction potential. If used for sleep, there are a number of other agents besides benzodiazepines that could be used to help patients sleep that are non-addicting and would be less likely to cause interaction with the opioids and Soma.

- Evidence of a true anxiety disorders in patients checking anxiety is questionable. Anxiety disorders fall into several categories such as "generalized anxiety disorder", "social anxiety disorder", "panic disorder", etc, which have a clearly defined set of symptoms and guidelines for diagnosis. (*American Psychiatric Association*: Diagnostic and Statistical Manual of Mental Disorders, 1994) none of these are investigated or documented. Often times there may be cross-over between diagnosis of anxiety disorders and depression. No attempt was made to further define this anxiety nor were there any referrals for it. Alprazolam (Xanax) is approved for the short-term treatment of non-specific anxiety. This particular agent has a relatively high potential for abuse when compared to other benzodiazepines. The risk of dependence with the benzodiazepines clearly increases with increasing time of use and is generally thought to occur after 12 weeks of therapy with higher doses, but has been documented with much shorter use.

USAO-004119

Recommended doses for the treatment of anxiety in adults are starting doses of 0.5 mg PO three times per day, increased to 1 mg in increments as needed, at intervals of 3-4 days up to a maximum of 4 mg/day. A number of patients were started on 1.0 mg or even 2.0 mg qid. Alprazolam is a favored benzodiazepine of abuse to its rapid onset and thus heightened effect. An extended release version of alprazolam is available that has a slower onset of action, and thus reduced potential for abuse (Klein, J. Clin. Psychiatr, 2002). However, this formulation was never used or even discussed with patients.

- Obvious patient medical issues were missed or ignored. A number of patients came in with very significant elevations in blood pressure. Others were significantly obese. Many patients smoked but only one chart (Brian Smith) mentioned any counseling regarding smoking cessation. No lab tests, chest x-rays or other standard testing (i.e. lipid panels, blood glucose, PSA, etc) were performed or ordered.

- Most patients tested positive for oxycodone, many for opiates and benzodiazepines. Some (L. Smith, G. Reece) for THC which should raise an additional red flag for a recreation drug user and abuser.

- Flexeril (cyclobenzaprine). Is a muscle relaxant that can be used for illicit purposes. The drug is referred to as "cyclone" or "mellow yellow" with recreational doses ranging from 20 to 80 mg. At these dosages, users report mild to moderate drowsiness and relaxation as the primary effects. Compared with other commonly abused CNS depressants, cyclobenzaprine's effects are considered to be mild, limiting its popularity as a recreational drug. Schedule IV agent in Georgia. The drug is contraindicated in patients with cardiac arrhythmia or heart block. No EKG's were taken or questions asked as to whether any of the patients prescribed this drug had any cardiac issues. Significant interactions can occur with other CNS depressants such as Xanax, oxycodone or hydrocodone. It is indicated for short-term use (2-3 weeks).

- Doses of Lorcet (hydrocodone, Schedule III) appear to be excessive, especially in light of the "vague" indications. Although used for muscle pain (myalgia) hydrocodone/acetaminophen is not actually indicated by the FDA for this use. When used for muscle pain, the standard recommended dosage of hydrocodone/acetaminophen in adults (according to the Clinical Pharmacology database) is 5 mg/500 mg (1-2 tablets) every 4-6 hours as needed. Maximum dosage of acetaminophen should not exceed 4 g/day and hydrocodone should not exceed 60 mg/day. New FDA guidelines will limit single doses of acetaminophen to no more than 325 mg and is considering lowering maximal daily dose to 3000mg. Lorcet is likewise not FDA approved for the use of chronic back pain.

USAO-004120

- Numerous patients with elevated blood pressure but no discussion, intervention or follow-up recommended:

Gossett:



- o ▮▮▮. – 155/106
- o ▮▮▮ – 153/96
- o ▮▮ – 172/99
- o ▮▮▮. – 188/103, 192/105
- o ▮▮. – 155/98
- o ▮▮▮. – 150/100

Azmat:

- o ▮▮ – 147/99
- o ▮▮. – 184/92, 174/104, 157/85
- o ▮▮. – 196/116
- o ▮▮. - 173/112
- o ▮▮. – 203/105
- o ▮▮. - 153/89
- o ▮▮. – 159/89, 193/99
- o ▮▮ – 162/104
- o ▮▮. – 147/83, 145/101
- o ▮▮ – 158/106

- A number of patients with significant obesity but no discussion or intervention occurred:

Gossett:

- o ▮▮ – 6'0", 279 lbs
- o ▮▮. – 5'5", 269 lbs

Azmat:

- o ▮▮ – 5'6", 217 lbs
- o ▮▮. – 5'6", 261
- o ▮▮. – 5'6", 240
- o ▮▮ – 6'0", 284
- o ▮▮ –5', 238
- o ▮▮ – 6'8", 340

USAO-004121

- Several of Dr. Azmat's patients tested positive for THC but were still prescribed opioids & benzodiazepines.
  - o 
  - o
  - o
  - o


Martin M. Zdanowicz, Ph.D., M.A.

Submitted 10/22/2012

# EXHIBIT "C"

|     | Case # | Patient Name | Medications on Presentation | Medications Changed on First Visit |
| --- | --- | --- | --- | --- |
| 1. | 98 | ▓▓▓▓▓▓ | i) Oxycodone 30 # 210<br>ii) Oxycodone 15 # 90<br>iii) Xanax 2mg #35 | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 2. | 99 | ▓▓▓▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 90<br>iii) Xanax 2mg #30 | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 3. | 94 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 90 | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 60 |
| 4. |  | ▓▓▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 90<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 60<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 5. |  | ▓▓▓▓ | i) Oxycodone 30 # 240<br>ii) Oxycodone 15 # 180 | i) Oxycodone 30 # 90<br>ii) Oxycodone 15 # 30 |
| 6. | 78 | ▓▓▓▓▓▓ | i) Oxycodone 30 # 240<br>ii) Oxycodone 15 # 110<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 30<br>iii) Xanax 1mg # 30 |
| 7. | 97 | ▓▓▓▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 60<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 8. | 83 | ▓▓▓▓ | i) Oxycodone 30 # 150<br>ii) Hydrocodone 10 # 90<br>iii) Lorazepam 2mg #30 | i) Oxycodone 30 # 150<br>ii) Hydrocodone 10 # 60<br>iii) Lorazepam discontinued |
| 9. | 91 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 90<br>iii) Diazepam 10mg #30 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 90<br>iii) Diazepam discontinued |
| 10. | 92 | ▓▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 90<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 30<br>iii) Xanax discontinued |
| 11. | 88 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 60<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 30<br>iii) Xanax discontinued |
| 12. | 100 | ▓▓▓▓ | i) Oxycodone 30 #168<br>ii) Soma 350mg # 60<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Soma Discontinued<br>iii) Xanax 1mg #15 |
| 13. | 90 | ▓▓▓▓▓ | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax 1mg #30 |

| 14. | 85 | ▓▓▓▓ | i) Oxycodone 30 # 210<br>ii) Valium 10mg #30 | i) Oxycodone 30 # 150<br>ii) Valium discontinued |
| 15. | 84 | ▓▓▓▓ | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax 2mg #30 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 30<br>iii) Xanax discontinued |
| 16. | 66 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Percocet 10 # 120<br>iii) Xanax 2mg #30 | i) Oxycodone 30 # 150<br>ii) Percocet discontinued<br>iii) Xanax discontinued |
| 17. | 86 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 90<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Percocet 10 # 60<br>iii) Oxycodone 15 discontinued<br>iv) Xanax discontinued |
| 18. | 82 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 84<br>iii) Xanax 2mg #30 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 19. | 87 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 60<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 20. | 93 | ▓▓▓▓ | i) Oxycodone 30 # 150<br>ii) Lorcet 10 # 60<br>iii) Valium 10mg #30 | i) Oxycodone 30 # 150<br>ii) Lorcet 10 # 60<br>iii) Valium discontinued |
| 21. | 89 | ▓▓▓▓ | i) Oxycodone 30 # 1800<br>ii) Oxycodone 15 # 60<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 discontinued<br>iii) Xanax discontinued |
| 22. | 95 | ▓▓▓▓ | i) Oxycodone 30 # 180<br>ii) Oxycodone 15 # 150<br>iii) Xanax 2mg #30<br>iv) Soma 350mg #90 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued<br>iv) Soma discontinued |
| 23. | 81 | ▓▓▓▓ | i) Oxycodone 30 # 210<br>ii) Oxycodone 15 # 120<br>iii) Xanax 2mg #60 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 # 60<br>iii) Xanax discontinued |
| 24. | 79 | ▓▓▓▓ | i) Oxycodone 30 # 120<br>ii) Oxycodone 15 # 90<br>iii) Valium 10mg #30 | i) Oxycodone 30 # 120<br>ii) Oxycodone 15 # 90<br>iii) Valium discontinued |
| 25. | 96 | ▓▓▓▓ | i) Oxycodone 30 # 210<br>ii) Oxycodone 15 # 120<br>iii) Xanax 2mg #90 | i) Oxycodone 30 # 150<br>ii) Oxycodone 15 discontinued<br>iii) Xanax discontinued<br>iv) Percocet 10 # 60 |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | INDICTMENT NUMBER: |
| | ) | CR 4:13 – 028 |
| DR. NAJAM AZMAT, | ) | |
| | ) | |
| Defendant. | ) | |

## DR. AZMAT'S SUPPLEMENT TO MOTION TO EXCLUDE GOVERNMENT EXPERTS DR. GENE KENNEDY AND MARTIN ZDANOWICZ

COMES NOW, Dr. Najam Azmat, ("Dr. Azmat") one of the defendants herein, and files this, his Supplement to Motion to Exclude Government Experts Dr. Gene Kennedy and Martin Zdanowicz (hereinafter "Supplement"), and hereby requests that his Motion be granted.

On October 25, 2013, the Dr. Azmat filed his *Daubert* Motion to Exclude Government Expert's Dr. Gene Kennedy and Martin Zdanowicz and Request for an Evidentiary Hearing (hereinafter "*Daubert* Motion"), Doc. # 241, seeking to exclude the alleged expert witnesses proffered by the Government, Dr. Gene Kennedy and Martin Zdanowicz, Ph.D., pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993); Federal Rules of Evidence 401, 403, 701, 702, 703, and 704; and the Due Process Clause of the Fifth Amendment.

Over three (3) weeks have expired since Dr. Azmat filed his *Daubert* Motion. The government has not response or filed papers in opposition to Dr. Azmat's *Daubert* Motion. It follows that Dr. Azmat's *Daubert* Motion is due to be granted and any and all proposed

1

testimony from the Government's experts, Dr. Gene Kennedy and Martin Zdanowicz, Ph.D., should be excluded from any trial in this case.

The Local Rules for Criminal Cases, 12.1 provide that "[u]nless otherwise ordered, responses to motions shall be filed within fourteen (14) days of filing." LCrR 12.1. The Court's Local Rules for Civil Actions are furthermore fully applicable in criminal cases. *See* Local Rules for the Administration of Criminal Cases ("These Local Rules for the Administration of Criminal Cases are supplemental in nature, and are to be construed consistently with the generally applicable Local Rules, *supra*"). And, Local Rule 7.5 provides that "[f]ailure to respond [to a motion] within the applicable time period shall indicate that there is no opposition to a motion." LR 7.5. The Government has failed to respond to Dr. Azmat's Daubert Motion within fourteen (14) days and is now over a week outside such period, even if an additional three (3) days for certain kinds of service are added under Federal Rule of Civil Procedure 6(d). Nor has the Government moved for any extension of time in which to file a response under Local Civil Rule 6.1. *See* LR 6.1. The Government may accordingly be held to have no opposition to Dr. Azmat's *Daubert* Motion.

The Court has enforced its rule that motions to which there is no response filed within fourteen (14) days are held to be unopposed in hundreds of cases up until the present. *See Martinez-Garcia v. Perez*, No. CV613-015, 2013 WL 5606366, *1 (S.D.Ga., October 11, 2013) (observing that the Court had granted the plaintiffs' motion for fees and expenses where the defendant failed to respond, citing LR 7.5); *Johnson v. Coca Cola Bottling Co. United East, LLC*, No. CV413-053, 2013 WL 4590786, *1 (S.D.Ga., August 28, 2013)

2

(granting the defendants' motions to dismiss where the plaintiff filed no response to the motions, holding that the motions were "unopposed by operation of Local Rule 7.5"); *Wilson v. Probate Court, County of Emanuel, Georgia*, No. CV613-065, 2013 WL 4458526, *1 (S.D.Ga., August 19, 2013) (granting the defendant's motion to dismiss where the plaintiff failed to respond to the motion); *Morris v. McCallar*, No. CV411–309, 2012 WL 3095543 (S.D.Ga., July 30, 2012) (same). The rule is fully capable of being applied in criminal case. *See United States v. Honken*, 378 F.Supp.2d 928, 964 (N.D.Iowa 2004) ("Where the defendant has never attempted, even belatedly, to respond to the government's motion for admissibility of audio recordings on the merits, despite notice of his procedural default, the court can find no reason to refrain from granting the motion as unresisted pursuant to N.D. IA. L.CR.R.. 47.1 and N.D. IA. L.R. 7.1(f)"). The Court should follow its Rule in this case and grant Dr. Azmat's *Daubert* Motion and exclude the Government's proposed, alleged expert testimony.

The Government has managed to timely respond to Defendant's Motion for Reconsideration of Detention Order, Doc. # 38, and Defendant's Appeal to the District Court for Review of Detention Order, Doc. # 57. See Doc. # 47, 68. Here, however, regarding this *Daubert* issue, it is silent.

For the reasons set forth herein, therefore, Dr. Azmat's *Daubert* Motion should be granted and the alleged expert testimony from the Government's experts should be excluded.

WHEREFORE, for the reasons set forth herein and in Defendant Najam Azmat's *Daubert* Motion to Exclude Government Expert's Dr. Gene Kennedy and Martin Zdanowicz

and Request for an Evidentiary Hearing, Doc. # 241, the Court should grant the Motion and

exclude the expert witnesses proffered by the Government, Dr. Gene Kennedy and Martin

Zdanowicz, Ph.D., from any trial of this case.

This the __19th__ day of _____November_____, 2013.

>/s/ **Thomas A. Withers, Esq.**
>Thomas A. Withers, Esq.
>Georgia Bar Number: 772250
>Attorney for Dr. Najam Azmat
>Gillen, Withers & Lake, LLC
>8 East Liberty Street
>Savannah, Georgia 31401
>Telephone: (912) 447-8400
>E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that I have on this day served all the parties in this case in

accordance with the notice of electronic filing ("NEF") which was generated as a result of

electronic filing in this court.

This __19th__ day of _____November_____, 2013.

>/s/ **Thomas A. Withers, Esq.**
>Thomas A. Withers, Esq.
>Georgia Bar Number: 772250
>Attorney for Dr. Najam Azmat
>Gillen, Withers & Lake, LLC
>8 East Liberty Street
>Savannah, Georgia 31401
>Telephone: (912) 447-8400
>E-Mail: Twithers@gwllawfirm.com

4

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA        )
                                )
v.                              )        CASE NO. CR413-28
                                )
SEAN MICHAEL CLARK, ADELAIDA    )
M. LIZAMA, DANIEL JOHN WISE,    )
NAJAM AZMAT,                    )
                                )
_____Defendants._____      )

O R D E R

Before the Court are Defendant Azmat's Motion to
Exclude Government Experts (Doc. 241) and Supplemental
Motion to Exclude Government Experts (Doc. 260), along with
motions to adopt by Defendants Clark, Lizama, and Wise
(Docs. 244, 245, 246). The Government has responded in
opposition. (Doc. 262.) Defendant Azmat has filed a
reply. (Doc. 270.) As Defendants Lizama and Clark have
already pled guilty in this case, their motions are
DISMISSED AS MOOT. Defendant Wise's Motion to Adopt is
GRANTED. Defendant Azmat's Supplemental Motion to Exclude
Government Experts is DENIED. The original Motion to
Exclude Government Experts is DENIED IN PART, but the
Government is DIRECTED to respond on or before JANUARY 6,
2014 explaining how its proposed expert testimony passes
Daubert's reliability requirement. The Court defers making
a final judgment on the merits of Defendants' Motion to

Exclude Government's Experts until after the Government's supplemental response. Defendants should not file a reply brief.

## I. PRELIMINARY MATTERS

As a preliminary matter, the Court considers Defendant Wise's motion to adopt Defendant Azmat's challenge to the Government's expert witnesses—Dr. Gene Kennedy and Dr. Martin Zdanowicz. (Doc. 246.) In the interest of judicial economy and because the admissibility of Dr. Kennedy's and Dr. Zdanowicz's testimony is sufficiently pertinent to Defendant Wise's case, the Court **GRANTS** this motion. Accordingly, the Court considers Defendant Azmat's motions as if they were filed by both Defendants.

Additionally, the Court will first address Defendants' supplemental motion, which seeks to exclude the Government's expert testimony due to the Government's failure to file a timely response.[1] (Doc. 260.) Unlike the cases cited by Defendants, however, the non-moving party in this case has eventually responded in opposition. Given the Court's strong interest in resolving cases on the merits, the Court finds that Defendants' motion should not

---

[1] The Court cannot find, and the Government does not provide, any support for the Government's contention that a motion to adopt extends the time with which a party has to respond to a motion. (Doc. 262.)

2

be considered unopposed simply because the Government responded in an untimely fashion. <u>See, e.g.</u>, <u>Whitehead ex rel. Whitehead v. Sch. Bd. for Hillsborough Cnty.</u>, 932 F. Supp. 1396, 1399 (M.D. Fla. 1996) (finding that Eleventh Circuit policy strongly favors resolving issues on the merits rather than on procedural technicalities). Accordingly, this motion (Doc. 262.) is **DENIED**.

## II. DEFENDANTS' MOTION TO EXCLUDE GOVERNMENT EXPERTS

Defendants argue that neither Dr. Kennedy nor Dr. Zdanowicz's proposed expert testimony satisfies the requirements for admissibility as articulated in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). The admission of expert testimony is controlled by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 was amended in response to <u>Daubert</u>, which compelled district courts to perform a gatekeeping function concerning the admissibility of expert testimony. <u>Id.</u> at

3

597.   The Eleventh Circuit Court of Appeals has explained that district courts fulfill that function by engaging in a three part inquiry, considering whether

> (1)   the   expert   is   qualified   to   testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as  to  be  determined  by  the  sort  of  inquiry mandated   in   Daubert;   and   (3)   the   testimony assists   the   trier   of   fact,   through   the application   of   scientific,   technical,   or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).   While there will often be some overlap between these   concepts   of   qualification,   reliability,   and helpfulness, they are distinct concepts that courts should be  careful  not  to  conflate.   Quiet  Tech.  DC-8,  Inc.  v. Hurel-Dubois,  UK,  Ltd.,  326  F.3d  1333,  1341  (11th  Cir. 2003).   The burden of establishing that these requirements are met rests with the proponent of the expert testimony, and  not  the  Daubert  challenger.   McCorvey  v.  Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).

Further, Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue."   However, an expert may not "merely tell the jury what result to reach."   Montgomery v. Aetna Cas.  &  Sur.  Co.,  898  F.2d  1537,  1541  (11th  Cir.  1990)

4

(citing Fed. R. Civ. P. 704 committee notes (telling jury what result to reach is not helpful to jury and therefore not admissible testimony)).  For expert testimony that properly goes to the ultimate issue, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."  Quiet Tech, 326 F.3d at 1341; see also Rosenfield v. Oceania Cruises, Inc., 654 F.3d 1190, 1193-94 (11th Cir. 2011).  The Supreme Court in  Daubert  opined  that  "vigorous  cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means  of  attacking  shaky  but  admissible  evidence." Daubert, 509 U.S. at 596; see Quiet Tech, 326 F.3d at 1341.

## A. Challenges to Dr. Kennedy

Defendants'  primary  challenge  to  Dr.  Kennedy's proposed testimony is that it does not satisfy Daubert's reliability requirement.  Although the Court believes the proposed testimony's deficiencies can be cured and will give the Government an opportunity to do so, the Court agrees that the proposed testimony is presently inadequate. While Dr. Kennedy's disclosure describes Defendant Azmat's actions and opines that it fails to meet the required standard  of  care,  it  does  not  outline  what  is  the appropriate standard of care and how Dr. Kennedy determined

these were the standards. (Doc. 241, Ex. A.) The Government's response is equally unhelpful as it says only that Dr. Kennedy relied on his or her experience and possibly standard reference materials. (Doc. 262 at 2.) To allow the testimony without any further explanation of the standards applied in this case or how they were developed would undercut the reliability requirement of the Daubert analysis. See Frazier, 387 F.3d at 1261 ("If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.").

In addition, Defendants argue extensively that the lack of testability should render Dr. Kennedy's testimony inadmissible. (Doc. 241 at 9-13.) However, the Court will not prohibit an expert from testifying simply because he is qualified solely or primarily by experience or because the evidence does not easily lend itself to empirical review. Still, as stated above, the Government must demonstrate what methodology Dr. Kennedy used in creating his opinions and by what standards he evaluated Defendant Azmat's actions. See, e.g., United States v. Pacheco, 2009 WL383257 (S.D. Fla. 2009) ("If the witness is relying solely or primarily on experience, then the witness must

explain how that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). The Court must have a meaningful opportunity to examine and evaluate Dr. Kennedy's methodology to ensure the testimony's reliability prior to trial. See Frazier, 387 F.3d at 1262 (finding that the Court has considerable discretion in evaluating testimony, but a determination of reliability must be made prior to its admissibility). Because the Court believes that Dr. Kennedy's testimony would ultimately be helpful to the jury in this trial if its technical deficiencies can be overcome, the Government is **DIRECTED** to file, on or before **JANUARY 6, 2014**, a supplemental response explaining the standards of care against which Dr. Kennedy evaluated Defendant Azmat's actions and how he determined that those were the applicable standards.

Defendants further argue that Dr. Kennedy's testimony is inadmissible because it fails to account for alternative explanations. (Doc. 241 at 14-15.) However, the Court finds this argument to be without merit and outside the scope of a Daubert analysis. This argument has no bearing on the admissibility of Dr. Kennedy's testimony, but instead addresses the weight a jury should ultimately give that testimony. See Quiet Tech, 326 F.3d at 1341 ("In the

7

end, although '[r]ulings on admissibility under Daubert inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology,' it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." (quoting McCorvey, 298 F.3d at 1256)). This argument thus belongs in Defendants' cross-examination and, accordingly, this portion of Defendants' motion is **DENIED**.

Defendants also argue that Dr. Kennedy should be prohibited from offering an opinion as to whether medical examinations performed by Defendant Azmat were "credible" (Doc. 241 at 12-13), and that prescriptions were given out "without a legitimate medical purpose" (id. at 16-18). Defendants argue that this testimony constitutes improper opinion testimony under Federal Rule of Evidence 704 and amounts to "little more than telling the jury what result should be reached." (Id. at 18-19.) However, if a proper foundation for reliability is established, the Court will not prevent Dr. Kennedy from testifying on these matters. As stated above, an expert is not barred from giving an opinion simply because it goes to an ultimate issue. Fed. R. Evid. 704(a). Such is the case here. A medical expert's opinion that a physical examination is not credible or that a prescription is without a legitimate

8

medical purpose, when based on a comparison with the appropriate standard of care, is not an invasion into the jury's purview. These are informed comparisons based on medical standards; not legal conclusions of guilt or liability. An expert is free to give this opinion so long as the methodology used to arrive at the conclusion is sufficiently reliable. Accordingly, this portion of Defendants' motion is **DENIED**.

Lastly, Defendants question the relevancy of Dr. Kennedy's testimony by arguing that the standard in this case is whether Defendant Azmat "stopped being a doctor at all and was acting as a drug dealer." (Doc. 241 at 13-14.) However, this is not the standard for the admissibility of Dr. Kennedy's testimony in this case. The requirement of relevancy for expert testimony is that it must "assist[] the trier of fact, through the application of . . . expertise, to understand the evidence or to determine a fact in issue." Frazier, 387 F.3d at 1260. If a proper foundation of reliability is established, the Court finds no reason to conclude that this testimony would be irrelevant. Dr. Kennedy's testimony would aid the jury in understanding the complex medical facts of this case to determine whether Defendant Azmat's actions met or fell

below the appropriate standard of care required. Accordingly, this portion of Defendants' motion is **DENIED**.

### B. Challenges to Dr. Zdanowicz

Defendants' primary argument against the admissibility of Dr. Zdanowicz's testimony is that he is not a physician and therefore unqualified to testify on clinical matters of care. (Doc. 241 at 19.) However, the fact that Dr. Zdanowicz is a pharmacologist and not a physician does not disqualify him from offering testimony as an expert witness in this case. See, United States v. Ignasiak, 667 F.3d 1217, 1225 (11th Cir. 2012) (expert testimony of a pharmacologist on the medical propriety of treatments was admissible). While Dr. Zdanowicz is not qualified to opine as to the medical examinations performed by Defendant Azmat, the Government has not indicated a desire for him to do so. (Doc. 262 at 2.) Rather, his proposed testimony relates to whether Defendant Azmat's actions represented a pattern of over-prescribing controlled substances based on the factual circumstances of individual patients. (Doc. 262 at 2.) The Court finds that his background in pharmacology and knowledge of drugs and drug-seeking behavior is likely to assist a jury in both understanding the prescriptions provided by Defendant Azmat and ultimately deciding whether they were provided without a

legitimate medical purpose. Accordingly, the Court finds no reason to conclude that Dr. Zdanowicz is unqualified to offer his proposed expert testimony.

However, the proposed testimony of Dr. Zdanowicz suffers from the same deficiency as that of Dr. Kennedy. The Government has not presented the methodology and standards by which Dr. Zdanowicz has developed his opinions. Accordingly, for the same reasons as stated above concerning Dr. Kennedy's proposed testimony, the Government is **DIRECTED** to file, on or before **JANUARY 6, 2014,** a supplemental response explaining the standards against which Dr. Zdanowicz evaluated Defendant Azmat's actions and how he determined those were the applicable standards.

Defendants also argue that much of Dr. Zdanowicz's testimony is irrelevant and should be barred at trial. While it is true the relevancy of some of the proposed testimony is not readily apparent to the Court,[2] the nature of this case is complex and these questions are difficult to consider absent the context of trial. Accordingly, Defendants' argument is **DENIED**, subject to the Government

---

[2] For instance, the Court can discern no need for Dr. Zdanowicz to discuss the possible harmful effects of Soma (carisoprodol) as it was never prescribed by Defendant Azmat in this case. (Doc. 241, Ex. B at 4.)

laying a proper foundation at trial. If necessary due to the context in which the Government offers the proposed testimony, Defendants may renew their objections at trial.

Defendants offer a final argument that Dr. Zdanowicz's opinions are inadmissible because they are contrary to the evidence, particularly as to whether or not Defendant Azmat weaned his patients off of prescribed drugs during the course of treatment. (Doc. 241 at 21.) The Court finds no merit in this argument. This evidence, if proven, only goes to the weight the jury should ultimately give the testimony and not whether it satisfies _Daubert's_ requirements. If the Government provides evidence of a reliable methodology used by Dr. Zdanowicz in developing his opinions, the Court will not prohibit his testimony at trial simply because Defendants do not find it convincing.

Conclusion

As Defendants Lizama and Clark have already pled guilty in this case, their motions are **DISMISSED AS MOOT**. Defendant Wise's Motion to Adopt is **GRANTED**. Defendant Azmat's Supplemental Motion to Exclude Government Experts is **DENIED**. The original Motion to Exclude Government Experts is **DENIED IN PART**, but the Government is **DIRECTED** to respond on or before **JANUARY 6, 2014** explaining how its proposed expert testimony passes _Daubert's_ reliability

12

requirement. The Court defers making a final judgment on the merits of Defendants' Motion to Exclude Government's Experts until after the Government's supplemental response. Defendants should not file a reply brief.

SO ORDERED this 27th day of December 2013.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR 413-28 |
| | ) | |
| v. | ) | |
| | ) | |
| SEAN MICHAEL CLARK, ET AL. | ) | |

## GOVERNMENT'S RESPONSE TO COURT ORDER OF DECEMBER 27, 2013 [DOC 291] CONCERNING RELIABILITY OF PROPOSED EXPERT TESTIMONY

Now comes the United States of America, by and through Edward J. Tarver, United States Attorney for the Southern District of Georgia, and files the government's response to the Court's order of December 27, 2013 concerning the reliability of proposed expert testimony.

As noted in the Government's Disclosure of Expert Testimony Pursuant to Federal Rule of Criminal Procedure 16 (a)(1(G) [Doc 223], the United States intends to call during its case-in-chief, Gene Kennedy, M.D., as an expert witness in the field of medicine and pain management and Martin M. Zdanowicz, Ph.D., as an expert in the field of pharmacology. This supplemental notice addresses how the experts' testimony passes Daubert's reliability requirements by demonstrating the appropriate standards of care; how Dr. Kennedy and Dr. Zdanowicz determined the standards of care; and the methodology used in creating the opinions in evaluating Dr. Azmat's conduct. [1]

1. The Standard of Care used by both experts is whether Dr. Azmat prescribed controlled substances without legitimate medical purpose, or outside the usual course of practice generally recognized and accepted in the United States.

Both doctors, Dr. Kennedy, M.D., and Dr. Zdanowicz, Ph.D., will testify that Dr. Azmat prescribed controlled substances without legitimate medical purpose and outside the usual course

---

[1] This document incorporates previously filed Document 223, the CVs of Kennedy and Zdanowicz (attached as exhibit 1); and the previously disclosed expert summary reports of Kennedy and Zdanowicz (attached as exhibit 2 and 3, respectively).

of practice generally recognized and accepted in the United States. As outlined below, the doctors will provide their expert opinions based on their respective educational backgrounds, training, and experience. They will also base their findings on their respective reviews of Dr. Azmat's patient files. They may also rely upon the standards outlined in the Controlled Substances Act, codified in Title 21 of the United States Code, the Georgia Medical Board standards related to Unprofessional Conduct, as defined in O.C.G.A. § 360-3-.02 , the Georgia Medical Practice Act, Title 43, Ch. 34, and respected, peer-reviewed, medical and scientific literature. Both doctors will also rely upon fundamental concepts of medicine, learned from the incipient stages of their respective studies including the Hippocratic Oath to "do no harm."

As an independent and further basis for both experts' opinions, each expert has reviewed the patient files outlined as substantive counts in the indictment. Both experts reserve the right to supplement their respective opinions as necessary to fully address the medical issues raised in this case. They may review additional material prior to and during trial to further ensure the opinions remain accurate and complete. They reserve the right to supplement the disclosures as needed. All of the doctors' opinions will be expressed to a reasonable degree of medical and professional certainty.

**2. Dr. Gene Kennedy, M.D**

As stated in the previously disclosed *Curriculum Vitae*, Dr. Kennedy received his Bachelor of Science Degree from Louisiana State University in 1988. He studied medicine at St. Georges University in Grenada, West Indies and New York Medical College, Valhalla, New York, where he received his Medical Degree in 1992. From 1992 through 2013, he has actively practiced medicine. As outlined in his *Curriculum Vitae*, among other things, Dr. Kennedy has served as the Medical Director at different facilities; worked as a hospice medical director and

2

focused the last nine years practicing pain management. He serves as a Diplomat for the

Academy of Pain Management; and has been qualified as an expert witness in physician pain

management practices in an administrative hearing and in federal trials in this jurisdiction. Dr.

Kennedy maintains an active pain management practice. He frequently reviews literature from

the American Academy of Pain Management and attends lectures related to pain management.

He has passed exams given by the Academy testing his knowledge of pain management. He has

reviewed accepted, peer reviewed, medical and scientific literature related to the practice of pain

management, including but not limited to, FDA warnings and labels, the Georgia Composite

Medical Board standards related to Unprofessional Conduct, as defined in O.C.G.A. § 360-3-.02,

the Federation of State Medical Boards (FSMB) Model Policy, the Federation of State Medical

Boards Model Policy on Data 2000 and the Treatment of Opioid Addiction in the Medical

Office; the Model Policy on the Use of Opioid Analgesics in the Treatment of Chronic Pain,

May 2003, May 2004), the Physician's Desk Reference, the Merck Manual, the American

Academy of Pain Management resource materials, Walls and Melzack's, Textbook of Pain,

*Responsible Opioid Prescribing, A Clinician's Guide*, (first and second editions), Scott Fishman,

M.D., FSMB Foundation, *Guidelines for the Use of Opioid Therapy in Patients with Chronic*

*Noncancer Pain*, Am Fam Physician. 2009 Dec. 1; 80(11):1315-1318, *Clinical Guidelines for*

*the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, American Pain Society (APS)

and the American Association of Pain Medicine (AAPM), (Chou et. al. 2009a); and *Evaluation*

*and Treatment of Posterior Neck Pain in Family Practice*, Journal of the American Board of

Family Practice, December 2004. Dr. Kennedy, who has passed specialty exams related to pain

management, frequently reviews literature from the American Academy of Pain Management

and the American Society of Addiction.

3

Dr. Kennedy is a court recognized expert in the field of pain management. He bases his opinions of the appropriate standard of care based on his education, training, experience, respected medical and scientific literature, federal and state codified standards including those referenced above, discussions with fellow pain management physicians and physicians in the Southern District of Georgia and elsewhere; and the fundamental duties of physicians to do no harm.

### Overview of Pain Management and Treatment Options

Dr. Kennedy is expected to provide an overview of pain management and treatment options, including:

-explanation of pain management treatment;

-various forms of pain management treatment;

-identification and explanation of controlled substances, and schedules;

-addictive risks of controlled substances including oxycodone, alprazolam, and others;

-opioid pain management treatment, when it should be used, the risks, side effects, and dangers;

-red flags associated with pill mills and physicians who prescribe controlled substances for no legitimate reasons;

-proper charting;

-indications of potential drug aberrant behavior;

-dangers of relying solely on a patient's word;

-screening methods to identify drug seekers;

-the doctor / patient relationship;

-physical examinations and the need to request and verify the previous medical history of a patient when dealing with controlled substances;

-precautions when dealing with out-of-state patients;

4

Case: 14-13703 Date Filed: 11/19/2014 Page: 211 of 250

-precautions when dealing with patients who arrive with family members (or persons with the same address) who seek the same drugs; and

-precautions when dealing with patients who request a particular drug.

Dr. Kennedy is expected to testify about the applicability and use of the fundamental medical philosophy to "do no harm," and the guidelines outlined in the aforementioned literature regarding pain management practices, in particular during the relevant time period. Dr. Kennedy recognizes that the practice of medicine is not mathematic. There are no formulas that physicians must use to evaluate pain and to ensure the patient is receiving the appropriate medication. There are, however general principles and standards that guide the practice of medicine. A physician's job is to help the patient. Physicians are duty bound to help rather than hurt. Knowingly prescribing highly addictive controlled substances to addicts does not help the patient, but runs contrary to a physician's duty; as does a physician's deliberate ignorance. Because the practice of medicine is not mathematical, physicians cannot simply consult a book to answer questions. For example: if patient A presents certain characteristics, the physician cannot simply turn to a page in a book, and then provide a cure. There is no "if x, then y."

However, in the medical profession there is respected and peer reviewed literature that cautions physicians when prescribing controlled substances. This literature provides a framework and guidance for physicians to utilize in combination with the physician's training and experience. When dealing with controlled substances, the literature encourages physicians to be cautious. Doctors should not solely rely on a patient's complaint of pain. While it is true that pain is somewhat subjective, tests can be performed to corroborate whether the pain is legitimate. A doctor should take steps to ensure the patient is not merely an addict seeking pills to feed his or her addiction or to divert pills to other unlawful uses. As the references cited

above outline, physicians should conduct thorough interviews. They should ask questions related to the patient's occupation, prior drug use, cause of the injury, if any, how long the patient has been taking narcotics, and prior methods of treatment. Due to the addictive nature of the narcotics, physicians should take steps to justify the prescriptions. This can be done in a number of ways: review of previous medical history; conversations with previous physicians; thorough physical examinations; inquiries as to whether patients have been referred to specialists; and by referring the patients to other specialists, if necessary. As the literature explains, drug tests are one way to determine whether a patient is truly taking the drugs prescribed or if he or she might be selling them. When patients test positive for other narcotics, this positive alert is a red flag that the patient may be a drug seeker.

There are a number of protective actions that pain management doctors should incorporate to substantiate the prescription. The red flags should be addressed by the physician. As explained in the literature, some of the red flags that a patient may be a drug seeker, rather than a legitimate patient are: whether the patient travelled long distances to procure the prescription; whether the patient has any previous medical history; whether the patient appears disheveled or under the influence of narcotics; whether the patient tested positive for other drugs; whether the patient requested specific narcotics; whether the patient exaggerated his or her pain on the paperwork; claims he or she is a 10 on a scale of 1-10, but drove 8 hours to see the doctor; whether the patient arrived with other patients who were seeking the same narcotics; whether the patient presented dubious medical reports, for instance MRI reports indicating no referring doctor.

Dr. Kennedy used his training and experience, and consulted with the aforementioned medical literature, to form his bases of opinion. This literature also outlines red-flags to look for

6

in determining whether a doctor is acting as a doctor, or prescribing controlled substances

outside the course of professional practice. For instance, according to the Georgia Composite

Medical Board standards related to Unprofessional Conduct, as defined in O.C.G.A. § 360-3-.02:

Unprofessional conduct includes:

-"Prescribing controlled substances for a known or suspected habitual drug abuser or

other substance abuser in the absence of substantial justification." In this regard, Dr. Kennedy

will testify the files lacked justification; and the red flags waved warnings of patients seeking

drugs for inappropriate purposes.

-"Failing to maintain appropriate patient records whenever Schedule II, III, IV or V

controlled substances are prescribed [including, but not limited to]. . . records concerning the

patient's history." In the case at hand, Dr. Kennedy will opine that none of the patients' files

contained records from previous physicians concerning the patient's history. While it is true the

files contained MRI's, some of the MRI's appeared highly questionable based on findings and/or

geographic location;

-"Failing to use such means as history, physical examinations, laboratory or radiographic

studies, when applicable, to diagnose a medical problem." In the case at hand, Dr. Kennedy will

opine that the files lacked patient histories from other physicians. The examinations were

cursory at best; and the documents related to radiographic studies, did not justify the

prescriptions;

-"Failing to use medications and other modalities based on generally accepted or

approved indications, with proper precautions to avoid adverse physical reactions, habituation, or

addiction in the treatment of patients. . . ." Dr. Kennedy will testify that Dr. Azmat did not use

medications or other modalities based on generally accepted indications. There were no records

of precautions to avoid adverse physical reactions or records of precautions to habituation and addiction. Additionally, alternative forms of treatment could have been explored and were not.

Dr. Kennedy will reference the Georgia Composite State Board of Medical Examiners, "Guidelines for the Use of Controlled Substances for the Treatment of Pain: Ten Steps," adopted 1/11/2008. These guidelines provide orientation for physicians intending to prescribe schedule II and III analgesics for the purpose of treating chronic pain conditions. The guidelines were intended to "curtail drug diversion, a serious public safety concern for the Board and law enforcement agency." In summary, the ten steps outlined in the document are as follows:

1) A medical history and physical examination must be obtained, evaluated, and documented in the medical record.

2) Create a treatment plan, which includes the use of appropriate non-controlled drugs, and consider referrals to appropriate specialists, such as neurologists, orthopedists, pain management specialists.

3) Before beginning a regimen of controlled drugs, make a determination through trial or through a documented history and physical that non-controlled drugs are not appropriate or effective for the patient's condition.

4) Review the patient's prescription records and discuss the patient's chemical history before prescribing a controlled drug. If a patient is new or otherwise unknown to you, at a minimum obtain an oral drug history and medication allergies, and discuss chemical use and family chemical history with the patient and obtain old records which may include pharmacy records.

5) The physician should discuss the risks and benefits of the use of controlled substances with the patient.

8

6) The physician must regularly monitor the patient.

7) The physician must keep detailed records of the type, dosage and amount of the drug prescribed. It encourages physicians to check with pharmacies who may indicate that a patient is obtaining additional drugs or is doctor shopping.

8) With the patient's permission, the patient's family may be a valuable source of information on the patient's response to the therapy regimen and the patient's functional status, and may provide more accurate and objective feedback than the patient alone.

9) Maintaining adequate records is extremely important.

10) Document, document, document: Keep accurate and complete records to include: the medical history and physical examination; diagnostic, therapeutic and laboratory results, evaluations and consultations, and treatment objectives.

As stated above, Dr. Kennedy bases his opinions on guidelines outlined in other respected periodicals and books, including *Responsible Opioid Prescribing, A Clinician's Guide (first and second edition)*, Scott Fishman, M.D., FSMB Foundation, which offers clinicians effective strategies for reducing the risk of addiction, abuse and diversion of opioids that they prescribe for their patients in pain. The book outlines guidelines from leading pain medicine societies and the Federation of State Medical Boards into pragmatic steps for risk reduction and improved patient care, including:

-Patient evaluation, including risk assessment;

-treatment plans that incorporate functional goals;

-informed consent and prescribing agreements;

-periodic review and monitoring of patients;

9

-referral and patient management;

-documentation;

-compliance with state and federal law; and

-termination strategies for chronic opioid therapy.

This reference, like the other references cited herein, and used by Dr. Kennedy, expresses the need for physicians to conduct thorough interviews, procure medical history, address red flags, conduct thorough examinations, refer patients to specialists, and explore alternative means of treatment. Dr. Kennedy will opine that Dr. Azmat did not comply with the simplest of these measures and that his doctoring amounted to nothing more than writing prescriptions for highly addictive controlled substances based on suspect MRI's and patients' oral histories.

The Federation of State Medical Boards created a policy for physicians in 2004. This policy was in effect when Dr. Azmat committed the offenses herein. Like the other literature cited above, Dr. Kennedy has referred to these standards in forming his opinions. The Model Policy for the Use of Controlled Substances for the Treatment of Pain has been distributed to state medical boards, medical professional organizations, other health care regulatory boards, patient advocacy groups, pharmaceutical companies, state and federal regulatory agencies, and practicing physicians and other health care providers. The Model Guidelines have been endorsed by the American Academy of Pain Medicine, the Drug Enforcement Administration, the American Pain Society, and the National Association of State Controlled Substances Authority. The policy was designed to communicate messages to licensees that, *inter alia*, the use of opioids for other than legitimate medical purposes poses a threat to the individual and society; and that physicians have a responsibility to minimize the potential for the abuse and diversion of controlled substances. The policy adopted criteria to use when evaluating a physician's

treatment of pain, including the use of controlled substances.  The criteria is outlined in other documents cited herein, used by Dr. Kennedy in forming his opinions.  They are summarized hereafter:

1) Evaluation of the patient- a medical history and physical examination must be obtained, evaluated, and documented in the medical record.  The medical record should document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of pain on physical and psychological function, and history of substance abuse.  Dr. Kennedy will testify that Dr. Azmat's evaluation of the patients was substandard.  He did not procure adequate medical history.  He performed ineffective physical examinations.

2) Treatment Plan- The written treatment plan should state objectives that will be used to determine treatment success, such as pain relief and improved physical and psychosocial function, and should indicate if any further diagnostic evaluations or other treatments are planned.  After treatment begins, the physician should adjust drug therapy to the individual medical needs of each patient; and should consider other treatment modalities.  Dr. Kennedy will testify that Dr. Azmat did not prepare individual treatment plans and did not explore other treatment modalities.

3) Informed Consent and Agreement for Treatment- the physician should discuss the risks and benefits of the use of controlled substances with the patient.  The patients should receive prescriptions from one physician and one pharmacy whenever possible.  If the patient is at high risk for medication abuse or has a history of substance abuse, the physician should take special precautions.  Dr. Kennedy will testify that Dr. Azmat failed

11

to adequately discuss the risks and benefits of the use of controlled substances with the patient. Additionally, he failed to address the risks that patients were drug abusers.

4) Periodic Review- The physician should periodically review the course of pain treatment and any new information about the etiology of the pain or the patient's state of health. Objective evidence of improved or diminished function should be monitored and information from family members or other caregivers should be considered in determining the patient's response to treatment. If the patient's progress is unsatisfactory, the physician should assess the appropriateness of continued use of the current treatment plan and consider the use of other therapeutic modalities. Dr. Kennedy will testify that Dr. Azmat did not procure information from objective sources, including family members. Additionally, all of the patients indicated that they had been taking narcotics for treatment for significant periods of time. Dr. Azmat failed to consider the lack of effectiveness or any alternative forms of treatment.

5) Consultation- The physician should be willing to refer the patient as necessary for additional evaluation and treatment in order to achieve treatment objectives. Dr. Kennedy will testify that Dr. Azmat failed to reasonably or consistently employ methods of treatment other than opioid prescriptions.

6) Medical Records- The physician should keep accurate and complete records to include: the medical history and physical examination, diagnostic, therapeutic and laboratory results, evaluations and consultations, treatment objectives, discussions of risks and benefits, informed consent, treatments, medications, instructions and agreements and periodic reviews. Dr. Kennedy will testify that Dr. Azmat failed to keep accurate and complete records. He failed to procure adequate medical history; and he performed

cursory physical examinations. He failed to keep any records of therapeutic treatment, evaluations or consultations. He failed to outline treatment objectives. He failed to outline risks and benefits of opioid use.

7) Compliance with Controlled Substance Laws and Regulations- the physician must comply with applicable federal and state regulations. As outlined above, Dr. Kennedy will testify that Dr. Azmat failed to comply with applicable state and federal regulations. He never even transferred his DEA registration to the East Health Center, which in itself violates federal regulations.

Dr. Kennedy is expected to testify that Dr. Azmat prescribed controlled substances for no legitimate medical reason and outside the course of professional practice. This opinion is based on Dr. Kennedy's training, experience, and medical literature, outlined above, that highlights the danger of prescribing controlled substances, along with the red flags that a physician should address.

Dr. Kennedy is expected to testify that Dr. Azmat was acting outside the usual course of professional practice as a medical doctor and without legitimate purpose relating to the practice of medicine,

-by not maintaining proper files;

-by not documenting files properly;

-by doing cursory exams or no exams on patients;

-by doing cursory physical exams or no physical exam at all;

-by not reviewing or requesting previous medical files from patients;

-by not reading the files correctly;

-by not questioning the patients about why they lived outside the state of Georgia and why many patients presented state issued ID card instead of a driver's license;

13

Case: 14-13703 Date Filed: 11/18/2014 Page: 220 of 250

-by prescribing people high amounts of highly addictive substances, without explaining the consequences of taking the drugs;

-by not referring the patients to any specialist;

-by not referring the patients to physical therapists;

-by accepting cash or credit only;

-by spending inadequate time with patients;

-by prescribing the same controlled substances to people who arrive in groups;

-by relying solely on the word of a patient;

-by writing prescriptions for specific drugs upon request;

-by writing prescriptions for patients who failed drug screens;

-by not discussing health issues with patients;

-by prescribing almost every patient high dosages of oxycodone; and

-by failing to implement treatment plans for the patients.

Dr. Kennedy is expected to testify that all of these indications demonstrate that Dr. Azmat was acting outside the usual course of professional practice as a medical doctor and without legitimate purpose relating to the practice of medicine in prescribing controlled substances. Dr. Kennedy, as outlined in the original expert witness summaries, will testify that Dr. Azmat did not take reasonable efforts to obtain patient history, as shown in the files seized from East Health Center. Dr. Kennedy will also testify that Dr. Azmat's efforts to evaluate patients for drug aberrant behavior fell below accepted standards. For instance, Dr. Azmat prescribed highly addictive controlled substances to at least one patient who tested positive for THC without commenting on the illicit finding. Dr. Kennedy will testify that Dr. Azmat did not credibly chart the patients' files. Some of the files were almost identical, with identical findings.

Dr. Kennedy will testify that Dr. Azmat fell below the applicable standard of care. Dr. Kennedy is familiar with the standard of care based on his educational background (graduating medical school), his training (research via respected journals and scientific literature), and his experience (by operating a legitimate pain clinic for many years and testifying as an expert witness in the Southern District of Georgia and elsewhere). Dr. Kennedy's basis of knowledge is consistent with the accepted practice in the pain management profession. The methodology he employed (reviewing files, peer reviewed literature, and exercising his judgment as a pain management practitioner) is consistent with methodology employed by him in other cases of a similar nature wherein this Court declared him an expert. This methodology has been used in other cases by other experts, and has satisfied Daubert's standards. See, e.g., United States v. Zolot, ---F. Supp.2d----, 2013 WL 4832705 (D.Mass 2013).

In Zolot, the government called a physician as an expert to testify that the defendant prescribed controlled substances without legitimate medical purpose. The government's expert, Dr. Aronoff, reviewed 25 patient files and opined that the defendant violated the standards of care. Dr. Aronoff used the FSMP Model Policy as a standard of care and explained how the defendant failed to comply with the standards. The Court ruled the expert's opinion was "reliable because it applied the medical standard identified to the evidence elicited from the defendant's patient files."

Likewise in the case at hand, Dr. Kennedy reviewed over 25 Azmat patient files and opined that the defendant violated the standards of care, as outlined in respected medical literature. Dr. Kennedy outlined the bases for the standards of care; and how Dr. Azmat failed the standards.

15

3. **Dr. Martin M. Zdanowicz, PH.D.**

Dr. Martin M. Zdanowicz, PH.D., is a court recognized pharmacology expert. He received his Bachelor of Science degree from the Polytechnic Institute of New York, Brooklyn, New York. He received his M.A. in Biology and Psychology from the State University of New York at Binghamton, Binghamton, New York. He received his Ph.D. in Pharmaceutical Sciences-Pharmacology School of Pharmacy and Allied Health from St. John's University, Jamaica, N.Y; and an M.A.Ed. in Higher Education from Argosy University Online, Sarasota, Florida. He has served as the Chair of Pharmaceutical Sciences at South University School of Pharmacy in Savannah, GA; and now is the Associate Dean of Health Studies, School of Nursing and Health Studies, University of Miami. As outlined in his attached *Curriculum Vitae*, he has clinical experience and teaching experience in Pharmacology.

Dr. Zdanowicz, a court recognized expert in the field of pharmacology, bases his opinions via his education, training, experience, and respected medical and scientific literature. He also basis his opinions of the appropriate standard of care based on Title 21 of the United States Code.

### Overview of Pain Management and Treatment Options

Dr. Zdanowicz is expected to provide an overview of pain management pharmacology and treatment options, including:

-explanation of pharmacology;

-relationship between pharmacology and pain management treatment;

-various forms of pain management treatment;

-identification and explanation of controlled substances, and schedules;

-addictive hazards of controlled substances including oxycodone, alprazolam, and others;

16

Case: 14-13703   Date Filed: 11/19/2014   Page: 223 of 250

-opioid pain management treatment, when it should be used, the risks, side effects and withdrawal symptoms and dangers;

-red flags associated with pill mills and physicians who prescribe controlled substances for no legitimate reasons;

-proper charting;

-indications of potential drug aberrant behavior; and

-the pathological effects of controlled substances.

As outlined in his expert opinion reports, previously provided to the defense, and attached as an exhibit, Dr. Zdanowicz is expected to testify about the applicability and use of the fundamental medical/pharmacological philosophy to "do no harm." He will testify that Dr. Azmat prescribed controlled substances for no legitimate medical reason and outside the usual course of professional practice. This opinion is based on Dr. Zdanowicz's training and experience, and his consultation with respected medical and scientific literature including, but not limited to, the American Pain Society and the American Academy of Pain Medicine, Roger Chou, et al. *Opioid Treatment Guidelines: Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain,* The Journal of Pain, 10(2), 2009; the American Society of Anesthesiologists Task Force on Chronic Pain Management. *Practical Guidelines for Chronic Pain Management,* Anesthesiology 112(4), 2010; Roger Chou, et. al. *Diagnosis and Treatment for Low Back Pain: A Joint Clinical Practice Guideline from the American College of Physicians and the American Pain Society,* Annals of Internal Medicine, 147, 2007; NIH Public Access, Khary K. Rigg, et al. *Prescription Drug Abuse and Diversion: Role of the Pain Clinic.* Journal of Drug Issues, 40(3), 2010; the American College of Obstetricians and Gynecologists Committee Opinion: *Opioid Abuse, Dependence and Addiction in Pregnancy.* Number 524, May 2012; and the Clinical Pharmacology Electronic Database; FDA guidelines; USDA

guidelines; the Physician's Desk Reference, drug manufacturers' literature; and standard therapeutic guidelines for opioid practice and treatment of pain.

According to the American Pain Society and the American Academy of Pain Medicine, Roger Chou, et. al. *Opioid Treatment Guidelines: Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, physicians should employ certain guidelines to mitigate the risk of prescribing controlled substances to drug addicts. The article highlights actions physicians should employ in pain management practice. The document states that "[s]afe and effective chronic opioid therapy for chronic noncancer pain requires clinical skills and knowledge in both the principles of opioid prescribing and on the assessment and management of risks associated with opioid abuse, addiction and diversion." A summary of recommended practices is outlined below:

1) Patient Selection- clinicians should conduct a history, physical examination and appropriate testing, including an assessment of risk of substance abuse, misuse, or addiction. Dr. Zdanowicz will testify that Dr. Azmat failed to properly select and monitor patients. He did not adequately conduct physical examinations. He failed to procure adequate patient history. He failed to conduct adequate physical examinations. He also ignored red flags. Patients who travel hundreds of miles, and/or in groups, to see a doctor, and who request opioid prescriptions, and who fail drug screens are more likely to be addicts seeking drugs for the wrong reasons. Dr. Azmat failed to properly screen patients. He did not question the distances travelled. He did not conduct an adequate physical examination; and he failed to document his file properly.

18

Case: 14-13703 Date Filed: 11/19/2014 Page: 225 of 250

2) Opioid Management Plans- Clinicians should procure informed consent- by discussing with patients goals, expectations, risks, and alternatives of opioid treatment. Dr. Zdanowicz will testify that Dr. Azmat failed to discuss patient goals, expectations, risks, and alternatives to opioid treatment.

3) Initiation and Titration of Opioid Treatment- Clinicians and patients should regard initial treatment with opioids as a therapeutic trial to determine whether opioid treatment is appropriate. Dr. Zdanowicz will testify that Dr. Azmat failed to prescribe individualized doses of opioid treatment. He ignored aberrant drug-related behaviors including addiction and diversion. Almost every patient received the same prescriptions. The prescriptions were not individualized.

4) Monitoring- Clinicians should periodically obtain urine drug screens to determine whether the patients are engaged in aberrant drug-related behaviors. Dr. Zdanowicz will testify that Dr. Azmat failed to properly monitor for aberrant behavior. He knowingly prescribed highly addictive substances to patients who demonstrated drug aberrant behavior.

5) High Risk Patients- Clinicians should consider alternative forms of treatment, other than opioid treatment to patients who demonstrate aberrant behavior. Dr. Zdanowicz will testify that Dr. Azmat knowingly prescribed highly addictive substances to patients who demonstrated drug aberrant behavior. He did not consider alternative forms of treatment. He ignored red flags associated with drug aberrant behavior, including but not limited to: driving long distances to procure prescriptions, travelling in groups, requesting specific drug prescriptions, general complaints of pain, exaggerating pain on the pain scale, and lack of medical records.

6) Indications for Discontinuation of Therapy- Patients should be tapered or weaned off opioids when they engage in serious or repeated aberrant drug-related behaviors or diversion, or make no progress toward meeting therapeutic goals. Dr. Zdanowicz will testify that Dr. Azmat failed to discontinue therapy when appropriate. Dr. Azmat saw many patients who were involved in aberrant drug-related behavior and/or did not progress with the use of opioid treatment; yet, he continued to prescribe high doses of opioids, without considering the aberrant behavior, or considering alternative forms of treatment.

7) Driving and Work Safety- Clinicians should counsel patients about transient or lasting cognitive impairment that may affect driving and work safety. Dr. Zdanowicz will testify that Dr. Azmat failed to question or caution patients regarding driving or working. A majority of the patients who received opioids were not from the area and drove great distances to receive the prescriptions. The file does not indicate that any warnings were given to the patients.

8) Opioid Policies- Clinicians should be aware of current federal and state laws, regulatory guidelines, and policy statements. Dr. Zdanowicz will testify that Dr. Azmat ignored current federal and state laws by prescribing highly addictive controlled substances outside the course of legitimate treatment and for no legitimate medical reason.

Dr. Zdanowicz is expected to testify that Dr. Azmat was not acting in the usual course of medical professional practice:

-by not maintaining proper files;

-by not documenting files properly;

20

-by doing cursory exams or no exams on patients;

-by doing cursory physical exams or no physical exam at all;

-by not reviewing or requesting previous medical files from patients;

-by not reading the files correctly;

-by not questioning the patients about why most were from outside the state of Georgia;

-by prescribing people high amounts of highly addictive substances, without explaining consequences of taking the drugs;

-by not referring the patients to any specialist;

-by not referring the patients to physical therapists;

-by accepting cash or credit only;

-by spending inadequate time with patients;

-by prescribing the same controlled substances to people who arrive in groups;

-by relying solely on the word of a patient;

-by writing prescriptions for specific drugs upon request;

-by writing prescriptions for patients who fail drug screens;

-by not discussing health issues with patients and/or ignoring medical issues;

-by prescribing almost every patient with high dosages of oxycodone; and

-by failing to implement treatment plans for the patients.

The United States submits that the proposed expert testimony by both Dr. Kennedy and Dr. Zdanowicz is relevant and admissible. This Court, the Eleventh Circuit, and other jurisdictions have routinely allowed similarly situated experts to testify about the proposed information outlined above and in previous notices. In United States v. Johnston, 322 Fed. App'x 660, 667 (11th Cir. 2009), the Eleventh Circuit Court of Appeals determined that expert testimony regarding "red flags" (or warning signs) pertaining to a physician's medical practice

was admissible under Federal Rule of Evidence 702.  Evidence of cursory medical examinations, or no medical examinations, during initial and follow up visits is relevant and admissible. United States v. Merrill, 513 F.3d 1293, 1297 (11th Cir. 2008).  Lack of medical history in files is relevant and admissible.  United States v. Thompson, 624 F.2d 740, 741 (5th Cir. 1980).  Cash only practice is relevant.  United States v. McIver, 470 F.3d 550, 553 (4th Cir. 2006).  Another relevant fact is whether patients live far from doctor's office and travel distance to fill prescriptions.  Id. at 554.  Whether physician prescribed multiple drugs within the same drug category is a factor to consider.  Merrill, at 1297, 1302-03.  Failing to refer patients to specialist for treatment is a factor.  Id. at 1298.  Whether patient fails toxicology screen, and doctor prescribes controlled substance anyway, is a factor.  United States v. Williams, 445 F.3d 1302, 1305 (11th Cir. 2008).  Lack of individualized dosing of medication is another red flag.  United States v. Jackson, 576 F.2d 46, 50 (5th Cir. 1978).

WHEREFORE, the government requests that the Court permit Gene Kennedy, M.D. and Martin M. Zdanowicz, Ph.D. to testify as experts in their respective fields, subject to the government laying the proper evidentiary foundation at trial.

Respectfully submitted,

EDWARD J. TARVER
UNITED STATES ATTORNEY

*/s E. Greg Gilluly, Jr.*

E. Greg Gilluly, Jr.
Assistant United States Attorney
Tennessee Bar No. 019397

*/s Karl I. Knoche*

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624

22

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 6th day of January, 2014.

Respectfully submitted,

EDWARD J. TARVER
UNITED STATES ATTORNEY

*s/ Karl I. Knoche*

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624

Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION


## CLERK'S MINUTES - GENERAL

CASE NO. CR413-28-04                    DATE  1/13/14

TITLE  USA V. NAJAM AZMAT

TIMES  8:54 – 5:26                      TOTAL  8:32

Honorable : William T. Moore, Jr., U. S. District Court Judge        Courtroom Deputy : Jennifer Bodaford

Court Reporter : Marie Cowart          Interpreter :

Attorney for      Plaintiff            Attorney for Defendant(s)        Defendant(s)

KARL KNOCHE                            THOMAS WITHERS
GREG GILLULY, JR.


PROCEEDINGS : JURY SELECTION AND TRIAL.        ☑ In Court
                                               ☐ In Chambers


Court opens: 8:54
Roll called and jurors qualified:  8:56 -9:02
Judge enters: 9:03
Court addresses jurors: 9:03 - 9:08
Excuses: 9:08 - 9:10  Juror #28 excused, must submit documents from his doctors office within 1 week.
9:10 - 9:13  Court introduces Court personnel
9:26 - 11:24  Voir Dire begins
9:33 - 9:37 Side bar re: juror #24
10:08 - 10:24 Recess
10:24 - 10:45 Jurors answer questions on sheet
10:45 - 10:59  Silent strike
10:59 - 11:01 Jurors called
11:01 - 11:02 Jurors sworn
11:04 - 11:08 Remainder of jurors excused with thanks from the Court
11:10 - 11:16 Late jurors #2, 6 & 37 addressed and will be summoned on next trial

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

## CLERK'S MINUTES - GENERAL

CASE NO. CR413-28-04                                     DATE  1/13/14

TITLE   USA V. NAJAM AZMAT

PROCEEDINGS (continued):   JURY SELECTION AND TRIAL

11:16 - 11:24 Parties address Court re:  sequestration of Government's Agent Kahn; dft. Azmat waives
any conflict with witness Clark.
11:24 - 11:53 Preliminary instructions
11:53 - 1:13 Lunch
Opening statements
1:13 - 1:38 Government
1:38 - 1:57 Defendant

Gov't calls Dr. Mary Kay Ross
direct:    1:58 - 2:08
cross:    2:08 - 2:11
re-direct:  2:11 - 2:12
recross:    2:12 - 2:12

Gov't calls Dr. David Hatmaker
direct:    2:14 - 2:23
cross:    2:23 - 2:28
re-direct:  2:23 - 2:29

Gov't calls Charles Sikes
direct:    2:29 - 3:09
recess:    3:09 - 3:22
direct:    3:22 - 3:56
cross:    3:56 - 4:49
re-direct:  4:49 - 5:00
recross:    5:00 - 5:04

5:04 - 5:10 Jurors sent home with instructions from the Court
5:10 - 5:26 Court addresses parties re:  request to charge and voir dire
5:26       Court adjourned for the day

(Rev 7/2003)                                     GENERAL CLERK'S MINUTES (continued)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA )
                          )
vs.                       )
                          )
                          )   No. CR413-028
NAJAM AZMAT,              )
            Defendant.    )

## DEFENDANT NAJAM AZMAT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29

COMES NOW Defendant Najam Azmat and moves for judgment of acquittal pursuant to Fed. R. Crim. P. 29 on counts 2 through 50 and 52 of the superseding indictment and shows the Court the following:

## I. BACKGROUND

Dr. Najam Azmat, is a medical doctor licensed by the State of Georgia. He holds a Drug Enforcement Administration (DEA) license to prescribe controlled substances. He does not hold a DEA license to dispense controlled substances.

Count 1 of the Superseding Indictment claims that the defendants conspired to **distribute and dispense**, and caused to be distributed and dispensed, Schedule II, III, and IV controlled substances. [Doc 156-Pgs 6-11]

Counts 2 through 50 assert that Dr. Azmat, aided and abetted by his co-

1

defendants, "did, outside the usual course of professional practice as a medical doctor and without legitimate purpose relating to the practice of medicine, knowingly, intentionally and unlawfully **dispense**" Schedule II, III, and IV controlled substances on various occasions from February 21, 2011, to March 15, 2011, all in violation of 21 U.S.C. § 841(a)(1). [Doc 156-Pgs 11-15][emphasis added]. Count 52 contends that Dr. Azmat and his co-defendants conspired to launder money, with the specified unlawful activity being "the **dispensation** of Schedule II, III, and IV controlled substances." [Doc 156-Pg 16] [emphasis added].

Dr. Azmat presaged this argument when the original Indictment was returned. Dr. Azmat was charged in Count Two with maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1). [Doc 3-Pg 12]. That count charged Dr. Azmat with knowingly and intentionally opening and maintaining a place known as East Health Center for the purpose of "**dispensing** Schedule II, III and IV controlled substances... in violation of Title 21, United States Code, Section 856(a)(1)." [Doc 3-Pg 12] [emphasis added].

Dr. Azmat moved to dismiss that charge for failure to state a claim. [Doc 115-Pgs 1-5] Dr. Azmat argued that the plain language of 21 U.S.C. § 856 makes it unlawful to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, **distributing**, or using

2

any controlled substance..." 21 U.S.C. § 856(a)(1) (emphasis added). Accordingly, the place must have been operated or maintained "'for the purpose of manufacturing, distributing, or using any controlled substance.'" United States v. Garcia, 405 F.3d 1260, 1271 (11th Cir. 2005) (quoting United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2004)). [Doc 115-Pgs 1-5]

Count Two, however, charged an offense – maintaining a place to **dispense** controlled substances – that is not found in Section 856. Count Two was accordingly deficient for failure to allege an essential element of the statute (manufacturing, distributing or using, as opposed to dispensing). [Doc 115-Pgs 1-5] The government did not respond to Dr. Azmat's motion, but rather, realizing the plain flaw in their charge, returned a Superseding Indictment that eliminated the Section 856 charge. [Doc 156].

The Section 841 charges here suffer from the other side of the "distribution" versus "dispensation" distinction – a distinction with a plain statutory difference for each of the charges here alleges that Dr. Azmat "dispensed" controlled substances as opposed to "distributed" controlled substances. The government failed to produce any evidence that Dr. Azmat "dispensed" controlled substances. For the reasons set forth herein, the grant of judgment of acquittal under Federal Rule of Criminal 29 in favor of Dr. Azmat is proper.

3

## II. ARGUMENT AND CITATION OF AUTHORITY

Each of the charges in question ground themselves on the **dispensing** of Schedule II, III, and IV controlled substances. Since Dr. Azmat was not authorized to "dispense" and the government has not proven that he dispensed any medication, Counts 2 through 51 are fatally defective. Count 52, the money laundering conspiracy, should also be dismissed since the specified unlawful activity is dispensation.

Federal Rule of Criminal Procedure 29 itself provides, in relevant part, that:

> (a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed.R.Crim.P. 29(a). In deciding a motion for judgment of acquittal pursuant to Rule 29, a district court must "determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Grigsby, 111 F.3d 806, 833 (11th Cir. 1997) (quoting United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987); citing Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781 (1979)).

4

Stated another way, the test on a motion for judgment of acquittal is "whether a reasonable jury could conclude that the evidence established guilt beyond a reasonable doubt." United States v. Russo, 717 F.2d 545, 549 (11th Cir. 1983) (citing United States v. Pierre, 688 F.2d 724, 725 (11th Cir. 1982); United States v. Roper, 681 F.2d 1354, 1359 (11th Cir. 1982)). "If a reasonable jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the conviction must be reversed." Id. (citing United States v. Marx, 635 F.2d 436, 438 (5th Cir. 1981)).

## A. Counts 2 through 50 are fatally defective.

Counts 2 through 50 charge Dr. Azmat with a violation of 21 U.S.C. § 841(a)(1), which provides as follows:

> Except as authorized by this subchapter, it shall be unlawful for a person knowingly or intentionally –
> (1) to. . .**distribute, or dispense** . . . a controlled substance. . . .

21 U.S.C. § 841(a)(1) (emphasis added). Title 21 defines "dispense" as follows:

> The term "dispense" means **to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner,** including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery. The term "dispenser" means a practitioner who so delivers a controlled substance to an ultimate user . . .

21 U.S.C. § 802(10) (emphasis added). Title 21 defines "distribute" as follows:

> The term "distribute" means to deliver **(other than by administering or**

5

**dispensing)** a controlled substance . . . The term "distributor" means a person who so delivers a controlled substance. . . . .

21 U.S.C. § 802(11) (emphasis added).

The government has proven that Dr. Azmat "prescribed" controlled substances. The government has not proven that he "dispensed" controlled substances beyond a reasonable doubt. The plain language of the statute demonstrates that "prescribe" and "dispense" are distinct ways in which the statute can be violated. The statute itself defines "dispense" as:

> to **deliver** a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing **and** administering of a controlled substance **and** the packaging, labeling **or** compounding necessary to prepare the substance for such delivery . . .

21 U.S.C. § 802(10) (emphasis added). The Eleventh Circuit Court of Appeals and other courts have expressly recognized that "'dispense' by statutory definition is **delivery** performed by a practitioner." United States v. Steele, 117 F.3d 1231, 1235 (11th Cir. 1997), overruled on other grounds in United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) (affirming the defendant's conviction for knowingly and intentionally dispensing controlled substances in violation of Section 841(a)(1), finding that "because [the defendant] was acting as an agent of a registered pharmacy, he was authorized to dispense controlled substances in the course of his professional practice as a pharmacist, **but only pursuant to a prescription issued by a**

6

**practitioner**") (emphasis added); see also United States v. Genser, 710 F.2d 1426, 1431 (10th Cir. 1983) ("To prove the crime of dispensation, the government must show knowing or intentional **delivery** of a controlled substance by a practitioner") (emphasis added) (citing United States v. Bartee, 479 F.2d 484, 488 (10th Cir. 1973); United States v. Varma, 691 F.2d 460, 462 (10th Cir. 1982); United States v. Rogers, 609 F.2d 834, 839 (5th Cir. 1980)). Thus, to "dispense" a controlled substance, a practitioner has to deliver the controlled substance, i.e. by prescribing **and** administering it **and** packaging, labeling, or compounding it. "Administer" refers "to the direct application of a controlled substance to the body of a patient or research subject . . . ." 21 U.S.C. § 802(2). There is no evidence in this case that Dr. Azmat "delivered" any controlled substances through "administering" controlled substances to any patient or research subject, or that he "packaged," "labeled," or "compounded" any controlled substance.

Not only does the statute define "distribute" and "dispense" as separate and distinct ways to violate Section 841, but also the comprehensive regulatory scheme for prescription drugs demonstrates the same. One commonly thinks of physicians as prescribing drugs and pharmacists as dispensing drugs; "dispensing" connotes the packaging and the delivery of a prescription drug to a patient. The DEA's regulations contemplate such a scheme for Schedule II, III, and IV drugs. There are rare occasions

7

where a practitioner may directly dispense Schedule II, III, or IV controlled substances – for instance, in drug treatment programs or for acute withdrawal symptoms. See 21 U.S.C. § 829(a), (b); see also 21 C.F.R. § 1306.07 (describing controlled substance dispensation by physicians in drug treatment programs and acute care situations); 21 C.F.R. § 1306.11(a), (b) (explaining exceptions for Schedule II drugs); 21 C.F.R. § 1306.21(a), (b) (explaining exceptions for Schedule III, IV drugs).

In typical situations, "[a] prescription for a controlled substance may be issued only by an individual practitioner" who is authorized by his state's licensing board and registered by the DEA. 21 C.F.R. § 1306.03(a). "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice. . . . or [a] registered institutional practitioner." 21 C.F.R. § 1306.06. Schedule II drugs may be dispensed by a pharmacist "only pursuant to a written prescription signed by a practitioner." 21 C.F.R. § 1306.11(a), (b). Schedule III and IV controlled substances carry similar requirements – i.e., that a pharmacist may dispense these drugs only pursuant to a practitioner's prescription, and the practitioner may dispense these drugs directly only upon meeting the requirements of Section 1306.07. 21 C.F.R. § 1306.21(a), (b).

Here, Dr. Azmat had a license to prescribe, but not a license to dispense. Counts 2 through 50 which charge that he dispensed the medication are fatally flawed. As a

8

result of the government's flawed allegations, the jury must necessarily entertain a reasonable doubt as to whether Dr. Azmat allegedly "dispensed" any controlled substances, and the grant of judgment of acquittal in Dr. Azmat's favor is appropriate.

The case law supports this contention as well as do the charging decisions of the government in this District. The seminal case which clarified that physicians who illegally dispensed and prescribed controlled substances could be prosecuted under Title 21 is the Moore case from the U.S. Supreme Court. Moore itself involved an indictment charging a physician with "the knowing and unlawful distribution and dispensation" of a controlled substance. Moore, 423 U.S. at 124. And Eleventh Circuit cases have noted that physicians have been charged with distributing, dispensing, or both. See, e.g., United States v. Joseph, 709 F.3d 1082, 1087 (11th Cir. 2013) (noting that indictment charged physician and physician's assistant with "dispensing or distributing controlled substances"); United States v. Bourlier, 518 Fed. Appx. 848 (11th Cir. 2013) (noting physician's conviction for dispensing); United States v. Ignasiak, 667 F.3d 1217, 1219 (11th Cir. 2012) (noting that physician convicted of "dispensing controlled substances")[1]; United States v. Baron, 284 Fed. Appx. 781, 782

---

[1] Ignasiak cited 21 U.S.C. '830(b)(3)(A)(ii) for the proposition that a "DEA-registered physician may dispense controlled substances so long as he does so 'for a legitimate medical purpose' and while 'acting in the usual course of his professional practice.'" Id. at 1228. It then observed that for conviction, the government must prove that a physician dispensed controlled substances in violation of these requirements. Id.

9

(11th Cir. 2008) (discussing sentencing appeal of physician who pleaded guilty to

distributing controlled substances); United States v. Dicter, 198 F.3d 1284, 1287-88

(11th Cir. 1999) (noting physician's conviction for distributing controlled substances

based upon doctor's selling prescriptions for narcotics); United States v. Hammond,

781 F.2d 1536, 1537 (11th Cir. 1986) (noting physician's conviction for distribution

via prescribing controlled substances).

The indictment should have charged Dr. Azmat with distributing, not

dispensing. Another court has given this explanation:

> The real issue . . . is the meaning of "dispense," which the statute defines
> as "deliver[ing] a controlled substance to an ultimate user or research
> subject by, or pursuant to the lawful order of, a practitioner . . ." 21
> U.S.C. § 802(10) . . ."Practitioner" is defined as a "physician . . .
> registered, or otherwise permitted, by the United States or the
> jurisdiction in which he practices or does research, to distribute,
> dispense, conduct research with respect to, administer, or use in teaching
> or chemical analysis, a controlled substance in the course of professional
> practice or research." 21 U.S.C. § 802(20) . . .The combined effect of
> these statutory definitions in the present context is to limit the meaning
> of "dispense" to delivery of controlled substances by a physician who is
> acting in the course of professional practice or research. The point is
> made explicitly in the regulations. See 21 C.F.R. § 1306.04(a). .
> .Delivery of controlled substances outside the course of professional
> practice or research would constitute "distributing," see 21 U.S.C. §
> 802(11). . ., an activity which violates § 841(a)(1) even if carried on by a
> registered physician.

---

But '830(b)(3)(A)(ii) never mentions dispensing; it defines the term "valid
**prescription**."

Case: 14-13703   Date Filed: 11/19/2014   Page: 242 of 250

United States v. Badia, 490 F.2d 296, 298 (2d Cir. 1973).[2] See United States v. Leigh,

487 F.2d 206 (5th Cir. 1973) (concluding summarily under § 802(10) that "a doctor

who administers or prescribes a controlled substance is, for the purposes of the statute,

dispensing it," and dismissing indictment against physician alleging distribution).

And, as another court observed:

> By definition "dispense" expressly contemplates a "lawful order"; if the
> order is not such, the prescription is not lawful under 21 U.S.C. s 829.
> [Fn]. If the prescription is not lawful, the "practitioner" does not
> dispense; rather, under s 802(11), he "distributes"-that is, he effects
> delivery "other than by dispensing." [Fn]. In short, a "practitioner" who
> dispenses does not violate the Act.

United States v. Black, 512 F.2d 864, 866 (9th Cir. 1975) (citing 21 U.S.C. § 829(a);

21 C.F.R. § 306.04(a); Badia, 490 F.2d 296).

Indeed, in the last alleged pill mill case before this Court, Dr. Ly was charged

with and convicted of prescribing and dispensing controlled substances. See United

States v. Ly, CR 207-286 (S.D.GA). However, in that case the government proved that

Dr. Ly was, indeed "dispensing" medication. Here, there is no such proof.

---

[2] Badia explained its belief that Congress included "dispense" in § 841(a)(1) "to compel physicians to become properly licensed"; if not, "a physician could then be convicted of unlawful dispensing." Id. at 298, n. 4. Upon a physician's licensing, illegal **prescribing** could be prosecuted under a charge alleging distribution. Id.

Case: 14-13703 Date Filed: 11/19/2014 Page: 243 of 250

In <u>United States v. Tighe</u>, 551 F.2d 18 (3d Cir. 1977), the defendant argued that he did not dispense a controlled substance because he did not "deliver [it] to an ultimate user. . ." since the user's prescriptions remained unfilled. <u>Id</u>. at 19. The court after some strained reasoning concluded that placing a prescription for controlled substance in the hands of the end user completes the offense of dispensing. <u>Id</u>. at 20.

Two things support the error of <u>Tighe</u>'s holding. First, <u>Tighe</u> equates "prescribe" with "deliver" in the applicable statutory definition. Substituting the former for the latter renders other language superfluous, to wit:

> The term "dispense" means to [prescribe] a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery. . . .

21 U.S.C. § 802(10). If "deliver" merely means to "prescribe," then there is no reason to provide that "dispense" includes prescribing and administering. Second, requiring possession of a controlled substance by the ultimate user is consistent with both its definition and the definition of "dispense." <u>See</u> 21 U.S.C. § 802(27). As the Eleventh Circuit has recognized, "[a]n 'ultimate user' is 'a person who has **lawfully obtained ... a controlled substance** for his own use or for the use of a member of his household,' 21 U.S.C. § 801(27), as by prescription from a practitioner." <u>Steele</u>, 147 F.3d at 1318 (emphasis added). At the very least, "dispense" requires prescribing and packaging or

12

Case: 14-13793   Date Filed: 11/19/2014   Page: 244 of 250

administering a controlled substance. 21 U.S.C. § 802(10). "Administering" involves "direct application of a controlled substance to the body of a patient" by a practitioner or the "patient. . . at the direction and in the presence of the practitioner. . . ." 21 U.S.C. § 802(2).

Given the statutory definitions and framework, the government cannot prove that Dr. Azmat alleged "dispensed" controlled substances under the plain definitions of Title 21 beyond a reasonable doubt, and Dr. Azmat's Motion for Judgment of Acquittal on Counts 2 through 50 should be granted.

## B. Count 52 relies on the activity specified in counts 2 through 50, so it should also be dismissed.

Count 52, which charges a money laundering conspiracy, describes the specified unlawful activity as "the unlawful dispensation of Schedule II, III, and IV controlled substances" – the conduct charged in counts two through 50. [Doc 156-Pg 16] Dr. Azmat did not violate Title 21's prohibition against dispensing controlled substances. Since no evidence shows that Dr. Azmat engaged in dispensation, the specified unlawful activity charged in the superseding indictment, insufficient evidence supports any conviction for money laundering conspiracy. See United States v. Medina, 485 F.3d 1291, 1300 (11th Cir. 2007). The Court should order judgment of acquittal on this charge, too.

13

Case: 14-13703 Date Filed: 11/19/2014 Page: 245 of 250

## C. Dismissal of Count 52 Is Appropriate Under Christo

The government has failed to present evidence sufficient to permit the jury to find Dr. Azmat guilty of alleged money laundering conspiracy in violation of 18 U.S.C. § 1956(h) beyond a reasonable doubt. In order to obtain a conviction for a money laundering conspiracy the government bears the burden of proving beyond a reasonable doubt that: (1) two or more persons agreed to commit a money laundering violation; and (2) that the defendant, knowing the unlawful plan, voluntarily joined the conspiracy. *See United States v. Martinelli*, 454 F.3d 1300, 1310 (11th Cir. 2006). In addition, the government must prove beyond a reasonable doubt that each defendant had a deliberate, knowing, specific intent to join the conspiracy. *See United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998).

Insufficient evidence has been presented to support any finding that Dr. Azmat allegedly conspired with any other persons to launder proceeds of any alleged specified unlawful activity. Furthermore, the government has failed to prove alleged money laundering conduct following, and sufficiently separate from, the underlying alleged over acts. Money laundering "must 'follow in time' the completion of the underlying transaction as an activity designed to conceal or disguise the origins of the proceeds." *United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999) (citing *United States v. Dimeck*, 24 F.3d 1239, 1246 (10th Cir. 1994)). "Before the primary

14

offense of money laundering can occur, the underlying criminal activity must be complete, generating proceeds to be laundered." *Majors*, 196 F.3d at 1212 n. 12 (citing *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997)).

"Congress aimed the crime of money laundering at conduct that **follows in time** the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity." *United States v. Edgmon*, 952 F.2d 1206, 1214 (10th Cir. 1991) (emphasis added); *accord United States v. Savage*, 67 F.3d 1435, 1442 (9th Cir. 1995) (describing proceeds as "funds obtained from prior, separate criminal activity"), *cert. denied*, 516 U.S. 1136 (1996). Distributing the fruits of a crime to co-conspirators does not necessarily constitute money **laundering**, since a crime may not be complete until such a distribution occurs. *See United States v. Dimeck*, 24 F.3d 1239, 1247 (10th Cir. 1994) (dismissing money laundering counts based on mere delivery of drug proceeds to co-conspirators, since "[t]he money laundering statute was designed to punish those drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises"). "The main issue in a money laundering charge, therefore, is determining when the predicate crime becomes a 'completed offense' after which money laundering can occur." *United States v. Christo*, 129 F.3d 578, 580 (11th Cir. 1997) (citing *United States v. Kennedy*, 64 F.3d 1465, 1477-78

15

(10th Cir. 1995)).

The evidence reveals that the government failed to carry its burden of proof. The government did not establish that Dr. Azmat entered into an alleged money laundering conspiracy, or that any acts of money laundering occurred separate from and subsequent to the underlying alleged offenses. Judgment of acquittal in favor of Dr. Azmat is appropriate under Fed.R.Crim.P. 29.

## III. CONCLUSION

The superseding indictment has charged Dr. Azmat with dispensing controlled substances, however, the government has failed to prove that Dr. Azmat "dispensed" controlled substances. Since the money laundering count is dependent on dispensing, which does not describe the conduct in this case, a judgment of acquittal should be granted as to count 52. Accordingly, the Court should order a judgment of acquittal on counts 2 through 50 and 52 of the superseding indictment.

Respectfully submitted, this 16th day of January, 2014.

s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

This 16th day of January, 2014.

s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:  (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

CERTIFICATE OF SERVICE

The undersigned certifies that she served a copy of the foregoing Appendix I on this date in accordance with the directives from the Court Notice of Electronic Filing ("NEF") that was generated as a result of electronic filing in this court.

This the 19th day of November, 2014.

/s/ Thomas A. Withers
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone: 912-447-8400
Facsimile:  912-629-6347
twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*