# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

### APPEAL NO. 14-13703-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NAJAM AZMAT,

Defendant-Appellant.

## APPENDIX VOLUME II

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone: 912-447-8400
Facsimile:   912-629-6347
twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*

# TABLE OF CONTENTS

## VOLUME I

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

DISTRICT COURT DOCKET SHEET . . . . . . . . . . . . . . . . . . . . . . . . . B

INDICTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUPERSEDING INDICTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

GOVERNMENT'S DISCLOSURE OF EXPERT TESTIMONY
PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE
16(A)(1)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

DR. AZMAT'S DAUBERT MOTION TO EXCLUDE GOVERNMENT
EXPERT'S DR. GENE KENNDY AND MARTIN ZDANOWICZ
AND REQUEST FOR AN EVIDENTIARY HEARING. . . . . . . . . . . . . 241

DR. AZMAT'S SUPPLEMENT TO MOTION TO EXCLUDE
GOVERNMENT EXPERTS DR. GENE KENNEDY AND MARTIN
ZDANOWICZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

ORDER ON DR. AZMAT'S MOTIONS TO EXCLUDE
GOVERNMENT EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

GOVERNMENT'S RESPONSE TO COURT ORDER OF
DECEMBER 27, 2013 CONCERNING REALIABILTY OF
PROPOSED EXPERT TESTIMONY. . . . . . . . . . . . . . . . . . . . . . . . . . . 297

COURT'S MINUTES FROM TRIAL (1/13/2014). . . . . . . . . . . . . . . . . 304

DR. AZMAT'S MOTION FOR JUDGMENT OF ACQUITTAL
PURSUANT TO FED. R. CRIM. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . 307

## VOLUME II

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

VERDICT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320

DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF
ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR
NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

DEFENDANT NAJAM AZMAT'S SUPPLEMENTAL MOTION FOR
JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE,
MOTION FOR NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

ORDER ON DEFENDANT AZMAT'S MOTION FOR JUDGMENT
OF ACQUITTAL OR, IN THE ALTERANTIVE, MOTION FOR
NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

DEFENDANT AZMAT'S SENTENCING MEMORANDUM
REGARDING THE GUIDELINE FOR OXYCODONE. . . . . . . . . . . . 354

DEFENDANT AZMAT'S SECOND SENTENCING
MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .359

SENTENCING MINUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 362

JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

NOTICE OF APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .369

SENTENCING TRANSCRIPT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

## VOLUME III

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 1 . . . . . . . . . . . . . . 385

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 2 . . . . . . . . . . . . . . 386

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 3 . . . . . . . . . . . . . . 387

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 4 . . . . . . . . . . . . . . 388

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 5 . . . . . . . . . . . . . . 389

CERTIFICATE OF SERVICE

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA )
                                )
v.                              )          CASE NO. CR413-28
                                )
NAJAM AZMAT,                    )
                                )
        Defendant.              )
_____)

### VERDICT FORM

WE, THE JURY, FIND THE DEFENDANT, NAJAM AZMAT

_Guilty_ AS TO COUNT ONE.

_Guilty_ AS TO COUNT TWO.

_Guilty_ AS TO COUNT THREE.

_Guilty_ AS TO COUNT FOUR.

_Guilty_ AS TO COUNT FIVE.

_Guilty_ AS TO COUNT SIX.

_Guilty_ AS TO COUNT SEVEN.

_Guilty_ AS TO COUNT EIGHT.

_Guilty_ AS TO COUNT NINE.

_Guilty_ AS TO COUNT TEN.

_Guilty_ AS TO COUNT ELEVEN.

_Guilty_ AS TO COUNT TWELVE.

_Guilty_ AS TO COUNT THIRTEEN.

_Guilty_ AS TO COUNT FOURTEEN.

_Guilty_ AS TO COUNT FIFTEEN.

U. S. DISTRICT COURT
Southern District of Ga.
Filed in Office

_____ M
      1 17   20 14
_____
Deputy Clerk

_Guilty_ AS TO COUNT SIXTEEN.

_Guilty_ AS TO COUNT SEVENTEEN.

_Guilty_ AS TO COUNT EIGHTEEN.

_Guilty_ AS TO COUNT NINETEEN.

_Guilty_ AS TO COUNT TWENTY.

_Guilty_ AS TO COUNT TWENTY-ONE.

_Guilty_ AS TO COUNT TWENTY-TWO.

_Guilty_ AS TO COUNT TWENTY-THREE.

_Guilty_ AS TO COUNT TWENTY-FOUR.

_Guilty_ AS TO COUNT TWENTY-FIVE.

_Guilty_ AS TO COUNT TWENTY-SIX.

_Guilty_ AS TO COUNT TWENTY-SEVEN.

_Guilty_ AS TO COUNT TWENTY-EIGHT.

_Guilty_ AS TO COUNT TWENTY-NINE.

_Guilty_ AS TO COUNT THIRTY.

_Guilty_ AS TO COUNT THIRTY-ONE.

_Guilty_ AS TO COUNT THIRTY-TWO.

_Guilty_ AS TO COUNT THIRTY-THREE.

_Guilty_ AS TO COUNT THIRTY-FOUR.

_Guilty_ AS TO COUNT THIRTY-FIVE.

_Guilty_ AS TO COUNT THIRTY-SIX.

_Guilty_ AS TO COUNT THIRTY-SEVEN.

_Guilty_ AS TO COUNT THIRTY-EIGHT.

_Guilty_ AS TO COUNT THIRTY-NINE.

Case: 14-13705 Date Filed: 11/13/2014 Page: 7 of 139

Guilty AS TO COUNT FOURTY.

Guilty AS TO COUNT FOURTY-ONE.

Guilty AS TO COUNT FOURTY-TWO.

Guilty AS TO COUNT FOURTY-THREE.

Guilty AS TO COUNT FOURTY-FOUR.

Guilty AS TO COUNT FOURTY-FIVE.

Guilty AS TO COUNT FOURTY-SIX.

Guilty AS TO COUNT FOURTY-SEVEN.

Guilty AS TO COUNT FOURTY-EIGHT.

Guilty AS TO COUNT FOURTY-NINE.

Guilty AS TO COUNT FIFTY.

Guilty AS TO COUNT FIFTY-TWO.

SO SAY WE ALL.

Thomas Vetter

FOREPERSON

January 17, 2014

DATE

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | INDICTMENT NUMBER: |
| | ) | CR 4:13 – 028 |
| DR. NAJAM AZMAT, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

Comes Now, Dr. Najam Azmat, Defendant herein, by and through undersigned counsel, and respectfully renews his motions for a judgment of acquittal, pursuant Fed. R. Crim. P. 29. In the alternative, the Defendant moves this Court for a new trial, pursuant to Fed. R. Crim. P. 33. In support of this motion, the Defendant submits the following memorandum.

### I. DR. AZMAT IS ENTITLED TO A JUDGMENT OF ACQUITTAL

To sustain a jury's verdict, the evidence presented by the government must pass a well-established test. The evidence must be sufficient to convince a reasonable, rational jury that the government has proven all the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). While the government need not exclude every reasonable hypothesis of innocence, a verdict cannot stand where the evidence "is wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989) (citations omitted). Jury verdicts cannot be sustained based on "speculation and conjecture." *Kelly*, 888 F.2d at 741. This principle is especially important in cases involving inherently complex regulatory scheme. *See, e.g., United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) (reversing Medicare fraud, conspiracy and false statement

1

convictions for insufficient evidence). Federal Rule of Criminal Procedure Rule 29 provides that at the close of the evidence and again after trial, upon motion by defendant, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

After the government rested Dr. Azmat moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29, on insufficiency of evidence as to all counts, that the government had indicted Dr. Azmat for unlawfully "dispensing," not distributing medication, that the money laundering conspiracy count failed since the specified unlawful activity alleged was the "dispensation" of controlled substances and the money laundering conspiracy charge failed under *Christo*. That motion was taken under advisement and denied at the conclusion of trial. Defendant hereby re-asserts the grounds stated in that motion and orally at trial and requests that the Court reconsider its ruling at trial denying it.

## II. **ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL**

### A. **New Trial For Collective Error**

Sections II and VI of this memorandum summarize most of the significant errors relating to trial errors. As this Court has noted in granting a Motion for New Trial, Rule 33 of the Federal Rules of Criminal Procedure provides that, "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." The decision whether to grant a new trial is within the sound discretion of the trial judge. *United States v. Shankman*, 13 F.Supp.2d 1358, 1362 (S.D. Ga. 1998), *aff'd* 181 F.3d 1264 (11th Cir. 1999) quoting *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir. 1987). Courts should exercise great caution when granting new trials and that motion should only be granted in exceptional cases. *Id*. In reviewing a motion for new trial based on the weight of the evidence, the court "need not view

2

the evidence in the light most favorable to the verdict," but rather, it may weigh the evidence and consider the credibility of the witnesses. *Id.*, quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1987). The evidence must weigh heavily against the verdict such that a miscarriage of justice would occur to let the verdict stand. *Id.* As noted by the court in *Shankman*, a new trial may be granted where the credibility of the government's witnesses has been impeached and the government's evidence marked by uncertainties and discrepancies. *Id.* In *Shankman*, Judge Alaimo independently evaluated the evidence regarding defendant Pedrick and the credibility of the witnesses and was left with a reasonable doubt as to Pedrick's guilt, finding that the evidence weighed heavily against finding that Pedrick knew of any agreement, or had the specific intent to defraud. *Id.*, at 1363.

Individually, but especially collectively, the errors set forth mandate a new trial. Even if multiple trial errors, viewed individually, would each be considered harmless, a new trial is mandated if the cumulative effect of the errors served to deprive a defendant of a fair trial. See, e.g., *United States v. Baker*, 432 F.3d 1189, 1223, 1229-31 (11th Cir. 2005) (reversing convictions of two defendants under "cumulative error doctrine"); *United States v. Hands*, 184 F.3d 1322, 1334 (11th Cir. 1999) (reversal required by effect of inflammatory, irrelevant evidence of spousal abuse and prosecutorial misconduct); *United States v. Marshall*, 173 F.3d 1312, 1318 (11th Cir. 1999) (combined evidentiary errors harmful even though one witness's testimony, if believed, would have sustained conviction); *United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) (cumulative effect of several incidents of prosecutorial misconduct requires reversal when combined with inadmissible hearsay challenging defendant's credibility). This standard was well defined by the court in *United States v. Sarracino*, 340 F.3d 1148, 1169 (10th Cir. 2003):

3

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmless-ness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error–courts look to see whether the defendant's substantial rights were affected.

See also *Baker*, 432 F.3d at 1223; *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir.1984);

*United States v. Sanchez*, 176 F.3d 1214, 1218 (9th Cir. 1999).

### III. THE INSUFFICIENT EVIDENCE

#### A. The Evidence was Insufficient - Conspiracy

To prove a Section 846 conspiracy, the government must show (1) an agreement between two or more people to commit a crime; (2) defendant's knowledge of that agreement; and (3) his voluntary joinder in the agreement. *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). Where a government's case is predicated largely, if not solely, on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict. *United States v. Perez-Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994). Association with a co-conspirator or presence at the scene of the crime is insufficient to prove participation in a conspiracy. *United Sates v. Brazel*, 102 F.3d 1120, 1131 (11th Cir. 1997). If there is insufficient proof that the defendant conspired with anybody, then a conspiracy conviction will not be sustained. *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1998).

There was no evidence that Dr. Azmat voluntarily joined a conspiracy to unlawfully distribute controlled substances under 21 U.S.C. Section 846. The testimony was just the opposite.[1] On his first day of work, Al LeFrancois decided that Dr. Azmat had to go and that he

---

[1] Dr. Azmat is in the process of requesting the transcript from the trial. Upon receipt of those transcripts, he reserves the right to supplement this Motion to include specific references to the

4

was going to be fired. Additionally, Mr. Wise testified that patients were unhappy with Dr. Azmat and that he was a disaster for the goals of East Health Center. Even accepting the evidence in the light most favorable to the government it is clear that Dr. Azmat was an outlier among a group of conspirators that he had no prior relationship with and that his actions were contrary, not consistent with, the goals of the conspirators from South Florida.

      Dr. Azmat is entitled to acquittal on Count One.

## B. The Dispensation Charges – Counts 2 Through 50

      The question for resolution for the jury on Counts 2 through 50 was whether under 21 U.S.C. § 841(a)(1) Dr. Azmat ceased being a doctor, even a poor or negligent doctor, and "intentionally … distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice." *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). In *United States v. Joseph*, 709 F.3d 1082, 1102-1104 (11th Cir. 2013), the Eleventh Circuit just one year ago, in affirming the conviction of the defendant-physician, noted the following indicia that the physician was a drug dealer: 1) he had prescribed an inordinately large quantity of controlled substances, 2) prescriptions were issued to one patient for delivery to others, 3) no physical examinations were conducted, 4) prescriptions were pre-signed and 4) prescriptions were issued to patients never seen by a physician. See also, *United States v. Elder*, 682 F.3d 1065, 1072 (8th Cir. 2012) (upholding conviction of physician-defendant where he did not maintain any patient files and rarely saw patients himself, yet prescribed medication to 544 patients in a five month period); *United States v. Bartee*, 479 F.2d 484, 485–87 (10th Cir. 1973) (finding there was sufficient evidence to support conviction under 21 U.S.C. § 841(a)(1) where

---

transcript, as well as additional basis for a judgment of acquittal and/or new trial based on specific citations to the transcript. Any effort in this motion to refer to statements made at trial are not direct quotations.

defendant-doctor told patient to go to "different drugstores each time [the patient filled a prescription]" because of pressure from the Federal Bureau of Narcotics and Dangerous Drugs, used slang terms for controlled substances, and that defendant-doctor never performed a physical examination); *United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) (defendant-physician convicted where he developed scheme for nurses to see patients without the doctor, and defendant-physician signed prescriptions without even knowing identity of patients); *United States v. Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978) (setting out list of factors for determining validity of conviction under 21 U.S.C. § 841, including that a physician warned patients to fill prescriptions at different drug stores and used street slang to refer to pain medications). These condemned behaviors include where the defendant physician:

- did not maintain patient records;

- issued inordinately large quantities of controlled substances;

- issued prescriptions to a patient known to be delivering the drugs to others;

- never conducted physical examinations;

- instructed patients to fill prescriptions at different drug stores; and

- used street slang to refer to controlled substances.

It is this set of objective condemned behaviors that may support a jury verdict that a medical professional is dealing drugs rather than practicing medicine. However, applying the *Rosen* factors to this case demonstrates that the evidence was insufficient to support the jury verdict.

The evidence at trial was that Dr. Azmat maintained detailed medical records of the physician-patient encounter, except for one patient (Latina Simpson), where he failed to note the diagnosis and treatment.

Rather than issuing inordinately large quantities of controlled substances, or a prescription drug cocktail that Dr. Kennedy testified was often present in pill mills, Dr. Azmat routinely eliminated the drug cocktail and reduced the medications the patient was on.

There was no evidence that Dr. Azmat issued prescriptions to a patient known to be delivering the drugs to someone else. In fact, each of the patients who testified admitted to exaggerating their symptoms for the purpose of deceiving Dr. Azmat.

There was no evidence that Dr. Azmat ever instructed a patient where to fill prescriptions, or that he used street slang in distributing controlled substances.

Viewing the evidence in the light most favorable to the government demonstrated that Dr. Azmat was usually paid cash by East Health Center, that a substantial number of the patients at the clinic were from out of state, and that five patients testified that little or no physical examination was performed. However, those facts alone do not justify a conviction.

In short, this case is a far cry from the evidence that has been presented for the purpose of sustaining a verdict of guilty.

## C. Counts Based Solely on Patient Records

The Indictment is based principally on the allegation that Dr. Azmat's treatment of a specific number of his patients so far exceeded the "standard of care" that he was no longer acting in his professional capacity as a physician but as a "drug pusher." Yet, for most of the counts, the government has chosen to base its case solely only an examination of Dr. Azmat's medical records. According to the government, because Dr. Azmat's medical records do not contain enough information to "justify" the prescriptions issued, it is permissible for a jury to convict him as being a criminal. In fact, the government has not even attempted to show, one way or the other, whether the patients identified in the Indictment had

7

injuries, illnesses or conditions that, within the wide range of discretion accorded physicians, might justify the use of controlled substances. For these patients, the government has relied entirely on the theory that Dr. Azmat's records alone failed to justify the prescriptions.

The government's evidence is patently insufficient under *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994). In that case, a doctor was convicted of 127 counts. The court affirmed the convictions were the patients *did* testify but reversed the convictions where they did not. The government presented seven patients who stated that they faked symptoms and Dr. Tran's examinations were perfunctory. They further testified that Dr. Tran made statements to them, such as reminding them that they could get pain medications. Dr. Tran also advised them to fill the prescriptions at different pharmacies so as not to arouse suspicion. For these counts, the Fourth Circuit found that the evidence was sufficient. However, for counts in which the government relied, as here, solely on the medical records, the Fourth Circuit reversed the convictions for insufficient evidence. The Fourth Circuit correctly perceived the logical flaw in this method of proving such serious charges:

> The present case is a classic example of "overkill" by the prosecution. It obtained an indictment containing 136 counts, of which 80 counts were supported only by copies of the prescriptions and by Dr. MacIntosh's testimony together with his summary of the office charts of 20 patients, who did not testify. *Such tactics invite a jury to find guilt by association __or as a result of a pattern__*, and to conclude that if the physician violated the Controlled Substance Act in those counts supported by the testimony of patient-witnesses as to their personal contact and conversations with the defendant, then the defendant must be guilty of the remaining counts.

*Tran*, 18 F.3d at 1142 (emphasis added) (reversing for insufficient evidence).

The Fourth Circuit was also critical of the government's failure to have its expert examine the patients at issue to determine whether there were medical reasons that might justify the treatment. *Id.* at 1141-42. At trial herein, Dr. Kennedy testified that he had never

8

examined a single patient and that he had never requested to examine a single patient. A doctor-defendant, the Fourth Circuit emphasized, was "entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt." *Id.* at 1142.

Conversely, in virtually every case where a federal circuit court has affirmed a doctor's conviction, the government's evidence included testimony directly from the patients. *See, e.g., United States v. Chube*, 538 F.3d 693 (7th Cir. 2008) (jury heard from 15 patients); *United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) (patients testified that they were addicts and received prescriptions that were not medically necessary); *United States v. Bek*, 493 F.3d 790 (7th Cir. 2007) (patients testified, some with visible scars from heroin abuse); *United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) (expansive summary of the evidence introduced for each patient and, in upholding the convictions for sufficient evidence, the court specifically referred to the patient testimony); *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006) (noting that some of Dr. Hurwitz's patients testified); *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) (numerous patients testified for the government, some testifying that the doctor kept prescribing to them even though he knew they were drug addicts); *United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006) (summarizing testimony from all 15 patients who testified for the government and expressly distinguishing *Tran* on this basis).

In this case only 7 of the 25 patients testified: Billy Letner (Counts 6 & 7), Kimberly Letner (Counts 8 & 9), Latina Simpson (Counts 12, 13, & 14), Joseph Bradley (Counts 27, 28 & 29), James Gable (Count 30), Patricia Rhorer (Counts 36 & 37) and Nancy Binion (Counts 47 & 48).

9

Therefore, Dr. Azmat is entitled to a verdict of acquittal on each count of the indictment were the patient did not testify and where the evidence presented relied only on the medical records presented.

## D. The Government Failed to Establish a Threshold Standard Under Georgia Law and How Dr. Azmat Violated that Standard

As Dr. Azmat pointed out in his *Daubert* Motion, the apparent distinction in the law between a doctor's malpractice, even gross malpractice, and criminal conduct is a matter of degree. When the physician's conduct (1) departs *to a sufficient degree* from (2) the *standard of care* against which the physician's conduct is measured, the law permits the inference that the physician is no longer "acting as a physician" (and, hence, immunized) but rather the physician is acting as nothing more than a "drug pusher." *See United States v. Moore*, 423 U.S. 122, 138 (1975); *United States v. Wexler*, 522 F.3d 194, 206 (2d Cir. 2008); *Tran Trong Cuong*, 18 F.3d at 1137; *United States v. Vamos*, 797 F.2d 1146, 1152 (2d Cir. 1986).

Dr. Azmat is entitled to a judgment of acquittal because the government never established the appropriate standards of care and never defined, through expert testimony or otherwise, the range of discretion permitted within that standard, when a violation of that standard is merely a form of civil "malpractice" and when the departure from the (undefined) standard is sufficiently egregious to cross the (undefined) civil-criminal boundary line. As the court correctly recognized in *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006), "only after assessing the standards to which medical professions generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal." *See also United States v. McIver,* 470 F.3d 550, 559-62 (4th Cir. 2006) (recognizing that "it is *the extent and severity of departures* from the professional norms that underpin a jury's finding of criminal

10

violations") (emphasis added). This Court ultimately instructed that the jury that the standard by which to measure Dr. Azmat's care was a State of Georgia standard and the government failed to establish what those standards were and how they were violated.

## E. Distribution v. Dispensation

Dr. Azmat incorporates by reference as if fully set forth herein his entire Motion for Acquittal regarding the government having indicted Dr. Azmat for "dispensing" controlled substances, but having proven only that he prescribed controlled substances. Doc # 307, pp. 4-13.

## F. Failure to Prove Count 52

Dr. Azmat incorporates by references as if fully set forth herein, his entire Motion for Acquittal regarding the failure to prove Dr. Azmat violated the law concerning Count 52 – the money laundering conspiracy. Specifically, the government's proof failed because the specified unlawful activity relied on the unlawful "dispensation" of controlled substances and it failed under the authority of *Christo* as fully set out in that Motion. Doc # 307, pp. 13-16.

## IV. IMPROPER ADMISSION OF EXPERT TESTIMONY

Although the government's amended papers on the Daubert issue filed just before trial, waxed extensively regarding the parameters of Dr. Kennedy's expert testimony, at trial, there was no such proof. *See* Doc # 297. The admissibility of the Government's proffered expert opinions under *Daubert* are analyzed within the framework of what the Government had to prove in this case – that Dr. Azmat was a drug dealer.

As this Court has noted, in *North American Specialty Co., v. Wells*, 2013 WL 4482455, *2 (S.D. Ga., August 19, 2013), the Eleventh Circuit and courts within the Eleventh Circuit have excluded expert testimony where it is simply a reiteration or recasting of a parties'

11

contentions. *See Cook ex rel. Estate of Tessier*, 402 F.3d at 1111 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Frazier*, 387 F.3d at 1262–63 ("[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."); *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir.1998).

Dr. Kennedy's opinions were inadmissible under *Daubert* as an expert may not offer an opinion based only on his own say-so. *See McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F.Supp.F.Supp.2d 418, 423-24 (D. Mass. 2008) ("Expert testimony is the product of reliable principles and methods if the theory employed by the expert to explain the meaning of her observations is shown to be valid and was derived through the so-called scientific method.") (internal quotations omitted). Such opinions are not reliable, because they are neither testable nor based upon any objective standard. *Daubert*, 509 U.S. at 591. In that regard, experience is not a proxy for reliability.

## A. Opinions About the Quality of Medical Care Based Only on an Expert's Say-So Or Personal Views Were Inadmissible

Courts across the country regularly exclude expert opinions about medical care where, as here, the opinions are based upon nothing but the expert's *ipse dixit* because such opinions are unreliable. *See, e.g., Adams v. Lab. Corp. of Am.*, 2012 WL 370262, at *14–15 (N.D. Ga. Feb. 3, 2012) (excluding expert testimony regarding the appropriate standard of care, because expert's opinion was unreliable where she agreed with objective benchmarks for evaluating care but did not apply them); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.F.Supp.2d 334, 354 (S.D.N.Y. 2005) (excluding expert opinion "which appears to be based on no scientific support other than his own personal experience" that defendant-physician's failure to respond to

discharge of synovial fluid following operation fell below the standard of care); *Algarin v. New York City Dep't of Corr.*, 460 F.Supp.2d 469, 477 (S.D.N.Y. 2006) (excluding as unreliable expert opinion that assessments resulting in psychiatric commitment "were not performed in conformity with the standards of the medical profession," because the expert was not relying on any objective standards but only how he thought the assessment should have been conducted). "An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the relevant professional community." *Berk*, 380 F.Supp.F.Supp.2d at 354. *Accord, Clarke v. Schofield*, 632 F.Supp.2d 1350 (M.D. Ga. 2009) (excluding emergency room physician's opinion regarding cause and location of deep vein thrombosis).

In *McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, for example, the Court excluded the testimony of plaintiff's expert regarding the appropriate standard of care in a medical malpractice case, because there were no indicia of reliability that the opinion was anything other than the expert's own say-so. 584 F.Supp.F.Supp.2d at 424-25 (D. Mass. 2008) Of course, an expert may testify "solely on the basis of experience," but "he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Brown*, 402 F.Supp.2d at 308-09. The plaintiff's expert in *McGovern* could not pass that rigorous test for demonstrating reliability when offering an opinion based only on one's experience and knowledge.

As the Supreme Court of the United States explained, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is only the *ipse dixit* of the expert. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). As the

Eleventh Circuit explained, "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

The recent case of *United States v. Zolot*, __ F.Supp.2d __, 2013 WL 4832705 (D. Mass. Sept. 13, 2013) is instructive. In *Zolot*, the court noted in ruling on the *Daubert* motions of both parties, that, while experts may testify on the basis of experience, if they are relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id.* at *11, (citing Fed.R.Evid. 702, Advisory Committee's Note). The government relied heavily on *Zolot* in crafting its Daubert responses, however, at trial, the government's proof failed to include any of the standards they contended undergirded his opinions.

In finding that the government's experts should be excluded the court found that the experts had failed to "sufficiently articulate the standard of care they are applying to assess the defendants' conduct . . . " *Id.*, at 14. The district court stated that the expert had to "specifically cite the written standard they are relying on or provide testimony as to the accepted standard in the field." *Id.*

Dr. Kennedy testified without offering what information informed his opinions that Dr. Azmat violated standards, or what those standards were. At the end of the day, Dr. Kennedy's opinions were the classic *ipse dixit* that should have been excluded.

## V. **THE COURT'S REJECTION OF PROPOSED JURY INSTRUCTIONS**

Under the law of this Circuit, a defendant has the right to theory of defense instructions even apart from instructions on elements of the offense. The failure to issue such

instructions has consistently been found to be reversible error in this Circuit. *See, e.g., United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995); *United States v. Morris*, 20 F.3d 1111 (11th Cir. 1994); *United States v. Banks*, 942 F.2d 1576, 1580 (11th Cir. 1991); *United States v. Hedges*, 912 F.2d 1397, 1405-06 (11th Cir. 1990). Indeed, as these and other Eleventh Circuit cases illustrate, perhaps the most frequent ground for reversal in this Circuit is the refusal of district courts to issue theory of defense instructions. *See also United States v. Vicaria*, 12 F.3d 195, 199 (11th Cir. 1994); *United States v. Opdahl*, 930 F.2d 1530, 1533 (11th Cir. 1991), *United States v. Orr*, 825 F.2d 1537 (11th Cir. 1987); *United States v. Lively*, 803 F.2d 1124, 1125-26 (11th Cir. 1986); *United States v. Gold*, 743 F.2d 800, 819 (11th Cir. 1984), *cert. denied*, 469 U.S. 1217 (1985). This is so, because a defendant is entitled to such an instruction so long as there is "any foundation" in the evidence to support it. *United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995); *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982), *cert. denied*, 103 S.Ct. 1497 (1983); *Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967); *Perez v. United States*, 297 F.2d 12, 13-14 (5th Cir. 1961). *Accord United States v. Pedroza*, 750 F.2d 187, 204-05 (2d Cir. 1984) (defendant entitled to theory of defense instruction "'for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be'") (citations omitted). Moreover, in deciding whether such a foundation exists, the Court is obliged to view the evidence in the light most favorable *to the accused*. *Middleton,* 690 F.2d at 826; *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979).

A district court has the discretion to refuse a proposed defense instruction only in the limited instances where:

(1)     The proposed instruction is not "substantially" correct;
(2)     There is some instruction that *is* in fact given which adequately and substantially addresses the same issue; or
(3)     The proposed instruction deals with an unimportant aspect of the trial

and, therefore, the failure to give it does not seriously impair the defendant's ability to defend himself against the charge.

*United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995); *Opdahl*, 930 F.2d at 1533, *quoting with approval Lively*, 803 F.2d at 1125-26.

In this case, the Court rejected numerous instructions proposed by the defendant that accurately defined the law and were critical to his defense.

As Dr. Azmat pointed out in his Daubert motion, the apparent distinction in the law between a doctor's malpractice, even gross malpractice, and criminal conduct is a matter of degree. Accordingly, Dr. Azmat submitted a series of instructions derived from Georgia law that either directly set standards of care or provided Georgia physicians with specific rights with respect to treating patients in Georgia with controlled substances. These Proposed Instructions included:

No. 21 (Standard of Care – Uncertainty in the Law)

No. 22 (Difference Between Civil Malpractice and Criminal Conduct)

No. 23 (Reasonable Physicians May Disagree)

No. 24 (Honest Information)

No. 25 (Physician's Duty to Relieve Pain)

In *United States v. Feingold*, 454 F.3d 1001, 1010 (9th Cir. 2006), the Court held that an instruction is improper if it allows a jury to convict a licensed practitioner under § 841(a) solely on a finding that he has committed malpractice, intentional or otherwise. Rather, the district court must ensure that the benchmark for criminal liability is the higher showing that the practitioner intentionally has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

There are cases in which the evidence arguably supports, and the Defendant may rely

16

upon, some specific theory of defense other than the traditional defenses covered by Special Instructions 13.1 through 17. In such cases, upon appropriate request, theory of defense instructions relating to material factual issues arising from the evidence must be given. *United States v. Conroy*, 589 F.2d1258, 1273 (5th Cir. 1979); *United States v. Lewis*, 592 F.2d1282 (5th Cir. 1979); *United States v. Sirang*, 70 F.3d 588 (11th Cir. 1995) (A defendant is entitled to a specific instruction on his theory of defense, not an abstract or general one). It is error to not give a requested instruction if the requested instruction's subject matter: is a correct statement of the law; is not covered by a separate pattern instruction; and goes to an important issue in the case. *See United States v. Woddard*, 531 F.3d 1352, 1364 (11th Cir. 2008).

Here, it was a theory of Dr. Azmat's defense that being a negligent physician, or even grossly negligent physician did not equate with being a drug dealer. Dr. Azmat was entitled to have the jury charged consistent with the instructions submitted.

## VI. **PROSECUTORIAL MISCONDUCT REQUIRES A NEW TRIAL**

During questioning of the defense expert, Dr. Tom Simopolous, government counsel asked Dr. Simopolous if he knew where Dr. Azmat obtained his medical education. Dr. Simopolous replied that he did not recall. The import of this question is that this was not a case regarding whether Dr. Azmat had negligently performed some procedure and whether his training was sufficient, but whether he had intentionally engaged in drug dealing. Not satisfied with Dr. Simopolous' answer, government counsel then specifically stated "Pakistan" asking if that refreshed the expert's opinion. Counsel for Dr. Azmat moved for a mistrial, which was denied. No curative instructions were given.

Allegations of prosecutorial misconduct are subject to a "two-part test." *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir.1990). Whether the challenged comments were

improper and if so, whether they prejudicially affected the substantial rights of the defendant. *United States v. Castro,* 89 F.3d 1443, 1450 (11th Cir.1996) (citing *Obregon,* 893 F.2d at 1310). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt,* 466 F.3d 938, 947 (11th Cir.2006).

There was no proper purpose in questioning Dr. Simopolous regarding Dr. Azmat's medical training. Again, his training and experience were not at issue in the case. The question for the jury was whether Dr. Azmat crossed the line from being a physician to drug dealer. Whether he was educated in the U.S. or Pakistan was of no event to that inquiry for the jury. Rather, the remark was intended to comment upon Dr. Azmat's national origin and engender prejudice against him. As the United States Supreme Court has held, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). "Undeniably, prosecutorial remarks kindling racial or ethnic predilections 'can violently affect a juror's impartiality.'" *United States v. Doe*, 903 F.2d 16, 28 (D.C.Cir. 1990) (quoting *Haynes v. McKendrick*, 481 F.2d 152, 156-159 (2d Cir. 1973); citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). The prosecution's eliciting of alleged evidence regarding Dr. Azmat's Pakistani national origin and training was intentionally calculated to kindle prejudice against him and create a prohibited propensity inference that Dr. Azmat allegedly violated the law as a result of his background and training.

In a close case, where Dr. Azmat was presenting the testimony of a Harvard trained expert, the comment regarding Dr. Azmat's national origin made a difference. The injection of such improper and prejudicial testimony constitutes reversible error and provides ground for the

ordering of a new trial. *See United States v. Herrera*, 531 F.2d 788 (5th Cir. 1976) (reversing the

defendant's convictions for importing and possessing cocaine with intent to distribute, holding

that the prosecutor's arguments as to "[w]hether any juror, or the prosecutor, or any other

American, would be afforded similar protections in defendant's home country or some other

foreign country had nothing to do with this case," and were "egregiously inappropriate"). The

testimony concerning Dr. Azmat's national origin was entirely irrelevant to the charges and

served no purpose other than to goad the jury to convict Dr. Azmat because he was of Pakistani

origin. Grant of a new trial is therefore supported by *United States v. Rodriguez Cortes*, in which

the Court of Appeals for the First Circuit reversed the convictions of one of the defendants for

conspiracy to import and distribute cocaine based upon the fact that the prosecution had

introduced the defendant's Colombia identification at trial, holding that the introduction of the

evidence was "obvious harmful error" and:

> [C]ould be taken as an appeal to the jurors to find the defendant guilty by reason
> of his national origin, inviting them to believe that if a person is born in
> Colombia, then he must be involved in drug trafficking. This form of reasoning is
> precisely the type of prejudice that Federal Rule of Evidence 403 is intended to
> guard against…
>     The admission of the card as an exhibit made it more likely that whatever
> preconceived notions the jury might have had about Colombians and drug
> trafficking would infect the deliberative process.

949 F.2d 532, 541, 42 (1st Cir. 1991); *see also United States v. Doe*, 903 F.2d at 20 (reversing the

convictions for drug and firearms charges of the defendants, several of whom were Jamaican,

where the prosecution made arguments and introduced expert testimony concerning alleged

"Jamaican gang activity," holding that the statements constituted prejudicial and harmful error:

"These statements hardly described for the jury the *modus operandi* of drug dealers, Jamaican or

otherwise, nor could they have provided legitimate assistance to the jurors in determining

whether appellants committed the offenses charged. [Fn.]. Instead, they focused on

monopolization of the local drug market by dealers tracing their ancestry to Jamaica, and strongly suggested that appellants were guilty because two of them are Jamaican) (internal footnote omitted); *see also United States v. Vue*, 13 F.3d 1206, 1213 (8th Cir. 1994) (reversing the convictions of the defendants, who were of Hmong descent, for opium smuggling, based upon the admission at trial of certain testimony related to the likelihood of the involvement in opium smuggling of persons of Hmong descent).

Based upon the egregious testimony regarding Dr. Azmat's ethnicity intentionally elicited by the prosecution in this case, a new trial should follow.

## VII. <u>ERRONEOUS ADMISSION OF ALL EAST HEALTH FILES</u>

The government introduced into evidence, over objection, all of the files at East Health Center for patients seen by Dr. Azmat. The introduction of this evidence was substantially outweighed by the risk of unfair prejudice.

In *United States v. Jones,* 570 F.2d 765 (8th Cir.1978), a physician was prosecuted for distributing Quaalude without legitimate medical purpose and outside the usual course of medical practice. The court held that it was prejudicial error to have introduced evidence relating to 478 prescriptions written by the defendant for Schedule II drugs, which prescriptions were not covered by the indictment, when there was no evidence concerning the doctor-patient relationship existing with respect to these prescriptions.

Citing the Supreme Court's seminal case, *United States v. Moore*, 423 U.S. 122, 138 (1975), the Eight Circuit held that, "Absent any evidence bearing upon Dr. Jones' treatment of the patients in question, issuance of the prescriptions without more does not show that Dr. Jones acted unprofessionally in issuing these prescriptions." *United States v. Jones*, 570 F.2d 765, 768 (8th Cir. 1978).

20

Similarly here, there was no evidence related to the other 200 patients that formed the basis for the admission of all of the EHC files and as pointed out by *Tran* the admission of such evidence not cabined by any evidence regarding the physician patient relationship runs the risk of guilt by association. The admission of that evidence was unfairly prejudical.

## VIII. <u>CONCLUSION</u>

Based upon all of the reasons and authorities set forth above, Dr. Azmat respectfully requests that this Court grant his Motion for Acquittal or, alternatively, grant his Motion for New Trial.

This the 31st day of January, 2014.

<u>/s/ Thomas A. Withers, Esq.</u>
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this court.

This 31st day of January, 2014.

**/s/ Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
E-Mail: Twithers@gwllawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | No. CR413-028 |
| NAJAM AZMAT, | ) | |
| Defendant. | ) | |

## DEFENDANT NAJAM AZMAT'S SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL

COMES NOW Defendant Najam Azmat and files this, his Supplemental Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial and shows the Court the following:

### I. BACKGROUND

As previously shown, Count 1 of the Superseding Indictment claimed that the defendants conspired to **distribute and dispense**, and caused to be distributed and dispensed, Schedule II, III, and IV controlled substances. [Doc 156-Pgs 6-11]

Counts 2 through 50 asserted that Dr. Azmat, aided and abetted by his co-defendants, "did, outside the usual course of professional practice as a medical doctor and without legitimate purpose relating to the practice of medicine, knowingly, intentionally and unlawfully **dispense**" Schedule II, III, and IV controlled substances

1

on various occasions from February 21, 2011, to March 15, 2011, all in violation of 21

U.S.C. § 841(a) (1). [Doc 156-Pgs 11-15][emphasis added]. Count 52 contended that

Dr. Azmat and his co-defendants conspired to launder money, with the specified

unlawful activity being "the **dispensation** of Schedule II, III, and IV controlled

substances." [Doc 156-Pg 16] [emphasis added].

The government defined the two terms at issue in the Superseding Indictment as

follows:

> 11. The term **"dispense"** means to deliver a controlled substance to an
> ultimate user or research subject by, or pursuant to the lawful order of, a
> practitioner, including the prescribing and administering of a controlled
> substance and the packaging, labeling or compounding necessary to
> prepare the substance for such delivery. The term "dispenser" means a
> practitioner who so delivers a controlled substance to an ultimate user or
> research subject. (21 U.S.C. § 802(10)).
> 12. The term **"distribute"** means to deliver (other than by administering
> or dispensing) a controlled substance or a listed chemical. The term
> "distributor" means a person who so delivers a controlled substance or a
> listed chemical. (21 U.S.C. § 802(11)).

[Doc 156-Pg. 4, Para. 11-12] [emphasis added]

The government, therefore, set the legal landscape for the charges against Dr.

Azmat – that he unlawfully "dispensed" controlled substances.

## II. <u>ARGUMENT AND CITATION OF AUTHORITY</u>

1.  **There was a Material Variance Between the Indictment and the Government's Proof at Trial.**

"A constructive amendment occurs when the essential elements of the offense as alleged in the indictment are altered to broaden the potential bases for conviction beyond what the indictment contains." <u>United States v. Tampas</u>, 493 F.3d 1291 (11th Cir. 2007) (citing <u>United States v. Narog</u>, 372 F.3d 1243, 1247 (11th Cir. 2004); <u>United States v. Keller</u>, 916 F.2d 628, 634 (11th Cir. 1990)); <u>see also</u> <u>United States v. Ward</u>, 486 F.3d 1212, 1227 (11th Cir. 2007). A constructive amendment of the indictment constitutes *per se* reversible error because it violates a defendant's Fifth Amendment right to be tried on charges presented to the grand jury. See <u>Tampas</u>, 493 F.3d 1291 (citing <u>United States v. Weissman</u>, 899 F.2d 1111, 1114 (11th Cir. 1990)). Under the Fifth Amendment, "a defendant can only be convicted for a crime charged in the indictment. It would be fundamentally unfair to convict a defendant on charges of which he had no notice." <u>Ward</u>, at 1227 (citing <u>Keller</u>, at 632-33).

The government now argues against itself. After charging Dr. Azmat with dispensing, and even, defining that term in the Superseding Indictment, the government now argues against itself contending that those separate statutory definitions mean the same thing, though the Superseding Indictment charged

3

substantive counts only as to dispensation, not distribution.

The Eleventh Circuit has found constructive amendments of indictments and improper broadening of the potential bases for conviction where the indictment charged the defendants with knowing or having reasonable cause to believe that pseudoephedrine would be used to manufacture methamphetamine, but the trial court instructed the jury that it could convict the defendants if it found that they knew or had reasonable cause to believe that the pseudoephedrine would be used to make "any controlled substance," Narog, 372 F3d at 1249; where the government charged that the defendant knowingly and "willfully" committed money laundering, but the court redacted the term "willful" from its charge on the definition of "intentional," United States v. Cancelliere, 69 F.3d 1116, 1121 (11th Cir. 1995); where the indictment alleged that the defendant conspired with a particular person and the trial court instructed the jury that it could convict the defendant if it found he conspired with "any" person, Keller, 916 F2d at 636; where the RICO charges in the indictment charged that the "enterprise" was a particular organized crime family but the court instructed the jury that it could convict the defendants if it found a different enterprise, Weissman, 899 F.2d at 1115; and, more recently, where the indictment charged one scheme to defraud, but proved another under the mail fraud statute, United States v. Lander, 668 F. 3d 1289 (2012).

4

Here the government's proof constructively amended the indictment resulted in a material variance requiring a verdict of acquittal on those charges.

**2.     The Government Improperly Commented on Dr. Azmat's National Origin**

The government conducts a *post hoc* rationalization for its question for Dr. Simopoulus about where Dr. Azmat went to medical school (the word Pakistan came from government counsel – not Dr. Simopolous) that they were really only questioning Dr. Azmat's credentialing because all of these patient's were traveling from out of state to visit him. Doc # 326, pp. 17-20.

The problem with that rationale is Dr. Azmat's education, training and experience was not an issue at trial. Claiming that "not once" did it ask a question about Dr. Azmat's national origin is too clever by half, for it was the government prosecutor who unsatisfied with Dr. Simopolous' answer that he didn't recall where Dr. Azmat went to medical school 30 years earlier – blurted out the word "Pakistan"! And, if the government's rationale for asking that question were really to test Dr. Azmat's training and experience – why not ask about the propriety of Dr. Azmat's residency training and fellowship training. Simply put – training and experience were not an issue in the case and the government's insertion into this case of Dr. Azmat's national origin had one purpose and one purpose only and that was to unduly prejudice Dr. Azmat and inflame the jury against him.

5

## III. <u>CONCLUSION</u>

Based upon all of the reasons and authorities set forth, Dr. Azmat respectfully

requests that his Renewed Motion for Verdict of Acquittal be granted.

Respectfully submitted, this 20th day of May, 2014.

<div align="right">

**s/ Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

</div>

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:    (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

This 20th day of May, 2014.

<div style="margin-left:40%;">

**s/ Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

</div>

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

```
UNITED STATES OF AMERICA      )
                              )
v.                            )
                              )
NAJAM AZMAT,                  )      CASE NO. CR413-28
                              )
        Defendant.            )
_____)
```

## O R D E R

Before the Court is Defendant Azmat's Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial. (Doc. 324.) In this motion, Defendant contends that the Government failed to present sufficient evidence such that a reasonable jury could have found him guilty. (Id. at 1-2.) In the alternative, Defendant contends that trial errors deprived him of a fair trial. (Id. at 2-4.) Defendant has also filed a Motion for Reconsideration of Bond Pending Sentencing. (Doc. 321.) For the following reasons, Defendant's motions are **DENIED**.

## I. MOTION FOR ACQUITTAL

In considering a motion for acquittal under Federal Rule of Criminal Procedure 29, the Court views the evidence in the light most favorable to the government. The issue before the Court is "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt."

United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir.
1989). Essentially, the goal is preventing verdicts based
wholly upon "speculation and conjecture." United States v.
Kelly, 888 F.2d 732, 741 (11th Cir. 1989).

In this case, Defendant first argues that the
Government failed to produce evidence at trial sufficient
to convince a reasonable jury that he voluntarily joined a
conspiracy to distribute controlled substances as charged
in count one of the indictment. (Doc. 324 at 4.) However,
the evidence at trial established that Defendant was
recruited to work at the pain clinic through a Craigslist
advertisement, that other members of the conspiracy
informed him that his role would be to write prescriptions
for pain medication, and that he was to be paid in cash at
the end of the day for his services. Witnesses testified
that this type of recruitment and pay system is not
utilized in a legitimate medical practice. Defendant's co-
conspirators also testified that the pain clinic was never
intended to serve as a legitimate medical office, and that
Defendant understood the pain clinic's actual purpose as a
drug-dealing operation. Based upon this evidence, a
reasonable jury could conclude that Defendant conspired to
illegally distribute controlled substances, as required for
the offense charged in count one of the indictment.

2

Second, Defendant argues that the Government failed to present sufficient evidence for a reasonable jury to conclude that he intentionally dispensed or distributed controlled substances for no legitimate medical purpose outside the usual course of professional practice, as charged in counts two through fifty. (Id. at 5.) Defendant argues that the evidence at trial could only show that Defendant was paid in cash, that a substantial number of the patients were from out of state, and that some patients received little or no physical examination. However, evidence was also presented at trial that indicated the pain clinic exhibited a number of other "red flags" that a jury could reasonably find persuasive in determining that Defendant was illegally prescribing controlled substances. Specifically, there was evidence at trial that showed Defendant's duties at the pain clinic consisted almost exclusively of writing prescriptions for large quantities of pain medications, that the pain clinic had minimal medical equipment and supplies, that patients were required only to have an MRI taken within the last two years to receive medications, and that the pain clinic operated on a primarily cash basis and did not accept insurance. The Government also produced an expert witness who testified that Defendant's prescriptions served no

medical purpose and were outside the usual course of a legitimate medical practice. Based upon this evidence, a reasonable jury could conclude that Defendant dispensed or distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice, as required for the offenses charged in counts two through fifty.[1]

Next, Defendant argues that he cannot be convicted of dispensing or distributing controlled substances with respect to those counts for which patient testimony was not offered. (Doc. 324 at 7-8.) However, patient testimony is not required to support a conviction for unlawful dispensation or distribution of controlled substances. The facts of this case are easily distinguishable from those of United States v. Tran Trong Cuong, 18 F.3d 1132 (4th Cir. 1994), upon which Defendant chiefly relies. The Court in Tran Trong found the prosecution's evidence insufficient

---

[1] Defendant argues that the evidence presented at trial did not support his conviction in part because his actions at the pain clinic—including normally maintaining patient records and reducing patient medications—are in contrast to the factors outlined in United States v. Rosen, 582 F.2d 1032 (5th Cir. 1978). However, Defendant's reliance on Rosen is misplaced. While Rosen includes a number of factors that may support a guilty verdict, they are only examples. (Id. at 1036.) The list is neither exclusive nor are all the factors necessary to find a Defendant guilty. A jury is free, as it did this case, to consider other evidence in determining that a defendant committed the offenses charged.

4

because it addressed the prescriptions at issue only in broad terms and without specificity, whereas in this case the Government's expert witness discussed the medical records of each patient charged in the indictment. This type of evidence may support a conviction under 28 U.S.C. § 841. See *United States v. Bourlier*, 518 F. App'x 848, 852 (11th Cir. 2013) (upholding jury conviction where expert witness physician discussed individual medical files of patients who did not testify at trial). Because evidence was offered in this case for each of the counts charged, there is no reason to overturn the jury's verdict for lack of evidence.

Defendant next argues that the Government did not establish an appropriate threshold standard for proper medical care by which the jury could measure his actions. (Doc. 324 at 10.) However, the Government's expert witness testified extensively about the applicable medical standards published by the Georgia Composite State Board of Medical Examiners as well as standard practice procedures outlined in various medical reference materials. The Court finds that the jury could fairly conclude from this evidence, combined with the evidence of Defendant's actions, that Defendant prescribed controlled substances outside the usual course of professional practice and

5

without a legitimate medical purpose as was charged in the indictment. See Bourlier, 518 F. App'x at 852 (upholding conviction where testimony of state medical board procedures and other medical procedural literature were sufficient to establish standard of care).

Defendant's final arguments for acquittal, which are simply restatements of his prior Motion for Acquittal (Doc. 307), are based on the idea that the Government proved only that Defendant prescribed controlled substances, rather than dispense controlled substances as charged in the indictment. The Court declines to engage in a full discussion of this issue as it previously denied Defendant's motion for acquittal. However, the Court does note that it can find no Eleventh Circuit case to support Defendant's proposition that a charge of "dispensing" controlled substances does not apply to a physician writing prescriptions without a legitimate medical purpose. In fact, the only binding precedent on the issue appears to hold quite the opposite. See United States v. Leigh, 487 F.2d 206, 207 (5th Cir. 1973)[2] ("It has been decided that a doctor can be indicted, tried, and convicted for the

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

unlawful dispensing of a controlled substance, if his
prescription is not for a legitimate medical purpose in the
usual course of his professional practice."); see also
Bourlier, 518 F. App'x 848 (affirming conviction for
dispensing controlled substances of physician who
prescribed controlled substances). In addition, the
indictment clearly lays out the various prescriptions for
which Defendant was charged, furthering discrediting
Defendant's claim that he was unfairly convicted on a
charge of which he had no notice. Accordingly, the Court
sees no reason to revisit its prior ruling denying
Defendant's motion for acquittal on these same grounds.

II.   MOTION FOR NEW TRIAL

     Defendant also argues that a new trial is proper
because a number of trial errors, both individually and
cumulatively, deprived him of a fair trial. (Doc. 324 at
2-3.) The court may grant a Defendant's motion for new
trial "if the interest of justice so requires." Fed. R.
Crim. P. 33(a). Where a Defendant moves for a new trial
based on improperly admitted evidence, the defendant must
show that an objection was properly preserved, the court
abused its discretion in admitting or rejecting the
evidence, and the error was prejudicial to the defendant.
United States v. Stephens, 365 F.3d 967, 974 (11th Cir.

7

2004). Motions for new trials based on other trial errors must demonstrate that the error created circumstances which rendered the trial prejudicially unfair. See United States v. Prunick, 273 F. App'x 807, 808 (11th Cir. 2008) (affirming decision to grant new trial where joinder of pornography counts with other charges resulted in prejudicially unfair trial); United States v. Martinez, 763 F.2d 1297, 1315 (11th Cir. 1985) (rejecting defendant's motion for new trial based on discovery violation because violation did not render trial "fundamentally unfair").

Defendant first argues that the Court erred in admitting the testimony of the Government's expert witness, Dr. Kennedy. (Doc. 324 at 11.) Specifically, Defendant argues that Dr. Kennedy's testimony is inadmissible because he offered his opinions without explaining what information informed those opinions and how he determined the applicable standards of medical practice. (Id. at 14.) However, Dr. Kennedy testified that he determined the appropriate standards of care in part by relying on his years of practice in pain management, reviewing of academic and professional medical literature that relate to pain management and prescription drug treatment, and examining the criteria outlined in professional guidelines used in the state of Georgia. Dr. Kennedy also testified that he

8

reviewed the patient files and records created by Defendant, and evaluated them in light of the standards produced by the methodology stated above. Such foundational evidence is sufficient to support expert testimony, meaning the testimony is not the mere ipse dixit that Defendant claims. See also United States v. Frazier, 387 F.3d, 1244, 1261 (11th Cir. 2004) (holding that expert witness may rely on experience so long as it is shown how experience forms sufficient basis for expert's opinion). Accordingly, the Court finds no error in admitting this testimony.

Second, Defendant argues that it was error by the Court to reject his proposed jury instructions. (Doc. 324 at 14-17.) A trial court's refusal to give a jury instruction is only reversible error if "(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." United States v. Paradies, 98 F.3d 1266, 1286 (11th Cir. 1996). Defendant argues that those jury instructions he proposed that were rejected by the Court were necessary to support Defendant's defense theory that

"being a negligent physician, or even grossly negligent physician did not equate with being a drug dealer." (Doc. 324 at 17.) However, the Court repeatedly instructed the jury as to Defendant's potential "good faith" defense, including the charge that "unless you [the jury] can find beyond a reasonable doubt that the conduct charged in a specific count of the indictment was not done in good faith in the course of a medical practice, you must acquit the defendant of that charge." (Doc. 319 at 17.) Further, no instructions were given as to suggest Defendant could be convicted for simply negligent conduct, as Defendant appears to have feared. Accordingly, the Court finds no error in the given jury instructions.

Defendant also argues that admission of all of the patient files from Defendant's time at East Health Center was unfairly prejudicial—and should have been excluded under Federal Rule of Evidence 403—because the Government failed to present evidence concerning the doctor—patient relationship with regard to any prescriptions not specifically identified in the indictment. (Doc. 20-21.) However, excluding evidence as unfairly prejudicial "is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." United States v. Betancourt, 734 F.2d 750, 757 (11th Cir. 1984) (citations omitted). Here, the

Court concludes that the patient files outlining the number of prescriptions as well as the residency of the patients were highly relevant evidence because they demonstrate overt acts by Defendant in furtherance of the conspiracy. It is axiomatic that this evidence is prejudicial towards Defendant, but the Court disagrees that it is unfairly so. See id. ("In criminal trials relevant evidence is inherently prejudicial.") Given the high probative value of this evidence, the Court finds no error in its admittance.

Lastly, Defendant argues that the Government committed prosecutorial misconduct in asking the defense's expert witness—Dr. Tom Simopolous—whether he knew Defendant had gone to medical school in Pakistan. (Doc. 324 at 17-20.) To constitute reversible error, the challenged statements must be both improper and prejudicially affect the Defendant's substantial rights. United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir. 1990). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome [of the trial] would be different." United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995) (citing Kennedy v. Dugger, 933 F.2d 905, 914 (11th Cir. 1991)). The Government's statements are also reviewed in light of

the particular facts of this case and in the context of the entire record.  <u>United States v. Smith</u>, 918 F.2d 1551, 1562 (11th Cir. 1990).

Although the Court agrees that the Government's question regarding the location of Defendant's schooling was improper, the Court does not agree that it prejudicially affected Defendant's case so as to deny him a fair trial.[3]  Because the Government presented a great deal of evidence to support Defendant's conviction, there is no reason to think that, but for the Government's statement, the outcome would have been different in this case. Accordingly, the Court finds the Government's comment inconsequential in light of the record in this case and that its utterance did not result in a prejudicially unfair trial.

III. <u>MOTION FOR BOND RECONSIDERATION</u>

Defendant argues that he should be released on bond pending sentencing pursuant to either 18 U.S.C. § 3143(a)(2) or 18 U.S.C. § 3145(c).  (Doc. 321 at 8.) Because release pursuant to § 3143(a)(2) requires that there be a substantial likelihood that a motion for acquittal or new trial will be granted, and because

---

[3] The Court notes that Defendant did not object or request any sort of curative jury instructions at the time the statement was made.

Defendant's motion on those grounds is denied, the Court need only address Defendant's argument for release under § 3145(c). As a prerequisite for consideration of release under § 3145(c), there must exist "exceptional circumstances" that make Defendant's detention inappropriate. However, even if the Court finds that exceptional circumstances do exist, it is under no obligation to release Defendant. See United States v. Meister, 744 F.3d 1236, 1240 (11th. Cir. 2013) (noting that whether or not to release defendant prior to sentencing was matter of district court's discretion).

As support for his contention that exceptional circumstances do exist in this case, Defendant states that he assists his wife in caring for his special needs teenage child (Doc. 321 at 8) and that the Chatham County jail where he is detained has provided him with unsatisfactory medical care (Doc. 328 at 9-10). After careful consideration, however, the Court finds Defendant's arguments unpersuasive. Defendant's medical needs and family concerns may unfortunately be complicated by his detention, but they do not constitute such exceptional circumstances as to merit his release. Accordingly, Defendant will remain in detention pending sentencing in this case.

## CONCLUSION

For the foregoing reasons, the Court finds that that
the Government presented sufficient evidence such that a
reasonable jury could have found him guilty of the charges
and that no errors at trial deprived Defendant of a fair
trial. Accordingly, Defendant's Motion for Judgment of
Acquittal or, in the Alternative, Motion for New Trial
(Doc. 324) is **DENIED**.[4] In addition, Defendant's Motion for
Reconsideration of Bond Pending Sentencing (Doc. 321) is
also **DENIED**.

SO ORDERED this 6th day of June 2014.


_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[4] Defendant has also filed a Supplemental Motion for
Acquittal or in the Alternative Motion for New Trial (Doc.
334) further arguing the same issues contained within
Defendant's original motion. Accordingly, this
supplemental motion is also **DENIED**.

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA  )
                            )
vs.                          )
                            )
                            )   No. CR413-028
NAJAM AZMAT,          )
                            )
    Defendant.          )

## DEFENDANT NAJAM AZMAT'S SENTENCING MEMORANDUM REGARDING THE GUIDELINE FOR OXYCODONE

COMES NOW Defendant Najam Azmat and files this, Sentencing Memorandum Regarding the Guideline For Oxycodone and shows the Court the following:

## I. INTRODUCTION

As will be demonstrated below, the conversion ratio employed by the Sentencing Commission with regard to oxycodone is not based on empirical data and/or national experience, is arbitrary and capricious, does not exemplify the Commission's exercise of its characteristic institutional role, rests upon faulty assumptions and creates unfair sentencing disparities for similar conduct. As a result, this Court is free to vary from that guideline.

1

Also, as further detailed herein, because the drug quantity tables are tied to mandatory minimums that were not based on empirical data, or national experience, this Court may likewise vary from them.

District courts may impose sentences that vary from guideline ranges if they disagree with a particular Sentencing Commission policy. *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007); *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010); *United States v. Merced*, 603 F.3d 203 (3d Cir. 2010); *United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010); *United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009), *United States v. Carr*, 557 F.3d 93, 106 (2nd Cir. 2009); *see United States v. Dossie*, 851 F.Supp. 2d 478 (E.D.N.Y. 2012) (sentencing a defendant in a drug trafficking case below the guidelines range where district court had underlying policy disagreement with the U.S.S.G. section 2D1.1 as a whole and holding that the district court's authority to vary is at its greatest where the offense guideline at issue is not the product of the Commission's empirical analysis and technical expertise).

In addressing the sentencing disparities in crack and powder cocaine, the Supreme Court acknowledged that the sentencing commission was established "to formulate and constantly revise national sentencing standards," and that, "in fulfilling this important institutional role," the Commission draws on a "capacity courts lack to base its determinations on empirical data and national experience,

2

guided by professional staff with appropriate expertise." *United States v. Diaz*, 2012 WL 322243, *3 (E.D.N.Y. Jan. 28, 2013) (quoting *Kimbrough*, 552 U.S. at 108-09). When an offense guideline is based on the Commission's analysis of empirical data and national experience, the advisory ranges it produces can fairly be said to "reflect a rough approximation of sentences that might achieve objectives of the [Sentencing Reform Act]." *Id.* In short, the courts should look more closely at sentences outside the applicable guidelines range where the Commission's assessment of a particular guideline imposed is supported by empirical data and national experience. However, where a variance is based on a policy disagreement with guidelines "not based on empirical data and national experience, and hence 'do not exemplify the Commission's exercise of its characteristic institutional role,'" appellate courts defer to the sentencing judge's reasonable policy disagreement with the guidelines. *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007).

3

## II. <u>ARGUMENT AND CITATION OF AUTHORITY</u>

### A. <u>The Guideline Conversion Ratio for Oxycodone Is Not Based on Empirical Data or National Experience, Is Arbitrary and Capricious, Does Not Exemplify the Commission's Exercise of Its Characteristic Institutional Role, and Creates Unfair Sentencing Disparities for Similar Conduct</u>

#### 1. <u>The Guidelines History Related to Oxycodone</u>

The original version of the Sentencing Guidelines which the Commission sent to Congress on May 13, 1987 set oxycodone as directly equivalent to heroin for sentencing purposes. At the time, the equivalency tables used heroin as the conversion baseline instead of marihuana, but the ratio between marihuana and heroin was the same as it is today (1 gm heroin = 1 kg marihuana). "To determine these finer distinctions, the Commission consulted numerous experts and practitioners, including authorities at the Drug Enforcement Administration, chemists, attorneys, probation officers, and members of the Organized Crime Drug Enforcement Task Forces, who also advocate the necessity of these distinctions." 52 Fed. Reg. 18046, 18064. The original drug equivalency table submitted to Congress established that "1 gm of Oxycodone = 1 gm of Heroin," and "1 gm of Morphine = 0.5 gm of Heroin". *Id.* However, in October of 1987 the Commission altered these Guidelines with a series of "technical and conforming amendments" before they became effective. Among these amendments was a reduction in the oxycodone equivalency to match the morphine ratio. Therefore, effective November 1, 1987, 1 gram of oxycodone was equivalent to 0.5 grams of heroin. 52 Fed. Reg. 44674,

44694. The Commission explained that they used the sentences provided in, and derived from 21 U.S.C. 841(b)(1) as a primary basis for the guideline sentences. They noted, however, that because the statute "provides direction only for the more common controlled substances, i.e., heroin...The Drug Equivalency Tables...provide conversion factors for other substances, which the Drug Quantity Table refers to as 'equivalents' of these drugs." *Id.*

Although the Commission articulated no specific rational for this specific change, the November revisions were preceded with the following statement: "Since May 1, 1987, the Commission has conducted extensive clinical testing of the guidelines. Those sessions produced useful suggestions for clarifying and reorganizing the commentary."

This "extensive clinical testing" along with the "consult[ation with] numerous experts and practitioners" upon which they relied in formulating the equivalency ratios supported a reduction in the oxycodone equivalency. In light of the stark similarity between oxycodone and morphine and the relative danger of heroin, the affirmative reduction in oxycodone's equivalency ratio makes sense. This basic ratio stayed in place (although the method of baseline equivalency changed from heroin to marihuana) until it was refashioned in 2003.

Effective November 1, 2003, Amendment 657 to the Federal Sentencing Guidelines changed the drug equivalency conversion from "1 gm of oxycodone =

5

500 gm of marihuana" to "1 gm of oxycodone (actual) = 6700 gm of marihuana." Oxycodone (actual) was defined as "the weight of the controlled substance, itself, contained in the pill, capsule, or mixture." The Commission explained that the amendment addressed proportionality issues: "(1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight."

The Commission's "solution" was to drastically increase oxycodone's equivalency ratio. It explained that "this equivalency keeps penalties for offenses involving 10 mg OxyContin pills identical to levels that existed prior to the amendment, substantially increases penalties for all other doses of OxyContin, and decreases somewhat the penalties for offenses involving Percoset." In the published minutes of the Commission's vote on this amendment, the Commissioners focused almost exclusively on the proportionality issue and ignored the drastically heightened equivalency ratio. *See* Minutes of the March 26, 2003 U.S.S.C. Public Meeting (http://www.ussc.gov/amendment-process/public-hearings-and-meetings/20030325-26/minutes-march-26-2003 ) (hereafter "March 26 Meeting"). The only reference to the increased Oxycodone penalties was an offhand remark by Chair Murphy that "members of Congress would be particularly interested in this amendment because the illicit drug market for oxycodone has grown." *Id.*

6

The Commission held no public hearing, reported absolutely *no* empirical data, and conducted absolutely *no* scientific studies, as to why the amendment wildly increased the drug equivalency for oxycodone.

Other than this comment from Chair Murphy - that it was a belief held by members of the Congress, there was no actual evidence offered to suggest that greatly increasing the penalty for oxycodone to 13 times greater than morphine was justified.

### 2. The Amended Oxycodone Equivalency Tables are Unreasonable and Arbitrary

There are several flaws with Amendment 657 and the current oxycodone sentencing policy. First, the equivalencies for morphine and codeine, drugs which are nearly identical to oxycodone, were not changed. Like oxycodone, morphine and codeine are Schedule II opioid analgesics with very similar chemical structure and clinical use. *See* AMDG, Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain, 2010 Update, p. 4, available at:

http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf.

Morphine in particular is a close equivalent to oxycodone for pharmaceutical and pain management purposes. Both oxycodone and morphine are "selective μ-opioid receptor agonists," which means that oxycodone has a similar potency for dependence and addiction as morphine. *See* Trescot, Datta, Lee, Hansen, *Opioid Pharmacology*, Pain Physician, Vol. 11, Issue 2S, March 2008, pp. 133-153. While

morphine and oxycodone utilize the same mechanism of action as other opioids, oxycodone has a shorter plasma half-life than an equivalent dose of morphine (it does not last as long). *See* A. O. Gallego, "Oxycodone: A Pharmacological and Clinical Review," Clinical and Translational Oncology, Vol. 9, No. 5, May 2007.

Oxycodone was initially developed to retain the analgesic effects of morphine and heroin with less dependence. To some extent, this was achieved, as studies found that both the strength and length of oxycodone's analgesic effects are less than that of heroin or morphine. *See* OxyContin Addiction Addressed by Tablet Redesign, Drug Addiction Treatment, found at:

http://www.drugaddictiontreatment.com/types-of-addiction/prescription-drug-addiction/oxycontin-addiction-addressed-by-tablet-redesign/ ; Eija Kalso, Oxycodone, Journal of Pain and Symptom Management, Vol. 29, No. 5S, May 2005, § 47 - S56.

The drugs are so similar that disparate treatment is not warranted. Scientific studies have placed oxycodone and morphine at the equi-analgesic ratio of anywhere between 1:1 and 2:1 depending on timing of the dosing. *See United States, ex rel. Mark Radcliffe v. Purdue Pharma L.P.*, 582 F.Supp.2d 766, 769 (W.D.Va. Oct. 14, 2008) (citing Agency for Health Care Policy & Research, Public Health Serv., U.S. Dept. of Health & Human Servs., Clinical Practice Guideline: Acute Pain Management: Operative or Medical Procedures and Trauma, app. C2 (Feb.1992);

8

United States Pharmacopeia-Dispensing Information 2238 tbl. 2 (16th ed 1996); Robert G. Twycross, Opioids, in Textbook of Pain 943, 953 tbl. 49.7 (Patrick D. Wall & Ronald Mezack, eds.3d ed. 1994)). The similarity of these drugs is borne out by physician opioid conversion tables, which show that oxycodone and morphine have a similar medical equivalency gram for gram. *See* Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain, p. 1 7.

Studies of the clinical application of both oxycodone and morphine have shown little clinical distinction but indicate that morphine could have more serious side effects and be less safe. A study published by the Department of Anesthesia Intensive Care Medicine and Pain Therapy at La Sapienza University in Rome Italy looked at over 15 different clinical studies dealing with the clinical use of oxycodone and other analgesic medicines specifically noted the similarities between morphine and oxycodone as well as the greater risk associated with morphine. *See* F. Coluzzi, C. Mattia, Oxycodone: Pharmacological Profile and Clinical Data in Chronic Pain Management, Minerva Anestesiol, Vol.71:451-60 (2005); *see also* Gallego, *supra*, (Both studies finding that side effects such as nausea and hallucinations are more prevalent with morphine than oxycodone).

Secondly, the Commission's decision to set one gram oxycodone (actual) as equivalent to 6700 grams marihuana is not reasonable. The Commission provided no evidence that oxycodone, as compared to morphine is more dangerous when

9

diverted from clinical use to abuse. Lacking such findings, it is fair for this Court to question the appropriateness of this discrepancy in the equivalency ratios, since no other opiate equivalencies were changed by Amendment 657 and oxycodone was altered so it is now sentenced 13 times higher than morphine which it had been equal to for purposes of offense level calculation for the previous 16 years!

If the Commission made the changes contained in Amendment 657 because it had evidence that opioid analgesics were more dangerous than previously believed, they should have altered the equivalency for a number of other drugs. This did not occur because no such evidence was presented in support of Amendment 657.

An examination of the Commission materials associated with Amendment 657 reveals that there was no explanation given for why oxycodone was treated differently than morphine or codeine. Therefore, the Commission's decision to single out oxycodone when setting the new equivalency table has no reasonable basis. Accordingly, this Court may disregard that Amendment and the drug equivalency table.

### 3. The Oxycodone Guidelines Result in Sentencing Ranges that Overstate the Seriousness of the Offense

Amendment 657 has the effect of penalizing oxycodone up to 6.7 times more severely that heroin and up to 13.4 times more severely than morphine. The treatment reflects an unsound judgment as to the relative danger of oxycodone abuse compared to these other substances. In a press release dated March 27, 2003, the

Commission stated that they had voted to "increase substantially the penalties for oxycodone trafficking...hop[ing] that this enhanced penalty [would] help deter any further increase in the abuse of this drug and serve to punish appropriately those criminals engaged in its illegal trafficking." The Commission, however, did not conduct a study or otherwise engage in appropriate fact finding to conclude that the new oxycodone guidelines were rationally proportional to the harm caused. Because the resulting guideline is not based on "empirical data and national experience," it "does not exemplify the Commission's exercise of its characteristic institutional role," and it is not an abuse of discretion to conclude that it yields a sentence that is greater than necessary even in a "mine-run case." *Kimbrough*, 128 U.S. at 575.

This unreasonableness is particularly acute when the oxycodone guideline is compared to the heroin guideline. This Court can draw on its own experience that oxycodone is much less dangerous to use, and oxycodone trafficking is much less violent and destructive than heroin trafficking. Heroin is a Schedule I drug with no approved medical use. The National Institute on Drug Abuse (NIDA) has reported that Heroin is the most abused and the most rapidly acting of the opiates. *See* NIDA Research Report, Heroin: Abuse and Addiction, Revised 2005, available at http://www.ehd.org/health_heroin_6.php. Moreover, in 2004, the year after the oxycodone amendment took effect, there were 215,000 heroin related visits to hospital emergency room, compared to 51,000 for oxycodone. *See* Drug Abuse

11

Warning Network, 2004 Selected Tables of National Estimates of Drug-Related Emergency Department Visits,

http://www.samhsa.gov/data/2k9/DAWN/ED2004/2004EDTables.pdf.

The drug equivalency table in 2D1.1 sets one gram of heroin equivalent to 1,000 grams of marihuana. This proportion is 6.7 times **less** than the current oxycodone equivalency, a proportion that becomes even more pronounced when taking dose equivalency into account since heroin doses are smaller than oxycodone doses.

Heroin is associated with dangerous drug traffickers who funnel money to violent foreign cartels which the DEA have linked to global terrorism. In Congressional testimony, the DEA stated that the opium and heroin industry in Afghanistan has provided hundreds of millions of dollars to the Taliban and other terrorist organizations, money which fuels armed conflicts, insurgencies, and terrorism against innocent people. *See* March 3, 2010 Statement of Anthony P. Placido, Assistant Administrator for Intelligence, United States Drug Enforcement Administration, Before the House Oversight and Government Reform Subcommittee on National Security and Foreign Affairs; Karen P. Tandy, DEA Administrator, Testimony before the House Committee on International Relations, February 12, 2004.

Oxycodone on the other hand, is a pharmaceutically produced controlled substance, which doesn't carry the same level of drug trafficking violence or association with terrorism. Since the illicit use and distribution of oxycodone doesn't impact public safety as dramatically as heroin, it shouldn't be penalized more severely at sentencing.

Indeed, it should not be penalized more severely than the most analogous Schedule II opioid analgesic: morphine. The fact that the Commission did not conduct a sentencing impact study prior to passing Amendment 657 is particularly troubling. When acting in their "institutional role," it should be the Commission's goal to fashion sentences which are based on "empirical data and national experience." *Kimbrough*, 128 U.S. at 575.

Compare the fact that the Commission didn't consult any empirical data when revising the oxycodone guidelines with the study that accompanied the study concerning public perceptions of sentencing guidelines for heroin. That study found that for heroin, "the distribution of survey preferences was centered around the guideline range; roughly equal proportions (between 45% and 47%) of survey respondents indicated punishment preferences either above or below the range." U.S.S.C., Just Punishment: Public Perceptions and the Federal Sentencing Guidelines, 1993-1994. These results imply that from a "national" perspective, the American people believe heroin sentences are roughly appropriate. This in spite of

13

the fact that heroin causes the most opioid related deaths, fuels violence and feeds funding for international terrorists. It would strain credulity to believe that "empirical data and national experience" demand a harsher penalty for a significantly less abused, less habit forming, slower acting, and less socially destructive opiate like oxycodone.

Similarly, the Commission recently surveyed district judges, and asked them if the guideline ranges were generally appropriate for several types of offenses. For oxycodone, 29 percent of the judges who responded viewed the guidelines as "too high." U.S.S.C. Results of Survey of United States District Judges: January 2010 through March 2010, Table 8. Approximately the same number (32%) found the heroin guideline too high, notwithstanding how much lower it is than oxycodone. *Id.*

In conclusion, statistical data, even from the Commission itself confirm that the Sentencing Commission was not exercising sound, reasoned sentencing judgment when it enhanced oxycodone penalties. Further, a comprehensive look at the development of oxycodone and other similar opioid substances show that the guidelines create sentencing disparities that are unwarranted and unjust under careful comparative analysis of these substances and the offenses concerning the use and abuse of these substances. The Commission's explanation for Amendment 657 dealt exclusively with their attempt to address a drug problem. They did not offer a

14

justification for the severe increase in penalties for moderate and high dose oxycodone pills. The oxycodone guideline does not deserve judicial deference in following Congress's directive that sentences be sufficient, but not greater than necessary to satisfy the goals of sentencing.

## B. The Drug Tables Are Not Based Upon Empirical Data, or National Experience and are Unreasonable and Arbitrary

In *U.S. v. Diaz*, 2013 WL 322243 (E.D.N.Y. 2013), Judge Gleeson in a detailed opinion noted how the historic rise in the incarceration rate of non-violent drug offenders has not simply been due to the mandatory minimum sentencing laws, but also b e e n   d u e   i n   part to the Sentencing Commission's abdication of its own responsibilities.

Judge Gleeson points to a pivotal moment in sentencing policy which has thus far generated too little public attention. When the Sentencing Commission was established in 1984 to promote uniformity in sentencing, it was directed by law to craft new Guidelines by examining past sentences imposed for various federal offenses – the collective wisdom and experience of judging. But while the Commission was crafting its initial set of Sentencing Guidelines, Congress passed a new crime law in 1986, creating new mandatory minimums for certain drug offenses – the Anti-Drug Abuse Act of 1986. *Diaz*, at *1-2.

These mandatory minimum sentences were, as Congress itself noted, aimed at high-level dealers, but as Judge Gleeson notes, the Sentencing Commission then

15

made a policy decision to throw past experience out the window, and tailor its new drug Guidelines instead so that they mirrored Congress' arbitrarily-chosen 1986 minimum penalties (including the 100-to-1 crack-to-powder cocaine ratio now widely recognized as irrational). Decades of past drug sentences were then simply ignored, and the 1986 Act's numbers were substituted and used instead. But these new minimums were meant to apply only to high-level dealers – not to also bend upward the sentencing ranges imposed on players with quantities below these stated, threshold amounts. *Diaz*, at \*4-6.

In 2004 the Commission's fifteen-year report to Congress had these words for the original Commission's failure to discuss why it extended the "quantity-based" approach of the ADAA across the entire spectrum of drug trafficking sentences: "The drug trafficking guideline ... had the effect of increasing prison terms far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." *See* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 49 (2004) [hereinafter FIFTEEN YEAR REPORT ] . That Report also noted that "In addition to linking the drug amounts in the statutes to guideline ranges at the five-and ten-year levels, the Drug Quantity Table extends

16

the quantity-based approach across 17 different levels falling below, between, and above the two amounts specified in the [ADAA]." *Id.*

What resulted, as Judge Gleeson explains, is a drug sentencing scheme that unduly skews sentences across the board based on attributed quantity amounts rather than the defendant's role in the offense, financial interest, or other meaningful factor. *Diaz*, at *6-8. . Minor players received guideline sentences not tied to actual culpability, but with a myopic view toward a sentence driven almost exclusively by drug quantity. *Diaz*, at *12.    And for over  t w o d e c a d e s our federal prisons have filled with low- or mid-level drug offenders – the type  easily replaced on the streets, with crime rates largely unaffected.

This nation's judges have been telling the Commission to de-link the drug trafficking offense guideline from those harsh mandatory minimums and to reduce the sentencing ranges. *Id.* at *9.   In order to appreciate that the quantity driven sentences are out of whack, courts have begun to look at what other judges are doing with the guidelines.  Those decisions in oxycodone cases are illustrative for purposes of demonstrating how far out of whack the guidelines are.  In 2013 the Sentencing Commission's own Quick Facts shows that only about thirty percent of oxycodone offenses are within the guidelines! Importantly, the rate of non-government sponsored, below guideline sentences was 31.1% in 2012 and 28.6% in 2013 with an average reduction in 2013 of 46.5%!  See 2012 Quick Facts

17

attached as Exhibit A and the 2013 Quick Facts attached as Exhibit B.

Judge Gleeson's *Diaz* opinion is an extraordinarily well-researched opinion, from a former federal prosecutor, dissecting how our system has strayed from the rational, and come to be so different from what it once was. He calls for moving from our present sentencing scheme, largely based on attributed drug quantity, to one based far more on a defendant's role- in-the-offense and criminal history, with Guideline quantity attributions immediately reduced by one-third, so that federal drug sentencing can return to its historical norms.

As Judge Gleeson poignantly argues, without a rational, normative based sentencing system, the unnecessarily punitive drug guidelines have real human costs: "children grow up, loved ones drift away; employment opportunities fade; parents die." *Id.*, at 18.

Since the drug quantity guidelines were not based upon empirical data, or national experience, this Court is authorized to vary from that guideline.

### III. <u>CONCLUSION</u>

WHEREFORE, based upon all of the reasons and citations set forth herein, Dr. Azmat respectfully submits that the sentence set forth in the Pre-Sentence Report is greater than necessary, and that this Court is authorized to vary from the proposed guideline.

Respectfully submitted, this 30th day of July, 2014.

s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

This the 30th day of July, 2014.

s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | |
| ) | **Indictment No. CR413-028** |
| DR. NAJAM AZMAT, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT NAJAM AZMAT'S SECOND SENTENCING MEMORANDUM

COMES NOW Defendant Dr. Najam Azmat and files this, his Second Sentencing Memorandum and shows the Court the following:

## I. THE PRESENTENCE REPORT

Dr. Azmat treated, according to the Presentence Investigation Report (PSI), 188 patients at the East Health Center. PSI, ¶ 13. Dr. Gene Kennedy reviewed 25 patient files and each of those patient files related to a count or counts in the Superseding Indictment. *Id.*, ¶ 10. Out of those 25 patients included in the 50 counts of the indictment, only 9 of those patients testified at trial.

The PSI attributes every prescription tablet prescribed by Dr. Azmat as an illegal prescription. PSI, ¶¶ 13, 17. The PSI, therefore, concludes that Dr. Azmat prescribed 643,050 milligrams of oxycodone, 1800 milligrams of hydrocodone and 164 units of Xanax. *Id.* The PSI converts that relevant conduct calculation into marihuana equivalency of 4,308,435 kilograms of marihuana, *id.*, yielding a base

1

offense level 34. *Id.*, ¶ 24. The PSI, therefore, suggests that Dr. Azmat be sentenced for his 19 days of employment at East Health as if he were a massive distributor of marijuana – 4,310 kilograms, or almost 10,000 pounds! *Id.* at ¶ 17. Resultingly, the PSI calculates that Dr. Azmat's guideline sentence should be an offense level 36 (two points being added for abuse of a position of trust) and a guideline range of imprisonment of 188 to 235 months. *Id.*, ¶ 71.

## II. THE HISTORY AND CHARACTERISTICS OF DR. NAJAM AZMAT

Najam Azmat was born on July 4, 1957 in Lahore, Pakistan into a family of career military officers. His father, Nurul Haq, was a Brigadier General in the Pakistani Army, who immigrated to the U.S. following his retirement who lived in Atlanta until he passed away. General Huq's older brother, Ajail Khan, was a Captain in the British Indian Army (before Pakistan became a separate nation) serving with the Allied Forces in Burma and was awarded the Victorian Cross. Both of Dr. Azmat's grandfathers fought with the British against the Germans on the Allied Front in the First World War.

His Mother's family was non-military. Among her siblings is a retired engineer living in Canada and one of his Mother's sisters also lives in Canada and is married to a C.P.A.

Education was a priority for Dr. Azmat's parents. He was educated at private, British boarding schools in Pakistan. He attended the prestigious Cadet

2

College, which was regarded as the number one academic institute in the country. Dr. Azmat graduated at the top of his class at Cadet College and from there went to Kyber Medical College in Peshawar, Pakistan – the medical university of such great interest to the government at trial.

Curiously, the government failed to ask about Dr. Azmat's training in the United States, for following medical school, Dr. Azmat started a general surgery residency at D.C. General Hospital in Washington D.C., followed by residency training at Brookdale Hospital in Brooklyn, New York. From there, Dr. Azmat proceeded to St. Vincent Medical Center in Toledo, Ohio, where he completed a vascular surgery Fellowship and his studies ended with a Fellowship in Endovascular Surgery at the Cleveland Clinic, one of the foremost cardio vascular departments in the world.

To engage in the practice of medicine following a medical education at a foreign medical school, Dr. Azmat completed the examination conducted by the Education for the Commission for Foreign Medical Graduates, the FLEX examination (Federal Licensing Examination) and the SPEX (Special Licensing Examination). Finally, Dr. Azmat was boarded by the American Board of Surgery in 1996 and re-certified in 2006.

Both of Dr. Azmat's sisters live in England and his brother, Nabil, is a graduate of Georgia State University with a degree in Computer Sciences who

3

lives and works in the Atlanta area. His mother lives with his brother in the greater Atlanta area.

Dr. Azmat and his wife, Sameena, were married in 1995 and they have 3 children: Nausher, age 17, Neesha, age 15 and Jansher, age 10. Sameena and her children moved to Atlanta at the end of the past school year and are getting ready to begin school in a new environment in the Atlanta area. Sameena's mother lives with her and since his conviction in January of this year, the entire family has contributed to the care and support of Dr. Azmat's wife and children. This situation is made particularly challenging because Nausher is a special needs child with a movement disorder who requires special education and attention. Nausher has been treated by specialists in Washington, D.C., Atlanta and Boston. As detailed in the testimony at the detention hearing and in Mrs. Azmat's letter to this Court, Nausher presents compelling and special circumstances for raising that until January of this year had been shouldered by Dr. Azmat.

## III. ARGUMENT AND CITATION OF AUTHORITY

### A.   Section 3553 Factors

The 18 U.S.C. § 3553 factors are familiar standards to the Court. A district court must "impose a sentence sufficient, but no greater than necessary," to comply with the penal aims of punishment, deterrence, protection of the public, and providing a defendant with necessary training, care, or correctional treatment. 18

U.S.C. §3553(a); *see also* 18 U.S.C. §3553(a)(2). To that end, the Court may consider the advisory guidelines range, but it must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant," and "the kinds of sentences available." 18 U.S.C. §§ 3553(a)(1), 3553(a)(3). The Court also must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The PSI calculates Dr. Azmat's guideline as 188-235 months. Dr. Azmat is a 57 year old man. He had a heart attack in August of last year. If Dr. Azmat serves 85 percent of the proposed sentence in the PSI of 188 months of he would serve over 13 years, leaving prison as a 70 year old man.

Consideration of the §3553(a) factors indicates that this sentence is greater than necessary to achieve the penal aims of punishment, deterrence, protection of the public, and providing a defendant with necessary training, care, or correctional treatment.

**B.**   **The PSI Did Not Appropriately Calculate Drug Quantity**

The single most important factor in arriving at a Guidelines range is the calculation of drug weight pursuant to U.S.S.G. § 2D1.1. Quite simply, however, the record is characterized by the striking absence of any reliable evidence as to what portion of the relevant prescriptions was legitimately used to treat pain. As such, it

5

is impossible based on the record before this Court to make the drug weight calculation contemplated by § 2D1.1, and it is inappropriate to base such a calculation on the entire weight of the drugs prescribed by Dr. Azmat.

What is left, therefore, is only speculation as to the weight of the drugs illegally distributed versus the weight of the drugs lawfully distributed and used for legitimate medical reasons. This Court, however, cannot base a § 2D1.1 drug weight calculation on speculation. Rather, in calculating the drug amounts for purposes of the Guidelines calculation, the Court must rely on information that is reliable. *See* U.S.S.G. § 6A1.3(a) (requiring information bearing on a factor important to the sentencing determination have "sufficient indicia of reliability to support its probable accuracy); *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998) (drug quantity "may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant, [but it] cannot be based on calculations of drug quantities that are merely speculative."). The burden is on the Government to establish any factor which would increase the guideline offense level. Here, the government presented no "sufficiently reliable" evidence that would allow this Court to make a determination regarding the total drug weight attributable to Dr. Azmat.

The drug quantity found under paragraph 17 of the PSR is merely a gross calculation of pills prescribed to the patients seen by Dr. Azmat. This does not

meet the Government's burden of proof. The Government's burden is explained in *United States v. Chube II*, 538 F.3d 693, 705 (7th Cir. 2008), which held that "[f]or a prescription to be included in relevant conduct, the court must evaluate the facts surrounding that particular prescription and explain why those facts render it unlawful." The Court in *Chube* was particularly concerned because there were indications in the physicians' notes that they were trying to "wean" the patients off of their medications, just as there were notes in the patient files here that Dr. Azmat was weaning patients off of the oxycodone. *Id*. The Court further noted that those notes were supported by the fact that many of the patient files supported that view because the amount of oxycodone prescribed was reduced, *id*., exactly as done by Dr. Azmat.

Accordingly, Dr. Azmat requests that this Court discard the drug quantity found at paragraph 17 and use as a starting point the alternative presented for drug calculation found at the PSI Addendum, p. 4, which calculates the base offense level at 28 based upon the counts of conviction with a resulting advisory guideline range of 97 to 121 months.

**C.**    **Dr. Azmat Should Receive the 2 Level 2D1.1 Reduction**

Effective November 1, 2014 (unless specifically rejected by Congress), drug offenders will receive a 2 level reduction. Importantly, that 2 level reduction will have retroactive application. Therefore, as a starting point, therefore, Dr. Azmat

should receive the 2 level reduction to his offense level. See copies of U.S. Sentencing Commission Press Release and U.S. Department of Justice Press Release announcing the retroactive application of that amendment both of which are dated July 18, 2014 attached hereto as Exhibits "A" and "B." Application of the 2 level reduction would reduce Dr. Azmat's offense level to a 26 with a resulting guideline range of imprisonment of 63-78 months.

**D.**    **Consideration of the Character of the Defendant**

It has been said that a man's reputation for good character is the shadow he casts on the everyday lives of others. If that is the case, the letters submitted on behalf of Dr. Azmat speak to a man committed to serving his family and community. (See attached Exhibit "C") These letters are a testament to a loving father and husband who has left a mark for good in his community in which he has lived and among whom he has worked. A brief summary of those letters is set out below to appropriately capture the character of Dr. Azmat.

Dr. Tahir Mufti, who works at the VA Medical Center in Evansville, Indiana, writes:

> Najam and I first met in Medical school in 1975 in Pakistan, and have been friends ever since. Najam was a constant pillar in my life to lean on. Throughout my life, Najam has been a support system anyone would be grateful to have. During the transition from Pakistan to America, extreme emotional and financial struggles were faced, Najam was the one that made the transition smoother. All in all, I have always known him to be an extremely helpful, thoughtful man

who is centered around his children, wife and community at large. He has great moral values and strong family bonds. His kids are excelling in school and he supports both his elderly mother and mother in law. His friendship gave me the strength to become a better father to my children, a helpful husband, and a loyal and caring son.

Another letter came from Dr. Darlene Tanner, Principal of Ware County Middle School, who this Court will recall, testified at the hearing on the appeal from the Order of Detention. Dr. Tanner writes:

> I have known Dr. Najam Azmat since 2009 when he enrolled his children in the Ware County Magnet School. It was evident from the beginning he was a loving and supportive father who encouraged his children to approach their education seriously. Our daughters became close friends, which gave me multiple opportunities to visit at his home. I found Dr. Azmat to be a man of his word, a man who set high moral standards for his family and himself, and a man committed to his faith, family and community.

Dr. Ahmad Irfan, a physician at Southeast Georgia Gastroenterology in Waycross, Georgia poignantly writes of Dr. Azmat's professional and personal qualities:

> I have known Dr. Najam Azmat since 2004. I had a close working relationship with him. Many of my patients benefitted from his surgical skills. I find him to be a very hard working, intelligent, and capable surgeon.

> I have known Dr. Azmat on a personal level as well. Our children attend school together. I have observed him to be an excellent parent that participates in his kids activities enthusiastically. He has a special needs child, whom he works with tirelessly.

> I have always found him to be a sincere, honest, hardworking, loving and caring person. His commitment to his family and kids is truly inspirational.

Finally, Dr. Azmat's 15 year old daughter writes that:

I've always been "Daddy's little princess".  He's always been with me through everything, never missing an awards ceremony, sport game, school club, competition, or even fulfilling a promise.

My dad is my role model.  I've never known a more loving, down to earth, honest or charitable man. He is a high educated, good faith man.

Dr. Azmat's dedication to his family and community did not begin when his legal troubles started. These letters reflect the life's work of a good, caring man.

## E.   The Need to Avoid Unwarranted Sentencing Disparity

One of the goals of the Sentencing Reform Act was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). A brief review demonstrates that goal of proportionality fails with respect to Dr. Azmat for he faces a sentence akin to that of a violent and dangerous offender. In the federal system, a bank robbery of over $5,000,000 with the discharge of a firearm results in an advisory guideline sentence of 188 to 235 months. U.S.S.G. § 2B3.1 (base offense level 20 (U.S.S.G. § 2B3.1(a)) + 2 for robbing a financial institution (U.S.S.G. § 2B3.1(b)(1)) + 7 for discharging a firearm (U.S.S.G. § 2B3.1(b)(2)) + 7 for more than $5 million dollar loss ((U.S.S.G. § 2B3.1(b)(1)) for a total offense level 36.   A defendant who stands convicted of second degree murder has a base offense level of 38 (only 2 points more than Dr. Azmat) and faces a sentence of 235 months at the low end of the

guideline. U.S.S.G. § 2A1.3.  And, one who commits the despicable act of selling or buying a child for use in the production of child pornography also faces a sentence of 235 months at the lower end of the applicable guideline. U.S.S.G. § 2G2.3.

Looking to state crimes, Georgia punishes the offenses of rape and aggravated sodomy by 25 years to life. *See* O.C.G.A. § 16-6-1(b) (rape); O.C.G.A. § 16-6-2(b)(2) (aggravated sodomy). Sodomy is punishable by 1 to 20 years. *See* O.C.G.A. § 16-6-2(b)(1). Statutory rape, if the defendant is 21 years old or older, is punishable by a sentence of 10 to 20 years. O.C.G.A. § 16-6-3. First offenders in child molestation cases face a sentence of 5 to 20 years. O.C.G.A. § 16-6-4(b)(1). And, a person who commits aggravated assault with the intent to rape a child under the age of 14 faces a minimum sentence of 25 years. O.C.G.A. § 16-5-21(k).

And, looking to sentencing disparity in this case demonstrates that a variance is needed. A sentencing disparity must be between similarly situated defendants with similar records. *See* 18 U.S.C. § 3553(a)(6); *see, e.g.*, *United States v. Spoerke*, 568 F.3d 1236, 1252 (11th Cir. 2009).  The sentences meted out in this case are as follows:

11

| NAME | DATE | COUNTS | SENTENCE |
|------|------|--------|----------|
| Shelly Morford | 07/09/2014 | 1 count | 13 months imprisonment |
| Candace Carreras | 08/04/2014 | 1 count | 24 months imprisonment |
| Adelaida Lizama | 08/04/2014 | 1 count | 18 months imprisonment |
| Al Lefrancois | 07/30/2014 | 1 count | 52 months imprisonment |
| Frankie Barbuscia | 07/30/2014 | 1 count | 42 months imprisonment |
| Dan Wise | 08/01/2014 | 1 count | 42 months imprisonment |
| Kenneth Gossett, M.D. | 08/01/2014 | 1 count | 42 months imprisonment |
| Konstantinos Afthinos | 08/01/2014 | 1 count | 15 months imprisonment |
| Sean Clark | 08/04/2014 | 1 count | 40 months imprisonment |
| Louis Tremetara/Nuvest | 04/04/2013 | 1 count | $ 2 million dollar fine |

The great majority of defendants in today's criminal justice system enter guilty pleas, in part to avoid the Draconian imposition of a guideline sentence. Dr. Azmat exercised his constitutional right to a jury trial. He should not have to suffer a trial penalty for exercising that right. This Court stands as a bulwark to insure that defendants can exercise their right to trial without fear of being sentenced 3 times more severely than those who entered guilty pleas. Dr. Azmat respectfully requests a sentence in line with those handed out above.

## F.    **Collateral Consequences of Conviction**

This Court is also authorized to consider the loss of Dr. Azmat's future livelihood in determining an appropriate sentence. This Court can vary from the applicable guideline range because of the collateral consequences of his conviction to the work life he had studied and trained for. In *United States v. Anderson*, 267 Fed.Appx. 847, 849 (11th Cir. 2008) (*per curiam*) (unpublished), the Eleventh Circuit affirmed a below guidelines sentence of probation and home detention because of the defendant's loss of job and "negative consequences" that flowed from his guilty plea. *Accord United States v. Adelson*, 441 F.Supp. 2d 506, 514 (S.D.N.Y. 2006) (finding that the ruin of the defendant's reputation by his conviction already served the purpose of deterrence). Therefore, this Court can consider the fact of the loss of Dr. Azmat's ability to engage in his profession as a factor warranting a below guidelines sentence.

## G.    **Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)**

Importantly, the Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"].

13

And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of*

*Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Therefore, a lengthy term of incarceration of Dr. Azmat is not needed to vindicate any need for deterrence.

## H. Dr. Azmat's Age, Education, Family History and Marital Status make him a very low risk to re-offend.

According to the Sentencing Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for offenders over age 50. U.S. Sent'g Comm'n, *Measuring Recidivism*, at 12 & Exh.9. "The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage. The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime. The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, *An Examination*

15

*of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011).

The cost of incarcerating prisoners age 50 and older has been estimated to be two

to four times that of the general inmate population. See, U.S. Dep't of Justice,

National Institute of Corrections, *Correctional Health Care: Addressing the Needs*

*of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 11 (2004) (*Addressing the*

*Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*), *available at*

http://www.nicic.org/pubs/2004/018735.pdf.

The Commission's research also demonstrates that employment, education,

and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g

Comm'n, *Measuring Recidivism*, at 12-13 & Ex. 10; U.S. Sent'g Comm'n,

*Recidivism and the "First Offender"* 8 (2004), as does substantial other research.

In short, Dr. Azmat's age, long marriage, strong family support, education

and gainful employment until his arrest support the conclusion that he will not re-

offend.

## I.  Family Responsibilities and Loss of Caretaking Support

U.S.S.G. § 5H1.6, comment. (n. 1.B) provides that this Court may consider a

downward departure from the applicable guideline range based on loss of caretaking

support. Dr. Azmat has been instrumental in caring for his physically

and mentally disabled 17 year old son, Nausher. Witnesses have described

Nausher's condition and the care required for him - which was provided

primarily by Dr. Azmat, until his current incarceration.

U.S.S.G. § 5H1.6, comment. (n. 1(B)) provides for a downward departure on the basis of loss of caretaking support for a family member:

> (B) Departures Based on Loss of Caretaking or Financial Support.-- A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:
>
> (I) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>
>> (ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
>>
>> (iii)    The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
>>
>> (iv)    The departure effectively will address the loss of caretaking or financial support.

Courts have granted downward departures for family circumstances. In *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007), the court rejected the government's appeal of a downward departure for family circumstances after determining that the

defendant was "irreplaceable." *Id*. at 327-29. The court upheld the district court's determination that there existed no "reasonably available" alternative for the defendant's care of her father and that jailing the defendant would have forced the entire family into welfare. *Id*. In *United States v. Holz*, 118 Fed.Appx. 928 (6th Cir. 2004), the defendant's wife had mental health issues and required care that the defendant was uniquely able to provide. *Id*. at 933-34. And, in *United States v. Marine,* 94 Fed.Appx. 307 (6th Cir. 2004), a ten level downward departure sentence was upheld in a drug conspiracy involving more than 15 but less than 50 kilograms of cocaine, holding that this dramatic downward departure sentence was justified by defendant's status as the irreplaceable caretaker of her three children and one grandchild. *See also United States v. Spero*, 382 F.3d 803, 804-05 (8th Cir. 2004) (stating defendant was crucial to child's daily routine where child had a variety of developmental disorders and required intense hands-on care); *United States v. Haversat*, 22 F.3d 790 (8th Cir.1994) (noting spouse required defendant in her life on a regular basis and his constant monitoring in order to prevent her suicide).

Dr. Azmat's caretaking function with his son, Nausher, fits squarely within the four conditions set forth in § 5H1.6, comment. (n. 1(B)). This Court is authorized to apply a downward departure or downward variance based on these circumstances. Society would not be harmed if this Court were to take these

18

circumstances into consideration in imposing a downward variance that would limit as much as possible the impact on Nausher and we respectfully ask this Court to do so.

## J. **Cumulative Factors Warrant a Variance**

Factors that support a downward variance, or departure include (1) Dr. Azmat's age, he turned 57 last month while incarcerated, (2) the need for unwarranted sentencing disparity, (3) the complete lack of any chance of recidivist behavior, (4) his combination of serious health problems, (5) his lack of prior criminal record, (6) his having been punished already by the loss of his medical licenses and professional career as a result of his conviction, and (7) the serious nature of his oldest son's health problems.

These factors and those set forth above establish that Dr. Azmat's case and his personal circumstances are far outside the heartland of cases contemplated by U.S.S.G. § 2D1.1 and § 2S1.1, and justify a substantial downward departure and downward variance. "[W]hen a court finds an atypical case, one to which a particular guideline linguistically applies but [in which] conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Koon v. United States*, 518 U.S. 81, 98-100 (1996). A departure is appropriate in the extraordinary case that falls outside the "heartland" of typical offenses covered by the conviction. This is such a case.

Dr. Azmat leaves for the Court the appropriate amount of any variance and imposition of sentence.

## III. <u>CONCLUSION</u>

WHEREFORE, Dr. Azmat respectfully requests that he be sentenced in accordance with the above stated reasons and authorities.

Respectfully submitted, this __5th__ day of August 2014.

<div align="right">

s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

</div>

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

This the  5th  day of August, 2014.

<div align="right">

s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

</div>

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:  (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

# EXHIBIT "A"



# U.S. Sentencing Commission
One Columbus Circle NE
Washington, DC 20002-8002

## NEWS RELEASE

July 18, 2014

**Contact:** Jeanne Doherty
Public Affairs Officer
(202) 502-4502

### U.S. SENTENCING COMMISSION UNANIMOUSLY VOTES TO ALLOW DELAYED RETROACTIVE REDUCTION IN DRUG TRAFFICKING SENTENCES
*Commission Authorizes Judges to Reduce Drug Sentences for Eligible Prisoners Beginning November 2015 if Congress Allows Guidelines Change to Stand*

WASHINGTON, D.C. (July 18, 2014) — The United States Sentencing Commission voted unanimously today at a public meeting to apply a reduction in the sentencing guideline levels applicable to most federal drug trafficking offenders retroactively, meaning that many offenders currently in prison could be eligible for reduced sentences beginning November 2015.

The Commission voted unanimously in April to amend the guidelines to lower the base offense levels in the Drug Quantity Table across drug types, which may mean lower sentences for most drug offenders going forward. Today the Commission decided that judges could extend that reduction to offenders currently in prison, but with a requirement that reduced sentences cannot take effect until November 1, 2015. Under the guidelines, no offender would be released unless a judge reviews the case to determine whether a reduced sentence poses a risk to public safety and is otherwise appropriate.

"This amendment received unanimous support from Commissioners because it is a measured approach," said Judge Patti B. Saris, chair of the Commission. "It reduces prison costs and populations and responds to statutory and guidelines changes since the drug guidelines were initially developed, while safeguarding public safety."

Congress has until November 1, 2014 to disapprove the amendment to reduce drug guidelines. Should Congress choose to let the guideline reductions stand, courts could then begin considering petitions from prisoners for sentence reductions, but no prisoners could be released pursuant to those reductions before November 1, 2015.

"The delay will help to protect public safety by enabling appropriate consideration of individual petitions by judges, ensuring effective supervision of offenders upon release, and allowing for effective reentry plans," Saris said.

The Commission is tasked by law with minimizing the likelihood that prison populations exceed capacity. Currently, the Federal Bureau of Prisons population exceeds capacity by around 32%. Under today's change addressing this problem, the Commission estimates that:

- 46,290 offenders would be eligible to have their cases reviewed by a judge to determine if their sentences should be reduced;

1

- Offenders eligible for a reduction could have their sentences reduced by an average of 25 months, or 18.8%. They would still serve 108 months, on average.
- Over time, these sentence reductions could result in a savings of up to 79,740 bed years (a bed year is the equivalent of one federal prisoner occupying a prison bed for a year).

The year-long delay in implementation of this change will allow judges more time to consider whether each eligible offender is an appropriate candidate for a sentence reduction and will give the government adequate time to object to sentence reductions when prosecutors believe public safety may be at risk. The delay will also give time for the federal Office of Probation and Pretrial Services to prepare for effective supervision of released offenders in the short term and will enable the Federal Bureau of Prisons to ensure that each prisoner receives transitional services including placement in halfway houses to help increase the chances of successful reentry into society.

"We listened very closely to the law enforcement community, and the amendment we voted for today seeks to address concerns about public safety," Saris said.

The Commission studied offenders released early after a similar 2007 amendment to the guidelines reducing sentences for crack offenders and found that those offenders were no more likely to reoffend than offenders who had served their original sentences.

The amendment the Commission approved in April, which was supported by the Department of Justice, the Judicial Conference, and many others, generally reduces by two levels the base offense levels for all drug types in the Drug Quantity Table in guideline §2D1.1, which governs drug trafficking cases. The drug guidelines under the amendment would remain linked to statutory mandatory minimum penalties.

The issue of whether to make the change to drug sentences retroactive drew more than 60,000 letters during a public comment period, including letters from members of Congress, judges, advocacy organizations, and individuals. The letters overwhelmingly favored retroactive application of the reduction in drug sentences. The Commission also heard testimony for and against retroactivity from a wide variety of experts at a June public hearing.

"The step the Commission is taking today is an important one," Saris said, "but only Congress can bring about the more comprehensive reforms needed to reduce disparities, fully address prison costs and populations, and make the federal criminal justice system work better."

More information about today's vote and amendments to the federal sentencing guidelines is available on the Commission's web site at www.ussc.gov.

### # # #

*The United States Sentencing Commission, an independent agency in the judicial branch of the federal government, was organized in 1985 to develop a national sentencing policy for the federal courts. The resulting sentencing guidelines provide structure for the courts' sentencing discretion to help ensure that similar offenders who commit similar offenses receive similar sentences.*

# EXHIBIT "B"

**JUSTICE NEWS**

## Department of Justice

Office of Public Affairs

FOR IMMEDIATE RELEASE                                        Friday, July 18, 2014

### Statement by Attorney General Holder on Sentencing Commission Vote Approving Retroactivity of Sentence Reductions for Drug Offenses

WASHINGTON—Attorney General Eric Holder today released the following statement regarding the U.S. Sentencing Commission vote approving retroactivity of sentence reductions for drug offenses:

"The department looks forward to implementing this plan to reduce sentences for certain incarcerated individuals. We have been in ongoing discussions with the Commission during its deliberations on this issue, and conveyed the department's support for this balanced approach. In the interest of fairness, it makes sense to apply changes to the sentencing guidelines retroactively, and the idea of a one-year implementation delay will adequately address public safety concerns by ensuring that judges have adequate time to consider whether an eligible individual is an appropriate candidate for a reduced sentence. At my direction, the Bureau of Prisons will begin notifying federal inmates of the opportunity to apply for a reduction in sentence immediately. This is a milestone in the effort to make more efficient use of our law enforcement resources and to ease the burden on our overcrowded prison system."

14-756                                                        Attorney General

# EXHIBIT "C"

Judge William T. Moore ,Jr

United States District Court.

Your Honor,

My name is Tahir Idris Mufti M.D., a practicing physician and Associate Chief of Primary Care of Veterans Affair Medical Center in Evansville, Indiana. Najam Azmat and I first met in Medical School in 1975 in Pakistan, and have been friends ever since. Through it all Najam was a constant pillar in my life to lean on. We remained close after medical school, throughout professional training and now, during our adult lives.

When I realized I had this opportunity to explain to the court the type of person Najam is, a million of memories flashback to me. Throughout my life, Najam has been a support system anyone would be grateful to have. It started with studying together in Medical School: helping me understand topics, surprise coffee deliveries which then carried on to our professional training. During the transition from Pakistan to America, extreme emotional and financial struggles were faced. Najam was the one that made the transition smoother, he helped me find a training spot and housing. Later on in our adult life, we were fortunate enough to live in the same neighborhood for a couple of years. Our families became close friends and I always felt safe knowing I had a dear friend down the street that would help my family if any problem surfaced. All in all, I have always known him to be an extremely helpful, thoughtful man

who is centered around his children , wife and community at large.

Najam is married to Samina, his wife of 19 years, and amongst them have raised 3 beautiful kids, 2 boys and 1 girl, with great moral values and strong family bonds. He has a very positive impact on his immediate family. His Kids are exceling in school and becoming to be a responsible and caring adults. Also, he has supported his mother in every respect. When his father passed away, he immediately supported his widowed mother who was going through difficult health challenges as well and still is to date. He supports both his elderly mother and his mother-in-law who live with him. His friendship gave me the strength to become a better father to my children, a helpful husband, and a loyal and caring son.

Tahir I Mufti     3.30.14.

6211 East Waterford Blvd

Evansville IN 47713

812-490-9075



# *Ware County Middle School*

2301 Cherokee Street
Waycross, GA 31503
Phone: 912-287-2341
Fax: 912-287-2353

*Principal*
Darlene Tanner, Ed. D.
*Academy Principals*
Emily Anderson
Beth Carter
Lamar Smallwood

April 5, 2014

The Honorable Judge William T. Moore, Jr.

U.S. District Court

Savannah, GA 31401

Dear Judge Moore:

I have known Dr. NaJam Azmat and his family for the past seven years. In the spring of 2009, Dr. and Mrs. Azmat met with me to enroll two of their children in the Ware County Magnet School for the 2009-2010 school term. During our meeting, Dr. Azmat was excited about the educational opportunities provided at the school. It was evident from the beginning he was a loving and supportive father who encouraged his children to approach their education seriously.

By August of 2009, Dr. Azmat's daughter, Neesha, and my daughter became close friends. As a result of their relationship and the Azmat's involvement in our school, I had multiple opportunities to converse with them and to visit with them in their home. Throughout this period, I found Dr. Azmat to be a man of his word, a man who set high moral standards for his family and himself, and a man committed to his faith, family, and community.

Thank you for taking the time to read my letter.

Sincerely,

Darlene Tanner

Darlene Tanner

Principal

*Children are our future. We are dedicated to their success.*

# DIGESTIVE DISEASE CONSULTANTS, P.C.
## SOUTH GEORGIA ENDOSCOPY CENTER, INC.

1501 Alice Street · Waycross, Georgia 31501
Phone (912) 285-0877 · Fax (912) 287-0387

**S. A. CHOUDHRI, M.D., AGAF, FACG, FACP**
Board Certified in Internal Medicine & Gastroenterology
Clinical Assistant Professor - Medical College of Georgia

**CRAIG M. KUBIK, D.O., FACP, FACG**
Board Certified in Internal Medicine & Gastroenterology
Clinical Assistant Professor - Medical College of Georgia
Clinical Assistant Professor - Georgia Campus - PCOM

April 11, 2014

The Honorable Judge William T. Moore, Jr.
U.S. District Court
Savannah, Georgia 31401

RE: Dr. Najam Azmat

Dear Sir:

I met Dr. Najam Azmat when he moved to Waycross, Georgia in 2009 and began working at Satilla Regional Medical Center. My professional experience with him at the hospital has always been satisfactory. In my experience he took very good care of his patients, seemed to be a caring and ethical physician, and was not an outlier in his prescribing of narcotics to patients. Since I have a ten year old, I also have experience with his family, as he has a son in the fifth grade at the same school as my daughter. His son is probably one of the brightest children in our school, as well as a very well behaved child. To me that would be a reflection of the values that were instilled in him by his parents. From what little I have seen of Dr. Azmat's interaction with his family, he seems to be an excellent father who has done a very good job of raising his children.

It is my sincerest hope that you would find it in your professional judgement to allow him to reunite with his family as soon as possible. His children are at a very impressionable age and are doing very well in school, and I believe they will be model citizens if they have minimal disruption in their lives. Dr. Azmat will have paid quite a price up to this point by losing his medical licenses and effectively wiping out all the years of education and training that he has had. Any further punishment to a person of his age and his physicial health will probably not be a benefit to his family or society, in my opinion.

Sincerely,

Sohail A. Choudhri, M.D.



# SOUTHEAST GEORGIA
# GASTROENTEROLOGY, P.C.
### AHMAD IRFAN, M.D.

2003–A Pioneer Street
Waycross, Georgia 31501

Telephone: 912-284-1210

April 14, 2014

Judge William T. Moore, Jr.

United States District Court

Savannah, GA

Dear Honorable Judge Moore:

I have known Dr. Najam Azmat since 2004, when he moved to Waycross, GA and established a practice of General and Vascular surgery. I had a close working relationship with him. Many of my patients benefited from his surgical skills. He took care of a lot of emergencies and performed numerous elective surgeries on my patients and my colleagues' patients as well. I find him to be a very hard working, intelligent, and capable surgeon.

I have known Dr. Azmat on a personal level as well. His children have attended school with my children. I have always observed him to be an excellent parent that participates in his kids activities enthusiastically. He has a special needs child, whom he works with tirelessly. My family and I always appreciated his dedication to his kids and his family.

In my dealings with him, I have always found him to be a sincere, honest, hardworking, loving, and caring person.  His commitment to his family and kids is truly inspirational. I have witnessed the devastating effect his current situation has brought to him and his family. If there is one person who deserves a second chance, that would be him.

Please consider his services to numerous patients, who have nothing but nice things to say about him and grant leniency in your final judgment so that he can return to a productive and meaningful life.

Sincerely,

Ahmad Irfan, MD, AGAF, FACG


**MAYO CLINIC**
**HEALTH SYSTEM**

**Waycross**
1900 Tebeau Street
Waycross, Georgia 31501
912-283-3030

04/12/14

Judge William T. Moore, Jr.
United States District Court
Savannah, Georgia

Dear Honorable Judge Moore:

I have known Dr. Najam Azmat since 2004 when he moved to Waycross, Georgia and had a General/ Vascular surgery practice that was next to my office. I had a very good working relationship with him. He was a member of the trauma team of our hospital. He took care of a lot of emergencies and saved so many lives. Furthermore, he performed numerous elective surgeries on my patients. I found him as a very dedicated worker and a good surgeon.

In my personal dealing and relationship with him, I witnessed Dr. Azmat as an honest, caring, and sincere person. His children are attending the same school as my children, and I have observed him to be an exceptional father who participates in his children's activities with joy and fun. He has an older son who is a special needs child, and I have seen Dr. Azmat working with him tirelessly. My wife and I admire Dr. Azmat for his dedication to his children and family as a whole.

I have witnessed the devastating effect on Dr. Azmat because of his current situation. He suffered a heart attack, and his family has suffered a great deal because of these circumstances. If there is a second chance for a person who deserves and needs it, there is no doubt in my mind that would be him.

Dear Judge, before you give your final judgment, please consider his services to so many of his past patients because he could be useful to so many patients in the future. Please grant leniency in your judgment so he can return to a meaningful life, serve the community, and raise his family.

Sincerely

Muhammad Akram, M.D., M.P.H.
1921 Alice Street
Waycross, GA 31501

208 Hazard Street
Waycross, Georgia 31501
April 24, 2014

Dear Honorable Judge Moore,

I became acquainted with Dr. Najam Azmat and his family when he and Mrs. Azmat enrolled their children at Memorial Drive Elementary School. I became the assistant teacher to work with their special needs son.

In my visits to the family home, I found Dr. Azmat to be very likeable, intelligent, loyal and faithful to his family. He showed great interest in the development of his children academically, socially and physically. He was very involved to make them well rounded children. Dr. Azmat took great pride in their accomplishments.
His situation is affecting his children.

Sincerely,
Gloria J. James
912-283-9490

April 10, 2014

Judge William T. Moore, Jr.

United States District Court

Savannah, GA

Dear Judge Moore,

I have known Dr. Azmat for two years. My knowledge of Dr. Azmat is limited to the time spent with his son and himself at Ware County High School, as his son is now in 10th grade. He seems to truly care for his family in the most upstanding way. He has been very supportive of the programs that his children are in at school. He is also very involved with the decisions that have been made on his son's behalf. If there has ever been a question or cause for meeting concerning school, he was only a phone call away. Both he and Mrs. Azmat have been very involved parents with both academic programs and extracurricular activities. I have personally seen Dr.Azmat with his children at both YMCA of Waycross as well as Trembling Earth Recreation Department in Waycros. It is very apparent that he cares for his family and supports them financially.

Please, Consider his situation sympathetically, so he can come back home to his children.

Sincerely,

Coach Matt Collin

Ware County High School

813 Garrison Circle
Waycross, GA 31503
March 20, 2014

Judge William T. Moore, Jr.
United States District Court

Dear Sir:

I met Najam and Sameena Azmat at my place of employment, Craven Harris Associates,
an accounting and tax preparation firm in Waycross. I have observed these qualities in
Dr. Azmat:

- His profession requires ethical conduct
- He has a stable marriage
- He provides support for his wife and their three children
- Both parents model a strong work ethic
- He has a strong desire to serve the community
- He appreciates the opportunities of living in this country

In my opinion he is an honest person who deserves to rejoin his family.

Sincerely,

*Barbara Getter*

Mrs. Barbara Getter
Office Manager

The Honorable Judge William T. Moore, Jr.
United States District Court
Savannah, GA

Re: Character Reference- Dr. Najam Azmat

Honorable Judge Moore,

I am a neighbor of Dr. Azmat and have lived in the same neighborhood with the Azmats for 4 years. My grandchildren are friends with Dr. Azmat's children. His children have been to my home and my grandchildren have been to their home. As a result I have the opportunity to observe Dr. Azmat as a father, husband and neighbor. I found Dr. Azmat a loyal family man. He is a loving father. His children are very attached with him. He has a special need son. He is fully involved in his children's activities. The present situation is devastation for his family. I know Dr. Azmat is a dedicated and compassionate doctor. He is a sincere, honest and good family man.

Thank you for your kind consideration.

Respectfully,

Lydia Brown

Lydia Brown   4/21/14

912-284-1319

Cell 912-390-0007

To Judge William T. Moore, Jr.
US District Court


Dear Judge Moore,

My impression of Dr. Azmat is that he is a hard-working individual. He takes good care of his family and is on friendly terms with all the neighbors. I think he deserves to be released.

Yours truly,

Sonja Craven

# DIGESTIVE DISEASE CONSULTANTS, P.C.
# SOUTH GEORGIA ENDOSCOPY CENTER, INC.

1501 Alice Street · Waycross, Georgia 31501
Phone (912) 285-0877 · Fax (912) 287-0387

**S. A. CHOUDHRI, M.D., AGAF, FACG, FACP**
Board Certified in Internal Medicine & Gastroenterology
Clinical Assistant Professor - Medical College of Georgia

**CRAIG M. KUBIK, D.O., FACP, FACG**
Board Certified in Internal Medicine & Gastroenterology
Clinical Assistant Professor - Medical College of Georgia
Clinical Assistant Professor - Georgia Campus - PCOM

April 10, 2014

The Honorable Judge William T. Moore, Jr.
U.S. District Court
Savannah, Georgia 31401

RE: Dr. Najam Azmat

Dear Sir:

I am a physician on the staff at Mayo Clinic Waycross Campus, and was there during Dr. Najam Azmat's tenure. He was personable and collegial. I found him to be a competent general surgeon, but had no experience with him as a vascular surgeon. He seemed a physician who took the care of his patients seriously, and his use of narcotics on post-operative patients seemed reasonable. I know of his case only what I read in the newspaper, but doubt Dr. Azmat was the mastermind behind this scheme. Much more likely, he was a gullible physician who got in over his head.

Thank you for your time,

Craig M. Kubik, D.O.

The Honorable Judge, William T. Moore, Jr.
United States District Court
Savannah, GA

Honorable Judge Moore,

Please allow me to say a few words about my husband, Dr. Najam Azmat.

I have known Dr. Najam Azmat for over 21 years and have been married for 19 years. We met in New York while he was in general surgical training. I was with him for a good part of this training and subsequent training in vascular surgery, followed by his practice in Kentucky and Georgia. When we first met, I found him to be an honest person, who was extremely dedicated to his profession with a very caring nature. In over 20 years of our relationship, I can say without any hesitation, that this has not changed a bit.

He has always been selfless and caring for his patients and I have personally witnessed him to place his patients before his family. I once confronted him with this, to which his response was that caring for his patients was an obligation that comes first. Nothing has changed in all the years that I have known him.

My husband is such a simple and sweet person. Sometimes he asked me, "Honey, do we have some funds to go on vacation" because he never keeps track of money or money was never an ultimate object of attraction for him. When he first opened his own office in Kentucky and he was in the process of applying to be a provider for Medicare, Medicaid and other insurances, there was a gap of at least 3 months. This did not keep him from taking care of his patients. In fact, he performed 8 surgical procedures in the first month and over 40 procedures in the next month that he knew he will not be paid for. This did not bother him one bit. He always tells me that he will not turn away a patient just because they cannot pay him. In fact all through his career he performed surgical procedures for free on scores of patients that did not have insurance coverage. Another example of the fact that money has never been a motivating factor in his patient care is that he never sent away any patient account that was unpaid to a collection agency and continued to take care of patients even though their accounts were unpaid. As if this was not enough, I personally noticed while helping him in his office that he never looked at any patients account.

Just because he is dedicated to his profession has not kept him from being a good husband and a good father. He takes care of our 16 year old son, who has special needs and is now grown to where it is not possible for me to handle at times. He is very attached to Najam who takes care of him like giving him a bath and shaving etc. At the same time he finds times to play baseball and golf with our 10 year old son, Jansher. He actively participated in his little league practices and games. With his loving nature, he also understands my 15 year old teenager daughter and get along with her very patiently.

Since I wanted to finish my Masters in Healthcare Management, he always supported me and paid all my college tuitions.

As a member of our community, everyone loves him. He is one of those fellows who is full of life. He was a very active member in the organizing committee who made an effort to save the closing of the magnet school. He made a very passionate speech at the school board meeting. When our son's friend and playmate tragically died in an accident, Najam made a very moving speech at his funeral in the church which was attended by the entire police department because he was a policeman's son.

My husband had suffered enough during his incarceration and knowing him as I do, I am sure he is extremely remorseful for all that happened. My husband worked so hard in his life to achieve all this education and degrees. Knowing him like I do, he would never do anything in bad faith, ever. My plea is for your kind consideration and I beg you to release my husband at the earliest so he can be with his family that badly needs him. Your sympathetic decision will not only give my husband another chance at life but also save my whole family.


Thank you

Sameena Azmat (wife)
707 Confederate Way,
Waycross.GA 31503
912 223 9599

Judge Moore,

Your honor, please allow me a chance to open my heart and ask your forgiveness and mercy for my husband.

On January 13, 2014 my husband's case started and on January 17, 2014 it was over. It seemed to me that a tsunami came and swept away my home that was built for over 19 years. Together we overcame all ups and downs of life. I and Najam are not only husband and wife; we have a deep friendship and love for each other. Together we have 3 beautiful children. My older son, Nausher is now 17 years old. He is a very special child. His doctors called him a miracle child. When he had a cardiac arrest right after birth, it was Najam and another anesthesiologist who gave him CPR and saved him. He had another cardiac arrest while transporting him to a bigger city. After staying in the ICU for three weeks, we brought him home. The ICU nurses told me that your husband stood beside the baby for almost first 72 hours, just monitoring his vital signs and praying for him. Nausher had a touch and go situation for first 72 hours of his life.

Once we brought him home, the struggle started. Najam used to tell me that surgery residency was a huge challenge but raising a special baby was the hardest of anything that he had ever done. He dedicated all his time for this baby. I was so heartbroken and often got frustrated. Najam has the patience, medical knowledge and lots and lots of energy that made the difference in Nausher's life. My doctor said that if we were not Nausher's parents, he would have been a totally different child. I used to cry a lot and felt that it was my body that could not protect Nausher. One day Najam took me out and said the most beautiful encouraging thing to me. He said that it didn't matter if Nausher couldn't be a doctor, lawyer or rocket scientist, but he will always be with us. Without his encouragement and help, he wouldn't be able to raise this child. He gave him a life. (He has the same kind of attitude and sincerity towards all of his patients regardless of where they come from.)

Najam used to give him baths from when Nausher was born, up until now every day. He made instruction charts for me. From everyday little things like brushing teeth, shaving, baths, breakfast and then picking and dropping him at school, dad is always there. Najam made sure to be available for all his school meetings for writing his IEP.

We were in Waycross for almost 9 years. Nausher grew up there from elementary school up until high school. He has a severe movement disorder. But many students are with him since elementary school. They accepted him and care for him. Nobody bullies him. I have recently moved to Atlanta to work. I do not have anyone to take care of my son when I am not available. During summer vacation, my daughter stays with him. I still have to take care of his certain needs before I go to work. Once the school will start on August 11, my daughter will not be available. I would not be able to go to work. Sending Nausher to a new public school, in a bigger city is also challenging at this time because of his movement disorder.

Since January 2014, not only that my life is totally destroyed and devastated, but Nausher is also extremely upset. He cannot express himself but he knows that Daddy is not here. He is totally lost without him and in distress. His Dad was always there to take care of him. Although, Najam has not been home for almost 7 months, he still talks to him all the time. He calls his name all day and pretends that he is talking to his Daddy. It is heartbreaking to see. At times he gets really frustrated and started hitting everyone and shows anger and defiance.

He is normally not an aggressive child, but he is unable to understand the situation. He asks me many times, "Where is Daddy? When can I go home?"

Your honor, its takes me 45 minutes to go to work and 45 minutes to come back. As soon as I get on the highway, a federal court appears in front of my eyes. It's a one man court. I take everyone's position, from the prosecutor, to defense, to expert, witness, and defendant. I argue like them for 45 minutes to work and back, every single day for the last 7 months. Then I come home and search for answers raised by them. Normally, I find answers for every question raised by anyone.

I researched all night that time, and many more nights afterwards. I found out that every act of humanity is done in good or bad faith. Everything that we think, do, or plan to do depends on faith. Even all religions depend on faith. You cannot see God, but you believe and have faith that He is there in your life all the time. Millions and millions of people have faith, which leads their life through happiness and pain.

Honorable Judge, I strongly believe that God has not only given you the highest position in life with all the legal knowledge and wisdom, but also gave you the power to look into someone's eyes and enter their hearts and find out the truth.

Over a span of 19 years, I've seen that my husband is the most honorable, professional, honest, and sincere doctor. He is a very caring and devoted father.

Please send him home not for me, but for his children, and his special child, who is calling for his Daddy all day long.

Thank you for allowing me to show you the most beautiful part of my husband—the Dad.

Sameena Azmat
707 Confederate Way,
Waycross. GA 31503
(912 223 9599)

Dear Judge Moore,

        I am Dr. Najam Azmat's mother, and wish to describe to you what kind of person my son really is. My husband, Najam's dad, passed away a few years ago otherwise he would have been the one to share these thoughts with you.

Our son, Dr. Najam Azmat was educated in private boarding schools from 3rd grade to 12th grade. These schools were run by the British and provided the highest level of education in the country. Najam excelled in studies and was always the top student in each grade level. His name is on honor board, displayed in the Assembly Hall at the Lawrence College Prep School in Murree, Pakistan, as the "All Round Best" student. He graduated in the top 10 of his medical school class of 300 students. His surgical training took place in Washington D.C., New York, Ohio and at some of the world renowned institutes, like Cornell University Medical Center, New York for General Surgery, and The Cleveland Clinic for Endo-Vascular Surgery. He passed all his exams, which included ECFMG, to enable him to practice in the United States;  FLEX, to get a license to practice in all 50 states;  SPEX, a special licensure qualification exam;  Board Certification in Surgery;  and Re-Certification in Surgery—all in the first attempt.

But, what stands out above his excellent educational qualifications and achievements is his dedication to the profession and the caring attitude that his late dad and I have noticed throughout his life. This was the motivating factor which steered his pursuit of a medical profession.   It is a blessing for us as parents to have a child like Najam, who has, and continues to take care of me and his dad, as long as he lived.

My son is a very loving, caring and responsible person. The whole family is devastated by this situation. Everyone is shocked and sad. The thought and the pain of ever losing my son and my guardian, at this age are unbearable. I am an old person with lot of medical problems. After my husband's death, I lean on my older son for every advice.  He is always standing by my side whenever I am sick or in hospital.

While I'm not familiar with the details of his present case, knowing my son, he must have made a good faith effort to take care of his patients. He is dedicated to the care of his children; above all he's a useful member of the community that he resides in. Given your favorable consideration, both, his family and the community that he resides in will benefit.

As a mother, I make a plea for your kindness and to allow my son to return home. I am confident that the lesson he has learned from his incarnation will not be wasted.

Thanking you,

Akhtar N. Haq

1075 Chandler Ridge Drive
    Lawrenceville.
      GA 30045
  678.377.9475.

Judge William T. Moore, Jr.,

United States District Court

Savannah. GA

Dear Judge,

My name is Zebun Nisa and I am Dr. Najam Azmat's mother in law. I live with Najam for almost Last 11 years. I have two of my own sons in London, England. My own sons are married and well establish there. They also love and respect me a lot. I always have a choice to go and live close to them. But in 2003, I came to visit Najam and Sameena when their third child was born. My health was really bad at that time. Najam suggested me to stay with them, so he can look after me. Since then I had almost 5 different surgeries. Najam took care of me. His medical advice and care help me a lot. He took the responsibility to take care of me because of my health issues. In today's world, your own children often neglect you or abundant you or get busy in their own lives. I do not have a blood relation with him but it is more than that. We have a love and trust relationship. I do not make any decision, medical or personal without his input.

My son in law is a man of very high values. I have known him for almost 20 years. I can assure you that he would never intentionally harm anyone. He must have done everything in good faith. People do make innocent mistakes in life. My mind is unable to understand and believe anything.

I want to beg you from the bottom of my heart to allow him another chance of life. His children are waiting for him every day. Please, give this family one more chance. As much as I know him, he must be extremely sorry and regretful for all that happened.

I am requesting for your kind and compassionate decision in saving this family.

Thanking you

Zebun Nisa

Zebun Nisa

707 confederate Way

Waycross. GA 31503

Nabil Azmat

1075 Chandler Ridge Drive,

Lawrenceville, GA 30045

April 14, 2014

Honorable Judge Moore,

     I am writing this letter in support of Dr. Najam Azmat.

Dr Azmat is my older brother by almost 14 years. As far back as my memory takes me, I have always looked upon him for support. He is responsible for bringing me into this country and taking care of me from the first day here, until I got on my feet after finishing my studies and obtaining gainful employment. He not only paid for tuition for my college education but also provided living expenses during my entire undergraduate education. He did so to enable me to concentrate on my studies without any financial worries.  He was supporting me at a time when he was himself in training to become a surgeon and had limited resources.

All my life I have looked up to my brother for guidance and advice, both of which have been invaluable for me. I could not have asked for a better person in my life. He worked very hard all his life to achieve everything.

I know my brother has high morals and is a person of great integrity, which I have personally observed and learned from him. He has been very kind, thoughtful and fulfilling for every need of the family. I have also personally observed his love and commitment to his special child, Nausher. Although he love and is fully involved in his younger son, Jansher baseball and golf games and other activities.

While I am not fully aware and understand the charges against my brother or the evidence against him, I do know that he has suffered more than he deserves. As such please consider my plea to allow him to come home to his family. The equation of this family, without Najam will always be incomplete. We sincerely do pray and request you that he gets a second chance.

 We await your kind and sympathetic consideration.

Thanking you.

Honorable Judge Moore,

My names Neesha Azmat. I'm 15 (and a half) and I'm the daughter of Dr. Najam Azmat. I'll be honest, I don't know where to start or what to say. Recently, I truely haven't known what to say. I didnt realize that this court case was as big as it was because my dad never discussed it with me. The day I came to the realization that this is a serious matter was probabley the day my mom and dad left for Savannah (for the case). I was standing in the driveway with my dog Blaze, waving goodbye to my dad. He looked at me and smiled and then looked away for a brief while. He smiled at me again but it wasn't the same smile. I may be just a child, but I can tell the difference between a "goodbye" smile, and smile full of pain. I realized he truely didnt want to drive away and it hurt him; no one likes to see their parents hurting. My dad is a very strong man, who is courageous and doesnt show pain, but that day was one of the few times I've seen his

vulnurability. I tend to argue with my parents about a lot of things, but through all my words of hate (which I'm ashamed of), I've never seen my dad hurt on the outside, He's always forgiven me, and loved me reguardless of the circumstances. I've always been "Daddy's little princess", which is my proudest title. He's always been with me through everything, never missing an awards ceremony, sports game, school club competition, or even fulfilling a promise. My dad and I have been talking about how fun it would be for him to teach me to drive upon getting my learners permit. Well I got my permit last month and he wasn't there with me the first time I sat in the drivers seat. That made me realize how devistating it would be if he missed any other important event in my life (prom, graduation, drivers liscense, starting college). I can't see myself moving through life without him by my side, He literally called ~~himself~~ himself my "biggest cheerleader."

My dad is my role model. I've never known a more loving, down-to-earth, honest, or charitable man. I look up to my dad in everything I do. I hope that 1 day I can be half the man he is. I'm aware that everyone makes mistakes. I'm also an avid believer in forgiuness. How can one learn and

move foreward in life without a second chance? I believe that God gives us chances and that Jesus died for our sins. I also believe that my dad is a good man. In my heart, I fully believe that God has a great plan for my family — that involves my dad. I trust that God will shine light on my family & lead us in the right direction. I pray to God day and night to reunite me with my dad, and now I'm asking you, human to human, not as case #....., to please release my dad and let him come home. I miss him, so much that it hurts to think about it. I have trouble going to school and saying the word "dad" when talking to my friends, or even with my family. I can't even find the strength to talk to him on the phone. I don't know what to say. He writes me but I don't know what to write back. I don't wanna say the wrong thing and hurt him. What kind of child is afraid of talking to their parents? My dad doesn't deserve what he's going through, because he's such a high educated, good faith man. My mom is also trying hard to hold it together. I can see her hurting all the time. She doesn't want to go anywhere or do anything. She's got all the stress of the family on

her shoulders. We all have really bad days sometimes, but the worst was the final day of the case. I've never cried so hard in my entire life. My mom called me sobbing and it was the most terrifying thing I've ever witnessed. The pain has never felt so real. I've decided that that was the worst day of my life. I lost so much that day.

I just ask of you now to please drop this case. I'm not 100% aware with the details of the trial, however. I know that my dad has the highest morals of any man you'll ever meet. He always does what is ethically right and wouldn't do something with ill faith, and this is a fact. However

With your experiance and honesty along with fairness, I ask that you please drop this case and let me have my dad back. My family is falling apart and pretty much broken, only my amazing dad can put the pieces back together.

Thank you so much for reading this letter. I wrote out my heart with all honesty and put what was in my mind onto paper, something I found hard to do at first, however once I got started, the words flowed easily. Thank you for your time

Sincerely,

Neesha Azmat

SENTENCING
MINUTES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JUDGE: WILLIAM T. MOORE, JR.
DATE: 8/6/14

CRIMINAL CASE NO. CR 413-28-04
UNITED STATES OF AMERICA VS. NAJAM AZMAT

COURTROOM DEPUTY BODAFORD

COURT REPORTER ROOT

ATTORNEY(S) FOR THE GOVERNMENT:

KARL KNOCHE/GREG GILLULY, JR.

U.S. PROBATION OFFICER:

JACOBS, BRAGG

_✓_ Presentence Report Reviewed In Full

_____ Objections to Factual Basis

_✓_ Objections To Guidelines Calculations

_____ Probation Officer Testifies

_____ Changes Ordered in Factual Basis/Calculations

_____ No Changes Ordered

_✓_ Findings Of The Court

_✓_ Factual Witnesses Testify

_✓_ Statements Of Counsel

_✓_ Statements By Defendant

_✓_ Sentence Pronounced

OTHER DIRECTIVES OF THE COURT

_____ Attach Statement of Reasons to the Judgment

_____ Transcribe Statement of Reasons

_✓_ Appeal Rights of Defendant Explained

_____ Appellate Disclosure Forms Provided

_✓_ Notice of Counsel's Post-Conviction
Obligations Provided

U.S. Deputy Marshal SID, MARK

Court Security Officer BUTCH

ATTORNEY(S) FOR THE DEFENDANT:

THOMAS WITHERS

DEFENDANT SENTENCED ON COUNT(S)

1 - 50, 52

Custody 133 Months B.O.P.
(See attached)

Probation _____

Supervised Release 2̶ 3 Years

Special Conditions ✓

Fine $ _____

Restitution $ _____

Special Assessment $ 5,100.⁰⁰

To Be Paid Immediately

Community Service _____

Facility Recommended ✓

Defendant Remanded To The USM ✓

Voluntary Surrender _____

To USM ☐ To Facility ☐

Nolle Prosse Count(s) _____

Plea Agreement Accepted and Ratified ✓

Departure From Guidelines ✓

Upward _____ Downward ✓

Time 2:59 to 5:24 Total 2 hrs. 5 min

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA

## CLERK'S MINUTES - GENERAL

CASE NO.                                                    DATE

TITLE

PROCEEDINGS (continued):

 Court directs USPO to amend the PSI as to Counts 1 & 13.

 Governments exhibit S-1 admitted.

 Defendant calls  Nabil Azmat

   direct:     3:31 - 3:39

   cross:      3:39 - 3:40

 "       "          Dr. Muhammad Akram

   direct:     3:41 - 3:45

   cross:      3:45 - 3:52

 re-direct:  3:52 - 3:54

 "       "          Christopher Ray

   direct:     3:55 - 4:01

   cross:      4:01 - 4:02

 4:03 - 4:10  Argument by the government

 4:10 - 4:20  "                  "  defendant

 4:20 - 5:04  Statement by defendant

 Sentence:

 60 months as to Count 1; 133 months as to Counts 2-13, 15-17, 19-25, 27, 28 and 30-50;

 60 months as to Counts 14, 26 and 29; 120 months as to Count 18 and 133 months as to Count 52;

 to be served concurrently.

 Supervised release:

 3 years as to each Count 1-50 & 52; to be served concurrently.

GAS 245B   (Rev. 09/11) Judgment in a Criminal Case
DC Custody TSR   Sheet 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| Najam Azmat | ) | Case Number:     4:13CR00028-4 |
| | ) | USM Number:     17954-021 |
| | ) | Thomas A. Withers |
| | | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to Counts

☐ pleaded nolo contendere to Count(s) _____ which was accepted by the court.

☒ was found guilty on Counts    1s-50s and 52s    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 841(b)(2) | Conspiracy to unlawfully dispense Schedule II, III, and IV controlled substances | December 2011 | 1s |
| 21 U.S.C. § 841(a)(1) and (b)(1)(C) | Unlawful distribution of Schedule II controlled substances | March 15, 2011 | 2s-13s, 15s-17s, 19s-25s, 27s, 28s, 30s-50s |
| 21 U.S.C. § 841(a)(1) and (b)(2) | Unlawful dispensation of Schedule IV controlled substances | March 1, 2011 | 14s, 26s, and 29s |

### SEE PAGE 2 FOR ADDITIONAL COUNTS
The defendant is sentenced as provided in pages 2 through   8   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on Count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

August 6, 2014
Date of Imposition of Judgment

_signature_
Signature of Judge

William T. Moore, Jr.
Judge, U.S. District Court

Name and Title of Judge
AUGUST 8, 2014
Date

GAS 245B
DC Custody TSR
(Rev. 09/11) Judgment in a Criminal Case
Sheet 1A

Judgment — Page 2 of 8

DEFENDANT: Najam Azmat
CASE NUMBER: 4:13CR00028-4

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(E) | Unlawful distribution of Schedule III controlled substances | February 28, 2011 | 18s |
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments | May 26, 2011 | 52s |

GAS 245B
DC Custody TSR

(Rev. 09/11) Judgment in a Criminal Case
Sheet 2 – Imprisonment

Judgment 8 Page 3 of 8

DEFENDANT:        Najam Azmat
CASE NUMBER:    4:13CR00028-4

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: 133 months. This term of imprisonment is comprised as follows:  a term of 60 months as to Count 1s (conspiracy); a term of 133 months as to each of Counts 2s through13s,15s through17s, 19s through 25s, 27s, 28s, and 30s through 50s (the counts involving Schedule II controlled substances); a term of 60 months as to each of Counts 14s, 26s, and 29s (the counts involving Schedule IV controlled substances); a term of 120 months as to Count 18s (the count involving Schedule III controlled substances); and a term of 133 months as to Count 52s (conspiracy to commit money laundering).  Each of the terms of imprisonment imposed as to Counts 1s through 50s and 52s are to be served concurrently with one another, for a total term of 133 months of imprisonment.

☒    The court makes the following recommendations to the Bureau of Prisons:
Designation to the Bureau of Prisons satellite camp located in Atlanta, Georgia, is recommended.

☒    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at _____    ☐  a.m.   ☐  p.m.    on _____

    ☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    before 2 p.m. on _____

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:




Defendant delivered on _____    to _____

at _____ , with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


By _____
DEPUTY UNITED STATES MARSHAL

DEFENDANT:    Najam Azmat
CASE NUMBER:    4:13CR00028-4

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: <u>3 years.  This term is comprised of terms of 3 years supervised release as to each of Counts 2s through 13s, 15s through 25s, 27s, 28s, and 30s through 50s; and a term of 1 year supervised release as to each of Counts 1s, 14s, 26s, 29s, and 52s, all to be served concurrently.</u>

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance.  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☒    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  *(Check, if applicable.)*

☒    The defendant shall cooperate in the collection of DNA as directed by the probation officer.  *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.  *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

14)   any possession, use, or attempted use of any device to impede or evade drug testing shall be a violation of supervised release.

DEFENDANT:      Najam Azmat
CASE NUMBER:    4:13CR00028-4

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program of testing for drug and alcohol abuse. Further, the defendant shall not tamper with any testing procedure.

2. The defendant shall submit his person, property, house, residence, office, papers, vehicle, computers (as defined in 18 U.S.C. § 1030(e)(1)), or other electronic communications or data storage devices or media, to a search conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

3. The defendant shall not be employed as a physician or otherwise dispense controlled substances during the term of supervision.

## ACKNOWLEDGMENT

Upon finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)     _____      _____

              Defendant                                                    Date

             _____      _____

             U.S. Probation Officer/Designated Witness            Date

DEFENDANT:      Adelaida M. Lizama
CASE NUMBER:    4:13CR00028-2

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|        | **Assessment** | **Fine** | **Restitution** |
|--------|----------------|----------|------------------|
| TOTALS | $ 5,100        | $ None   | $ Not applicable |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---------------|-------------|---------------------|------------------------|
|               |             |                     |                        |
| TOTALS        | $           | $                   |                        |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:      Najam Azmat
CASE NUMBER:    4:13CR00028-4

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☒   Lump sum payment of $    5,100      due immediately.

     ☐   not later than _____ , or
     ☐   in accordance   ☐   C,    ☐   D,    ☐   E, or    ☐   F below; or

B   ☐   Payment to begin immediately (may be combined with      ☐   C,    ☐   D, or    ☐   F below); or

C   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
        _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
        _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
        term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
        imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Pursuant to 18 U.S.C. § 3572(d)(3), the defendant shall notify the Court of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay the fine.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several
     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

GAS 245B
DC Custody TSR
(Rev. 09/11) Judgment in a Criminal Case
Sheet 7 – Denial of Federal Benefits

DEFENDANT: Najam Azmat
CASE NUMBER: 4:13CR00028-4

# DENIAL OF FEDERAL BENEFITS

*(For Offenses Committed On or After November 18, 1988)*

## FOR DRUG TRAFFICKERS PURSUANT TO 21 U.S.C. § 862(a)

IT IS ORDERED that the defendant shall be:

☒ ineligible for all federal benefits for a period of     5 years_____ .

☐ ineligible for the following federal benefits for a period of    _____ _____ _____ .
*(specify benefit(s))*

## OR

☐ Having determined that this is the defendant's third or subsequent conviction for distribution of controlled substances, IT IS ORDERED that the defendant shall be permanently ineligible for all federal benefits.

## FOR DRUG POSSESSORS PURSUANT TO 21 U.S.C. § 862(b)

IT IS ORDERED that the defendant shall:

☐ be ineligible for all federal benefits for a period of     _____ .

☐ be ineligible for the following federal benefits for a period of    _____ _____ .

*(specify benefit(s))*

☐ successfully complete a drug testing and treatment program.

☐ perform community service, as specified in the probation and supervised release portion of this judgment.

☐ Having determined that this is the defendant's second or subsequent conviction for possession of a controlled substance, IS FURTHER ORDERED that the defendant shall complete any drug treatment program and community service specified in this judgment as a requirement for the reinstatement of eligibility for federal benefits.

**Pursuant to 21 U.S.C. § 862(d), this denial of federal benefits does not include any retirement, welfare, Social Security, health, disability, veterans benefit, public housing, or other similar benefit, or any other benefit for which payments or services are required for eligibility. The clerk is responsible for sending a copy of this page and the first page of this judgment to:**

**U.S. Department of Justice, Office of Justice Programs, Washington, DC 20531**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | INDICTMENT NUMBER: |
| | ) | CR 4:13 - 028 |
| DR. NAJAM AZMAT, | ) | |
| | ) | |
| Defendant. | ) | |

## **NOTICE OF APPEAL**

COMES NOW DR. NAJAM AZMAT, Defendant in the above referenced

matter, by and through his counsel of record, and hereby appeals to the United

States Court of Appeals for the Eleventh Circuit from the judgment and sentence

imposed on August 6, 2014, which was filed on August 8, 2014. (Doc. #367).

Respectfully submitted this the 18th day of August, 2014.

GILLEN, WITHERS & LAKE, LLC

**s/Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar No: 772250
Attorney for Dr. Najam Azmat

P.O. Box 10164
Savannah, GA 31412
(912) 447-8400

## **CERTIFICATE OF SERVICE**

The undersigned certifies that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this court.

This 18th day of August, 2014.

GILLEN, WITHERS & LAKE, LLC

**s/Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar No: 772250
Attorney for Dr. Najam Azmat

P.O. Box 10164
Savannah, GA 31412
(912) 447-8400

1

1           THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                   SAVANNAH DIVISION

3

4   UNITED STATES OF AMERICA,    :
                                 :
5     v.                         :
                                 :   CASE NUMBER CR-4:13-28-04
6   NAJAM AZMAT,                 :
                                 :
7        Defendant.              :
   _____   :

8

9

10                                      COPY

11

12

13           TRANSCRIPT OF SENTENCING HEARING
       BEFORE THE HONORABLE WILLIAM T. MOORE, JR.
14              United States Courthouse
                   125 Bull Street
15                 Savannah, Georgia
                   August 6, 2014
16

17

18

19

20
   COURT REPORTER: Victoria L. Root, CCR
21                 United States Court Reporter
                   Post Office Box 10552
22                 Savannah, Georgia  31412

23

24
       *Proceedings recorded by mechanical stenography.*
25     *Transcript produced by computer-aided transcription.*

9

1          MR. KNOCHE:  Were actually seen and treated.

2          THE COURT:  Seen and treated?

3          MR. KNOCHE:  Yes, sir.

4          THE COURT:  Okay.  All right.  Then I'll ask the

5    probation officer, then, to amend the PSI and -- on Count 1

6    regarding the 5 years and also amend the PSI on Count 13 that

7    there were 196 patients that were seen and treated.

8          All right.  Now, go ahead, Mr. Withers.

9          MR. WITHERS:  Your Honor, my next objection addresses

10   the attributable conduct issue, which is set forth at Pages 2

11   and 3 of the addendum to the PSI.

12         First, I submitted a memorandum yesterday that sets

13   forth the *Chube*, C-h-u-b-e, case from the 6th Circuit,

14   Your Honor.  It dealt with a allegation -- or case of unlawful

15   prescribing by a physician.  I think that case is instructive.

16   And we would argue that there's no reliable evidence that

17   every prescription written by Dr. Azmat was for an unlawful or

18   improper purpose and, therefore, included within the

19   guidelines.

20         Dr. Kennedy, the Government's expert, reviewed

21   patient files for, I believe, 25 patients, Counts 2 through 50.

22         And if the Court recalls when Agent Sikes testified

23   the afternoon, I think, of the first day of trial, he

24   introduced into evidence Government Exhibit 26, which were a

25   handful of patient files that were strikingly inconsistent with

20

1    do so.  There was no insurance taken at the clinic.  Dr. Azmat

2    was typically paid in cash at the end of the business day,

3    $2,000 a day.

4              Your Honor, we think that -- when you consider all

5    those circumstances in their totality, that the Court should

6    find in favor of the probation officer's recommendation as to

7    relevant conduct, and that's the Government's request.

8              THE COURT:  The Court adopts the factual statements

9    contained in the presentence investigation report, to which

10   there are no objections as to the controverted factual

11   statements in Paragraphs 10, 13, 15, 16, 40, 61, and 62.  The

12   Court adopts the position of the probation officer stated in

13   the addendum.

14             Now, questions of guideline application have arisen

15   with respect to the conclusions contained in Paragraphs 13 and

16   17 dealing with drug quantity; Paragraphs 24 and 30 with the

17   base offense level; Paragraphs 26 and 35, the adjusted offense

18   level; Paragraph 36, the adjusted offense level for Group 1

19   and Group 2; Paragraph 39, the total offense level; and

20   Paragraph 71, the advisory guideline range.

21             After considering the objections raised in this case

22   and after considering all of the testimony during the trial and

23   the numerous exhibits that were admitted and reviewed by the

24   Court, the Court concurs with the findings in the presentence

25   report, including the addendum, with the exception of

55

1    commitment to his children that was inspirational.

2         And his 15-year-old daughter wrote the Court about

3    Dr. Azmat never missing an awards ceremony, Dr. Azmat being her

4    role model and a caring, loving father.

5         And there are -- no doubt, a lot of people come

6    before the Court who have literally found religion just before

7    sentencing, and this Court hears a lot of that.  But

8    Dr. Azmat's dedication to his family, his community did not

9    begin when his legal services -- his legal troubles first

10   surfaced.  But those letters that the Court has received, the

11   testimony that the Court has heard demonstrate a man whose

12   life's work is of a good, caring person.

13        Your Honor, with respect to the issue of sentencing

14   disparities, there are two sides of that coin.  One is that the

15   Sentencing Reform Act is supposed to provide proportionality

16   among different offenses.

17        And we've set forth in our papers that, for instance,

18   in this case, Dr. Azmat's guideline range of 188 to 235 is only

19   two points lower and at the lower end of the applicable

20   guideline range for someone who commits a bank robbery of over

21   $5 million where a firearm is discharged.

22        So, A, the proposed sentence by the guidelines

23   doesn't fit within that proportionality issue of different

24   offenses; and, B, it doesn't fit with respect to the other side

25   of that coin, and that is sentences meted out in this case that

56

1    have ranged from 52 months' imprisonment down to 13 months.

2          Even though the 11th Circuit recognizes that those

3    who enter pleas and who are rewarded with a 5K certainly are

4    dissimilar in a certain respect, they are not dissimilar when

5    we're talking about the exact same case and someone who simply

6    exercises the constitutional right to a jury trial.

7          And I would suggest that it's this Court that stands

8    as the bulwark to ensure that a defendant can exercise that

9    right to a trial without being -- having fear of being

10   sentenced three times more severely than those who enter a

11   plea.  And so we ask that the Court sentence Dr. Azmat within

12   the range of the sentences previously imposed in this case.

13         With respect to what Mr. Knoche mentioned about

14   deterrence, the Court knows through its experience -- and our

15   papers set out the proof of this -- that someone, A, that is

16   Dr. Azmat's age, B, that is in Dr. Azmat's health, C, that is

17   in Dr. Azmat's marital and family situation is not likely to

18   reoffend.  I think that the Court can rest upon that, that --

19   that fact that Dr. Azmat's circumstances mean that he is not a

20   likelihood to reoffend.

21         Also, I think the Court can consider the fact that

22   the loss of Dr. Azmat's future livelihood as a medical

23   practitioner -- because, in all likelihood, he will never

24   practice medicine again -- is a factor that the Court can

25   consider in imposing sentence.  And we've cited to the

86

1    the judgment of the Court that the defendant, Najam Azmat, is

2    hereby committed to the custody of Bureau of Prisons to be

3    imprisoned for a term of 133 months.  And this term of

4    imprisonment is comprised as follows:

5         A term of 133 months as to Count 1, the conspiracy

6    count; a term of 133 months as to each of Counts 2 through 13,

7    15 through 17, 19 through 25, 27, 28, and 30 through 50 --

8    those are the counts involving Schedule II controlled

9    substances -- a term of 60 months as to each of Counts 14, 26,

10   and 29, the counts involving Schedule IV controlled substances;

11   a term of 120 months as to Count 18, the count involving

12   Schedule III controlled substances; and a term of 133 months as

13   to Count 52, the conspiracy to commit money laundering.

14        Each of the terms of imprisonment imposed as to

15   Counts 1 through 50 and 52 are to be served concurrently with

16   one another for a total term of 133 months of imprisonment.

17        The Court has conducted a downward variance from the

18   advisory guideline range pursuant to the factors identified in

19   18, United States Code, Section 3553(a).

20        The Court, in imposing a sentence below the advisory

21   guideline range, has considered the Government's motion

22   regarding the proposed guideline amendment, which includes a

23   two-level reduction in the base offense level for drug-related

24   offenses.  That two-level reduction would yield a total offense

25   level of 34 with a criminal history category of I, and the

CERTIFICATE OF SERVICE

The undersigned certifies that she served a copy of the foregoing Appendix II on this date in accordance with the directives from the Court Notice of Electronic Filing ("NEF") that was generated as a result of electronic filing in this court.

This the 19th day of November, 2014.

/s/ Thomas A. Withers
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone: 912-447-8400
Facsimile:  912-629-6347
twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*