IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 14-13703-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NAJAM AZMAT,

Defendant-Appellant.

**APPENDIX VOLUME III**

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone: 912-447-8400
Facsimile:  912-629-6347
twithers@gwllawfirm.com

*Attorney for Defendant-Appellant
Najam Azmat*

# TABLE OF CONTENTS

## VOLUME I

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

DISTRICT COURT DOCKET SHEET . . . . . . . . . . . . . . . . . . . . . . . . . . B

INDICTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUPERSEDING INDICTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

GOVERNMENT'S DISCLOSURE OF EXPERT TESTIMONY
PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE
16(A)(1)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

DR. AZMAT'S DAUBERT MOTION TO EXCLUDE GOVERNMENT
EXPERT'S DR. GENE KENNDY AND MARTIN ZDANOWICZ
AND REQUEST FOR AN EVIDENTIARY HEARING . . . . . . . . . . . . . 241

DR. AZMAT'S SUPPLEMENT TO MOTION TO EXCLUDE
GOVERNMENT EXPERTS DR. GENE KENNEDY AND MARTIN
ZDANOWICZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

ORDER ON DR. AZMAT'S MOTIONS TO EXCLUDE
GOVERNMENT EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291

GOVERNMENT'S RESPONSE TO COURT ORDER OF
DECEMBER 27, 2013 CONCERNING REALIABILTY OF
PROPOSED EXPERT TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . 297

COURT'S MINUTES FROM TRIAL (1/13/2014) . . . . . . . . . . . . . . . . 304

DR. AZMAT'S MOTION FOR JUDGMENT OF ACQUITTAL
PURSUANT TO FED. R. CRIM. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . 307

## VOLUME II

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

VERDICT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 320

DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF
ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR
NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 324

DEFENDANT NAJAM AZMAT'S SUPPLEMENTAL MOTION FOR
JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE,
MOTION FOR NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 334

ORDER ON DEFENDANT AZMAT'S MOTION FOR JUDGMENT
OF ACQUITTAL OR, IN THE ALTERANTIVE, MOTION FOR
NEW TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

DEFENDANT AZMAT'S SENTENCING MEMORANDUM
REGARDING THE GUIDELINE FOR OXYCODONE. . . . . . . . . . . . 354

DEFENDANT AZMAT'S SECOND SENTENCING
MEMORANDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .359

SENTENCING MINUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 362

JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

NOTICE OF APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .369

SENTENCING TRANSCRIPT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

## VOLUME III

TABLE OF CONTENTS.......................................A

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 1 ...............385

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 2 ...............386

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 3 ...............387

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 4 ...............388

EXCERPTS OF TRIAL TRANSCRIPT VOLUME 5 ...............389

CERTIFICATE OF SERVICE

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

UNITED STATES OF AMERICA    *

v.                             *    CASE NUMBER CR413-28

NAJAM AZMAT              *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

<u>VOLUME 1 - 1/13/2014</u>

<u>PP. 57 - 201</u>

APPEARANCES:

For the Government                        KARL I. KNOCHE, AUSA
                                     GREGORY E. GILLULY, JR., AUSA

For the Defendant                          THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in conjunction with transcription of back–up recording.*

1  first day it opened its doors to the public in an old strip mall on Highway 80

2  East in Garden City. The clinic opened on February the 21st. It was closed

3  on May the 26th of 2011, a scant three months later, when DEA agents, CNT

4  agents, and other investigators served a federal search warrant at the

5  premises and seized numerous records and materials from the clinic.

6  Never reopened after that.

7        Now, this was no ordinary medical clinic. It did not open in

8  Garden City because of some perceived need, or gap, or void in the medical

9  community of Savannah. In fact very few, if any, of the patients who visited

10  East Health Center during its short tenure were from Savannah. The

11  majority of patients came from out of state, and not just over the border in

12  South Carolina, although there were some like that. No, the patients

13  typically and routinely came from far away places like the Commonwealth

14  of Kentucky, a full 10, 11-hour drive from Savannah. They came from all

15  over the state of Florida. They came from Orlando, they came from

16  Jacksonville. There were patients that came to see East Health Center

17  doctors who came from the state of Ohio and elsewhere. The government's

18  evidence will make this clear to you as we progress through the case that

19  this was a clinic serving an out-of-town, out-of-state clientele.

20        And likewise with the patients, the persons who organized the

21  East Health Center, they also weren't from Savannah. They were routinely

22  and typically from south Florida. They came from Boca Raton, Palm

23  Beach, and those areas in south Florida. Curiously, none of the organizers

24  of the clinic had any legitimate medical experience. The patients who came

25  to East Health Center, they typically traveled, because they were traveling

1    doctor, you fill out the paperwork. And what's one thing that is on every

2    one of those files? Name and address. And all that paperwork goes back to

3    the doctor. The doctor had to know, and we will present evidence that he

4    did know, that his patients were, the majority of them were from out of

5    state, and the vast majority came from long distances from Savannah,

6    Georgia, even if they were coming from within the state of Georgia.

7              There was no plan for treatment. Some patients, some patients

8    had dangerously high blood pressure. You'll hear from the patient whose

9    blood pressure at her initial visit with Dr. Azmat was 153/123. That's an

10   example. And there were others whose files you will be seeing during the

11   course of this trial. Nothing, nothing was said about that blood pressure,

12   even though those patients were ostensibly at a high risk for a stroke.

13             I've talked about the patients. I mentioned that the organizers

14   of this clinic were not from Savannah either. The organizers came from

15   Palm Beach, they came from Boca Raton. No legitimate medical

16   experience. You will hear from several of these, the first of which we expect

17   will be an individual with a somewhat long, unusual name, Adelard

18   LeFrancois. Mr. LeFrancois had no legitimate medical experience. He did

19   have experience managing pill mills in south Florida. And in particular, he

20   managed a pill mill in Boca Raton, Florida, and he learned about how the

21   business operated. He learned what props were necessary to try to make

22   the business look legitimate. He knew the dangers of seeing too many

23   patients at one time. He knew the drill. Ask if the MRI was less than two

24   years old.

25             He brought with him to Garden City, Georgia, this knowledge

1    rival pill mill clinics in the state of Florida, which, you know, at the time

2    was the capital of pill mills. You go to a rival clinic down there, and you

3    would look for the out-of-state license plates. You would look for the

4    patients, you know, congregating at the facilities, and you would put

5    leaflets in their hand. You would say, we have a new pain facility that we're

6    opening in the Savannah area. We have a doctor that will write what you

7    want. Come on up. It's closer to home. And they did this over a period of

8    several weeks and very successfully, between that and the word-of-mouth

9    in the addict community, before long, almost from day one, there was a

10   ready-made client base at East Health Center.

11            Dr. Azmat is the only defendant on trial. He's charged with the

12   conspiracy count, the charge that he conspired with Al LeFrancois, with

13   Adel Lizama, with Candace Carreras, with Frankie Barbuscia, with Sean

14   Clark, and others not named in the indictment. He conspired to dispense

15   controlled substances without a legitimate medical purpose, not in the

16   usual course of a professional medical practice. That's Count 1.

17            LeFrancois, Clark, Wise, they'll testify they have already

18   pleaded guilty to offenses related to East Health Center, and they'll tell you

19   that, and you can consider that when you assess their credibility and

20   whether you believe them. But you'll hear from them.

21            Count 52 is a money laundering count. The money which

22   passed through East Health Center came from the patients paying their

23   $300 to obtain --

24            THE COURT:  – Mr. Knoche, use the lectern.

25            MR. KNOCHE: Yes, sir.

1    Dr. Azmat do?  He exercised his clinical judgment, and he took them off of

2    the Xanax.

3              Now, you've heard about these folks, Mr. LeFrancios, Mr. Wise,

4    Mr. Clark, others.  They were down in – living and working down in south

5    Florida.  Dr. Azmat didn't know them.  They called – he responded to the

6    ad, he spoke to one of them, Mr. LeFrancois.  But when you listen to this

7    evidence from these various folks, you'll see that Dr. Azmat was an

8    outsider.  They all came up here and rented a house together out in Pooler.

9    Dr. Azmat didn't go out for drinks with them in the afternoon after work.

10   He didn't drink.  He didn't go to dinner with these folks when they would

11   go out for dinner together.  They all lived in the same house out in Pooler.

12   He's never been to that house, never went to that house.  He would eat

13   lunch at his desk in his office and then go home.  And after three-and-a-half

14   weeks of being there, he's terminated.  They said, you don't need to come

15   back.

16             Now, one of the things that Judge Moore has already spoken to

17   you about is witness credibility, and that's something we do every day.  See

18   somebody on the street, start talking to them, and we're evaluating that

19   person.  We may not do it consciously, but we all do it.  And as Judge

20   Moore has already told you, the kind of standards you use are common

21   sense things.  You know, does that person appear to be telling the truth?

22   Does he have a reason to lie?  Does he have a good memory?

23             And you're going to hear that these south Florida folks, many of

24   them were indicted in the same indictment, had over 50 counts dismissed

25   in this indictment, and they pled guilty to a separate charge where, where

1   A   In emergency medicine, and I had a private practice.

2   Q   Okay.  Now, the purpose of prescribing pain meds in the emergency

3   setting is to give that patient enough so that they can be stabilized and sent

4   to their primary care physician or specialist; is that fair to say?

5   A   That's correct.

6   Q   Now, you mentioned that Mr. LeFrancois and Mr. Clark told you that

7   it was their intention to dispense medication.

8   A   Correct.

9   Q   And there is a difference between prescribing and dispensing; is there

10  not?

11  A   Correct.

12  Q   In order to prescribe, you have to have a DEA license or registration,

13  I'm not sure which one it's called.  Is it a license or registration?

14  A   I believe it's a license.

15  Q   Okay, and to dispense, that usually happens at pharmacies, hospitals

16  perhaps, other facilities that are, again, licensed or registered for the

17  purpose of dispensing the medication; correct?

18  A   Correct.

19  Q   So that when you dispense the – when you prescribe the medication,

20  you're actually giving someone a paper prescription; correct?

21  A   Correct.

22  Q   But when you're dispensing the medication, you are giving them the

23  prescription in a bottle with the instructions on it; that's correct, is it not?

24  A   That's correct.

25  Q   And what they wanted to do, when they were speaking to you, is

1    A    Are you asking me whether or not dispensing a medication is the same

2    as writing a prescription –

3    Q    – If issuing the prescription is, you know, is dispensing the

4    medication.

5    A    And I believe what he was asking me earlier was, he was trying to

6    decipher the difference between the two.  I believe either way, you're

7    issuing the medication; correct?

8              MR.  WITHERS: If I can briefly follow up on that, Your Honor?

9              THE COURT: Yes, sir, go ahead.

10                        RECROSS-EXAMINATION BY

11    MR. WITHERS:

12    Q    If I'm a physician and I do not have a license to dispense, I cannot

13    dispense; correct?

14    A    You shouldn't, correct.

15    Q    That would be bad.

16    A    Right.

17              MR. WITHERS: Thank you.

18              THE COURT: Anything else of this witness:

19              MR. KNOCHE: If I could tender 28-1 and 2, Your Honor.

20              THE COURT: Admitted.  Can the witness be excused?

21              MR. KNOCHE: Yes, Your Honor.

22              THE COURT: All right, you're excused, ma'am.  Thank you.

23              DR. ROSS: Your Honor, would it be okay if I sat and watched

24    the rest, please?

25              THE COURT: Yes, ma'am.

1    A    Right.  Dr. Ross contacted Angela Coleman from CNT, and CNT

2    contacted our office, the Drug Enforcement Administration, also the

3    Georgia Bureau of Investigation.  And we got together and started initiating

4    the investigation.

5    Q    And what sort of things did you do in your investigation of East Health

6    Center?

7    A    We conducted surveillance.  We went out to the clinic, observed out-

8    of-state tags parked in front of it.  An agent from CNT, Ron Tyran, went out

9    and conducted an inspection of the facility.  We also spoke with local

10   pharmacists to find out what type of medications were being prescribed

11   from the clinic.  We got prescription profiles.  We saw that the majority of

12   the prescriptions were for oxycodone.  We also conducted trash pulls and

13   found that some of the patient files had been thrown away.

14   Q    Did you, during the course of your investigation, learn what was the

15   medium of exchange at the business?  Was it a cash business?  Was it a

16   credit card business?

17   A    Yes, East Health Center was primarily a cash business, but also it did

18   accept some credit card payments.

19   Q    And did you determine where the owners of the clinic were from?

20   A    Yes, they were from South Florida.

21   Q    And you indicated that you discovered through your surveillance and

22   the pharmacy searches that many of the patients came from out of state?

23   A    That's correct.

24   Q    And traveled long distances?

25   A    Yes, that's correct.

1    MR. KNOCHE: And I'd like to tender 29-1 and 29-1A, Your

2    Honor, and I'd like to publish some excerpts of 29-1A to the jury at this

3    time.

4    Q    And if you would, Agent Sikes, if you would look through the --

5    MR. KNOCHE: -- Yes, I tendered that into evidence, Your

6    Honor.  Did not hear if it was admitted.

7    THE COURT: Which one?

8    MR. KNOCHE: 29-1 and 1A that the agent ...

9    THE COURT: All right, they're admitted.

10   Q    Pick a date, if you would, Agent Sikes, from 29-1A and give us the

11   number from what Mr. Dean published.

12   A    2/21/2011.

13   Q    Is there a Bates number at the bottom of the page?

14   A    Oh, a Bates number, not on this -- no, there's not.

15   MR. KNOCHE: Excuse me a moment, Your Honor.

16   [NOTE: Mr. Knoche confers with technical person off the record.]

17   Q    What date ...

18   A    February 21, 2011.

19   Q    And what's the significance of February 21st?

20   A    This is the first day that Dr. Azmat worked for East Health Center.

21   MR. KNOCHE: If you would, Dean, if you'd call up 29-1A-50

22   and 51.

23   Q    What is this document we're looking at ?

24   A    This is a patient sign-in sheet from the first day that Dr. Azmat worked

25   there and the first day the clinic opened.

1    A    There were no other alternative forms of treatment.  All patients were

2    treated with narcotics.

3    Q    Did he refer customers to other specialists?

4    A    Dr. Azmat stated that he referred patients to other specialists, but he

5    did not document it in the charts.

6    Q    When you say "document," it wouldn't  have been written down

7    anywhere in the charts?

8    A    There was no evidence in the charts that I found where he referred

9    patients out.

10   Q    Did he say whether he had privileges at any local hospital in

11   Savannah?

12   A    He said he did not have privileges at any local hospitals.

13   Q    Did he tell you that during the – that he had been visited while at the

14   clinic by an agent of the Savannah-Chatham Counter Narcotics Team?

15   A    Yes, I believe he said a Savannah-Chatham police officer came to the

16   clinic, questioned him and Adelard LeFrancois about the lack of medical

17   equipment in the clinic.

18   Q    And what did Dr. Azmat say was his response to that visit?

19   A    He said that about a week later he contacted the officer and said, what

20   kind of medical equipment would we need to bring the clinic in compliance.

21   Q    Did Dr. Azmat – was he aware of the forms of payment which were

22   tendered by customers or patients at East Health Center?

23   A    Dr. Azmat said that the clinic only accepted cash, and they didn't

24   accept any other forms of treatment such as private insurance, Medicaid,

25   Medicare, anything like that.

1    Q    Did you verify that that was the case, that no insurance was accepted?

2    A    Yes, I did.

3    Q    And how did he say he was paid?

4    A    Dr. Azmat stated that he was paid by check at the end of each week.

5    Q    You've examined the records which have previously been admitted.

6    Do they bear that out?

7    A    No, the records I found is that Dr. Azmat was paid cash at the end of

8    each day, with a few exceptions. I think he did receive three or four checks

9    at the end of the day for those days.

10    [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

11    Q    (By Mr. Knoche) The East Health Center in Garden City, you obviously

12    visited there because you've testified about your search warrant.

13    A    Right, that's correct.

14    Q    That is in the Southern District of Georgia; is it not?

15    A    Yes, it is.

16    MR. KNOCHE: Pass the witness, Your Honor.

17    THE COURT: Questions, Mr. Withers?

18    MR. WITHERS: Yes, thank you very much, Judge.

19    CROSS-EXAMINATION BY

20    MR. WITHERS:

21    Q    Agent Sikes, good afternoon.

22    A    Good afternoon.

23    Q    Let's start where you ended off there. Are you referring to your notes

24    as you're testifying here?

25    A    No, I don't have any notes up here other than the exhibits that were

1    decrease or delete, discontinue the Xanax?

2    A    I don't know.

3    Q    On how many of those patients did Dr. Azmat decrease or discontinue

4    the Valium?

5    A    I don't know.

6    Q    How many patients did Dr. Azmat see more than once?

7    A    None.

8    Q    Now, you were telling us about some of the exhibits that were seized,

9    and y'all have them put into the notebooks in reverse date order; right?

10   A    Which notebooks are you referring to?

11   Q    Well, let me see if I can be more specific.  With respect to the patient

12   charts, and I'm talking about the sign-in sheets.

13   A    Okay.

14   Q    Those are in reverse date order; correct?

15   A    Yes, that's correct.

16   Q    And it shows, I think it's Tuesday, the 22nd, they saw ten patients;

17   correct?

18   A    I don't know.

19              [NOTE: Mr. Withers and Mr. Knoche confer off the record.]

20              MR. WITHERS: Your Honor, Mr. Knoche said that I can call

21   upon his assistant to pull up an exhibit.  May I do that?

22              THE COURT: Yes, sir.

23              MR. WITHERS: Sir, if you could pull up 29-1A-048.  048.

24   Q    And it looks like actually there were 11, excuse me, 11 total patients,

25   but one is stricken through; correct?

1    A    This is 26-11.

2    Q    All right, and are there medical records for Mr. Shaffer from

3    respectable medical?

4    A    Yes, there are four pages of medical records.

5    Q    If you would look at 26-8.  Do you see Dr. Azmat's note on that

6    patient?

7    A    Yes.

8    Q    Do you see where Mr. Craig came in complaining of having had past

9    leg surgery at the top of the complaint?

10   A    I see a note that says leg.  I – it may say surgery, I'm not sure.

11   Q    All right, and do you see meds, what it says there?

12   A    Yes.

13   Q    Read that for the jury.

14   A    [Reading:] Oxy 30, number 90, oxy 15, number 60, Xanax 2, number

15   30.

16   Q    All right, and I want you to look at the urine drug screen.  You know

17   that that was part of the patient file; correct?

18   A    Right, positive THC, positive benzos.

19   Q    Well, you're looking at – that's actually the wrong date.  We're on

20   March 3rd.

21   A    Oh, okay.  March 3rd, negative for benzos.

22   Q    All right, and so for that patient that was negative, what was the

23   prescription written by Dr. Azmat?  Back at Dr. Azmat's note.  Look at his

24   note, please.

25   A    Oh, okay.  His note says Motrin 800.

1    Q    So that patient was negative – urine drug screen of negative, and he

2    went away with a Motrin; correct?

3    A    That's correct.

4    Q    Look at 26-6, if you would, please. Do you see Dr. Azmat's note?

5    A    Yes.

6    Q    That patient, what did that patient tell Dr. Azmat he was taking in

7    terms of oxycodone 30 milligrams?

8    A    90 oxy 30s.

9    Q    And tell the jury, if you would, please, what that patient received by

10   way of medication by Dr. Azmat?

11   A    It appears the patient received Zydone, which is a hydrocodone

12   product, 60 count; and Xanax 15 – 1 milligram Xanax, 15 tablets; and I

13   believe 90 Motrin.

14   Q    All right, and what about the oxycodone 30, 90 tablets?

15   A    He did not receive the oxycodone.

16   Q    Previously you just testified to this jury that you weren't aware of any

17   patients being discontinued oxycodone; right?

18   A    Right. There's not any record other than Dr. Azmat's notes saying that

19   they were prescribed those medications. There's not any prescription

20   profiles – well, there is a prescription profile that shows he did not receive

21   it.

22   Q    I'm sorry?

23   A    He did not receive oxy 30.

24   Q    All right, and so Dr. Azmat discontinued that patient's oxycodone;

25   true?

1    A    Yes, he did.

2    Q    And read the jury what the note says down there next to the note of

3    Xanax.  You see the words, "to wean off?"

4    A    Yes, [reading]: Wean off Xanax 1 milligram.

5    Q    All right, as a drug diversion agent, you know what wean means; do

6    you not?

7    A    Yes, I do.

8    Q    And tell the jury what that means.

9    A    Means to decrease the dosage.

10    Q    Turn to patient 26-9, if you would, please.  Joe Sadler?  Do you see

11    that patient?

12    A    Yes.

13    Q    And that patient was not seen; correct?

14    A    Right.

15    Q    Because his pharmacy record didn't check out; correct?

16    A    There's a note that says [reading]: Why was patient not seen by doctor.

17    It doesn't – there's no notes.

18    Q    I'm sorry?

19    A    There's no notes why the patient wasn't seen.

20    Q    Turn to 26-3 if you would, please.  You see Dr. Azmat's note?

21    A    (No audible response.)

22    Q    Are you with me?

23    A    Yes, which note are you referring to?

24    Q    Dr. Azmat's note of this physical examination.  You there?

25    A    Yes.

1    Q    That patient reported that he was on 180 oxycodone 30; correct?

2    A    Yes.

3    Q    And Dr. Azmat reduced that to 90; did he not?

4    A    Yes, he did.

5    Q    That patient was on 90 oxycodone 15 milligrams; correct?

6    A    That's correct.

7    Q    Dr. Azmat reduced that to 60 tablets; correct?

8    A    Correct.

9    Q    That patient reported that he was on Xanax 2 milligrams of 60;

10   correct?

11   A    Correct.

12   Q    Dr. Azmat discontinued that Xanax; did he not?

13   A    Yes, he did.

14   Q    Turn to 26-5, if you would, please, sir.  Do you see that patient, Bruce

15   Kennedy?

16   A    Yes.

17   Q    Do you see the notation – did you see that Dr. Azmat actually saw that

18   patient?

19   A    Yes, it looks like he did.

20   Q    All right, and issued prescriptions; correct?

21   A    Yes, he did.

22   Q    And you see the notation at the front of that chart, sir, that says

23   [reading]: Physician needs to call pharmacy to destroy prescriptions?

24   A    Yes, I do see that.

25   Q    And then there is a quote, unquote, destroyed under that?

1    A    I don't see one under that.

2    Q    I'll come back to that.

3              MR. WITHERS: Well, if I could approach, Your Honor.

4              THE COURT: Yes, sir.

5    Q    I actually said under that; didn't I?

6    A    Yes, you did.

7    Q    And you said you didn't see one under that; didn't you?

8    A    That's correct.

9    Q    Where is the word "destroyed" written in big, dark letters?

10   A    Above the note there it says, destroy.

11   Q    Okay, my mistake.  Turn to 26-7, sir.  You with me?

12   A    Yes, I am.

13   Q    That's patient Kristin Phillips; correct?

14   A    Yes, it is.

15   Q    All right.  Turn to Dr. Azmat's note, if you would, please, sir.

16   A    Okay.

17   Q    You there?

18   A    Yes, I am.

19   Q    That patient reports being on oxycodone 30, 160; right?

20   A    That's right.

21   Q    And so the jury knows specifically what we're talking about is 30

22   milligrams of oxycodone; correct?

23   A    That's correct.

24   Q    160 tablets; correct?

25   A    That's correct.

1    Q    Tell the jury what Dr. Azmat did with respect to that oxycodone.

2    A    It looks like he discontinued oxy 30.

3    Q    All right.  The patient reported being on 60 milligram – excuse me,

4    hydrocodone 10 milligrams, 60 tablets; correct?

5    A    That's correct.

6    Q    Dr. Azmat increased the hydrocodone to 90; correct?

7    A    Yes, that's correct.

8    Q    And the patient reported being on Valium 10 milligrams, 30 tablets;

9    right?

10    A    That's correct.

11    Q    And Dr. Azmat decreased – or excuse me, discontinued that patient's

12    Valium; correct?

13    A    That's correct.

14    Q    And then gave the patient a Motrin 800 milligrams, 90 tablets;

15    correct?

16    A    Yes, that's correct.

17    Q    800 milligrams, by the way, is not available in Motrin over-the-

18    counter; you have to have a prescription for that for ...

19    A    Yes, I believe that's correct.

20    Q    Go to 26-10, William Sadler.

21    A    Okay.

22    Q    Mr. Sadler was – gave a history of oxycodone 30 milligrams, 90;

23    correct?

24    A    That's correct.

25    Q    Soma, 60 tablets; correct?

1     A     That's correct.

2     Q     Xanax 1 milligram, 60 tablets; correct?

3     A     Yes, that's correct.

4     Q     All right, and if you look down at the bottom of the page where Dr.

5     Azmat notes his prescriptions.

6     A     Okay.

7     Q     The oxycodone 30, 90 is continued; correct.

8     A     That's correct.

9     Q     The Soma is discontinued; correct?

10    A     That's correct.

11    Q     We haven't heard, but Soma is a muscle relaxant; true?

12    A     Yes, that's correct.

13    Q     And then he discontinued the Xanax; correct?

14    A     That's correct.

15    Q     I want you to find Dr. Cole's – look under the prescriptions there, and

16    go to Dr. Gossett's, and then Dr. Cole's prescriptions.

17          So when that – and just to finish that up, there's a Norco, I think,

18    that's mentioned as a prescription by –

19    A     – Right, a hydrocodone product was added.

20    Q     Okay, and then with respect to Dr. Cole, do you see that?

21    A     Yes, I do.

22    Q     All right, Dr. Cole had that patient on – just run through those

23    prescriptions with me.  I can't read my writing.

24    A     There was oxycodone 15 milligram, 120; Xanax 2 milligram, 30;

25    Motrin 800 milligram, 90; Soma, 30 tablets; oxycodone 30, 45 tablets.

1    Q    Okay. So she had added, if I'm accurate here, the oxycodone 15;

2    correct?

3    A    That's correct.

4    Q    She had added the Soma back in; correct? It had been discontinued.

5    A    Yes, that's correct.

6    Q    And she had added in the Xanax that had been discontinued.

7    A    That's correct.

8    Q    Turn to Jeff Smith, and I apologize for jumping around, but it's 26-12,

9    please. Do you see Dr. Azmat's notes, sir?

10    A    Yes, I do.

11    Q    That patient is Jeff Smith?

12    A    Yes, it is.

13    Q    What's the date that he was seen by Dr. Azmat?

14    A    March 3rd.

15    Q    I'm sorry?

16    A    March 3rd.

17    Q    Third?

18    A    Yes.

19    Q    That patient was on oxycodone 30 milligrams, 180 tablets; correct?

20    A    Yes, I believe so.

21    Q    Oxycodone 15, 60 tablets; correct?

22    A    Correct.

23    Q    Norco 10, 90 tablets; correct?

24    A    That's correct.

25    Q    Xanax 2 milligrams, 90 tablets; correct?

1  A    That's correct.

2  Q    And by the way, as a diversion investigator, when you see this

3  combination of drugs here, the Xanax combined with the oxycodone, you

4  understand that that can be a dangerous combination; do you not?

5  A    Yes, I do.

6  Q    All right, and so Dr. Azmat, when he saw this patient, he reduced the

7  oxy 30, 180, 30 tablets down to 150; correct?

8  A    Correct.

9  Q    He took the oxy 15 milligrams, 60 tablets, discontinued that; right?

10 A    Yes, he did.

11 Q    The Norco 90 discontinue – excuse me, went down to 60; correct?

12 A    That's correct.

13 Q    The Xanax 2 milligrams, 90 tablets, tell the jury what Dr. Azmat did

14 with that.

15 A    Discontinued Xanax.

16 Q    Okay.  So he's taking a patient with a report of a dangerous

17 combination; correct?

18 A    Correct.

19 Q    And he's discontinuing one of those that causes that dangerous

20 combination; correct?

21 A    That's correct.

22 Q    I'm sorry?

23 A    That's correct.

24 Q    And read to the jury, if you would, please, sir, what Dr. Azmat's note

25 says about weaning off narcotics.

-174-

1    A    Says [reading:] Will continue to wean off, will continue to wean –

2    something – narcotics.

3    Q    It looks like two down arrows maybe.

4    A    Yes.

5    Q    Okay, and again, if you would turn to 26-13. Phillip Smith, a Georgia

6    patient; correct?

7    A    Let me see. Yes.

8    Q    What date was Mr. Smith seen by Dr. Azmat?

9    A    Looks like March 6, 2011.

10   Q    By the way, as a diversion investigator – as a diversion investigator –

11   you have learned through your investigations that what drug dealers like to

12   do is, they like to make their clients happy; right?

13   A    That's correct.

14   Q    I mean, in other words, a drug dealer that is saying, I'm not going to

15   sell to you, that's not going to go well for that drug dealer; is it?

16   A    No.

17   Q    Now, let's look at Mr. Smith. Mr. Smith had oxy 30 milligrams, 120

18   tablets; right?

19   A    That's right.

20   Q    And tell the jury what Dr. Azmat did with Mr. Smith and his 30

21   milligrams of oxycodone, 120 tablets.

22   A    Discontinued.

23   Q    Look at the Soma, 60 tablets. Do you see that?

24   A    Yes, I do.

25   Q    And I asked you earlier about Xanax, combination of Xanax and

1    oxycodone being troublesome from a health perspective. When you throw

2    in Soma, that makes it even more problematic for that person who's taking

3    that combination of drugs; correct?

4    A    That's correct.

5    Q    And so tell the jury what Dr. Azmat did with the Soma.

6    A    I believe he discontinued it.

7    Q    And the Xanax 1 milligram, 30 tablets, what did Dr. Azmat do with

8    that Xanax?

9    A    Discontinued it.

10    Q    26-14, Eric Thomas. Mr. Thomas came in with – on oxycodone 30

11    milligrams, 180 tablets; correct?

12    A    That's correct.

13    Q    Dr. Azmat reduced that to 150; correct?

14    A    That's correct.

15    Q    Mr. Thomas came in on Xanax 2 milligrams, 90 tablets; correct?

16    A    That's correct.

17    Q    And there again, Agent, is that troublesome combination of Xanax and

18    oxycodone. Tell the jury what Dr. Azmat did with that combination.

19    A    I believe he discontinued the Xanax.

20    Q    Now, you've got Michael Thomas as 26-15; correct?

21    A    That's correct.

22    Q    Turn to the medical note that you have in the file there, sir, 26-15. You

23    see that medical note?

24    A    Yes.

25    Q    Do you see the note that's dated 3/18 of '11?

1  A    Yes, I do.

2  Q    Who signed that note?

3  A    There's no one signed the one for 3/18, but where it's dated 3/21, that

4  was signed by Dr. Gossett.

5  Q    Okay. That patient does not have any interaction with Dr. Azmat; did

6  he?

7  A    There's no notes that Dr. Azmat saw him.

8  Q    Okay. So that patient was seen by Drs. Gossett and Cole; correct?

9  A    Correct.

10  Q    He was not seen by Dr. Azmat; correct?

11  A    That's correct. There's no note saying he was.

12  Q    Turn to 26-16, Troy Vosaturo. Do you see Dr. Azmat's note?

13  A    Yes, I do.

14  Q    That patient was on oxycodone 30, 180 tablets; correct?

15  A    That's correct.

16  Q    Dr. Azmat reduced that to 150 tablets; correct?

17  A    That's correct.

18  Q    He was on oxycodone 15 milligrams, 90 tablets; correct?

19  A    That's correct.

20  Q    That patient's prescription was reduced to 60 tablets of oxycodone 15;

21  correct?

22  A    That's correct.

23  Q    And Dr. Azmat again discontinued the Xanax that patient was on;

24  correct?

25  A    That's correct.

1    Q    And discontinued the Soma that that patient was on; correct?

2    A    That's correct.

3    Q    Leslie Willis, 26-17. That was March 4, 2011?

4    A    Yes, it was.

5    Q    And is that a patient by the last name of Willis; correct?

6    A    Can you repeat your question?

7    Q    The patient's last name was Willis?

8    A    Yes, it is.

9    Q    The patient was not seen by Dr. Azmat; correct?

10   A    That's correct.

11   Q    26-18, Edward Wilson. Do you have that note?

12   A    Yes, I do.

13   Q    What's the date of it?

14   A    March 15, 2011.

15   Q    That patient was on oxycodone 30 milligrams, 180 tablets; correct?

16   A    That's correct.

17   Q    Dr. Azmat reduced that to 120; true?

18   A    That's correct.

19   Q    Dr. Azmat – or that patient was on oxycodone 15 milligrams, 90

20   tablets; correct?

21   A    That's correct.

22   Q    Dr. Azmat discontinued that; didn't he?

23   A    That's correct.

24   Q    That patient was on Xanax 2 milligrams, 90 tablets; correct?

25   A    That's correct.

1  Q    That Xanax was discontinued; correct?

2  A    That's correct.

3  Q    The next exhibit is curious to me, 26-19, Wesley Wren, W-R-E-N.  Can

4  you find a doctor's note?

5  A    (No audible response.)

6  Q    There's no doctor's note for Dr. Azmat on this patient, is there?

7  A    No, there's not.

8  Q    26-20, Hatfield, I believe is that patient's name?

9  A    Right, that's correct.

10 Q    This patient was on no previous medications; correct?

11 A    That's correct.

12 Q    And her urine drug screen was negative; correct?

13 A    Yes, that's correct.

14 Q    What does she report as her mechanism of an injury?  Put another

15 way, more simple way, what caused her hurting?

16 A    I can't read the notes.

17 Q    That's okay, that's all right.  There is a description in there as to the

18 history for her pain; correct?

19 A    That's correct.

20 Q    It's hard to read.  I got better at it.  What Dr. Azmat did with that

21 patient is put her on Percocet; correct?

22 A    That's correct.

23 Q    All right.  So this is a patient with no previous medications, and she

24 gets Percocet and naproxen; correct?

25 A    That's correct.

1    Q    And naproxen is a – is that a non-steroidal anti-inflammatory?

2    A    Yes, that's correct.

3    Q    Michael Linton, 26-21?  This patient was actually on – reported being

4    disabled on social security; correct?

5    A    Yes, that's correct.

6    Q    All right, and did Dr. Azmat see that patient?

7    A    Yes, he did.

8    Q    And maintained those prescriptions, if my notes are accurate.

9    A    No, actually he gave him oxycodone and Percocet that he wasn't

10    previously on.

11    Q    Okay, all right, and then –

12            MR. WITHERS: Just a couple more, Your Honor.

13    Q    – Wilson Lopez, the next one, 26-22?  See Dr. Azmat's note?

14    A    Yes.

15    Q    That patient was on 30 milligrams of oxycodone, 150 tablets; right?

16    A    That's correct.

17    Q    Reduced to 120; correct?

18    A    That's correct.

19    Q    Hydrocodone 10 milligrams, 60 tablets?

20    A    That's correct.

21    Q    That was continued; correct?

22    A    Yes.

23    Q    And then the Valium 10 milligrams, 20 tablets was discontinued;

24    correct?

25    A    That's correct.

1    Q    Stevie Spell, 26-23. That's a Georgia patient; correct?

2    A    (No audible response.)

3    Q    I'm sorry, I don't think we got that.

4    A    Yes, this is a Georgia patient.

5    Q    And what's the date of that treatment?

6    A    I believe it's 2/24/2011.

7    Q    That patient was on oxycodone 30 milligrams, 180 tablets; correct?

8    A    That's correct.

9    Q    And that was reduced by Dr. Azmat to 150 tablets; correct?

10   A    That's correct.

11   Q    Lorcet 10 milligrams, 90 tablets; correct?

12   A    That's correct.

13   Q    I don't think we've heard Lorcet before. What's Lorcet?

14   A    Lorcet is a hydrocodone product.

15   Q    And hydrocodone is ...

16   A    It's a controlled substance, Schedule III. That is hydrocodone with

17   acetaminophen, Tylenol.

18   Q    And that was 90 tablets, 10 milligrams, 90 tablets reduced to 60;

19   correct?

20   A    That's correct.

21   Q    The Soma, 90 tablets, discontinued; right?

22   A    That's correct.

23   Q    The Xanax, 60 tablets, discontinued; correct?

24   A    That's correct.

25   Q    So again we're going from the troublesome combination of oxycodone,

1    Soma and Xanax to – excuse me, oxycodone, Lorcet, Soma and Xanax to

2    oxycodone and Lorcet, with both of those being reduced; correct?

3    A    That's correct.

4           MR. WITHERS: If I can have just a minute, Your Honor.

5           [NOTE: Mr. Withers confers with defendant off the record.]

6           MR. WITHERS: I think that's all I have, Your Honor.  Thank

7    you.

8           THE COURT: Any redirect, Mr. Knoche?

9           MR. KNOCHE: Yes, sir.

10                  REDIRECT EXAMINATION BY

11   MR. KNOCHE:

12   Q    Agent Sikes, every patient that Dr. Azmat would have seen at East

13   Health Center would've been a new patient.

14   A    That's correct.

15   Q    He was the physician there when the door opened.

16   A    That's correct.

17   Q    And so if a patient walked in the door, they had not –

18          MR. WITHERS: – Objection to leading, Your Honor.

19          THE COURT: Yeah, don't lead the witness.

20   Q    Is there any way that he would have  seen them before at that clinic?

21   A    No, these are all new patients to Dr. Azmat.  He was the first physician

22   to work at the clinic.

23   Q    And when counsel asked – or points out Dr. Azmat reducing

24   prescriptions, that is – from the record, is that based on what the patient is

25   telling the doctor?

# IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF GEORGIA

### SAVANNAH DIVISION

UNITED STATES OF AMERICA    *

v.                       *    CASE NUMBER CR413-28

NAJAM AZMAT           *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR., Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

## VOLUME 2 - 1/14/2014

### PP. 202 - 456

APPEARANCES:

For the Government               KARL I. KNOCHE, AUSA
                           GREGORY E. GILLULY, JR., AUSA

For the Defendant                THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in conjunction with transcription of back–up recording.*

1    [NOTE: Court is opened on 1/14/2014. The proceedings are

2    continued in the presence of the jury as follows:]

3    THE COURT: Good morning, ladies and gentlemen. I

4    appreciate you being here on time on a wet, dreary morning. I hope you

5    had a pleasant evening last night, and we're ready to proceed.

6    Mr. Knoche?

7    MR. KNOCHE: Mr. LeFrancois.

8    [Witness Sworn]

9    CLERK: You may be seated. Please state your name and

10    occupation, and spell your first and last name for the record.

11    MR. LeFRANCOIS: Adelard LeFrancois. A-D-E-L-A-R-D. L-E-

12    F-R-A-N-C-O-I-S. Employment, I work for a company called RGIS, which

13    is an inventory service company. I'm a manager for RGIS.

14    A D E L A R D    L e F R A N C O I S

15    GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

16    DIRECT EXAMINATION BY

17    MR. KNOCHE:

18    Q    What city and state do you live in, Mr. LeFrancois?

19    A    Boynton Beach, Florida.

20    Q    And for those members of the jury who aren't familiar with Florida

21    geography, where is Boynton Beach?

22    A    In South Florida.

23    Q    Near what -- what's the next biggest city?

24    A    Boca Raton and Ft. Lauderdale. Just south of that.

25    Q    How long have you lived in Florida?

1   meds, what they received, and some patients were unhappy with what they

2   received and someone else received, too, and then they would fight over

3   meds and – so instances like that.

4   Q    Did Mr. Clark or Mr. Barbuscia have any formal medical training to

5   your knowledge?

6   A    No, sir.

7   Q    You're not from Savannah.  Ever lived here?

8   A    No, sir.

9   Q    Do you recall back in the beginning of 2011 opening a clinic, a pain

10  management clinic in Garden City, Georgia?

11  A    Yes, sir.

12  Q    And tell the members of the jury how it came to be that you left your

13  employment at Palm Beach Pain and Rejuvenation and decided to open a

14  clinic in Garden City, Georgia.

15  A    While I was so employed with Palm Beach Pain and Rejuvenation, I

16  was always wanting to open up my own clinic, 'cause I knew all the ins and

17  outs of how to open up a clinic, from the groundwork from A-to-Z,

18  everything involved in opening up a clinic, the licensing, getting of the

19  doctor, getting of the patients, everything, I knew how to do that.  So I

20  talked to a friend of mine named Lewis Trematerra, who happened to be an

21  investor with Palm Beach Pain, and I told him I was looking to branch out

22  on my own.

23       And at the time the laws in Florida had changed where after October

24  1st of 2010 you cannot dispense for more than 72 hours unless you were

25  owned – unless you have insurance, you had insurance there, and we did

1    because I had a good relationship with them, and they were comfortable

2    working with me, and they decided to come and work for me – work with

3    me at the office up in Georgia.

4    Q    And since none of you lived up here, I assuming arrangements had to

5    be made for living space?

6    A    Yes, sir.  The original plan was to have Adel, Candace and myself come

7    up and train, and get everybody – we had another team come up.  The

8    name was Dan Wise and a gentleman named Kostas and a lady named

9    Shelly, who were going to come up, and they were going to live here and

10   stay here and work in the clinic.  And we went up there, Candace, Adel and

11   myself, to train them and spend time with them to show them how

12   everything worked with the doctor, with the patients, with the files, and

13   then we were going to come back down to Florida and then monitor

14   everything from Florida.

15   Q    And so did you rent a house?

16   A    They rented a house, yes, sir.  I'm not sure exactly the location 'cause I

17   was never in the house, but they did rent a house, Dan Wise and Shelly and

18   Kostas, they rented a house, yes, sir.

19   Q    And did people who were from Florida and then involved in East

20   Health Center, did they stay at that house while working at East Health

21   Center?

22   A    Yes, sir.

23   Q    Did Sean Clark or Frankie Barbuscia come with you?

24   A    Yes, sir, they came up and they were – their job capacity was the same

25   as it was when they worked in Florida.  They did the marketing, and we

1    A    Yes, sir.  We had rented in a park in Boca Raton, yes, sir.

2    Q    And why did you keep that separate office?

3    A    Well, we wanted to maintain everything from one central facility.  I

4    had webcams installed so I could see all the location, all the activity going

5    on during the day.  So even though I was in Florida, I could see everything

6    that was going on during the day, from the lobby to the outside of the place,

7    make sure there was no problems.  So I could just basically monitor

8    everything, all the activity, during the day.

9    Q    I'm going to approach you and show you what's been marked as

10   Government's Exhibits 30-4 and 34 – excuse me, that's 30-4-2.

11            MR. KNOCHE: May I approach, Your Honor?

12            THE COURT: Yes.

13   Q    Would you look at those and tell us if you recognize 30-4 and 30-4-2.

14   A    Yes, sir, these were the ads that I placed in Craigslist looking for a

15   doctor for our location in East Health Center.

16            MR. KNOCHE: And can we –

17   Q    – Well, were those the ads that you ran?

18   A    Yes, sir.

19            MR. KNOCHE: Could you show us those, Dean?  Would you

20   highlight the text.

21   Q    [Reading]: New office in Savannah looking for experienced doctors.  Is

22   that your ad?

23   A    Yes, sir.

24   Q    Okay, and the date on that is January the 20th of 2011?

25   A    Yes, sir.

1    over for what Adel was doing, as far as everybody knowing how to handle

2    the patients and handle everything as far as dealing with the patients,

3    dealing with the blood test, the drug test for the patients, and then finishing

4    up everything with the end-of-day reports.

5    Q    Your Craigslist ad –

6    A    Yes, sir.

7    Q    – in response to that, do you remember talking to a Dr. Mary Kay

8    Ross?

9    A    Yes, sir. Dr. Ross responded to the ad, and she was interested in the

10   position, and I actually met with her with Sean Clark at a local restaurant in

11   Savannah to discuss the location, what we were going to be doing, what we

12   were going to be specializing in, and I wanted her to come and see the

13   location to see if she was interested. So we had lunch, and then after lunch

14   we came to see the facility. And after that she responded to me a couple

15   days saying that she was not going to able to take the position.

16   Q    Did you discuss pay with her?

17   A    Pay was not – pay was discussed at the time. I told her I would do

18   fifteen-hundred dollars a day with her, but it never came to fruition after

19   that. And she was with her husband at the time, too.

20   Q    Did you have any discussion with her where you told her what kind of

21   patients she would be seeing?

22   A    Yes, sir. I told her we would specialize in – we would do pain

23   management, and basically I had experience in the business in Florida, and

24   that I was looking to do the same thing here in Georgia. And it was just

25   basically pain management clientele, and she was – she understood that.

1    Q    Okay, and how much was that?

2    A    $2,000 a day.

3    Q    And did you tell him how that would be paid to him?

4    A    I told him that it would be paid cash daily at the end of the day.

5    Q    And was that what your practice turned out to be?

6    A    Yes, sir.

7    Q    He accepted the position?

8    A    Yes, sir.

9    Q    Was he the physician at East Health Center on day one, February 21st

10   of 2011?

11   A    Yes, sir, he was.

12   Q    And any other doctors working at the clinic at that time?

13   A    No, sir, he was the only doctor at the clinic at that time.

14   Q    And you described a – I believe from day one a patient came to the

15   clinic with cold or flu symptoms wanting to see the doctor.  Is he the one

16   that refused to see that patient?

17   A    That is correct, yes, sir.

18   Q    Now, you had several forms that were filled out by patients at East

19   Health Center; is that correct?

20   A    That's correct, sir.

21         MR. KNOCHE: And if I may, Dean, could you call up Exhibit 1-

22   002.  And if you'd highlight – well ...

23   Q    What was the template for the creation of that form?  I mean, did you

24   make this up just when you started East Health Center?

25   A    The templates for all the forms were created from all our offices in

-243-

1    Q    From patients paying?

2    A    East Health Center.  Patients pay, yes, sir.

3    Q    After SunTrust closed the account, did you open a – you mentioned I

4    think those BB&T Bank records as well?

5    A    We opened up account with BB&T for the East Health Center, and we

6    did the same business we were doing with SunTrust, making the deposits

7    on a daily basis.

8    Q    You paid your help that worked at the facility?

9    A    Yes, sir, we paid our help weekly pay.  Every week we'd pay them, yes,

10    sir.

11    Q    Would that include Sean Clark?

12    A    Sean Clark, that would include Frankie Barbuscia, that would include

13    Kostas, Adel, Candace, myself and Dan Wise.

14    Q    And you had agreed upon amounts that you paid each of those folks?

15    A    Yes, sir.  We agreed upon, it was $500 for the staff. $500 for Adel,

16    $450 for Candace, a thousand dollars for myself, a thousand dollars for

17    Dan – excuse me, a thousand dollars for Sean, and I believe it was 750 for

18    Frankie.

19    Q    And you paid your doctors?

20    A    Yes, sir, that was cash –

21    Q    – Dr. Azmat in particular?

22    A    That was cash every day, $2,000.

23    Q    And the source of that cash was, what?

24    A    From the proceeds from the patients paying for their visits.

25    Q    You have Exhibit 30-2?

1    Q    Business records that you kept in the ordinary course of your

2    business?

3    A    All the records, yes, sir, everything.

4           MR. KNOCHE: Your Honor, I'd like to tender 30-1, 30 – 30-1 is

5    the notebook labeled cash audit and end-of-day reports; 30-2, the lease;

6    30-3, the folder with bank records; 30-4 we've already tendered, the

7    Craigslist ads; and 30-5, the certified copy of articles of the incorporation.

8    A    Yes, sir.

9           MR. KNOCHE: Move those into evidence, Your Honor.

10          THE COURT: Admitted.

11    Q    (By Mr. Knoche) After – you were open from February the 21st to May

12    the 26th?

13    A    That's correct, yes, sir.

14    Q    Dr. Azmat didn't work there the whole time?

15    A    No, sir, he did.

16    Q    Okay, and did he leave on his own, or did you terminate him?

17    A    I let him go, yes, sir.

18    Q    And why did you let him go?

19    A    We were – after the first day, we started receiving calls from

20    pharmacies, and the pharmacies – at the time we weren't dispensing in-

21    house –

22           THE COURT: – Don't ask him what pharmacists told him, Mr.

23    Knoche.

24           MR. KNOCHE: I'm sorry, Your Honor.

25          THE COURT: Don't ask him what pharmacists told him. That's

1    hearsay and you know it, so let's don't get into that.

2    Q    Did you terminate him based on complaints of patients?

3    A    Yes, sir.

4    [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

5    Q    (By Mr. Knoche) Prior to Dr. Azmat beginning his employment at East

6    Health Center, did you have the same sort of conversation with him as you

7    had with Dr. Ross?

8    A    Our conversation – well, our conversation was via telephone because I

9    didn't meet him until the 21st when we opened up, and our conversation

10   was that I was looking for a doctor for pain management.  He said he had

11   vast experience in a pain management facility, he had multiple DEA

12   licenses, and he said that, I'd be able to take care of everything for you, so

13   that sounded like the perfect fit for us.

14   Q    Did you discuss with him your expectations, what you expected of

15   him?

16   A    Yes, sir.  Our conversation basically was that we're looking – you

17   know, we're going to see patients from out of state, and they're looking for,

18   you know, pain management, specifically clientele pain management, and

19   he was okay with that.

20   Q    And when you say pain management, you're discussing a particular

21   subset of pain management; is that correct?

22   A    Yes, sir, basically it was catering the same thing as I did – I mentioned

23   to him my experience in Florida with the pill mills and working in that

24   capacity, so it was the same type of operation.

25   Q    And as you described with – or as Dr. Ross described, did you – you

1 A Correct.

2 Q And you entered a plea here to a single count of conspiracy, as we

3 heard you testify; correct?

4 A That's correct.

5 Q And so you understand, by the way, that in Palm Beach County you

6 have a deal with the prosecutors there; do you not?

7 A Yes, sir.

8 Q And that deal is going to call for an extremely lenient sentence for you;

9 is it not?

10 A I believe so.  My attorney is going to advise me on that one, too.

11 Q I'm sorry?

12 A My attorney down there –

13 Q – No, don't tell me what your attorney has told you.  But you

14 understand, though, or you hope for a sentence of probation to arise out of

15 those charges in Palm Beach County; do you not?

16 A I do hope for that, yes.

17 Q All right.  Now, under the plea agreement that you have here with the

18 government, you face a maximum term of imprisonment of five years;

19 correct?

20 A Yes, sir.

21 Q Sixty months; correct?

22 A Correct, sir.

23 Q So what you have gone from – and you understand, by the way, if you

24 had been charged here, you would be facing dozens and dozens of years of

25 imprisonment; correct?

1    A    Yes, I did.

2    Q    You told other people about that; didn't you?

3    A    Yes, I did.

4    Q    You stole tens of thousands of dollars; didn't you?

5    A    Yes.

6    Q    Would it be over a hundred?

7    A    No, sir.

8    Q    Going back to the money – going back to the money, you know from

9    keeping up with the money – see if we can agree on this – that you never

10    paid Dr. Azmat for his travel from Waycross to East Health Center; right?

11    A    No, sir.

12    Q    You know that that's right; correct?  You didn't do it.

13    A    Correct.

14    Q    You know that you didn't ever pay for any overnight stays of Dr.

15    Azmat; correct?

16    A    Not to my knowledge, no, sir.

17    Q    And that's something that you would be knowledgeable about; true?

18    A    For the most part, yes, sir.  I was only there for the first two weeks, but

19    after that, no.  But when I was there, for my time I was there, no, I didn't

20    pay for any overnight expenses or anything like that.  Just gave him cash

21    every day.

22    Q    Never paid his expenses; that's true?

23    A    Correct.

24    Q    Now, you said you got your training at the Margate Pain Management

25    Clinic, and is that in Palm Beach as well?

1    THE COURT: All right, Mr. Withers.

2    Q    (By Mr. Withers) Sir, I was asking you about what y'all did down at

3    Margate.

4    A    Yes, sir.

5    Q    Am I pronouncing that right?

6    A    Margate Pain, yes, sir.

7    Q    Margate you dispensed the controlled substances; did you not?

8    A    Correct.

9    Q    That means giving it to the patient in its pill container; correct?

10   A    Yes, sir.

11   Q    And you never – you wanted to do that here at East Health Center;

12   right?

13   A    I did, yes, sir.

14   Q    And in fact we saw some pictures of pill containers; correct?

15   A    Yes, sir, I ordered those, yes, sir.

16   Q    But the patients here at East Health Center was never – excuse me,

17   strike that.

18        The facility here at East Health Center was never set up to dispense.

19   A    That's correct.

20   Q    But you continued after Dr. Azmat left trying to get East Health Center

21   set up to dispense; did you not?

22   A    We did, yes, sir.

23   Q    Now, you have previously stated to Mr. Barbuscia – am I pronouncing

24   that right?

25   A    I believe so.

1   Q   – that Dr. Azmat was a disaster; correct?

2   A   Correct.

3   Q   You have told Mr. Barbuscia that he didn't want to give anybody

4   anything that they were usually on; correct?

5   A   I believe so, yes, sir.

6   Q   Words to that effect; is that fair?

7   A   Correct.

8   Q   In other words, you were complaining to – can I call him Frankie?  Is

9   that what you call him, Frankie?

10  A   I call him Frankie, yes.

11  Q   You were complaining to Frankie that Dr. Azmat was not giving folks

12  what they wanted; correct?

13  A   On occasion, yes, sir.

14  Q   You told him that he's no good; correct?

15  A   Yes.

16  Q   That he's not writing heavy; correct?

17  A   I don't remember that part.

18  Q   Do you recall telling Frankie that you wanted to replace Dr. Azmat

19  with someone who would write more freely.

20  A   I don't recall that.

21  Q   Now, through your experience down in Florida, you came to know

22  what was required by Florida law; correct?

23  A   Yes, sir.

24  Q   With respect to a pain management clinic; right?

25  A   Yes, sir.

1    you?

2    A    No, sir.

3    Q    Now, as I understand it, when the facility in Jacksonville was closed,

4    you and Mr. Trematerra decided that y'all would come up here; right?

5    A    That was one of the reasons.

6    Q    And one of the things that you wanted to do was take care of primary

7    care patients; right?

8    A    Pain management patients.

9    Q    No, one of the things that you wanted to expand into was primary care

10    patients.

11    A    That was an idea that Lewis Trematerra and I had, yes.

12    Q    Okay, and one of the things that you wanted to do was take Blue

13    Cross-Blue Shield; correct?

14    A    I was looking to become a member of Blue Cross-Blue Shield, yes, sir.

15    Q    But you found out that – I think you testified that Dr. Azmat told you

16    that he could not treat primary care patients; correct?

17    A    I don't remember that.  I don't remember – I'm sure I did.  I don't

18    remember if I did say that or not.

19    Q    Do you recall Dr. Azmat telling you that he did not have malpractice

20    for primary care?

21    A    Yeah, after I saw his first two patients and he told me that.

22    Q    Okay.  Fair to say that when he told you that he could not see primary

23    care, you were shocked; right?

24    A    I was very shocked, yes, sir.

25    Q    You were livid with him; correct?

-271-

1    A    I was upset.

2    Q    You had something of a confrontation with Dr. Azmat that day;

3    correct?

4    A    I'm not sure it was a confrontation.  We had a – we had a – I was mad,

5    but I don't know if we had a confrontation.

6    Q    In fact you had never met Dr. Azmat until that morning; right?

7    A    Until that Monday, yes, sir.

8    Q    Had a – I think you testified a couple of phone calls and you

9    exchanged a couple of emails.

10    A    That's correct.

11    Q    In fact, your first email with him was at the beginning of February;

12    correct?

13    A    Okay.

14    Q    And he sent you his Georgia license and his DEA Registration;

15    correct?

16    A    Correct, sir.

17    Q    And after that first confrontation you had with – or where you were

18    livid, put it in your – shocked, put it in your words, on his first day of work,

19    you decided that was the beginning of the end for you with respect to Dr.

20    Azmat; correct?

21    A    Among other things, yes.

22    Q    And you started immediately searching for a replacement; did you

23    not?

24    A    I inquired about, yes, trying to find somebody else.

25    Q    By the way, you had said that you told Dr. Azmat that you were just

1    me, two days later, Thursday, March 3, 2011.

2    A     I believe so, yes, sir.

3    Q     And I believe you testified earlier that ultimately you ended up

4    discharging Dr. Azmat; correct?

5    A     Correct.

6    Q     And do you recall the date that you terminated him?

7    A     I believe it was the 18th of March.  That's what I'm going to say, I think

8    it was that Friday.

9    Q     When Dr. Azmat was at the clinic, fair to say that the patients were

10   unhappy with Dr. Azmat; correct?

11   A     Fair to say, yes.

12   Q     When Dr. Azmat was at the clinic, it's fair to say that the patients were

13   dissatisfied their drugs were being cut; correct?

14   A     Among other things, yes, sir.

15   Q     Fair to say that patients were unhappy that Dr. Azmat was routinely

16   discontinuing Xanax; correct?

17   A     I don't recall that.

18   Q     And when you spoke with Dr. Azmat on the phone, you never told him

19   that this is what he had to prescribe.

20   A     Had to, no.

21   Q     You never told him that, you're only prescribing oxycodone; correct?

22   A     No, sir.

23   Q     And I believe you actually testified earlier – or strike that.

24        The fact is that you didn't see it as your place to tell the doctor what to

25   do; true?

-288-

1  A   I'm in the elevator trade.  I do modernization, rip out old elevators,

2  install new ones for the Union, Local 71.

3           MR. GILLULY: One second.  Ma'am?

4           REPORTER: I need him to speak up.

5  Q   Again, the court reporter is having a difficult time hearing.  Even if you

6  have to exaggerate your voice, if you could just speak louder.

7  A   Okay.  No problem.

8  Q   It's so deep it's hard to hear sometimes.

9  A   Okay.

10  Q   Into the microphone loud.

11  A   Okay.

12  Q   All right.  You said that you were in the elevator business; right?

13  A   Yes, sir.

14  Q   You help repair elevators?

15  A   Actually I uninstall old ones and reinstall new ones.

16  Q   Okay.  And where do you live?

17  A   Right now, 513 Southwest, Ft. Lauderdale.

18  Q   Okay.  You live in South Florida; right?

19  A   Yeah.

20  Q   How long have you lived in Florida?

21  A   Since 2005, April 2005.

22  Q   And before living in Florida where did you live?

23  A   Brooklyn, New York.

24  Q   And what brought you from Brooklyn down to Florida?

25  A   I just wanted to get out of Brooklyn.  It's nothing but trouble.

1    right?

2    A    Me being the marketing person that has to secure the clientele, to my

3    standpoint, yes.

4    Q    He didn't want to give anybody anything that they were usually on;

5    correct?

6    A    I wouldn't say that would be correct. I would say that nobody could

7    get their prescriptions filled with him.

8              MR. WITHERS: May I approach, Your Honor?

9              THE COURT: Yes, sir.

10             MR. WITHERS: And again, Your Honor, if I could have the

11   Court's permission to examine the witness from –

12             THE COURT:  – This is the last witness we're going to do that

13   with, Mr. Withers. If you're going to question them about any of this,

14   you're going to have to get your own copy.

15             MR. WITHERS: Yes, sir.

16   Q    (By Mr. Withers) You testified in front of the grand jury in November

17   of 2011; correct?

18   A    Yes, sir.

19   Q    Sworn to tell the truth; right?

20   A    Yes, sir.

21   Q    And the question was [reading]: Why do you say that Dr. Hazmat was

22   a disaster?

23             And your answer was [reading]: He was just from what everybody

24   complained about he didn't want to give anybody anything that they were

25   usually on; correct?

1    A   I guess so.  That's a long time ago.  Or get their prescriptions filled.

2    Q   And the fact is that patients were complaining and not showing back

3   up; right?

4    A   Yes, sir.

5    Q   And Al was telling you the doctor's horrible; correct?

6    A   Yes, sir.

7    Q   Al told you he's not writing heavy; correct?

8    A   I don't quite remember that.

9           MR. WITHERS: May I approach, Your Honor?

10          THE COURT: Yes, sir.

11          MR. WITHERS: Counsel, Page 60, Lines 1 and 2.

12    Q   You with me there at the top of the page, sir?

13    A   Yes, sir.  Yes, yes.

14    Q   What you said when you testified before the grand jury was [reading]:

15  They weren't getting enough drugs; correct?

16    A   Yes, now I remember now.

17    Q   You said [reading]: Al was basically like, the doctor's horrible; correct?

18    A   Yes.

19    Q   [Reading]: He's not writing heavy; correct?

20    A   Yes.

21    Q   [Reading]: He's not good; correct?

22    A   Correct.  I'm sorry, my memory's a little jogged.  It's been many years.

23  Can't remember every word.

24    Q   And so Al wanted to replace him with a doctor who would write more

25  heavily; correct?

1    there, and down left arm and shoulder.

2    A    Right.

3    Q    Was that true?

4    A    Yes.

5    Q    And you see where it says oxy 30, 180 right there?

6    A    Yes.

7    Q    That was true as well, was it not?

8    A    Yes.

9    Q    And right next to that, ma'am, I think it says oxy 15, and I think that

10   says 84, although it's hard to read.

11   A    Yes.

12   Q    And then Xanax right next to that; correct?

13   A    Yes.

14   Q    And there were a couple of others, Flexeril, and I'm not sure that I can

15   read that other one.  And then if we look down here, the oxycodone 30

16   milligram tablets were reduced from 180 down to 150.

17   A    Yes.

18   Q    The oxy 15 milligram tablets were reduced from 84 tablets down to 60;

19   correct?

20   A    Yes.

21   Q    And then the Xanax was discontinued; was it not?

22   A    Yes.

23   Q    So that when you went into see Dr. Azmat, you came out with fewer

24   oxycodone; correct?

25   A    Yes.

| | | |
|---|---|---|
| 1 | A | I live in Lake Worth, Florida. |
| 2 | Q | And where – is that middle, northern, or southern Florida? |
| 3 | A | South Florida. |
| 4 | Q | Okay.  How long have you lived in Florida? |
| 5 | A | Twelve years. |
| 6 | Q | What brought you down there? |
| 7 | A | College, place to stay with the folks. |
| 8 | Q | And did you attend college? |
| 9 | A | I did, a few. |
| 10 | Q | And did you graduate? |
| 11 | A | No. |
| 12 | Q | Okay.  Mr. Afthinos, you are in fact – you stand before the Court now, |
| 13 | | you've been convicted of a federal crime. |
| 14 | A | Yeah. |
| 15 | Q | You were convicted of a misprision charge related to unlawful |
| 16 | | distribution of controlled substances and money laundering; is that right? |
| 17 | A | Yes. |
| 18 | Q | And you're awaiting sentencing? |
| 19 | A | I am. |
| 20 | Q | And as part of your plea agreement you've agreed to testify and |
| 21 | | cooperate with the United States Government; is that right? |
| 22 | A | I have, yes. |
| 23 | Q | Okay, and you are represented by counsel; is that right? |
| 24 | A | Yeah. |
| 25 | Q | Okay.  I would like to date your attention back to in or about 2011.  Did |

1    Q    Okay, and did you have occasion to meet a female named Adel and

2    Candace?

3    A    Yeah.

4    Q    And were they from Florida also?

5    A    Yeah.

6    Q    And did they start working at East Health Center?

7    A    Yes.

8    Q    And what was their job at East Health Center?

9    A    Just to come up and train us on front desk, and how to take drug tests

10    and urine tests and all that.

11    Q    Okay.  So after doing some marketing -- or, you did some marketing

12    before East Health opened; is that correct?

13    A    Yeah, before it opened.

14    Q    And there was a point where your job switched from marketer to

15    actually working inside the clinic; is that right?

16    A    Yeah.

17    Q    And who trained you?

18    A    Candace.

19    Q    And to your knowledge does Candace have any medical training?

20    A    No.

21    Q    What about Adel?

22    A    Not that I know of.

23    Q    Pardon me?

24    A    No, not that I know of.

25    Q    Okay, and when you came up here to Garden City, Georgia, where

1    A   Cash.

2    Q   And do you know where the money came from?

3    A   From the patients.  Every day we would count out – from whatever

4    money we made we'd count out $2,000, wrap it up in a piece of paper, and

5    hand it to Dr. Azmat.

6    Q   Were there any rules related to where people could hang out?

7    A   Yeah, that's what he was there for.  I mean, no one was scared of a

8    fight breaking out or anything, but if there was, he was there.

9    Q   By he, you mean the security guard?

10    A   Yeah, security guard.  And he would tell people, you know, what they

11    wanted me to do at the beginning, you can sit here, you can stand there, if

12    you want to smoke you can go over there, no loitering in the front.  That

13    was his job.

14    Q   Did you ever see kids there?

15    A   Yeah, true.

16    Q   And what were they – who were they with?

17    A   Their parents.

18    Q   And what did parents and other people who attended East Health

19    Center look like?

20    A   Every-day normal folks.  I can't say I'd seen anybody sick and I –

21    again, I don't have any medical expertise, but from what I learned about

22    these drugs and what was being prescribed, and I would ask them at triage,

23    what's your pain, 1 out of 10, and they'd say 10.  And it's like, how did you

24    drive from Oklahoma if your pain's a 10 –

25           MR. WITHERS:  – Objection to the editorial, Your Honor.

1    A    Yes, uh-huh.

2    Q    And you would get those faxed the same day the patient was there.

3    A    Yeah, before they got seen.

4    Q    Before the patient was seen by the doctor.

5    A    By the doctor, yeah.

6    Q    And you talked to a lot of patients who would tell you that they were in

7    pain; correct?

8    A    Sure, yeah.

9    Q    And you had been told by your friends that you came up here with that

10    you were going to keep this within the confines of the law; right?

11    A    Yeah, whatever that was.

12    Q    You never thought it was going to come to this –

13    A    No.

14    Q    -- that's fair to say.

15    A    I thought at the worst case scenario they'd shut us down.  I never

16    thought I'd be standing here before you or be in this kind of trouble, no.

17    Q    And the fact is, Dr. Azmat didn't last very long at that facility; did he?

18    A    Yeah.  No one would fill his scripts.

19    Q    All right, and there was an issue as well with respect to the patients

20    being dissatisfied with Dr. Azmat for other reasons; right?

21    A    Uh-huh.

22    Q    Yes?

23    A    Yeah.

24    Q    And you recall in fact Dan being upset with Dr. Azmat because he was

25    taking too long with the patients; right?

1    A    Yeah.

2    Q    And what he was complaining about was that Dr. Azmat wasn't writing

3    enough prescriptions; correct?

4    A    Yeah.  They had a talk about that, yeah.

5    Q    All right, and he told Dr. Azmat, step it up; correct?

6    A    I don't know if those were his words, but something to that effect, yes.

7    Q    Something to that effect.  And that's because Dr. Azmat was spending

8    15-to-20 minutes per patient; true?

9    A    Yeah, and we want to get these turned over.

10              MR. WITHERS: That's all I have, thank you.

11              THE COURT: Any other questions of this witness?

12              MR. GILLULY: Yes, Your Honor.

13                        REDIRECT EXAMINATION BY

14    MR. GILLULY:

15    Q    Mr. Afthinos, you indicated that was part of why you are testifying

16    today, in the hopes of getting a better deal.  What's the other part?

17    A    Coming to terms with what I've done.  Coming to terms with the

18    position I'm in.  Knowing what I was a part of, what I was pushing.

19    Understanding these pills, what they do.  I have never thought of myself as

20    being this kind of person, and I took a job opportunity that I knew wasn't

21    right, but I wanted a job.  And so if I were sentenced back in February, I'd

22    probably be out by now.  It's not just to cooperate and make things easier in

23    my life, it's just trying to set it straight.

24    Q    Did we ever tell you what to say?

25    A    Never.

<u>DIRECT EXAMINATION BY</u>

<u>MR. GILLULY:</u>

Q    And Mr. Clark, how old are you, sir?

A    Thirty-four.

Q    And where – you said the Lawyer Referral Network in Florida.  Do you live in Florida?

A    Yes.

Q    And where in Florida do you live?

A    Deerfield Beach.

Q    And is that middle, northern or southern?

A    South Florida.

Q    And you've got an accent.  Prior to coming to Florida, where are you from?

A    From Long Island, New York.

Q    And what brought you down to Florida?

A    I had some substance abuse issues, and I came down to Florida to go to a halfway house in '08.

Q    Okay, and you stand before the Court and the jury today convicted. You've pled guilty to a conspiracy charge related to the distribution of controlled substances and money laundering, and you're awaiting sentencing; is that correct?

A    Yes.

Q    And you're represented by counsel –

A    Yeah, Mr. Phillips is here.

Q    – whose actually in the courtroom.

1    A    Richard McMillan.

2    Q    Okay, and did there come a time through working with Rich McMillan

3    where you met Al LeFrancois?

4    A    Yeah, Al was the office manager in Boca Raton.

5            MR. GILLULY: Okay, if you could put 28-1 on the screen,

6    please.

7    Q    The individual on the screen, who is that?

8    A    Yeah, that's Adelard LeFrancois, Al.

9    Q    And did you participate in marketing with others for pain

10    management clinics in Florida?

11    A    Yes.

12    Q    Who was your target audience?

13    A    Well, in South Florida at the time there was a lot of pill mills, and

14    people were coming down from Tennessee, Kentucky, Ohio, as far away as

15    Maine.  And there was a lot of – a lot, a lot of people that came down.  So

16    our target audience was people that were coming from out of state to go to

17    these clinics.

18    Q    Okay, and just describe some of the marketing techniques you

19    employed.

20    A    Most of them, you know, traveling so far, they would stay in a hotel the

21    night before.  So we had a list of a couple of dozen hotels that were like $40

22    a night.  We would go there, and we would put flyers on all the windows.

23    And then during business hours, when they came, we would go to other

24    clinics and MRI places and hand out cards, and direct them to the clinics

25    that I worked for.

1    Q    And did there come a time when you and Al LeFrancois and others

2    decided to open your own pain clinic in Garden City, Georgia?

3    A    Yeah, I wasn't involved in the initial conversation to open it, but very

4    shortly thereafter, before it opened, I was approached by Lewis and Al, and,

5    yes.

6    Q    And that's Lewis Trematerra?

7    A    Yes.

8    Q    And who selected Savannah area for the pill – pain management

9    place?

10   A    I'm not sure. I found the actual office that we leased. I don't know

11   who actually made the selection, but in a conversation I had with them they

12   asked me to come up here into Chatham County and look for a location.

13   Q    In fact you found the place that ultimately became East Health Center;

14   is that right?

15   A    Yeah, and Frankie met with a Realtor, and we looked at several

16   buildings. We would take pictures of them and send them back to them.

17   And when we found the office on Route 80, I eventually – you know, once I

18   got their approval, I signed a lease for it.

19   Q    Okay, and why – I mean, why did you pick that location?

20   A    Well, most of the people that were coming to Florida, you know, they

21   were traveling from north of here, you know, Tennessee, Kentucky, West

22   Virginia. So I think that it was close to a main road, and it was a lot less of a

23   distance from where a lot of the people were coming from.

24   Q    Okay, and you said you signed a lease.

25        MR. GILLULY: If you will put, Dean, 32-5 on the overhead,

1    A    Yes, sir.

2            MR. WITHERS:  And this is Government's Exhibit 13-013.

3    Q    What Dr. Azmat did is, he reduced it to Xanax 1 milligram; correct?

4    A    Yes, sir.

5    Q    And he wrote you a prescription for Motrin 800 milligrams, as well;

6    true?

7    A    Yes, sir.

8    Q    And if we look up here, Mr. Bradley, under the oxycodone 30 on that

9    prescription, you see those words where it says, all or none?

10   A    Yes, sir.

11   Q    And you understood that to mean, did you not, that you had to fill

12   either all of those or none of those?

13   A    Actually, I wasn't even aware that was on there, to be honest with you.

14   Q    Okay.  The combination of that oxycodone and Xanax, I believe you

15   described that as a combination of – or a cocktail prescribed by pill mills;

16   correct?

17   A    Usually, yes.

18   Q    And when you filled out the paperwork at East Health Center, you

19   indicated that you were on both of those drugs, oxycodone and Xanax;

20   correct?

21   A    Yes, sir.

22   Q    And the reality was that you were on occasion selling some of your

23   drugs.

24   A    No, sir.

25   Q    Not true?

1    A    I wasn't too worried about the Xanax, to be honest with you.

2    Q    All right, well you were unhappy, were you not, that you had come all

3    the way up here from Jacksonville and ended up getting less medication

4    than you had gotten in Florida?

5    A    Yes, sir.

6    Q    Now, you actually complained about Dr. Azmat that day; did you not?

7    A    There was probably a discussion about it, yes, sir.

8    Q    Do you remember complaining to somebody out front, or in the front

9    office about Dr. Azmat?

10   A    Yes, sir, it was Dan.

11   Q    And you could actually hear the discussion between Dan and Dr.

12   Azmat?

13   A    Yes, sir.

14   Q    It wasn't a discussion right in front of you, but it was a discussion

15   behind the door where you could hear what was going on.

16   A    I can't remember if they were in front of the door or behind the door,

17   but I do remember the discussion.  Actually, I think they were on the far

18   side of the waiting room, is what it was.

19   Q    Okay.  But you -- not in your presence --

20   A    I can't remember exactly.

21   Q    -- but you could hear.

22   A    Yes, sir.

23   Q    All right, and you had complained to Dan because you had gotten

24   fewer medications; right?

25   A    Basically the same thing, what I wanted for basically what I could've

1   A   Yes.

2   Q   And then under the medication here, it looks previous medication,

3   oxycodone 30, 240 is – was that true, to your recollection?

4   A   Before I seen him, yes.

5   Q   And then 15 milligram oxycodone, 110; correct?

6   A   Yes.

7   Q   And then Xanax 2 milligrams, 60, it looks like; correct?

8   A   60 or 50, I don't remember, one or the other.

9   Q   Okay, and if I add those up correctly, 240, 110, and if it's 50, that

10   would be an even 400 tablets that you were on at that point in time.

11   A   Yes.

12   Q   And Dr. Azmat, with respect to the prescriptions that he gave you, he

13   reduced the Xanax from 2 milligrams to 1 milligram.  You see that?

14   A   Yes.

15   Q   And he reduced the number from 50 or 60 down to 30; right?

16   A   Yes.

17   Q   He reduced the oxycodone 30 from 240 tablets down to 150.

18   A   Yes.

19   Q   That's a sizeable drop; wasn't it?

20   A   Yes.

21   Q   Then the oxycodone 15, he reduced from 110 down to 30; correct?

22   A   Yes.

23   Q   That's another sizeable drop; correct?

24   A   Yes.

25   Q   So when you left, having been seen by Dr. Azmat, your prescriptions

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

UNITED STATES OF AMERICA    *

v.    *   CASE NUMBER CR413-28

NAJAM AZMAT    *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

VOLUME 3 - 1/15/2014

PP. 457 - 734

APPEARANCES:

For the Government          KARL I. KNOCHE, AUSA
GREGORY E. GILLULY, JR., AUSA

For the Defendant           THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in conjunction with transcription of back–up recording.*

-553-

1    Q    And do you see that Dr. Azmat reduced that patient from 180 tablets

2    of 30 milligrams down to 60?  Do you see that?

3    A    I do.

4    Q    That's a reduction to – to a third, by a third, I'm confusing myself right

5    now.  A lot; right?

6    A    By a third, yes.

7    Q    And that the oxycodone 90 has been reduced from – excuse me,

8    oxycodone 15 has been reduced from 90 down to 60; you see that?

9    A    I do.

10   Q    And that the Xanax 2 milligrams, 60 tablets, has gone to discontinue

11   the Xanax; do you see that?

12   A    I do.

13   Q    Be fair to say that with this patient that Dr. Azmat has reduced those

14   medications by a significant manner; correct?

15   A    Correct.

16   Q    That's fair to say; isn't it?

17   A    In this chart, yes.

18   Q    And do you see where it says wean off medications?  Down at the very

19   last …

20   A    Yes.

21   Q    Doctor, if someone is on up to 270 oxycodone on a monthly basis, it

22   would be appropriate to try and wean that patient off that medication if her

23   objective symptoms didn't bear out her complaint of pain; correct?

24   A    Correct.

25   Q    In other words, you wouldn't want to completely discontinue the

1    A    That's my understanding.

2    Q    Were you there that day?

3    A    No.

4    Q    You were interviewed that day; were you not?

5    A    Right.  I never made to the office.

6    Q    Did the DEA ask you to surrender your license to prescribe after that?

7    A    Yes.

8    Q    And you did so.

9    A    I did.

10   Q    You did not have a license to dispense; correct?

11   A    Correct.

12   Q    And you did not dispense out of that facility; correct?

13   A    Correct.

14   Q    You are licensed to practice medicine in how many states?

15   A    Georgia and Alabama.

16   Q    Did you surrender your Georgia license?

17   A    No.

18   Q    So you said here today that you are engaged in the landscaping

19   business, but you continued to practice medicine after the entry of your

20   guilty plea; did you not?

21   A    I did.

22   Q    All right.  So you came in here before this Court – and I believe it was

23   October of 2012 – and entered a guilty plea; is that accurate?

24   A    Correct.

25   Q    It looks like the date of your plea, or at least the date of the

1    designated as a second draft of the proposed charges, and after we adjourn

2    court this afternoon, whatever time that is, I'm going to want to discuss

3    those with you before you get out of here.

4            So I'll see you at 1:15.

5            [NOTE: Whereupon a luncheon recess is taken, after which the

6    proceedings are continued in the presence of the jury as follows:]

7            THE COURT: Ladies and gentlemen, I hope you enjoyed your

8    lunch. I appreciate you all being back on time. And you may proceed, Mr.

9    Knoche.

10            MR. KNOCHE: Dan Wise.

11        [Witness Sworn]

12            CLERK: You may be seated. Please state your name, your

13    occupation, and spell your last name for the record.

14            MR. WISE: Daniel Wise, W-I-S-E. Occupation is marketing.

15                    D A N I E L   W I S E

16        GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

17                    DIRECT EXAMINATION BY

18    MR. KNOCHE:

19    Q    Mr. Wise, where do you live?

20    A    West Palm Beach, Florida.

21    Q    All right, sir, and when you say marketing, what are you doing right

22    now?

23    A    I work for a sales and marketing company.

24    Q    You were originally, until just last week, a defendant in this case

25    pending trial; is that right?

1    substance.

2    Q    And was that a felony as well?

3    A    I believe so, yes.

4    Q    All right, sir.  Mr. Wise, how old are you now?

5    A    Thirty-five.

6    Q    And how long you lived – you say you live in West Palm now?

7    A    Yes.

8    Q    How long have you lived in West Palm?  Is that your hometown –

9    A    – Majority of my life.

10    Q    Most of your life?

11    A    Yes.

12    Q    Have you ever lived in the Savannah area?

13    A    I lived in Pooler, Georgia for a few months.

14    Q    For a few months, okay, and tell us how it was that you came to reside

15    for that brief interval in Pooler, Georgia.

16    A    While working in Boca Raton, Florida for a gentleman by the name of

17    Sean Clark and Adelard LeFrancois for a telemarketing company, they told

18    me that they were opening an office in Savannah – or, I'm sorry, Garden

19    City, Georgia doing pain medicine, or pain clinic, and asked if I'd be

20    interested in coming up and working there as their office manager, just to

21    kind of keep everybody doing what they were supposed to be doing on a

22    day-to-day basis.  So that's how I came about to move up to Pooler.

23    Q    And it's a big move –

24    A    Yeah.

25    Q    – distance-wise, or fairly significant.  What did they offer you in

1      exchange for your agreement?

2      A     Originally they offered me a salary of $10,000 a month, and paying for

3      my expenses to live, plus my – you know, that's all.  It was just a $10,000 a

4      month salary and my expenses paid.

5      Q     And what were your duties to be?

6      A     Kind of oversee day-to-day operations.  When patients came in just

7      kind of really just make sure everybody was doing what they were supposed

8      to be doing, make sure patients weren't loitering outside.  Basic stuff.  It

9      wasn't like an actual detail put into place.

10     Q     Did you know that it would be a nominal pain management clinic?

11     A     I did.

12     Q     Okay.  A doctor's office?

13     A     Yes.

14     Q     And what kind of patients were you led to believe would be coming to

15     the facility?

16     A     Patients that were seeking pain medication from different areas, from

17     different states.  They wanted to do it in Georgia versus Florida because

18     Florida passed a law where you can't dispense inside the same – if it's a

19     pain clinic they can't also dispense, they'd have to open a separate

20     dispensary.  So they planned to be able to have the prescriptions written

21     and filled in-house, or dispense in-house as well.  They never got that far,

22     but that was the intent.

23     Q     Was Georgia considered to be more hospitable to such a facility?

24     A     Yeah, they picked Savannah, Georgia specifically because of where –

25     or, I'm sorry, Garden City, Georgia specifically because it was located near

1    the clinic?

2    A    Yes, there was one gentleman in particular that stuck out, and I believe

3    his name was Leroy.  He would come there quite often, maybe two times a

4    week, sometimes more.  Then he might not show up for a week, and then

5    he would be back there two or three times again.

6    Q    And you indicated that you did have issues with patients arriving with

7    out-of-state license plates.

8    A    Correct.

9    Q    Do you recognize Najam Azmat?

10   A    I do.

11   Q    Okay.  Could you describe him for the record?

12   A    His appearance?

13   Q    Yeah, describe him so that the record will reflect that you've identified

14   him.  What color tie is he wearing.

15   A    He's wearing a red tie.

16          MR. KNOCHE: May I have the record reflect that identification.

17          THE COURT: So noted.

18   Q    Was Dr. Azmat the physician employed by East Health Center when

19   you started working inside the clinic as the manager?

20   A    Yes, he was.

21   Q    And did you have occasion to get to know Dr. Azmat?

22   A    I wouldn't say got to know him but, I mean, day-to-day, just talking

23   office talk, yes.

24   Q    How – who paid him?

25   A    Well, the – you mean ...

| | | |
|---|---|---|
| 1 | Q | Yeah, who paid him?  I mean ... |
| 2 | A | East Health Center.  I'm the one that handed him the cash. |
| 3 | Q | Where'd you get the cash with which you paid him? |
| 4 | A | From the daily take of whatever came in that day. |

5          MR. KNOCHE: Could we see 29-2A-23, please.  Excuse me,

6  check that, 29-5A-1.

| | | |
|---|---|---|
| 7 | Q | Did you have a surveillance camera, surveillance system? |
| 8 | A | Yes, we did. |
| 9 | Q | Okay, and why did you have surveillance cameras? |
| 10 | A | They put surveillance in, they said it was for – just for security |

11  purposes because there was cash onsite, and potentially there was

12  supposed to be medication onsite as well.  Just to prevent people from

13  wanting to break in.

14          MR. KNOCHE: And 29-5A-8.

| | | |
|---|---|---|
| 15 | Q | Do you recognize yourself there? |
| 16 | A | I do. |
| 17 | Q | Okay, and you saw the other picture a moment ago. |
| 18 | A | Yes. |
| 19 | Q | What are you doing? |
| 20 | A | There it looks like I was doing maybe the daily count. |
| 21 | Q | Okay.  Is that counting cash? |
| 22 | A | Yes. |
| 23 | Q | Okay, and you did that at the end of each and every business day? |
| 24 | A | Correct. |
| 25 | Q | Okay, and from those proceeds did you pay Dr. Azmat? |

1   A    Correct.

2   Q    And once again shows Dr. Azmat, paid him $2,000 cash.

3   A    Yes.

4   Q    And that was your typical arrangement with him?

5   A    Yes, it was.

6   Q    Did you ever pay him by other means?

7   A    Once in a while if they did not have the funds in cash he was paid with

8   a check.

9   Q    Did Dr. Azmat know that the patients who came to East Health Center

10  were paying cash?

11  A    I believe so, yes.

12  Q    And why do you believe that?

13  A    I couldn't give you an exact reason why.  It was just kind of -- I mean,

14  everybody paid with cash.  The doctor knew we didn't take insurance.

15  Never specifically spoke about whether it was check or cash.

16  Q    He knew he was paid in cash; did he not?

17  A    Yes.

18  Q    Is that what he preferred?

19  A    Yes.

20  Q    Did Dr Azmat know about how you had recruited so many people to

21  come here at your clinic?

22  A    Yes.  We didn't have in-depth conversations about it.  It was more of,

23  when we would go out and do marketing we would, you know, say -- 'cause

24  there were some times when I first went and started working out of the

25  East Health Center when I was also temporarily doing part-time marketing.

-584-

1    So I was in and out of the office, and I would let everybody know that I'm

2    going to market other pain clinics, you know, to bring in patients. So that it

3    was something that was very candidly and openly talked about within the

4    office.

5    Q    Did pharmacies ever call back in to East Health Center when they

6    received a prescription from a patient of Dr. Azmat's and –

7    A    Yes.

8    Q    – tell you – question it?

9    A    Quite often.

10   Q    Or not fill it?

11   A    Both.

12   Q    Did patients call and complain?

13   A    All the time.

14   Q    Did patients ever complain to you that they were not satisfied with the

15   amount of drugs they were prescribed?

16   A    Yes, that happened quite often as well.

17   Q    Did you discuss that with Dr. Azmat?

18   A    Yes.

19   Q    And what would he tell you?

20   A    I would get a call from either Sean or Al and was told to go tell Dr.

21   Azmat that he needs to increase what he's writing 'cause the patients are all

22   calling complaining. And Dr. Azmat would get frustrated and explain that

23   it was his license on the line, that he wasn't going to do what they wanted

24   him to do, and he would increase the patients' prescription on their next

25   visit. He wanted to show that they weren't starting off at a high amount.

1    medications.

2        Schedule V would be kids' cough syrup.

3    Q    And when we say benzodiazepine, what are some of the names that the

4    jury may have heard for a drug which is a benzodiazepine?

5    A    Valium, Ativan, Xanax.

6    Q    As a pain management physician, you prescribe controlled substances

7    such as oxycodone or hydrocodone when you deem it appropriate?

8    A    I do.

9    Q    And it is not your view that people should be denied such pain

10   medications.

11   A    No, sir.

12   Q    Are you familiar with the standards and the guidelines of The Georgia

13   Composite State Medical Board concerning the prescription of controlled

14   substances for the treatment of pain?

15   A    Yes.

16   Q    In fact, have you presented some public comment on these guidelines at

17   meetings of The Georgia Composite Medical Board?

18   A    I did.

19   Q    Was that back in 2011?

20   A    Yes.

21   Q    Are you familiar with national policies such as those in the Federation

22   of State Medical Boards model policy?

23   A    Yes.

24   Q    Are the standards similar?

25   A    Yes, they —

-619-

1    the minimum criteria necessary under Rule 702, and I would like to reserve

2    other issues regarding the weight and credibility of that, including his

3    training and experience, with the Court's permission.

4         THE COURT:  But you do not wish to voir dire the witness now

5    on the tender of Mr. – or offer of Mr. Knoche that this witness be admitted as

6    an expert to testify in the field of pain management.

7         MR. WITHERS: I do not, Your Honor, and I'll reserve all those

8    other questions with respect to weight and credibility.

9         THE COURT: All right, he's admitted, Mr. Knoche.

10   Q    (By Mr. Knoche)  Dr. Kennedy, we've talked about some of the reference

11   materials and standards used to determine if controlled substances are

12   appropriate to be prescribed.  Is the medical history of the patient relevant?

13   A    Yes, of course.

14   Q    And why is that?

15   A    It's impossible to render a diagnosis, certainly on a chronic patient,

16   without a medical history.

17   Q    And how is a medical history usually taken from a patient?

18   A    Most offices will have a patient history intake form, and the physician,

19   having reviewed that, will discuss any issues that are on there with the

20   patient and, additionally, their treatment records from other physicians'

21   offices.

22   Q    And is it your practice to – an accepted practice to request records from

23   other physicians when determining if it's appropriate to prescribe controlled

24   substances?

25   A    Yes, sir.

1   Q    And tell us about the importance of a physical exam.

2   A    A physical exam is the second part, or another major part of what helps

3   a physician render a diagnosis and decide on a treatment.

4   Q    Have you heard of treatment plans?

5   A    Yes, sir.

6   Q    And what is – it seems obvious. What is a treatment plan?  What does it

7   – what is it's purpose?

8   A    A treatment plan is what the physician and the patient agree on as a

9   course that they are going to proceed with to hopefully help improve their

10  life.

11  Q    When creating that treatment plan, is it appropriate in all cases to

12  include – consider the use of non-controlled drugs?

13  A    Is it appropriate in all cases –

14  Q    – Is to consider the use of non-controlled drugs?

15  A    Yes, sir.

16  Q    Is it appropriate to consider referrals to specialists?

17  A    Yes.

18  Q    What type of specialist might one in chronic pain expect to be referred

19  to from time to time?

20  A    In a practice that is handling a lot of patients who have chronic pain

21  issues, I would expect that there would be referrals for physical therapy,

22  occupational therapy, perhaps interventional pain management,

23  orthopedics, neurology, neurosurgery.  All are possibilities.

24  Q    And if a referral is made, should that be indicated in the patient's chart?

25  A    Yes, sir.

1  getting their pain medications filled, where they're getting them filled, who is

2  prescribing them, that sort of thing.

3  Q    And what are ways that a pain management doctor, or any doctor,

4  might go about documenting and reviewing the patient's prescription

5  record? Where might it come from?

6  A    Of a great deal of importance would be to have the previous physician's

7  treatment records.

8  Q    And sometimes pharmacy records?

9  A    Yes, sir.

10  Q    Should that prescription record be reviewed and discussed with the

11  patient before prescribing a controlled drug?

12  A    Should it be reviewed and discussed with the patient?

13  Q    Yes, the prescription record.

14  A    Well, in my opinion, it should be reviewed. I don't know about

15  necessarily discussed, but it should be reviewed.

16  Q    Do the standards require that the physician discuss the risks and

17  benefits of the use of controlled substances with the patient?

18  A    Yes.

19  Q    And does that include explaining the risks and benefits of the drug

20  which is being considered for prescription?

21  A    Yes.

22  Q    When embarking on what appears to be the long-term use of an

23  addictive substance such as a Schedule II drug, is it appropriate to – or wise

24  to hold family conferences?

25  A    It can be useful.

1    Q    Is it appropriate to explain the differences between dependence,

2    tolerance, and addiction?

3    A    That also can be important.

4    Q    What are the differences?

5    A    Dependence is a physiologic state that begins to occur after a patient has

6    been on a scheduled medication, on an opiate medication for a long time.

7    And it is indicated that one of the things that demonstrate dependence is

8    when a patient has also developed tolerance, where they require more of any

9    given agent to achieve the same effect.  So that's chemical dependence and

10    tolerance.  And was there –

11    Q    – Addiction.

12    A    And addiction is where someone has chemical dependency that they

13    pursue despite obvious adverse effects to themselves.

14    Q    How importance is it to maintain regular monitoring of the patient who

15    is on controlled substances?

16    A    In my opinion, it's important.

17    Q    Should follow-up examinations be conducted?

18    A    Yes, sir.

19    Q    And record keeping, discuss record keeping standards.

20    A    Well, as far as the standards are concerned, certainly physicians are

21    required to document what it is that they're prescribing, how much of what it

22    is that they're prescribing, as well as why they are prescribing it.

23    Q    And record keeping requirements, I'm assuming, are important.

24    A    They are.

25    Q    Dr. Kennedy, in this case you have reviewed 25 patient files which are

-624-

1   the subject of the indictment that the jury is hearing.  I would like to discuss

2   with you each of those patient files and ask you your opinion about the

3   medical legitimacy of the prescriptions which were alleged.  So you may have

4   some records with you if you need to refer to them.

5       Jim Brooks would be the first patient I'd like to discuss with you.  What

6   did you determine from the evaluation of the file of Jim Brooks, which is

7   Government Exhibit Number 1?

8   A   In my opinion, it was not legitimate medical management.

9   Q   And would you state the basis for your opinion, sir?

10  A   This patient on presentation – this is a summary of all the information

11  that's in the chart – but on presentation the patient had a rated pain level of

12  9.  Physical examination notwithstanding, he had a urine toxicology screen

13  that was entirely negative despite being prescribed – I'm sorry, sir.

14  Q   Keep your voice up.  I think counsel's having a hard time.

15  A   Where should I be speaking?

16  Q   Let me come and maybe I can … I think the microphone is somewhat

17  obstructed.  I know it is a narrow area –

18  A   – Oh, I'm sorry.  I had my book over it.

19  Q   And, I'm sorry.  This patient you determined to be  63 year old from

20  Kentucky?

21  A   Yes, that's correct.

22  Q   And was there an MRI in the file?

23  A   There was.

24  Q   How old was it?

25  A   The MRI was from 2009.

1    Q    And would that lend some suggestion that the patient is

2    misrepresenting his using of the drug?

3    A    Possibly.

4    Q    Were there any other physician, doctor records in that file other than

5    the ones from East Health Center?

6    A    There were no previous medical records.

7    Q    Other than the MRI.

8    A    That's correct.

9    Q    Now, this patient was from Kentucky; is that right?

10    A    Yes, it is.

11    Q    Now, Kentucky has some big cities in it?

12    A    Yes.

13    Q    Like Lexington, Kentucky?

14    A    Yes, sir.

15    Q    This patient from Kentucky presented in Georgia for narcotic pain

16    management.  Is that unusual?

17    A    It is.

18    Q    And why?

19    A    Well, one of the things that pain management physicians, physicians

20    who are prescribing a lot of scheduled medications look for, something that

21    raises an index of suspicion with them, is if patients are coming from a long

22    distance to obtain prescriptions.

23    Q    Now, the MRI itself, where was that from?

24    A    The MRI was from Florida.

25    Q    And does that in any way contribute to your opinion that this was not

1    legitimately –

2    A    Yes, sir, it does.

3    Q    – prescribed?

4    A    Yes, sir.

5    Q    This patient received how many pills, a prescription for how many

6    controlled substance pills?

7    A    On the initial appointment, the patient was prescribed 240 scheduled

8    pills.

9    Q    And in your experience and your opinion, is that a lot?

10    A    It is.

11    Q    That was 180 oxy 30 milligram?  Can you see it in your notes?

12    A    Yes.

13    Q    And 60 oxy 15s –

14    A    – 60 15 milligrams.

15    Q    In your opinion, Dr. Kennedy, what is a large number of – in your

16    practice, a large number of controlled substance pills for a patient to take per

17    day?

18    A    Well, it can vary.  It can vary.  And a patient can take as low as one pill a

19    day up to many.  But based on the history and the physical examination that

20    I'm looking at in this chart, in my opinion, eight high dosage oxycodone pills

21    per day is a very high dosage of this medication.

22        MR. KNOCHE: Can we see Exhibit 1-16 briefly.

23    Q    And are those the prescription forms that you see in the file which

24    you've just indicated was 180 oxy 30s, and 60 oxy 15s.

25    A    Yes, sir.

-628-

1   Q   Now, let's go to the next patient, George Hunter, Government Exhibit 2.

2   Did you have an opportunity to look at this file?

3   A   I did.

4   Q   And did the file document this is a 35-year-old patient from Kentucky?

5   A   Yes.

6   Q   And how many years had this patient complained of pain?

7   A   He reported of a pain complaint going back ten years.

8   Q   And the pain level was described as a 9; was it not?

9   A   Nine out of 10.

10   Q   And how credible is that?

11   A   Well, it depends.  It's possible that that can be a credible pain

12  complaint, and it's also possible that it might not be a credible pain

13  complaint.  But if a patient reports a pain level of 9, I would expect him to be

14  fairly distressed.

15   Q   Would you expect such a patient with a pain level of 9 to be traveling to

16  Georgia to seek narcotic pain management?

17   A   I would think that would be unlikely.

18   Q   There is a – is there an indication of the patient's blood pressure?  This

19  is George Hunter.

20   A   Yes, sir.

21   Q   And what was the blood pressure?

22   A   His initial blood pressure was 158/106.

23   Q   And is that a high or a low blood pressure reading?

24   A   Diastolic of 106 is high enough that it should alarm a physician.

25   Q   Was there anything in the file which indicates that that was addressed?

1 A No, sir.

2 Q Was there any treatment plan?

3 A No, sir.

4 Q The lumbar flexion is indicated as 60 degrees. You would say that was

5 normal?

6 A I – well, there is some variation on that, but for a patient who has a pain

7 complaint of 9 from a ten-year-old back injury, I would consider that to be

8 pretty good.

9   MR. KNOCHE: If we may see Government 2-013.

10 Q This patient was prescribed controlled substances by Dr. Azmat; is that

11 correct?

12 A Yes, sir.

13 Q Can you read that for the jury?

14 A 180 oxycodone 30 milligram pills, and 60 oxycodone 15.

15 Q That's 240.

16 A Yes, it is.

17 Q How many pills a day would that be over the course of a month?

18 A Eight pills per day.

19 Q In your opinion, was that legitimate?

20 A No, sir.

21 Q Was there a legitimate medical reason shown in the file?

22 A No, sir, it was not.

23 Q This individual also was quite a large person; is that right?

24 A 6' 8", 340 pounds.

25 Q And neurologic exam was normal?

1    A    Yes.

2    Q    And were there any other physician records in the file, or evidence that

3    some attempt was made to contact a previous physician?

4    A    No, sir.

5    Q    Let's turn to Government Exhibit 3, which is Billy Letner.  Do you have

6    that file, and have you had a chance to review it?

7    A    Yes.

8    Q    What were your findings upon review of Billy Letner's file?

9    A    It was not medically legitimate.

10   Q    And why?

11   A    The physical examination and the obtained  history did not rise to the

12   level of the narcotics that were prescribed.

13   Q    Was there any indication of a request for records of prior physicians?

14   A    No, sir.

15   Q    Was there any other contributing medical history provided?

16   Q    No, sir.

17   A    Was there a plan of treatment?

18   Q    No, sir.

19   Q    This patient is one who had a ten-year complaint secondary to a fall as

20   you indicated earlier.  Would you expect that there would be a significant

21   record?

22   A    Yes.

23   Q    And this patient was from where?

24   A    He was from Florida.

25   Q    And specifically, from Kissimmee, Florida?  That would be in the file?

1    A    I know the MRI was from Plantation, Florida.  His address ...

2    Q    Is that – as you've indicated with our first two witnesses, or excuse me,

3    our first two exhibits – suspicious, that a patient from that area would be

4    coming to Georgia for narcotics treatment?

5    A    Having a patient come from a great distance and crossing state lines,

6    travel a great distance would raise a red flag and an elevated level of

7    suspicion for me.

8                    MR. KNOCHE: 3-014.

9    Q    Did Mr. Billy Letner receive narcotics prescriptions as shown by the

10    file?

11    A    Yes, sir.

12    Q    For 180 oxy 30s?

13    A    Yes, sir.

14    Q    And 60 oxy 15s?

15    A    That's correct.

16    Q    In your opinion was that medically legitimate?

17    A    It was not.

18    Q    Let's go to Kim Letner.  Did you review this file?  It's –

19    A    I did.

20    Q    – Government Exhibit 4.

21    A    I did.

22    Q    And this individual has the same last name as the other patient, David

23    Letner; is that right?

24    A    Yes.

25    Q    And how old is Ms. Letner?

1    A    46.

2    Q    And she was presenting with what kind of a complaint?

3    A    Back pain.

4    Q    And secondary to what?

5    A    And auto accident-related injury.

6    Q    What did she report her usual level of pain as?

7    A    Eight to 9.

8    Q    And was there an MRI in the chart?

9    A    There was.

10   Q    And was that MRI from South Florida, as well?

11   A    It was Plantation, Florida.

12   Q    Were there any other previous medical records in the file?

13   A    No, sir.

14   Q    What was your opinion of the prescription of controlled substances to

15   her, if any?

16   A    It was not medically legitimate.

17         MR. KNOCHE: Show us 4-013.

18   Q    What did Ms. Kimberly — excuse me, Kimberly Letner receive?

19   A    That prescription, what I'm looking at, is for 60 oxy — 15 milligram

20   oxycodone pills.

21   Q    And why, in your opinion was that not for a legitimate medical

22   purpose?

23   A    The physical exam and medical records and the MRI did not support

24   prescription of any narcotics, narcotics at this level, in my opinion.

25   Q    Is there anything unusual about family members traveling together

1   from Florida to a south Georgia pill mill to seek drugs?

2   A     Yes, sir.

3   Q     And why is that?

4   A     That would raise a red flag for me if family members were both traveling

5   together long distances with essentially identical or very similar complaints

6   for essentially identical narcotic medications.

7   Q     Let's turn to David Letner.  Did you review this file?  That's Exhibit

8   Number. 5.

9   A     Yes, sir.

10  Q     And what were your findings, Dr. Kennedy?

11  A     Treatment is not medically legitimate.

12  Q     And tell us why.

13  A     This patient was a 25 year old who presented with a usual pain level of

14  9.  He had an MRI from Delray Beach, Florida that was, in my opinion,

15  unimpressive.  Initial physical examination reported a pain level of 10 in this

16  25-year-old guy.  He was prescribed oxycodone in several different strengths,

17  and his physical examination was essentially identical to both his mother

18  and his father's, whose also were identical, more or less.

19  Q     Did this individual in his — he reported to the doctor that he was taking

20  480 pills per month; is that right?

21  A     That was what was written in the intake documentation.

22  Q     How impressive is that?

23  A     In my opinion, that's extremely impressive.  If a 25 year old were to

24  come in my office and report a pain level of 9, and state that his previous

25  physician had been prescribing 480 scheduled pills per month, or 16

1    scheduled pills per day, and this patient was coming to me from another

2    state, it would raise a very, very, very high index of suspicion.

3    Q    Dr. Kennedy, in your opinion, when, if ever, is it appropriate for a pain

4    management doctor to prescribe narcotics to drug addicts?

5    A    That potentially can occur.  If you have someone who is addicted to

6    medication, a heroin addict for example, and they have a horrible accident,

7    they're involved in a motor vehicle accident, or something happens to them,

8    just because they're addicted to medication doesn't mean that they are not

9    allowed to have adequate pain relief.  It's just that that has to be verified and

10   appropriate.

11   Q    You described earlier the distinction between a person who is addicted,

12   right, versus a person who is dependent, okay.

13   A    Yes.

14   Q    And remind the jury of that distinction.

15   A    Addiction is where someone has a chemical dependency where they

16   utilize a medication despite it being bad for them, despite the adverse

17   consequences that causes in their life.

18   Q    Would some of the adverse consequences be the expense of pursuing

19   the drugs to sustain that, the drug addiction?

20   A    Certainly.

21   Q    Are you aware in your professional experience that controlled

22   substances like oxycodone are frequently diverted to the street?

23   A    Yes, sir.

24   Q    Is that something that the practitioner who is writing the prescription

25   needs to consider before writing such a prescription?

1    A    Yes, sir.

2    Q    Would an individual like Mr. David Letner claiming such a high number

3    of pills per day, over 12, 13 pills a day, would that indicate the potential for

4    that sort of diversion?

5    A    In my opinion, yes, sir.

6    Q    Let's go to Latina Simpson, please. Did you have a chance to review

7    Latina Simpson's file?

8    A    I did.

9    Q    And what were your findings, Dr. Kennedy?

10   A    In my opinion the treatment was not legitimate.

11   Q    Where was this patient from?

12   A    This patient was from Kentucky.

13   Q    And would it, again, seem odd to you that a patient would come all the

14   way from Kentucky to Garden City for  pain management treatment?

15   A    Again, particularly with an MRI report from South Florida.

16   Q    Would your finding be compounded if you knew that she came with her

17   husband and father-in-law in the same trip?

18   A    Definitely.

19   Q    Did you know that Jim Brooks was the father-in-law of Ms. Simpson,

20   who is Exhibit Number 1?

21   A    Not until today.

22   Q    They have different last names.  Why, in your opinion, other than her

23   being from Kentucky with a MRI from Florida, is this prescription not issued

24   for a legitimate medical purpose?

25   A    In my opinion, the lack of medical records, the combination of the MRI

1    report and the physical examination note, which was essentially nonexistent,

2    did not at all rise to the level of the medication she received.

3    Q    And this patient, did she not complain of a pain secondary to an

4    unspecified accident at age 19?

5    A    Yes.

6    Q    Would you expect there would be a significant clinical record of her

7    injury and therapy that she's undergone in those many years, 20 years?

8    A    Yes, sir.

9         MR. KNOCHE: May we see 6-018?

10   Q    Are those the prescription forms that you saw in the file, Dr. Kennedy?

11   A    Yes.

12   Q    150 oxy 30s; is that right?

13   A    Yes.

14   Q    And 30 Xanax 1s?

15   A    Yes.

16        MR. KNOCHE: Scroll up.

17   Q    30 oxycodone 15s.

18   A    Yes.

19   Q    Are there some dangers involved with the prescription of oxycodone

20   and Xanax in tandem?

21   A    Potentially, yes.

22   Q    And what is that potential?

23   A    The greatest one is respiratory depression, which either of these drugs

24   can cause, but if you take them together, combined, particularly with alcohol,

25   it can cause respiratory depression and you potentially can overdose and die.

1        MR. KNOCHE: Pull up 6-013.

2    Q    Is that the initial – the exam form from Ms. Simpson –

3    A    Yes.

4    Q    – that was in that file?

5    A    Yes.

6        MR. KNOCHE: Scroll so we can see that, Dean.

7    Q    Describe, in your opinion, the thoroughness of the examination which

8    was conducted by Dr. Azmat for Ms. Simpson.

9    A    Well, as you can see from looking at everything that comes after the

10   physical examination heading, the examination itself is extremely cryptic,

11   meaning it's difficult to interpret.  The lumbar – where it says MS spine,

12   which is the back examination, it says flexion of 75 degrees, which is in the

13   normal range.  So essentially what we're looking – and extremities, F-R-O-

14   M, that means full range of motion.

15       So what we're looking at is a physical examination which essentially is

16   extremely poorly documented; and what is documented is normal.

17   Q    And there is no diagnosis; is that correct?

18   A    That's correct.

19   Q    And no treatment?

20   A    That's correct.

21   Q    And as you perused all of these files and examined them, did you notice

22   that chronic lower back pain was the most frequent diagnosis given?

23   A    Yes, sir.

24   Q    James Lockwood, please.  You have that file, or you've reviewed that

25   file, Dr. Kennedy?

1    A    Yes, sir.

2    Q    What were your findings with Mr. Lockwood?

3    A    In my opinion, the prescriptions were not legitimate.

4    Q    And tell us, you know, when you reviewed the file, did you determine

5    where Mr. Lockwood was from?

6    A    He was from Kentucky.

7    Q    And how old?

8    A    Forty-two.

9    Q    And what kind of complaint did he present with?

10   A    He had a six-year complaint job related back pain.

11   Q    And his usual pain level was recorded at 7 to 8?

12   A    Yes, sir.

13   Q    And this individual, did you notice in his file that he had a state ID card

14   as opposed to a driver's license?

15   A    I did.

16   Q    And what, as a practitioner of pain management medicine, what red

17   flags are raised by the state ID card?

18   A    Well, this is a matter of some importance. If you have particularly a

19   young patient who does not have a driver's license, and they have a state-

20   issued ID card, then the question of whether or not this patient potentially

21   had been involved in DUI before is very important. When you add that to

22   the fact that it's a patient from Kentucky with a state-issued ID card

23   presenting with an MRI from Plantation, Florida to south Georgia for

24   narcotics management, there just is a very, very increasing number of red

25   flags that are going up.

1   Q    And this individual like – as I believe you just indicated is from

2   Kentucky; right?

3   A    Yes, sir.

4   Q    And the MRI was from Florida?

5   A    Yes, sir.

6           MR. WITHERS: Objection to leading, Your Honor.  I've tried to

7   be ...

8           THE COURT: Yes, sir, he's already asked and answered those

9   questions.  I don't know why you need to ask him the same thing over again.

10  I understood, and I think the jury understood what he said.

11          MR. KNOCHE: Yes, Your Honor. 7-009, please.

12  Q    (By Mr. Knoche) Dr. Kennedy, did you find a form like this in each of

13  the patient files that you reviewed?

14  A    To the best of my recollection, yes, sir.

15  Q    Can you read where it says, I, James Lockwood?

16  A    [Reading:] I, James R. Lockwood, have read the above information or it

17  has been read to me, and all my questions regarding the treatment of pain

18  with opioids have been answered to my satisfaction.  I hereby give my

19  consent to participate in the opioid medication therapy and acknowledge

20  receipt of this document.

21  Q    Hypothetically, if that document were filled out before seeing the doctor,

22  would that presuppose that narcotics will be prescribed?

23  A    Opioids, yes, sir.

24  Q    Does, in your opinion, the form suggest that?

25  A    It does.

-640-

1    Q    If this is the patient's first visit, would you expect that the doctor would

2    examine the patient before obtaining the patient's consent to receiving

3    opioids?

4    A    Certainly, the patient's case would be discussed with the patient before

5    considering that.

6    Q    And what would that suggest as to the standard of care being employed?

7    A    The implication is that there is an assumption being made that patients

8    will be prescribed opioid medications before they're seen in the clinic.

9    Q    And in fact –

10         MR. KNOCHE: 7-017, please.

11    Q    – this patient was prescribed drugs; right?

12    A    Yes, sir.

13    Q    And you see on there the patient was prescribed 150 oxy 30s?

14    A    Yes, sir.

15    Q    60 oxy 15s?

16    A    Yes, sir.

17    Q    For a total of 210 pills.

18    A    Oxycodone pills.

19    Q    And that would be seven per day; is that right?

20    A    Yes.

21    Q    And your opinion was that that was not legitimate.

22    A    No.

23    Q    Carlie Cole. If you would, Dr. Kennedy, describe briefly what the file

24    reflected upon your examination. You did make some indication of the

25    patient's age, what state, how old the complaint. Would you tell the jury

1  about that?

2  A    Forty-nine year old from Kentucky being treated for back pain, six-year

3  complaint of pain dating from a motor vehicle accident which she rated as 8

4  in severity without medications and zero in severity with medications.

5  Q    Did the chart contain an MRI?

6  A    It did.

7  Q    Did it have any other medical charts in the file?

8  A    There were no previous treatment records.

9  Q    And this Kentucky patient, where was her MRI from?

10  A    Delray Beach, Florida.

11  Q    In your opinion, was the exam which was documented in the file

12  supportive of prescribing narcotics?

13  A    No, sir.

14  Q    And why not?

15  A    What is reported was lumbar flexion of 75 degrees, which is normal, and

16  lateral flexion of 20 degrees, which is arguably normal, and no tenderness on

17  palpation.  The examination was essentially normal.

18  Q    How about the pain level 8 without meds and the zero with meds?

19  A    That is not credible.

20  Q    Is it suspicious?

21  A    It's very suspicious to me.

22  Q    Why is that?

23  A    A patient who is 49 years – whose pain is severe enough that they are

24  going to all this trouble to be seen is not going to have pain that goes to zero

25  by being treated with anything.

1          MR. KNOCHE: And 8-014.

2    Q    The patient was in fact given prescriptions; is that right?

3    A    Yes, sir.

4    Q    Is that 150 oxy 30s? Is that what you read?

5    A    Yes.

6    Q    And 60 hydrocodone 10/325.

7    A    Yes.

8    Q    We have not seen, I don't believe, prescriptions for hydrocodone since

9    you've been on the stand. What is the significance of the hydrocodone

10   10/325?

11   A    Hydrocodone is a opiate medication similar to oxycodone. It is a

12   Schedule III and not a Schedule II medication, meaning that it is less

13   stringently scheduled. And the reason is because it is always prepared with

14   Tylenol, acetaminophen, or Ibuprofen which is Advil, and that's why it says

15   10/325. So the 10 milligrams is the hydrocodone; the 325 is Tylenol.

16   Q    And I believe you've given your opinion about that. Not legitimate?

17   A    Not in my opinion.

18   Q    Paul Cole. Did you review that file, Dr. Kennedy?

19   A    I did.

20   Q    Did you note that Paul Cole provided the same address as Carlie Cole,

21   31 Baker Drive, Jackson, Kentucky?

22   A    I did not note that at the time, but once the charts were all put together,

23   I noted that they came together.

24   Q    Would that suggest that they might be husband and wife?

25   A    Yes, sir.

1    Q    Tell us what you found upon reviewing Paul Cole's file?

2    A    Fifty year old being treated from back pain reportedly from accidents

3    dating to the 1980s.  Stated that his pain level was a 9 out of 10.

4    Q    Were there previous medical records in the chart besides the MRI and

5    other office documents from East Health Center?

6    A    No, sir.

7    Q    And this individual was from Kentucky.  Suspicious again; correct?

8    A    Yes, sir.

9    Q    How about the pain level of 9?

10    A    Again, that would be something that would raise my eyebrows and a

11    level of suspicion, unless the patient was extremely distressed.

12                    MR. KNOCHE: Exhibit 9-014.

13    Q    Those are the prescription documents which were in the file signed by

14    Dr. Azmat?

15    A    Yes, sir.

16    Q    150 oxy 30s?

17    A    Yes, sir.

18    Q    90 oxy 15s?

19    A    Yes, sir.

20                    MR. KNOCHE: Can you scroll down, Dean?

21    Q    And 90 Motrin 800.

22    A    Yes.

23    Q    Have you ever heard the terminology fill all or none?

24    A    Yes.

25    Q    Tell us the significance of fill all or none.

1    A    Physicians will on occasion, to insure that their patients are taking their

2    medications as prescribed -- specifically all of their medications as prescribed

3    -- will put on the prescription form fill all or none.  So if the patient was to

4    say that they just wanted to fill the oxycodone prescriptions, the pharmacist

5    would be in a position to insist that they fill all of their prescriptions or get

6    none of them filled.

7    Q    Is it a -- in your experience with reviewing illegitimate medical

8    prescriptions, is it common for a doctor to prescribe a Motrin or other over-

9    the-counter drug along with the controlled substances?

10    A    In the case of prescriptions that are not medically legitimate, in my

11    experience, if a patient, if a physician is writing prescriptions for fill all or

12    none, it will usually be for a inexpensive muscle relaxant or an inexpensive

13    nonsteroid medication.

14    Q    Are those costly drugs, the Motrin, the ...

15    A    In medication such as Flexeril, a muscle relaxant, they are quite

16    inexpensive.

17    Q    Does it provide any real deterrent to the person who really wants just

18    the oxycodone to fill the prescription for the Motrin with that?

19    A    No, sir.

20    Q    Exhibit 10 will be Tyrice Harris.  Take a moment and tell us what you

21    found upon review of the file of Tyrice Harris.

22    A    Thirty-year-old patient from Florida who presented with a usual pain

23    level of 10 out of 10, had a Florida state ID card, had a history of low back

24    pain which dated back to a motor vehicle accident in 2006.

25    Q    Was there any prior medical history or, excuse me, records from

-645-

1     previous treating physicians incident to that motor vehicle accident in 2006?

2     A     No, sir.

3     Q     And I hate to be redundant, but a pain level of 10, that's 10 on a scale of

4     1 to 10, being the highest.

5     A     Yes, sir.

6     Q     Have you ever seen patients with pain levels of 10?

7     A     I have.

8     Q     Presenting at your office?

9     A     I may have over the course of the years had one or two people who

10    presented with a pain level of 10.  Ten is a pain level that is as bad as can be

11    imagined, and if somebody has a pain level of 10, I would expect them to be

12    screaming.

13    Q     Would you expect them to be in an ambulance going to the emergency

14    room?

15    A     Pain level of – potentially.  Pain level of 10 is a very severe, very

16    alarming level of pain, assuming that somebody understands the pain scale.

17    Q     Would you assume that person would commute from Jacksonville,

18    Florida to the Savannah area to wait in line to see a doctor to get a

19    prescription, to fill a prescription, in order to alleviate that pain level of 10?

20    A     No, sir.

21    Q     There might be more expeditious routes?

22    A     You would think so.

23             MR. KNOCHE:  Show us the prescription record, which was –

24    Q     – well, first, the drug screen in this case, did you make some note

25    whether the drug screen was positive or negative?

1    A    It was negative.

2         MR. KNOCHE: 10-14 – 10-014.

3    Q    Those are the prescription records in that file?

4    A    Yes, sir.

5    Q    150 oxy 30s?  30 oxy 15s; is that correct?

6    A    That's correct.

7    Q    In your opinion, was that – the issuance of that prescription done for a

8    legitimate medical reason?

9    A    It was not.

10   Q    It was not?

11   A    It was not medically legitimate.

12   Q    In the MRI file, did you notice that the MRI report indicated no

13   referring doctor?

14   A    I did.

15   Q    Describe if that, in your opinion, is an unusual circumstance.

16   A    In the entirety of my career, both doing family practice and medical

17   pain management, I cannot recall a single episode of seeing an MRI from a

18   self-referred patient.

19   Q    Did you notice –

20   A    – It's possible, but it would be very, very unusual.

21   Q    Did you notice that a number of the MRIs in the files that you reviewed

22   came from the same facility or cluster of facilities in South Florida?

23   A    Yes, sir.

24   Q    Advanced MRI.  I think POM MRI was another?

25   A    I don't recall the names specifically, but that sounds correct.

-647-

1    Q    Dannelle Perry.  Tell us if you reviewed this file, what are your findings

2    as far as the biographical circumstances of the patient.

3    A    This patient was another one with a Florida state ID card, 45 year old

4    being treated for low back pain of one-year duration, rated as 10 on a 10

5    scale.

6    Q    Ten out of 10?

7    A    Yes, sir.

8    Q    And the complaint was from – incident to what sort of event?

9    A    Fell from a tree.

10   Q    Like the last patient, did you notice the drug screen?  The urine screen

11   was negative?

12   A    Yes.

13   Q    Suggesting that the patient was not using oxycodone?

14        MR. WITHERS: Your Honor, I object to leading.

15   Q    Does it suggest that the patient was not using oxycodone?

16   A    It suggests the patient was not using oxycodone.

17   Q    And is that a red flag as far as potential diversion of the drugs that are

18   prescribed?

19   A    It can be.

20   Q    I believe you indicated Florida ID as opposed to a driver's license for

21   this patient?

22   A    That's correct.

23        MR. KNOCHE: 11-14, please.

24   Q    Yet the patient did receive prescriptions for controlled substances;

25   correct?

1    A    That's correct.

2    Q    Shown on the screen, 150 oxy 30s, 30 oxy 15s.

3    A    Yes, sir.

4    Q    Is there something peculiar, it seems many of these patients that you're

5    describing we're seeing prescriptions for 150 oxy 30s. Did that seem to be

6    mode during your review?

7    A    It was common.

8    Q    And have you – if you would, opine whether or not the issuance of those

9    prescriptions to Mr. Dannelle Perry of Jacksonville, Florida were medically

10   legitimate?

11   A    In my opinion it was not.

12   Q    Brian Smith. What are his biographical circumstances?

13   A    This patient had a Georgia state ID card, 43 years old, presented with a

14   pain level of 10, with a greater than 20-year pain complaint from job and

15   accident-related circumstances.

16   Q    May we assume there was an MRI in the file?

17   A    There was.

18   Q    Were there any other medical – previous medical records in the chart?

19   A    No, sir.

20   Q    Did you notice the urine screen in this case?

21   A    Yes.

22   Q    Was there anything significant about the urine screen?

23   A    The urine drug screen which was photographed and scanned into the

24   chart, there is a statement that it was positive for meth.

25   Q    And what could meth be?

1    A    I am assuming in a parlance of my office on the urine drug screens that

2    we use, it would be for methamphetamine.  Potentially, if the abbreviations

3    are different, it could be for methadone.  But whether it's for methadone or

4    methamphetamine, it is an alarming finding.

5    Q    Was it remarked upon in the medical records made by Dr. Azmat?

6    A    No, sir.

7    Q    Did the individual receive a prescription?

8    A    Yes.

9            MR. KNOCHE: Can we see 12-26, please?

10   Q    Is that from the file –

11   A    Yes, sir.

12   Q    – that you reviewed, okay.  And there was a prescription for 150 oxy

13   30s, 15 Xanax 1 milligram?  Is that correct?

14   A    Yes.

15   Q    And I believe also Flexeril and Motrin were also prescribed; is that

16   right?

17   A    That's correct.

18   Q    In your opinion, was the issuance of that prescription medically

19   legitimate?

20   A    No, sir.

21   Q    And why not?

22   A    I would be very alarmed to prescribe 165 scheduled agents to a patient

23   who had an abnormal urine drug screen.

24   Q    And how about the physical findings?  Do you have an opinion as to

25   whether they supported the prescription of –

1    A    – The physical examination did not rise to the level, in my opinion, of

2    requiring scheduled medications.

3    Q    And this patient was from Georgia, not from Kentucky, not from

4    Florida, but from Brunswick; is that correct?

5    A    Georgia I know, Brunswick I can tell you in a moment. Yes, yes,

6    Brunswick.

7    Q    He was not a patient of yours.

8    A    No, sir.

9    Q    St. Simons is in the Brunswick area; correct?

10    A    It's across the causeway.

11    Q    Can we go to Joseph Bradley's file? You reviewed that, Mr. Kennedy?

12        THE COURT: Mr. Knoche, let me give the jury a five-minute

13    recess before we begin with this file.

14        [NOTE: A brief recess was taken, after which the proceeding was

15    continued in the presence of the jury as follows:]

16        THE COURT: All right, you may proceed, Mr. Knoche.

17        MR. KNOCHE: Yes, your Honor.

18    Q    (By Mr. Knoche) Dr. Kennedy, we're moving to Joseph Bradley,

19    Middleburg, Florida. What were your findings as to this patient?

20    A    This patient was a 26 year old presenting with a Florida state ID card,

21    reporting that his pain was 9 out of 10. The chart contained, in his case,

22    pharmacy printout which indicated that he had five previous prescribers of

23    scheduled medications.

24    Q    There was an MRI, as well?

25    A    Yes, sir.

1    Q    But no other – besides those, the MRI and the pharmacy reports,

2    nothing else.

3    A    No, sir.

4    Q    Other than what he reported?

5    A    (No audible response.)

6            MR. KNOCHE: Dean, 15-013.

7    Q    He did receive prescriptions; correct?  150 oxy 30s, 60 oxy 15s.  And

8    what was below those?

9            MR. KNOCHE:  Dean?

10   Q    30 Xanax, 1milligram; is that correct?

11   A    That's correct.

12   Q    And the Motrin; correct?

13   A    Yes, sir.

14   Q    Do you have an opinion whether that was – those prescriptions were

15   given in a legitimate – for a legitimate medical reason?

16   A    Yes, sir.  In my opinion, it was not medically legitimate.

17   Q    And tell the jury why you have that opinion.

18   A    Well, again, this is a 26 year old from Florida with a pain complaint of 9,

19   presenting with out-of-state MRIs with no previous medical records, five

20   previous treating physicians, none of whom were contacted, and he was

21   prescribed this level of scheduled medications.  In my opinion it's not

22   medically legitimate.

23   Q    And this is another patient who received Xanax; correct?

24   A    Yes, sir.

25   Q    And you've described that that can be problematical when prescribed in

1   combination with oxycodone?

2   A   Potentially, yes, sir.

3   Q   And what is the potential?

4   A   The potential is respiratory – the potential, the worse potential probably

5   is respiratory depression and death that can occur if somebody has an

6   overdosage.

7   Q   James Gable is our next.  You reviewed this file; is that correct?

8   A   I did.

9   Q   What did you learn from reviewing the office records from East Health

10  Center about Mr. James Gable?

11  A   This patient was a 37 year old from South Carolina, again with MRI

12  from Florida, presenting in Georgia with a 15-year pain complaint related to

13  heavy lifting at work, and reporting his pain level as 9 in severity.

14  Q   Were there any other medical records other than the MRI in the file?

15  A   No, sir.

16  Q   Did you notice in this file, Dr. Kennedy that the patient also indicated

17  that he had an allergy to OxyContin?

18  A   Yes, sir.

19  Q   Other than that allergy being noted, was there any other indication of

20  what, if any, counseling took place about that allergy?

21  A   No, sir.

22          MR. KNOCHE:  Prescription document which I'd like to publish

23  is 14 – excuse me, 14-22.

24  Q   You see that prescription for 150 oxy 30s?

25  A   Yes, sir.

-653-

1    MR. KNOCHE: Is there anything else with that, Dean?

2    Q    Do you have an opinion whether that was given for a legitimate medical

3    reason?

4    A    In my opinion it was not medically legitimate.

5    Q    And defend your opinion, Dr. Kennedy.  Why not?

6    A    Well, again, this is a fairly young patient, 37 years old, with a 15-year

7    pain complaint, which would have dated to him being 22 years old.  I would

8    expect there to be an extensive medical record.  With him showing up from

9    South Carolina with an MRI report from yet another state, showing up in

10   Georgia, there are more and more red flags that go up.

11   Q    I'd like you to explain as best you can to the jury neurologic findings of

12   nonfocal.  What does that mean?

13   A    To me, in terms of the examinations I'm looking at, if somebody says a

14   nonfocal neurologic exam, it indicates that they did a neurologic exam but

15   there wasn't anything specific.

16   Q    And what is a grossly intact neurologic exam?

17   A    Well, grossly intact neurologic exam implies to me less of an exam and

18   perhaps just observational, with not noting anything that's wrong on

19   observation.

20   Q    How is that conducted, to make that conclusion as grossly intact?  Can

21   you watch me walk into the room and make that opinion?

22   A    Yes, sir.

23   Q    Is that all there is to it?

24   A    Well, you would hope not, but that could be an accurate statement.

25   Q    All right, sir.  And you've indicated that that was not legitimately –

1    A    Not in my opinion.

2    Q    – issued.

3         Let's go to Gary Evans.  Tell the jury what you learned about Gary

4    Evans from looking at that file, his age, where he's from.

5    A    Patient was a 60 year old from Kentucky who presented with back and

6    knee pain related to a job injury in 1999.  Stated on presentation that his

7    pain level was 10 in severity without medications, and 3 in severity with his

8    medications.

9         MR. KNOCHE: Exhibit 15-23.

10   Q    Was prescribed those medicines; is that correct?  From the file, 150 oxy

11   30s, 30 oxy 15s?

12   A    Yes, sir.

13   Q    And I believe there was a noncontrolled drug at the bottom of that

14   chart, Motrin?

15   A    Yes, sir.

16   Q    Was that, in your opinion, medically legitimate?

17   A    No, sir.

18   Q    And why not?

19   A    Well, again, for the reasons that I have stated, we have a patient who is

20   coming from one state to Georgia, essentially for narcotic management, who

21   is reporting their pain level as being 10 without their medications, 3 with

22   their medications, with what amounts to a noncredible physical examination

23   and no previous medical records.

24   Q    The MRI here showed a chronic anterior tear of the medial collateral

25   ligament.  Was there any indication that the patient's knee was examined?

1    A    No.

2    Q    No other records in the file?

3    A    No.

4    Q    How about a treatment plan?

5    A    No treatment plan.

6    Q    Chris Conkel.  And Dr. Kennedy, this is from Government Exhibit 16.

7    Tell us about Chris Conkel, what you learned of him from your examination

8    of the East Health Center medical file.

9    A    This patient was a 49 year old from Florida who, again, presented with a

10   Florida identification card and not a driver's license, who reported an eight-

11   year history of low back pain secondary to a motor vehicle accident.

12            MR. KNOCHE: 16-020

13   Q    Mr. Conkel was prescribed 150 oxy 30s, is that right, by Dr. Azmat, and

14   Motrin?

15   A    Yes, sir.

16   Q    In your opinion, was that done for a legitimate medical reason?

17   A    No, sir.

18   Q    And why not, in your opinion?

19   A    Again, for the reasons that I noted with the problems of credibility of

20   physical examination, the patient's identification, the fact that he was seen

21   for several follow-up visits where no physical examination whatsoever was

22   even documented.

23   Q    The MRI in this case indicated a -- I believe a broad-based posterior disc

24   herniation.  Was that -- is a finding like that as you read on that MRI

25   sufficient to justify the prescription which this patient received?

1    A    On its own?  In my opinion, no.

2    Q    Why not?

3    A    Even if there was – because the finding here is – the finding here is

4    something that is potentially significant.  In itself,  my opinion, it needs to be

5    combined with an adequate physical examination and followup in order to

6    establish that it's significant.

7    Q    Patient's blood pressure was 150/96.  Is that a problem, in your

8    opinion?

9    A    Well, it's not normal.  In my opinion I'd like to think that I would have a

10   word with the patient about his blood pressure.

11   Q    Is there any indication that a word was had with the patient?

12   A    No, sir.

13   Q    One last question before I move off the MRI:  is it – would you like to

14   see some numeric value assigned to the size of the bulge shown on the MRI?

15   I mean, does it say anything about the size of the bulge?

16   A    Characteristically, MRI studies, if they're reporting a disc herniation or

17   they were reporting a disc bulge, it'll have a numeric value that says it bulges

18   so many millimeters in a certain direction.

19   Q    Joshua Merryman, please.  This is Exhibit 17.  Tell us about what you've

20   learned about Mr. Merryman.

21   A    This patient was a 27 year old who presented with a Florida state ID

22   card, stating that his usual pain level was 9.  Patient had an eight-year pain

23   complaint secondary to a fal injury at work dating to when he was 21 years

24   old.

25   Q    What kind of patient history was in the file other than MRI?

1    A    There was no history.  There were no previous medical records.

2    Q    And the MRI was from Florida?

3    A    Yes, sir.

4    Q    As was the patient?

5    A    Yes, sir.

6            MR. KNOCHE: 17-020.

7    Q    You see those prescriptions in the file?  You see the prescription from

8    Dr. Azmat for 150 oxy 30s and 60 Percocet 10/325s?

9    A    Yes.

10           MR. KNOCHE: Anything else, Dean, on that?

11   A    Naprosyn and Flexeril.

12   Q    What are those drugs?

13   A    Naprosyn is a nonsteroidal anti-inflammatory medication sold over the

14   counter as Aleve, and Flexeril, which is a muscle relaxer.

15   Q    In your opinion, was that prescription for 150 oxy 30s and 60 Percocet

16   10s given for a legitimate medical reason?

17   A    No, sir.

18   Q    Why not?

19   A    As stated, when a very young patient from out of state with extremely

20   high pain levels reported, no previous medical records, and physical

21   examination which was not supported.

22   Q    Did the examination noted by Dr. Azmat in that file indicate the patient

23   had a full range of motion of extremities?

24   A    Yes.

25   Q    And this patient was another one diagnosed with chronic low back pain;

1    is that correct?

2    A    Yes, sir.

3    Q    Does that seem to be the diagnosis, that most of these patient files

4    you've reviewed had that same diagnosis?

5    A    That or similar wording is recurrent.

6    Q    How about the long-term goal of medical management as a goal of

7    treatment?  What do think of that?

8    A    Medical management is not a long-term goal.  The prescribing of

9    narcotics is supposed to be based on improving somebody's function.  And if

10   somebody tells you, for example, that they can't go to the park with their kids

11   and you consider prescribing narcotic medications, if they're able to go to the

12   park with their kids, then you know that they're benefitting from it.  And that

13   kind of a functional goal is a treatment goal.  Medical management in and of

14   itself is not a treatment goal.  In my opinion.

15   Q    Patricia Rohrer, please.  Exhibit 18.

16   A    Yes.

17   Q    Tell us about Ms. Rohrer.  What did you learn about her?

18   A    This patient is a 55 year old from Kentucky, again with an MRI from

19   Plantation, Florida.  Presented with a pain level report of 9.  Initially was

20   found to have a blood pressure of 119 over – or, I'm sorry, of 196/116, which

21   was not addressed in the medical record.  And in my opinion, the treatment

22   was not medically legitimate.

23   Q    196/116, for us laypersons, how dangerous is that?

24   A    Malignant hypertension, to my recollection, is something that is

25   diagnosed when somebody has a diastolic blood pressure,  the lower

1    number, of 120 or above.  So -- and a person could reasonably be hospitalized

2    for that.  So if somebody presents with blood pressure of 116, it's possible it

3    could be managed appropriately in the office, but I would expect to see some

4    kind of mention, at least in passing, in the medical record.

5                    MR. KNOCHE: 18-014.

6    Q    Patient did receive prescriptions for controlled substances.  I see 60 oxy

7    15s.

8                    MR. KNOCHE: You can scroll down, Dean.

9    Q    Plus the Flexeril.  150 oxy 30s; is that correct?

10   A    Yes, sir.

11   Q    And you've opined that that was not medically legitimate.  Would you

12   further defend your opinion for the jury, please.

13   A    This patient on the initial appointment was prescribed a total of 210

14   scheduled pills, or seven scheduled pills per day, and it was not – it was not

15   supported by records or physical examination.

16   Q    She complained of neck pain; is that right?  Chronic neck pain?

17   A    That is correct.

18   Q    Was the cervical exam – that's the examination of the neck – was that in

19   your opinion a credible examination?

20   A    No.

21   Q    Why not?

22   A    The only notation is decreased range of motion, flexion-extension,

23   lateral flexion rotation, no C-spine tenderness, restricted left lumbar

24   rotation.  Examination was otherwise normal.  There were no positive

25   neurologic findings and the remainder of the physical examination was

1    certainly not exhaustive.

2    Q    In your experience, Dr. Kennedy, would you expect that a patient like

3    Patricia Rohrer might cope adequately with over-the-counter pain medicines

4    and heat pad?

5    A    That would depend on my feeling about the patient after doing the

6    physical examination.  It's impossible to say without examining the patient.

7    But potentially.

8    Q    Would you try that first?

9    A    Possibly.  I would like to think so.

10    Q    Jessica Rogers.  Tell us about her, Dr. Kennedy.

11    A    This patient was a 26 year old from Kentucky with a four-year pain

12    complaint that she reported was work related and was level of 8 in severity,

13    the usual pain level of 8.

14    Q    Unusual for such a young patient from Kentucky?

15    A    Yes, sir.

16    Q    And in particular, from such a patient seeking narcotic treatment in

17    Savannah, Georgia?

18    A    A pain level of 8 in a 26-year-old patient is certainly something to be

19    noticed.

20            MR. KNOCHE: Show us 19-20, please?

21    Q    Those prescription records you see noted in the file?

22    A    Yes, sir.

23    Q    60 oxy 15s?  That looks like Ibuprofen.  Is that what it looks like to you,

24    Dr. Kennedy?

25    A    Yes.

1            MR. KNOCHE: And scroll down.

2    Q    And 150 oxy 30s?

3    A    Yes, sir.

4    Q    In your opinion, was that prescription medically legitimate?

5    A    No, sir.

6    Q    And can you defend your opinion, please?

7    A    MRI didn't document findings that alone supported narcotic

8    management.  Nothing else in the chart, no patient history. 26 year old from

9    South Carolina presenting for narcotic management in Georgia.

10   Q    From Kentucky, I believe you said.

11   A    What did I say?  I'm sorry.

12   Q    I think you just said South Carolina.

13   A    Forgive me, Kentucky.

14   Q    Twenty-six year old from Kentucky, MRI from West Palm Beach; right?

15   A    From Florida, and pain level of 8, and physical examination was

16   inadequate.  No medical history to contribute.

17   Q    No other records in the file other than the MRI?

18   A    That's correct.

19   Q    Let's go to Troy Roark, Government Exhibit 20.  Tell us about Mr.

20   Roark.

21   A    Mr. Roark was a patient that was 62 years old from Kentucky that was

22   being treated for back pain.  He reportedly had a history of three previous

23   back surgeries and a spinal cord stimulator implantation.  He reported his –

24   or his pain level was reported as 9.  And on his initial physical examination, a

25   surgical scar was noted, and a blood pressure of 203/105 was also recorded

1    in the chart but not addressed in the notes.

2         MR. KNOCHE: 20-015, please.

3    Q    Mr. Roark received prescription for 150 oxy 30s; is that right?

4    A    Yes, sir.

5    Q    60 Lorcet 10/500s?

6    A    Yes, sir.

7         MR. KNOCHE:  And anything else you got?  Yeah.

8    Q    Naprosyn, that's the Advil; is that right?

9    A    That's sold over the counter as Aleve.

10   Q    Aleve, I'm sorry.  In your opinion, were those prescriptions, the

11   oxycodone prescriptions, issued for a legitimate medical reason?

12   A    In my opinion, no.

13   Q    And why do you have that opinion?

14   A    Sixty-two year old from – well, from out of state presenting for narcotic

15   management in Georgia.  Physical on examination initially revealed only

16   nonfocal neurologic finding.  And in my opinion, the straight leg raise exam

17   portion of that was not credible.

18   Q    Describe that some more.  Why is that straight leg raise exam not

19   credible?

20   A    Well, this is a 62-year-old patient who reportedly has had three previous

21   lumbar surgeries, and a spinal cord stimulator implantation, which is an

22   interventional technique for severe pain.  What's written down is that the

23   straight leg raising test was 90 degrees on the left, which is essentially

24   perpendicular, which would be very unexpected in my opinion.

25   Q    Unexpectedly good?

1  A    Yes, yes.

2        MR. KNOCHE: 21-020.

3  Q    Prescription for 150 oxy 30s, Flexeril.  You've described Flexeril.

4        MR. KNOCHE: And scroll down.

5  Q    90 Motrins?

6  A    Yes, sir.

7  Q    In your opinion, was that prescription for this Kentucky patient of 150

8  oxy 30 milligrams medically legitimate?

9  A    In my opinion, no, sir.

10 Q    Why not?

11 A    Well, again, because this is a 22 year old from Kentucky presenting for

12 narcotic management in Georgia based on MRIs from Florida.  In reviewing

13 the chart, at one point on presentation he reported that his usual pain level

14 was 9, which alone raises an index of suspicion.  And in totality, combined

15 with the physical examination, which was not adequately supported, my

16 opinion is that it is not medically legitimate.

17 Q    Dr. Kennedy, again this was a 22-year-old patient; right?

18 A    Yes, sir.

19 Q    22 years old from Florida.  Anything in that MRI report which

20 supported the prescriptions that were given?

21 A    No.  No, sir.

22 Q    Jason Jarvis.  Tell us about Jason Jarvis, please.

23 A    This patient was a 30 year old from Ohio, who presented with an MRI

24 from Plantation, Florida, reportedly having a six-year pain complaint

25 secondary to a motor vehicle accident in 2005, and a fall injury in 2009.

1    Reported that his usual pain level was 9.

2    Q    And any other prior physician records in the file other than the MRI?

3    A    No, sir.

4    Q    And the MRI was from Plantation, Florida?

5    A    That's correct.

6         MR. KNOCHE: 22-017.

7    Q    And you noted those prescriptions in the file, Dr. Kennedy?

8    A    Yes, sir.

9    Q    150 oxy 30s?

10   A    Yes, sir.

11   Q    The Naprosyn.

12        MR. KNOCHE: And scroll down, Dean.

13   Q    60 oxy 15s?

14   A    Yes.

15   Q    And the – is that – I won't pronounce it correctly – Neurontin?

16   A    Neurontin.

17   Q    What kind of drug is that?

18   A    Neurontin is an antiseizure medication that falls in that category of

19   drugs that are called neuroleptic medications, and sometimes they can be

20   used to treat painful conditions.

21   Q    In your opinion, were those prescriptions for oxycodone, two of them,

22   were they issued for a legitimate medical purpose?

23   A    No, sir.

24   Q    And why do you have that opinion?

25   A    Well, again, this is a young – a 30-year-old patient with a six-year pain

1    complaint who is from Ohio with an MRI from Florida, presenting in Georgia

2    for narcotic medical management.  This patient – with the pharmacy

3    printout that was in the chart, there were two previous recorded treating

4    physicians, but there is no indication that either of them were contacted.  In

5    my opinion it was not medically legitimate.

6    Q    Was any treatment planning indicated?

7    A    No, sir.

8    Q    Any indication of return appointments or anything like that in any of

9    these files that you recall?

10   A    Some of the patients had return appointments.

11   Q    Sherry Fields.  Dr. Kennedy, tell us what you learned about reviewing

12   Sherry Fields' file, as far as the basic information, her age, what state is she

13   from.

14   A    This was a 37-year-old patient from Kentucky who, again, presented

15   with a state-issued ID card.  She reported her presenting pain level as 9 out

16   of 10 in severity, and again, her pain complaint was 11 years in duration.

17   Q    What other – well, excuse me, was there an MRI in the file?

18   A    Yes.

19   Q    Where was the MRI from?

20   A    The MRI was from Florida.

21   Q    So what did this –

22         MR. KNOCHE:  – if you could, for just a moment, show us

23   Exhibit 23-18.

24   Q    She received those prescriptions, Dr. Kennedy?  Did you see those in

25   the file?

1    A    Yes.

2    Q    150 oxy 30s; is that right?

3    A    Yes.

4    Q    60 oxy 15s?

5    A    Yes.

6         MR. KNOCHE: And scroll down.

7    Q    The Motrin and the – I don't even know what the other drug is.  What is

8    that, Dr. Kennedy?

9    A    Elavil.

10   Q    Were those prescriptions for oxycodone, the 150 30s and the 60 15s,

11   medically legitimate?

12   A    Not in my opinion.

13   Q    In your opinion, and why is that?

14   A    Patient from Kentucky with MRI report from Florida, with no previous

15   medical records, and a reported pain severity of 9, with nothing else in the

16   chart that supported the prescriptions that were prescribed, and the physical

17   examination not being supported either, in my opinion, is not medically

18   legitimate.

19   Q    This patient was – the diagnosis of Dr. Azmat indicated chronic low

20   back pain.  Reconcile that with the physical exam, Dr. Kennedy, showing a

21   lumbar flexion of 90 degrees and straight leg raising of 90 degrees.

22   A    Essentially, that means that the patient with his complaint of back pain

23   that was 9 in – a level of 9 in severity could bend perpendicular to the floor at

24   the waist, and from lying – from a lying-on-her-back position could have her

25   leg raised perpendicular as well.  That does not at all support the history or

1          MR. KNOCHE: Dean, scroll down if there is anything else.

2     Q     The over-the-counter medicines?

3     A     It's a prescription strength nonsteroid medication, the Naprosyn, and

4     the Neurontin.

5     Q     Any – what kind of medications are prescribed for high blood pressure?

6     A     Anti-hypertensive medications.  There's a whole –

7     Q     – What are some that the jury may have heard of?

8     A     Commonly?  Well,  there are a whole bunch of classes of medications,

9     including beta blockers is one class.  Other medications are called ACE

10    inhibitors or ARB inhibitors or vasodilators.  There are a whole gamut of

11    anti-hypertensive medications.

12    Q     Was there any indication in the file that such medicine was prescribed

13    for Ms. Binion with her malignant hypertension?

14    A     No, sir.

15    Q     In your opinion, were those prescriptions for the oxycodone, the two of

16    them, were they for legitimate medical reason?

17    A     No, sir.

18    Q     And I'd like you to elaborate on how you reached that opinion.

19    A     Well, this is a 41-year-old patient from Kentucky, MRI as previously

20    from Florida, and is presenting in Georgia for narcotic management with a

21    malignant hypertension that was unaddressed.  Her physical examination

22    revealed that she was 268 pounds, with a straight leg raising of 75 degrees

23    bilaterally, which is potentially true, but it's not supportive of prescribing

24    narcotic medications in my opinion.  Based on all of the things together, my

25    opinion is, it's not legitimate medical management.

1    Q    You may not know, but hypothetically, if you knew that she came with

2    her husband on the same date to the same clinic seeking the same drugs,

3    would that punctuate your opinion?

4    A    Definitely.

5    Q    And by that I mean, add an exclamation mark to it.

6    A    I would have a definite increased level of concern.

7    Q    And John Koenig, Exhibit 25.

8    A    Yes, sir.

9    Q    Tell the jury about his medical file, the biographical and other data

10   about Mr. John Koenig from South Carolina.

11   A    Patient was a 33 year old, South Carolina, presenting with a South

12   Carolina state ID card, reporting that his pain level was 10 without his

13   prescribed medications and 4 – I'm sorry, pain level of 10 without his

14   prescribed medications and 4 with his medications.  Reportedly had an

15   eight-year pain complaint secondary to a motor vehicle accident.

16   Q    Were there clinical records in the file from that motor vehicle accident?

17   A    No, sir.

18   Q    Would you expect that they would be available if requested or

19   demanded of the patient?

20   A    With an eight-year pain history, I would expect that some previous

21   treatment records would be available.

22   Q    There was a pharmacy record indicating that Mr. Koenig, the 33 year

23   old from South Carolina, had two prior physicians?

24   A    Yes, sir.

25   Q    Any indication in the record of attempts to contact those physicians?

1    A    No.

2          MR. KNOCHE: 25-19.

3    Q    Are those the prescriptions that you noted from Mr. Koenig's file?

4    A    Yes, sir.

5    Q    And were those prescriptions for 150 oxy 30 milligram; correct?

6    A    Yes.

7    Q    And 60 Percocet 10/325s, and Naprosyn; is that right?

8    A    Yes.

9    Q    In your opinion, were those prescriptions for oxycodone issued for a

10   legitimate medical purpose?

11   A    No, sir.

12   Q    Why not, Dr. Kennedy?

13   A    This patient was young at 33 with an eight-year reported pain

14   complaint, reporting a pain level of 10, presenting from South Carolina with

15   no previous treatment records.  MRI, again, obtained out of state.  Physical

16   examination was not contributory and was not entirely credible.  And based

17   on the totality of all of these things, my opinion is it's not medically

18   legitimate.

19   Q    Do you agree that pain is a subjective thing?

20   A    Yes, sir.

21   Q    And so what might be a high level of pain for one person may be lower

22   for another?

23   A    Yes, sir.

24   Q    But as a physician, do you agree that it's necessary to verify a patient's

25   self-reported levels of pain?

1    A    Yes.  And let me say that I think that it can be appropriate to give

2    patients pain medication on an initial visit without having extensive records,

3    but not at the levels that I'm seeing here and not without a required -- not

4    without a requirement that the patient produce some kind of medical records

5    that support the history that we're talking about.

6    Q    But you would agree that verification is essential.

7    A    Yes, sir.

8    Q    And is that need to verify accentuated by the biographical data that

9    you've recited about these patients concerning the distances that they

10   traveled?

11   A    In my opinion it makes it an even larger matter of concern.

12   Q    And when they've traveled from state "A" to state "B" with MRI from

13   state "C", does that just compound your concerns?

14   A    Yes, sir.

15   Q    Now, we've been through a lot of records here, 25 patient records, Dr.

16   Kennedy.  In your opinion, were any of the prescriptions that you've

17   reviewed in these 25 patient files – and I'm talking the prescriptions for the

18   controlled substances – issued for a legitimate medical purpose or in the

19   usual course of professional practice?

20   A    In my opinion, no.

21                [NOTE: Mr. Knoche confers with Mr. Gilluly.]

22   Q    And is that – would that opinion be under guidelines and standards of

23   the State of Georgia?

24   A    I'm not exactly sure –

25   Q    – Would those guidelines, whether we're looking at this from a national

1    or a state standard, would your opinion be the same?

2    A    Yes, sir.

3              MR. KNOCHE: Pass the witness, Your Honor.

4              THE COURT: Mr. Withers.

5                        CROSS-EXAMINATION BY

6    MR. WITHERS:

7    Q    Dr. Kennedy, good afternoon.

8    A    Afternoon.

9    Q    My name is Tom Withers.  I represent Dr. Azmat in this matter.

10         Tell us what a board certification is, please, sir.

11   A    A board certification in the U.S. means that something – it is a

12   certification that is awarded by a entity that is approved by the ACGME,

13   which is the overall governing body for medical boards – for medical

14   specialties, if I'm not mistaken.

15   Q    Right.  The board of medical specialties; fair to say?

16   A    Yes, sir.

17   Q    And you are not board certified in pain management; correct?

18   A    That is correct.

19   Q    And tell us what board eligible means, please.

20   A    Board eligible would be someone who has, for example, done a

21   residency, but has not sat for the examination, but they have met the

22   requirements to sit for the examination to become board eligible.

23   Q    You are not board eligible in pain management; are you?

24   A    There is not – in pain medicine, there is not an American board of pain

25   management –

1    A    There were Xanax prescriptions in the chart also.  I mean, there were

2    also patients for whom Xanax was continued, and I don't remember

3    specifically about initiated.  But, again, if Xanax was discontinued, that

4    would not surprise me.

5    Q    It would be – if there is a combination, if a patient was on, Dr.

6    Kennedy, a combination of oxycodone and Xanax, and if Dr. Azmat

7    discontinued that Xanax, that would be a positive thing for the patient;

8    right?

9    A    Generally speaking, yes.

10   Q    Do you recall that Dr. Azmat – if you don't, it's fine, I know you've

11   reviewed a lot – wrote Xanax for only three patients?

12   A    I don't recall, but that number doesn't sound incorrect to me.

13   Q    And do you recall that on each of those three, he reduced the

14   milligrams from 2 milligrams to 1 milligram?  Did you notice that?

15   A    I noticed that the dosage was decreased on some Xanax prescriptions,

16   yes, sir.

17   Q    Now, you know what a drug detoxification is; don't you?

18   A    Yes.

19   Q    That can be a dangerous situation for a patient; can it not?

20   A    It can.

21   Q    In which case, sometimes the patients are hospitalized as result of

22   drug detoxification.

23   A    You talking about drug withdrawal?

24   Q    Yes, sir.

25   A    Yes.

1    pain. Your organization recognizes that the primary complaint of chronic

2    pain deals with the low back; right?

3    A    Yes, sir.

4    Q    So it's not surprising to you as a physician that you're seeing the

5    complaints of pain with respect to low back pain; right?

6    A    I would not expect to see that as an almost exclusive thing, but I would

7    expect to see a fairly large number, perhaps even a preponderance, of low

8    back pain. To my knowledge, there was one chart that was neck pain, and

9    the remainder of the patients were low back pain, if I remember correctly.

10   Q    By the way, you dispense medication from your office; do you not?

11   A    I do.

12   Q    You did not find that medications were dispensed from East Health

13   Center; did you?

14   A    No, sir.

15   Q    Dr. Azmat was writing prescriptions, not dispensing; correct?

16   A    That's correct.

17   Q    Now, you believe that the use of urine toxicology screens is appropriate

18   in the pain management world; correct?

19   A    Yes.

20   Q    Now, to be fair, even though there are urine toxicology screens used

21   here at East Health Center, that's not a requirement by any means in terms

22   of either a civil standard of care or otherwise; correct?

23   A    The laws have changed over the last couple of years, and The Georgia

24   State Medical Board has recently – their guidelines do include urine

25   toxicology screening in patients who are receiving narcotics medications;

1    here in a criminal case; don't you?

2    A    Yes.

3    Q    And with Mr. Bradley – this is Defendant's Exhibit Number 11 – Mr.

4    Bradley was positive for benzodiazepine when he came in; was he not?

5    A    Yes.

6    Q    And the history that he gave was Xanax, that looks like 30 milligrams;

7    right?

8    A    Right.  30 pills.

9    Q    I'm sorry, Xanax 2 milligrams, 30 pills.  Do you read that the same

10   way I do?

11   A    Yes.

12   Q    And Dr. Azmat reduced that to Xanax 1 milligram, 30 pills; correct?

13   A    Yes.

14   Q    That would be, in the treatment of a patient, a good thing to reduce

15   that Xanax; correct?

16   A    Yes.

17   Q    Now, I notice, by the way, Doctor, that you pick and choose what you

18   wish to use against Dr. Azmat to your purpose, and I'm showing you –

19           THE COURT:  – Is that a statement or a question, Mr. Withers?

20           MR. WITHERS: I'm sorry, Your Honor, I apologize.

21   Q    I'm showing you, sir –

22           THE COURT: – No, sir, just – is that a statement or is that a

23   question, Mr. Withers?

24           MR. WITHERS: Well, it is a question.

25   Q    In fact you do pick and choose what –

1   Q   Well, let me ask you this: see where it says tree logger?

2   A   Yes.

3   Q   Your presumption would be that the fellow told Dr. Azmat that he's a

4   tree logger?

5   A   Yes, sir.

6   Q   And the oxy 30 milligram, 210 tablets was reduced to 180; correct?

7   A   Yes.

8   Q   The oxy 15 milligram, 90 tablets was reduced to 60; correct?

9   A   Yes.

10   Q   And the Xanax 35 tablets was discontinued; correct?

11   A   Yes.

12   Q   And if – and you have previously written in these reports and

13   previously testified about the dangerous combination of oxycodone and

14   Xanax, and eliminating the Xanax for that patient would be a good thing;

15   correct?

16   A   Generally, yes, sir.  But I would note that the numbers that were

17   circled on that physical examination form are not reflected in the

18   medications that are listed or what the patient reported on presentation.

19   That's why I said that that's what we presume, is that's what the patient

20   told the physician while they were in the room and he circled it in there.

21   Q   Right. Well, I mean, again it's one thing when you have a doctor who's

22   not writing anything down in a patient record, but here we've got a patient

23   record; correct?

24   A   We have a patient record.

25   Q   And you're certainly not going to suggest, are you, that Dr. Azmat

# IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF GEORGIA

### SAVANNAH DIVISION

UNITED STATES OF AMERICA    *

v.                         *    CASE NUMBER CR413-28

NAJAM AZMAT              *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

VOLUME 4 - 1/16/2014

PP. 735 - 932

APPEARANCES:

For the Government                      KARL I. KNOCHE, AUSA
                                     GREGORY E. GILLULY, JR., AUSA

For the Defendant                          THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in conjunction with transcription of back–up recording.*

1    A    No, sir, I'm not aware of that.

2    Q    Now, Ms. Letner, when she reported to Dr. Azmat, reported 30

3    oxycodone – 30 milligrams oxycodone, 180 tablets; correct?

4    A    That's not – that's what's written here, but I don't – without referring

5    to the patient notes I can't tell you that's what the patient indicated on the

6    office forms that they fill out listing their medications.

7    Q    And I'm assuming that you, then, don't credit what Dr. Azmat has

8    taken here as the history of trauma.

9    A    (No audible response.)

10    Q    Do you believe what's written on the history of trauma or not?

11    A    In this particular instance, or for all of the charts?

12    Q    Well let's do it both ways.  In this particular instance.

13    A    Possibly.

14    Q    All right, possibly.  For all of the charts?

15    A    Possibly.

16    Q    Very good.  And then we've got a report of oxycodone – let me ask you

17    this way: Dr. Azmat has recorded that the patient told him that she was on

18    oxycodone 15 milligrams, 90 tablets; correct?

19    A    That's what's written there.

20    Q    And he also reflects that she told him she was on Xanax 2 milligram,

21    60, it looks eight tablets, or maybe it's a 60 tablets; correct?

22    A    That's what is written there.

23    Q    And Dr. Azmat reduced the 180 tablets down to 60; correct?

24    A    Yes.

25    Q    He reduced the 90 tablets down to 60 tablets; correct?

1   A    Yes.

2   Q    And he discontinued the Xanax; correct?

3   A    Yes.

4   Q    And he notes down here at the bottom, wean off narcotics; right?

5   A    Yes.

6   Q    And when you wean someone off narcotics, that means you are going

7   to gradually reduce the number and amount of narcotics that person is on;

8   correct?

9   A    That's true.

10  Q    And that's so that you prevent the physical problems that you

11  described in terms of the detoxification.

12  A    Yes, sir.

13  Q    And you would agree with me, would you not, that the number of

14  prescriptions before and after seeing Dr. Azmat is reduced to a third.

15  A    Yes.

16  Q    Weaning a patient off of narcotics is a legitimate medical goal; is it

17  not?

18  A    It is.

19  Q    I'm going to talk to you a minute about David Letner.  Similarly – and

20  this is Defense Exhibit 104 –  David Letner, that report was prepared

21  March 19, 2013.

22  A    Yes.

23  Q    And when David Letner saw Dr. Azmat, David Letner, according to the

24  note, was on oxycodone 30 milligram, 240 pills; correct?

25  A    Yes.

1   Q   And oxycodone 15, 180 tablets; correct?

2   A   Yes.

3   Q   And is this the patient you said that that's just too remarkable, that

4   one patient can't tolerate that much oxycodone?

5   A   Sir, I never said that.

6   Q   Okay, and Dr. Azmat reduced the oxycodone 30 milligrams down to

7   90 tablets; correct?

8   A   Yes.

9   Q   And the oxycodone 15 milligrams down to 30 tablets; correct?

10   A   Yes.

11   Q   If my math is right, Mr. Letner, David Letner, was receiving 240

12   oxycodone tablets before he saw Dr. Azmat, and 120 after he saw Dr.

13   Azmat; correct?

14   A   No, sir.  There is nothing in the record to support that this patient was

15   getting those medications previously.

16   Q   Other than what's reflected in the record.

17   A   Other than what the patient reported and wrote down.

18   Q   Latina Simpson.  On the next patient -- and I want to be fair with the

19   jury, this is where Dr. Azmat neglected to note a diagnosis and treatment.

20   It's not filled in; is it?  It's up on the screen, sir.

21   A   It is not.

22   Q   That would be a mistake; correct?

23   A   It would be a mistake.

24   Q   Mistakes can happen; correct?

25   A   They can.

1    Q    I'm going to show you the copy of your report on this particular

2    patient. Your report actually reflects Dr. Gossett; correct?

3    A    It does.

4    Q    And you were doing that for Dr. Azmat; correct?

5    A    Well, the reports come packaged to me for different physicians, and

6    sometimes there is more than one physician who is treating a patient. So I

7    head it however it is that it is packaged by the organization that is sending

8    it to me.

9    Q    All right. So you wouldn't acknowledge that that would be a mistake

10   on your behalf.

11   A    I'm uncertain without going through and reviewing every patient visit.

12   Q    And with respect to Ms. Simpson, Ms. Simpson reported to Dr. Azmat

13   that she was on 240 30 milligram tablets; correct?

14   A    Yes.

15   Q    110 15 milligram tablets; correct?

16   A    That's what's written.

17   Q    And 2 milligram Xanax, 60 tablets; correct?

18   A    Yes, sir.

19   Q    And although it's not noted, you reviewed earlier a copy of the chart –

20   and this is Government's Exhibit 6-018 – that showed Dr. Azmat's

21   prescriptions. The Xanax was reduced 1 milligram; correct?

22   A    Yes.

23   Q    The oxycodone 30 milligram was reduced from 250 – excuse me, 240

24   to 150; correct?

25   A    Yes.

1    Q    And the oxycodone 15 milligram was reduced from 110 down to 30;

2    correct?

3    A    Yes.

4    Q    So that's a patient, again, who came in, was reporting to Dr. Azmat

5    total prescription tablets of 200 – excuse me, 410, if my math is accurate,

6    and she left with roughly half of that, 210; correct?

7    A    Sir, that was, again a patient with an unsupported narcotics history of,

8    as you point out, over 400 pills per month that was issued in a reduced

9    number.

10    Q    And again, on your report concerning Dr. Azmat for the patient James

11    Lockwood – that's going to be Defense Exhibit 121 – do you see where

12    you've reported Dr. Azmat's name?

13    A    Yes, sir.

14    Q    And you see where you've reported the patient's name, James

15    Lockwood; correct?

16    A    Yes.

17    Q    But on the second page of that, you say [reading]: Pn the follow-up

18    encounter, a physical examination was not performed, Xanax was added

19    without explanation, and the patient was again prescribed 210 oxycodone

20    pills.

21        That's what you write; correct?

22    A    Yes, sir.

23    Q    But that is all written about someone other than Dr. Azmat; do you

24    recall that?

25    A    Not specifically in this instance, no.

1    Q    I don't know if I can do side by side, but I'm going to try. You see

2    Brian Smith? Well, I'll do it this way, sir. See Brian Smith 2/24/11 –

3    A    I do.

4    Q    – positive meth?

5    A    I do.

6    Q    You see Brian Smith 2/28/11, negative?

7    A    Yes.

8    Q    And in fact, and I'm not going to belabor this with the particular

9    numbers, but on this particular patient, Dr. Azmat decreased – or excuse

10   me, discontinued the Soma; correct?

11   A    Yes, sir.

12   Q    And reduced the number of Xanax from Xanax 2 milligram, 60 tablets

13   down to 1 milligram, 15 tablets; correct?

14   A    That's true.

15   Q    And also in the file was a return visit that you note of Mr. Brian Smith;

16   correct? But that return visit was not Dr. Azmat's, it was someone else's.

17   And I just want to show you this for illustration. This is a doctor by the

18   name of Dr. Gossett, and we've seen his name on your files where you've

19   compared the two, or combined the two; correct?

20   A    Yes.

21   Q    And what Dr. Gossett notes on the return visit of Mr. Smith on the 28th

22   of March is, chronic low back pain, and the assessment. And then – excuse

23   me, in the doctor note, the assessment, chronic low back pain, feels Xanax

24   and Soma were very helpful. Will add Xanax – Soma, Xanax and

25   oxycodone, and he goes through and describes the 30 to 90; correct?

1    MR. WITHERS: Judge, I do have a motion for verdict of

2    acquittal that I can make orally.  I can file one during the lunch break.

3    THE COURT: You can make it now, and if you want to file one

4    later, I'll leave it open.  But you can go ahead and make it now.

5    MR. WITHERS: Judge, I want to move for a verdict of acquittal

6    on general grounds of insufficiency of evidence on each of Counts 1 through

7    52 – 51 doesn't apply to Dr. Azmat.  And specifically, with respect to the

8    Counts 2 through 50, I would move for directed verdict on the charging

9    language in the indictment as dispensation of controlled substance.  And I

10    believe, Your Honor – or it is our position that there is a distinction

11    between the dispensation and distribution in 21 U.S.C. 841.  And that's

12    what I'm addressing, those particular counts.   And specifically, 21 U.S.C.

13    841 provides that it shall be unlawful for any person knowingly to

14    distribute or dispense.  Title 21 defines – at 21 U.S.C. 802(10) defines

15    dispense as [reading]: To deliver a controlled substance by or pursuant to a

16    lawful order of practitioner, including the prescribing and administering –

17    and this is the important part, I think, Your Honor – and the packaging,

18    labeling or compounding necessary to prepare the substance for delivery.

19    Distribute means, basically, anything else.  To quote the statute, the term

20    distribute means [reading]: To deliver (other than by administering or

21    dispensing) a controlled substance.

22    The government has proven in its case-in-chief that Dr. Azmat

23    prescribed controlled substances.  They have not proven that he dispensed

24    controlled substances beyond a reasonable doubt, or there was a wholesale

25    lack of proof on that issue.  Again, the statute describes – or defines

1   dispense as the delivery by a lawful order and the packaging, labeling or

2   compounding. And there were several witnesses who testified that East

3   Health Center never dispensed.

4          And so – and the indictment actually, at Paragraph 11 of the

5   superseding indictment, defines dispense. And I think, you know, in

6   general parlance we think of the physician writing the prescription and the

7   pharmacist dispensing the prescription. And here Dr. Azmat – neither Dr.

8   Azmat nor East Health Center ever dispensed. And so we would ask for the

9   grant of our motion for verdict of acquittal with respect to Counts 2 through

10  50.

11         Interestingly, with respect to Count 1, the government does

12  charge that in the conjunctive. They have charged distribute and dispense

13  in Count 1, so that argument does not apply to Count 1.

14         Count 52, because it relies on the activities specified in Counts 2

15  through 50, likewise – and that being the unlawful dispensation, because

16  the unlawful dispensation is the specified unlawful activity, we would

17  submit that Count 52 therefore fails – that's the money laundering count.

18         And, finally, Your Honor, with respect to the money laundering

19  count, the law – and I don't have the cite in my head, but it's the *Christo*

20  case, and in *Christo* the Eleventh Circuit held that the money laundering

21  activity has to be separate and apart from the underlying specified unlawful

22  activity. And so under the authority of *Christo* we would move for a

23  directed verdict on Count 52 as well.

24         THE COURT: Thank you, Mr. Withers. Do you want to

25  respond, Mr. Knoche?

-860-

1    A    That is correct.

2    Q    In fact there are pain management doctors in pretty much every state

3    in the United States, most of whom are not board certified; is that correct?

4    A    That is correct.

5    Q    There are pain management doctors in Kentucky?

6    A    Yes.

7    Q    Tennessee?

8    A    Yes.

9    Q    Ohio?

10   A    Yes.

11   Q    Florida?

12   A    Yes.

13   Q    South Carolina?

14   A    Yes.

15   Q    In fact pain management doctors don't even have to have hospital

16   privileges; is that right?

17   A    That is correct.

18   Q    And you've reviewed records in this case.  Do you know whether Dr.

19   Azmat was board certified or not?

20   A    I don't think he was.

21   Q    Okay, and he did not have hospital privileges either.

22   A    That I don't know, if he had those.

23   Q    Do you know whether he had medical malpractice insurance?

24   A    I don't know that offhand.

25   Q    Okay.  Dr. Azmat, do you know where he graduated from medical

1 school?

2 A I don't recall offhand.

3 Q Okay. Pakistan? Does that ring a bell?

4 A Yes, it does. I can't recall the name of the university.

5 Q Yes, sir, but you are familiar with the -- you're not familiar with the

6 courses he took while he was in Pakistan; that's fair to say.

7 A That is correct, yes.

8 Q And you would agree with me that whether board certified or not,

9 when a physician practices pain management, it is important to know the

10 prevailing standards in the area in which they practice.

11 A Yes.

12 Q For instance, a doctor practicing in Georgia should know the

13 prevailing standards in Georgia.

14 A Yes.

15 Q And that includes laws from The Georgia Medical Board -- or rules

16 from The Georgia Medical Board?

17 A Yes.

18 Q And it also includes the prevailing laws of the United States.

19 A Yes.

20 Q And federal regulations in the Code of Federal Regulations.

21 A Yes.

22 Q And these include -- well, scratch that actually. Regardless of what

23 kind of practice a physician practices, you would agree with me it is

24 important for the physician to act like a physician.

25 A Yes, absolutely.

1    is they have an MRI, they come in, they get, as we saw, prescriptions, as we

2    saw, of this combination. It's more commonly done in the primary care

3    since they first encounter the patient.

4    Q    Certainly. In fact most — I mean, isn't it correct that 99 — I'd say 99

5    percent of the people at Beth Israel who are being seen for pain

6    management issues are from referrals?

7    A    Yes.

8    Q    Or is it a hundred percent?

9    A    There are some self-referrals, but most of them are referrals from

10    various specialties, most commonly things that would hurt, orthopedic,

11    orthopedists ...

12                [NOTE: Due to an equipment power failure, there is a brief

13    interruption in the proceedings.]

14                THE COURT: Ladies and gentlemen, if you want to stand up

15    and stretch while we address this problem you may certainly do so.

16                MR. WITHERS: Judge, while we're waiting, could we have a

17    side bar, please?

18                THE COURT: Yes, sir.

19                [NOTE: Side bar conference on the record during the

20    interruption of proceedings:]

21                MR. WITHERS: I want to make a motion for a mistrial. Mr.

22    Gilluly inserted the issue of my client's nationality into this case, and that is

23    done for one purpose, and only one purpose. It is shocking to me that an

24    Assistant United States Attorney in this district would do something like

25    that. That was done for no other purpose but to —

1    MR. GILLULY: – Absolutely not, Judge. I certainly didn't

2  mean anything beyond asking if he knew where he went to medical school.

3  It had nothing to do with –

4    MR. WITHERS: – He asked the question in such a way, did he

5  know he went to medical school in Pakistan and –

6    MR. GILLULY: – There is nothing wrong with him being from

7  Pakistan, Your Honor –

8    THE COURT: – Wait, let's stop – stop. I was surprised that

9  you didn't object at the time, but I thought, well, he's asking this witness

10  what he knows about the experience and background of the defendant,

11  whose files he reviewed to make a determination in this case, so then I let it

12  go. And your motion for mistrial is DENIED, but I agree that it was a low

13  blow, but it doesn't rise to the level of granting a mistrial.

14    [NOTE: Side bar conference concluded. Thereafter the

15  electrical problem is corrected, and the proceedings are continued in the

16  presence of the jury as follows:]

17    THE COURT: I'm sorry for this inconvenience. I tried cases as

18  a lawyer for 30 years. I've been on this bench a long time. I can tell you in

19  the past we never had these problems. Every time equipment is updated,

20  every time a new program is put in, it just creates more and new problems.

21  But that's the world that we live in today, ladies and gentlemen. So

22  hopefully we won't have any more of those problems.

23    And you may continue, counsel.

24  Q    (By Mr. Gilluly) Dr. Simopoulos, with regard to patients who are

25  coming to your facility, they actually receive thorough evaluations, and

1    violation of your oath. It would subject you being held in contempt of

2    court, it would end up with a mistrial, and it would end up with this effort

3    having to be done all over again. And I'm sure none of us want those things

4    to happen.

5              So leave your notepads and pencils here. When you come in in

6    the morning there will be some refreshments for you. And again just try to

7    go home and forget about this and don't think about this case until you

8    start driving in to the courthouse in the morning.

9              So with those instructions you're excused for the evening.

10             [NOTE: The jury is excused for the day. The proceedings are

11   continued outside of the presence of the jury as follows:]

12             THE COURT: You know what the charge is going to be now,

13   counsel, and we'll be working on cleaning them up and getting them in the

14   final form tonight. And when you come in in the morning, those charges

15   will be on your desks before you begin your closing argument, but you

16   already know what's going to be in there.

17             Anything else that we need to discuss before we adjourn for the

18   evening, Mr. Knoche?

19             MR. KNOCHE: Nothing from the government, Your Honor.

20             MR. WITHERS: If I can just step ...

21             [NOTE: Mr. Withers and Mr. Knoche confer off the record.]

22             MR. WITHERS: Your Honor, two things. One, I'm not certain

23   it's necessary, but if the Court would permit me to renew and adopt by

24   reference the arguments I made on the Rule 29 motion for verdict of

25   acquittal, I would do so now.

# IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF GEORGIA

### SAVANNAH DIVISION

UNITED STATES OF AMERICA    *

v.                       *   CASE NUMBER CR413-28

NAJAM AZMAT            *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

### VOLUME 5 - 1/17/2014

#### PP. 933 - 987

APPEARANCES:

For the Government                  KARL I. KNOCHE, AUSA
                             GREGORY E. GILLULY, JR., AUSA

For the Defendant                 THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in*

*conjunction with transcription of back–up recording.*

1  [NOTE: Court is opened on 1/17/2014. The proceedings are

2  continued in the presence of the jury as follows:]

3  THE COURT: Good morning, ladies and gentlemen. I hope

4  that you members of the jury had a restful evening last night, and we're

5  ready to proceed.

6  You may begin, Mr. Knoche.

7  CLOSING ARGUMENT BY

8  MR. KNOCHE:

9  May it please the Court, ladies and gentlemen, for four days of

10  evidence, today the last stage of the presentation of the case is the

11  argument of counsel, then you will retire to deliberate, and this matter will

12  be in your hands. And as you deliberate over this case, I suggest to you that

13  you always keep in mind, keep at the forefront, the big picture concerning

14  the East Health Center. And there are several things I would like you to

15  remember.

16  Keep in mind the background and training of the individuals

17  who started and ran this clinic. You heard from Mr. LeFrancois; you heard

18  from Mr. Sean Clark; you've heard from Dan Wise; you heard from Frankie

19  Barbuscia. None of these individuals, any legitimate medical training or

20  experience. Their background was, they had experience running pill mills

21  similar to the East Health Center down in south Florida.

22  Keep in the forefront of your minds the reasons why these

23  individuals chose to open East Health Center in Garden City, Georgia.

24  Keep in mind that it was – had the advantage of being at the

25  intersection of two major interstates; that the laws of Georgia were more

1    Medical Board.

2        William F. Buckley, a famed author and founder of a magazine,

3    once said, I'd rather entrust the government of the United States to the first

4    400 people listed in the Boston telephone directory than to the faculty of

5    Harvard University.

6        Most of all, what Dr. Kennedy didn't do, he did not make the

7    mistake of Dr. Simopoulos.  He considered the patient files in context.  He

8    got the whole picture, which is what I submit you members of the jury

9    should do.  He looked at the patient's overall condition at the clinic.  He

10   considered things which were evident to anyone who cared to notice.  He

11   concluded that the prescriptions charge in Counts 2 through 50 were

12   written for no legitimate medical purpose, outside of the usual course of

13   professional practice.  I will submit to you that that is the most obvious

14   conclusion that one could draw.  I will submit to you, that is the only

15   conclusion that one could draw.

16       As I said at the beginning of this case back on Monday, East

17   Health Center did not open because of any real or perceived need for such a

18   clinic in the Savannah area.  This is an area which is blessed to be served

19   with a number of very fine medical institutions. We've got  Memorial

20   Hospital, St. Joseph-Candler, number of doctors that are very capable, and

21   we are well served.  They didn't come here because there was a void in the

22   pain management area.  They came here for two reasons: number one,

23   there is big money to be made from pill mills; and number two, the laws in

24   Florida where pill mills are in abundance, which you may think of as the

25   pill mill capital of the United States, the laws have become less hospitable.

1  supposed to get paid, remember, to give her prescriptions to her sponsor, a

2  fellow named David Henderson.

3      Day one the clinic's open, Latina Simpson, she's one of the

4  substantive of counts in the indictment. Jim Brooks and Latina Simpson's

5  husband, Michael Brooks, they all show up at the clinic from Frenchburg,

6  Kentucky. And were they asked, wow, three patients on day one from

7  Frenchburg, Kentucky. Why is this? Dr. Azmat must have been in too big a

8  hurry to collect his $2,000 and skedaddle back to Waycross or the motel to

9  ask those questions.

10     James Gable, another man battling the demon of drug

11  addiction to this day. He told you, he's ridden the pill mill circuit for years,

12  knows what to say. It's expected. You walk into the clinic. I'm an 8, 9, or a

13  10 in pain. This makes it worse. Here's my money. Here's my MRI, bingo.

14  He says everybody knows that. Everybody knows it but Dr. Azmat. Strains

15  credulity to the breaking point, beyond the breaking point.

16     Azmat came to East Health Center for one reason, and that was

17  not to minister to people's pain. He is every bit as cynical and ruthless as

18  Al LeFrancois, Sean Clark, Frankie Barbuscia, all those wannabe wise guys

19  from south Florida. He's no different. He's no better.

20     He answered the Craigslist ad. You can understand the

21  temptation, $2,000 a day. The temptation. We understand that, but you

22  can't succumb to that temptation. He knew they were addicts. He told that

23  to Investigator Sikes. You've heard his testimony about the interview of Dr.

24  Azmat, which occurred after the clinic was closed down. He knew they

25  were addicts. Knew they came from out of state. Knew they paid in cash.

1    demands a finding of guilty.  Thank you.

2            THE COURT: Thank you, Mr. Gilluly.  Would you hand out the

3    charges to the jury please.

4            CLERK: Yes, Your Honor.

5            [NOTE: Written copies of jury charge are given to jurors. The

6    proceedings are continued with the Court's charge to the jury, which is not

7    a part of this record.]

8            THE COURT: Now, in just a few moments you will begin your

9    deliberations, and you will have a copy of these charges to take with you.

10   And shortly after you get into the jury room, the Clerk will send out to you

11   the exhibits that have been admitted during this trial.

12           [NOTE: Alternates are identified and seated.]

13           THE COURT: Now, ladies and gentlemen, the remainder of

14   you should take your notepads and a copy of the charges and follow my

15   instructions by going to the jury room and first selecting one of your

16   members to serve as your foreperson.  And very shortly the exhibits will be

17   sent out to you.  So I'll ask you to retire to the jury room at this time.

18           [NOTE: The jury retires to the jury room to begin deliberations

19   at 11:38 a.m.  The proceedings are continued outside of the presence of the

20   jury as follows:]

21           THE COURT: Counsel, for the record, the defendant's Rule 29

22   motion for judgment of acquittal has been considered by this Court, and

23   that motion is DENIED.  I'll place that on the record at this time.

24           It is my practice, as you know, that if the jury should send out

25   any message or any note, that before I answer that question that I have

CERTIFICATE OF SERVICE

The undersigned certifies that she served a copy of the foregoing Appendix III on this date in accordance with the directives from the Court Notice of Electronic Filing ("NEF") that was generated as a result of electronic filing in this court.

This the 19th day of November, 2014.

/s/ Thomas A. Withers
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone: 912-447-8400
Facsimile:  912-629-6347
twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*