No. 14-13703-EE

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**vs.**

**NAJAM AZMAT,**

**Defendant-Appellant.**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
_____

**BRIEF OF APPELLEE**
_____

EDWARD J. TARVER
UNITED STATES ATTORNEY

James C. Stuchell
Assistant United States Attorney

United States Attorney's Office
22 Barnard Street, Suite 300
Savannah, Georgia  31401
(912) 652-4422

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISLOSURE STATEMENT

Azmat, Najam, Appellant

Buerstatte, Jeffrey J., Assistant United States Attorney

Burns, David M., Jr., Prior Attorney for Appellant

Carreras, Candace Anne, Co-Defendant

Clark, Sean Michael, Co-Defendant

Durham, James D., First Assistant United States Attorney

Gillen, Withers & Lake, LLC

Gilluly, E. Gregory, Jr., Assistant United States Attorney

Knoche, Karl I., Assistant United States Attorney

Lizama, Adelaida M., Co-Defendant

Moore, Hon. William T., United States District Judge

Morford, Shelly Lynn, Co-Defendant

Rafferty, Brian T., Assistant United States Attorney

Stuchell, James C., Assistant United States Attorney

Tanner, R. Brian, Assistant United States Attorney

Tarver, Edward J., United States Attorney

Wise, Daniel John, Co-Defendant

Withers, Thomas A., Attorney for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not warranted and would not significantly aid the decisional process because the briefs adequately present the facts and legal arguments.  <u>See</u> Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure
  Statement ......................................................................... C-1

Statement Regarding Oral Argument ....................................... i

Table of Contents ................................................................. ii

Table of Citations ............................................................... iv

Jurisdiction.......................................................................... 1

Issues .................................................................................. 1

Statement of the Case .......................................................... 3

  I.    Proceedings and Disposition Below ........................ 3

  II.   Facts .................................................................... 5

  III.  Standards of Review ............................................ 28

Summary ............................................................................ 29

Argument ........................................................................... 32

  I.    The District Court Did Not Err by Ruling that Sufficient
        Evidence Supported the Jury's Verdict Finding Azmat
        Guilty on All Counts ........................................... 32

  II.   The District Court Did Not Abuse Its Discretion by
        Qualifying Dr. Kennedy as an Expert Witness ................ 52

  III.  The District Court Did Not Commit Clear Error by
        Holding Azmat Accountable for All the Oxycodone,
        Hydrocodone, and Xanax He Prescribed While Working at
        the Center ......................................................... 55

IV.    The District Court Did Not Abuse Its Discretion by
Sentencing Azmat to a Longer Prison Term Than His
Codefendants, Who Pleaded Guilty.....................................65

V.    The District Court Did Not Commit Plain Error by
Sentencing Azmat for the Crimes the Jury Convicted Him
of Committing and Refusing to Give Him the Benefits His
Codefendants Earned by Pleading Guilty to Lesser
Offenses................................................................................68

VI.    There Was No Prosecutorial Misconduct Amounting to
Plain Error ..........................................................................72

VII.   There Was No Cumulative Error .....................................81

Conclusion .............................................................................82

Certificate of Compliance and Service...............................83-84

iii

# TABLE OF CITATIONS

## Cases

Alabama v. Smith, 490 U.S. 794, 109 S. Ct. 2201 (1989) ......................72

Blackledge v. Allison, 431 U.S. 63, 97 S. Ct. 1621 (1977) ...............71, 72

Harris v. United States, 400 F.2d 264 (11th Cir. 1968) ........................76

Johnson v. Breeden, 280 F.3d 1308 (11th Cir. 2002) .............................44

Lindsey v. Smith, 820 F.2d 1137 (11th Cir. 1987)..................................79

Schefano v. United States, 84 F.2d 513 (5th Cir. 1936) .........................79

Tucker v. Kemp, 762 F.2d 1496 (11th Cir. 1985) ..................................79

Whitfield v. United States, 543 U.S. 209, 125 S. Ct. 687 (2005)............49

Willis v. Kemp, 838 F.2d 1510 (11th Cir. 1988) ...................................76

United States v. $242,484.00, 389 F.3d 1149 (11th Cir. 2004) ..............65

United States v. Badia, 490 F.2d 296 (2d Cir. 1973).......................45, 46

United States v. Bailey, 123 F.3d 1381 (11th Cir. 1997)............72, 73, 76

United States v. Barsoum, 763 F.3d 1321 (11th Cir. 2014) .......56, 58, 63

United States v. Bell, 667 F.3d 431 (4th Cir. 2011) ..............................63

United States v. Brannan, 562 F.3d 1300 (11th Cir. 2009) ...................52

United States v. Calderon, 127 F.3d 1314 (11th Cir. 1997)...................35

United States v. Chastain, 198 F.3d 1338 (11th Cir. 1999)...................33

United States v. Chotas, 968 F.2d 1193 (11th Cir. 1992) .....................66

iv

United States v. Chube II, 538 F.3d 693 (7th Cir. 2008) ................. 62, 63

United States v. Crawford, 407 F.3d 1174 (11th Cir. 2005) ................... 28

United States v. Docampo, 573 F.3d 1091 (11th Cir. 2009) ............. 66, 67

United States v. Drum, 733 F.2d 1503 (11th Cir. 1984) ........................ 79

United States v. Ellisor, 522 F.3d 1255 (11th Cir. 2008) ....................... 32

United States v. Foley, 508 F.3d 627 (11th Cir. 2007) ...................... 78, 79

United States v. Frank, 599 F.3d 1221 (11th Cir. 2010) ................. 72, 80

United States v. Frazier, 89 F.3d 1501 (11th Cir. 1996) ................. 28, 55

United States v. Harrell, 751 F.3d 1235 (11th Cir. 2014) ...................... 28

United States v. House, 684 F.3d 1173 (11th Cir. 2012) ........................ 81

United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012) ................... 43

United States v. Isaacson, 752 F.3d 1291 (11th Cir. 2014) ................... 33

United States v. Jacoby, 955 F.2d 1527 (11th Cir. 1992) ....................... 80

United States v. Jayyousi, 657 F.3d 1085 (11th Cir. 2011) ................... 53

United States v. Johnson, 440 F.3d 1286 (11th Cir. 2006) ................... 48

United States v. Johnston, 322 Fed. Appx. 660 (11th Cir. 2009) ........... 43

United States v. Joseph, 709 F.3d 1082 (11th Cir. 2013) .............. passim

United States v. Kelley, 471 Fed. Appx. 840 (11th Cir. 2003) .............. 52

United States v. Killian, 541 F.2d 1156 (5th Cir. 1976) ........................ 78

United States v. Langston, 590 F.3d 1226 (11th Cir. 2009)...................67

United States v. Lee, 68 F.3d 1267 (11th Cir. 1995) ..............................56

United States v. Leigh, 487 F.2d 206 (5th Cir. 1973) ................. 42, 43, 46

United States v. Lopez, 590 F.3d 1238 (11th Cir. 2009) ........................81

United States v. Mateos, 623 F.3d 1350 (11th Cir. 2010) ............... 34, 35

United States v. Moriarty, 429 F.3d 1012 (11th Cir. 2005) ...................29

United States v. Navarro-Ordas, 770 F.2d 959 (11th Cir. 1985) ...........32

United States v. Nechy, 827 F.2d 1161 (7th Cir. 1987).........................47

United States v. Newsom, 428 F.3d 685 (7th Cir.2005).........................68

United States v. Pintado, 715 F.2d 1501 (11th Cir. 1983) .....................36

United States v. Reeves, 742 F.3d 487 (11th Cir. 2014)................... 34, 35

United States v. Regueiro, 240 F.3d 1321 (11th Cir. 2001) ...................66

United States v. Rodriguez, 398 F.3d 1291 (11th Cir. 2005) ................56

United States v. Roe, 670 F.2d 956 (11th Cir. 1982)..............................69

United States v. Roya, 574 F.2d 386 (7th Cir. 1978).............................41

United States v. Schmitz, 634 F.3d 1247 (11th Cir. 2011).............. 29, 81

United States v. Silvestri, 409 F.3d 1311 (11th Cir. 2005) ...................48

United States v. Singleton, 545 F.3d 932 (11th Cir. 2008) ...................55

United States v. Smith, 122 F.3d 1355 (11th Cir. 1997).......................46

vi

United States v. Summersett, 504 Fed. Appx. 789 (11th Cir. 2012) ..... 68

United States v. Taylor, 792 F.2d 1019 (11th Cir. 1986) ....................... 79

United States v. Thompson, 422 F.3d 1285 (11th Cir. 2005) ................. 35

United States v. Thompson, 624 F.2d 740 (5th Cir. 1980) ......... 43, 46, 47

United States v. Tighe, 551 F.2d 18 (3rd Cir. 1977) .............................. 41

United States v. Tisdale, 817 F.2d 1552 (11th Cir. 1987) ............... 77, 79

United States v. Tombrello, 666 F.2d 485 (11th Cir. 1982) .................. 50

United States v. US Infrastructure, 576 F.3d 1195
    (11th Cir. 2009) ........................................................................... passim

United States v. Weinstein, 762 F.2d 1522 (11th Cir. 1985) ................ 73

United States v. Williamson, 339 F.3d 1295 (11th Cir. 2003) .............. 52

United States v. Wilson, 657 F.2d 755 (5th Cir. 1981) .......................... 40

**Statutes**

18 U.S.C. § 371 ..................................................................................... 71

18 U.S.C. § 3231 ..................................................................................... 1

18 U.S.C. § 3551(a) ............................................................................... 70

18 U.S.C. § 3553(a) ............................................................................... 66

18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(4)(A) ......................................... 70

18 U.S.C. § 3553(a)(6) ........................................................................... 67

18 U.S.C. § 3584(a) ............................................................................... 71

18 U.S.C. § 3742 ...................................................................... 1

21 U.S.C. § 802(8) ...................................................... 40, 44, 47

21 U.S.C. § 802(10) .................................................... <u>passim</u>

21 U.S.C. § 841 .......................................................... 3, 4, 34

21 U.S.C. § 841(a)(1) ....................................................... 38, 41

21 U.S.C. § 846 ............................................................... 3, 34

21 U.S.C. § 1956(a)(1)(A)(i) ..................................................... 51

21 U.S.C. § 1956(h) ........................................................ 4, 47

28 U.S.C. § 1291 ...................................................................... 1

**Rules**

Fed. R. App. P. 34(a)(2)(C) ......................................................... i

**Sentencing Guidelines**

U.S.S.G. § 1B1.1(a)(1) ........................................................... 70

U.S.S.G. § 1B1.2(a) .............................................................. 70

U.S.S.G. § 2D1.1 ................................................................ 56

U.S.S.G. § 2D1.1(c)(3) ........................................................... 57

## JURISDICTION

The grand jury for the Southern District of Georgia indicted Dr. Najam Azmat on multiple offenses against the United States. (Doc.156.)  The district court therefore had subject-matter jurisdiction pursuant to 18 U.S.C. § 3231.  After a guilty verdict (Doc.320), the district court sentenced Azmat on August 8, 2014 (Doc.367).  Azmat filed a notice of appeal on August 18, 2014.  (Doc.369.)  This Court has jurisdiction over this appeal from the final decision of a criminal sentence pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUES

I.    Did the district court err by ruling that sufficient evidence supported Azmat's convictions on all counts?

A.    Did Azmat conspire to dispense controlled substances by writing illegal prescriptions while working at a pill mill his codefendants established?

B.    Did Azmat "dispense" controlled substances by prescribing them where the law establishes that prescribing constitutes dispensing?

1

C.      Did Azmat conspire to launder money by working at a pill mill that sold his illegal prescriptions and used those proceeds to promote the illegal enterprise by paying various operating expenses?

II.      Did the district court abuse its discretion by admitting a government witness as an expert after Azmat's attorney conceded that the witness met the minimal qualifications?

III.      Did the district court commit clear error by including in Azmat's drug quantity all the prescriptions he issued for oxycodone, hydrocodone, and Xanax where the trial evidence proved that they were illegitimate?

IV.      Did the district court abuse its discretion by sentencing Azmat, who put the government to its burden of proof at trial, to a longer prison term than his codefendants, who pleaded guilty?

V.      Did the district court commit plain error by sentencing Azmat for the crimes the jury convicted him of committing and refusing to give him the lower sentence his codefendants earned by pleading guilty to lesser crimes?

2

VI.   Did the prosecutor commit misconduct amounting to plain error by demonstrating that the defense expert was not familiar with Azmat's basic professional qualifications and by colorfully describing the evidence linking Azmat to his codefendants' illegal pill mill in South Florida where the other evidence against Azmat was strong and the jury instructions remedied any improprieties?

VII.   Was there cumulative error where there was no error, the evidence against Azmat was overwhelming, and Azmat received a fundamentally fair trial?

## STATEMENT OF THE CASE

## I.   <u>Proceedings and Disposition Below</u>.

The superseding indictment charged Dr. Azmat with 51 federal crimes stemming from his participation in a "pill mill."  Count one alleged that Dr. Azmat conspired with five codefendants to distribute and dispense controlled substances in violation of 21 U.S.C. §§ 841 and 846.  Counts two through 50 charged Dr. Azmat with dispensing controlled substances outside the usual course of professional practice

3

and without legitimate medical purpose in violation of 21 U.S.C. § 841.

Count 51 did not implicate Dr. Azmat.  Count 52 alleged that Dr. Azmat

conspired with five codefendants to launder monetary instruments in

violation of 21 U.S.C. § 1956(h).  (Doc.56.)

The government will describe the evidence at trial in its statement

of facts.  After deliberating less than three hours over lunch, the jury

unanimously found Azmat guilty on all counts.  (Trial Transcript ("TT"):

973,977.)

At sentencing, the district court determined that Azmat had a

total offense level of 36 and a criminal history category of I, yielding a

guideline prison range of 188 to 235 months.  (Doc.381:21.)  The court

sentenced Azmat to serve only 133 months in prison.  (Id:86.)  That

sentence was a downward variance from the bottom of the advisory

guideline range based on Azmat's poor health and in anticipation of a

forthcoming amendment to the guidelines that would lower the base

offense level for drug crimes by two.  (Id:86-88.)

4

## II.    Facts.

### A.    Government's Evidence.

#### 1.    Azmat's Codefendants Operate a Pill Mill in Florida.

In 2009, codefendant Adelard LeFrancois was working as the office manager of a pain-management clinic in South Florida.  (TT:202-04.)  The clinic was not engaged in legitimate medical activity; it only dispensed drugs.  (TT:206,220.)  At least 90% of the patients came from out of state, some from as far away as Maine and Ohio.  The patient would fill out a simple questionnaire, the doctor would perform a cursory exam and ask how he or she felt, and after only 15 minutes the patient would receive prescriptions for drugs, usually oxycodone, Percocet, and Xanax.  The patient was required to present a Magnetic Resonance Image (MRI) taken within the previous two years.  If the patient did not have one, the clinic would refer him or her to a cooperative local facility where the patient could obtain a current MRI and return the next day to obtain drugs.  At that time, Florida law allowed the doctor to prescribe enough drugs to last the patient 28 days.

5

Like clockwork, on the 29th or 30th day, the patient would return to the clinic for more drugs.  The clinic saw between 50 and 100 patients each day.  There were frequent scuffles among the patients.  The clinic paid its employee-doctor $2,000 cash at the end of each day.  (TT:204-09,212.)

Codefendants Adelaida Lizama, Candace Carreras, Sean Clark, and Francis Barbuscia all worked with LeFrancois at that clinic.  None of them had any medical training.  They would market their clinic by going to the parking lots of rival pain clinics and low-end motels, look for beat-up cars with out-of-state license plates, and place their advertisements in car windows.  Most of the patients looked like zombies and drug addicts.  (TT:210-14,291,389.)

2.    Azmat's Codefendants Conspire to Open a Pill Mill in Georgia.

In 2010, Florida began shutting down its pill mills.  (TT:221.)  A change in Florida law prevented the clinic from dispensing drugs to last the patient more than 72 hours.  Patients from out of state would not travel all the way to South Florida to get only enough drugs to last

6

them for three days, so the clinic lost a lot of business.  Consequently, LeFrancois decided to open his own pill mill in Georgia, where the laws remained favorable: pain management clinics did not have to be owned by doctors, and they could dispense drugs on-site to patients for up to 28 days.  LeFrancois and Clark scouted several locations in Georgia and finally settled on Garden City because it was just off Interstate 95 and easily accessible for all the patients from other states.  Clark rented a space in a strip mall at 626 U.S. Highway 80 in Garden City, Georgia. They called their pill mill the East Health Center.  (TT:214-15,217, 219,298,387,572.)

LeFrancois recruited Lizama, Carreras, Clark, Barbuscia, and Dan Wise to move to Garden City and work in the East Health Center in the same capacities they had worked at the Florida pill mill.  They rented a house to live in; the Center paid the rent and utilities.  They planned on operating the East Health Center according to the same business plan as the Florida pill mill.  The Center would only sell controlled substances; it would not engage in any legitimate medical

7

activity.  (TT:216,219,230,298.)  For that reason, the Center had only

the most basic equipment and supplies: a bed, stethoscope, tongue

depressor, blood pressure monitor, cotton balls, Band-Aids, and posters

on the walls.  Most of those items were just props and never used.  The

Center did not carry malpractice insurance.  (TT:230-32.)  The forms

the defendants used at the Center were virtually identical to those they

had used at the pill mill in South Florida.  (TT:227-28.)

     3.   <u>Azmat Joins the Conspiracy</u>.

After setting up the facility, LeFrancois was still missing one

thing: "The only thing I needed to do was to find myself a doctor now."

In January 2011, he placed an advertisement for a physician on "Craig's

List."  (TT:217.)

The first person to respond was Dr. Mary Kay Ross.  (TT:225.)  Dr.

Ross met with LeFrancois and Clark to discuss the job.  Dr. Ross

noticed that neither LeFrancois nor Clark had any medical background

but seemed very well versed in pain medications.  They offered to pay

her $2,000 per day cash to work in their pain management clinic.  They

indicated that some patients were already lined up and ready to come. They said most of their patients would come from out of state; she thought that was unusual. They told her that they would expect her to prescribe 150 to 190 pills per patient per visit; she was not comfortable with that quantity. Visiting the Center, Dr. Ross noticed the absence of adequate medical equipment and concluded it was not a legitimate medical practice. Dr. Ross declined the job and reported the Center to law enforcement agents. (TT:84-89.) A second physician LeFrancois interviewed, Dr. David Hatmaker, likewise concluded that the Center was not legitimate and reported it to the DEA. (TT:95-103.)

LeFrancois interviewed Dr. Najam Azmat. He had the same conversation with Azmat that he had previously had with Dr. Ross. LeFrancois described his work with the Florida pill mills and told Azmat that the Center would operate the same way. LeFrancois told Azmat that it would be his role to see patients who came to the Center from out of state to get oxycodone. Azmat told LeFrancois that he had vast experience in pain management and would "be able to take care of

9

everything for you." LeFrancois offered Azmat the job paying $2,000

cash each day, and Azmat accepted. (TT:226,246.)

     4.   The East Health Center Opens for Business.

The Center opened on February 21, 2011. (TT:220.) Initially, the

Center used a SunTrust bank account; it later utilized a BB&T account.

Each day the Center deposited into its account the cash its customers

paid for their prescriptions. The Center paid its expenses out of those

proceeds: the lease payment on the building, utilities, salaries for

employees, and daily lunches. The rest was pure profit. (TT:241-44.)

The Center paid Azmat $2,000 per day, usually in cash but occasionally

by check. (TT:582-83.)

     The Center's marketing plan was to convince patients to transfer

their business from one pill mill to the Center. Frankie Barbuscia, a

former elevator repairman, intercepted patients as they entered and

exited other pill mills. He approached people driving raggedy cars

bearing out-of-state license plates at gas stations. He especially

targeted people traveling in groups because the more patients he

10

brought in, the longer he could keep his job.  He described the Center's customers as looking like zombies and drug addicts.  He had a few confrontations with security guards at rival pill mills.  The Center's patients came from all over the country.  (TT:220,290,293-96,298,574.)

Aware that Florida was shutting down its pill mills, LeFrancois instituted several rules designed to help the Center fly under law enforcement's radar.  He instructed the employees to bring in no more than 30 customers a day so as to keep a low profile in the new location. Each customer had to bring an MRI that was no more than two years old.  The Center instructed its customers to back their cars into the lot and to park either behind the Center or in the lot of the adjoining business so that the Center's own lot would not be full of cars bearing out-of-state plates.  The customers were permitted to smoke outside the back of the building.  (TT:222-23,576.)

5.    Azmat's Customers.

In an interview with a DEA agent, Azmat constantly called his patients at the Center "customers."  He acknowledged that most

11

customers were from out of state, came from other pill mills where they were previously prescribed oxycodone, and were addicted to oxycodone. He admitted that he refused to see customers who requested legitimate primary care. He offered no alternative forms of treatment. (TT:147-49.) According to LeFrancois, a few patients sought treatment for colds. Azmat refused to treat them because he had no malpractice insurance. Thereafter, the Center turned away any patient seeking treatment for legitimate sickness. (TT:224.)

Most of the Center's customers came in groups. Almost all paid in cash. Many customers had "sponsors." Sponsors would drive the customer to the Center, pay for his or her visit, and receive approximately one-half of the drugs prescribed to the patient. (TT:577.)

The Center kept files on each of its customers. Each file contained the date of the visit, the customer's name, date of birth, where he or she received an MRI, and the types and quantities of drugs Azmat prescribed for him or her. (TT:133-36.)

The total number of customers who signed in to the Center while Azmat worked there was 238.  Of that total, 196 received prescriptions for drugs from Azmat; 96% of them received oxycodone.  From that amount, the government charged Azmat with 49 counts of illegal dispensation of controlled substances.  (TT:160,182-83.)  Of the customers comprising those charged counts, 52% were from Kentucky, 8% were from South Carolina, 4% were from Ohio, and only 4% were from Georgia.  Of that same group of customers, 72% got their MRIs in Florida, 16% in Kentucky, 4% in South Carolina, and only 4% in Georgia.  (TT:142-43.)

Of the 42 customers who signed in to the Center but did not receive prescriptions, 20 of them had no notes in their files indicating that they even saw Azmat.  Of the remaining 22, the Center referred nine of them to get the requisite MRI.  Of the remaining 13, four tested positive for illicit drugs such as cocaine or marijuana and two others tested positive for controlled substances not previously prescribed them;

the Center asked all six of them to come back three days later.  (TT:182-83.)

Quite often, pharmacies would call the Center and question Azmat's prescriptions.  Customers complained all the time that some pharmacies would not fill their prescriptions because they had an issue with Azmat.  Customers also complained that Azmat was not prescribing them enough drugs.  In response, Azmat explained that his medical license was on the line.  To protect himself, Azmat wanted to show that he was prescribing his customers fewer drugs than they had received at some other pill mill.  Azmat would then promise to increase the amount of drugs on the customer's next visit. (TT:300,308,391,413,468,584-85.)

Eight of Azmat's customers at the Center testified at trial. (TT:312-351,403-452,457-537.)  Most were addicted to oxycodone at the time they went to the Center.  (TT:404,459,481,499,520.)  Several related that they had to sign a form attesting that they had received, read, and understood written information about opioids and consented

14

to opioid medication therapy <u>before</u> seeing Azmat.  (TT:408,484,499,502,

520.)  They described Azmat's exam as very cursory: it would last only 5

to 10 minutes while Azmat listened to the customer's heartbeat,

touched the part of the body where the customer claimed pain, and

checked the customer's reflexes.  (TT:410,463,486,504,506,521.)  Azmat

never discussed the customer's previous medical treatments, the

addictive nature of oxycodone, alternative treatments, the customer's

MRI, physical therapy, allergies, or possible referrals to specialists.

(TT:411-12,466,468,487,504-05,518.)  When one young customer failed

his drug screen, a Center employee suggested that his mother take the

test for him.  (TT:523.)

> 6.    <u>Expert Testimony</u>.

Dr. Gene Kennedy testified as an expert on pain management.

(TT:619.)  He reviewed the Center's files on all of Azmat's prescriptions

covered by the indictment.  He explained why Azmat's prescriptions

were in each case outside the usual course of professional practice and

without legitimate medical purpose.

Customer Jim Brooks was a 63 year old male from Kentucky who claimed his lower back pain rated nine on a scale of one to ten. Dr. Kennedy opined that it would be unusual for a patient in that much pain to travel from Kentucky to Georgia for pain management. Other than the requisite MRI, Brooks presented no medical records. Brooks's urine drug screen came back negative, belying his claim that other doctors had legitimately prescribed him controlled substances. Despite these red flags, Azmat prescribed him 240 oxycodone pills, which would average eight pills a day for one month. (TT:624-27.)

George Hunter was 6'8" tall and weighed 340 pounds. He claimed chronic back pain over the previous ten years. Although he insisted his current pain level was nine, he nevertheless traveled from his home in Kentucky to the Center. His lumbar test result was actually quite good for a man of that size claiming such longstanding back pain. His blood pressure of 158/106 was alarming, but Azmat's file did not indicate that he even mentioned it to the patient, much less developed a treatment plan. Hunter's neurological exam was normal. His file contained no

16

previous medical records or any evidence of an attempt to contact a previous physician.  Nevertheless, Azmat prescribed him 240 oxycodone pills.  (TT:628-30.)

Billy Letner was from Kissimmee, Florida.  He claimed he suffered pain from a fall ten years ago.  His file contained no contributing medical history, no indication of a request for records from a prior physician, and no plan of treatment.  Nevertheless, Azmat prescribed him 240 oxycodone pills.  (TT:624-27.)

Kim Letner, Billy's wife, was from Kissimmee, Florida.  She claimed a current pain level of eight resulting from an auto accident.  Her file contained no previous medical records.  Dr. Kennedy opined that it was unusual for family members to travel together out of state to get the same drugs.  Nevertheless, Azmat prescribed her 60 oxycodone pills.  (TT:631-33.)

David Letner, their son, was from Kissimmee, Florida.  He claimed a current pain level of nine.  Azmat gave him a physical exam nearly identical to that of his parents.  He told Azmat that he was

17

taking 480 oxycodone pills each month.  Nevertheless, Azmat gave him a prescription for 90 oxycodone pills.  Dr. Kennedy explained that Letner's reported monthly intake of oxycodone should have raised a very high suspicion that he was diverting the pills to the street. (TT:633-635.)

Latina Simpson traveled all the way from Kentucky with her husband and father-in-law.  She claimed to suffer current pain from an auto accident 20 years ago.  With that type of injury, she should have had a significant clinical record.  Nevertheless, her file contained no previous medical records other than the standard MRI from South Florida.  Azmat's notes from her exam were cryptic, but they showed normal results and a full range of motion.  Azmat made no diagnosis and offered no treatment plan.  Chronic lower back pain was the most frequent diagnosis throughout Azmat's customer files.  (TT:635-37.)

James Lockwood claimed a current pain level of eight in his back resulting from his job six years ago.  Nevertheless, he traveled all the way from Kentucky with an MRI from South Florida.  He presented a

18

state identification card instead of a driver's license, raising the real possibility that he had a conviction for driving under the influence. Lockwood's file contained a signed, written form acknowledging his receipt of information and consenting to opioid medication therapy.  Dr. Kennedy found a similar form in each customer's file at the Center. The form suggested that the customers filled it out before seeing Azmat, thus presupposing his prescriptions for narcotics.  Despite all these red flags, Azmat prescribed Lockwood 210 oxycodone pills.  (TT:637-40.)

Carlie Cole traveled from Kentucky.  Her file contained no prior medical treatment records other than the standard South Florida MRI. Azmat's examination of her yielded normal results.  She claimed to have suffered an auto accident six years ago.  She insisted that her current pain level was eight without medication and a zero with medication.  Dr. Kennedy opined that her self-reported pain level of eight was suspicious and that the pain should not drop to a level of zero regardless of the treatment method.  Nevertheless, Azmat prescribed her 150 oxycodone pills and 60 hydrocodone pills.  (TT:641-42.)

19

Paul Cole traveled with Carlie Cole from the same address in Kentucky. He reported a pain level of nine resulting from an auto accident back in the 1980s. His file contained no previous medical records. Azmat prescribed him 240 oxycodone pills. (TT:642-44.)

Tyrice Harris traveled from Florida, presented a Florida identification card, and claimed pain from an auto accident in 2006. Harris reported a current pain of level ten. Dr. Kennedy opined that a person in that much pain would be screaming and would not drive all the way from Florida to Georgia and wait in line to get a prescription for pain medication. Harris's drug screen test was negative. Harris's South Florida MRI was the only one Dr. Kennedy has ever seen that did not indicate any referring doctor. Nevertheless, Azmat prescribed Harris 180 oxycodone pills. (TT:644-46.)

Dannelle Perry traveled from Florida with a Florida identification card. Perry claimed a current pain level of ten in the lower back resulting from falling out of a tree one year earlier. Perry's urine screen was negative for the presence of prescription drugs, raising the

20

possibility of diversion.  Nevertheless, Azmat prescribed 180 oxycodone pills.  (TT:647-48.)

Brian Smith presented a Georgia identification card and claimed a current pain level of 10 resulting from a job-related accident 20 years earlier.  His file contained no prior medical records other than the standard MRI.  Smith tested positive for meth.  Azmat's physical exam did not justify any prescriptions of controlled substances.  Nevertheless, Azmat prescribed 180 oxycodone and 15 Xanax.  Dr. Kennedy testified that Azmat's prescription to Smith was "alarming."  (TT:648-50.)

Joseph Bradley traveled from Florida, presented a Florida identification card, and claimed a current pain level of nine.  His file contained only the standard Florida MRI and a pharmacy printout indicating five previous prescribers of controlled substances.  Azmat prescribed him 210 oxycodone and 30 Xanax.  Dr. Kennedy explained that the combination of oxycodone and Xanax is dangerous, potentially resulting in respiratory depression and death.  (TT:650-52.)

21

James Gable was a 37-year old man from South Carolina. He reported a current pain level of nine resulting from heavy lifting at work 15 years earlier. His file contained no prior medical records other than the typical South Florida MRI. He reported an allergy to OxyContin, but his file contained no evidence that Azmat counseled him about it. Azmat performed a nonfocal neurological exam that revealed nothing specific and a grossly intact neurological exam based only on observing the customer. Nevertheless, Azmat prescribed him 150 oxycodone tablets. (TT:652-53.)

Gary Evans traveled from Kentucky. He claimed a current pain level of 10 in his back and knee from an injury sustained in 1999. The only medical record in the file was an MRI showing a chronic anterior tear in the medial collateral ligament of Evans's knee. The file showed no evidence that Azmat examined the knee or developed a treatment plan. Instead, Azmat prescribed 180 oxycodone tablets. (TT:654-55.)

Chris Conkel traveled from Florida and presented a Florida identification card. He claimed an eight-year history of lower back pain

resulting from a car accident.  His MRI indicated that he suffered a

broad-based posterior disc herniation.  Dr. Kennedy described that as a

potentially significant injury that should have prompted Azmat to

perform a physical examination and follow-up; he did not.  Conkel's

blood pressure was 150/96, but there was no indication that Azmat

counseled him about it.  Instead, Azmat prescribed 150 oxycodone

tablets.  (TT:655-56.)

Joshua Merryman was a 27-year old who traveled from Florida

and presented a Florida identification card.  He claimed a current pain

level of nine resulting from a fall at work six years earlier.  His file

contained no medical history and no prior medical records other than

the standard MRI.  Azmat's exam notes indicated that Merryman had

the full range of motion in his extremities.  Nevertheless, Azmat

prescribed 180 oxycodone and 60 Percocet.  (TT:656-58.)

Patricia Rohrer traveled from Kentucky with the typical South

Florida MRI.  She claimed a pain level of nine in her neck.  Azmat's

physical exam was inadequate because it noticed only a decreased

23

range of motion.  There were no positive neurologic findings, and otherwise the results were normal.  In addition, Rohrer's blood pressure was 196/116.  Dr. Kennedy explained that a diastolic blood pressure of 120 is dangerous and could justify sending the patient to the hospital. Yet Azmat's notes do not indicate that he even counseled Rohrer about it.  Instead, he prescribed her 210 oxycodone pills.  (TT:658-60.)

Jessica Rogers traveled from Kentucky.  The only medical record in her file was the ubiquitous South Florida MRI, which did not document any findings that supported narcotic management.  She reported a current pain level of eight resulting from an incident at work four years earlier, but Azmat did not perform an adequate physical exam.  Azmat prescribed 210 oxycodone pills.  (TT:660-61.)

Troy Roark was a 62-year old man who traveled from Kentucky despite claiming a current pain level of nine.  Roark reported a history of three back surgeries and implantation of a spinal cord stimulator. Azmat's physical exam revealed only a nonfocal neurological finding. Roark also performed unexpectedly well on a straight leg raise test.

24

Moreover, his blood pressure was 203/105, but Azmat did not address it or counsel him.  Instead, Azmat prescribed 150 oxycodone pills and 60 Lorcet tablets.  (TT:661-62.)

Barry Hinkle traveled all the way from Kentucky despite a claimed current pain level of nine resulting from a car accident that occurred five years earlier.  The only medical records in his file were the standard Florida MRI and one pharmacy printout.  Nothing in either Azmat's exam or the MRI supported prescriptions.  Yet Azmat prescribed him 150 oxycodone pills and 90 Motrin.  (TT:663-64.)

Jason Jarvis traveled all the way from Ohio with the standard South Florida MRI despite a purported pain level of nine.  He claimed an automobile accident in 2005.  His file contained a pharmacy printout with the names of two prior treating physicians, but there was no indication that Azmat tried to contact them.  Azmat prescribed 210 oxycodone pills.  (TT:664-66.)

Sherry Fields traveled all the way from Kentucky with the standard South Florida MRI despite a purported pain level of nine.  She

25

claimed to have suffered pain for the last 11 years.  Azmat's exam showed that Fields could perform both a lumbar flexion and a straight-leg raise to 90 degrees.  Dr. Kennedy opined that those results did not support either the customer's claim of pain or prescriptions.  Nevertheless, Azmat prescribed 210 oxycodone tablets.  (TT:666-67.)

Nancy Binion traveled all the way from Kentucky with the standard South Florida MRI despite a purported pain level of ten.  She claimed to have suffered pain for the last three years without any known precipitating incident.  She weighed 268 pounds with a blood pressure of 155/123 and a pulse of 106.  Dr. Kennedy found those figures extremely alarming and testified that Azmat should have re-checked those readings, counseled Binion about them, and perhaps prescribed her an anti-hypertensive medication.  Instead, Azmat prescribed 210 oxycodone.  (TT:668-69.)

Finally, John Koenig traveled from South Carolina despite a purported pain level of ten.  He claimed to have suffered pain for the last eight years after a car accident.  His file contained no previous

26

treatment records.  A pharmacy record included the names of two prior treating physicians, but Azmat made no effort to contact them.  Azmat prescribed 150 oxycodone and 60 Percocet.  (TT:670-71.)

Dr. Kennedy concluded that it is important for doctors to verify their patients' self-reported levels of pain.  He allowed that it can, in certain circumstances, be appropriate to prescribe pain meds upon an initial visit without extensive verification, but not at the levels Azmat prescribed without at least some medical records supporting the patient's claims.  It compounds the need for verification when patients travel long distances to get drugs and produce MRIs from other states.  Dr. Kennedy concluded that all of Azmat's prescriptions were not issued for a legitimate medical purpose or in the usual course of professional practice.  (TT:672.)

B.    Azmat's Evidence.

Azmat's sole witness was Dr. Thomas Simopoulos, an expert on pain management and pain medicine.  Dr. Simopoulos testified that all

Azmat's prescriptions were issued in the usual course of professional practice and with legitimate medical purpose.  (TT:783-918.)

## III.  **Standards of Review.**

This Court reviews the sufficiency of evidence <u>de novo</u>.  <u>See</u> <u>United States v. US Infrastructure</u>, 576 F.3d 1195, 1203 (11th Cir. 2009).

This Court reviews the admission of expert testimony for an abuse of discretion.  <u>See</u> <u>United States v. Harrell</u>, 751 F.3d 1235, 1242 (11th Cir. 2014).

This Court reviews the district court's "determination as to the quantity of drugs attributable to a defendant under the clearly erroneous standard."  <u>United States v. Frazier</u>, 89 F.3d 1501, 1506 (11th Cir. 1996).

This Court reviews the reasonableness of a criminal sentence for an abuse of discretion.  <u>See</u> <u>United States v. Crawford</u>, 407 F.3d 1174, 1178 (11th Cir. 2005).

28

Objections not raised before the district court are reviewed only

for plain error.  See United States v. Moriarty, 429 F.3d 1012, 1018-19

(11th Cir. 2005).  To establish plain error, a defendant must show that

"there is (1) error, (2) that is plain, and (3) that affects substantial

rights."  Id.  "Before an error is subject to correction under the plain

error rule, it must be plain under controlling precedent or in view of the

unequivocally clear words of a statute or rule."  United States v.

Schmitz, 634 F.3d 1247, 1270-71 (11th Cir. 2011) (quotation omitted).

## SUMMARY

Sufficient evidence supported Azmat's conviction for conspiracy to

dispense controlled substances.  While working at a Florida pain clinic

where they illegally dispensed controlled substances, Azmat's

codefendants hatched a plan to open the same sort of pill mill in

Georgia.  They told Azmat of their plan when they offered him

employment as the doctor at the Center.  Azmat participated in the

conspiracy every day by writing prescriptions for controlled substances

29

outside the usual course of professional practice and without legitimate medical purpose.

Sufficient evidence supported Azmat's conviction for illegally dispensing controlled substances. Both the governing statute and binding precedent establish that a doctor dispenses a controlled substance by issuing a prescription. Azmat issued prescriptions to his customers at the Center.

Sufficient evidence supported Azmat's conviction for conspiracy to launder money. Azmat's customers paid the Center cash for his illegal prescriptions. The Center used those proceeds to promote and continue the illegal enterprise by paying its ongoing expenses, such as salaries, rent, utilities, and a residence for employees. Azmat participated in that conspiracy full time for almost one month.

The district court did not abuse its discretion by admitting Dr. Kennedy as an expert because Azmat's attorney conceded that he met the minimal qualifications.

30

The district court did not commit clear error by including in Azmat's drug quantity all the prescriptions he issued for oxycodone, hydrocodone, and Xanax because the trial evidence proved that Azmat issued them all illegally.

The district court did not abuse its discretion by sentencing Azmat, who put the government to its burden of proof at trial, to a longer prison term than his codefendants, who pleaded guilty.

There was no prosecutorial misconduct amounting to plain error. The prosecutor's question concerning Azmat's medical education in Pakistan demonstrated that the defense expert was not familiar with Azmat's basic professional qualifications and that Azmat was less likely to be familiar with Georgia medical standards.  The evidence at trial supported the prosecutor's link between Azmat and his codefendants' prior illegal pill mill activities in South Florida.  The prosecutor's statements did not prejudice Azmat's substantial rights because the evidence against him was strong and the jury instructions remedied any improprieties.

31

**ARGUMENT**

**I.    The District Court Did Not Err by Ruling that Sufficient Evidence Supported the Jury's Verdict Finding Azmat Guilty on All Counts.**

"This Circuit will not overturn a conviction on the ground of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." US Infrastructure, 576 F.3d at 1203.  "The evidence need not be inconsistent with every hypothesis other than guilt, as the jury is free to choose among reasonable constructions of the evidence." Id.  "The question is whether reasonable minds could have found guilt beyond a reasonable doubt, not whether reasonable minds must have found guilt beyond a reasonable doubt." United States v. Ellisor, 522 F.3d 1255, 1271 (11th Cir. 2008).  "[I]n determining the sufficiency of the prosecution's case, we make no distinction between direct and circumstantial evidence." United States v. Navarro-Ordas, 770 F.2d 959, 966 (11th Cir. 1985).

32

This Court examines the evidence in the light most favorable to the government and resolves all reasonable inferences and credibility issues in favor of the guilty verdict.  See US Infrastructure, 576 F.3d at 1203.  To the extent a sufficiency-of-the-evidence argument "depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit this question."  United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999).  This Court

> will upset a jury's decision to credit a witness's testimony only in the rare circumstance that the testimony is incredible as a matter of law. Testimony is incredible as a matter of law only if it concerns facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature.

United States v. Isaacson, 752 F.3d 1291, 1304 (11th Cir. 2014) (citations and quotations omitted).

33

### A.    Azmat Conspired to Distribute Controlled Substances.

Count one alleged that Azmat conspired with five codefendants to distribute and dispense controlled substances in violation of 21 U.S.C. §§ 841 and 846.  (Doc.156.)

> To sustain a conviction for conspiracy to distribute drugs in violation of 21 U.S.C. § 846, the government must prove that 1) an agreement existed between two or more people to distribute the drugs; 2) that the defendant at issue knew of the conspiratorial goal; and 3) that he knowingly joined or participated in the illegal venture.

United States v. Reeves, 742 F.3d 487, 497 (11th Cir. 2014) (quotation and citation omitted).  "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  United States v. Mateos, 623 F.3d 1350, 1362 (11th Cir. 2010) (citation omitted).  Therefore, "[a] conspiracy conviction will be upheld ... when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that

knowledge of its character can fairly be attributed to [him]." <u>Id.</u>
(citation omitted).

"[A]n agreement to distribute drugs may be inferred when the
evidence shows a continuing relationship that results in the repeated
transfer of illegal drugs to a purchaser." <u>United States v. Thompson</u>,
422 F.3d 1285, 1292 (11th Cir. 2005) (quotations, citations, and
alteration omitted). "[O]nce the government establishes the existence of
the underlying conspiracy, it only needs to come forward with slight
evidence to connect a particular defendant to the conspiracy." <u>United
States v. Calderon</u>, 127 F.3d 1314, 1326 (11th Cir. 1997) (quotation,
alteration, and citation omitted). "[A] defendant may be found guilty of
participating in a conspiracy if the evidence demonstrates that he was
aware of its essential nature, even if he did not know all its details or
played only a minor role in the overall scheme." <u>Reeves</u>, 742 F.3d at
497 (quotation and citation omitted). "The government need not prove
that a defendant participated in every stage of the conspiracy or had
direct contact with each of the other alleged co-conspirators." <u>Id.</u> at 498

(citation omitted).  "No showing of an overt act is required to prove a conspiracy under 21 U.S.C. § 846."  United States v. Pintado, 715 F.2d 1501, 1503 (11th Cir. 1983) (citation omitted).

Here, the evidence establishing Azmat's knowing participation in the conspiracy to dispense and distribute controlled substances was overwhelming.  Almost every piece of evidence the government introduced helped to establish the conspiracy.  Azmat's codefendants worked at a Florida pain clinic where they illegally dispensed controlled substances without legitimate medical purpose.  When Florida enacted stricter laws to shut down its pill mills, the defendants hatched a plan to open the same sort of business in Georgia.  The defendants told Azmat of their plan when they offered him employment at the Center. Azmat participated in the conspiracy every day by writing prescriptions for controlled substances outside the usual course of professional practice and without legitimate medical purpose.

On appeal, Azmat argues that several random pieces of trial testimony disprove his participation in the conspiracy.  (Brief:20-21.)

36

Conspicuously missing from Azmat's argument is a citation to any opinion holding that any of those factors invalidates his conspiracy conviction as a matter of law. Logically speaking, none can. For example, Azmat claims that he argued with LeFrancois about the center's lack of malpractice insurance. Even if the center had obtained malpractice insurance, that would not have negated his agreement to assist the other defendants in selling drugs to its customers. In fact, Azmat's suggestion could have been a strategic "cover" move recognizing that it would be much easier to disguise the center's true status as a pill mill with malpractice insurance than without it.

Likewise, the fact that Azmat sold some of his customers fewer drugs than other doctors had been willing to sell them is irrelevant because selling them any drugs at all was outside the usual course of professional practice and without legitimate medical purpose. Finally, Azmat's lack of a prior relationship with his conspirators before their conspiracy began and his termination from the center after only a few weeks does not dispel his willing participation in the scheme while he

37

worked there.  Azmat's arguments on this point attack not the legal

sufficiency of the evidence to convict him but rather its weight,

credibility, and reasonable inferences, all of which are the exclusive

province of the jury.  See US Infrastructure, Inc., 576 F.3d at 1203.  The

jury properly resolved all such issues as establishing Azmat's guilt.

### B.    Azmat Dispensed Controlled Substances by Selling Prescriptions to His Customers.

It is a federal crime for any person to "manufacture, distribute, or

dispense" a controlled substance without lawful authority.  21 U.S.C. §

841(a)(1).  Counts two through 50 charged Azmat with illegally

dispensing controlled substances.  (Doc.156.)  "To convict a licensed

physician under section 841(a)(1), it is incumbent upon the government

to prove that he dispensed controlled substances for other than

legitimate medical purposes in the usual course of professional practice,

and that he did so knowingly and intentionally."  United States v.

Joseph, 709 F.3d 1082, 1094 (11th Cir. 2013) (quotations, brackets, and

citations omitted).  On appeal, Azmat contests only the element

requiring dispensation.  He argues that his convictions are invalid

because he merely gave his customers prescriptions for controlled

substances, which supposedly does not amount to dispensing them.

(Brief:22-31.)

Azmat's argument is contrary to both the plain meaning of the

statute and binding precedent.  As a matter of law, a doctor dispenses

controlled substances merely by prescribing them.

> The term "dispense" means to deliver a controlled substance
> to an ultimate user or research subject by, or pursuant to the
> lawful order of, a practitioner, including the <u>prescribing</u> and
> administering of a controlled substance and the packaging,
> labeling or compounding necessary to prepare the substance
> for such delivery. The term "dispenser" means a practitioner
> who so delivers a controlled substance to an ultimate user or
> research subject.

21 U.S.C. § 802(10) (emphasis added).  Thus, a dispensation occurs

when a practitioner "delivers" a controlled substance to an ultimate

user.  Azmat does not dispute that he was a practitioner, that the drugs

he prescribed were controlled substances, or that his customers were

ultimate users.

Azmat "delivered" the drugs by prescribing them.  "The terms

'deliver' or 'delivery' mean the actual, constructive, or attempted

39

transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." 21 U.S.C. § 802(8). In general, "constructive transfer" means "delivery of an item—esp. a controlled substance—by someone other than the owner but at the owner's direction." Black's Law Dictionary 1503 (7th ed. 1999). A constructive transfer occurs, for example, when (1) the defendant had authority or control over the actions of the actual transferor, (2) there is an understanding that the transferor will act in the defendant's stead, or (3) the defendant takes some action to further the ultimate sale, such as vouching for the quality of the drugs. See United States v. Wilson, 657 F.2d 755, 762 (5th Cir. 1981) (quotations and citations omitted).

When a doctor writes a prescription for a controlled substance, he initiates a constructive transfer of that controlled substance. No pharmacist can fill a prescription unless and until some authorized physician first writes it. By writing a prescription, a doctor directs a pharmacist to supply the patient with that drug. The doctor exercises authority and control over the transfer by specifying the exact type and

40

amount of drug the pharmacist may sell to the patient.  The doctor's prescription vouches that the patient has a legitimate medical need for that drug.  For these reasons, a prescription constitutes a constructive transfer of a controlled substance.  See, e.g., United States v. Roya, 574 F.2d 386, 393 (7th Cir. 1978) ("Thus, 'dispense' includes constructive transfers which encompass Roya's actions of issuing written prescriptions to patients entitling them to purchase the substances from a pharmacist."); United States v. Tighe, 551 F.2d 18, 21 (3rd Cir. 1977) ("[W]e hold that by placing a prescription for a controlled substance, issued outside of the usual course of medical practice, in the hands of an ultimate user a physician completes the offense of dispensing under 21 U.S.C. § 841(a)(1).").

The statute explicitly states that prescribing controlled substances qualifies as dispensing them.  The definition of "dispense" sets forth three distinct, nonexclusive examples of ways in which a practitioner may deliver controlled substances to an end user: (1) by "prescribing"

them, (2) by "administering" them, and (3) by "packaging, labeling or compounding" them.  21 U.S.C. § 802(10).

Binding precedent establishes that a doctor dispenses controlled substances by prescribing them.  In <u>United States v. Leigh</u>, the government indicted the defendant, a doctor, for unlawfully <u>distributing</u> controlled substances "by means of a prescription" in violation of section 841(a)(1).  487 F.2d 206, 207 (5th Cir. 1973).  The district court dismissed the indictment for failure to charge an offense, and the government appealed.  <u>Id.</u>  The old Fifth Circuit first noted that distributing controlled substances and dispensing controlled substances are separate offenses under section 841(a)(1).  The Court next examined the section 802(10) definition of "dispense," which was identical to the current definition.  The Court concluded: "This clearly means that a doctor who administers or prescribes a controlled substance is, for the purposes of the statute, <u>dispensing</u> it"; "if he performs that function in an unlawful manner he may be indicted, tried and convicted for it." <u>Id</u>:208 (emphasis added).  Thus, the Court ruled that prescribing drugs

42

qualifies as dispensing them.  Because the indictment charged the

defendant with distributing, rather than dispensing, the drugs, the

Court affirmed dismissal of the charge.  Id.  See also United States v.

Thompson, 624 F.2d 740, 741 (5th Cir. 1980) ("[A] doctor who

administers or prescribes a controlled substance in an unlawful manner

is to be indicted for dispensing it rather than distributing it.").

On the strength of that binding precedent, the Eleventh Circuit

has upheld the convictions of doctors for illegally dispensing controlled

substances by prescribing them.  See, e.g., United States v. Ignasiak,

667 F.3d 1217, 1227-28 (11th Cir. 2012); United States v. Johnston, 322

Fed. Appx. 660, 668 (11th Cir. 2009).

On appeal, Azmat offers several unavailing arguments.  First,

Azmat argues that he could not be convicted of dispensing because

several witnesses testified at trial that neither he nor the Center

actually dispensed drugs.  (Brief:22-23,26,31.)  Azmat's argument is

linguistic legerdemain; it intentionally confuses the common

understanding of a word with the statutory definition of a specific legal

43

term of art.  Where statutory language provides an explicit definition, it

applies even if it differs from the term's ordinary meaning.  <u>See</u> <u>Johnson</u>

<u>v. Breeden</u>, 280 F.3d 1308, 1325 (11th Cir. 2002).  Azmat concedes that,

in everyday parlance, "'dispensing' connotes the packaging and the

delivery of a prescription drug to a patient." (Brief:25.)  That was the

sense of the term the witnesses used at trial to testify that Azmat wrote

prescriptions but did not actually give the controlled substances to his

customers.  By contrast, the legal definition of "dispense" requires a

delivery, and a delivery in turn requires only the constructive or

attempted transfer of the controlled substance.  <u>See</u> 21 U.S.C. §§ 802(8),

(10).  Azmat's prescriptions meet that broader legal definition.

Therefore, the testimony at trial that Azmat did not actually give out

drugs to his customers does not mean that his convictions for

dispensing controlled substances fail as a matter of law.  For example,

under cross-examination, Dr. Ross initially agreed that, colloquially,

dispensing means giving the medication in a bottle.  Upon redirect,

however, she clarified that, legally, prescribing counts as dispensing.

(TT:91-94.)

Second, Azmat argues that "to 'dispense' a controlled substance, a

practitioner has to deliver the controlled substance, i.e. by prescribing

and administering it and packaging, labeling, or compounding it."

(Brief:24.)  Azmat misinterprets the statute.   The statute gives three

examples of ways a practitioner may "deliver" controlled substances: by

"prescribing," "administering," and "packaging, labeling or

compounding" them.  21 U.S.C. § 802(10).  A practitioner dispenses

drugs by doing any of those things; Azmat has not cited a single case

construing the statute to require that the defendant do all of them.

 Next, Azmat cites United States v. Badia, 490 F.2d 296 (2d Cir.

1973).  (Brief:27-28.)  Badia held that

> [t]he combined effect of these statutory definitions in the
> present context is to limit the meaning of "dispense" to
> delivery of controlled substances by a physician who is
> acting in the course of professional practice or research. . . .
> Delivery of controlled substances outside the course of
> professional practice or research would constitute
> "distributing."

45

490 F.2d at 298.  First off, <u>Badia</u> carries no weight in the Eleventh

Circuit because there is binding precedent to the contrary.  Anyway, the

Eleventh Circuit has already rejected that same argument.  <u>See</u> <u>Joseph</u>,

709 F.3d 1082, 1098 (11th Cir. 2013); <u>see also</u> <u>Thompson</u>, 624 F.2d at

741-42.

Finally, Azmat attempts to distinguish <u>Leigh</u> and <u>Thompson</u>, the

two binding precedents that directly foreclose his claim.  Of course, this

panel must follow those precedents even if it disagrees with their

reasoning or results.  <u>See</u> <u>United States v. Smith</u>, 122 F.3d 1355, 1359

(11th Cir. 1997).  Anyway, Azmat attacks those opinions in vain.  Azmat

claims they are wrong because "[s]ection 802(10) clearly envisions that

'dispensing' occurs when a drug is <u>physically</u> delivered with its

packaging and labeling to an ultimate user or research subject,

pursuant to a prescription by a practitioner." (Brief:31.)  The statute

does not require the actual, complete, physical delivery of the drug.  As

noted, a dispensation requires a delivery, and a delivery in turn

requires only the constructive or attempted transfer of the controlled substance.  See 21 U.S.C. §§ 802(8), (10).

Anyway, Azmat suffered no prejudice from being charged with illegal dispensation rather than distribution.  There is no difference in either proof or penalty between those two crimes.  By charging him with illegal dispensation, the indictment adequately informed him of the evidence he would have to meet.  There is no danger whatsoever that, having already been convicted of illegal dispensation, he could one day be tried for illegal distribution based on the same prescriptions he wrote at the Center.  See Thompson, 624 F.2d at 742 n.2; United States v. Nechy, 827 F.2d 1161, 1168-69 (7th Cir. 1987).

## C.    Azmat Conspired to Launder Money.

In count 52, the government alleged that Azmat conspired to launder monetary instruments in violation of 21 U.S.C. § 1956(h). Specifically, the government alleged that, after earning money from their illegal dispensation of controlled substances, the defendants promoted the carrying on of that unlawful activity by (1) opening a

47

bank account, (2) making multiple periodic salary payments by cash,

check, and credit card to Azmat and the other conspirators, (3) paying

to lease the premises on which the Center operated, and (4) renting a

house where various conspirators resided during the conspiracy.

(Doc.156.)

To obtain a conviction for a promotional money laundering

conspiracy, the government must prove that (1) two or more persons

agreed to commit a section 1956(a)(1)(A)(i) promotional money

laundering violation and (2) Azmat, knowing the unlawful plan,

voluntarily joined the conspiracy.  See United States v. Johnson, 440

F.3d 1286, 1294 (11th Cir. 2006) (citation omitted).  "The existence of an

agreement may be proven by circumstantial evidence, including

inferences from the conduct of the alleged participants or from

circumstantial evidence of a scheme.  Indeed, the government may

establish knowledge of an illegal agreement by showing that the

defendant knew the essential object of the conspiracy." United States v.

Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005) (citations and quotations

48

omitted).  "Because the text of § 1956(h) does not expressly make the

commission of an overt act an element of the conspiracy offense, the

Government need not prove an overt act to obtain a conviction."

Whitfield v. United States, 543 U.S. 209, 214, 125 S. Ct. 687, 691

(2005).

    In one sentence without any citation to the record, Azmat asserts

conclusorily that the evidence was insufficient to convict him of the

money-laundering conspiracy.  (Brief:33.)  Azmat does not even specify

which essential elements of the conspiracy are supposedly missing.

Perhaps the reason Azmat does not discuss any of the actual evidence

at trial is because it conclusively establishes his guilt.  Azmat's

customers paid the Center cash for his illegal prescriptions.  At the end

of each day, the Center would use those proceeds to pay Azmat his

salary of $2,000.  The Center would also use the proceeds to pay other

expenses, such as rent and utilities for its facility.  Paying all those

expenses promoted the carrying on of the illegal enterprise.  Azmat

joined the conspiracy by participating full time for almost one month.

Azmat contends that he could not be guilty of the money-laundering conspiracy because the government failed to prove one of the essential elements of a completed, substantive crime of money laundering.  (Brief:33-34.)  "A conspiracy and the related substantive offense which is the object of the conspiracy are separate and distinct crimes. . . . The illegal conspiracy is complete regardless of whether the crime agreed upon is actually consumated, and a defendant may be convicted of conspiracy even though he is acquitted of the substantive count."  United States v. Tombrello, 666 F.2d 485, 489 (11th Cir. 1982) (citations omitted).  The absence of an essential element of a substantive money-laundering offense, which the government never even alleged that Azmat committed, does not imply the invalidity of his conviction for conspiracy to launder money.

Anyway, the evidence actually established the element of the substantive offense that Azmat wrongly claims is missing from his conspiracy conviction.  Azmat claims that "[t]here was no separate act of money laundering separate from, and following in time, the

50

completed, underlying activity." (Brief:34.) The illegal activity

underlying Azmat's conspiracy conviction was the illegal dispensation of

controlled substances. That crime was complete each time Azmat sold a

prescription to a customer; that is why the jury convicted him on 49

separate counts. Thereafter, the defendants used the proceeds from

that illegal activity to promote and carry on their illegal business by

opening checking accounts, paying to lease the premises where the

Center operated, and renting a house where several conspirators lived.

(TT:240-44,298.) Azmat does not dispute any of this evidence or deny

that each such step, even standing alone, constituted a financial

transaction undertaken with intent to promote the carrying on of the

defendants' illegal dispensation of drugs. See 21 U.S.C. §

1956(a)(1)(A)(i).

In addition, the defendants also used their drug proceeds to pay

themselves and Azmat regular salaries. (TT:240-41.) Azmat argues

that the mere distribution of proceeds is insufficient to support a

conviction for promotional money laundering. Even if he were correct,

the other three steps the defendants took with their proceeds would still

be enough to sustain Azmat's conspiracy conviction.  But Azmat is

wrong.  This Court has held that conspirators' sharing the proceeds of

their crime can both promote their ongoing and future illegal activity

and further the ultimate object of their conspiracy.  <u>See</u> <u>United States v.</u>

<u>Williamson</u>, 339 F.3d 1295, 1302 (11th Cir. 2003); <u>United States v.</u>

<u>Kelley</u>, 471 Fed. Appx. 840, 845 (11th Cir. 2003) ("[T]he monthly

dividend payments were designed to give the principal players in the

steroid distribution scheme an incentive to continue their activities

despite the risks inherent in such activity.").

## II.    The District Court Did Not Abuse Its Discretion by Qualifying Dr. Kennedy as an Expert Witness.

As an initial matter, this issue is not reviewable because Azmat

invited any error.  Under the invited-error doctrine, "if a party waives a

procedural right or agrees to the admissibility of certain evidence, he

cannot later complain that any resulting error is reversible."  <u>United</u>

<u>States v. Brannan</u>, 562 F.3d 1300, 1306 (11th Cir. 2009) (citations

omitted).  After Dr. Kennedy explained his qualifications, the

government offered him as an expert in pain management.  Defense

counsel conceded that the prosecutor "has established the minimum

criteria necessary under Rule 702" but reserved "all those other

questions with respect to weight and credibility."  The court thus

admitted Dr. Kennedy as an expert.  (Doc.387:618-19.)  Because Azmat

conceded Dr. Kennedy's qualification as an expert, he cannot argue

otherwise on appeal.

Even if Azmat had not invited the ruling, Dr. Kennedy's

admission as an expert would not have amounted to plain error because

his qualifications easily met the threshold.

> In determining the admissibility of expert testimony under
> Rule 702, district courts must consider whether the expert
> can testify competently on the areas he intends to discuss,
> whether the expert's methodology is sufficiently reliable, and
> whether the expert's testimony, through the application of
> his scientific, technical, or specialized expertise, will assist
> the trier of fact to understand the evidence.

United States v. Jayyousi, 657 F.3d 1085, 1106 (11th Cir. 2011) (citation

omitted).  Dr. Kennedy has been licensed to practice medicine in

Georgia since 2001.  He has specialized in pain management since 2005

and maintained credentials from the American Board of Pain Management since 2008. He serves as a peer reviewer for the Georgia State Medical Board and gives expert advice to local, state, and federal law enforcement agencies. He previously testified as an expert in two federal criminal cases. Dr. Kennedy is familiar with both the general medical and pain-management standards established by the Georgia Composite State Medical Board, the Federation of State Medical Board's model policy, and the standard medical reference materials, including the Physician's Desk Reference, the Merck Manual, and other textbooks. He relies on those standards both in his own practice and when rendering an expert medical opinion. (TT:612-18.)

Dr. Kennedy's qualification as an expert was harmless. Expert medical testimony is not necessary to sustain a conviction because a jury may find that a doctor violated the Controlled Substances Act "from evidence received from lay witnesses surrounding the facts and circumstances of the prescriptions." United States v. Joseph, 709 F.3d

1082, 1100 (11ᵗʰ Cir. 2013) (citations omitted).  Here, the testimony of

lay witnesses was easily sufficient.

### III.  The District Court Did Not Commit Clear Error by Holding Azmat Accountable for All the Oxycodone, Hydrocodone, and Xanax He Prescribed While Working at the Center.

"Calculating the base offense level for drug distribution requires a

determination of the quantity of illegal drugs properly attributable to a

defendant.  Where there is no drug seizure or the amount seized does

not reflect the scale of the offense, the court shall approximate the

quantity of the controlled substance."  United States v. Frazier, 89 F.3d

1501, 1506 (11ᵗʰ Cir. 1996) (citations omitted).  The district court may

base its drug-quantity determination on "fair, accurate, and

conservative estimates" so long as they are supported by "some

evidence" and are not "merely speculative."  United States v. Singleton,

545 F.3d 932, 934 (11ᵗʰ Cir. 2008).  Where such determination derives

from witnesses' testimony at trial, this Court gives "great deference" to

the district court's assessment of their credibility and the evidentiary

content of their testimony.  See United States v. Lee, 68 F.3d 1267,

1276 (11th Cir. 1995).

In arriving at a drug-quantity determination, the district court

may consider a variety of imprecise factors, including a coconspirator's

estimates of the number of times the defendant transported drugs and

the average amount of drugs transported each time, see United States

v. Rodriguez, 398 F.3d 1291, 1296-97 (11th Cir. 2005), "the price

generally obtained for the controlled substance, financial or other

records, similar transactions in controlled substances by the defendant,

and the size or capability of any laboratory involved," U.S.S.G. § 2D1.1,

comment. (n.12).  In United States v. Barsoum, the district court held

the defendant accountable for 56,000 oxycodone pills.  763 F.3d 1321,

1332 (11th Cir. 2014).  It arrived at that figure by conglomerating four

categories of evidence: (1) a co-conspirator's estimate of the number of

prescriptions filled per month for 17 months, (2) the number of

prescriptions found in the defendant's pharmacy, (3) another co-

conspirator's "four very different estimates" of the number of pills he

56

obtained, and (4) the number of pills obtained  during DEA controlled

buys.  Id:1333-1336.  This Court affirmed that methodology and drug

quantity.  Id:1336.

Here, the district court properly calculated Azmat's drug quantity.

The probation officer determined that, during the time Azmat worked

at the Center, he prescribed more than 643,000 milligrams of

oxycodone, 1,800 units of hydrocodone, and 164 units of Xanax.  (PSI ¶

17.)  Those quantities converted to the equivalent of more than 4,310

kilograms of marihuana, indicating a base offense level of 34 pursuant

to U.S.S.G. § 2D1.1(c)(3).  (PSI ¶¶ 17, 24.)

Azmat objected to the finding that all his prescriptions for

oxycodone, hydrocodone, and Xanax were illegal.  (PSI, Addendum ¶ 5.)

The probation officer reiterated the evidence at trial demonstrating that

all Azmat's prescriptions for those drugs were illegitimate.  Although

Azmat's customers routinely claimed pain levels of nine on a scale of

one to ten, they typically traveled great distances from other states to

the Center for treatment.  Many of them traveled in groups.  Azmat

57

gave his customers cursory physical exams, kept no medical records in their files, and made no referrals to specialists or alternative treatment plans. Azmat refused to treat several customers who complained of colds. Azmat ignored one customer's positive test for meth and prescribed him oxycodone and Xanax. Azmat did not discuss the risk of stroke for customers with high blood pressure. Thus, the probation officer held Azmat responsible for all the oxycodone, hydrocodone, and Xanax he prescribed. (Id.)

At the sentencing hearing, Azmat reiterated his objection to the drug quantity. (Doc.381:9-10.) In reply, the prosecutor summarized some of the evidence demonstrating that the entire operation at the Center was outside the usual course of professional practice and without legitimate medical purpose. The founders of the Center relocated their business to Georgia because strict changes to Florida law made their existing pill-mill operations too risky. They recruited Azmat from an Internet advertisement on "Craig's List" and paid him $2,000 cash every day out of the proceeds from his drug sales. They

58

solicited customers by going to rival pill mills and handing out flyers

advertising the Center's willingness to prescribe drugs.  They told their

customers not to congregate outside the Center, not to smoke in the

back yard, and to back their cars into the parking lot so that their out-

of-state license plates were not so easily visible.  (Id:17-18.)

The customers came from all over the southeastern United States.

Some customers spent tens of thousands of dollars fueling their

addictions to drugs.  Many customers bought drugs at the Center only

to resell them on the street.  The only customers the Center accepted

were those seeking opioids; Azmat turned away several patients who

sought treatment for colds. The Center's medical files on its customers

contained scarcely any legitimate medical information.  The customers

had to sign a consent to opioid therapy before the doctor would even see

them.  The customers paid $300 cash per visit for their prescriptions.

The Center did not accept insurance.  (Id:19-20.)  Upon explicit

consideration of all of the evidence at trial, the district court concurred

with the findings in the PSI and its addendum and overruled Azmat's
objection to his drug quantity. (Id:20.)

Azmat claims that the district court attributed him with all the
pills he prescribed to all his customers. That is incorrect; his
attribution included only his prescriptions for oxycodone, hydrocodone,
and Xanax. Azmat argues that there was no reliable evidence as to
what portion of those prescriptions was legitimately used to treat pain.
Actually, the district court admitted as trial evidence the Center's
records for all its customers during the time Azmat worked there,
including those who were not covered by the indictment. The jury
found Azmat guilty on all 49 charged counts. At sentencing, the district
court relied on that same trial evidence and found that the Center was
a pill mill whose entire operation was outside the usual course of
professional practice and without legitimate medical purpose.
Therefore, the district court properly included all Azmat's prescriptions
for hydrocodone, oxycodone, and Xanax in his drug quantity. (PSI ¶¶
17, 24; PSI, Addendum ¶ 5; Doc.381:17-20.)

60

Azmat argues that the drug quantity was clearly erroneous because he reduced or discontinued some customers' prescriptions. (Brief:39-40.) Azmat violated section 841(a)(1) the moment he sold any customer any prescription for any amount of any controlled substance without a legitimate medical purpose. It is completely immaterial whether the number of pills Azmat prescribed to a customer was lower than the number some other quack doctor in another state supposedly previously prescribed to that same customer. In the vast majority of cases, there was no real proof of what quantity some other doctor had previously prescribed; Azmat just took the customer's word. Anyway, Azmat intentionally gave his customers fewer drugs in an attempt to cover his own tracks. When customers complained that he was not giving them enough, Azmat explained that his medical license was on the line. To protect himself, Azmat wanted to show that he was prescribing his customers fewer drugs than they had supposedly received at some other pill mill. Azmat would then promise to increase the amount of drugs on the customer's next visit. (TT:584-85.)

61

The cases Azmat cites demonstrate that his drug quantity is accurate.  In <u>United States v. Chube II</u>, the government charged Dr. Randy Chube with 33 counts of unlawful distribution of controlled substances at his pain clinic.  538 F.3d 693, 694 (7th Cir. 2008).  Eleven of the 15 patients who testified at trial were suffering from true medical problems when they consulted the doctor; the other four confessed that they had fabricated their complaints solely to obtain painkillers.  The jury convicted the doctor of only one count.  <u>Id</u>:696.  At sentencing, the district court held Chube accountable for every prescription for a controlled substance contained in all 98 patient files the government seized from the clinic.  <u>Id</u>:701.

The Seventh Circuit ruled that the sentencing record "did not offer any explanation why the prescriptions in the 98 files were not merely unnecessary, but indicative of illegal drug-pushing." <u>Id</u>:703.  In light of the trial evidence that many patients had true medical problems, the district court's "assumption of a lack of legitimate medical purpose for every prescription in 98 files after discussing only 10 files with any

62

specificity was not enough to support its findings." Id:704.  Therefore, the Seventh Circuit vacated and remanded for resentencing.  Id:706.

Here, the district court did not assume that any of Azmat's prescriptions were illegitimate; the evidence at trial proved it.  The overwhelming evidence at trial showed that the Center was a pill mill and all of Azmat's prescriptions were illegitimate.  The jury found Azmat guilty on all 49 counts of illegally prescribing controlled substances.  Based on that same evidence, the district court found that all of Azmat's prescriptions for those three drugs were illegal and therefore included them in its calculation of the drug quantity.  There was no countervailing evidence that any of Azmat's prescriptions were legitimate.  In Chube, by sharp contrast, the jury had acquitted the doctor on 14 of the 15 counts.  Here, the district court's calculation of Azmat's drug quantity was much more accurate than the four-part estimate this Court upheld in Barsoum, 763 F.3d at 1332.

Azmat fares no better with United States v. Bell, 667 F.3d 431 (4th Cir. 2011).  In that case, Bell regularly and lawfully obtained oxycodone

for seven years to relieve her legitimate longstanding pain.  Although Bell consumed some of those pills, she also illegally resold others. Id:434.  She pleaded guilty to conspiracy to distribute a controlled substance.  Id:435.  Bell appealed her sentence.  The Fourth Circuit's actual holding was merely that "the district court failed to explain adequately its methodology for calculating drug quantity and otherwise to make findings sufficient to permit appellate review."  Id:433.  In dicta, the court reiterated that Bell had received the pills validly and consumed some of them lawfully.  The Fourth Circuit then reminded the district court that, absent a finding supported by reliable evidence that all the pills prescribed to Bell were within the scope of her criminal conspiracy, it would be improper to include the pills she lawfully consumed in her illegal drug quantity at sentencing.  Id:444.  Here, by contrast, the overwhelming trial evidence did in fact demonstrate that all of Azmat's prescriptions for oxycodone, hydrocodone, and Xanax were illegal.

64

Finally, Azmat suggests that the district court failed to make findings of fact to resolve his objection to the drug quantity. This Court will not "insist that trial courts make factual findings directly addressing each issue that a litigant raises"; it will "instead adhere to the proposition that findings should be construed liberally and found to be in consonance with the judgment, so long as that judgment is supported by evidence in the record." United States v. $242,484.00, 389 F.3d 1149, 1154 (11th Cir. 2004) (quotations and citation omitted). The district court heard argument concerning drug quantity from the probation officer, Azmat, and the government at the sentencing hearing. It then concurred with the findings in the PSI and its addendum and overruled Azmat's objection. (Id.20.) Thus, the district court made the explicit findings Azmat claims are missing.

## IV.    The District Court Did Not Abuse Its Discretion by Sentencing Azmat to a Longer Prison Term Than His Codefendants, Who Pleaded Guilty.

As an initial matter, "[d]isparity between the sentences imposed on co-defendants is generally not an appropriate basis for relief on

appeal." <u>United States v. Regueiro</u>, 240 F.3d 1321, 1325-26 (11th Cir.

2001). "[T]o adjust the sentence of a co-defendant to cure an apparently

unjustified disparity between defendants in an individual case will

simply create another, wholly unwarranted disparity between the

defendant receiving the adjustment and all similar offenders in other

cases." <u>United States v. Chotas</u>, 968 F.2d 1193, 1197-98 (11th Cir.

1992). Azmat has not cited a single case in which this Court reversed a

sentence based on unwarranted disparities.

In addition, by focusing exclusively on an alleged sentencing

disparity, Azmat's argument fails to establish that his sentence does not

achieve the purposes of sentencing embodied in the various other

factors enumerated in 18 U.S.C. § 3553(a). In <u>United States v.</u>

<u>Docampo</u>, the defendant maintained that his sentence created an

unreasonable disparity with that of a codefendant; he did not even

argue that his sentence was unreasonable based on any other section

3553(a) factor. 573 F.3d 1091, 1103 (11th Cir. 2009). This Court

declined to assume the role of counsel and make a new argument for the

defendant.  Because the defendant failed to establish that his sentence

failed to achieve the purposes of section 3553(a), this Court concluded

that his sentence was reasonable.  Id.  Azmat's argument fails for the

same reason.

Most important, no codefendant is similarly situated to Azmat.  In

selecting sentences, a district court should "avoid unwarranted sentence

disparities among defendants with similar records who have been found

guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  "[T]here is no

unwarranted disparity when a cooperating defendant pleads guilty and

receives a lesser sentence than a defendant who proceeds to trial."

United States v. Langston, 590 F.3d 1226, 1237 (11th Cir. 2009).  Azmat

was the only defendant in this case who forced the government to trial,

where a jury found him guilty of all 51 counts.  All other defendants

earned justifiably lower sentences by accepting responsibility for their

crimes, pleading guilty to offenses that carried lesser penalties than

those crimes Azmat was convicted of committing, and cooperating with

the prosecution.  (PSI:Pgs.2-3.)

67

Azmat asserts that the other defendants are similarly situated simply because they were part of the same conspiracy.  That will not suffice.  "It is not enough for [defendant] to simply compare the initial sentences and reduced sentences of others to his own; there must be comparable underlying factual circumstances." United States v. Summersett, 504 Fed. Appx. 789, 792 (11th Cir. 2012).  "[O]ne needs to know more than the crime of conviction and the total length of the sentence to evaluate disparities; the specific facts of the crimes and the defendant's individual characteristics are also pertinent." Id. (quoting United States v. Newsom, 428 F.3d 685, 689 (7th Cir.2005)).  Azmat has not cited any specific facts demonstrating that any codefendants are similarly situated.

## V.    The District Court Did Not Commit Plain Error by Sentencing Azmat for the Crimes the Jury Convicted Him of Committing and Refusing to Give Him the Benefits His Codefendants Earned by Pleading Guilty to Lesser Offenses.

Azmat argues that the district court violated his right to trial by imposing a sentence greater than those it imposed on his codefendants,

68

who pleaded guilty.  (Brief:45-51.)  There is no legal or factual basis for Azmat's novel claim.

"A sentencing court has wide discretion as to the factors it may consider in imposing the sentence," but it "may not present the defendant with a choice between admitting his guilt and enduring a harsher sentence for failing to do so."  United States v. Roe, 670 F.2d 956, 973 (11th Cir. 1982) (citations omitted).  In Roe, the district court first sentenced the defendant and then expressed its disappointment that he continued to profess his innocence despite the overwhelming evidence of his guilt.  Id:972.  The old Fifth Circuit found that the district court's comment did not rise to the level of improper pressure on the defendant to admit guilt.  Id:973.  It also ruled that the district court did not penalize the defendant for failing to admit guilt because it imposed a sentence that was much smaller than the statutory maximum.  Id.

Here, there is even less evidence of an improper sentence.  In fact, Azmat has not pointed to anything the district court either did or said

69

even remotely suggesting that it enhanced his sentence to punish him for going to trial.  On the contrary, the district court exercised its discretion and gave Azmat a prison term that was 55 months below the bottom of his advisory guideline range.  (Doc.381:21,86.)  That, alone, is proof positive that the court did not penalize him for going to trial.

Undeterred, Azmat asserts that the sheer magnitude of his sentence, compared to those of his codefendants who pleaded guilty, shows that it resulted solely from his decision to go to trial.  (Brief:49.)  There is, however, a much more obvious and accurate explanation: defendants convicted of more serious offenses naturally receive longer prison sentences than those who plead guilty to lesser crimes.  In fashioning a reasonable sentence within any limits set by statute, a district court must consider the offenses for which the defendant "has been found guilty."  18 U.S.C. § 3551(a).  See also 18 U.S.C. §§ 3553(a)(1), (a)(2)(A),  (a)(4)(A); U.S.S.G. §§ 1B1.1(a)(1), 1B1.2(a).

The jury found Azmat guilty of three serious crimes: conspiracy to illegally dispense controlled substances, 49 counts of illegally

dispensing controlled substances, and conspiracy to launder money.
More than 40 of those counts each carried a statutory maximum penalty
of 20 years in prison.  (PSI ¶ 70.)  The district court had discretion to
run them consecutively.  See 18 U.S.C. § 3584(a).  As a practical matter,
then, Azmat's possible sentence could easily have encompassed the rest
of his life in prison.  By sharp contrast, each of Azmat's five
codefendants pleaded guilty to only one crime.  The most serious offense
to which one of those codefendants pleaded was conspiracy to commit an
offense against the United States, which carries a maximum penalty of
five years in prison.  See 18 U.S.C. § 371.  Azmat received a much
longer sentence than his codefendants because the legal process
determined that he was guilty of much more serious crimes.

The process whereby Azmat's codefendants obtained lower
sentences did not violate his constitutional rights.  "[T]he guilty plea
and the often concomitant plea bargain are important components of
this country's criminal justice system.  Properly administered, they can
benefit all concerned."  Blackledge v. Allison, 431 U.S. 63, 71, 97 S. Ct.

1621 (1977). "[A] guilty plea may justify leniency; a prosecutor may

offer a recommendation of a lenient sentence or a reduction of charges

as part of the plea bargaining process." <u>Alabama v. Smith</u>, 490 U.S.

794, 802, 109 S. Ct. 2201, 2206 (1989) (citations omitted). Unlike

Azmat, the codefendants wisely and responsibly obtained lower

sentences as rewards for their guilty pleas. Their lower sentences in no

way constitute additional punishment for Azmat.

## VI.    There Was No Prosecutorial Misconduct Amounting to Plain Error.

"When a defendant fails to object to the prosecutor's closing

argument, relief is available to rectify only plain error that is so obvious

that failure to correct it would jeopardize the fairness and integrity of

the trial." <u>United States v. Bailey</u>, 123 F.3d 1381, 1400 (11th Cir. 1997).

This Court "must examine the statements in the context of the trial as a

whole and assess their probable impact on the jury." <u>United States v.

Frank</u>, 599 F.3d 1221, 1237 (11th Cir. 2010) (quotation and citation

omitted). "Reversal on the basis of prosecutorial misconduct requires

that the misconduct be so pronounced and persistent that it permeates

the entire atmosphere of the trial." <u>United States v. Weinstein</u>, 762

F.2d 1522, 1542 (11th Cir. 1985). "For a claim of prosecutorial

misconduct relating to the closing argument to be successful, the

argument must be improper and prejudicial to a substantial right of the

defendant." <u>Bailey</u>, 123 F.3d at 1400.

    A.   <u>The Prosecutor's Statements Were Not Improper</u>.

    The prosecutor properly asked the defense expert about Azmat's

medical education in Pakistan. "[A] prosecutor may not make an

argument directed to passions or prejudices of the jurors instead of an

understanding of the facts and law." <u>Bailey</u>, 123 F.3d at 1400. The

government readily agrees that any attempt to use a defendant's race or

national origin as evidence of criminal behavior would be reprehensible.

The prosecutor made no such attempt in this case.

    While cross-examining Azmat's expert witness, the prosecutor

probed the expert's familiarity with Azmat's objective professional

credentials. For example, the prosecutor asked the expert if he knew

whether Azmat was board certified, had any hospital privileges, and

had any medical malpractice insurance.  The expert did not know the

answers to any of those questions.  (Doc.388:860.)  The prosecutor then

continued that same line of inquiry:

Q:    [D]o you know where [Dr. Azmat] graduated from
      medical school?
A:    I don't recall offhand.
Q:    Okay.  Pakistan?  Does that ring a bell?
A:    Yes, it does.  I can't recall the name of the university.
Q:    [Y]ou're not familiar with the courses he took while he
      was in Pakistan; that's fair to say.
A:    That is correct, yes.
Q:    And you would agree with me that whether board
      certified or not, when a physician practices pain
      management, it is important to know the prevailing
      standards in the area in which they practice.
A:    Yes.
Q:    For instance, a doctor practicing in Georgia should
      know the prevailing standards in Georgia?
A:    Yes.
Q:    And that includes . . . rules from The Georgia Medical
      Board?
A:    Yes.
Q:    And it also includes the prevailing laws of the United
      States?
A:    Yes.
Q:    And federal regulations in the Code of Federal
      Regulations?
A:    Yes.

(TT:860-61.)  Azmat's attorney did not timely object.

Later, defense counsel accused the prosecutor of inserting Azmat's nationality into the case and moved for a mistrial. The prosecutor explained that he "certainly didn't mean anything beyond asking if [the expert] knew where [Azmat] went to medical school. . . . There is nothing wrong with [Azmat] being from Pakistan, Your Honor." The district court ruled that the prosecutor was "asking this witness what he knows about the experience and background of the defendant, whose files he reviewed to make a determination in this case." On that basis, the court denied the mistrial motion. (TT:868-89.)

There were two legitimate bases for the prosecutor's question. It flowed in the same vein as the immediately preceding inquiries impeaching the expert by demonstrating that he was ignorant of some of Azmat's most basic qualifications. It also raised the inference that Azmat's medical education in a foreign country made it at least somewhat less likely that he was familiar with the governing medical standards in Georgia and the United States. The question carried no implication about Azmat's race or national origin. The inquiry was

75

benign, especially when compared to the overtly inflammatory racial statements this Court has deemed insufficient to reverse criminal convictions in other cases.  See Harris v. United States, 400 F.2d 264, 266 (11th Cir. 1968) (evidence that the black defendant said he could not trust and would never deal with whites, whom he called "tallow faces," did not warrant mistrial);   Willis v. Kemp, 838 F.2d 1510, 1522-23 (11th Cir. 1988) (evidence that the black defendant called his white victim a "honkey" did not warrant a mistrial).

It was not improper for the prosecutor during closing argument to link Azmat to his codefendants and the pill mills they had previously operated in South Florida.

> While a prosecutor may not exceed the evidence in closing argument, he may state conclusions drawn from the evidence.  Although a prosecutor may not make an argument directed to passions or prejudices of the jurors instead of an understanding of the facts and law, there is no prohibition on colorful and perhaps flamboyant remarks if they relate to the evidence adduced at trial.

Bailey, 123 F.3d at 1400.  "[U]nflattering characterizations of a defendant will not provoke a reversal when such descriptions are

76

supported by the evidence." <u>United States v. Tisdale</u>, 817 F.2d 1552,

1555 (11th Cir. 1987) (quotations and citation omitted).

During closing argument, the prosecutor told the jury that Azmat

started working at the Center "for one reason, and that was not to

minister to people's pain. He is every bit as cynical and ruthless as Al

LeFrancois, Sean Clark, Frankie Barbuscia, all those wannabe wise

guys from South Florida. He's no different. He's no better." (TT:944.)

Ample evidence supported that comparison. Codefendant

Barbuscia, one of the main organizers of this conspiracy, testified that it

began in South Florida when he and other defendants were working at

similar pill mills there. (TT:290,303.) Codefendant LeFrancois,

another major organizer, was working at several pill mills in South

Florida that were not legitimate medical clinics. (TT:202,204,207,

220,261-64.) Florida authorities changed their lax laws and began to

shut down many pill mills in that state. (TT:214,221.) Consequently,

he recruited codefendants Lizama, Carreras, and Clark, who were

likewise working at Florida pill mills, to help him open a new pill mill

77

in Georgia, where the laws were still permissive. (TT:211, 215-16.)

When LeFrancois hired Azmat to work at the Center, he told him that it

would operate in the same manner as the Florida pill mills. (TT:246.)

After opening the Center in Georgia, the codefendants recruited

customers from Florida pill mills to bring their drug needs to the

Center. (TT:217.) A large percentage of the Center's customers

travelled from Florida and had MRIs from Florida. (TT:142-43.)

The prosecutor's statement during closing was proper because it

directly related to evidence at trial. In light of the testimony that

Azmat's codefendants were involved in illegal pill mills in Florida, the

prosecutor's use of the term "wise guys" was a flamboyant but

permissible characterization drawn from the evidence. "An analogy

used by the prosecutor in closing argument need not parallel the

charged crime in every minute detail." United States v. Killian, 541

F.2d 1156, 1162 (5th Cir. 1976). Thus, in United States v. Foley, this

Court held that the prosecutor's comment comparing the defendant,

who was charged with mail fraud and money laundering, to "drug

dealers" and "gun runners" did not constitute error.  508 F.3d 627, 638

(11th Cir. 2007).  "Wise guys" is significantly less incendiary than other

prosecutorial statements this Court has in other cases deemed

insufficient to warrant reversal of criminal convictions.  See, e.g.,

Tucker v. Kemp, 762 F.2d 1496, 1507 (11th Cir. 1985) (prosecutor

described defendant as "less than human," "not somebody in our society

that we can afford to keep," and "a danger like a time bomb");  United

States v. Tisdale, 817 F.2d 1552, 1555 (11th Cir. 1987) ("dirty, low-life

criminal"); Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir. 1987)

("scum"); United States v. Taylor, 792 F.2d 1019, 1027 (11th Cir. 1986)

("hit man"); United States v. Drum, 733 F.2d 1503, 1508 (11th Cir. 1984)

("racketeer" and "tape pirate"); Schefano v. United States, 84 F.2d 513,

515-16 (5th Cir. 1936) ("one of the biggest law violators and tax evaders

we have in this county").

     B.   The Statements Did Not Prejudice Azmat's Substantial
          Rights.

     "A defendant's substantial rights are prejudicially affected when a

reasonable probability arises that, but for the remarks, the outcome of

the trial would be different.  Thus, even when error occurs, the defendant's substantial rights are not affected if the evidence sufficiently established his guilt." <u>Frank</u>, 599 F.3d at 1238 (brackets and citations omitted).  For that reason, this Court has repeatedly held that even improper remarks do not warrant reversal of a criminal conviction that is supported by strong evidence establishing the defendant's guilt.  <u>Id:</u>1239.  Here, the evidence establishing Azmat's guilt on all the charges was overwhelming.

"The district court may rectify improper prosecutorial statements by instructing the jury that only the evidence in the case is to be considered." <u>United States v. Jacoby</u>, 955 F.2d 1527, 1541 (11th Cir. 1992).  Here, the district court instructed the jurors that their verdict "must be based only on the evidence presented"; "[e]vidence includes the testimony of witnesses and the exhibits admitted.  But, anything the lawyers say is not evidence and is not binding on you."  The court also cautioned the jury that it "must not be influenced in any way by either

sympathy for or prejudice against the defendant or the government."
(Doc.319:1-2.)

Azmat has not cited any precedent from either the Supreme Court
or this Court directly establishing that the prosecutor's remarks were
both improper and prejudicial to his substantial rights.  Therefore, the
prosecutor did not commit plain error.  See United States v. Schmitz,
634 F.3d 1247, 1270-71 (11th Cir. 2011).

## VII.  There Was No Cumulative Error.

"[W]here there is no error or only a single error, there can be no
cumulative error."  United States v. House, 684 F.3d 1173, 1210 (11th
Cir. 2012).  Even if there had been one error, Azmat would be due no
relief.  "In addressing a claim of cumulative error, we must examine the
trial as a whole to determine whether the appellant was afforded a
fundamentally fair trial."  United States v. Lopez, 590 F.3d 1238, 1258
(11th Cir. 2009).  The purported errors of which Azmat complains are
minuscule compared to the mountain of uncontested evidence
conclusively establishing his guilt.

## CONCLUSION

This Court should affirm Azmat's convictions and sentence.

This 30th day of January, 2015.

**EDWARD J. TARVER**
**UNITED STATES ATTORNEY**

***/s/ James C. Stuchell***

James C. Stuchell
Assistant United States Attorney
Virginia Bar No. 41941
James.Stuchell@usdoj.gov

Post Office Box 8970
Savannah, Georgia 31412
Telephone Number: 912-652-4422

82

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 13,865 words, excluding parts exempted by subsection (iii).

This brief complies with Fed. R. App. P. 32(a)(5) because I prepared it in Microsoft Word 2010 using Century Schoolbook, a proportionally spaced typeface, with 14-point font.

My office complied with 11th Cir. R. 31-3 by today mailing seven paper copies of this brief to the 11th Cir. clerk's office.

My office complied with 11th Cir. R. 25-3(a) by today filing this brief electronically through the 11th Cir. E.C.F. system.

This brief complies with Fed. R. App. P. 25(d) because its E.C.F. filing constitutes automatic electronic service on Thomas A. Withers,

83

counsel to Appellant, pursuant to 11th Cir. Guide to Electronic Filing R.

7.2.

   This 30th day of January, 2015.

                              */s/ James C. Stuchell*

                              James C. Stuchell
                              Assistant United States Attorney
                              Virginia Bar No. 41941
                              James.Stuchell@usdoj.gov

Post Office Box 8970
Savannah, Georgia 31412
Telephone Number: 912-652-4422