IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 14-13703-E

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NAJAM AZMAT,

Defendant-Appellant.

**On Appeal from the United States District Court
for the Southern District of Georgia**

**REPLY BRIEF OF APPELLANT**

Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant
Najam Azmat*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS i

TABLE OF AUTHORITIES iii

TABLE OF RECORD REFERENCES IN vii
THE BRIEF

ARGUMENT AND CITATION OF 1
AUTHORITIES

I. The Evidence Was Insufficient to 1
Support a Finding that Dr. Azmat
Was Guilty and Trial Court Erred In
Denying Appellant's Motion for
Judgment of Acquittal

 A. The Evidence Was Insufficient to 1
  Support a Finding that Dr. Azmat
  Was Guilty on Count One of the
  Superseding Indictment—The
  Conspiracy Count

 B. The Evidence Was Insufficient to 7
  Support a Finding that Dr. Azmat
  Was Guilty on Counts Two
  through Fifty of the Superseding
  Indictment—The "Dispensing
  Controlled Substances" Counts

 C. The Evidence Was Insufficient to 11
  Support a Finding that Dr. Azmat
  Was Guilty on Count Fifty-Two
  of the Superseding Indictment—
  The "Money Laundering
  Conspiracy" Count

II.      The Trial Court Abused Its                                    15
         Discretion in Admitting the
         Testimony of Dr. Gene Kennedy

III.     The Trial Court Clearly Erred in                             18
         Determining the Drug Quantity
         Attributable to Dr. Azmat

IV.      Dr. Azmat's Sentence Was                                     20
         Unreasonable as a Result of the
         Trial Court's Failure to Consider the
         Need to Avoid Unwarranted
         Sentence Disparities

V.       Dr. Azmat's Punishment Was in                               21
         Violation of His Sixth Amendment
         Right to Trial Because Dr. Azmat
         Chose to Exercise His Right Instead
         of Entering a Guilty Plea

VI.      Reversal Is Warranted Based Upon                            23
         Prosecutorial Misconduct

CONCLUSION                                                           28

CERTIFICATE OF COMPLIANCE                                            29

CERTIFICATE OF SERVICE                                              30

# TABLE OF AUTHORITIES

## Cases

*Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296
(11th Cir. 2014) ........................................................................... 16

*Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 103 S.Ct. 986
(1983) ............................................................................................ 8

*Felker v. Turpin*, 83 F.3d 1303 (11th Cir. 1996) ............................. 24

*Government of the Virgin Islands v. Walker*, 261 F.3d 370
(3d Cir. 2001) ............................................................................... 23

*Hall v. United States*, 419 F.2d 582 (5th Cir. 1969) ........................ 28

*Hutchins v. Wainwright*, 715 F.2d 512 (11th Cir. 1983) ................. 27

*Lohr v. Medtronic, Inc.*, 56 F.3d 1335 (11th Cir. 1995) .................... 8

*Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552,
110 S.Ct. 2126 (1990) ................................................................... 8

*Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655 (1994) ........... 8

*United States v. Alvarez*, 610 F.2d 1250 (5th Cir. 1980) ............... 4, 6

*United States v. Bailey*, 123 F.3d 1381 (11th Cir. 1997) ............ 23, 26

*United States v. Baldwin*, 774 F.3d 711 (11th Cir. 2014) ............... 20

*United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515 (1971) ............... 10

*United States v. Blakey*, 14 F.3d 1557 (11th Cir. 1994) ....... 26, 27, 28

*United States v. Brannan*, 562 F.3d 1300 (11th Cir. 2009) ............ 15

*United States v. Brown*, 587 F.3d 1082 (11th Cir. 2009) ................. 1

*United States v. Butler*, 211 F.3d 826 (4th Cir. 2000)                                    15

*United States v. Butler*, 41 F.3d 1435 (11th Cir. 1995)                              19

*United States v. Campos–Serrano*, 404 U.S. 293,                                10
   92 S.Ct. 471 (1971)

*United States v. Castellini*, 392 F.3d 35 (1st Cir. 2004)                        14

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004)                   5

*United States v. Colbert*, 302 Fed.Appx. 886 (11th Cir. 2008)           20

*United States v. Edgmon*, 952 F.2d 1206 (10th Cir. 1991)                 15

*United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007 (1973)         10

*United States v. Falcone*, 109 F.2d 579 (2d Cir. 1940)                          4

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)                   16

*United States v. Frazier*, 89 F.3d 1501 (11th Cir. 1996)                     19

*United States v. Genser*, 710 F.2d 1426 (10th Cir. 1983)                   10

*United States v. Grassi*, 616 F.2d 1295 (5th Cir. 1980)                         6

*United States v. Hall*, 613 F.3d 249 (D.C.Cir. 2010)                     14, 15

*United States v. Houser*, 754 F.3d 1335 (11th Cir. 2014)                    1

*United States v. Johnson*, 440 F.3d 1286 (11th  Cir. 2006)               12

*United States v. Lamonds*, 291 Fed.Appx. 314 (11th Cir. 2008)       20

*United States v. Lawrence*, 47 F.3d 1559 (11th Cir. 1995)                 19

*United States v. Mankarious*, 151 F.3d 694 (7th Cir. 1998)               15

*United States v. Matthews*, 168 F.3d 1234 (11th Cir. 1999)                1

*United States v. Miles*, 360 F.3d 472 (5th Cir. 2004)                14

*United States v. Mintmire*, 507 F.3d 1273 (11th Cir. 2007)          1

*United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335 (1975)          10

*United States v. Nechy*, 827 F.2d 1161 (7th Cir. 1987)              10

*United States v. Peoni*, 100 F.2d 401 (2nd Cir. 1938)               5

*United States v. Phipps*, 81 F.3d 1056 (11th Cir. 1996)         8, 10, 11

*United States v. Reeves*, 742 F.3d 487 (11th Cir. 2014)             1

*United States v. Regueiro*, 240 F.3d 1321 (11th Cir. 2001)          20

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006)               27

*United States v. Rodriguez*, 765 F.2d 1546 (11th Cir. 1985)         26

*United States v. Santos*, 553 U.S. 507, 128 S.Ct. 2020 (2008)       15

*United States v. Stone*, 139 F.3d 822 (11th Cir. 1998)              15

*Walker v. Government of Virgin Islands*, 124 F.Supp.2d 933          23
      (D. Virgin Islands 2000)

## Statutes

18 U.S.C. § 1956                                                 11, 12, 21

18 U.S.C. § 3553                                                      20

21 U.S.C. § 802                                                   7, 8, 9, 10

21 U.S.C. § 841
                                                                 7, 8, 10, 11
21 U.S.C. § 846

v

21 U.S.C. § 846                                                    1, 21

21 U.S.C. § 856                                                       21

31 U.S.C. § 5324                                                     11

42 U.S.C. § 280g-3                                                    9

**Federal Rules**
                                                                    19
Fed.R.Crim.P. 32

Fed.R.Evid. 702                                                  16, 17

**Sentencing Guidelines**

U.S.S.G. § 2D1.1                                                     18

### TABLE OF RECORD REFERENCES IN THE BRIEF

| **Brief Page #** | **Document** | **Docket #** |
|---|---|---|
| 21 | Indictment | 3 |
| 13 | Superseding Indictment | 156 |
| 16 | *Daubert* Motion to Exclude Government's Experts Dr. Gene Kennedy and Martin Zdanowicz and Request for an Evidentiary Hearing | 241 |
| 16 | Supplement to Motion to Exclude Government Experts Dr. Gene Kennedy and Martin Zdanowicz | 260 |
| 18, 20, 22, 23 | Sentencing Transcript (proceedings held on 8/6/14) | 381 |
| 2, 11, 12, 13, 25 | Trial Transcript (proceedings held on 1/13/14) | 385 |
| 2, 3, 4, 6, 11, 12, 13, 22, 26 | Trial Transcript (proceedings held on 1/14/14) | 386 |
| 2, 4, 5, 6, 11, 12, 13, 16, 17, 18, 26 | Trial Transcript (proceedings held on 1/15/14) | 387 |
| 2, 13, 23, 24, 25 | Trial Transcript (proceedings held on 1/16/14) | 388 |

<u>ARGUMENT AND CITATION OF AUTHORITIES</u>

I. <u>The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty and the Trial Court Erred In Denying Appellant's Motion for Judgment of Acquittal</u>

    A. <u>The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Count One of the Superseding Indictment—The Conspiracy Count</u>

The Government maintains that the evidence at trial was sufficient to support a finding beyond a reasonable doubt that Dr. Azmat knowingly joined and participated in a conspiracy with his co-defendants to dispense controlled substances. A challenge to the sufficiency of the evidence involves a determination whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Houser*, 754 F.3d 1335, 1349 (11th Cir. 2014) (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)). The essential elements of a conspiracy under 21 U.S.C. § 846 are that "1) an agreement existed between two or more people to distribute the drugs; 2) that the defendant at issue knew of the conspiratorial goal; and 3) that he knowingly joined or participated in the illegal venture." *United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014) (quoting *United States v. Brown*, 587 F.3d 1082, 1089 (11th Cir. 2009); quoting *United States v. Matthews*, 168 F.3d 1234, 1245 (11th Cir. 1999)).

The Government contends in its Brief that the evidence of Dr. Azmat's "knowing" participation in the charged conspiracy to dispense and distribute

1

controlled substances was "overwhelming." Appellee Brief, p. 36. In actuality, there was no evidence that Dr. Azmat knowingly joined or participated in a conspiracy with his co-defendants to unlawfully dispense controlled substances. As Dr. Azmat has already set forth, the evidence at trial showed that he worked at East Health Center for only approximately three weeks. (Doc. 385, 127; Doc. 386, 245, 276). Adelard LeFrancois, the owner of East Health Center, testified that he had a disagreement with Dr. Azmat on Dr. Azmat's first day on the job, and that LeFrancois determined that Dr. Azmat had to go and started searching for a replacement. (Doc. 386, 270-71). During the three weeks Dr. Azmat worked at East Health Center, the Center received complaints from patients that Dr. Azmat was not giving them what they wanted and was reducing the amount of their medications. (Doc. 386, 246, 263-64, 276, 308-09, 377-78; 387, 584). LeFrancois stated that Dr. Azmat was a "disaster." (Doc. 386, 264).

In addition, Drug Enforcement Administration Diversion Investigator Charles Sikes admitted at trial that Dr. Azmat discontinued or cancelled some patients' prescriptions for narcotics; reduced some patients' prescriptions for narcotics, or "weaned" the patients off narcotics; and prescribed some patients non-narcotic drugs. (Doc. 385, 165-181; 387, 553, 694, 716, 719; 388, 739-743, 748). Patient witnesses called by the Government corroborated Investigator Sikes' testimony. (Doc. 386, 345, 424, 451).

2

This was wholly insufficient evidence to support a finding by the jury beyond a reasonable doubt that Dr. Azmat knowingly joined in any conspiracy with his co-defendants. Rather, the evidence showed that the *leader* of the conspiracy, LeFrancois, was unhappy with Dr. Azmat from day one and immediately sought to replace him. Furthermore, discontinuing or reducing patients' medications, prescribing patients non-narcotic drugs, and making customers angry is conduct wholly inconsistent with knowingly joining or participating in a conspiracy to dispense controlled substances.

Additional evidence negating any finding beyond a reasonable doubt that Dr. Azmat conspired with the co-defendants to dispense controlled substances was adduced at trial. LeFrancois himself admitted on cross-examination that he did not discuss his plans with Dr. Azmat:

> Q    You told us about having a meal with Dr. Ross where you went out and discuss what y'al1 were going to do and what your intentions were; right?
> A    Yes, sir.
> Q    You never had such a discussion with Dr. Azmat; did you?
> A    No, sir, 'cause I was back up in Florida at the time – down in Florida, excuse me. Down in Florida…
> Q    He was something of an outsider amongst you folks from South Florida; true?
> A    True.

(Doc. 386, 273). He also conceded that he never told Dr. Azmat what to do:

> Q    And when you spoke with Dr. Azmat on the phone, you never told him that this is what he had to prescribe.
> A    Had to, no.

Q      You never told him that, you're only prescribing oxycodone;
correct?
A      No, sir.
Q      And I believe you actually testified earlier—or strike that.
       The fact is that you didn't see it as your place to tell the doctor
what to
do; true?
A      True.

(Doc. 386, 276-77). LeFrancois also acknowledged that Dr. Azmat would not see

patients who were doctor-shopping, who had forged their MRIs, or who had failed

their urine drug screens. (Doc. 386, 266). LeFrancois' statements demonstrate that

Dr. Azmat was an outsider, as opposed to a conspiracy insider. In the words of Judge

Learned Hand, the co-conspirator "'must in some sense promote their venture

himself, make it his own, have a stake in its outcome.'" *United States v. Alvarez*,

610 F.2d 1250, 1256 (5th Cir. 1980) (quoting *United States v. Falcone*, 109 F.2d

579, 581 (2d Cir. 1940)). Moreover, evidence was presented showing that Dr. Azmat

was in fact concerned about doing anything improper or unlawful. As Daniel Wise,

a marketer for East Health Center, testified:

> I would get a call from either Sean or Al and was told to go tell Dr.
> Azmat that he needs to increase what he's writing 'cause the patients
> are all calling complaining. And Dr. Azmat would get frustrated and
> explain that it was his license on the line, that he wasn't going to do
> what they wanted him to do, and he would increase the patients'
> prescription on their next visit.

(Doc. 387, 584).

       As the Court has held:

4

> Since no one can be said to have agreed to a conspiracy that they do not
> know exists, proof of knowledge of the overall scheme is critical to a
> finding of conspiratorial intent. "Nobody is liable in conspiracy except
> for the fair import of the concerted purpose or agreement as he
> understands it."

*United States v. Chandler*, 388 F.3d 796, 806 (11th Cir. 2004) (quoting *United States v. Peoni*, 100 F.2d 401, 403 (2nd Cir. 1938)). The Government failed to prove that Dr. Azmat entered into any concerted purpose or agreement beyond a reasonable doubt.

The Government's arguments that the evidence of Dr. Azmat's "knowing" joining and participation in the conspiracy was sufficient rest on the fact that LeFrancois and the other "South Florida" co-defendants operated "pill mills" in Florida, and then opened East Health Center and eventually "hired" Dr. Azmat. *See* Appellee Brief, p. 36. However, no evidence was presented at trial that Dr. Azmat was aware of his co-defendants' background. Also, contrary to the Government's Statement of Facts, there was no evidence that Dr. Azmat was aware that that patients were coming to the clinic in groups, or that he was aware that Center employees suggested that relatives take drug screens for patients who failed the drug screens.[1] *See* Appellee Brief, p. 15.

_____

[1] In its Brief, the Government repeatedly points out that the individuals coming to East Health Center were "addicts." *See* Appellee Brief, pp. 6, 11, 12, 14, 59. However, its own witness, Gene Kennedy, M.D., testified that just because a person is addicted does not mean that he or she should not be treated or should not have adequate pain relief. (Doc. 387, 634, 682). Dr. Kennedy also admitted that he could

Finally, the government claims that Dr. Azmat fails to cite to any authority holding that any of the facts which he has raised would support the invalidation of his conspiracy conviction. *See* Appellee Brief, p. 37. On the contrary, Dr. Azmat cited several authorities which support a conclusion that the evidence was insufficient to find him guilty beyond a reasonable doubt of knowingly joining or participating with the other co-conspirators in a scheme to dispense controlled substances. *See United States v. Grassi*, 616 F.2d 1295, 1301 (5th Cir. 1980) (reversing one defendant's conviction for a conspiracy to acquire weapons, silencers, and drugs based on the fact that "[n]owhere does the record show that [the defendant] had joined the… conspiracy, although it is clear that he was familiar with the conspirators and knew of their activities"); *United States v. Alvarez*, 610 F.2d at 1257 (holding that a defendant who knew that his co-defendants were flying an aircraft loaded with marijuana from Colombia to the United States and who stated that he

---

not tell if a patient was an "addict" by looking at his or her chart. (Doc. 387, 682). Moreover, the Government cites the fact that some patients filled out forms that they consented to opioid medication before being seen by Dr. Azmat. *See* Appellee Brief, pp. 14-15, 19. LeFrancois read one of the forms at trial. (Doc. 386, 229). The forms expressly stated that "It is up to the physician and your medical records showing your chronic pain injury of which medications the physician feel will work better for you on your current medications." (*Id*.) Finally, the Government erroneously states that Dr. Azmat had "no" medical malpractice insurance. *See* Appellee Brief, p. 12. On the contrary, LeFrancois admitted that Dr. Azmat did have insurance, but did not have coverage for primary care. (Doc. 386, 270).

intended to unload the illegal cargo upon the aircraft's arrival was not punishable for conspiracy).

The Government in this case failed to present any evidence at trial that Dr. Azmat took part in any negotiations or discussions with his co-defendants regarding illegal dispensing of controlled substances. Conversely, Dr. Azmat's actual conduct does not establish his knowing intent to join in the conspiracy. "[E]ven if a conspiracy between two parties is established, not every act of a third person that assists in the accomplishment of the objective of the conspiracy is a sufficient basis to demonstrate his concurrence in that agreement." *Alvarez*, 610 F.2d at 1256. The evidence at trial was insufficient for the jury to find Dr. Azmat guilty of knowingly joining a conspiracy to dispense controlled substances beyond a reasonable doubt, and his conviction should be reversed.

**B.** **The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Counts Two through Fifty of the Superseding Indictment—The "Dispensing Controlled Substances" Counts**

The Government concedes, in its Brief, that "dispensing" for the purposes of 21 U.S.C. § 802(10) and 21 U.S.C. § 841(a)(1) occurs when a practitioner "'delivers a controlled substance to an ultimate user.'" Appellee Brief, p. 39. The Government's equating of "prescribing" with "delivering" or "dispensing" is erroneous, however. *Id*.

The statutory definition of "dispense" is clear and has not been changed for decades:

> The term "dispense" means *to deliver a controlled substance to an ultimate user… by, or pursuant to the lawful order of, a practitioner***,** *including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery.* The term "dispenser" means a practitioner who so delivers a controlled substance to an ultimate user…

21 U.S.C. § 802(10) (emphasis added). As the Court has recognized, "'in determining the scope of a statute, one is to look first at its language. If the language is unambiguous... it is to be regarded as conclusive unless there is a clearly expressed legislative intent to the contrary.'" *United States v. Phipps*, 81 F.3d 1056, 1059-1060 (11th Cir. 1996) (quoting *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 110, 103 S.Ct. 986 (1983)). Furthermore, as Dr. Azmat has previously argued, "[i]t is a basic tenet of statutory construction that courts should refrain from construing a statutory provision in a way that renders meaningless another provision within the same statute." *Id.*, at 1060 (citing *Ratzlaf v. United States*, 510 U.S. 135, 114 S.Ct. 655 (1994); *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126 (1990); *Lohr v. Medtronic, Inc.*, 56 F.3d 1335, 1344 (11th Cir. 1995)).

Put simply, the clear language of 21 U.S.C. § 802(10) shows that "dispensing" for the purposes of 21 U.S.C. § 802(10) and 21 U.S.C. § 841(a)(1) occurs when a person (1) delivers; (2) to an ultimate user; (3) a controlled substance; (4) which has

8

been lawfully ordered by a practitioner; (5) with all the packaging, labeling or compounding necessary to prepare the controlled substance for delivery. *See* 21 U.S.C. § 802(10). The Government's arguments about "constructive transfer" would render 21 U.S.C. § 802(10)'s requirement that a person deliver a controlled substance which has been fully prepared for delivery meaningless. *See* Appellee Brief, pp. 40-41.

Regardless of the Government's contentions, although the statute may list ways of delivering controlled substances, its clear language nonetheless emphasizes that the substance must have been fully "prepared" for delivery to the ultimate user, whether dispensed through a pharmacy or administered by a physician directly to a patient. *See* Appellee Brief, p. 45. In this sense, 21 U.S.C. § 802(10)'s definition of "dispense" contrasts with other, broader, definitions of the term, such as that contained in 42 U.S.C. § 280g-3(m)(3), which governs State controlled substance monitoring programs, and which provides that "dispense" means "to deliver a controlled substance to an ultimate user by, or pursuant to the lawful order of, a practitioner, irrespective of whether the dispenser uses the Internet *or other means* to effect such delivery." 42 U.S.C. §§ 280g-3(m)(3) (emphasis added).

The Government accurately summarizes in its Brief the holdings of selected cases on this issue. *See* Appellee Brief, pp. 45-47. However, Dr. Azmat shows that other courts have arrived at a similar interpretation of 21 U.S.C. § 802(10) as he. For

9

instance, in *United States v. Nechy*, 827 F.2d 1161 (7th Cir. 1987), a pharmacist was indicted for violating 21 U.S.C. § 841(a)(1) and for conspiring to violate and aiding and abetting a violation of the provision, *id*., at 1164. On appeal, Judge Richard Posner writing for the Seventh Circuit Court of Appeals construed the definition of "dispense" in 21 U.S.C. § 802(10), pursuant to its plain language, to mean that "a pharmacist is a dispenser while someone who is not a pharmacist, doctor, etc. is a *distributor*." *Id*., at 1169 (emphasis added) (citing *United States v. Genser*, 710 F.2d 1426, 1429–31 (10th Cir. 1983)). "*[A] doctor would be a dispenser if he gave a drug to a patient…*" *Id*., at 1168 (emphasis added) (citing *United States v. Moore*, 423 U.S. 122, 137, 96 S.Ct. 335 (1975)). The Government's interpretation of 21 U.S.C. § 802(10) is contrary to the canons of statutory construction and should be rejected. Principles of lenity furthermore urge the interpretation of 21 U.S.C. § 802(10) in Dr. Azmat's favor. "[I]t is well settled that criminal laws are to be strictly construed." *Phipps*, 81 F.3d at 1059-1060 (citing *United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007 (1973); *United States v. Campos–Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471 (1971); *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515 (1971)).

There was no evidence whatsoever presented at trial that Dr. Azmat ever "dispensed" or gave any drugs in the sense of delivering them to an ultimate user with all necessary packaging and labeling. On the contrary, Investigator Sikes admitted at trial that "dispensing" of controlled substances usually occurs at

10

pharmacies, hospitals, and other facilities which are licensed or registered for the purpose of dispensing medication, and consists of giving a person a prescription in a bottle with instructions on it. (Doc. 385, 91). LeFrancois testified that East Health Center was never authorized to "dispense" medications. (Doc. 386, 263). And Kenneth Gossett, M.D., a physician who worked for East Health Center after LeFrancois terminated Dr. Azmat, admitted that Dr. Azmat did not have a license to dispense medications and that he did not dispense medications. (Doc. 387, 556).

The evidence at trial was insufficient to find Dr. Azmat guilty of "dispensing" controlled substances beyond a reasonable doubt, in violation of 21 U.S.C. § 841(a)(1). *See Phipps*, 81 F.3d at 1060 (reversing the appellant's conviction under 31 U.S.C. § 5324(a)(1) for structuring transactions to avoid report requirements, observing that "the government's expansive interpretation of § 5324(a)(1) is that it would render § 5324(a)(3) entirely superfluous"). Dr. Azmat was prejudiced by the Government's flawed charging in its Indictment, and his convictions on Counts Two through Fifty of the Indictment should be reversed.

### C. The Evidence Was Insufficient to Support a Finding that Dr. Azmat Was Guilty on Count Fifty-Two of the Superseding Indictment—The "Money Laundering Conspiracy" Count

The Government takes issue in its Brief with Dr. Azmat's assertion that the evidence was insufficient to convict him for alleged money laundering conspiracy, pursuant to 18 U.S.C. § 1956(a)(1)(A)(i). *See* Appellee Brief, p. 49. It correctly

states, however, that, in order to convict Dr. Azmat of money laundering conspiracy, the Government had to prove beyond a reasonable doubt that "(1) two or more persons agreed to commit a section 1956(a)(1)(A)(i) promotional money laundering violation and (2) Azmat, knowing the unlawful plan, voluntarily joined the conspiracy." *Id*., p. 48 (citing *United States v. Johnson*, 440 F.3d 1286, 1294 (11th Cir. 2006)). In both his opening Brief and this Reply, Dr. Azmat has set forth at length evidence negating any finding that he knowingly joined any conspiracy—whether to dispense controlled substances or to engage in money laundering. LeFrancois, the owner of East Health Center, resolved to replace Dr. Azmat on Dr. Azmat's first day on the job, and terminated him less than a month later. (Doc. 386, 245, 270-71, 276). LeFrancois admitted that he did not discuss his plans with Dr. Azmat or tell Dr. Azmat what to do, and that Dr. Azmat was an "outsider." (Doc. 386, 273, 276-77). This evidence did not support a finding beyond a reasonable doubt that Dr. Azmat knowingly conspired and joined with LeFrancois and others in a money laundering conspiracy. Moreover, Dr. Azmat's actions during his three weeks at the Center in refusing to prescribe or increase patients' medications and reducing medications, were both inconsistent with a co-conspirator in a conspiracy to dispense controlled substances or a co-conspirator in a scheme to promote the laundering of proceeds from the illegal dispensing of controlled substances. (Doc. 385, 165-181; 386, 246, 263-64, 276, 308-09, 377-78; 387, 553, 584, 694, 716, 719;

12

388, 739-743, 748). The Government's evidence at trial was plainly insufficient to permit a finding beyond a reasonable doubt that Dr. Azmat knowingly entered into a conspiracy with his co-defendants to commit money laundering violations.

The Government next contends that the evidence conclusively established Dr. Azmat's guilt on the money laundering conspiracy charge. *See* Appellee Brief, p. 49. To the contrary, the evidence was that his co-defendants paid Dr. Azmat his compensation from the monies paid by patients, before the cash was deposited. (Doc. 385, 149-150; 386, 227, 243, 255, 260; 387, 578-79, 583). Moreover, the Government failed to present any evidence at trial that Dr. Azmat knowingly agreed with his co-conspirators to conduct financial transactions with funds which were the proceeds of specified unlawful activity such as opening checking accounts or making rent or lease payments. *See* Appellee Brief, p. 51; (Doc. 156, 16). The only overt act which the Government alleged against Dr. Azmat was his receipt of daily salary payments. (Doc. 156, 18). These payments constituted the payment of proceeds and the completion of the underlying controlled substances conduct, and therefore the money laundering conspiracy charge is merged with the underlying conduct. The payments conversely cannot support either a conviction for money laundering or money laundering conspiracy because they constitute the payment of the expenses of the enterprise. As another Court has observed:

> The crime of money laundering promotion is aimed not at maintaining
> the legitimate aspects of a business nor at proscribing all expenditures

13

of ill-gotten gains, but only at transactions which funnel ill-gotten gains directly back into the criminal venture. To hold otherwise would be to ignore [the] warning that the money laundering statute is not a mere money spending statute.

*United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). In this case, Dr. Azmat's salary payments cannot be found to have been re-invested in East Health Center, or to promote its activities.

A conclusion that the evidence in this case was insufficient to support a conviction of Dr. Azmat beyond a reasonable doubt for alleged promotional money laundering conspiracy is supported by *United States v. Hall*, 613 F.3d 249 (D.C.Cir. 2010), in which the defendant, a loan officer for a mortgage company, became involved in a scheme in which a co-conspirator would purchase homes in disrepair and would sell the homes to a straw purchaser, who would have the homes falsely appraised as if they had been renovated, *id.*, at 251. The defendant and his co-conspirators would then submit the false appraisals to mortgage companies for mortgage funding, and the defendant would receive proceeds from the settlement of the loan for "rehab construction" which was not done. *Id*. The defendant was charged and convicted of bank fraud, wire fraud, and money laundering conspiracy, and appealed. *Id*. The District of Columbia Court of Appeals reversed the defendant's conviction for money laundering conspiracy, ruling that money laundering must be separate and distinct from the underlying offense that generated the money to be laundered. *Id.*, at 254 (citing *United States v. Castellini*, 392 F.3d 35, 47 (1st Cir.

14

2004); *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000); *United States v. Mankarious*, 151 F.3d 694, 706 (7th Cir. 1998); *United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir. 1991)). The Court found that the defendant's receipt of a check from the settlement of the loans could not be money laundering. *Id*. the Court also noted that the payments to the defendant could not be money laundering because it was an "expense" of the bank fraud. *Id*., at 255 (citing *United States v. Santos*, 553 U.S. 507, 128 S.Ct. 2020 (2008)).

Following *Hall*, Dr. Azmat did not engage in any acts of money laundering separate from the underlying controlled substances transactions. His co-defendants' payment to him of his salary was an expense of East Health Center's operations and cannot be money laundering. There was moreover no evidence presented that Dr. Azmat was aware of any money laundering activity. Dr. Azmat's conviction for money laundering conspiracy should be reversed.

## II. The Trial Court Abused Its Discretion in Admitting the Testimony of Dr. Gene Kennedy

In its Brief, the Government contends that Dr. Azmat has purportedly waived any objection to Dr. Kennedy's testimony under the "invited error" doctrine. *See* Appellee Brief, pp. 52-53. This argument is meritless. "The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) (citing *United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998)). Dr. Azmat did not

invite any error during Dr. Kennedy's testimony. On the contrary, as Dr. Azmat

has shown, prior to trial he filed a motion to exclude Dr. Kennedy's testimony, and

a supplement thereto. (Docs. 241, 260). Furthermore, at trial, Dr. Azmat's counsel

explicitly stated that Dr. Azmat was "renewing" his previous motions. (Doc. 387,

618).

The Government's "invited error" arguments are inapposite for an additional

reason. Federal Rule of Evidence 702 provides that:

> A witness who *is qualified* as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
>> (a) the expert's scientific, technical, or other specialized
>> knowledge will help the trier of fact to understand the evidence
>> or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods

Fed.R.Evid. 702. Accordingly, under Federal Rule of Evidence 702, expert

testimony is admissible if:

> (1) [T]he expert is *qualified to testify regarding the subject of the
> testimony*; (2) the expert's methodology is "*sufficiently reliable* as
> determined by the sort of inquiry mandated in *Daubert*"; and (3) the
> expert's testimony will assist the trier of fact in understanding the
> evidence or determining a fact at issue.

*Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1304 (11th Cir.

2014) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en*

*banc*)). Under Rule 702, the qualification of an expert and the reliability of his or her

methods are two separate elements which must be established in order for the

16

testimony to be admissible. The portion of the trial relied upon by the Government concerned Dr. Kennedy's qualification as an expert, and not the reliability of his opinions and whether his testimony should be admitted under Rule 702. (Doc. 387, 618). The Court can review the district court's admission of Dr. Kennedy's testimony and the denial of Dr. Azmat's motion to exclude his testimony.

Dr. Kennedy's opinions were not reliable and were not reasonably applied to facts of the case. In addition to the various grounds set forth in Dr. Azmat's opening Brief indicating the unreliability of his testimony, Dr. Kennedy acknowledged that there was no specific, recommended dosage unit for Oxycodone and that the unit dosage was up to the clinical judgment of the physician. (Doc. 387, 691). He furthermore stated that a physician would not look at an MRI alone in assessing whether a patient should be prescribed medication, but subsequently admitted that an MRI could support initiation of medications in some cases. (Doc. 387, 712-13). In fact, the unreliability of Dr. Kennedy's methods and the application thereof were demonstrated by his own acknowledgement at the end of his cross-examination that he was uncertain regarding the relevant guidelines and standards:

> Q      … In your opinion, were any of the prescriptions that you've reviewed in these 25 patient files—and I'm talking the prescriptions for the controlled substances—issued for a legitimate medical purpose or in the usual course of professional practice?
> A      In my opinion, no…
> Q      And is that—would that opinion be under guidelines and standards of the State of Georgia?
> A      I'm not exactly sure—

Q     — Would those guidelines, whether we're looking at this from a national or a state standard, would your opinion be the same?
A     Yes, sir.

(Doc. 387, 672-73).

Dr. Kennedy's opinions applied an unreliable methodology unreliably to the facts. His testimony was central to the Government's case against Dr. Azmat, and its admission caused substantial prejudice to Dr. Azmat. The district court's admission of the testimony constituted an abuse of discretion. Dr. Azmat's convictions should be reversed as a result of the erroneous admission of Dr. Kennedy's testimony.

## III.  <u>The Trial Court Clearly Erred in Determining the Drug Quantity Attributable to Dr. Azmat</u>

The Probation Officer attributed all of the controlled substances prescribed by East Health Center to Dr. Azmat in calculating his sentence under U.S.S.G. § 2D1.1(c)(3). *See* Appellee Brief, p. 57. The district court did not make any findings of reliability regarding the calculation, it merely adopted the calculation. (Doc. 381, 20).

The Government, in its Brief, recites many facts relating to East Health Center's operations, its recruitment of Dr. Azmat, the type of patients who visited the Center, and Dr. Azmat's treatment of patients, but little or no facts to support a conclusion that it established the quantity of controlled substances at sentencing by a preponderance reliable evidence. *See* Appellee Brief, pp. 57-59.

18

The Court has previously recognized that where a defendant challenges a factual basis for his sentence, the prosecution has the burden to establish the disputed fact by a preponderance of the evidence and then the district court must either make explicit factual findings or determine that no findings are necessary because the challenged matter will not be taken into account in sentencing. *See United States v. Butler*, 41 F.3d 1435, 1444 (11th Cir. 1995) (citing Fed.R.Crim.P. 32(c)(3)(D)). In *Butler*, the Court vacated the appellants' sentences for conspiracy to distribute cocaine base and related substantive offenses as a result of the district court's failure to make necessary findings, including the scope of involvement of the defendants in the conspiracy and a reliable method of quantifying the amount of drugs attributable to the appellants. *Id.*, at 1447-48. The Government's failure to establish the quantity of controlled substances attributable to Dr. Azmat and the district court's failure to make explicit findings regarding the quantity dictate that his sentence be vacated. *See United States v. Frazier*, 89 F.3d 1501, 1507 (11th Cir. 1996) (vacating a defendant's sentence and remanding where the district court did not make specific findings concerning the number of drug transactions the defendant engaged in during the periods at issue or the amount of contraband involved in those transactions) (citing *Butler*, at 1447-48; *United States v. Lawrence*, 47 F.3d 1559, 1568 (11th Cir. 1995)).

19

## IV. Dr. Azmat's Sentence Was Unreasonable as a Result of the Trial Court's Failure to Consider the Need to Avoid Unwarranted Sentence Disparities

The district court imposed a sentence of 133 months' imprisonment on Dr. Azmat. (Doc. 381, 86). LeFrancois, who operated a pill mill in Florida, who opened East Health Center in Georgia, and who hired and fired Dr. Azmat, received a sentence less than half of that imposed on Dr. Azmat.

The Government maintains that disparities between sentences imposed on co-defendants are not an appropriate basis for relief on appeal. *See* Appellee Brief, p. 65 (quoting *United States v. Regueiro*, 240 F.3d 1321, 1325-26 (11th Cir. 2001)). It furthermore accurately points to the fact that the Court has not reversed a sentence based upon unwarranted sentencing disparities. *See id.*, p. _. Contrary to the Government's contentions however, the Court has considered arguments regarding unwarranted sentencing disparities on appeal. *See United States v. Baldwin*, 774 F.3d 711, 729 (11th Cir. 2014). It has moreover affirmed departures from the recommended sentencing range based upon such disparities. *See* Appellant's Brief, p. 34-35 (citing *United States v. Colbert*, 302 Fed.Appx. 886, 889 (11th Cir. 2008) (*per curiam*; unpublished); *United States v. Lamonds*, 291 Fed.Appx. 314, 317 (11th Cir. 2008) (*per curiam*; unpublished)).

18 U.S.C. § 3553 requires a sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added).

20

Here, all of the defendants were charged with conspiracy under 21 U.S.C. § 846, maintaining drug involved premises under 21 U.S.C. § 856(a)(1), and conspiracy to commit money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). (Doc. 3). All defendants furthermore pled guilty or were convicted at trial. Dr. Azmat and the other defendants may be found to be similarly situated.

Dr. Azmat submits that the Court may hold the widely disparate sentence imposed upon him as compared to the lenient sentences received by the non-medical owners and operators of East Health Center to warrant reversal of his sentence.

## V. Dr. Azmat's Punishment Was in Violation of His Sixth Amendment Right to Trial Because Dr. Azmat Chose to Exercise His Right Instead of Entering a Guilty Plea

Dr. Azmat received a sentence anywhere from more than twice as great to ten times greater than his co-defendants. The Government contends that Dr. Azmat was not penalized at sentencing for exercising his right to trial by jury. *See* Appellee Brief, p. 70. However, at sentencing, the prosecution effectively urged that Dr. Azmat be singled out from his co-defendants and punished for exercising his constitutional right to trial:

> All of his codefendants eventually – some sooner, some later, but all eventually accepted plea offers from the Government; cooperated with the Government; testified at grand jury; testified at trial; came before your court and expressed their contrition, their sorrow for the – their roles in the offense and the harm which they had done to others both in their own families, members of the community, and, in particular, the patients who were treated at East Health Center, said treatment consisting solely of the prescription of controlled substances.

21

Dr. Azmat stands alone.

(Doc. 381, 49-50).

The Government next argues that Dr. Azmat's sentence was proper because he was found guilty of "more serious" crimes than his co-defendants. *See* Appellee Brief, pp. 70-71. In doing so, it ignores the facts which it has previously proffered regarding LeFrancois and the other "South Florida" defendants. *See id*., pp. 16-18. These include the fact that the South Florida defendants worked in a pain-management clinic in South Florida which only dispensed drugs and whose patients were 90% from out-of-state. *See id*., p. 16. None of the South Florida defendants possessed any medical training. *See id*. The defendants marketed the clinic by placing advertisements on vehicles in the parking lots of rival pain clinics and low-end motels. *See id*.

When the State of Florida began cracking down on "pill mills," LeFrancois decided to avoid the new law by opening his own "pill mill" in Georgia. *See id*., pp. 16-17. LeFrancois persuaded his co-conspirators to move from South Florida to Georgia. *See id*., p. 17.

In contrast to his co-defendants, Dr. Azmat's involvement with their clinic lasted only three weeks. (Doc. 386, 245, 276). Yet he received a sentence two to ten times greater than any of the management or personnel of the pill mills, in violation of his constitutional rights. In determining whether Dr. Azmat was penalized for

22

exercising his right to trial by jury, the Court may consider "'[t]he extreme disparity of sentences imposed on [different defendants], [and] the harshness of [the defendant's] sentence for a first-time, nonviolent offense…'" *Government of the Virgin Islands v. Walker*, 261 F.3d 370, 376 (3d Cir. 2001) (quoting *Walker v. Government of Virgin Islands*, 124 F.Supp.2d 933, 938 (D. Virgin Islands 2000)). The Court should also consider the fact that the Government expressly differentiated Dr. Azmat from his other, more cooperative co-defendants at sentencing in requesting that the sentencing court impose a greater punishment on Dr. Azmat. (Doc. 381, 49-50). Dr. Azmat's sentence should be reversed as having been imposed as punishment for the exercise of his constitutional rights.

## VI. <u>Reversal Is Warranted Based Upon Prosecutorial Misconduct</u>

At trial, the prosecution intentionally made arguments "'directed to the passions or prejudices of the jurors instead of an understanding of the facts and law.'" *See* Appellee Brief, p. 76 (quoting *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997)). To begin with, the prosecutor intentionally stated that Dr. Azmat graduated from medical school in "Pakistan" in cross-examining Dr. Azmat's expert and sole witness, Thomas Simopoulos, M.D. (Doc. 388, 860-61). Although it denied the defense's motion for mistrial, the district court agreed that the prosecutor's reference was "a low blow." (Doc. 388, 869).

The Government responds that its references to Dr. Azmat's Pakistani

ethnicity and nationality before the jury were legitimate because they were "in the same vein" as the immediately preceding questions impeaching Dr. Simopoulos as being ignorant of Dr. Azmat's qualifications. *See* Appellee Brief, p. 75. That was not the case. The prosecutor injected his references to Dr. Azmat's ethnicity and nationality almost immediately after beginning his cross-examination of Dr. Simopoulos. (Doc. 388, 859-861). The prosecutor asked Dr. Simopoulos whether physicians had to be board certified in order to practice pain management, and Dr. Simopoulos answered that they did not. (Doc. 388, 859-860). The prosecutor proceeded to ask Dr. Simopoulos whether there were pain management doctors who were not board certified in various States. (Doc. 388, 860). The prosecutor next asked whether pain management doctors were required to have hospital privileges, and Dr. Simopolous stated that they did not. (*Id*.).

The prosecutor then asked Dr. Simopolous if he knew whether Dr. Azmat was board certified. (Doc. 388, 860). Dr. Simopolous answered that he did not think Dr. Azmat was. (*Id*.). The prosecutor asked if Dr. Azmat had hospital privileges, and Dr. Simopolous stated that he did not know. (*Id*.). This was not impeachment. The prosecutor did not "disprove" Dr. Simopolous' testimony. *See Felker v. Turpin*, 83 F.3d 1303, 1314 (11th Cir. 1996). Rather, the questions asked of Dr. Simopolous established that whether Dr. Azmat was board certified in pain management or had privileges at any hospitals was not relevant to whether Dr. Azmat could properly

24

treat for pain management.

The prosecutor next asked Dr. Simopolous whether Dr. Azmat possessed medical malpractice insurance and then immediately asked the witness whether Dr. Azmat graduated from medical school in Pakistan. (Doc. 388, 860-61). This question was also not relevant to whether Dr. Azmat could properly treat patients for pain management. Rather, it was an intentional appeal to prejudice designed to inject prejudice into the trial.

The Government also contends that the question raised an inference that Dr. Azmat's medical education made it less likely that he would be familiar with governing medical standards in the United States and Georgia. *See* Appellee Brief, p. 85. However, the prosecutor failed to ask Dr. Simopolous whether the fact that Dr. Azmat possessed a degree from a foreign medical school would make it more or less likely that he would be familiar with standards in the United States and Georgia, or even how a physician acquires knowledge of the prevailing standards in the State or area in which they practice. (Doc. 388, 861). Contrary to the Government's contentions, the prosecutor's references to Dr. Azmat's Pakistani ethnicity, nationality, and medical background constituted misconduct and an intentional appeal to prejudice, and resulted in prejudice to Dr. Azmat.

The Government's repeated references throughout trial to the management and personnel of East Health Center being from "South Florida" (Doc. 385, 110;

25

386, 202, 216, 288, 353, 358, 384; 387, 569, 571), ended with references to "South Florida" in its closing to the jury (Doc. 389, 933, 940), and the prosecutor's wholly unwarranted and prejudicial statement that "Azmat came to East Health Center for one reason, and that was not to minister to people's pain. He is every bit as cynical and ruthless as Al LeFrancois, Sean Clark, Frankie Barbuscia, all those wannabe wise guys from south Florida. He's no different. He's no better," (Doc. 389, 944). The reference to Dr. Azmat as "cynical" and "ruthless" and association of Dr. Azmat with asserted "wannabe wise guys" was not a "'colorful and perhaps flamboyant remark[ ]... relat[ing] to the evidence adduced at trial," Appellee Brief, p. 76 (quoting *Bailey*, 123 F.3d at 1400), as contended by the Government. It was not based on any evidence at trial. It is also the case that "'a prosecutor may not make suggestions, insinuations, and assertions calculated to mislead the jury.'" *United States v. Blakey*, 14 F.3d 1557, 1560 (11th Cir. 1994) (quoting *United States v. Rodriguez*, 765 F.2d 1546, 1559 (11th Cir. 1985)).

In this case, there was no evidence that Dr. Azmat was "cynical" or "ruthless." On the contrary, there was evidence that Dr. Azmat was concerned for his patients' welfare, such as when he diagnosed Mr. Bradley with a heart murmur and referred him to a cardiologist. (Doc. 386, 427).

The Government again relates the "South Florida" defendants' history with pill mills. *Id.*, p. 77-78. However, there was no evidence presented at trial that Dr.

26

Azmat was aware of this history. Furthermore, there was no evidence that LeFrancois and his South Florida associates sought any association with organized crime, much less Dr. Azmat. *See United States v. Reifler*, 446 F.3d 65, 92 (2d Cir. 2006) (observing that the term "wise guy" is a reference to an initiated member of an organized crime family).

The Government's statements were prejudicial and did prejudice Dr. Azmat's substantial rights. Reversal is supported by *United States v. Blakey*, in which the Court reversed the appellant's convictions based upon several improper comments by the prosecutor during his closing arguments, including that the defendant was a "professional criminal." 14 F.3d at 1559. The Court found that the prosecutor's "professional criminal" remark "went outside the evidence, and impugned [the appellant's] character with an inaccurate characterization. Such argument [wa]s clearly improper because it encouraged the jury to convict [the appellant] based on facts not admitted as evidence." *Id.*, at 1560 (citing *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983)). The Court furthermore recognized that:

> "This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations. Out of the usual welter of grey facts it starkly rises-succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government."

*Id.*, at 1561 (quoting *Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969)). The Court found that the prosecution's comments during closing arguments prejudiced the appellant and denied him a fair trial. *Id.*, at 1562.

Similar to the comments in *Blakey*, the prosecutor's intentional reference to Dr. Azmat's alleged "cynicism" and "ruthlessness," and his connection to alleged "wannabe wise guys" from "South Florida" constituted an improper invitation to the jury to find Dr. Azmat guilty based upon prejudice, rather than evidence. Furthermore, the evidence against Dr. Azmat was not "overwhelming" that Dr. Azmat knowingly participated in the charged conspiracy to dispense controlled substances. Dr. Azmat's conviction should be reversed based upon the prosecution's prejudicial statements, which denied Dr. Azmat a fair trial.

## CONCLUSION

For the reasons set forth herein, this Court should reverse Defendant-Appellant's conviction.

Respectfully submitted, this 24th day of February, 2015.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because it contains 6,905 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*

29

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing filing was this day served by the undersigned by depositing the filing in the United States mail, for delivery within three days, for filing and service, served on the following persons at the following addresses:

**R. Brian Tanner**
**Jeffrey J. Buerstatte**
**James D. Durham**
**E. Gregory Gilluly, Jr.**
**Karl I. Knoche**
**Brian T. Rafferty**
**Edward J. Tarver**
**United States Attorney's Office**
22 Barnard Street
Suite 300
Savannah, Georgia 31401

This 24th day of February, 2015.

/s/Thomas A. Withers_____
Thomas A. Withers
Gillen, Withers & Lake, LLC
8 E. Liberty Street
Savannah, GA 31401
Telephone:  912-447-8400
Facsimile:  912-233-6584
Email: twithers@gwllawfirm.com

*Attorney for Defendant-Appellant*
*Najam Azmat*